## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **THE CITY OF CHICAGO,** | |
| *Plaintiff,* | |
| *v.* | **Civil Action No. 1:17-cv-5720** |
| **JEFFERSON BEAUREGARD SESSIONS III,** Attorney General of the United States | |
| *Defendant.* | |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff the City of Chicago hereby alleges as follows:

### INTRODUCTION

1.      Chicago brings this action to enjoin the Attorney General of the United States from imposing sweeping new conditions on an established federal grant program—the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG")—that has for years provided crucial support for law enforcement in Chicago and other cities.  These new conditions—which would give federal officials the power to enter city facilities and interrogate arrestees at will and would force the City to detain individuals longer than justified by probable cause, solely to permit federal officials to investigate their immigration status—are unauthorized and unconstitutional.  These new conditions also fly in the face of longstanding City policy that promotes cooperation between local law enforcement and immigrant communities, ensures access to essential city services for all residents, and makes all Chicagoans safer.  Neither federal law nor the United

States Constitution permits the Attorney General to force Chicago to abandon this critical local policy.

2.     Since the 1980s, the City has directed its police officers to prioritize local law enforcement and public safety rather than diverting time, attention, and resources to investigating residents' immigration status.  Now codified as the Welcoming City Ordinance, this policy promotes public safety by ensuring that no city resident or visitor, regardless of immigration status, is afraid to cooperate with law enforcement, report criminal activity to the police, testify as a witness in court, or seek help as a victim of crime; and by ensuring that police officers focus on criminal activity occurring in Chicago instead of federal civil immigration infractions.  The Welcoming City Ordinance represents a clear, concerted, and smart policy choice in favor of inclusion and strong relations between the community and law enforcement.  Chicago, its residents, and its leaders have stood behind that choice for over a generation.

3.     The federal government's aggressive and escalating efforts to force Chicago and other cities, counties, and States to adhere to federal priorities began during the current President's first week in office, with an executive order targeting so-called sanctuary cities—*i.e.*, cities that have exercised their basic right to self-government by focusing their resources on enforcement of local laws rather than on policing federal civil immigration violations.  The executive order commanded federal agencies to withhold funds from these cities unless they changed their policies.  After a court enjoined enforcement of much of that order, the Department of Justice (the "Department" or "DOJ") singled out Chicago and eight other cities by demanding, on pain of losing their funding under last year's Byrne JAG program, that they certify compliance with 8 U.S.C. § 1373 ("Section 1373"), a federal statute that bars local

governments from restricting the sharing of immigration status information with federal immigration agents.

4.     Chicago complied.  In fact, Chicago officials simply do not collect immigration status information in the first place, and thus there is no information for the City to share (or restrict from sharing).  Moreover, if Chicago officials happen to come across immigration status information, they are not restricted from sharing it with federal officials.  Accordingly, because it is in fact in compliance, Chicago certified its compliance with Section 1373 in late June without conceding that the federal government could constitutionally condition Byrne JAG funding on compliance with that provision.  In response to Chicago's and other cities' good-faith effort, the Department issued an ominous press statement indicating that it believes some cities that certified compliance with Section 1373 are in violation of that statute.  But the Department did not identify those jurisdictions, or explain why they are not in compliance.

5.     Then, in late July 2017, the Department announced via press release that the FY 2017 Byrne JAG application would include two *additional* intrusive grant conditions.  These new conditions would require Chicago (1) to detain its own residents and others at federal immigration officials' request, in order to give the federal government a 48-hour notice window prior to an arrestee's release; and (2) to give federal immigration officials unlimited access to local police stations and law enforcement facilities in order to interrogate any suspected non-citizen held there, effectively federalizing all of the City's detention facilities.  On top of this, the Department has demanded yet *another* certification of compliance with Section 1373—but this time under the cloud of confusion caused by the Department's aforementioned statements.

6.     The FY 2017 Byrne JAG application is due on September 5, 2017 and requires compliance with all three of these conditions.

7.      These conditions are inconsistent with the Byrne JAG statute itself, with the limitations imposed by the Constitution's Spending Clause and the Fourth Amendment, and with basic separation of powers principles.  Compliance with the conditions would require Chicago to violate Illinois law.  And it would undermine public safety and effective policing in the City and upend Chicago's Welcoming City policy.

8.      The executive branch of the federal government may not arrogate to itself the powers that our Constitution reserves to Congress, on the one hand, or to state and local governments on the other.  It may not unilaterally concoct and import into the Byrne JAG program sweeping new policy conditions that were never approved (and indeed were considered and rejected) by Congress and that would federalize local jails and police stations, mandate warrantless detentions in order to investigate for federal civil infractions, sow fear in local immigrant communities, and ultimately make the people of Chicago less safe.  Nor may it continue to insist that Chicago certify compliance with Section 1373 even as it withholds clear guidance about the City's prior certifications while implying that it does not accept them, or others like them, for some unarticulated reason.

9.      The Department puts Chicago in an untenable position, with the clock winding down: agree, by September 5, 2017, to accept the Department's new unconstitutional grant conditions, which would wipe away policies that have built trust and cooperation between law enforcement and immigrant communities over the decades; or stand on its rights and forfeit crucial funds that it and the eleven other jurisdictions on whose behalf it submits Byrne JAG applications have counted on for more than a decade to provide critical (and, at times, lifesaving) equipment to Chicago Police officers and critical services to Chicago residents.

10.     Chicago thus brings this action to avoid that impending harm and to prevent the Department from imposing unlawful and counterproductive conditions on the Byrne JAG program that would override local judgments about how best to enforce the law and protect the community.  Chicago seeks a declaration that it complies with Section 1373 and that the Department's immigration-related conditions on Byrne JAG funding are unlawful, as well as an injunction preventing those conditions from being included in the FY 2017 Byrne JAG application or in future applications, thereby ensuring that Chicago's longstanding Welcoming City Ordinance can remain in full effect.

## PARTIES

11.     Plaintiff Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.  Chicago was incorporated in 1837, is the third largest city in the United States, and is home to almost 3 million residents, including a diverse array of immigrant communities.

12.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States.  He is sued in his official capacity.  The Attorney General is the federal official in charge of the United States Department of Justice, which took and threatens imminently to take the governmental actions at issue in this lawsuit.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346.  The Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

14.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(e)(1) because substantial events giving rise to this action occurred therein and because Chicago resides therein and no real property is involved in this action.

## FACTUAL ALLEGATIONS

**I.    CHICAGO HAS OPERATED UNDER ITS WELCOMING CITY POLICY FOR DECADES**

15.    Chicago is one of America's great cities, a metropolis of almost 3 million people that has attracted migrants and immigrants of different races, nationalities, and creeds to the shores of Lake Michigan for nearly two centuries, seeking good jobs and better futures for themselves and their children.

16.    Chicago's diverse population requires a public safety strategy that takes into account the needs of all the City's residents.  One aspect of that strategy—Chicago's Welcoming City Ordinance—has developed over the past few decades to address the needs and concerns of the City's residents.

17.    The first formal iteration of the current policy was announced by then-Mayor Harold Washington in March 1985 in Executive Order 85-1, which provided that "all residents of the City of Chicago, regardless of nationality or citizenship, shall have fair and equal access to municipal benefits, opportunities and services."  To ensure this equal access, the Order stated that City officials would not "request information about or otherwise investigate or assist in the investigation of the citizenship or residency status of any person" unless required by other law to do so.

18.    Mayor Richard M. Daley reiterated this policy upon taking office in April 1989. His Executive Order 89-6 similarly emphasized that all Chicago residents "shall have fair and equal access to municipal benefits, opportunities and services" and prohibited City agents and agencies from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or residency status of any person unless such inquiry or investigation is required by statute, ordinance, federal regulation or court decision."

19.     In 2006, the Chicago City Council unanimously incorporated the policies of the
1985 and 1989 executive orders into the City's Municipal Code by enacting the Welcoming City
Ordinance in response to increased pressure from the federal government to assist in immigration
enforcement.  The City Council was concerned by the suggestion that Chicago should "expend
limited local resources on traditionally federal functions."  Furthermore, the City Council noted
that "requiring, or even promoting, local enforcement of immigration laws" would both "give[]
rise to an increased threat of immigrant and minority profiling and harassment" and "cause a
chilling effect on crime prevention and solving if both witnesses and victims are called upon to
weigh a need to cooperate with local authorities against a fear of deportation, thereby
undermining long-standing efforts to engender trust and cooperation between law enforcement
officials and immigrant communities."

20.     Like the executive orders that preceded it, the 2006 Ordinance prohibited City
"agent[s]" and "agenc[ies]" from "request[ing] information about or otherwise investigat[ing] or
assist[ing] in the investigation of the citizenship or residency status of any person unless such
inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision."
It also barred disclosure of "information regarding the citizenship or residency status of any
person unless required to do so by legal process or such disclosure has been authorized in writing
by the individual to whom such information pertains."

21.     In 2012, Mayor Rahm Emmanuel and the Chicago City Council expanded the
Welcoming City Ordinance to address increasing federal requests that Chicago detain individuals
suspected of immigration-related offenses.  Also known as "immigration detainers" or
"immigration holds," these requests issued by U.S. Immigration and Customs Enforcement
("ICE") ask that local law enforcement "maintain custody" of a targeted individual for up to "48

hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department [of Homeland Security ("DHS")]." 8 C.F.R. § 287.7(d).

22.    The expanded Welcoming City Ordinance provides that undocumented individuals will be detained at the federal government's request only when Chicago has an independent reason to believe they might pose a threat to public safety: for example, if they have an outstanding criminal warrant, have been convicted of a felony, are a defendant in a criminal case where judgment has not been entered and a felony charge is pending, or have been identified as a known gang member.

23.    This expansion responded in part to concerns that "undocumented Chicagoans who have not been convicted of a serious crime and are not wanted on a criminal warrant" might be denied "basic protections" in the face of an ICE detainer request.[1]

24.    These concerns have proven to be well founded.  Since the Welcoming City Ordinance was expanded in 2012, many courts have held that detaining persons for additional time solely because of an ICE detainer request is unconstitutional or otherwise unlawful.  *County of Santa Clara v. Trump*, Nos. 17-cv-00574-WHO & 17-cv-00485-WHO, 2017 WL 1459081, at *4 (N.D. Cal. Apr. 25, 2017) ("Several courts have held that it is a violation of the Fourth Amendment for local jurisdictions to hold suspected or actual removable aliens subject to civil detainer requests because [such] requests are often not supported by an individualized determination of probable cause that a crime has been committed."); *see, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 214-218 (1st Cir. 2015); *Galarza v. Szalczyk*, 745 F.3d 634, 643-645 (3d Cir. 2014).  Indeed, apparently recognizing that such detentions are likely illegal, United States Senators Jeff Flake and John McCain recently introduced legislation that would

---

[1] *See* Press Release, Office of the Mayor, City of Chicago, Mayor Emanuel Introduces Welcoming City Ordinance 1 (July 10, 2012), https://tinyurl.com/yb6pzhhy.

"indemnify local law enforcement entities for complying" with ICE detainers. *See* S. 1039, 115th Cong. (2017); *see id.* § 2 ("[T]he Federal Government shall be responsible to pay for the costs of any legally cognizable injuries to third parties resulting from the issuance and execution of [immigration] detainers.").

25.    The 2012 Welcoming City Ordinance reflects the Chicago City Council's findings that (1) "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems," (2) "assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all [of the City's] residents," and (3) "[t]he cooperation of the City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City." Chicago Municipal Code § 2-173-005.

26.    In its current form, the Welcoming City Ordinance, codified as Chapter 2-173 of the Chicago Municipal Code, contains four key prohibitions relevant to this lawsuit.

    a.    Subject to certain exceptions for certain criminal suspects and gang members,[2] Section 2-173-042 prohibits City "agent[s]" or "agenc[ies]" from "arrest[ing], detain[ing] or continu[ing] to detain a person solely on the belief that the person is not present legally in the United States, or that the person has committed a civil immigration violation," or doing so "based upon an immigration detainer, when such immigration detainer is based solely on a violation of a civil immigration law."

---

[2] Specifically, and as noted above, the Section 2-173-042 restrictions do not apply if the subject of the ICE investigation "(1) has an outstanding criminal warrant; (2) has been convicted of a felony in any court of competent jurisdiction; (3) is a defendant in a criminal case in any court of competent jurisdiction where a judgment has not been entered and a felony charge is pending; or (4) has been identified as a known gang member."

b.    Subject to the same exceptions, as well as an exception for "legitimate law enforcement purpose[s] . . . unrelated to the enforcement of a civil immigration law," Section 2-173-042 also prohibits City "agent[s]" or "agenc[ies]" from, "while on duty, expend[ing] their time responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date," or from "permit[ting] ICE agents access to a person being detained by, or in the custody of, the agency or agent" or "permit[ting] ICE agents use of agency facilities for investigative interviews or other investigative purpose."

c.    Section 2-173-020 prohibits City "agent[s]" or "agenc[ies]" from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or immigration status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision."

d.    Section 2-173-030 prohibits City "agent[s]" or "agenc[ies]" from "disclos[ing] information regarding the citizenship or immigration status of any person" unless "otherwise provided under applicable federal law," the City is "required to do so by legal process," or "such disclosure has been authorized in writing by the individual to whom such information pertains."

27.    These and other provisions of the Welcoming City Ordinance play a vital role in strengthening the relationship between Chicago's government, its police force, and its immigrant communities. This relationship is built city block by city block, and it is essential that Chicago's police officers have the flexibility they need to engage the immigrant communities in their crime-fighting initiatives without projecting a constant threat of deportation.

## II.    THE ADMINISTRATION ATTACKS SO-CALLED "SANCTUARY CITIES" AND TARGETS THE CITY OF CHICAGO

28.    The City's Welcoming City policies are sound.  In fact, as one study found, "crime is statistically significantly lower in sanctuary counties compared to nonsanctuary counties . . . controlling for population characteristics."[3]  Indeed, as a broad coalition of police chiefs explained recently, "build[ing] trusting and supportive relations with immigrant communities . . . is essential to reducing crime and helping victims."[4]

29.    The idea that policies like Chicago's encourage or facilitate crime is simply a "[m]yth": "[S]tudies have found no support for the idea that immigrants are responsible for more crime" or that "sanctuary policies lead to increased crime."[5]

30.    Despite the soundness of Chicago's policies—and despite the City's inherent right to decide its own law enforcement priorities and strategies—the Trump Administration has singled out Chicago and other so-called sanctuary jurisdictions for criticism.  In his first week in office, President Trump issued Executive Order 13768, which threatened to deny federal grants and take enforcement actions against such jurisdictions.  Purporting to "inform the public regarding the public safety threats associated with sanctuary jurisdictions," President Trump ordered DHS to publish weekly lists of any municipalities that refused to comply with detainer requests, together with lists of any undocumented immigrants arrested—but not necessarily convicted—for any non-immigration offenses.[6]  This executive order was later enjoined in large

---

[3] Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy* 6 (2017), http://tinyurl.com/y75lsykd (emphasis added).
[4] Press Release, Major Cities Chiefs Ass'n, U.S. Mayors, Police Chiefs Concerned with Sanctuary Cities Executive Order (Jan. 25, 2017), http://tinyurl.com/y8zqhypw.
[5] Benjamin Gonzalez et al., *The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration*, 53 Urb. Aff. Rev. (forthcoming 2017) (manuscript at 9-10, 18-24), http://tinyurl.com/y8hb9fnc.
[6] *See* Alan Gomez, *Trump Pressures 'Sanctuary Cities' That Won't Hold Undocumented Immigrants*, USA Today (Mar. 20, 2017, 6:14 PM ET), http://tinyurl.com/yctkoj9e.

part by a federal court for violating numerous provisions of the Constitution. *See County of Santa Clara*, 2017 WL 1459081, at *21-*29.

31.     Just last month, President Trump spoke of "predators and criminal aliens who poison our communities with drugs and prey on innocent young people," avowing that these "animals" "will find no safe haven anywhere in our country."[7]  He added: "[T]hey're not being protected any longer, folks.  And that is why my administration is launching a nationwide crackdown on sanctuary cities."[8]

32.     Attorney General Sessions, without any factual basis, has also labeled sanctuary jurisdictions a "clear and ongoing threat to public safety."[9]  He recently announced, for instance, that "'sanctuary' policies make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes"; he even suggested that they "encourage . . . human trafficking."[10]  And he has insisted that "cities with these policies have more violent crime on average than those that don't."[11]

33.     The Administration's rhetoric is divorced from reality.  As explained above, the City's policies are a sound approach to reducing crime, building trust with immigrant

---

[7] *See* Maya Oppenheim, *Donald Trump Brands Illegal Immigrant Gang Members 'Animals' Who 'Slice and Dice' Young Beautiful Girls*, Indep. (July 26, 2017), http://tinyurl.com/y986sguu.

[8] *Id.*; *see also* Pete Williams, *Attorney General Sessions Raises Stakes for Sanctuary Cities*, NBC News (July 25, 2017, 8:49 PM ET), http://tinyurl.com/yb3rzza8 (President Trump declaring that cities should be sanctuaries "for law-abiding Americans," "not for criminals and gang members that we want the hell out of our country").

[9] Press Release, U.S. Dep't of Justice, Statement by Attorney General Jeff Sessions on the U.S. Immigration and Customs Enforcement Declined Detainer Outcome Report (Mar. 20, 2017), http://tinyurl.com/ybrrnf8g.

[10] *See* Michelle Mark, *The Trump Administration Just Toughened Its Crackdown on 'Sanctuary Cities,'* Bus. Insider (July 25, 2017, 6:42 PM), http://tinyurl.com/yb29dpob.

[11] *See* Michelle Ye Hee Lee, *Attorney General Jeff Sessions's Claim That 'Criminals Take Notice' of Cities with Sanctuary Policies*, Wash. Post (July 17, 2017), http://tinyurl.com/ycwho7u5; *see also* Press Release, Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy (quoting Attorney General Sessions as saying that sanctuary policies "put the lives and well-being of their residents at risk" and "give sanctuary to criminals, not to law-abiding Americans").

communities, and enhancing cooperation with law enforcement. Indeed, the authors of the very study cited by Attorney General Sessions have squarely rejected his position, saying he misrepresented their work.[12]

34. Meanwhile, Congress has also considered legislation that would penalize cities for seeking to set their own law enforcement priorities. *See* Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) (proposing funding cuts for any sanctuary jurisdiction that violates Section 1373 or "prohibits any government entity or official from complying with a detainer"). Notably, however, Congress has *never passed* any such legislation authorizing the executive branch to impose any penalty on local jurisdictions based on their refusal to comply with detainer or other immigration enforcement requests.

## III. THE ADMINISTRATION SEEKS TO USE CONDITIONS ON THE BYRNE JAG PROGRAM, A CRITICAL SOURCE OF FUNDS FOR CHICAGO, TO DICTATE CITY POLICING STRATEGY

35. With Congress having declined to authorize the executive branch to override Welcoming City-style policies, and courts having blocked the executive branch's effort to do so through executive order, the Trump Administration has sought to expand its limited role in administering an existing congressional program, the Byrne JAG program, in an attempt to pressure cities and other local governments to abandon their policies.

36. Congress established the Byrne JAG program in 2005 to serve as the primary source of federal criminal justice funding for States and localities. The goal of the program is to allow State and local governments the "flexibility to spend money for programs that work for

---

[12] *See* Miriam Valverde, *Jeff Sessions Cites Study on Sanctuary Cities, Researchers Say He Misrepresented It*, PolitiFact (July 24, 2017, 10:35 AM), http://tinyurl.com/y7ohqtz6; *see also* Loren Collingwood & Benjamin Gonzalez-O'Brien, *Jeff Sessions Used Our Research to Claim That Sanctuary Cities Have More Crime. He's Wrong*, Wash. Post (July 14, 2017), http://tinyurl.com/y8rwvwbz (objecting that author's "findings have been so misrepresented" by the Justice Department).

them rather than to impose a 'one size fits all' solution" for local policing. *See* H.R. Rep. No. 109-233, at 89 (2005).[13]

37.     To that end, the Byrne JAG is structured as a formula grant, awarding funds to all eligible grantees according to a prescribed formula. *See* 42 U.S.C. § 3755(d)(2)(A) (providing that the Attorney General "shall allocate to each unit of local government" funds consistent with the established formula). The Byrne JAG distribution formula for States is a function of population and violent crime. *See id.* § 3755(a). The formula for local governments, in turn, is a function of the State's allocation and the ratio of violent crime in the locality to violent crime in the State. *See id.* § 3755(d).

38.     Unlike discretionary grants, which agencies award on a competitive basis subject to agency discretion, "formula grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989). States and local governments are entitled to their share of the formula allocation as long as their proposed programs meet at least one of eight broadly defined goals, *see* 42 U.S.C. § 3751(a)(1)(A)-(H) (listing eligible programs ranging from general law enforcement to technology to mental health), and their applications contain a series of statutorily required certifications and attestations. *See id.* § 3752(a).

39.     The statute nowhere authorizes the Department to create new substantive conditions on grant funds. Indeed, doing so would upend Congress's formula approach for distributing funds based on population and violent crime, instead allocating grants using criteria invented by the Department. *See Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990) ("Where Congress prescribes the form in which an agency may exercise its

_____

[13] The Byrne JAG program was created in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006), which in turn amended the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197.

authority, . . . we cannot elevate the goals of an agency's action, however reasonable, over that prescribed form.").

40.     Chicago has received Byrne JAG funds since 2005, the year the program began, and every year since.  In FY 2016, Chicago received $2.33 million through the Byrne JAG program.

41.     Chicago has used Byrne JAG funds to support projects ranging from critical law enforcement equipment and overtime to community policing outreach and engagement.  Since FY 2005, for instance, Chicago has spent approximately $33 million in Byrne JAG funds to buy nearly 1,000 police vehicles.  Several of those projects have extended across multiple grant years, including the Force for Good program, which began in 2011 and helps not-for-profit organizations meet community needs.  Recognizing that creating safe neighborhoods is impossible unless government and communities work together, the Force for Good program provides capacity-building support to over 80 not-for-profit organizations that operate in neighborhoods experiencing high rates of violent crime in order to help improve their ability to provide services such as emergency shelter, food, and clothing; youth mentoring and structured activities in safe places; job training and placement; conflict resolution; and activities to strengthen community cohesion and resilience.  Without Byrne JAG funds, Chicago would have to shut down some or all of these programs, change their staffing, scope, or goals, or else divert funds from other policing objectives to sustain them.

42.     Additionally, eleven other localities depend on Chicago's Byrne JAG application for the funds they receive through the program each year.  Because Chicago's costs of preventing and investigating violent crimes far outstrip those of the surrounding jurisdictions—including those of Cook County, in which it sits—42 U.S.C. § 3755(d)(4) obligates Chicago to file a Byrne

JAG application on behalf of not only itself but also those other, neighboring communities. Accordingly, each year Cook County, the Village of Bellwood, the City of Calumet, the City of Chicago Heights, the Town of Cicero, the Village of Dolton, the City of Evanston, the City of Harvey, the Village of Maywood, the Village of Riverdale, and the Village of Skokie rely on Chicago's application to receive their own Byrne JAG funds.

43.     Until now, the Department has never questioned Chicago's ability to achieve the programmatic goals for Byrne JAG funds because of the City's approach to improving law enforcement through respect for and collaboration with immigrant communities.

### A.     THE DEPARTMENT OF JUSTICE REQUIRES CHICAGO TO CERTIFY COMPLIANCE WITH SECTION 1373 AS A CONDITION OF RECEIVING BYRNE JAG FUNDING

44.     For over a decade, the Department administered the Byrne JAG program as Congress intended: funding critical local law enforcement initiatives without once seeking to leverage that funding to conscript local agencies to enforce federal immigration law.  But that changed in late 2016 when, for the first time, DOJ required grantees to "undertake a review to validate [their] compliance with 8 U.S.C. § 1373" as a condition of receiving FY 2016 Byrne JAG funds.

45.     On April 21, 2017, the Department sent letters to Chicago and eight other jurisdictions seeking submission of "documentation to [the Department's Office of Justice Programs ("OJP")] that validates that your jurisdiction is in compliance with 8 U.S.C. § 1373." The letter indicated that the "documentation must be accompanied by an official legal opinion from counsel that adequately supports the validation and must be submitted to OJP no later than June 30, 2017."[14]

---

[14] *See* Letter from Alan R. Hanson, Acting Assistant Attorney Gen., U.S. Dep't of Justice, to Eddie T. Johnson, Superintendent of Police, Chi. Police Dep't (Apr. 21, 2017), https://tinyurl.com/y7t4mxxy.

46. Section 1373, the statute for which DOJ sought certification, prohibits state and local entities from "prohibit[ing], or in any way restrict[ing]" their entities and officials from "sending," "requesting," "receiving," "maintaining," or "requesting" citizenship or immigration status information from or to federal immigration enforcement authorities.

47. Section 1373 imposes no affirmative obligation on state or local entities to collect immigration status information; does not require state or local entities to take any specific actions upon receiving immigration status information absent a request for that information; does not address detainer requests or release-date notification requests; and does not require state or local entities to act in a manner inconsistent with the United States Constitution or other federal law.

48. The Byrne JAG authorizing statute requires a "certification" that "the applicant will comply with all provisions of this part and all other applicable Federal laws." 42 U.S.C. § 3752(a)(5)(D). OJP indicated that it considers "all other applicable Federal laws" to encompass Section 1373.

49. Chicago replied to the Department's letter on June 30, 2017, explaining how and why it complies with Section 1373. *See* Memorandum from Edward Siskel, Corporation Counsel, City of Chicago, to Tracey Trautman, Acting Director, Bureau of Justice Assistance, Office of Justice Programs, U.S. Dep't of Justice (June 30, 2017) (attached as Ex. A).

50. Chicago's letter explained that the City, as a general rule, does not collect citizenship or immigration status information from its residents. Both the Welcoming City Ordinance and Chicago Police Department policy bar the City from doing so. *See* Chicago Municipal Code § 2-173-020; Chicago Police Department Special Order S06-14-03. Chicago therefore does not "restrict" or "prohibit" its employees from taking any actions with regard to

information covered by this non-collection policy: The City cannot prohibit or restrict the sharing of information it does not possess. *See* Ex. A at 2-5.

51. The letter further explained that when the City's officers or agents do happen to possess citizenship or immigration status information, the Welcoming City Ordinance expressly permits them to share this information with federal immigration enforcement officials. Although the Ordinance prohibits disclosure of citizenship or immigration status information in response to requests from private parties, it expressly permits such disclosure as "provided under applicable federal law." One such "applicable federal law" is Section 1373. The Welcoming City Ordinance thus does not restrict city officers and employees from responding to requests from federal immigration enforcement officials. *See* Ex. A. at 5-6.

52. A few days after receiving certifications from Chicago and the other targeted jurisdictions, the Department issued a press release suggesting that some jurisdictions' certifications might be found insufficient: "It is not enough to assert compliance, the jurisdictions must actually be in compliance." The press release further indicated that the Department was "in the process of reviewing" the certifications and planned to "examine these claims carefully." Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

53. Despite generally expressing skepticism about the certifications of some unspecified jurisdictions and even though the deadline to submit Byrne JAG applications for FY 2017 is less than a month away, the Department has not communicated any particular concerns to Chicago or, on information and belief, to any of the other eight jurisdictions.

54. The FY 2017 grant application will require Chicago to again certify compliance with Section 1373—but this time, it must do so after DOJ purports to impose new requirements

that reach well beyond the statute, discussed below, and under a cloud of uncertainty created by DOJ's increasingly aggressive positions. Furthermore, the FY 2017 application requires certifications by both Chicago's chief legal officer and its chief executive. Although Chicago is confident that it complies with Section 1373 and has certified as such, DOJ's public statements concerning the Section 1373 certifications it has received to date make it unclear whether DOJ will agree that Chicago's existing certification is satisfactory under DOJ's interpretation of the law.

### B. THE DEPARTMENT OF JUSTICE ANNOUNCES TWO ADDITIONAL UNLAWFUL CONDITIONS FOR THE FY 2017 BYRNE JAG PROGRAM

55. In late July 2017, shortly before the Byrne JAG application for FY 2017 was set to go online, the Department suddenly announced significant changes to the Byrne JAG application process in a two-paragraph press release and accompanying press "backgrounder" document. *See* Press Release, U.S. Dep't of Justice, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017), https://tinyurl.com/y9ttqhsl (attached as Ex. B); U.S. Dep't of Justice, Backgrounder on Grant Requirements, https://tinyurl.com/ycfgbgl4 (attached as Ex. C).

56. These changes, announced with virtually no analysis or explanation and no opportunity for public notice and comment, apply to the FY 2017 grant application, which is due on September 5, 2017. *See* U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY 2017 Local Solicitation (2017), https://tinyurl.com/ya535xua (attached as Ex. D).

57. Both changes would countermand the Welcoming City Ordinance and require a reordering of law enforcement practice in Chicago to accommodate a major new role for federal immigration enforcement.

58. *The "notice" condition:* First, the Department will require grant applicants to "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." Ex. D at 30. This policy directly conflicts with the City's longstanding Welcoming City Ordinance (Section 2-173-042(a), (b)(1)(C)), would effectively require compliance with detainer requests even in the absence of any probable cause, and would sow fear and mistrust as between immigrant communities and law enforcement.

59. *The "access" condition:* Second, the Department will require grant applicants to "permit personnel of the [DHS] to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States." Ex. D at 30. The Department has not defined "correctional" or "detention" facility,[15] but the requirement appears to mandate that federal immigration agents be given unprecedented and unfettered access to local law enforcement facilities and to any person being held there. This policy directly conflicts with the City's longstanding Welcoming City Ordinance (Section 2-173-042(b)(1)(A)-(B)), would interfere with the administration of local police stations and lockups, including the investigations of criminal activity that routinely take place there, and would sow fear and mistrust as between immigrant communities and law enforcement.

---

[15] As explained elsewhere, Chicago operates only temporary "lockup" facilities, in which individuals are briefly detained prior to release or their appearances in Cook County court for probable cause proceedings. It is not at all clear whether these temporary facilities are "detention facilities" within the meaning of this condition. Nor is it clear whether Chicago can comply with this condition without impeding the timely and orderly administration of probable cause hearings in the Cook County courts. Timely and orderly administration of such hearings is necessary as a matter of both constitutional law and public safety.

60.     The City of Chicago does not itself operate jails or long-term detention facilities. The City detains arrestees in 18 temporary police "lockup" facilities, used for immediate post-arrest holding and processing, as well as post-arrest investigation.  Arrestees not released on their own recognizance generally are transported by the Chicago Police Department the next morning to the Circuit Court of Cook County for probable cause proceedings or to Cook County detention facilities.  Thus, as a matter of practice and procedure, the City itself infrequently detains individuals for more than 24 hours.

61.     Moreover, in compliance with the Supreme Court's ruling in *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), Chicago Police Department regulations require that individuals arrested without a warrant be released or transferred to Cook County court "without unnecessary delay," but "[u]nder no circumstances . . . any later than 48 hours from the time of arrest."  Chicago Police Department General Order G06-01 § II(C).

62.     These regulations are also informed by Chicago's obligations under state law. The Illinois Code of Criminal Procedure requires that any arrested person in lockup be taken "without unnecessary delay" to a judge.  Ill. Code Crim. Proc. § 109-1(a).  The Illinois Administrative Code additionally specifies that "[t]he maximum period of detention in a jail should not normally exceed 48 hours" and that "[n]o minor shall be detained in a municipal lockup for more than six hours."  Ill. Admin. Code §§ 720.30, 720.150.

63.     As a practical matter, then, Chicago can comply with the Department's new notice condition and provide DHS with 48 hours of lead time prior to arrestees' release only if the City detains arrestees for longer than they would otherwise be held in the City's custody, which implicates constitutional, state-law, fiscal, logistical, and other legal concerns.  In particular, the prolonged detention caused by the notification requirement would force the City to

-21-

potentially violate both arrestees' Fourth Amendment rights to be free of unreasonable seizures and state law, putting Chicago at risk of liability under the civil rights laws.

64.     The Department imposed these new notice and access conditions without any explanation, reasoning, or opportunity for exchange with local governments or law enforcement. The Department's press release makes perfunctory mention of community safety and criminal behavior.  *See* Ex. B.  But it fails to explain how it arrived at these new conditions or what alternatives it may have considered.  The press release is silent as to the purposes of the Byrne JAG program and in what ways the newly imposed notice or access conditions (or for that matter the Section 1373 condition) are related to, let alone serve to advance, the interests of the Byrne JAG program.  And it fails to provide local law enforcement any guidance as to how the conditions will operate in practice.

65.     In fact, these conditions have no legal basis.  The Department has not pointed to any statutory authority for imposing these conditions on Byrne JAG applicants.  To be sure, the authorizing legislation requires program applicants to certify that they will "comply with all . . . applicable Federal laws."  42 U.S.C. § 3752(a)(5)(D).  But even stretching that provision to cover Section 1373—a construction the City has never endorsed as a lawful interpretation, *see* Ex. A at 1 n.1—the Department has made no effort to identify any federal law requiring "at least 48 hours' advance notice" before the City releases an alien in its custody, or any law requiring local police departments to allow DHS officials to access detention facilities.

66.     These conditions also represent a sharp break with core constitutional principles. In our constitutional order, "the National Government possesses only limited powers; the States and the people retain the remainder."  *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533 (2012).  Federalism "secures to citizens the liberties that derive from the diffusion of

sovereign power." *Id.* at 536 (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)).

Because of its intimate connection to liberty, our federalist design is protected by constitutional

limits on undue federal encroachment on state and local autonomy. And separation of powers

principles also operate as independent restraints on cooperative federalism arrangements like the

Byrne JAG program. The Constitution gives the spending power to Congress, not the Executive

Branch. Federal agencies therefore may not invent funding conditions out of whole cloth.

## IV. THE DEPARTMENT OF JUSTICE'S UNLAWFUL NEW CONDITIONS WILL INJURE CHICAGO, FORCING THE CITY TO CHOOSE BETWEEN VITAL LAW ENFORCEMENT FUNDING AND ITS CONSTITUTIONAL RIGHTS

67.     The Administration's unlawful actions pose a threat of imminent harm to

Chicago. Its Byrne JAG application for FY 2017 is due in just 29 days—on September 5, 2017.

For over ten years, the City has routinely applied for and received those funds, which have gone

toward police vehicle purchases, law enforcement equipment, and community crime-prevention

programs. This year, however, the Department's actions loom over the City's decisionmaking

process.

68.     After demanding that Chicago certify and justify its compliance with

Section 1373, the Department cryptically announced that "[s]ome" jurisdictions "potentially

violate" Section 1373, without indicating which certifications it found lacking and without

identifying any particular defect.[16] This uncertainty has clouded the City's ability to apply for

critical law enforcement funds that it has relied upon for over a decade.

69.     The two new conditions that the Department just announced are equally if not

more harmful. The notice condition would require the City to detain individuals longer than it

otherwise would, potentially violating the individuals' Fourth Amendment rights and state law

---

[16] Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

and thereby expose the City to liability; the access condition would demand that the City open its lockup facilities to federal officials without regard to local detention needs.

70.     Just as fundamentally, complying with the new conditions would undermine public safety in Chicago.  The Welcoming City Ordinance assists effective policing by building trust between law enforcement officers and the immigrant community.  Conversely, policing suffers when members of that community, whatever their immigration status, do not feel free to report crimes, assist in investigations, or testify as witnesses.  The Department's insistence that Chicago give immigration enforcement agents on-demand access to its detention facilities in order to investigate potential civil immigration violations, and that Chicago detain individuals solely so that they can be investigated for possible civil immigration violations, would undermine crucial public trust, cut local law enforcement efforts off at the knees, and make everyone in Chicago less safe.

71.     The Department has thus put Chicago to an impossible choice: sacrifice its sovereignty and its residents' safety by acceding to unlawful funding demands that will undermine community-officer trust and cooperation built over decades; or forfeit crucial monies on which it has relied for more than a decade to fund essential policing operations.  And if the City chooses the latter, the City will not be the only jurisdiction to lose out on critical funding. The eleven neighboring jurisdictions that depend on Chicago's Byrne JAG application for their own Byrne JAG funding will lose their funding as well.

72.     Worse still, the Department has required Chicago to make its decision under extreme time pressure.  Chicago's FY 2017 application is due in just 29 days.

73.     As that deadline swiftly approaches, Chicago faces the prospect of a severe federal incursion on its sovereignty.  Sovereignty implies self-determination—a government's

ability to select and implement policies of its own choosing. But in a little under a month,
Chicago will be denied that most basic right: Instead of focusing (as it always has) on the best
interests of its residents and officers, Chicago will soon be required to revise basic law
enforcement policy decisions in order to suit the demands of the Department. When a
municipality is forced to desert its concerted policy choices under the influence of the federal
government's coercive power, it suffers a deep and irreparable injury to its sovereignty.

74.     Moreover, whichever decision Chicago ultimately makes, its residents and police
force will be immediately and irreparably harmed. If Chicago submits to the Department's
demands, it will forfeit decades' worth of trust and goodwill that its police force has built in the
communities it serves. And as those decades of experience show, that kind of trust, once lost, is
lost forever. Alternatively, if Chicago asserts its right to determine its own policy and refuses to
certify compliance with the Department's new and unlawful conditions, it (and the eleven other
jurisdictions who depend on Chicago's application for their Byrne JAG funds) will forever
forfeit the FY 2017 Byrne JAG grant monies—monies that are critical to Chicago's community
policing operation and that purchase essential and life-saving equipment for Chicago and its
neighboring jurisdictions. Indeed, the FY 2017 Byrne JAG application itself makes clear that if
Chicago refuses the federal government's demands and thus declines to submit an application by
September 5, it will miss out on that year's funds. Ex. D at 28 (explaining that untimely
applications will not be considered). Moreover, the Byrne JAG statue's grant formula indicates
that those forfeited funds will be divvied up and parceled out to other jurisdictions around the
country, impossible for Chicago and its neighboring communities to later reclaim. See 42 U.S.C.
§ 3755 (providing the formula for dividing each year's total grant funds). And even if Chicago
and its neighbors could later claw back those funds, the damage would have already been done in

the months or years their police forces and residents will have spent without access to crucial equipment and services.

75.     The Department cannot force Chicago to choose between its right to make smart policing decisions for itself as an exercise of municipal sovereignty and its right to receive formula grant funds that Congress has allocated to it.

## COUNT ONE: ULTRA VIRES

76.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

77.     The Department of Justice may exercise only authority conferred by statute. *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

78.     The Department lacks statutory authority to condition Byrne JAG funds on the new notice and access conditions. Indeed, such authority is at odds with the text, structure, and purpose of the Byrne JAG statute.

79.     The text of the Byrne JAG statute recognizes no authority for DOJ to impose additional substantive grant conditions on Byrne JAG funds. In fact, Congress has repeatedly demonstrated its ability (when it so desires) to expressly confer agency discretion to add substantive conditions to federal grants. In the same statute that includes the Byrne JAG grant, the Omnibus Crime Control and Safe Streets Act of 1968, Congress created a different grant program that expressly authorized administering agencies to impose reasonable grant conditions. *See* 42 U.S.C. § 3796gg-1(e)(3) (Attorney General may "impose reasonable conditions on grant awards . . . ."); *see also Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) (courts will not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply" especially where Congress has done so in the "same statute"). And

Congress has expressly conferred such authority in other federal grant programs. *See, e.g.*, 47 U.S.C. § 1204(b)(2) (Under Secretary of Commerce can "establish such conditions . . . as may be appropriate to ensure the efficiency and integrity of the grant program"); 25 U.S.C. § 1652(b) (similar); 42 U.S.C. § 2850-2(b) (similar).

80.     It did not do so with the Byrne JAG program. Rather, the Byrne JAG statute expressly gives the Attorney General a limited ministerial authority to specify the "form" of the application, 42 U.S.C. § 3752(a) (requiring jurisdictions to submit an application containing the enumerated components "in such form as the Attorney General may require"), but omits any authorization to add additional substantive conditions to that application. Congress's decision to confer discretion over form, but not substance, should be respected. *Russello v. United States*, 464 U.S. 16, 23-24 (1983) ("Congress acts intentionally and purposely in the disparate inclusion or exclusion of statutory text.").

81.     The Department's purported authority to promulgate the new notice and access conditions is also contradicted by the formula-grant structure of the Byrne JAG program. Byrne JAG funds are distributed across States and localities based on their population and relative levels of violent crime. *See* 42 U.S.C. § 3755(d)(2)(A). The formula-based approach makes States and localities eligible to receive their formula-specified share as long as they comply with the grant's administrative requirements and propose using funds in at least one of eight broadly defined programmatic areas. *See* 42 U.S.C. § 3751(a)(1)(A)-(H) (noting that grants can be used for "any one or more of the following programs" and then listing areas ranging from "[l]aw enforcement" to "[d]rug treatment" to "[m]ental health"); *id.* § 3752(a)(6)(B) (requiring applications to "include a description of how the State will allocate funding within and among [those uses]"). If DOJ had the authority to impose new substantive conditions on all grantees,

the effect would be to contradict Congress's formula and reallocate funds to jurisdictions that adopted DOJ's preferred policy.

82.     It would also contradict the fundamental purpose of the JAG program: to give States and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution."  H.R. Rep. No. 109-233, at 89.

83.     Moreover, the Department also lacks statutory authority to condition Byrne JAG funds on compliance with Section 1373.  The Byrne JAG statute's requirement that grantees comply with "all applicable Federal laws" does not confer authority on DOJ to condition Byrne JAG funding on Section 1373 compliance, because Section 1373 is not an "applicable" law here. The phrase "all applicable Federal laws" in the Byrne JAG statute refers to the host of laws that regulate the conduct of federal grant recipients *as grant recipients*.[17]  It does not refer to every section of the U.S. Code that could possibly apply to a state or local government.  Section 1373 does not regulate grantees as grantees nor do its terms mention federal grants or funds.

84.     As a direct and proximate result of these unlawful conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds and shut down the programs they support.

85.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Attorney General is without authority to impose the notice, access, and Section

---

[17] *See, e.g.,* 41 U.S.C. § 4712(a)(1) ("An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds . . . ."); 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.").

1373 conditions for FY 2017 Byrne JAG funds, an order that those conditions be set aside, and an injunction preventing those conditions from going into effect.

## COUNT TWO: SEPARATION OF POWERS

86.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

87.     The Constitution vests the spending power in Congress, not the President.  U.S. Const. art. I § 8, cl. 1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (line-item veto violates constitutional separation of powers principles); *County of Santa Clara*, 2017 WL 1459081, at *21-*22.

88.     The President "does not have unilateral authority to refuse to spend . . . funds" that have already been appropriated by Congress "for a particular project or program."  *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Train v. City of New York*, 420 U.S. 35, 44 (1975) (the Executive lacked discretion to spend less than the full amount of funds authorized by Congress under the Federal Water Pollution Contract Act Amendments of 1972).

89.     Imposing a new condition on a federal grant program amounts to refusing to spend money appropriated by Congress unless that condition is satisfied.

90.     The notice condition was not imposed by Congress, but rather by the Department in issuing the FY 2017 Byrne JAG application.  Therefore, the notice condition amounts to improper usurpation of Congress's spending power by the Executive Branch.

91.     The access condition was not imposed by Congress, but rather by the Department in issuing the FY 2017 Byrne JAG application. Therefore, the access condition amounts to improper usurpation of Congress's spending power by the Executive Branch.

92.     The Section 1373 condition was not imposed by Congress, but rather by the Department in issuing its Office of Justice Programs guidance and the FY 2016 and FY 2017

Byrne JAG applications.  Therefore, the Section 1373 condition amounts to improper usurpation of Congress's spending power by the Executive Branch.

93.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the notice, access, and Section 1373 conditions for the FY 2017 Byrne JAG violate the constitutional principle of separation of powers and impermissibly arrogate to the executive branch power that is reserved to the legislative branch, as well as an injunction preventing those conditions from going into effect.

COUNT THREE: SPENDING CLAUSE

94.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

95.     In any event, Congress could not have authorized the immigration conditions here because they do not satisfy the additional requirements of the Spending Clause.

96.     Accordingly, those requirements must be enjoined.  *National Fed'n of Indep. Bus.*, 567 U.S. at 585 (to "fully remed[y]" a Spending Clause violation, the federal government must be barred from withholding "funds for failure to comply with the [unconstitutional] requirements").

**A.     The Department's Three Immigration-Related Conditions Are Not Germane To The Byrne JAG Funds It Has Received For Over A Decade**

97.     Conditions on spending grants must be "relevant to [the] federal interest" in the particular grant program.  *Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275, 295 (1958); *accord South Dakota v. Dole*, 483 U.S. 203, 207-208 & n.3 (1987) (conditions must be "reasonably related," or "germane[]," to the particular program).  This nexus requirement ensures that the federal government does not use spending conditions to regulate state and local governments beyond the contours of the spending program itself.  *See also N. Ill. Chapter of Associated*

-30-

*Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir. 2005) ("Conditions on spending may become regulation if they affect conduct other than the financed project.").

98.     The notice and access conditions are not relevant to the federal interest in the Byrne JAG funds Chicago receives.  Chicago uses those funds for the purchase of replacement vehicles for worn-out police patrol cars, funding the Force for Good program, and law enforcement equipment.  Information concerning when detainees will be released from lockup and policies respecting access for federal immigration agents bear no relevance to the acquisition of safe and effective patrol cars, community programs, or other uses to which Chicago puts Byrne JAG funds.

99.     The notice and access conditions also are not relevant to the federal interest in the Byrne JAG program more generally.  The central objectives of the Byrne JAG program are (1) to ensure that funds are distributed across the country in a way that accounts for population and violent crime, *see* 42 U.S.C. § 3755, and (2) to "give State and local governments more flexibility to spend [federal] money for programs that work for them rather than to impose a 'one size fits all' solution," H.R. Rep. No. 109-233, at 89.  The conditions do not support those goals; indeed, they undermine them.  The conditions virtually guarantee that cities across the country that have used the local flexibility promoted by the Byrne JAG program to innovate police-immigrant relations will not receive their share of Byrne JAG formula funds.  And, by their very nature, the broadly applicable, locally indifferent conditions contradict Congress's express rejection of a "one size fits all" approach to federal law enforcement funding.  Conditions that undermine Congress's goals cannot satisfy the constitutional nexus requirement.

100.    The Section 1373 condition is not relevant to the federal interest in the Byrne JAG funds Chicago receives.  Information sharing with federal officials regarding an individual's

immigration status bears no connection to the replacement vehicles for worn-out police patrol cars, support for the Force for Good program, or the acquisition of new law enforcement equipment.

101.    The Section 1373 condition also is not relevant to the federal interest in the Byrne JAG program more generally.  As with the other conditions, it actively undermines Congress's goals of dispersing funds across the country, targeting funds to combat violent crime, and respecting local judgment in setting law enforcement strategy.  The Section 1373 condition would in effect rewrite Congress's formula and mandate a "one size fits all" approach to local policies regarding immigration status.

102.    All three immigration-related conditions are therefore not germane to the Byrne JAG funding Chicago receives or to the Byrne JAG program generally.

### B.    The Department's Notice And Access Conditions Would Impermissibly Induce Unconstitutional Activities

103.    The Spending Clause additionally prohibits the federal government from imposing spending conditions in order to "induce the States to engage in activities that would themselves be unconstitutional."  *Dole*, 483 U.S. at 210.

104.    The notice and access conditions require Chicago to inject unreasonable delays into its existing booking, charging, and release processes in violation of the Fourth Amendment. With regard to the notice condition in particular, providing DHS with 48 hours' advance notice of an arrestee's release from Chicago's custody would require the City to presumptively violate the Fourth Amendment every time it arrested a possible non-citizen without a warrant; the only way Chicago could provide the requested notice is by holding those arrestees longer than *McLaughlin*'s presumptively reasonable 48 hours.  *See* 500 U.S. at 56.  Holding an individual for longer than 48 hours without probable cause is only reasonable where the government

"demonstrate[s] the existence of an emergency or other extraordinary circumstance" justifying the delay. *Lopez v. City of Chicago*, 464 F.3d 711, 714 (7th Cir. 2006). Extended detention in order to provide release notifications to DHS qualifies as neither "extraordinary" nor an "emergency." *See Arizona v. United States*, 567 U.S. 387, 413 (2012) ("[D]elay[ing] the release of some detainees for no reason other than to verify their immigration status . . . would raise constitutional concerns.").

105.    Independent of *McLaughlin*'s 48-hour presumption, the notice condition would require detention beyond the period authorized by the Fourth Amendment in many instances. A warrantless arrest initially reasonable for Fourth Amendment purposes becomes unreasonable once the task that occasioned the original seizure is complete. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) ("[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment."). Detaining an arrestee beyond the period justified by the probable cause supporting the initial arrest requires independent probable cause to justify continued seizure. *See Morales*, 793 F.3d at 218; *Miranda-Olivares*, 2014 WL 1414305, at *9.

106.    Nearly all of Chicago's arrestees who are released from the City's custody are released within 24 hours. Holding arrestees for 48 hours in order to comply with the notice condition would require Chicago to hold individuals longer than required by the fact of their initial arrest, and would thus require independent probable cause.

107.    Probable cause to detain any person must be measured on an individual basis. Plainly, Chicago would not have probable cause to detain every known or suspected non-citizen for the 48-hour period DOJ seeks. Yet the notice condition is not limited to situations where there exists probable cause sufficient to extend the detention. The notice condition states only

that jurisdictions receiving Byrne JAG funding are required to hold suspected non-citizens "when DHS requests such notice." Ex. D at 30. Complying with the notice condition any time DHS "requests" such notice without regard to probable cause exists to justify continued detention would violate the Fourth Amendment.

108.     The notice condition seeks to require grant recipients to engage in unconstitutional activity and is therefore impermissible under the Spending Clause.

109.     The access condition would similarly require Chicago to hold individuals longer than necessitated by the initial probable cause finding supporting their arrests in at least some circumstances. Permitting DHS to question suspected non-citizens in Chicago's custody would inevitably require an extension of the detention period beyond that justified by the fact of arrest; at least some of those custodial interviews would interfere with Chicago's existing booking and release process.

110.     Any extension to the detention period constitutes a subsequent seizure that must be independently supported by probable cause. *See Morales*, 793 F.3d at 218; *Miranda-Olivares*, 2014 WL 1414305, at *9. Unless Chicago has independent probable cause sufficient to justify continued detention, it cannot extend the period of arrest to allow such questioning. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015); *Arizona*, 567 U.S. at 387; *Muehler v. Mena*, 544 U.S. 93, 101 (2005).

111.     The access condition is not limited to those situations in which there exists probable cause sufficient to extend the detention. Instead, it requires Chicago to permit DHS personnel to access "any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien)" without articulating a limiting principle. Ex. D at 30.

112. The access condition seeks to require grant recipients to engage in unconstitutional activity and is therefore impermissible under the Spending Clause.

### C. The Department's Three Immigration-Related Conditions Are Unconstitutionally Ambiguous

113. Federal restrictions on state and local funding must also be articulated "unambiguously" so that the recipient can "voluntarily and knowingly accept[]" Congress's terms. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16-17 (1981). Under *Pennhurst*, grant conditions are not "unambiguous[]" if the recipient "is unable to ascertain what is expected of it." *Id.*; *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("[Recipients] cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" (quoting *Pennhurst*, 451 U.S. at 17)).

114. All three immigration-related conditions are ambiguous as to what is expected of grant recipients in Chicago's position, particularly given Chicago's Welcoming City Ordinance and other relevant policies and practices.

115. The notice condition is ambiguous because, as explained in detail already, it would require Chicago to engage in presumptively unconstitutional behavior. This condition forces grantees to (a) decide whether DOJ intends the condition to be read consistent with the Constitution, and assuming so, (b) decide for themselves how the condition could be complied with *without* raising constitutional difficulties. Requiring grantees to embark on careful constitutional analysis of federal grant conditions does not give grantees appropriate notice of what is "expected of" them.

116. The access condition is ambiguous because, as drafted, Chicago cannot discern what "detention facilities" it must permit federal agents to access. Specifically, it is not clear whether "detention facility" encompasses the holding cells operated by the Chicago Police

-35-

Department. Nor is it clear how the City should proceed when, given the very brief nature of most detentions, it is impossible to grant ICE access to a detainee because doing so would interfere with the Police Department's internal practices and unduly delay a detainee's release from custody. *Cf. McLaughlin*, 500 U.S. at 56 (Fourth Amendment prohibits "unreasonable delay" in releasing arrestees held without a judicial determination of probable cause).

117.    The Section 1373 condition is also ambiguous, and the Department's guidance documents and other actions have only added to the confusion. For instance, the statute uses sweeping language with no discernable limiting principle—*i.e.*, barring agencies from "prohibit[ing], or *in any way* restrict[ing]" the sharing, maintenance, or exchange of immigration status information. And the Department has added to the difficulties State and localities would have in discerning the scope of that bar by suggesting without explanation that Section 1373 implicates a wide range of state and local governance practices from formal laws to informal cultural norms. At other times, the Department has actively contradicted itself in a bid to interpret Section 1373. For instance, it has stated both that Section 1373 requires no affirmative action by States and local governments, U.S. Dep't of Justice, Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373, at 1 (2016), https://tinyurl.com/y8e4j8es, and that States and local governments may need to provide affirmative instruction to employees to be in compliance, Memorandum from Michael E. Horowitz, Inspector Gen., U.S. Dep't of Justice, to Karol V. Mason, Assistant Attorney Gen., Office of Justice Programs, U.S. Dep't of Justice, Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients 6 (May 31, 2016), https://tinyurl.com/y9rpwge4 ("[W]e have concerns that unless city employees were made explicitly aware that the local ordinance did not limit their

legal authority to respond to such ICE requests, employees likely would be unaware of their legal authority to act inconsistently with the local ordinance.").

118.    Finally, many interpretations of Section 1373 would raise serious constitutional concerns.  Where a grant recipient must resolve tension between the Constitution and an informal interpretation announced by an agency in a guidance document to ascertain what is expected of it, the condition cannot be characterized as unambiguous.

### D.    The Department's Three Immigration-Related Conditions Are Unconstitutionally Coercive

119.    The Spending Clause further prohibits grant conditions that are "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211 (citation omitted).

120.    As a direct and proximate result of the notice, access, and Section 1373 conditions, Chicago is forced to either accept an unlawful and unconstitutional grant condition or forego Byrne JAG funds.

121.    The loss of Byrne JAG funds would strain the Chicago Police Department's budget resources for replacing failing and inoperable patrol cars needed to provide a public presence and respond to emergency calls, and would curtail community outreach and engagement programs, such as the Chicago Police Department's Force for Good program.

122.    All three immigration-related conditions therefore threaten financial consequences that exceed the point at which pressure turns to constitutionally impermissible compulsion.

123.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the three immigration-related conditions for the FY 2017 Byrne JAG violate the Constitution's Spending Clause as well as an injunction preventing those conditions from going into effect.

## COUNT FOUR: COMMANDEERING

124.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

125.    The Tenth Amendment prohibits the federal government from "requir[ing]" States and localities "to govern according to Congress's instructions," *New York*, 505 U.S. at 162, or "command[ing] the States' officers . . . to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997).

126.    Where the "whole object" of a provision of a federal statute is to "direct the functioning" of state and local governments, that provision is unconstitutional, *Printz*, 521 U.S. at 932, and must be enjoined, *id.* at 935; *New York*, 505 U.S. at 186-187.  That description precisely fits each of the three immigration-related conditions.

127.    The notice condition seeks to fundamentally reorganize the manner in which Chicago has chosen to balance its Fourth Amendment obligations against its interest in effective law enforcement.  Compliance with the notice condition would require Chicago to hold detainees longer than it currently does and would, at bottom "command the States' officers . . . to administer or enforce a federal regulatory program," *Printz*, 521 U.S. at 935.

128.    The notice condition therefore impermissibly commandeers local governments and cannot be validly imposed on Byrne JAG funding recipients.

129.    The access condition requires a fundamental restructuring of Chicago Police Department procedures and functions in order to accommodate on-demand access to detainees by federal agents.  This federalization of bedrock local government functions violates the Tenth Amendment's anti-commandeering principle.  State and local governments can define their sovereignty only "[t]hrough the structure of [their] government, and the character of those who exercise government authority." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  Instituting an open-door policy for federal immigration officials to enter local facilities and interrogate local

detainees displaces Chicago's exercise of its fundamental police powers and compromises local political and law enforcement officials' ability freely to direct the City's law enforcement strategies and priorities.

130.    The access condition therefore impermissibly commandeers local governments and cannot be validly imposed on Byrne JAG funding recipients.

131.    Congress enacted Section 1373 on the belief that "[e]ffective immigration law enforcement requires a cooperative effort between all levels of government." S. Rep. No. 104-249, at 19 (1996). Specifically, Congress sought to ensure that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies" could be used to enforce federal law. *Id.* at 19-20. In doing so, it sought to "require [state and local officers] to provide information that belongs to the State and is available to them only in their official capacity"—in other words, to engage in unconstitutional commandeering. *Printz*, 521 U.S. at 932 n.17.

132.    Further, Section 1373 prohibits state and local governments from engaging in a core aspect of governing: controlling the actions of their own employees. States and local governments can act "only through [their] officers and agents." *Nevada v. Hicks*, 533 U.S. 353, 365 (2001) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)). Thus, personnel decisions—including decisions about how personnel interact with the federal government—are "decision[s] of the most fundamental sort" for Chicago. *Gregory*, 501 U.S. at 460. Statutes like Section 1373—which require state officers to follow federal directives and usurp the state-level policymaking process—break the chain of accountability for state-level officers.

133.    Section 1373 is therefore facially unconstitutional and cannot be validly imposed on Byrne JAG recipients as "applicable Federal law[]." 42 U.S.C. § 3752(5)(D).

134.    As a direct and proximate result of these unconstitutional conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds and shut down or materially alter the programs they support.

135.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the three immigration-related grant conditions the Department has sought to impose on FY 2017 Byrne JAG program participants violate the Tenth Amendment as well as an injunction preventing those conditions from going into effect.

## COUNT FIVE: DECLARATORY JUDGMENT THAT CHICAGO COMPLIES WITH SECTION 1373

136.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

137.    Chicago has certified compliance with Section 1373 and provided an accompanying legal analysis describing the basis for the City's certification. DOJ guidance indicates that the statue does not impose an affirmative obligation on state or local entities to collect information from private individuals regarding their immigration status. *See* U.S. Dep't of Justice, Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373, at 1 (2016), https://tinyurl.com/y8e4j8es ("Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information."). Section 20 of Chicago's Welcoming City Ordinance and Chicago Police Department Special Order S06-14-03 establish a general policy of not collecting immigration status information unless such collection is required by state or federal law, a judicial decision, or as part of anticipated litigation. Because Chicago cannot restrict the sharing of information it does not collect, the City's policy of non-collection renders it necessarily compliant with Section 1373 for all cases covered by the non-collection policy.

138.    Where City officials or agents do incidentally come to possess immigration status information, the City has no policy restricting the sharing of such information contrary to Section 1373 because Section 30 of the Welcoming City Ordinance contains a "saving clause" that limits the disclosure of an individual's citizenship or immigration status information "[e]xcept as otherwise provided by applicable federal law."  In the context of the Welcoming City Ordinance, "applicable federal law" includes Section 1373 to whatever extent Section 1373 and any individual federal request made pursuant to that provision is a lawful and constitutional exercise of federal authority.

139.    Chicago has received no formal notification regarding the acceptability of that certification but the Department has indicated that certifications from at least some jurisdictions are likely to be rejected.  *See* Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

140.    While Chicago is confident it complies with Section 1373, DOJ's conduct has sown confusion and created the impression that the federal government believes otherwise, notwithstanding Chicago's legal analysis.  Chicago is reluctant to certify compliance with the Section 1373 in its FY 2017 Byrne JAG application, which is due imminently, until the Department affirms that the City's prior certification is acceptable.

141.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that it complies with Section 1373.

## COUNT SIX: ADMINISTRATIVE PROCEDURE ACT (FAILURE TO USE NOTICE AND COMMENT PROCEDURES; ARBITRARY AND CAPRICIOUS)

142.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

143.     In addition to lacking statutory and constitutional authority to impose the immigration-related conditions, the conditions were adopted without using notice-and-comment procedures and are arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

144.     DOJ's decision to condition Byrne JAG funds on compliance with the notice, access, and Section 1373 conditions is a legislative rule that "impose[s] obligations . . . on private interests." *Associated Builders & Contractors, Inc. v. Reich*, 922 F. Supp. 676, 681 (D.D.C. 1996). It is therefore subject to the APA's requirement that legislative rules be enacted through notice and comment rulemaking procedures. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015); *see also* 42 U.S.C. § 3754 ("The Attorney General shall issue rules to carry out this part."). DOJ issued the Section 1373 compliance condition through a guidance document and the notice and access conditions through a press release and subsequent inclusion by fiat in the grant solicitation. Those steps do not comply with notice and comment procedures. *See* 5 U.S.C. § 553.

145.     All three conditions are also arbitrary and capricious because DOJ failed to rely on reasoned decisionmaking and, to the extent it cited reasons at all, those reasons are contradicted by evidence. Among other things, DOJ "relied on factors which Congress has not intended it to consider," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), by, for example, evaluating grant applicants on the basis of their immigration policies rather than on their compliance with expressly enumerated statutory application requirements. *See* 42 U.S.C. § 3752(a)(1)-(5). It "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, including but not limited to the policing challenges created by alienating and inducing fear in immigrant communities. It

"offered an explanation for its decision that runs counter to the evidence before the agency," *id.*, including the evidence submitted by nine jurisdictions in their Section 1373 certification letters indicating that Welcoming City-style policies promote rather than detract from effective policing. Indeed, when the Attorney General referred to one study in the press that showed that such policies lead to higher crime, *the study's own authors said he was misrepresenting their work*.

146. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the three immigration-related conditions for the FY 2017 Byrne JAG funds are in violation of the APA as well as an injunction preventing those conditions from going into effect.

**COUNT SEVEN: ADMINISTRATIVE PROCEDURE ACT (PAPERWORK REDUCTION ACT)**

147. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

148. DOJ additionally issued the new conditions "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

149. The FY 2017 Certification of Compliance with Section § 1373 attached to the FY 2017 Byrne JAG application, *see* Ex. D. at 37-38, is a "collection of information" within the meaning of the Paperwork Reduction Act and implementing regulations. *See* 44 U.S.C. § 3502; 5 C.F.R. § 1320.3(h) ("[A] certification would likely involve the collection of 'information' if an agency conducted or sponsored it . . . to monitor . . . compliance with regulatory standards.").

150. The Paperwork Reduction Act bars federal agencies, including the Department, from "conduct[ing] or sponsor[ing] a collection of information" unless that agency has provided "60-day[s] notice in the Federal Register" and "otherwise consult[ed] with members of the public and affected agencies" to, *inter alia*, "evaluate whether the proposed collection of

information is necessary for the proper performance of the functions of the agency." 44 U.S.C. §§ 3506(c)(2), 3507(a)(1); 5 C.F.R. § 1320.10.

151. The Department has not published a Paperwork Reduction Act Notice in the Federal Register relevant to the FY 2017 Certification of Compliance with Section 1373.

152. The Paperwork Reduction Act and implementing regulations further provide that that "no person shall be subject to any penalty for failing to comply with a collection of information" if the relevant collection of information does not display "a currently valid OMB control number" or if the agency "fails to inform" the person responding to the collection of information "that such person is not required to respond to the collection of information unless it displays a currently valid OMB control number." 44 U.S.C. § 3512; 5 C.F.R. § 1320.6; *see also Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001) (where agency "did not get prior approval from OMB" for an information collection covered by the Paperwork Reduction Act, agency "had no authority to enforce the information request").

153. The protection provided by the Paperwork Reduction Act "may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto." 44 U.S.C. § 3512(b).

154. The FY 2017 Certification of Compliance with Section 1373 displays no OMB control number, and Chicago has not been informed that it is not required to submit the FY 2017 Certification of Compliance.

155. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that it is not required to submit a FY 2017 Certification of Compliance with Section 1373 and that its failure to do so cannot the basis for denying it FY 2017 Byrne JAG funds.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays this Court:

a)      Declare that all three immigration-related conditions for the FY 2017 Byrne JAG are unlawful and that Chicago complies with 8 U.S.C. § 1373;

b)      Enjoin the Department of Justice from enforcing the notice, access, or Section 1373 conditions for the FY 2017 Byrne JAG and retain jurisdiction to monitor the Department's compliance with this Court's judgment; and

c)      Grant such other relief as this Court may deem proper.


August 7, 2017.                              Respectfully Submitted,

| | |
|---|---|
| | EDWARD N. SISKEL |
| JAMIE S. GORELICK (*pro hac* vice pending) | Corporation Counsel of the City of |
| DAVID W. OGDEN (*pro hac vice* pending) | Chicago |
| ARI HOLTZBLATT (*pro hac vice* pending) | BENNA R. SOLOMON |
| ARI SAVITZKY (*pro hac vice* pending) | Deputy Corporation Counsel |
| MOLLY JENNINGS (*pro hac vice* pending) | JUSTIN A. HOUPPERT |
| BRIDGET FAHEY* (*pro hac vice* pending) | Assistant Corporation Counsel |
| WILMER CUTLER PICKERING HALE | SCOTT D. SPEARS |
|    AND DORR LLP | Assistant Corporation Counsel |
| 1875 Pennsylvania Avenue NW | 121 N. LaSalle Street, Suite 600 |
| Washington, DC 20006 | Chicago, IL 60602 |
| (202) 663-6000 | (312) 744-0220 |
| | |
| DEBO P. ADEGBILE (*pro hac vice* pending) | By  /s/ Andrew W. Worseck |
| WILMER CUTLER PICKERING HALE | ANDREW W. WORSECK |
|    AND DORR LLP | Chief Assistant Corporation Counsel |
| 7 World Trade Center | 30 N. LaSalle Street, Suite 1230 |
| 250 Greenwich Street | Chicago, IL 60602 |
| New York, NY 10007 | (312) 744-0220 |
| (212) 230-8800 | andrew.worseck@cityofchicago.org |
| | |
| * Admitted to practice only in Colorado. | MATTHEW C. CROWL |
| Supervised by members of the firm who | NICK KAHLON |
| are members of the District of Columbia | LAURA KLEINMAN |
| Bar | RILEY SAFER HOLMES & CANCILA LLP |

Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700


*Attorneys for the City of Chicago*