## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

**THE CITY OF CHICAGO,**

*Plaintiff,*

*v.*

**JEFFERSON BEAUREGARD SESSIONS III,**
**Attorney General of the United States**

*Defendant.*

Civil Action No. 1:17-cv-5720

Hon. Harry D. Leinenweber

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ........................................................................................................................ 1

BACKGROUND .......................................................................................................................... 2

      A.     Chicago Has Operated Under Its Welcoming City Policy For Decades ............................................................................................................. 2

      B.     The Trump Administration Attacks What It Calls "Sanctuary Cities" ............ 4

      C.     The Trump Administration Distorts The Byrne JAG Program To Advance Its Attack On "Sanctuary Cities" ........................................................ 5

      D.     The Three Conditions The Department Seeks To Impose Impermissibly Intrude On Chicago's Sovereignty And Place Chicago In An Impossible Bind ........................................................................................ 7

ARGUMENT ................................................................................................................................. 9

    I.     CHICAGO IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS ...................................................................................................................... 9

      A.     The Notice and Access Conditions Are Unlawful ........................................ 10

          1.     The Notice And Access Conditions Are *Ultra Vires* ..................... 10

          2.     The Notice And Access Conditions Violate The Spending Clause ................................................................................................. 13

          3.     The Notice And Access Conditions Would Impermissibly Force Chicago To Violate The Fourth Amendment ........................ 14

          4.     The Notice And Access Conditions Violate The Separation Of Powers .................................................................................... 17

      B.     The Section 1373 Condition Is *Ultra Vires* And Unconstitutional ............ 18

    II.     CHICAGO WILL BE IRREPARABLY HARMED ABSENT PRELIMINARY RELIEF ............................................................................................ 21

    III.     THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY RELIEF ............................................................................. 25

CONCLUSION .......................................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amalgamated Transit Union v. Skinner,*
   894 F.2d 1362 (D.C. Cir. 1990) ............................................................................13

*American Trucking Ass'ns, Inc. v. City of Los Angeles,*
   559 F.3d 1046 (9th Cir. 2009) ..............................................................................22

*Arizona v. United States,*
   567 U.S. 387 (2012) ..............................................................................................16

*Bond v. United States,*
   564 U.S. 211 (2011) ..............................................................................................25

*Charles v. Verhagen,*
   348 F.3d 601 (7th Cir. 2003) ................................................................................15

*City of Arlington v. FCC,*
   133 S. Ct. 1863 (2013) ..........................................................................................10

*City of Los Angeles v. McLaughlin,*
   865 F.2d 1084 (9th Cir. 1989) ..............................................................................11

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ..............................................................................................18

*County of Riverside v. McLaughlin,*
   500 U.S. 44 (1991) ...................................................................................15, 16, 17

*County of Santa Clara v. Trump,*
   Nos. 17-cv-00574-WHO & 17-cv-00485-WHO, 2017 WL 1459081
   (N.D. Cal. Apr. 25, 2017) .............................................................................4, 18, 22, 24

*Ezell v. City of Chicago,*
   651 F.3d 684 (7th Cir. 2011) ................................................................................22

*FERC v. Mississippi,*
   456 U.S. 742 (1982) ..............................................................................................21

*Gerstein v. Pugh,*
   420 U.S. 103 (1975) ..............................................................................................15

*Gordon v. Holder,*
   721 F.3d 638 (D.C. Cir. 2013) ..............................................................................25

*Gregory v. Ashcroft,*
 501 U.S. 452 (1991) ...................................................................................... 18, 20-21

*Illinois v. Caballes,*
 543 U.S. 405 (2005) .............................................................................................. 16

*In re Aiken County,*
 725 F.3d 255 (D.C. Cir. 2013) ............................................................................ 18

*Ivanhoe Irrigaton District v. McCracken,*
 357 U.S. 275 (1958) .............................................................................................. 13

*Jama v. ICE,*
 543 U.S. 335 (2005) .............................................................................................. 11

*Kansas v. United States,*
 249 F.3d 1213 (10th Cir. 2001) ..................................................................... 21-22

*Lopez v. City of Chicago,*
 464 F.3d 711 (7th Cir. 2006) ............................................................................... 16

*Melendres v. Arpaio,*
 695 F.3d 990 (9th Cir. 2012) ............................................................................... 25

*Morales v. Chadbourne,*
 793 F.3d 208 (1st Cir. 2015) ............................................................................... 16

*Morales v. Trans World Airlines, Inc.,*
 504 U.S. 374 (1992) .............................................................................................. 22

*Muehler v. Mena,*
 544 U.S. 93 (2005) ............................................................................................... 17

*Myers v. United States,*
 272 U.S. 52 (1926) ............................................................................................... 18

*National Federation of Independent Business v. Sebelius,*
 567 U.S. 519 (2012) ......................................................................................... 21, 22

*New York v. United States,*
 505 U.S. 144 (1992) .............................................................................................. 21

*Nken v. Holder,*
 556 U.S. 418 (2009) ............................................................................................... 9

*Northern Illinois Chapter of Associated Builders & Contractors, Inc. v. Lavin,*
 431 F.3d 1004 (7th Cir. 2005) ............................................................................ 14

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) ................................................................................... 19, 20

*Planned Parenthood Arizona, Inc. v. Betlach,*
    899 F. Supp. 2d 868 (D. Ariz. 2012) ........................................................ 23

*Planned Parenthood of Central N.C. v. Cansler,*
    804 F. Supp. 2d 482 (M.D.N.C. 2011) ..................................................... 23

*Planned Parenthood Gulf Coast, Inc. v. Kliebert,*
    141 F. Supp. 3d 604 (M.D. La. 2015) ...................................................... 23

*Planned Parenthood of Indiana, Inc. v. Commissioner of Indiana State Dep't of Health,*
    699 F.3d 962 (7th Cir. 2012) ............................................................. 23, 25

*Printz v. United States,*
    521 U.S. 898 (1997) .................................................................................. 20

*Reno v. Condon,*
    528 U.S. 141 (2000) .................................................................................. 20

*Rodriguez v. United States,*
    135 S. Ct. 1609 (2015) ............................................................................. 17

*Roland Machinery Co. v. Dresser Industries, Inc.,*
    749 F.2d 380 (7th Cir. 1984) ................................................................... 23

*Russello v. United States,*
    464 U.S. 16 (1983) ................................................................................... 11

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ....................................................................... 13, 14-15

*Train v. City of New York,*
    420 U.S. 35 (1975) ................................................................................... 18

*United States v. Jacobsen,*
    466 U.S. 109 (1984) ................................................................................. 16

*Universal Health Servies, Inc. v. United States ex rel. Escobar,*
    136 S. Ct. 1989 (2016) ............................................................................. 19

*USAID v. Alliance for Open Society International,*
    133 S. Ct. 2321 (2013) ............................................................................. 14

*Willis v. City of Chicago,*
    999 F.2d 284 (7th Cir. 1993) ......................................................... 15-16, 17

*Winter v. Natural Resources Defenses Council, Inc.,*
    555 U.S. 7 (2008) ..........................................................................................................9

## CONSTITUTIONAL PROVISIONS, STATUTES, RULES, AND REGULATIONS

8 U.S.C. § 1373 .......................................................................................................*passim*

25 U.S.C. § 1652(b) ......................................................................................................10

29 U.S.C. § 794(a) ........................................................................................................19

42 U.S.C.
    § 1769e(b) ............................................................................................................10
    § 2000d ................................................................................................................19
    § 3712(a)(6) ....................................................................................................12-13
    § 3751(a)(1) ..........................................................................................................12
    § 3751(c) ...............................................................................................................11
    § 3751(d) ..............................................................................................................12
    § 3752(a) .....................................................................................................5, 10-11
    § 3752(a)(4) .......................................................................................................5, 11
    § 3752(a)(5)(D) ....................................................................................................19
    § 3752(a)(6)(B) ....................................................................................................12
    § 3755 .............................................................................................................22, 23
    § 3755(d)(2)(A) .................................................................................................5, 11
    § 3755(d)(4) ...........................................................................................................9
    § 3796gg-1(e)(3) ..................................................................................................10
    § 6102 ..................................................................................................................19
    § 10305(a)(2) ........................................................................................................10

Ill. Code Crim. Proc. § 109-1 ........................................................................................15

U.S. Const. art. I, § 8, cl. 1 ...............................................................................13, 14, 18

U.S. Const. amend. IV ...............................................................................................*passim*

U.S. Const. amend. X ...................................................................................................21

## OTHER AUTHORITIES

*Justice Assistance Grant (JAG) Program: FY 2017 Allocations,*
    www.bja.gov/Programs/jag/17jagallocations.html ....................................................11

*Enforce the Law for Sanctuary Cities Act,* H.R. 3009, 114th Cong. (2015) ...........................12

Executive Order 13768 ....................................................................................................4

The Federalist No. 51 .....................................................................................................18

H.R. Rep. No. 109-233 (2005) ............................................................................5, 12, 14

S. Rep. No. 104-249 (1996) ...................................................................................................... 20

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) .................................................. 11-12

U.S. Dep't of Justice, Byrne JAG Program Frequently Asked Questions (2017),
        https://www.bja.gov/Funding/JAGFAQ.pdf ............................................................... 12

## INTRODUCTION

Every day, local law enforcement in Chicago brings its years of experience and relationships with the community to bear in fighting crime. At this critical time, when local law enforcement relies on every precious dollar to ensure the safety of the City, the Attorney General of the United States threatens to snatch away congressionally allotted law enforcement funding in an unlawful effort to coerce Chicago—and practically every other major city in the country—to carry out the Administration's immigration policy goals. This Court must prevent this irreparable injury to the people of Chicago.

In this motion, Chicago seeks to enjoin the imposition of unlawful and unconstitutional conditions on federal law enforcement grants under the Edward Byrne Justice Assistance Grant ("Byrne JAG") program. Earlier this fiscal year, the Department of Justice (the "Department") overreached its statutory authority when it required recipients of those funds to certify that they do not restrict intergovernmental sharing of immigration status information. Then, just one week ago, the Department decreed that it would additionally condition those funds on the City's agreement (1) to detain arrestees in violation of the Fourth Amendment in order to give federal immigration agents 48-hours' notice prior to their release, and (2) to provide immigration agents with unlimited access to City detention facilities and any suspected non-citizens held in them. These two new conditions flatly contravene longstanding City policies. Absent preliminary relief, Chicago has a few short weeks before it must apply for a grant that will force it to choose between its constitutional right to self-government and critical local law enforcement funding.

Either option would make Chicagoans less safe. If Chicago acquiesces and abandons its autonomy and constitutional rights, the two new conditions will overrule Chicago's decades-old Welcoming City policy, which is designed to build trust and cooperation between the Chicago Police Department ("CPD") and immigrant communities by requiring CPD to prioritize public safety over

civil immigration enforcement, promoting the public safety of all Chicagoans. And if Chicago stands on its sovereignty, the Attorney General will withhold Byrne JAG funds. Chicago cannot lawfully be put to such a choice. Preliminary relief is warranted.

Chicago is likely to succeed on the merits, on multiple fronts. *First*, the conditions are unlawful because they stray far beyond the limited, largely administrative authority that Congress provided to the Attorney General in the Byrne JAG statute, as the text, structure, and purpose of that statute all make clear. *Second*, even if Congress had authorized the Attorney General to impose policy conditions on Byrne JAG grants (and it did not), *these* conditions violate the Spending Clause—among other reasons because they are not germane to the purpose of the Byrne JAG grants and because they would require Chicago to violate detainees' Fourth Amendment rights. *Third*, the two new conditions upset the separation of powers between Congress and the Executive—a particularly alarming prospect where, as here, the Executive has bypassed Congress and sought to alter, by executive fiat, the balance of power between national and local government.

And Chicago and its residents will suffer irreparable injury unless granted preliminary relief. The new conditions will force the City to surrender its sovereignty, violate its core values, and abrogate a sound longstanding policy choice to foster cooperation with immigrant communities, or else to forgo altogether critical Byrne JAG funds that Congress allocated to it for law enforcement programs, and that Chicago and many other cities have received and relied on for more than a decade. The Byrne JAG application—with the unlawful and unconstitutional new commitments included—is due in less than one month. Preliminary injunctive relief is urgently required.

## BACKGROUND

### A.     Chicago Has Operated Under Its Welcoming City Policy For Decades

Since the 1980s, Chicago has embraced a Welcoming City policy to build trust and cooperation between CPD and immigrant communities by prioritizing local crimefighting and public

safety over the policing of federal civil immigration infractions. *See* Request for Judicial Notice ("RJN") Ex. A (Executive Order 85-1); RJN Ex. B (Executive Order 89-6). In 2006, facing pressure from the federal Executive to assist with civil immigration enforcement, the City Council unanimously enacted the Welcoming City Ordinance ("WCO"). *See* RJN Ex. C (2006 Ordinance). The WCO rejected the expenditure of "limited local resources on traditionally federal functions." *Id.* at 74,326. City leaders understood that the "threat of immigrant and minority profiling and harassment" would "chill[]" effective law enforcement if "fear of deportation" led "witnesses and victims" to avoid cooperation with police. *See id.* at 74,327. Mayor Rahm Emanuel and the City Council expanded the WCO in 2012. RJN Ex. D (amended WCO). The 2012 WCO reaffirmed that "[t]he cooperation of the City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City." *Id.* § 2-173-005, at 33,043.

The current version of the WCO contains four key provisions relevant to this lawsuit:

*First*, subject to exceptions for detainees who are suspected of serious crimes, have serious criminal histories, or are identified as known gang members, the WCO prohibits City officials "while on duty" from "expend[ing] their time responding to [Immigration and Customs Enforcement ("ICE")] inquiries . . . regarding a person's custody status or release date." *See* RJN Ex. E (current WCO), § 2-173-042. *Second*, subject to those same exceptions, the WCO prohibits City officials from "permit[ting] ICE agents access to a person being detained by, or in the custody of, the agency or agent" or "permit[ting] ICE agents use of agency facilities for investigative interviews or other investigative purpose." *Id.* As noted, these restrictions on the City's cooperation with ICE do not apply if a detainee is suspected or convicted of a serious crime or is a known gang member.

*Third*, the WCO prohibits City officials from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or immigration status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or

court decision." *See id.* § 2-173-020. *Fourth*, except when "otherwise provided under applicable federal law," "required . . . by legal process," or with written permission, the WCO prohibits City officials from "disclos[ing] . . . [the] immigration status of any person." *See id.* § 2-173-030.

The WCO is designed to build trust and cooperation with immigrant communities by permitting CPD to engage with federal immigration enforcement only when it serves to fight serious crime. *See* Hannigan Decl. ¶¶ 4-5. That policy is sound: As one study of so-called "sanctuary" jurisdictions found, "crime is statistically significantly lower in sanctuary counties compared to nonsanctuary counties . . . controlling for population characteristics." *See* Worseck Decl. Ex. A (Wong study) at 6. Police chiefs have explained that their on-the-ground experience is consistent with that insight: "[B]uild[ing] trusting and supportive relationships with immigrant communities," they said, "is essential to reducing crime and helping victims." *See* Worseck Decl. Ex. B. The idea—advanced by President Trump and Attorney General Sessions, among others, *see* Compl. ¶¶ 28-33; *see also* Worseck Decl. Exs. C-G—that policies like Chicago's encourage crime is a "[m]yth": There is "no support for the idea that immigrants are responsible for more crime" or that "sanctuary policies lead to increased crime." *See* Worseck Decl. Ex. H (Gonzalez study) at 9-10, 30.

## B. The Trump Administration Attacks What It Calls "Sanctuary Cities"

Despite the City's and CPD's sound judgment that cooperation with immigrant communities makes Chicagoans safer—and despite the City's inherent authority to direct its law enforcement officers' priorities, tactics, and strategies—the Trump Administration has singled out Chicago and other so-called "sanctuary cities" for criticism. In his first week in office, President Trump issued Executive Order 13768, which threatened to deny federal money to and take enforcement actions against an undefined group of "sanctuary jurisdictions." That order was later enjoined by a federal court for violating numerous provisions of the Constitution. *See, e.g. Cty. of Santa Clara v. Trump*, Nos. 17-cv-00574-WHO & 17-cv-00485-WHO, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017).

President Trump's unjustified disparagement of these cities continued throughout his first six months in office. Referring to "criminal aliens who poison our communities with drugs and prey on innocent young people," the President vowed "a nationwide crackdown on sanctuary cities" so that those "animals" and "predators" would "find no safe haven anywhere in our country." Worseck Decl. Ex. D; *see also* Worseck Decl. Ex. E. Attorney General Sessions has echoed those views, insisting that "'sanctuary' policies make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes.'" Worseck Decl. Ex. F.

### C. The Trump Administration Distorts The Byrne JAG Program To Advance Its Attack On "Sanctuary Cities"

After the failure of its initial executive order, the Trump Administration developed a new strategy for pursuing its anti-"sanctuary city" policy: threatening local law enforcement funding under the Byrne JAG program. Congress created the Byrne JAG program in 2005 to assist state and local police departments across America and to provide those departments with the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing. H.R. Rep. No. 109-233, at 89 (2005). To that end, Congress structured the Byrne JAG program as a formula grant, in which funds are awarded to local governments based on their state's population and the ratio of violent crime in the locality to violent crime in the state. *See* 42 U.S.C. § 3755(d)(2)(A). To obtain its allocation under the formula, a local government must submit an application that includes a plan detailing how the grant will be used in one of eight programmatic areas enumerated in the statute, as well as a series of enumerated assurances and certifications. *See id.* § 3752(a); *see also* Sachs Decl. ¶ 12. Although the statute authorizes the Attorney General to exercise discretion over limited tasks while implementing the Byrne JAG program, like specifying the "form" of the application, *see* 42 U.S.C. § 3752(a), and designating the programmatic and financial information grantees must report to the Department, *id.* § 3752(a)(4), it does not authorize

the Department to invent and impose new substantive conditions on grant recipients or exercise wide-ranging policy discretion.

Notwithstanding Congress's decision to carefully circumscribe the Department's discretion in distributing Byrne JAG funds, the Department seeks to use the program to coerce "sanctuary cities" into adopting new policing policies. First, the Department forced the City to certify that it complies with 8 U.S.C. § 1373 ("Section 1373"), a federal law that prohibits local governments from restricting the intergovernmental sharing of immigration status information, as a condition for receiving Byrne JAG funds. On April 21, 2017, the Department sent letters to Chicago and eight other jurisdictions seeking submission of an "official legal opinion" and "documentation . . . that validates that [the] jurisdiction is in compliance with [Section] 1373." *See* RJN Ex. F. Chicago replied on June 30, 2017, explaining that it complies with Section 1373, both because it does not collect—and therefore cannot withhold—immigration information and because nothing in the WCO or CPD policy prevents the sharing of such information with federal officials. *See* RJN Ex. G. The Department stated it was "in the process of reviewing" the certifications and planned to "examine these claims carefully." RJN Ex. H. It later issued approving responses to at least two jurisdictions, *see* RJN Exs. P-Q, but still has not responded to Chicago's certification.

And the Department did not stop there. In late July 2017, with the Byrne JAG application for the 2017 fiscal year ("FY 2017") about to go online, the Department issued a two-paragraph press release and accompanying press "backgrounder" announcing that it was imposing two *new* unprecedented conditions on Byrne JAG grantees. *See* RJN Ex. I (press release), RJN Ex. J (backgrounder). The Department released the FY 2017 application containing these conditions a few days later, on August 3. *See* RJN Ex. K. Each of those conditions would press Chicago's law enforcement officers into federal immigration enforcement efforts.

*First*, the Department's new "notice" requirement would require grant applicants to "provide at least 48 hours' advance notice to [the Department of Homeland Security ("DHS")] regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." RJN Ex. K at 30. To comply, a grantee must agree to hold any detainee for at least 48 hours, regardless of when he or she would otherwise be released, whenever DHS submits a request.

*Second*, the Department's new "access" requirement would require grant applicants to "permit [DHS personnel] to access any correctional or detention facility in order to meet with" and interrogate anyone suspected of being a non-citizen. RJN Ex. K at 30. The Department has not defined "correctional" or "detention" facility, but to comply it appears a grantee must allow federal immigration agents to enter local law enforcement buildings and question any person held in them regardless of whether there is probable cause to believe that person is in the country illegally.

### D. The Three Conditions The Department Seeks To Impose Impermissibly Intrude On Chicago's Sovereignty And Place Chicago In An Impossible Bind

Each of the new conditions sets up an impossible choice for Chicago: The City must decide whether to forgo funding critically needed by CPD but maintain its longstanding policies designed to protect the legal rights of residents, bolster public safety, and foster cooperation between the police and immigrant communities, or to abandon those policies altogether but continue to receive vital public safety funds through the Byrne JAG program.

The Department's new "notice" condition undermines the WCO's prohibition against expending CPD resources on notifying federal officials about arrestees' "custody status or release date" unless the arrestee is involved in gang activity or felony crime. RJN Ex. E, § 2-173-042. Likewise, the Department's new "access" condition conflicts with the WCO's provision expressly prohibiting City officers from "permit[ting] ICE agents access to a person being detained by, or in

the custody of," CPD or "permit[ting] ICE agents use of agency facilities for investigative interviews or other investigative purpose[s]," unless the person is involved in such criminal activity.  *Id.*

Moreover, it is effectively impossible for Chicago to provide DHS or ICE with 48 hours' notice in advance of a non-citizen's release.  Chicago does not itself operate jails or long-term detention facilities.  Its only detention role is to hold arrestees in temporary "lockup" facilities prior to their appearances in the Circuit Court for Cook County for probable cause proceedings.  Arrestees detained in City facilities are generally transferred each morning to the Circuit Court for Cook County for those proceedings.  *See* Hannigan Decl. ¶¶ 6-8.  Indeed, Chicago holds most individuals less than 24 hours—often significantly less, for example when arrestees are released on their own recognizance or charges are not filed.  *Id.* ¶¶ 9-10.  Moreover, CPD General Order G06-01 flatly prohibits the City from detaining most individuals for more than 48 hours in City facilities: "Every person arrested without a warrant, who is not eligible to be released . . . or has not been released . . ., will appear in court, without unnecessary delay.  Under no circumstances will such a person appear in court any later than 48 hours from the time of arrest."  *See* RJN Ex. L, § II(C) (emphasis omitted).

The Department's insistence that Chicago certify compliance with Section 1373 also creates additional hurdles for the City.  As explained, Chicago *does* comply with Section 1373.  *See* RJN Ex. G.  But in light of the Department's ominous silence about Chicago's certification, Chicago cannot hope to properly direct further "diligent inquiry and review" of its policies as the FY 2017 application requires, *see* RJN Ex. K at 38, or to properly certify compliance.

Should Chicago opt out of the Byrne JAG program in order to maintain its sovereignty and the policies behind its Welcoming City Ordinance, it would forgo a longstanding and critical source of funding for CPD.  Chicago has applied for and received Byrne JAG funding every year it has been available.  *See* Sachs Decl. ¶ 3.  Indeed, Chicago applies for Byrne JAG grants not only for

-8-

itself, but also (as required by statute) for Cook County and ten smaller communities, *see* 42 U.S.C. § 3755(d)(4), including the City of Evanston and the Village of Skokie. *See* Sachs Decl. ¶¶ 3, 11-12.

Byrne JAG funding is vital to Chicago and CPD. *See* Sachs Decl. ¶¶ 3-9; Hannigan Decl. ¶ 11. Each year, for example, Chicago uses millions of dollars of Byrne JAG funds to support its effort to replace broken-down or unsafe police vehicles; since the Byrne JAG program's inception, it has provided Chicago with approximately $33 million to purchase nearly 1,000 vehicles. *See* Sachs Decl. ¶ 4. Additionally, Byrne JAG provides the exclusive source of funding for CPD's Force for Good program, which helps nonprofits working to reduce violence in the City's most crime-ridden neighborhoods to increase their capacity. *Id.* ¶ 6. Without Byrne JAG funds, Chicago would have to shut down those programs, change their staffing, scope, or goals, or else divert funds from other policing objectives to sustain them. *See id.* ¶¶ 9, 13.

The deadline to apply for the Byrne JAG is September 5, 2017—less than four weeks away. Without this Court's intervention, Chicago will be forced to choose between untenable options.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "[W]hen the Government is the opposing party," the last two factors "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## I.   CHICAGO IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

Chicago is likely to succeed on the merits because the notice and access conditions, as well as the Section 1373 condition, are unlawful. These policy conditions are outside the Department's sharply limited authority to administer the formula-driven Byrne JAG program, and are *ultra vires*.

They also violate the Spending Clause in myriad ways. And the notice and access conditions, which are premised on no statutory authority whatsoever, also contravene separation of powers principles.

### A. The Notice And Access Conditions Are Unlawful

#### 1. The Notice And Access Conditions Are *Ultra Vires*

Agency action must be authorized by statute. Consistent with basic separation of powers principles, Executive Branch agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013). Here, nothing in the Byrne JAG statute gives the Department authority to invent and impose novel new conditions on grant eligibility that would override local policy choices. Just the opposite: The text, structure, and purpose of the statute show that the Department has only limited authority in administering the Byrne JAG program.

The Department's lack of authority to impose the notice and access conditions is clear from the statutory text. Congress knows how to confer agency discretion to add substantive conditions to federal grants when it so desires. Indeed, in the larger statute that houses the Byrne JAG program, the Omnibus Crime Control and Safe Streets Act of 1968, Congress created a different grant program that expressly authorizes the Attorney General to "impose reasonable conditions on grant awards." 42 U.S.C. § 3796gg-1(e)(3). Congress frequently deploys such language in federal grant statutes when it wishes to authorize an agency to impose policy conditions. *See, e.g.*, 42 U.S.C. § 10305(a)(2) (Secretary can impose conditions he "considers to be in the best interest of the Nation"); 25 U.S.C. § 1652(b) (agency authorized to "include such conditions as the Secretary considers necessary to effect the purpose of this subchapter"); 42 U.S.C. § 1769e(b) (similar). Yet Congress provided no such authority in the Byrne JAG statute. Instead, the Byrne JAG statute provides the Attorney General with only limited, administrative powers, *e.g.*, 42 U.S.C. § 3752(a)

(Attorney General may specify the "form" of the application), and circumscribed authority to ensure that local programs that receive Byrne JAG funds have financial integrity and meet their own stated programmatic goals, *see id.* § 3752(a)(4) (Attorney General can "reasonably require" applicants to "maintain and report . . . data, records, and information (programmatic and financial)"); *id.* § 3751(c) (Attorney General must set guidelines for a "program assessment component" for Byrne JAG-funded programs). The statute's meaning is clear: Congress conferred discretion over format and matters of technical administration but withheld any open-ended authority to impose *substantive* policy conditions. *See Russello v. United States*, 464 U.S. 16, 23-24 (1983) ("Congress acts intentionally and purposely in the disparate inclusion or exclusion" of statutory text); *see also Jama v. ICE*, 543 U.S. 335, 341 (2005) (courts will not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply," especially where Congress has expressly included such text in the "same statute").

The Byrne JAG program's structure reinforces these strict statutory limitations. Congress designed the program as a formula grant, which divides up each year's appropriated funds according to a statutorily prescribed formula based on population and levels of violent crime. *See* 42 U.S.C. § 3755(d)(2)(A); *see also* Justice Assistance Grant (JAG) Program: FY 2017 Allocations, www.bja.gov/Programs/jag/17jagallocations.html (last visited Aug. 9, 2017). Formula grants like the Byrne JAG are *by definition* inconsistent with agency authority to impose substantive policy conditions: Such grants "are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("In the formula grant program the authorizing Act of Congress determines who the recipients are and how much money each shall receive." (citation omitted)). Tellingly, Congress has repeatedly considered, but never enacted, proposed legislation that would condition Byrne JAG funding on the adoption of local immigration enforcement policies. *See, e.g.*, Stop Sanctuary Cities

Act, S. 1814, 114th Cong. § 2(b)(2) (2015) (proposing removal of Byrne JAG funding); Enforce the

Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015) (directing Attorney General to

"withhold" Byrne JAG funding).

And the Attorney General's lack of authority to use the Byrne JAG program as a policy

cudgel is also evident in light of the Byrne JAG program's overarching purpose. Congress enacted

the Byrne JAG statute to "give State and local governments more flexibility to spend [federal]

money *for programs that work for them rather than to impose a 'one size fits all' solution.*"

H.R. Rep. No. 109-233, at 89 (emphasis added). Rather than impose detailed substantive conditions

or allow the Attorney General to do so, the grant provides recipients with significant flexibility by

asking that they use their funds for at least one of eight broadly defined purposes. *See* 42 U.S.C.

§ 3751(a)(1)(A)-(H) (noting that grants can be used for areas ranging from "[l]aw enforcement" to

"[d]rug treatment" to "[m]ental health"); *id.* § 3752(a)(6)(B) (requiring applications to "include a

description of how the State will allocate funding within and among" those uses"); *see also id.*

§ 3751(d) (providing a limited list of prohibited uses for Byrne JAG money, such as real estate and

"luxury items"). The Department itself has explained that "JAG funding may be used to support a

broad range of criminal justice activities/projects/programs." U.S. Dep't of Justice, Byrne JAG

Program Frequently Asked Questions 8 (2017), https://www.bja.gov/Funding/JAGFAQ.pdf.

Combined with its formula-based structure, the Byrne JAG program's overarching commitment to

defer to—and foster—local policy choices is even more apparent.

Nor does 42 U.S.C. § 3712(a)(6) provide the Department with the authority to impose policy

conditions on Byrne JAG funding, as the Department has claimed, *see* RJN Ex. M. Section 3712

enumerates the responsibilities of the Assistant Attorney General for the Office of Justice Programs

(the "AAG"). The section's final enumerated item is a catch-all: In addition to the responsibilities

expressly mentioned, the AAG must also carry out any "other powers and functions as may be

-12-

vested in [the AAG] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." 42 U.S.C. § 3712(a)(6). The AAG can thus exercise functions that are "vested in" the AAG, or otherwise "delegate[ed]" by the Attorney General. But there must be some independent source of statutory authority for the functions to be so vested or delegated in the first place. Section 3712 *assigns* existing authority, but does not *create* any new authority. Any reliance on Section 3712's mention of grant conditions will therefore fail: While imposing grant conditions is an example of the type of function that the AAG might exercise where otherwise authorized, here the Byrne JAG statute does not "vest[]" or "delegate" any authority at all to impose policy conditions.

For these reasons, the Attorney General's attempt to use Byrne JAG funding to control local policy decisions and policing priorities is flatly contrary to the text, structure, and purpose of the Byrne JAG statute as Congress wrote and designed it. Even if his policy aims were legally sound, Congress has given him no authority to impose them. *See, e.g., Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990) ("Where Congress prescribes the form in which an agency may exercise its authority, . . . we cannot elevate the goals of an agency's action . . . over that prescribed form."). The Attorney General's use of a grant program, intended by Congress to foster local policy choices, to enforce a new federal orthodoxy is *ultra vires* and should be enjoined.

### 2.    The Notice And Access Conditions Violate The Spending Clause

Even if Congress had given the Attorney General authority to create and impose policy conditions on grant recipients—and it did not—the notice and access conditions would violate the Spending Clause, which is constrained by federalism principles that protect local autonomy. For one, conditions on spending grants like the Byrne JAG must be "relevant," *Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275, 295 (1958), or "germane[]," *South Dakota v. Dole*, 483 U.S. 203, 207-208 & n.3 (1987), to the federal interest in a particular grant program. The required nexus between the

strictures of the condition and the purpose of the program ensures that the federal government cannot use spending conditions to foist general "regulation" on local governments. *N. Ill. Chapter of Assoc. Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir. 2005) ("Conditions on spending may become regulation if they affect conduct other than the financed project.").

Here, the sweeping tools for federal immigration enforcement imposed by the new conditions are not reasonably relevant to the objectives of the Byrne JAG program.[1]  As noted, the program combines substantial local discretion—giving local governments "more flexibility . . . rather than to impose a 'one size fits all' solution," H.R. Rep. 109-233, at 89—with a formula grant model. A policy condition that mandates a particular area of enforcement—and especially one that mandates expenditure of resources to enforce federal civil violations—will *undermine* the Byrne JAG's statutory goal of supporting flexible, locally driven policing and crime-reduction efforts.  In light of Congress's express rejection of a "one size fits all" approach with the Byrne JAG program, the Attorney General's effort to impose a top-down federal immigration enforcement program at the local level is an impermissible attempt to regulate conduct *outside* the Byrne JAG program entirely.  *Cf. USAID v. Alliance for Open Soc'y Int'l*, 133 S. Ct. 2321, 2328 (2013) (approving "conditions that define the limits of the government spending program" and prohibiting "conditions that seek to leverage funding to regulate . . . outside the contours of the program itself").

### 3.     The Notice And Access Conditions Would Impermissibly Force Chicago To Violate The Fourth Amendment

The notice and access conditions also violate the Spending Clause for another reason:  They seek to "induce [Chicago] to engage in activities that would themselves be unconstitutional." *Dole*,

---

[1] Moreover, the notice and access conditions extend far beyond any nexus with the "financed project." *Lavin*, 431 F.3d at 1006.  While some cities may use Byrne JAG funds to support immigration enforcement, Chicago does not.  Chicago uses Byrne JAG funds to replace worn-down police vehicles, to support community-based nonprofits operating in high-crime areas, and to acquire other necessary equipment. *See* Sachs Decl. ¶¶ 3-8. The Department's immigration enforcement conditions have no relationship to providing police with safe and effective patrol cars or improving the capacity of local community organizations.

483 U.S. at 210; *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003). Specifically, those conditions would require Chicago to violate the Fourth Amendment by postponing arrestees' constitutionally mandated probable cause hearing, or unjustifiably extending the detention of individuals who would otherwise be released from custody. The Department may not force Chicago to violate the Fourth Amendment as a condition of receiving Byrne JAG funds.

CPD takes pains to ensure that it complies with the Fourth Amendment for the entire time an arrestee is in its custody. When CPD makes a warrantless arrest, officers either transfer the arrestee to Cook County custody for a probable cause hearing in Circuit Court, release the arrestee on a recognizance bond, or release them without further process if no charges are filed; in all events, they do so as quickly as the requirements of initial processing and charging allow. *See* RJN Ex. L at 1 (individuals arrested without warrant must be released or given a probable cause hearing "without unnecessary delay"); *see also* Ill. Code Crim. Proc. § 109-1. "Under no circumstances" is a person arrested without a warrant to be released or transferred from City custody "any later than 48 hours from the time of arrest." RJN Ex. L at 1-2. Arrestees usually remain in City custody for less than 24 hours. *See* Hannigan Decl. ¶ 9. These policies are calibrated to ensure a "timely judicial determination of probable cause" prior to an extended detention. *Gerstein v. Pugh*, 420 U.S. 103, 126 (1975). The 48-hour rule in particular reflects the presumption that detaining an individual for a longer period prior to a judicial probable cause determination would be unreasonable under the Fourth Amendment. *See Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991).

The notice and access conditions would inject unreasonable delays into Chicago's existing booking, charging, and release processes by effectively requiring Chicago to hold arrestees longer than justified by the offense of arrest in order to permit DHS investigation into unrelated offenses. "Prolong[ing] custody without judicial scrutiny so that the police can undertake further investigative steps that require the presence of the defendant" is flatly inconsistent with the Fourth Amendment.

*Willis v. City of Chicago*, 999 F.2d 284, 289 (7th Cir. 1993). The 48-hour notice condition would require the City to presumptively violate the Fourth Amendment every time DHS requested notice for a non-citizen arrested without a warrant. In those circumstances, the only way Chicago could provide the requested 48 hours' notice would be by holding arrestees *longer* than *McLaughlin*'s presumptively reasonable 48 hours. Detention for longer than 48 hours without a judicial determination of probable cause is reasonable only where there is "an emergency or other extraordinary circumstance" justifying the delay. *Lopez v. City of Chicago*, 464 F.3d 711, 714 (7th Cir. 2006). Providing release notifications to DHS is neither "extraordinary" nor an "emergency." *See Arizona v. United States*, 567 U.S. 387, 413 (2012) ("[D]elay[ing] the release of some detainees for no reason other than to verify their immigration status . . . . would raise constitutional concerns.").

Even independent of *McLaughlin*'s 48-hour presumption, the notice condition would require detention beyond the period authorized by the Fourth Amendment in many instances. A warrantless arrest initially reasonable for Fourth Amendment purposes becomes unreasonable once the "mission" that occasioned the original seizure is complete. *See Illinois v. Caballes*, 543 U.S. 405, 476 (2005); *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) ("[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment . . . ."). Because Chicago is able to release nearly all arrestees within 24 hours, holding arrestees for more than 48 hours to comply with a DHS request for advance notice would require Chicago to hold individuals longer than necessary, and thus longer than allowed by the fact of their initial arrest. Doing so would violate detainees' Fourth Amendment rights unless supported by an independent finding of probable cause. *Willis*, 999 F.2d at 289; *see also Morales v. Chadbourne*, 793 F.3d 208, 218 (1st Cir. 2015).

The notice condition is not restricted to situations in which independent probable cause exists; rather, ***it applies each and every time*** "DHS requests such notice." RJN Ex. K at 30. Chicago would not have sufficient probable cause to detain every known non-citizen in its custody

for the 48-hour period DHS seeks. Were Chicago to comply with this inflexible federal mandate by holding non-citizens solely on the strength of a request for notice from DHS without regard to whether independent probable cause exists, it would regularly violate the Fourth Amendment. *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (seizure "remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop'" (citation omitted)).

The access condition is similarly problematic. Permitting DHS to question suspected non-citizens in Chicago's custody would inevitably extend the detention of at least some arrestees. For instance, an arrestee who would be released on a recognizance bond within a few hours of arrest might be held for additional time to permit questioning by DHS. Another might miss the daily shuttle to Circuit Court if she were being interrogated when the shuttle arrived. *Cf. Willis*, 999 F.2d at 286 (Fourth Amendment violation where arrestee held for an additional 24 hours because additional investigation ongoing at time of daily shuttle). Unlike permissible delays inherent in the booking and charging process, such as initial processing and arranging for transportation, delays to accommodate DHS interviews are neither "unavoidable" nor occasioned by "practical realities," *McLaughlin*, 500 U.S. at 56-57. Nor are they part of the "mission" of the initial arrest. *Cf. Rodriguez*, 135 S. Ct. at 1615. Those interviews cannot prolong detention unless independent probable cause exists, unrelated to the fact of the initial arrest. *See id.*; *Muehler v. Mena*, 544 U.S. 93, 101 (2005). But, as with the notice condition, the access condition contains no probable cause limitation, instead requiring on-demand access to "any" detention facility "in order to meet with an alien (or an individual believed to be an alien)." RJN Ex. K at 30. Complying would inevitably require Chicago to violate the Fourth Amendment.

### 4. The Notice And Access Conditions Violate The Separation Of Powers

Finally, in imposing the notice and access conditions, the Executive Branch has impermissibly sought to exercise power that the Constitution assigns exclusively to Congress.

Article I of the Constitution grants Congress, not the Executive, the Spending Clause power. U.S. Const. art. I, § 8, cl. 1; *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (line-item veto violates constitutional separation of powers principles); *Cty. of Santa Clara*, 2017 WL 1459081, at *21-*22. The President, accordingly, "does not have unilateral authority to refuse to spend . . . funds" that have been appropriated by Congress "for a particular project or program." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Train v. City of New York*, 420 U.S. 35, 44 (1975) (Executive lacked discretion to spend less than the full amount of funds authorized by Congress under 1972 statute). Yet that is exactly what the Department seeks to do here. When the Department withholds funds from an otherwise eligible Byrne JAG applicant solely because the applicant refuses to comply with the notice and access conditions of its own (rather than Congress's) invention, it refuses to distribute money that Congress has mandated be spent without regard to those conditions. *See supra* Part I.A.1 (discussing formula-based nature of Byrne JAG allocations).

The basic structural principles of our system—the separation of powers and federalism—are meant to provide "a double security . . . to the rights of the people." The Federalist No. 51 (Madison). Where the Executive arrogates to himself power that our Constitution reserves to Congress, and then uses that ill-gotten power to intrude on local self-government, he strikes at the twin foundations of our liberty. The separation of powers, which "preclude[s] the exercise of arbitrary power," *Myers v. United States*, 272 U.S. 52, 293 (1926) (Brandeis, J., dissenting), is thus particularly critical where federalism principles are threatened. It is "Congress" that must speak with "unmistakabl[e] cl[arity]" where the federal-state balance of power is at stake. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). The Department's end-run around Congress should be enjoined.

### B.     The Section 1373 Condition Is *Ultra Vires* And Unconstitutional

Like the notice and access conditions, the condition requiring grantees to certify compliance with Section 1373 contradicts Congress's formula-driven, locally responsive approach to Byrne JAG

funding. *See supra* Part I.A.1. And while the Department may argue that Byrne JAG grantees must certify compliance with "all applicable Federal laws," 42 U.S.C. § 3752(a)(5)(d), Section 1373 is not an "applicable" law under the Byrne JAG statute—and cannot be construed as one without violating the Constitution. Congress (not the Department or the Executive Branch) must speak with a clear voice when deploying conditions on spending grants. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18 (1981) (courts "must carefully inquire" whether Congress "imposed an obligation" on local government "as a condition of receiving federal moneys"). Yet neither Section 1373 itself nor the Byrne JAG statute authorize the Department to enforce Section 1373 through a certification condition on the Byrne JAG grant.

In the Byrne JAG statute, Congress could have authorized the Department to require compliance with "all Federal laws," but doing so would have made the grant and its certification regime a compliance mechanism for an enormous body of law. Like federal contractors, federal grantees can be "subject to thousands of complex statutory and regulatory provisions." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2002 (2016). Instead, in the Byrne JAG statute, Congress authorized the Department to require certifications only with "*applicable* federal laws." To do any work, the word "applicable" must have a limiting effect. And in light of *Pennhurst*'s clear statement rule, this limited set of "applicable" Federal laws must make clear to grant recipients that their receipt of money is conditioned on compliance. 451 U.S. at 18.

There is a set of laws that fits this description exactly: the specialized body of statutes that govern federal grantmaking. Congress has passed a range of laws that *by their own terms* are applicable specifically to recipients of federal funds and enforceable by cutting off those funds. *See, e.g*, 42 U.S.C. § 2000d (condition applies to "any program or activity receiving Federal financial assistance"); 29 U.S.C. § 794(a) (same); 42 U.S.C. § 6102 (same). Those are the statutes to which "all applicable Federal laws" refers. Indeed, that appears to be the view the Department itself has taken

for all certifications except with respect to Section 1373. Of the more than a dozen laws about which the Department requires Byrne JAG grantees to make certifications, RJN Ex. K at 41, every one *except* Section 1373 is a law that applies only as a condition of receiving federal funds. *Pennhurst*'s clear statement rule is met for those statutes. By contrast, both *Pennhurst* and rules of statutory construction forbid interpreting "all applicable Federal laws" to include laws that, like Section 1373, do not even suggest that they can be enforced as a condition of receiving federal funds.[2]

And there is another reason why Chicago cannot be made to certify compliance with Section 1373 as a condition for receiving Byrne JG funds: Section 1373 constitutes facially unconstitutional commandeering. Like other federal laws that infringe on the inherent sovereignty of states and local governments, the "whole object" of Section 1373 "is to direct the functioning" of state and local governments. *Printz v. United States*, 521 U.S. 898, 932 (1997). Congress enacted Section 1373 on the belief that "[e]ffective immigration law enforcement requires a cooperative effort between all levels of government." S. Rep. No. 104-249, at 19 (1996). It then mandated this "cooperative effort," "requir[ing] [state and local officers] to provide information that belongs to the State and is available to them only in their official capacity," *Printz*, 521 U.S. at 932 n.17, and "requir[ing] state officials to assist in the enforcement of federal statutes regulating private individuals," *Reno v. Condon*, 528 U.S. 141, 151 (2000). This is a classically impermissible federal intrusion in local matters.

Section 1373 is particularly problematic because it prohibits state and local governments from engaging in a core aspect of governing: controlling the actions of their employees. States define their sovereignty "[t]hrough the structure of [their] government, and the character of those

---

[2] Even if the Byrne JAG statute did authorize the Department to require Chicago to certify that it complies with Section 1373—and it does not—Chicago does comply. *See* RJN Ex. G. This is so for two reasons. First, Chicago generally prohibits collection of the "immigration status information" contemplated by Section 1373. *See* RJN Ex. E, § 2-173-020; RJN Ex. N (CPD Special Order S06-14-03); *see also* RJN Ex. O at 2. The City therefore cannot, as a practical matter, restrict the sharing of information it does not possess. Second, the WCO *allows* intergovernmental sharing of such information when "otherwise provided under applicable federal law." RJN Ex. E, § 2-173-030.

who exercise government authority." *Gregory*, 501 U.S. at 460. Personnel decisions—including decisions about how state and local personnel interact with the federal government—are "of the most fundamental sort" for Chicago. *Id.* Section 1373's prohibitions usurp policymaking processes, requiring local governments to "follow the direction of Congress" in passing ordinances or adopting policies, *New York v. United States*, 505 U.S. 144, 177 (1992), rather than "promulgat[ing] [ordinances or policies] of [their] choosing," *FERC v. Mississippi*, 456 U.S. 742, 761 (1982). Section 1373 exceeds the powers granted to the federal government under our Constitution.

## II.    CHICAGO WILL BE IRREPARABLY HARMED ABSENT PRELIMINARY RELIEF

The application for FY 2017 Byrne JAG funds is due on September 5, 2017; Chicago has less than a month to decide whether it will apply for a grant that includes the Department's ultimatum. If Chicago capitulates to the Department's demands, it jeopardizes the trust and cooperation between law enforcement and immigrant communities that it has strived to build over decades and will be forced to violate the constitutional rights of arrestees. But if it asserts its sovereignty and stands by its policies, Chicago (and eleven localities that depend on its application) will forfeit millions of dollars of funds to supply their police with crucial, sometimes lifesaving equipment and support outreach programs vital to maintaining community-police relations.

Chicago suffers an irreparable harm to its sovereignty simply from being put to that choice. The Tenth Amendment guarantees Chicago the right to basic self-government. *E.g.*, *New York*, 505 U.S. at 177. That right is violated equally when the federal government "indirectly coerces" Chicago to adopt a policy as when it "directly commands" Chicago to: The "pressure" to "accept policy choices" itself is the incursion on Chicago's sovereignty. *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578, 580 (2012). And because money cannot compensate a sovereign for being denied the right to determine its own destiny, where "sovereign interests and public policies [are] at stake, . . . the harm the State stands to suffer [is] irreparable." *Kansas v. United States*, 249 F.3d 1213, 1227 (10th

Cir. 2001); *see also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (explaining that, in certain cases of "constitutional violations," "irreparable harm is presumed"). Accordingly, violations of local sovereignty are uniformly remedied by striking the offending law, not by ordering a cash payment. *See, e.g.*, *Nat'l Fed. of Indep. Bus.*, 567 U.S. at 587. Because the injury arises from being put to the choice, rather than from the consequences of any particular decision, the choice itself must be enjoined to prevent constitutional injury. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058-1059 (9th Cir. 2009) (irreparable harm exists when entity put to "a stark choice—either violation of their constitutional rights or loss of their" income source); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 380-381 (1992) (irreparable harm where entity "faced with a Hobson's choice": "violate the . . . law and expose themselves to potentially huge liability" or "suffer the injury of obeying the law"); *Cty. of Santa Clara*, 2017 WL 1459081, at *27-*28 ("By forcing the Counties to make this unreasonable choice, the Order results in … irreparable harm.")

The damage to its sovereignty is not the only injury Chicago stands to suffer. If Chicago accedes to the Department's demands, that decision to break faith with the immigrant community would eviscerate goodwill that the City's officers have carefully cultivated for a generation. Such trust, once lost, cannot be resurrected by a money judgment down the line. CPD officers know from their work on the ground that trust is an invaluable crimefighting tool. *See, e.g.*, Hannigan Decl. ¶¶ 4-5. Capitulating to the Department's demands risks a massive setback to Chicago's policing.

Alternatively, if Chicago refuses the Department's coercive conditions, it forfeits its FY 2017 funds. Indeed, the Byrne JAG statute indicates that those monies are not merely forgone, but divvied up and parceled out to other jurisdictions around the country, impossible for Chicago to later reclaim. *See* 42 U.S.C. § 3755. And even if they could be recovered, significant, irreversible harm will have been done in the meantime.

An organization is irreparably injured when a loss of income forces it to "shut down" its activities. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Courts routinely find irreparable harm when an impending withdrawal of funding threatens to cause cuts to services or employees. *See, e.g.*, *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 980 (7th Cir. 2012).[3] The loss of Byrne JAG funds will trigger just such an impact. CPD's Force for Good Program, for instance, which partners with local nonprofit groups working to reduce violence in the City's most crime-ridden neighborhoods, is funded exclusively with Byrne JAG dollars and would likely be cancelled without them. *See* Sachs Decl. ¶¶ 6, 9. The Byrne JAG program is also the sole source of funds for a full-time CPD employee who manages more than forty sub-grants issued by Chicago. *Id.* ¶¶ 8-9. And each year, Chicago counts on Byrne JAG funds to purchase dozens of police vehicles "vital to the Department's community policing strategy," Worseck Decl. Ex. I at 1—1,000 vehicles since the Byrne JAG program started. *See* Sachs Decl. ¶ 4. As CPD's Director of Grants Management explained, "short of taking away officer uniforms and weapons, nothing would more negatively impact CPD operations" than losing those vehicles. *Id.*

This detrimental impact is not limited to Chicago. Under 42 U.S.C. § 3755, Chicago is obligated to apply for Byrne JAG funds not only for itself, but also for eleven neighboring localities. Each of those other jurisdictions also uses Byrne JAG monies to fund critical police operations. The Town of Cicero, for instance, used its FY 2016 Byrne JAG funds to purchase "crime fighting equipment" to aid its officers "in their high-risk searches and gang activity control." Worseck Decl. Ex. I at 4. The Village of Skokie similarly directed some of its FY 2016 Byrne JAG funds toward acquiring (among other things) "portable stretchers" for use in "critical incident scenes." *Id.* at 10-11. The loss of FY 2017 funding threatens residents and officers across the entire region.

---

[3] *See also Planned Parenthood Gulf Coast, Inc. v. Kliebert*, 141 F. Supp. 3d 604, 649-650 (M.D. La. 2015), *aff'd*, 862 F.3d 445 (5th Cir. 2017); *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868, 886 (D. Ariz. 2012); *Planned Parenthood of Cent. N.C. v. Cansler*, 804 F. Supp. 2d 482, 499 (M.D.N.C. 2011).

Moreover, the loss of FY 2017 Byrne JAG funds would come too late in Chicago's budget process for the City to replace the missing federal dollars. *See* Sachs Decl. ¶ 13. Work on the 2018 budget, which has been underway for months, is rapidly approaching completion, and there is not enough time left for the City to push through a sudden increase. *Id.* CPD will be left without millions of dollars they had counted on for essential equipment and programs. *Id.* Post-judgment damages will not be able to undo the harm to public trust and community-police relations that will occur when the withholding of Byrne JAG funds means that vital police services are lost or neighborhood anti-violence groups defunded. *See Cty. of Santa Clara*, 2017 WL 1459081, at *27 (finding irreparable harm where "[t]he threat of the [Executive] Order [targeting sanctuary jurisdictions] and the uncertainty it is causing impermissibly interferes with the Counties' ability to operate, to provide key services, to plan for the future, and to budget").

The budgetary uncertainty caused by the Department's new conditions is only compounded by the confusion over the Section 1373 condition, where, in response to the certifications of Chicago and other jurisdictions, the Department has issued cryptic statements suggesting some jurisdictions would be held in violation, *see* RJN Ex. H, issued letters of approval to a few jurisdictions that contain no legal rule or guidance, RJN Exs. P-Q, and meanwhile never responded to Chicago at all. Preliminary relief is required so that Chicago may plan its affairs and govern.

In the *Santa Clara* case, the court found that a generalized executive order posed a sufficient threat of irreparable harm to justify a preliminary injunction based both on a forced choice between funding and constitutional rights and on budgetary uncertainty. *See* 2017 WL 1459081, at *26-*28. Here, the case for irreparable harm is stronger. Chicago faces an imminent deadline under a specific policy, after which, unless it abandons its constitutional rights, it will forfeit congressionally allotted Byrne JAG funds that are already built into the City budget. Only injunctive relief can prevent the imminent harms posed by the Department's unlawful conditions.

## III.     THE EQUITIES AND THE PUBLIC INTEREST FAVOR PRELIMINARY RELIEF

Chicago's interest in its sovereignty and its citizens' interest in community policing far outweigh the Department's interest in enforcing its unconstitutional grant conditions.  After all, "enforcement of an unconstitutional law is always contrary to the public interest."  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *accord Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

Numerous other factors weigh in favor of an injunction here.  First, Chicago and its people have an independent interest in an injunction that protects local autonomy:  "State sovereignty" is among the most fundamental of the Constitution's protections; it "is not just an end in itself," but a guarantee that "secures to citizens the liberties that derive from the diffusion of sovereign power." *Bond v. United States*, 564 U.S. 211, 221 (2011).  No less important, millions of Chicagoans have a vital interest in the type of strong relations between CPD and immigrant communities—and the public safety benefits that flow from those relations—that the Welcoming City policy promotes.  And both the City and its residents (in addition to the eleven other localities whose Byrne JAG funds would be withheld along with Chicago's, *see* Sachs Decl. ¶ 11; *see also, e.g.*, Worseck Decl. Ex. I at 1) have an interest in ensuring that the dollars Congress chose to allocate to them are put to use on vital public safety needs rather than redistributed away.  That interest is even more acute here, where it is too late in the budgeting cycle for Chicago to make up for the shortfall, putting crucial programs at risk. *See* Sachs Decl. ¶ 13.  Injunctive relief is particularly appropriate where, as here, it protects not just the plaintiff, but those whom the plaintiff serves.  *See Planned Parenthood of Ind.*, 699 F.3d at 981.

On the other side of the ledger, the Department's attack on so-called "sanctuary cities" is factually groundless, *e.g.*, Worseck Decl. Ex. H at 9-10, 30, and the Byrne JAG program has existed for over a decade without these or any substantive policy conditions.  No interest in securing local compliance with the Administration's immigration policy can justify the damage to the Constitution, federalism, and public safety that Chicago faces from the Department's unlawful conditions.

## CONCLUSION

The motion for a preliminary injunction should be granted.


August 10, 2017.

JAMIE S. GORELICK (*pro hac* vice pending)
DAVID W. OGDEN (*pro hac vice* pending)
ARI HOLTZBLATT (*pro hac vice* pending)
ARI SAVITZKY (*pro hac vice* pending)
MOLLY JENNINGS (*pro hac vice* pending)
BRIDGET FAHEY* (*pro hac vice* pending)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000


DEBO P. ADEGBILE (*pro hac vice* pending)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800


* Admitted to practice only in Colorado.
Supervised by members of the firm who are
members of the District of Columbia Bar

Respectfully Submitted,

By  /s/ Edward N. Siskel
EDWARD N. SISKEL
Corporation Counsel of the City of Chicago
JUSTIN A. HOUPPERT
Assistant Corporation Counsel
SCOTT D. SPEARS
Assistant Corporation Counsel
121 N. LaSalle Street, Suite 600
Chicago, IL 60602
(312) 744-0220
edward.siskel@cityofchicago.org

ANDREW W. WORSECK
Chief Assistant Corporation Counsel
30 N. LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-0220

RONALD S. SAFER
MATTHEW C. CROWL
NICK KAHLON
LAURA KLEINMAN
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700


*Attorneys for the City of Chicago*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 10, 2017, I caused the foregoing to be electronically transmitted to opposing counsel at the email addresses listed below.

Steven Buckingham, SBucking@civ.usdoj.gov

John Tyler, JTyler@civ.usdoj.gov

Thomas Walsh, Thomas.Walsh2@usdoj.gov

<u>  /s/    Edward N. Siskel    </u>