**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| THE CITY OF CHICAGO,<br><br>                      Plaintiff,<br><br>    v.<br><br>JEFF SESSIONS, Attorney General of the<br>United States,<br><br>                 Defendant. | No. 1:17-cv-05720<br><br>Judge Leinenweber |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION**
**FOR PRELIMINARY INJUNCTION**

CHAD A. READLER
Acting Assistant Attorney General

JOEL R. LEVIN
Acting United States Attorney

JOHN R. TYLER
Assistant Director

STEPHEN J. BUCKINGHAM
Special Counsel

W. SCOTT SIMPSON
ARJUN GARG

Attorneys, Department of Justice
Civil Division, Room 7210
Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044
Telephone:    (202) 514-3330
Facsimile:    (202) 616-8470
E-mail:  stephen.buckingham@usdoj.gov

COUNSEL FOR DEFENDANT

**Table of Contents**

INTRODUCTION ............................................................................................................ 1

STATUTORY AND ADMINISTRATIVE BACKGROUND ...................................... 4

    The Immigration and Nationality Act ................................................................ 4

    OJP and the Byrne JAG Program ..................................................................... 6

    The Byrne JAG Program Grant Application and Approval Process ................... 7

    Additional Conditions Contemplated for FY 2017 Byrne JAG Program ............ 8

ARGUMENT ................................................................................................................ 9

    I.    The City Is Unlikely to Succeed on the Merits of Its Claims ...................... 10

        A.    The Challenged Conditions Are Consistent with the Governing Statutes and the Constitutional Separation of Powers. .................................................. 10

            1.    Federal Statutes Authorize Imposition of the Challenged Conditions ............ 11

            2.    The City Is Unlikely to Succeed on Its *Ultra Vires* Claim. ........................... 15

            3.    The City Is Unlikely to Succeed on Its Separation of Powers Claim ............. 16

        B.    The Custody Release and Correctional Facility Access Conditions Are Consistent with the Spending Clause. ...................................................... 17

    II.    The City Has Not Shown a Likelihood of Irreparable Harm Absent Preliminary Relief. .......................................................................................... 22

    III.    The Public Interest and the Balance of Equities Militate Against a Preliminary Injunction. .................................................................................... 25

    IV.    Any Preliminary Injunction Should Be Limited in Scope ........................... 26

CONCLUSION ............................................................................................................ 27

## Table of Authorities

### Cases

*Am. Hosp. Ass'n v. Harris*,
  625 F.2d 1328 (7th Cir. 1980) ............................................................. 23

*Am. Hosp. Ass'n v. Schweiker*,
  721 F.2d 170 (7th Cir. 1983) ............................................................... 24

*Ameron, Inc. v. U.S. Army Corps of Engineers*,
  809 F.2d 979 (3d Cir. 1986) ............................................................... 16

*Arizona v. United States*,
  567 U.S. 387 (2012) ......................................................................... 4, 5

*Barbour v. Washington Metro. Area Transit Auth.*,
  374 F.3d 1161 (D.C. Cir. 2004) .......................................................... 18

*Cause of Action Inst. v. Eggleston*,
  224 F. Supp. 3d 63 (D.D.C. 2016) ...................................................... 11

*Charles v. Verhagen*,
  220 F. Supp. 2d 955 (W.D. Wis. 2002) ............................................... 17

*Charles v. Verhagen*,
  348 F.3d 601 (7th Cir. 2003) ...................................................... 3, 17, 19

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ........................................................................... 21

*Clinton v. City of New York*,
  524 U.S. 417 (1998) .......................................................................... 16

*ConverDyn v. Moniz*,
  68 F. Supp. 3d 34 (D.D.C. 2014) ........................................................ 22

*Cornish v. Dudas*,
  540 F. Supp. 2d 61 (D.D.C. 2008) ...................................................... 24

*Ditton v. Rusch*,
  2014 WL 4435928 (N.D. Ill. Sep. 9, 2014) .......................................... 21

*DKT Mem'l Fund Ltd. v. AID*,
  887 F.2d 275 (D.C. Cir. 1989) .................................................... 3, 11, 16

*Florida Dep't of State v. Treasure Salvors, Inc.*,
  458 U.S. 670 (1982) .......................................................................... 14

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) .......................................................................... 24

ii

*Jones v. Markiewicz-Qualkinbush*,
  842 F.3d 1053 (7th Cir. 2016) ................................................................... 10

*Larson v. Domestic & Foreign Commerce Corp.*,
  337 U.S. 682 (1949) ................................................................................... 15

*Lewis v. Casey*,
  518 U.S. 343 (1996) ................................................................................... 25

*Logansport Mach. Co. v. Neidlein-Spannzeuge GmbH*,
  2012 WL 1877854 (N.D. Ind. May 22, 2012) ........................................... 23

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ................................................................................... 25

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ................................................................... 18

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ..................................................................................... 9

*McDavid Knee Guard, Inc. v. Nike USA, Inc.*,
  683 F. Supp. 2d 740 (N.D. Ill. 2010) ........................................................ 23

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ................................................................................... 25

*N. Illinois Chapter of Associated Builders & Contractors, Inc. v. Lavin*,
  431 F.3d 1004 (7th Cir. 2005) ................................................................... 17

*N.Y. v. United States*,
  179 F.3d 29 (2d Cir. 1999) ........................................................................ 14

*N. Arapaho Tribe v. Burwell*,
  90 F. Supp. 3d 1238 (D. Wyo. 2015) ........................................................ 24

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  132 S. Ct. 2566 (2012) ............................................................................... 22

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................... 24

*Pennhurst State Sch. & Hosp. v. Halderman*,
  465 U.S. 89 (1984) ........................................................................... 3, 14, 15

*PepsiCo, Inc. v. Redmond*,
  54 F.3d 1262 (7th Cir. 1995) ..................................................................... 25

*Petzel v. Kane Cty. Dep't of Transp.*,
  2017 WL 2880880 (N.D. Ill. July 6, 2017) ............................................... 15

*Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*,
  699 F.3d 962 (7th Cir. 2012) ..................................................................... 23

iii

*Rivas v. Martin*,
    781 F. Supp. 2d 775 (N.D. Ind. 2011) ................................................................. 21

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ........................................................................... 9

*S. Dakota v. Dole*,
    483 U.S. 203 (1987) ........................................................... 13, 15, 17, 19

*Sec'y of Labor v. Fitzsimmons*,
    805 F.2d 682 (7th Cir. 1986) ..................................................................... 4, 24

*Sofinet v. I.N.S.*,
    188 F.3d 703 (7th Cir. 1999) ..................................................................... 4, 24

*Thomas v. City of Peoria*,
    580 F.3d 633 (7th Cir. 2009) ........................................................................... 21

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    136 S. Ct. 1807 (2016) ................................................................................. 15

*United States v. Berkos*,
    543 F.3d 392 (7th Cir. 2008) ........................................................................... 12

*United States v. Salerno*,
    481 U.S. 739 (1987) ..................................................................................... 14

*Winter v. National Resources Defense Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................... 10, 24

**<u>Statutes</u>**

5 U.S.C. § 704 ................................................................................................. 15

8 U.S.C. §§ 1101-1108 ........................................................................................ 5

8 U.S.C. § 1226(a) ............................................................................................ 21

8 U.S.C. § 1227(a) ............................................................................................. 5

8 U.S.C. § 1228 ............................................................................................... 5

8 U.S.C. § 1252c ............................................................................................. 19

8 U.S.C. § 1324(c) ........................................................................................... 19

8 U.S.C. § 1357(a) ......................................................................................... 5, 12

8 U.S.C. § 1357(g) ........................................................................................... 18

8 U.S.C. §1373 ......................................................................................... passim

42 U.S.C. § 2000cc-1(a) ...................................................................................... 17

42 U.S.C. § 3711 .................................................................................................... 6

42 U.S.C. § 3712 ........................................................................................... passim

42 U.S.C. §§ 3750-3758 ................................................................................ passim

## **Regulations**

2 C.F.R. § 200.203 ............................................................................................ 7, 9

2 C.F.R. § 2800.101 .............................................................................................. 7

## **Other Authorities**

City of Chicago, *2016 Budget Overview,*
    https://www.cityofchicago.org/content/dam/city/depts/obm/supp_info/2016Budget/2016Budg
    etOverviewCoC.pdf .......................................................................................... 22

Chicago Data Portal, *Number of Employees by Department*,
    https://data.cityofchicago.org/ Administration-Finance/ Number-of-Employees-by-
    Department-Based-on-Current/atdi-52tt ........................................................ 23

Consolidated Appropriations Act, 2017, Pub. L. 115-31 ........................................ 7

ICE Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers
    (Mar. 24, 2017), https://www.ice.gov/detainer-policy .................................. 21

Mem. from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen.,
    Office of Justice Programs, Department of Justice Referral of Allegations of Potential
    Violations of 8 U.S.C. § 1373 by Grant Recipients (May 31, 2016),
    https://oig.justice.gov/reports/2016/1607.pdf ................................................. 8

OJP Grant Process Overview,
    https://ojp.gov/funding/Apply/GrantProcess.htm ........................................... 7

OJP Guidance Regarding Compliance with 8 U.S.C. 1373,
    https://www.bja.gov/funding/8uscsection1373.pdf ........................................ 2

Omnibus Crime Control and Safe Streets Act of 1968 Pub. L. 90-351,
    82 Stat. 197 ..................................................................................................... 6

U.S. Const. Art. I, § 8, cl. 1 ........................................................................... 15, 16

Welcoming City Ordinance § 2-173-042(c) ......................................................... 21

## INTRODUCTION

The Department of Justice distributes federal grant funds to aid law enforcement in jurisdictions throughout the country. These funds serve to aid both local and cooperative law enforcement priorities. Consistent with federal prerogatives, the Department has long imposed conditions on these grants, including on the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program").

One such cooperative priority for the Department is the enforcement of a lawful system of immigration, including the removal of aliens who have committed crimes. Accordingly, the Department notified applicants that the Fiscal Year ("FY") 2017 Byrne JAG Program grants will include conditions that require modest cooperation with federal law enforcement prerogatives in the immigration setting. Those conditions will require grant recipients (1) to certify their compliance with a federal statute, 8 U.S.C. §1373, which prohibits local government and law enforcement entities or officials from restricting certain communications with the Department of Homeland Security ("DHS") ("the Section 1373 compliance condition"); (2) to ensure that certain federal officials are permitted access to state or local correctional facilities for certain immigration enforcement purposes ("the correctional facility access condition"); and (3) to ensure that certain federal officials are provided advance notice of the scheduled release date of certain individuals held in state or local correctional facilities ("the custody release condition"). *See generally* Declaration of Alan R. Hanson ("Hanson Decl.") (attached as Ex. 1).

The City of Chicago ("the City") has repeatedly objected to cooperating fully with requests from the federal government relating to the enforcement of the nation's immigration laws, and it has adopted ordinances, policies, and practices that frustrate the federal government's ability to remove criminal aliens from the country. In addition to avoiding

cooperative efforts through its own, local policies, the City now seeks to do the same with respect to federal prerogatives, asking the Court to enjoin the Department from imposing immigration-related law enforcement conditions on the receipt of *federal dollars*. The City's position would, in essence, allow the City, not the Department, to determine the conditions associated with a federal grant that Congress has authorized the Department to award. The City's position contravenes clear statutory language authorizing the Department to condition Byrne JAG Program funding, and ignores the close relationship between the federally-imposed conditions and federal law enforcement prerogatives.

For these reasons and others, the City has not carried its burden to establish a compelling basis for preliminary injunctive relief against the Department. The City is unlikely to succeed on the merits of the claims asserted in its motion. The City's claims of *ultra vires* agency action and violation of the constitutional separation of powers fail because Congress has expressly authorized the Assistant Attorney General ("AAG") for DOJ's Office of Justice Programs ("OJP") to impose the challenged conditions; the AAG enjoys statutory authority to "plac[e] special conditions on all grants," and to "determin[e] priority purposes for formula grants." 42 U.S.C. § 3712(a)(6). With respect to Section 1373 in particular, the City is independently required to comply with federal law (including Section 1373) regardless whether it accepts federal grant funding, and, in any event, Congress has separately authorized the Department to require grantees in the Byrne JAG Program to comply with "all . . . applicable Federal laws," of which Section 1373 is one. *Id*. § 3752(a)(5); *see also* OJP Guidance Regarding Compliance with 8 U.S.C. § 1373, *available at* https://www.bja.gov/funding/8uscsection1373.pdf. The Department is thus not "without any authority whatever," to impose the challenged conditions, nor does the imposition of the conditions violate the constitutional separation of powers.

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984); *see also DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

The City also is unlikely to succeed on its Spending Clause challenge. The Byrne JAG Program and the challenged conditions "share[] the same goal," and thus meet the relatedness requirement of the Spending Clause. *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003). OJP and the grant programs it administers are designed to strengthen law enforcement and to "maintain liaison" among the various branches of government "in matters relating to criminal justice." 42 U.S.C. § 3712(a)(2). The challenged conditions emanate from "the Department of Justice's top priority of reducing violent crime" and the "long-established cooperative principles among law enforcement agencies." *See, e.g.*, News Release, *Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs* (Jul. 25, 2017) ("AG News Release"), *reprinted in* Pl's Req. Jud. Notice, Ex. I (ECF No. 26-9). The conditions fit comfortably within the general relatedness requirement of the Spending Clause.

Nor can the City show that the challenged conditions would require the City to violate the Fourth Amendment (or any other constitutional provision, for that matter). As is evident from the language of the conditions, which the Department has provided to certain units of local government that have applied to the FY 2017 Byrne JAG Program, nothing in the challenged conditions would require the City to detain any individual "beyond the date and time the individual would have been released in the absence of [the] condition." *See, e.g.*, Byrne JAG Program Grant Award for County of Greenville, SC at ¶¶ 55-56 (attached as Ex. A to the Hanson

3

Decl.).    Thus, the City is unlikely to succeed on its claim that the challenged conditions will require it to violate the Fourth Amendment.

The City likewise fails to establish the irreparable harm needed for preliminary relief, as the harm it alleges is neither immediate nor substantial.  The City faces no immediate deadline for consenting to the challenged conditions because it has not applied to participate in the FY 2017 Byrne JAG Program, and the Department has not issued grant award documents to the City.  Should the City apply and receive award documents, it will still have 45 days to review them and the specific grant conditions therein, before determining whether to accept or reject the funding.  The City's allegations of substantial harm are similarly insufficient; the funding at issue under the program amounts to less than one tenth of one percent of the City's budget. Accordingly, the City has not established the irreparable harm needed for preliminary relief.

The public interest and the balance of equities also militate against preliminary relief. "[T]he United States has an interest in enforcing federal law," *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 693 (7th Cir. 1986) (*en banc*) (emphasis omitted), including the "speedy and effective enforcement of the immigration laws."  *Sofinet v. I.N.S.*, 188 F.3d 703, 708 (7th Cir. 1999).  The challenged conditions are designed to promote those interests and to effectuate the Department's mission of reducing crime and illegality and promoting law enforcement cooperation. *See generally* Declaration of Jim Brown ("Brown Decl.") (attached as Ex. 2).  Those interests far outweigh the City's speculative allegations of public harm.

## STATUTORY AND ADMINISTRATIVE BACKGROUND

### The Immigration and Nationality Act

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."  *Arizona v. United States*, 567 U.S. 387, 394 (2012).

4

Through the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101-07, Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States. The INA authorizes DHS, the Department of Justice, and other Executive Branch agencies to administer and enforce the immigration laws. Likewise, the INA permits the Executive Branch to exercise considerable executive discretion to direct enforcement pursuant to federal policy objectives. *See*, *e.g.*, *Arizona*, 567 U.S. at 396.

The INA includes several provisions that protect the ability of federal officials to investigate the status of non-citizens in the United States and otherwise enforce the immigration laws. For example, the statute provides that a federal immigration officer "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1). Separately, pursuant to 8 U.S.C. § 1373, "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a).[1] The INA provides that certain classes of non-citizens shall be removed from the United States upon the order of the Attorney General or the Secretary of Homeland Security. *See*, *e.g.*, *id.* §§ 1227(a), 1228.

---

[1] Additionally, 8 U.S.C. § 1373(b) provides that "[n]otwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity."

## **OJP and the Byrne JAG Program**

Title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, established OJP and provides for it to be headed by an Assistant Attorney General. *See* Pub. L. No. 90-351, 82 Stat. 197, *codified as amended at* 42 U.S.C. § 3711. Congress provided the AAG certain "specific, general and delegated powers," including the power to "publish and disseminate information on the conditions and progress of the criminal justice systems" and "maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice." *Id.* §§ 3712(a)(1), (2). The AAG shall also "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants.*" *Id.* § 3712(a)(6) (emphasis added).

The Omnibus Crime Control Act also established the Byrne JAG Program. *See generally* 42 U.S.C. §§ 3750-3758. Under this program, OJP is authorized to –

> make grants to States and units of local government . . . to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of [certain enumerated] programs.

*Id.* § 3751(a)(1). The Byrne JAG Program is a formula grant program, under which funds are made available pursuant to a statutory formula based on population, the rate of violent crime, and other factors. *Id.* §§ 3751(a)(1), 3755.

To request funds under the Byrne JAG Program, applicants must "submit an application to the Attorney General . . . in such form as the Attorney General may require." *Id.* § 3752(a). Congress provided that these applications must include, among other things, "[a] certification, made in a form acceptable to the Attorney General, . . . that . . . the applicant will comply with all provisions of this part and *all other applicable Federal laws.*" *Id.* § 3752(a)(5) (emphasis added). Before issuing a final disapproval of an application under the Byrne JAG Program, the

Attorney General must "first afford[] the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration." *Id.* § 3753.

Funding under the Byrne JAG Program is subject to annual appropriations. For FY 2017, Congress appropriated $396,000,000 for the Byrne JAG Program, with certain carve-outs from that amount obligated to specific initiatives. *See* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135 (2017).

## The Byrne JAG Program Grant Application and Approval Process

The federal grant-making process, including the issuance of Byrne JAG Program grants, contains several steps. The awarding agency typically issues a solicitation that contains "sufficient information to help an applicant make an informed decision about whether to submit an application." *See generally* Office of Management and Budget Guidance for Grants and Agreements ("OMB Uniform Guidance"), 2 C.F.R. § 200.203(c)(2);[2] *see also* OJP Grant Process Overview, *available at* https://ojp.gov/funding/Apply/GrantProcess.htm. Applicants respond to the solicitation by submitting an application in the form specified and with the relevant information requested. *See generally* OJP Grant Process Overview. The deadline for local units of government to submit FY 2017 Byrne JAG Program applications is September 5, 2017. *See* Byrne JAG Program, FY 2017 Local Solicitation, *reprinted in* Pl's Req. for Jud. Notice at 2, Ex. K (ECF No. 26-11).

For grants administered by OJP and its subcomponents, OJP engages in a multi-factored review of each application and, for those applications that are approved, OJP generates an award package that is transmitted to the applicant. *See generally* OJP Grant Process Overview. Applicants typically have 45 calendar days to accept the award documents, during which time the applicant has an opportunity to "[r]eview the special conditions on the award documents[.]" *Id.* Throughout the course of the grant period, OJP monitors compliance with the terms and

---

[2] The Department of Justice has adopted the OMB Uniform Guidance through regulation, with limited exceptions. *See* 2 C.F.R. § 2800.101.

7

conditions of the award and, ultimately, the grantee and OJP engage in certain activities to complete relevant closeout requirements for each award. *Id.*

In past years, OJP has included a variety of special conditions in the Byrne JAG Program grant award documents, including, for example, conditions requiring the grantee to comply with regulations pertaining to civil rights and nondiscrimination, conditions requiring that body armor purchased with grant funding meet certain minimum quality standards, and conditions designed to encourage grantees to adopt policies banning employees from text messaging while driving on duty. Indeed, for FY 2016, the Chicago/Cook County award included fifty-two special conditions, none of which generated objections or legal challenges from the City. *See, e.g.*, FY 2016 Chicago/Cook County JAG Program Grant Award (Sept. 7, 2017) at 2-13 (attached as Ex. C to the Hanson Decl.). In FY 2016, OJP included for the first time an explicit recognition that Section 1373 was an applicable federal law under the Byrne JAG Program. *Id.* at 13. That recognition was prompted by a memorandum issued by the Department of Justice's Inspector General on May 31, 2016, expressing concern that several state and local governments receiving federal grants may not be complying with Section 1373. *See* Mem. from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen., Office of Justice Programs, Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients (May 31, 2016), *available at* https://oig.justice.gov/reports/ 2016/1607.pdf. Although the Inspector General observed that applications of certain local ordinances might be inconsistent with Section 1373, *id.* at 4-8, the report made clear that "no one at DHS . . . has made a formal legal determination whether certain state and local laws or policies violate Section 1373, and we are unaware of any Department of Justice decision in that regard." *Id.* at 8 n.12.

### Additional Conditions for the FY 2017 Byrne JAG Program

In July 2017, OJP published a solicitation seeking applications from units of local government for participation in the FY 2017 Byrne JAG Program. *See* Byrne JAG Program, FY 2017 Local Solicitation (ECF No. 26-11). That solicitation notified potential applicants that the grant award documents for FY 2017 would contain two new special conditions, in addition to the

8

requirement to certify compliance with 8 U.S.C. § 1373. *Id.* at 30. Specifically, OJP notified potential applicants that the correctional facility access condition would be designed to ensure that Byrne JAG Program grantees would permit "personnel of . . . DHS to access any correctional or detention facility in order to meet with an alien . . . and inquire as to his or her right to be or remain in the United States." *Id.* OJP further notified potential applicants that the custody release condition would be designed to ensure that Byrne JAG Program grantees would "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the [INA]." *Id.*

Relevant to the City's claims in this case, the notification contained in the FY 2017 solicitation is not itself a grant condition, akin to those contained in the grant award documents; rather, it is merely a notification designed to "help an applicant make an informed decision about whether to submit an application." 2 C.F.R. § 200.203. Following the filing of the instant motion, OJP issued Byrne JAG Program grant award documents to certain local units of government, and those grant award documents contain the precise text of the conditions that the City has challenged in this lawsuit. *See, e.g.,* Byrne JAG Program Grant Award for County of Greenville, SC at ¶¶ 53, 55-56 (attached as Exhibit A to the Hanson Decl.); *see also* Hanson Decl. at ¶ 6 (confirming that the text of conditions 53, 55, and 56 also "are being included in each award document . . . for awards under the FY 2017 Byrne JAG - Local Solicitation, including any such award document that would be generated for the City of Chicago").

## ARGUMENT

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *see Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) ("[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it."). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In the Seventh Circuit, "[t]o obtain a preliminary injunction, the plaintiffs must show that (1) they will suffer irreparable harm in the period before final resolution of their claims; (2) traditional legal remedies are inadequate; and (3) the claim has some likelihood of success on the merits.  If the plaintiffs make this showing, [the Court] will weigh the factors against one another, assessing whether the balance of harms favors them or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1058 (7th Cir. 2016) (citation omitted).

**I.      The City Is Unlikely to Succeed on the Merits of Its Claims.**

**A.      The Challenged Conditions Are Consistent with the Governing Statutes and the Constitutional Separation of Powers.**

Under theories related to prohibitions against *ultra vires* agency action and the constitutional separation of powers, the City first contends that the Department lacks statutory or constitutional authority to impose special conditions on the Byrne JAG Program that would require applicants to certify compliance with 8 U.S.C. § 1373, that relate to providing DHS access to detention facilities, or that relate to providing DHS advance notice of the scheduled release date of non-citizens.  *See* Pl.'s Mem. of Law in Support of Mot. for Prelim. Inj. ("Pl.'s Mem.") at 10-13, 17-21 (ECF No. 23).  Congress, however, has expressly authorized the AAG to "plac[e] special conditions on all grants" administered by OJP, 42 U.S.C. § 3712(a)(6), to "determin[e] priority purposes for formula grants," *id.*, and to ensure that grantees in the Byrne JAG Program "comply with . . . all other applicable Federal laws." *Id.* § 3752(a)(5).  Because the Department will impose the challenged special conditions pursuant to these express statutory authorizations, the City cannot reasonably contend that the Department is engaging in "the sort

10

of completely unauthorized or illegal conduct that would allow the Court to engage in *ultra vires* review." *Cause of Action Inst. v. Eggleston*, 224 F. Supp. 3d 63, 77 (D.D.C. 2016). Moreover, because Congress may delegate authority to the Executive to condition federal spending, and because it has done so here, the challenged conditions comport with the constitutional separation of powers. *See DKT Mem'l Fund Ltd.*, 887 F.2d at 280-81.

### 1. Federal Statutes Authorize Imposition of the Challenged Conditions.

In attempting to support its *ultra vires* and separation of powers claims, the City first asserts that the AAG's authority to "plac[e] special conditions on all grants" and to "determin[e] priority purposes for formula grants," 42 U.S.C. § 3712(a)(6), cannot apply here because "there must be some independent source of statutory authority for the functions to be so vested or delegated in the first place." *See* Pl.'s Mem. at 13. But the City provides no support for this limited interpretation of the statute, which contravenes the statute's plain language.

In setting forth the parameters of the AAG's power, Congress instructed that the AAG shall exercise such "other powers and functions as may be vested in the [AAG] pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." 42 U.S.C. § 3712(a)(6). Pursuant to the plain reading of the statutory language, the AAG's power must *include*, at a minimum, the power to "plac[e] special conditions on all grants" administered by OJP, regardless of whether there is "some independent source of statutory authority." Pl.'s Mem. at 12-13.

The breadth of the AAG's statutory authority is reinforced by the AAG's authority to "determin[e] priority purposes for formula grants." 42 U.S.C. § 3712(a)(6). Pursuant to that authority, the AAG may prioritize formula grants, like the Byrne JAG Program, for jurisdictions that assist federal authorities in the enforcement of immigration law. Further, the authority to

11

include the custody release and correctional facility access conditions is even clearer in light of 8 U.S.C. § 1357(a)(1), which authorizes federal immigration officers, without a warrant, "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."

Additionally, if the City's interpretation were accepted, and the AAG's power to include special conditions on all grants must be independently provided for in separate statutory provisions, there would be no reason to convey that authority through Section 3712. The City thus falters by "interpreting a statute in a way that renders a word or phrase redundant or meaningless." *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008).

The City also takes issue with the scope of the Department's statutory authority to ensure that grantees in the Byrne JAG Program "comply with . . . all other applicable Federal laws." 42 U.S.C. § 3752(a)(5)(D). According to the City, the term "applicable Federal laws" should be interpreted as referring only to federal statutes "that by their own terms are applicable specifically to recipients of federal funds and enforceable by cutting off those funds." *See* Pl.'s Mem. at 19. Again, the City provides no support for that narrowed interpretation of the statutory language, and its proffered interpretation is inconsistent with the plain reading of the statutory text. The relevant statutory language provides:

> To request a grant under this part, the chief executive officer of a . . . local government shall submit an application to the Attorney General . . . in such form as the Attorney General may require. Such application shall include the following:
>> (5) A certification, made in a form acceptable to the Attorney General . . . that— . . .
>>> (D) the applicant will comply with all provisions of this part and all other applicable Federal laws.

42 U.S.C. § 3752 (emphasis added). Congress's decision to empower the Attorney General to determine the form of Byrne JAG Program applications renders the most natural reading of this

provision as a delegation to the Attorney General to determine whether a particular federal law constitutes an "applicable Federal law[]." *Id.* § 3752(a)(5)(D). If Congress had intended to limit the term "applicable Federal laws" as referencing only statutes of the kind that the City suggests, it could have done so expressly.

The City is also incorrect in asserting that every law as to which Byrne JAG Program grantees must certify compliance, "except 8 U.S.C. § 1373[,] is a law that applies only as a condition of receiving federal funds." Pl.'s Mem. at 20. As reflected in the certified standard assurance form appended to the FY 2017 Byrne JAG Program solicitation, *see* ECF No. 26-11 at 42, grantees are required to certify compliance with a variety of wide-ranging federal laws and regulations, including laws relating to civil rights protections, to the treatment of displaced persons, and to the political activities of government employees.

Finally, the City is unlikely to succeed on its claim that the Department lacks authority to impose the Section 1373 compliance condition on the ground that "Section 1373 constitutes facially unconstitutional commandeering." Pl.'s Mem. at 20. As an initial matter, because participation in the Byrne JAG Program is voluntary, the Section 1373 compliance condition does not "commandeer" the City's resources or employees. The Supreme Court has routinely held that conditioning the receipt of federal funds on whether a state or local jurisdiction complies with a federal statute or takes some other action does not violate the Tenth Amendment, so long as the "State could . . . adopt the simple expedient of not yielding to what she urges is federal coercion." *S. Dakota v. Dole*, 483 U.S. 203, 210 (1987) (A "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants."). Thus, if the City is disinclined to

certify compliance with Section 1373 (or disinclined to comply with any other grant provision), it may simply decline to participate in the grant program.

Additionally, even aside from the voluntary nature of the grant program, the City is unlikely to succeed on its claim that Section 1373 facially violates the Tenth Amendment. In enacting Section 1373, Congress determined that a state or local government policy barring voluntary cooperation through information sharing with federal immigration officials is incompatible with the effective implementation of federal law. The Second Circuit rejected a facial Tenth Amendment challenge to Section 1373 of the kind the City raises here. *See City of N.Y. v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). The Tenth Amendment does not give States and their subdivisions "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs," particularly in the information sharing context. *Id.* at 34-35; *see also Printz v. United States*, 521 U.S. 898, 917-18 (1997). Accordingly, because the City will be unable to establish that "no set of circumstances exists under which [Section 1373] would be valid," it is unlikely to succeed in any facial challenge that it purports to raise to that provision. *United States v. Salerno*, 481 U.S. 739, 745 (1987).

## 2. The City Is Unlikely to Succeed on Its *Ultra Vires* Claim.

The Supreme Court has held that an "officer may be said to act *ultra vires* only when he acts without any authority whatever." *Pennhurst State Sch. & Hosp.*, 465 U.S. at 101 n.11; *see also Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 697 (1982) (same). Thus, claims that an agency has used its authority erroneously or inappropriately are insufficient to state an *ultra vires* claim. Rather, *ultra vires* claims must be based on an "officer's *lack* of delegated power"; merely claiming an "error in the exercise of that power is . . . not sufficient." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949) (emphasis added).

14

Here, the City does not argue that the Department lacks "any authority whatever" to impose the challenged conditions. *Pennhurst State Sch. & Hosp*, 465 U.S. at 101 n.11. To the contrary, the City affirmatively acknowledges that the Department intends to impose those conditions pursuant to the statutory provisions contained at 42 U.S.C. §§ 3712(a)(6) and 3752(a)(5)(D). *See, e.g.*, Pl.'s Mem. at 12 (noting that the Department has claimed authorization pursuant to 42 U.S.C. § 3712(a)(6)). Thus, rather than legitimately challenging the existence of any authority, the City is necessarily taking issue with the Department's *interpretation* of its authority. Arguments concerning a purported "error in the exercise" of delegated authority, however, are "not sufficient" to state an *ultra vires* claim. *Larson*, 337 U.S. at 690.[3]

### 3. The City Is Unlikely to Succeed on Its Separation of Powers Claim.

These same statutory authorities render it unlikely that the City will establish a violation of the constitutional separation of powers. Article I of the Constitution confers on Congress the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. Art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds . . . ." *Dole*, 483 U.S. at 206. Importantly, Congress may delegate to the Executive Branch the authority to attach conditions on funding. *See*, *e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to

---

[3] To the extent that the City's *ultra vires* theory is predicated on a claim under the Administrative Procedure Act ("APA"), the claim is unlikely to succeed for several additional reasons, including because the APA allows judicial review only of "final agency action." 5 U.S.C. § 704. The City does not challenge final agency action, nor could it, as it has not yet applied for FY 2017 Byrne JAG Program funds, much less been the subject of an agency action that "mark[s] the consummation of the agency's decision-making process," or "determine[s] legal rights and obligations." *Petzel v. Kane Cty. Dep't of Transp.*, No. 16 CV 5435, 2017 WL 2880880, at *3 (N.D. Ill. July 6, 2017) (citing *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016)).

spend, particular sums of money."); *Ameron, Inc. v. U.S. Army Corps of Engineers*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent."); *DKT Mem'l Fund Ltd.*, 887 F.2d at 280-81.

Through the statutory authorities described above, Congress delegated authority to the Attorney General and the AAG to impose the challenged conditions on units of local government participating in the Byrne JAG Program. As mentioned, the custody release and correctional facility access conditions are authorized under the AAG's ability "plac[e] special conditions on all grants" administered by OJP, and to "determin[e] priority purposes for formula grants." 42 U.S.C. § 3712(a)(6). In addition to that authority, the Section 1373 compliance condition is further authorized by the AAG's ability to ensure that grantees in the Byrne JAG Program "comply with . . . all other applicable Federal laws." *Id.* § 3752(a)(5). Thus, because Congress has explicitly delegated to the Executive certain powers to attach conditions on the receipt of federal funds, the City is unlikely to establish a separation of powers violation here.

**B.    The Custody Release and Correctional Facility Access Conditions Are Consistent with the Spending Clause.**

The City also asserts that two of the challenged grant conditions – the custody release and correctional facility access conditions – would violate the Spending Clause of the U.S. Constitution. Pl.'s Mem. at 13-17. The Spending Clause provides that Congress may "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. As the Supreme Court has recognized, Congress may employ the spending power "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Dole*, 483 U.S. at 206.

16

*Dole* described certain limitations or potential limitations on the spending power. Among other things, the Court observed, "our cases have suggested . . . that conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *Id.* at 207-08, 211. The Court also noted that "other constitutional provisions may provide an independent bar to the conditional grant of federal funds." *Id.* at 207-08. Relying on these two aspects of *Dole,* the City argues that the challenged conditions are not "reasonably relevant to the objectives of the Byrne JAG program," and they might require the City to "engage in activities that would themselves be unconstitutional." Pl.'s Mem. at 14.

The City interprets the relatedness requirement much too narrowly; the custody release and correctional facility access conditions are sufficiently related to the purposes of the Byrne JAG Program under the relevant constitutional analysis. The Seventh Circuit illuminated the relatedness element in *Charles,* where state prison officials challenged a requirement to abide by the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1(a), as a condition of federal corrections funding. 348 F.3d at 609.[4] The state officials argued that "there must be a particularized relationship between a condition's subject matter and the underlying federal grant to which the condition attaches." *Charles v. Verhagen*, 220 F. Supp. 2d 955, 963-64 (W.D. Wis. 2002), *aff'd,* 348 F.3d at 601. The district court rejected that argument, and the Seventh Circuit affirmed that decision, explaining that a challenged funding condition and the program involved must only "share[] the same goal," which, in that matter, concerned "the goal of [prisoner] rehabilitation." *Charles*, 348 F.3d at 609; *see also Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (holding that conditions on federal funding must

---

[4] The Seventh Circuit decision on which the City relies in this regard (Pl.'s Mem. at 14) is a federal preemption case, not a Spending Clause case. *See N. Illinois Chapter of Associated Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004 (7th Cir. 2005).

only "bear some relationship to the purpose of the federal spending."). Courts have generally found that the relatedness showing does not pose a difficult hurdle. As the D.C. Circuit has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The grant conditions at issue here satisfy the relatedness requirement. Contrary to the City's view that Byrne JAG Program's primary goal is to preserve "flexibility" for grantees, *see* Pl.'s Mem. at 14, the program's overall goals are much broader: to support and strengthen law enforcement and criminal justice. The program's organic statute specifies that Byrne JAG funds are designed to provide resources "*for criminal justice*," to support programs including law enforcement, prosecution, crime prevention and corrections, and victim and witness assistance. 42 U.S.C. § 3751(a)(1) (emphasis added). These goals are also reflected in the responsibilities of the AAG, which involve strengthening "criminal justice." *Id.* § 3712(a)(1), (2).

Consistent with that programmatic goal, the challenged conditions are designed to promote criminal justice priorities related to enforcement of criminal immigration statutes. The Attorney General has confirmed that the conditions were prompted by "the Department of Justice's top priority of reducing violent crime" and the "long-established cooperative principles among law enforcement agencies." *See* AG News Release at 3 (ECF No. 26-9). Those goals are consistent with the AAG's express statutory responsibility to "maintain liaison" between and among the various branches of government "in matters relating to criminal justice." *See* 42 U.S.C. § 3712(a)(2). Similarly, the INA also contemplates cooperation among State and local officers and federal officials on immigration enforcement. *See, e.g.*, 8 U.S.C. § 1357(g) (providing that DHS may enter into formal cooperative agreements with states and localities under which appropriately trained and qualified state and local officers may perform specified

18

functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); *see also* 8 U.S.C. § 1324(c) (authorizing state and local law-enforcement officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); 8 U.S.C. § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States). Given that the INA *expressly* contemplates local law enforcement activity with respect to immigration law enforcement, it is perfectly germane and appropriate for the Department to condition grant funding to promote this purpose, just as it does for other important federal priorities. Thus, as the Byrne JAG Program and the challenged conditions "share[] the same goal," of promoting criminal justice initiatives, *Charles*, 348 F.3d at 609, the conditions satisfy the relatedness requirement.

The City also alleges that the custody release and correctional facility access conditions will exceed the limitations of the Spending Clause by requiring the City to "engage in activities that would themselves be unconstitutional." Pl.'s Mem. at 14 (quoting *Dole*, 483 U.S. at 210). *Dole* emphasized the narrowness of this limitation on the spending power, noting that "the 'independent constitutional bar' limitation . . . is not . . . a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly." 483 U.S. at 210. Rather, the limitation "stands for the unexceptionable proposition that the spending power may not be used to induce the States to engage in activities that would themselves be unconstitutional . . . for example, a grant of federal funds conditioned on invidiously discriminatory state action or the infliction of cruel and unusual punishment would be an illegitimate exercise of the Congress' broad spending power." *Id*. at 210-11.

As is evident from the plain text of the custody release and correctional facility access conditions, those conditions will not "induce" the City to violate any constitutional prohibition.

19

As an initial matter, the Constitution does not forbid DHS employees from accessing detention facilities, nor does it forbid local government employees from providing DHS with certain detainee release information. Thus, in arguing that it will be coerced into violating the Constitution, the City is forced to set up a strawman argument: it contends that the custody release and correctional facility access conditions (which had not issued at the time the City filed its motion) would require the City to "hold arrestees longer than justified by the offense of arrest in order to permit DHS investigation into unrelated offenses" in violation of the Fourth Amendment. Pl.'s Mem. at 15. The City also asserts that the conditions would require it to further violate the Fourth Amendment by "extend[ing] the detention of at least some arrestees," such as when "an arrestee who [otherwise] would be released on a recognizance bond within a few hours of arrest might be held for additional time to permit questioning by DHS." *Id.* at 17.

The text of the conditions nullifies the City's constitutional concerns. The conditions make clear that "[n]othing in th[ese] condition[s] shall be understood to authorize or require any recipient . . . to maintain (or detain) any individual in custody beyond the date and time the individual would have been released in the absence of this condition." *See, e.g.*, Byrne JAG Program Grant Award for County of Greenville, SC at ¶¶ 55-56 (attached as Ex. A to the Hanson Decl.). The conditions further clarify that "[i]n the event that . . . the scheduled release date and time for an alien are such as not to permit the advance notice [of scheduled release] that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable." *Id.* Thus, because the fully-articulated custody release and correctional facility access conditions explicitly contravene the City's constitutional concerns, and because OJP is constitutionally prohibited from imposing conditions in a manner that would require grant

recipients to violate the Fourth Amendment rights of detainees, the City is unlikely to succeed on its claim that it will be forced it to engage in activity that violates the Constitution.[5]

## II.     The City Fails to Establish Irreparable Harm Absent Preliminary Relief.

"The threat of irreparable injury necessary to justify the extraordinary remedy of preliminary injunctive relief must be 'real,' 'substantial,' and 'immediate,' not speculative or conjectural." *Ditton v. Rusch*, No. 14 C 3260, 2014 WL 4435928, at *3 (N.D. Ill. Sep. 9, 2014) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  The City cannot meet its burden to make that showing here.  Most significantly, the City had offered only speculation and conjecture about irreparable harm because, at the time the City filed its motion, the Department had not yet issued the precise language of the custody release and correctional facility access conditions that would attach to the acceptance of FY 2017 Byrne JAG Program funds.  As described above, the final language of those conditions, now available in FY 2017 award documents that OJP issued to other units of local government, nullifies the City's constitutional concerns.

The City's claim that the conditions amount to an attempt to unconstitutionally coerce the City into abandoning its right to self-government also fails.  Pl.'s Mem. at 21-22.  The Supreme

---

[5] Even aside from the constitutionally valid language of the challenged conditions, there is no Fourth Amendment problem with a local jurisdiction cooperating with a federal request to detain an alien after a prison term has ended to facilitate an orderly transfer to DHS custody for removal proceedings.  As the Seventh Circuit has made clear, "arrests for violations of purely civil laws are common enough . . . ." *Thomas v. City of Peoria*, 580 F.3d 633, 638 (7th Cir. 2009).  And "[w]hen someone is arrested and detained without a warrant, it is presumptively reasonable for that person to be detained up to 48 hours." *Rivas v. Martin*, 781 F. Supp. 2d 775, 780 (N.D. Ind. 2011).  Immigration arrests premised on detainers are supported by a warrant. *See* 8 U.S.C. § 1226(a); ICE Policy No. 10074.2: Issuance of Immigration Detainers by ICE Immigration Officers (Mar. 24, 2017), *available at* https://www.ice.gov/detainer-policy.  Indeed, Chicago permits this method of detention under certain circumstances. *See* Welcoming City Ordinance § 2-173-042(c) (permitting cooperation in immigration detention requests when person in custody has committed a felony or is a known gang member).

21

Court has admonished that "courts should not conclude that [an enactment] is unconstitutional on this ground unless the coercive nature of an offer is *unmistakably clear*," such as where States are subjected to the risk of losing "over *10 percent* of a State's overall budget" if they decline to adopt certain conditions. *See Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*, 567 U.S. 519, 581-82 (2012) (emphasis added). The amount of funding at stake to the City through the Byrne JAG Program does not come close to meeting that constitutional threshold. For FY 2016, for example, the City's participation in the Byrne JAG Program secured $2.33 million, of which the City received $1.66 million, and other local jurisdictions received $669,000. *See* Decl. of Andrew W. Worseck, Ex. I at 1-2 (ECF No. 27-9). The City's proposed budget for 2016 was $9.32 billion. *See* City of Chicago, *2016 Budget Overview* at 21.[6] Thus, the funds at issue for the City constituted approximately 0.017% of the City's overall budget. Such a relatively miniscule impact on the City's overall budget does not meet the "unmistakably clear" threshold for establishing unconstitutional coercion. *NFIB*, 567 U.S. at 581; *see also ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D.D.C. 2014) (in determining irreparable harm, a "claim of substantial financial losses must be evaluated from the perspective of the organization's total revenues in order to determine if the harm is of a magnitude that warrants injunctive relief").

The City's attempt to establish "real" and "substantial" harm in the potential loss of a single City employee, a single $50,000 program, and a vague expectation of losing "goodwill" similarly fails. Pl.'s Mem. at 22-23. The loss of a relatively small program and a single employee, especially in a city with tens of thousands of employees,[7] does not constitute

---

[6] https://www.cityofchicago.org/content/dam/city/depts/obm/supp_info/ 2016Budget/2016BudgetOverviewCoC.pdf.

[7] *See* Chicago Data Portal, *Number of Emps. by Dep't*, https://data.cityofchicago.org/ Administration-Finance/Number-of-Employees-by-Department-Based-on-Current/atdi-52tt.

substantial, irreparable harm. By comparison, the case on which the City relies found irreparable harm where an organization "would have to lay off *dozens* of workers, close *multiple* clinics, and stop serving a *significant number* of its patients." *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 980 (7th Cir. 2012) (emphases added)). The City's vague contention concerning the purported loss of "goodwill" rests on a conclusory affidavit of one police officer expressing a personal opinion. Pl.'s Mem. at 22 (citing Decl. of Kevin R. Hannigan ¶¶4-5 (ECF No. 24)). A court "should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff." *McDavid Knee Guard, Inc. v. Nike USA, Inc.*, 683 F. Supp. 2d 740, 749 (N.D. Ill. 2010); *see also Logansport Mach. Co. v. Neidlein-Spannzeuge GmbH*, No. 3:12-CV-233 JD, 2012 WL 1877854, at *12 (N.D. Ind. May 22, 2012) ("Any proof regarding loss of goodwill is vague and speculative and does not lend much support to [plaintiff's] request for injunctive relief.").

Finally, the City complains of irreparable harm due to alleged "budgetary uncertainty" caused by the challenged conditions. Pl.'s Mem. at 24. But vague claims of "budgetary uncertainty" are not the type of "real" and "substantial" injury that suffices to establish irreparable harm. To the contrary, such uncertainty is the natural state of any municipality's fiscal affairs, which necessarily involve imprecise questions of costs (which are based on services provided) and income (which is based in part on tax revenues). Moreover, any "injury resulting from attempted compliance with government regulation ordinarily is not irreparable harm." *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980).

## III. The Public Interest and the Balance of Equities Militate Against an Injunction.

The City also bears the burden of establishing "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. These factors

23

merge in a suit against the Federal Government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, the public interest weighs heavily against the City's attempt to enjoin congressionally authorized Executive Branch policies designed to promote enforcement of federal immigration law in jurisdictions that receive Byrne JAG Program funds. Courts have routinely held that "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008), *aff'd sub nom. Cornish v. Doll*, 330 F. App'x 919 (Fed. Cir. 2009); *accord N. Arapaho Tribe v. Burwell*, 90 F. Supp. 3d 1238, 1255 (D. Wyo. 2015).

"The United States has an interest in enforcing federal law . . . ." *Fitzsimmons*, 805 F.2d at 693 (emphasis omitted). The City's requested relief threatens, in particular, "the public interest in the speedy and effective enforcement of the immigration laws . . . ." *Sofinet*, 188 F.3d at 708. The federal government also has an interest in seeing that federal funds are used "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980); *see Am. Hosp. Ass'n v. Schweiker*, 721 F.2d 170, 183 (7th Cir. 1983) (discussing "an exercise by the federal government of its authority under the spending power to bring about certain public policy goals"). The challenged conditions promote those interests by, for example, minimizing potentially hazardous public safety situations that may arise where criminal aliens are released into the community, minimizing officer safety risk by limiting potentially dangerous arrest situations, and promoting operational efficiency by conserving the resources needed by DHS to execute its mission. *See* Brown Decl. ¶¶ 6-11. At bottom, encouraging cooperation among local governments and DHS promotes the public interest in

executing federal laws that require removal of criminal aliens.  *Id.*  Those concrete interests tip

the equities at play here sharply toward denying an injunction.

**IV.     Any Preliminary Injunction Should Be Limited in Scope.**

Should the Court nevertheless determine that injunctive relief is appropriate here, any

such relief should be limited to the City.  "The remedy" sought "must be limited to the

inadequacy that produced the injury in fact that the plaintiff has established," *Lewis v. Casey*,

518 U.S. 343, 357 (1996), and an injunction "should be no more burdensome to the defendant

than necessary to provide complete relief to the plaintiffs."  *Madsen* v. *Women's Health Ctr.,*

*Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).  Indeed, "a court abuses its discretion where

the scope of injunctive relief exceeds the extent of the plaintiff's protectible rights."  *PepsiCo,*

*Inc. v. Redmond*, 54 F.3d 1262, 1272 (7th Cir. 1995).  Despite these limits, the City seeks a

sweeping injunction that would prohibit imposing the challenged conditions on Byrne JAG

Program funds to all applicants.  *See* Proposed Order (ECF No. 21-1).

Because injunctive relief against other Byrne JAG Program applicants is unnecessary to

provide complete relief to the City, and because the City has no protected interest in how the

Byrne JAG Program is administered as to other applicants, the requested injunction is overbroad.

*See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (narrowing

injunction in part because the plaintiffs "do not represent a class, so they could not seek to enjoin

such an order on the ground that it might cause harm to other parties").   Accordingly, should an

injunction issue, it should be limited to the City's FY 2017 Byrne JAG Program application.

**CONCLUSION**

WHEREFORE, the City's motion for preliminary injunction should be denied.

25

Dated:  August 24, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOEL R. LEVIN
Acting United States Attorney

JOHN R. TYLER
Assistant Director


*/s/ Stephen J. Buckingham*
STEPHEN J. BUCKINGHAM
Special Counsel
W. SCOTT SIMPSON
ARJUN GARG
Attorneys, Department of Justice
Civil Division, Room 7210
Federal Programs Branch
Post Office Box 883
Washington, D.C. 20044
Telephone:(202) 514-3330
Facsimile: (202) 616-8470
E-mail: stephen.buckingham@usdoj.gov

COUNSEL FOR DEFENDANT

CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2017, I caused the foregoing Opposition to Plaintiff's Motion for Preliminary Injunction to be filed electronically and that this document is available for viewing and downloading from the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ Stephen J. Buckingham*
Stephen J. Buckingham

27