UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **THE CITY OF CHICAGO,** | Civil Action No. 1:17-cv-05720 |
| *Plaintiff*, | |
| *v.* | Hon. Harry D. Leinenweber |
| **JEFF SESSIONS, Attorney General of the United States,** | |
| *Defendant*. | |

### DECLARATION OF JIM BROWN

Pursuant to 28 U.S.C. § 1746, I, Jim Brown, declare as follows:

1.      I am a Deputy Assistant Director in the Office of Enforcement and Removal Operations (ERO) of U.S. Immigration and Customs Enforcement (ICE).  I have been an Immigration Officer since June 30, 1991, serving in the former Immigration & Naturalization Service (INS) and continuing with ICE since its creation in March 2003. In my 26-year career, I have been a member of the management team of INS and ICE for over twenty of those years.

2.      My responsibilities include oversight of the Criminal Alien Division (CAD) within ERO.  I also have oversight responsibilities over the Special Operations Division within the ERO Field Operations Division.  I presently have direct responsibility for the management of the national programs of the Criminal Alien Program, the 287(g) Designated Officer program, the Combined Intelligence Unit, Firearms and Tactical Programs Unit and the Incident & Special Response Unit.

3.      ICE is the principal investigative arm of DHS.  ICE's primary mission is to promote homeland security and public safety through the criminal and civil enforcement of federal laws governing border control, customs, trade, and immigration.  A critical ICE mandate is the enhancement of public safety and the security of the American public through the enforcement of our immigration laws.  ICE is authorized to identify and remove aliens who have

1

been convicted of crimes such as murder, predatory sexual offenses, narcotics trafficking, alien smuggling, and a host of other offenses that harm persons in the United States and have extraordinary public safety consequences. Such aliens can be dangerous and recidivist.

4.     The Office of Enforcement and Removal Operations (ERO), within which I work, is one of the two principal operational components in ICE, the other being the Office of Homeland Security Investigations. ERO oversees programs and conducts operations to identify and apprehend removable aliens, to detain these individuals when necessary, and to remove illegal and removable aliens from the United States. ERO prioritizes the apprehension, arrest, and removal of convicted criminal aliens, those who pose a threat to national security, fugitives, recent border entrants, and aliens who thwart immigration controls. ERO manages all logistical aspects of the removal process, including domestic transportation, detention, alternatives to detention programs, bond management, and supervised release. In addition, ERO repatriates aliens ordered removed from the United States to more than 170 countries around the world. ERO consists of more than 7,500 employees, located at ICE headquarters and in 24 field offices in the United States and overseas.

5.     The Criminal Alien Division (CAD), which I oversee, supports ICE's mandate by performing strategic planning and establishing policy designed to augment ICE's ability to arrest and remove criminal aliens from the United States following removal proceedings and issuance of an Order of Final Removal.

6.     Where a state or local jurisdiction withholds cooperation with ICE's operational ability to enforce federal immigration law against criminal aliens, there are detrimental impacts on ICE's ability to fulfill its missions, and thereby to protect the public. These detrimental impacts can include:

    a.     a public safety risk, as criminal aliens are being released into the community with the potential to re-offend, rather than into ICE custody for removal proceedings;

      b.      an officer safety risk, as certain aliens who otherwise would have been transferred in a controlled, safe, and secure manner directly from state or local custody into ICE custody for removal proceedings are instead released at large, where they must be sought for arrest by ERO officers in riskier and potentially hazardous environments;

      c.      operational inefficiency, because after the alien has been released at large from state or local custody, attempting to take the alien into federal custody typically requires ERO officers to operate in multi-person, outfitted Fugitive Operation teams that entail a greater expenditure of time, effort, funds, and manpower relative to what is necessary to take custody of the alien directly from state or local detention; and

      d.      diminished enforcement, because the need to expend greater resources on apprehending aliens who have already been released at large limits the number of criminal aliens ERO is able to apprehend with its limited resources, leaving more criminal aliens at large and in violation of our immigration laws, and placing the public at greater risk.

7.      The cooperation ICE receives from state and local law enforcement agencies is critical to its ability to identify and arrest criminal aliens who meet DHS immigration enforcement and removal priorities.

8.      When deprived of access to state and local detention facilities and/or of communication with state and local officials, ICE is less able to identify criminal aliens who are subject to removal from the United States pursuant to federal law, and who are likely priorities for removal given their arrest and custody in a criminal justice system.  For example, ICE officers might have to resort to manually reviewing a list of offenders who were arrested the day before.  Such lists might be posted in a public access area of the state or local detention facility, and contain the name of the offender and his/her Incident Response (IR) number.  ICE officers then might, for example, run an IR number through a local database that queries the arrest record for the current offense and any other past offenses in the local area to determine the place of birth

of the offender. This data is then compared to data in various ICE databases to determine if there have been prior encounters with this individual, and to avoid placing detainers on naturalized citizens. Not only is this a more complex and laborious process than otherwise would be available with better cooperation from state and local authorities, but also many removable criminal aliens cannot be identified by this process and, consequently, they would be released from state or local custody without ICE becoming aware of their presence.

9. If ICE becomes aware of a criminal alien's imminent release from state or local detention and must make an arrest outside the detention facility, ICE policy requires at least two officers present for such encounters. Were ICE able to arrest within the detention facility, only one officer would be required. Thus, at a minimum, the manpower requirement at least doubles when arrests within state and local detention facilities are not made possible.

10. The absence of cooperation enabling ICE to take custody of criminal aliens directly from state or local detention creates the potential for more dangerous arrest situations where an alien has already been released at large. To apprehend such an alien, ICE will have to attempt to locate that person either at home or somewhere else in the community. This can create a more dangerous situation for ICE officers, who may have to go into a dangerous environment to find an individual, and potentially for community members, who may be caught in the middle of a less than peaceful surrender. This situation involves a greater possibility of the use of force or violence by the target, who, once out in the community, may resist being taken back into custody and may have greater access to weapons.

11. Having 48 hours' advance notice, where feasible, of a criminal alien's release from detention is extremely important to ICE so that it can determine how to best allocate its limited personnel resources. Apprehending criminal aliens after they have been released into the community requires the expenditure of significantly greater resources. ICE estimates that it takes ERO four times as long to conduct at-large arrests than to arrest aliens at jails and prisons through the Criminal Alien Program. At current staffing levels, ICE field offices are not able to

4

take custody of all criminal aliens and serve them with arrest warrants immediately after they are released from state or local custody.  ERO is also not able to identify and apprehend all at-large criminal aliens after they are released and before they reoffend, and in fact, ERO officers are only able to arrest a fraction of those released from state and local custody due to the significantly greater operational burden of conducting at-large arrests.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  August 24, 2017

Jim Brown

5