UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| THE CITY OF CHICAGO, *Plaintiff*, v. JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States, *Defendant*. | Case No. 1:17-cv-5720<br><br>Hon. Harry D. Leinenweber |

## BRIEF OF *AMICI CURIAE* CURRENT AND FORMER PROSECUTORS AND LAW ENFORCEMENT LEADERS IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### INTEREST OF *AMICI CURIAE*

*Amici* Current and Former Prosecutors and Law Enforcement Leaders file this brief as *Amici Curiae* in support of the Plaintiffs' Motion for Preliminary Injunction. *Amici* are criminal justice leaders who have extensive expertise in law enforcement, prosecution, and cooperative federal-state law enforcement activities. They are intimately familiar with the challenges of performing critical law enforcement and governance functions in communities where immigrants fear the police and are vulnerable to exploitation and crime. *Amici* represent jurisdictions from across the country that understand the challenges of balancing local community needs and public safety.

*Amici*'s experience in keeping their communities safe has underscored the critical importance of bringing immigrants and their families out of the shadows. Community trust and

1

cooperation are essential to public safety, and sound police work as well as successful prosecutors' efforts are undermined by undocumented immigrants' fears of interacting with law enforcement and the justice system. This dynamic, moreover, leaves undocumented immigrants more vulnerable to crime and exploitation, and undocumented immigrant victims less likely to come forward or cooperate with investigations and prosecutions, leading to more violence in the communities *amici* are charged with protecting.

*Amici* believe that the conditions imposed on federal law enforcement grants under the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program will dangerously impact local communities by requiring jurisdictions to prioritize civil immigration enforcement over public safety and by potentially stripping jurisdictions of funding for important public safety and community initiatives. Two of those conditions—first, generally requiring at least 48 hours' notice prior to the release of an individual in custody, and second, requiring that local jurisdictions provide immigration agents with unlimited access to detention facilities to inquire about immigration status—seek to compel local involvement in immigration enforcement. These requirements will cause community members to mistrust the police and justice system officials, and thereby result in a decrease in cooperation, hindering the ability of local law enforcement and local prosecutors to keep their communities safe. The conditions would also drain scarce resources that would otherwise be used to enhance public safety, depriving local law enforcement and justice system leaders of the discretion necessary to determine how best to protect their communities. Local officials are in the best position to know what policing and law enforcement policies work best for their communities.

Jurisdictions across the county rely heavily on Byrne JAG grants to support programs related to law enforcement, prosecution, corrections, courts, crime prevention and education, drug

and mental health treatment, and victim-witness initiatives. *Amici* believe that a preliminary injunction is necessary to halt this attempt to force local law enforcement officers and agencies into practices that would result in decreased public safety.

A full list of *amici* is attached as Exhibit A.

**INTRODUCTION**

The lessons *amici* have learned in protecting their communities shed important light on the issues raised in these cases. When community residents live in constant fear that interactions with local law enforcement officials could result in deportation, there is a fundamental breakdown in trust that impedes justice system leaders from doing their jobs and threatens public safety. Extensive evidence shows that undocumented immigrants—and their lawfully present family and neighbors—fear that turning to the police and cooperating with prosecutors could bring adverse immigration consequences. As a result, immigrant communities are less willing to report crime and cooperate with criminal investigations and prosecutions. This fundamental breakdown in trust poses a major challenge both to investigation and prosecution of individual crimes and to proper allocation of public safety resources.

Current policies limiting local and state involvement in federal immigration enforcement address this issue of trust. Though they take several different forms, these policies generally aim to preserve local and state resources and improve public safety by promoting cooperation between law enforcement and the communities they serve.[1] Many jurisdictions—whether via ordinance, administrative policy, or state law—limit the degree to which their officials may cooperate with

---

[1] *See Oversight of the Administration's Misdirected Immigration Enforcement Policies: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the S. Comm. on the Judiciary*, at 2 (July 21, 2015) (statement of Tom Manger, Chief, Montgomery Cty., Md., Police Dep't & President, Major Cities Chiefs Ass'n), *available at* http://www.judiciary.senate.gov/imo/media/doc/07-21-15%20Manger%20Testimony.pdf.

ICE detainers.[2] The Byrne JAG conditions upend these policies, to the detriment of community safety. The access and notification conditions seek to compel local jurisdictions to take part in federal immigration enforcement. Cities and counties must choose between building trust with immigrant communities and enhancing public safety on one hand, and the loss of vital federal funds on the other. The federal government cannot force local communities into such a Hobson's choice.

**ARGUMENT**

I. **Trust and Respect Between Communities and Law Enforcement Officials Is Essential to Public Safety and Is Thwarted When Victims and Witnesses Fear Deportation Consequences of Cooperating.**

The experience of policing cities across the country has taught law enforcement officers that "[t]o do our job, we must have the trust and respect of the communities we serve."[3] In order to stop crime, police officers "need the full cooperation of victims and witnesses."[4]

This common-sense philosophy is sometimes called "community policing." Community policing is an approach to policing whereby local law enforcement engage communities in a working partnership to reduce crime and promote public safety.[5] It thus requires police to interact with neighborhood residents in a manner that will build trust and improve the level of cooperation

---

[2] 8 C.F.R. § 287.7; *see also* Jasmine C. Lee, Rudy Omri, and Julia Preston, *What Are Sanctuary Cities?*, N.Y. TIMES, Feb. 6, 2017, http://www.nytimes.com/interactive/2016/09/02/us/sanctuary-cities.html; *Detainer Polices*, IMMIGRANT LEGAL RES. CTR. (Mar. 21, 2017), *available at* https://www.ilrc.org/detainer-policies [hereinafter *ILRC Detainer Policies*].
[3] Statement of Tom Manger, *supra* note 1, at 2.
[4] *Id.*
[5] *See* Anita Khashu, *The Role Of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, POLICE FOUND. (Apr. 2009) (citing Mark H. Moore, "Problem-Solving and Community Policing," MODERN POLICING (Michael Tonry & Norval Morris eds., 1992)), *available at* https://www.policefoundation.org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf.

with the police department.⁶ When that relationship of trust is missing—as it is when people believe that contacting police or cooperating with prosecutors could lead to deportation for themselves or others—community policing breaks down and the entire community is harmed.

According to a recent Pew survey, 67% of Hispanic immigrants, and 47% of all Hispanic adults in the United States, worry about deportation—of themselves, family members, or close friends.⁷ This fear necessarily affects cooperation and communication with police and prosecutors. Immigrants—and their family members and neighbors who may be U.S. citizens or lawfully present—often assume that interaction with law enforcement officials could have adverse consequences for themselves or a loved one.

As a result, immigrant communities in general, and undocumented immigrants in particular, are less likely to trust and cooperate with local police and prosecutors. One study of Latinos in four major cities found that 70% of undocumented immigrants and 44% of all Latinos are less likely to contact law enforcement authorities if they were victims of a crime for fear that the police will ask them or people they know about their immigration status; and 67% of undocumented immigrants and 45% of all Latinos are less likely to voluntarily offer information about, or report, crimes because of the same fear.⁸

---

⁶ *Id.*
⁷ *Latinos and the New Trump Administration*, PEW RESEARCH CTR.: HISPANIC TRENDS, Feb. 23, 2017, http://www.pewhispanic.org/2017/02/23/latinos-and-the-new-trump-administration/.
⁸ Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 5-6 (May 2013), *available at* www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF; *see also id.* at 1 ("Survey results indicate that the greater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police, . . . exacerbating their mistrust of law enforcement authorities.").

This study (among others) highlights that fears of immigration enforcement and the resulting damage to law enforcement cooperation affects not just the undocumented community but also individuals with citizenship or lawful status, particularly in "mixed-status" households.[9]

This problematic atmosphere of mistrust is felt by police as well. In one study, two-thirds of the law enforcement officers polled expressed the view that recent immigrants reported crimes less frequently than others.[10] Those surveyed also indicated that the crimes underreported by immigrants are most often serious ones, with domestic violence and gang violence at the top.[11] These trends have only worsened in recent months. According to the Houston Police Department, rape reporting by members of the Hispanic community has fallen over 40% from the first quarter of 2016, despite an overall *increase* in city-wide crime reports.[12] Los Angeles has also witnessed lagging sexual assault and domestic violence reporting by Hispanic persons—but not other ethnic groups—in the first quarter of 2017.[13]

Immigrants' widely recognized fear of interacting with law enforcement and prosecutors poses a fundamental challenge for community policing. Police cannot prevent or solve crimes if victims or witnesses are unwilling to talk to them or prosecutors because of concerns that they or

---

[9] An estimated 85% of immigrants live in mixed-status families. *See* Khashu, *supra* note 5, at 24; *see also* Jill Theresa Messing et al., *Latinas' Perceptions of Law Enforcement: Fear of Deportation, Crime Reporting, and Trust in the System*, 30 J. Women & Soc. Work 328, 334 (2015) ("The results indicate that for each 1-point increase in fear of deportation [e.g., from 'not much' to 'some' worry, or from 'some' to 'a lot'], Latina participants were 15% less willing to report being victim of a violent crime to police.").

[10] Robert C. Davis, Edna Erez & Nancy Avitabile, *Access to Justice for Immigrants Who Are Victimized: The Perspectives of Police and Prosecutors*, 12 Crim. Just. Pol'y Rev. 183, 187 (2001).

[11] *Id.* at 188-89.

[12] Michael Morris & Lauren Renee Sepulveda, *A New ICE Age*, TEXAS DIST. & CTY. ATTORNEYS ASS'N, *The Texas Prosecutor*, Vol. 47, No. 4 (July/Aug. 2017), *available at* https://www.tdcaa.com/journal/new-ice-age.

[13] Tom Dart, *Fearing Deportation, Undocumented Immigrants Wary of Reporting Crimes*, THE GUARDIAN, Mar. 23, 2017, https://www.theguardian.com/us-news/2017/mar/23/undocumented-immigrants-wary-report-crimes-deportation.

their loved ones or neighbors will face adverse immigration consequences. As the president of the Major Cities Chiefs Association has explained to Congress, "[c]ooperation is not forthcoming from persons who see their police as immigration agents."[14] As cautioned by one official, "immigrants will never help their local police to fight crime once they fear we have become immigration officers."[15]

The underreporting of crimes by recent immigrants is a problem for the entire criminal justice system.[16] The most immediate consequence, of course, is that serious crimes go unreported and unpunished. As one official explained, when criminal behavior goes unreported, "[c]rime multiplies" and "[u]nresolved resentments grow in the community."[17] Another added that the underreporting of crime "keeps fear at very high levels and diminishes quality of life."[18] Even beyond the underreporting of crime, undocumented immigrant victims and witnesses may refuse to come to court to testify in important criminal cases because of their fear of being detained and deported.

These concerns are anything but hypothetical. Throughout this year, they have manifested in ways that threaten long-term harm to criminal justice system operations. A Department of Homeland Security official recently illustrated why many immigrants hesitate to cooperate with law enforcement. In a briefing to reporters, he stated that "[j]ust because they're a victim in a certain case does not mean there's not something in their background that could cause them to be

---

[14] Statement of Tom Manger, *supra* note 1, at 2.
[15] *Local Law Enforcement Leaders Oppose Mandates to Engage in Immigration Enforcement*, NAT'L IMMIGRATION LAW CTR. (Aug. 2013), at 2 (statement of Chief Acevedo), *available at* https://www.nilc.org/wp-content/uploads/2017/02/Law-Enforcement-Opposition-to-Mandates-2013-08-30.pdf.
[16] Davis et al., *supra* note 10, at 188.
[17] *Id.*
[18] *Id.*

a removable alien."[19] An immigrant woman living in Texas learned that lesson all too perversely when she arrived at a courthouse seeking a protective order against her abusive boyfriend, only to leave under arrest—likely due to a tip from her abuser.[20] And earlier this month, federal agents detained an undocumented immigrant who had provided key testimony in two homicide cases.[21]

Precisely because victims and witnesses fear similar treatment from immigration authorities, some violent crimes have gone unreported, and pending prosecutions have disappeared from courts' dockets. A Texas district attorney confirmed that a victim of domestic violence had become uncooperative because she feared deportation.[22] Denver prosecutors were forced to drop four domestic abuse cases when similar worries deterred the victims from testifying.[23] An immigrant mother in New Jersey, fearing that interaction with the court system could trigger removal, declined to report that her son had been assaulted on his way to school.[24] And a victim

---

[19] Devlin Barrett, *DHS: Immigration Agents May Arrest Crime Victims, Witnesses at Courthouses*, WASH. POST, Apr. 4, 2017, https://www.washingtonpost.com/world/national-security/dhs-immigration-agents-may-arrest-crime-victims-witnesses-at-courthouses/2017/04/04/3956e6d8-196d-11e7-9887-1a5314b56a08_story.html.

[20] Katie Mettler, *"This is Really Unprecedented": ICE Detains Woman Seeking Domestic Abuse Protection at Texas Courthouse*, WASH. POST, Feb. 16, 2017, https://www.washingtonpost.com/news/morning-mix/wp/2017/02/16/this-is-really-unprecedented-ice-detains-woman-seeking-domestic-abuse-protection-at-texas-courthouse/.

[21] James Fanelli, *Father of Two Who Testified in Brooklyn Homicide Cases and Is Married to a U.S. Citizen Detained by ICE*, N.Y. DAILY NEWS, Aug. 2, 2017, http://www.nydailynews.com/new-york/dad-2-testified-brooklyn-murder-cases-detained-ice-article-1.3378899.

[22] Philip Jankowski, *Deportation Fears Keep Victim from Cooperating in Domestic Violence Case, Travis DA Says*, THE STATESMAN (Austin), Mar. 8, 2017, http://www.statesman.com/news/local/deportation-fears-keep-victim-from-cooperating-domestic-violence-case-travis-says/rdZAjFEAxjHWnxXV1LlpjM/.

[23] Heidi Glenn, *Fear of Deportation Spurs 4 Women to Drop Domestic Abuse Cases in Denver*, NPR, Mar. 21, 2017, http://www.npr.org/2017/03/21/520841332/fear-of-deportation-spurs-4-women-to-drop-domestic-abuse-cases-in-denver.

[24] S.P. Sullivan, *Advocates Say ICE Courthouse Arrests in N.J. Are Hurting Immigrant Crime Victims*, NJ, June 5, 2017, http://www.nj.com/politics/index.ssf/2017/06/advocates_say_ice_courthouse_arrests_are_hurting_i.html.

of domestic violence in New York City "did not think it was in her best interest" to pursue a protective order.[25] Deportation concerns aside, undocumented immigrant victims and witnesses may understandably recoil from a system that allows a person to walk freely into a courthouse to fulfill a civic responsibility to testify, only to be detained by immigration authorities and prevented from returning to their lives.

In response to these incidents, the chief justices of three state supreme courts have written top federal authorities to emphasize that preserving trust with immigrant communities is essential to the administration of justice.[26] As Massachusetts Attorney General Maura Healey has explained, using local court systems as levers for federal immigration enforcement "undercuts local law enforcement's ability to develop the critical trust needed to keep communities safe."[27]

Distrust between immigrants and law enforcement also results in greater victimization of immigrants. "When immigrants come to view their local police and sheriffs with distrust because they fear deportation, it creates conditions that encourage criminals to prey upon victims and witnesses alike."[28] This phenomenon has been termed the "deportation threat dynamic," whereby

---

[25] Emma Whitford, *Courthouse ICE Arrests Are Making Immigrants 'Sitting Ducks,' Lawyers Warn*, GOTHAMIST, June 22, 2017, http://gothamist.com/2017/06/22/ice_immigrants_courts.php.
[26] Letter from Tani G. Cantil-Sakauye, Chief Justice of the Supreme Court of California, to Jeff Sessions, Att'y Gen. of the U.S., and John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 16, 2017), *available at* http://newsroom.courts.ca.gov/news/chief-justice-cantil-sakauye-objects-to-immigration-enforcement-tactics-at-california-courthouses; Letter from Mary E. Fairhurst, Chief Justice of the Supreme Court of Washington, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Mar. 22, 2017), *available at* https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/KellyJohnDHSICE032217.pdf; Letter from Stuart Rabner, Chief Justice of the Supreme Court of New Jersey, to John F. Kelly, Sec'y of Dep't of Homeland Sec. (Apr. 19, 2017), *available at* https://www.documentcloud.org/documents/3673664-Letter-from-Chief-Justice-Rabner-to-Homeland.html#document/p1.
[27] Maria Cramer, *ICE Courthouse Arrests Worry Attorneys, Prosecutors*, BOSTON GLOBE, June 16, 2017, https://www.bostonglobe.com/metro/2017/06/15/ice-arrests-and-around-local-courthouses-worry-lawyers-prosecutors/xxFH5vVJnMeggQa0NMi8gI/story.html.
[28] Statement of Tom Manger, *supra* note 1, at 2.

individuals who fear removal from the United States do not report the crimes they suffer.[29] Nearly two-thirds of undocumented migrant workers participating in a study in Memphis, Tennessee reported being the victim of at least one crime, with the most common being theft and robbery.[30] Respondents indicated that fewer than a quarter of these crimes were reported to the police, and *only one* was reported by the victim himself.[31]

Undocumented immigrants are especially vulnerable to domestic violence. A number of studies have shown that abusive partners may exploit the threat of deportation in order to maintain power and control.[32] When the abusing partner has lawful status, financial dependence on a partner with stable immigration status may similarly facilitate violence.[33] Seventy percent of participants in one study of domestic abuse victims said that immigration status was a major reason keeping them from seeking help or reporting their abuse to the authorities—and thereby permitting the violence to continue.[34] In another study, immigration status was identified as the single largest factor independently affecting the rate at which battered immigrant Latina women called the police.[35]

---

[29] Elizabeth Fussell, *The Deportation Threat Dynamic & Victimization of Latino Migrants: Wage Theft & Robbery*, 52 Soc. Q. 593, 610 (2011).
[30] Jacob Bucher, Michelle Manasse & Beth Tarasawa, *Undocumented Victims: An Examination of Crimes Against Undocumented Male Migrant Workers*, 7 Sw. J. Crim. Just. 159, 164, 166 (2010).
[31] *Id.* at 165.
[32] *See, e.g.*, Messing, *supra* note 9, at 330 (citing several studies); Angelica S. Reina, Brenda J. Lohman & Marta María Maldonado, *"He Said They'd Deport Me": Factors Influencing Domestic Violence Help-Seeking Practices Among Latina Immigrants*, 29 J. Interpersonal Violence 593, 601 (2013). The latter study cited a participant who explained that a partner "beat me up and I could have called the police because that was what I thought to do . . . but he threatened me . . . . [H]e told me that if I called the police I was going to lose out . . . because [police officers] . . . would . . . take me, because I didn't have legal documents." Reina, Lohman & Maldonado at 601.
[33] *See, e.g.*, Messing, *supra* note 9, at 330.
[34] Reina, Lohman & Maldonado, *supra* note 32, at 600.
[35] Nawal H. Ammar et al., *Calls to Police and Police Response: A Case Study of Latina Immigrant Women in the USA*, 7 Int'l J. Police Sci. & Mgmt. 230, 237 (2005).

**II. Policies Limiting Local and State Involvement in Federal Immigration Enforcement Seek to Maintain and Build Trust Between the Community and Law Enforcement and Preserve Local Resources.**

Current policies limiting local and state involvement in federal immigration enforcement, including the City of Chicago's "Welcoming City" policy, universally aim to enhance community trust and preserve local resources. These policies seek to improve public safety by promoting cooperation between law enforcement and the communities they serve.

Some administrative policies or laws include formal restrictions on local law enforcement's ability to apprehend or arrest an individual for federal immigration violations, including restrictions on arrests for civil violations of federal immigration law.[36] Other policies include restrictions on local law enforcement inquiries or investigations into a person's immigration status or the gathering of such information on a local level.[37] Additionally, many jurisdictions have adopted policies against continued detention of an individual based on immigration detainer

---

[36] See MICHAEL JOHN GARCIA & KATE M. MANUEL, CONG. RESEARCH SERV., R43457, STATE AND LOCAL "SANCTUARY" POLICIES LIMITING PARTICIPATION IN IMMIGRATION ENFORCEMENT 9 (July 10, 2015), *available at* https://www.fas.org/sgp/crs/homesec/R43457.pdf; *see also* OR. REV. STAT. ANN. § 181A.820 ("No law enforcement agency of the State of Oregon or of any political subdivision of the state shall use agency moneys, equipment or personnel for the purpose of detecting or apprehending persons whose only violation of law is that they are persons of foreign citizenship present in the United States in violation of federal immigration laws."); Washington, DC, Mayor's Order 2011-174: Disclosure of Status of Individuals: Policies and Procedures of District of Columbia Agencies, at 2 (Oct. 19, 2011) ("No person shall be detained solely on the belief that he or she is not present legally in the United States or that he or she has committed a civil immigration violation."), *available at* http://dcregs.dc.gov/Gateway/NoticeHome.aspx?NoticeID=1784041 [hereinafter DC Order]; Phoenix, AZ, Police Dep't Operations Order Manual, at 1.4 (Jan. 2011) ("The investigation and enforcement of federal laws relating to illegal entry and residence in the United States is specifically assigned to [Immigration and Customs Enforcement within DHS]."), *available at* https://www.phoenix.gov/policesite/Documents/089035.pdf; *see also Melendres v. Arpaio*, 695 F.3d 990, 1001 (9th Cir. 2012) ("[The sheriff] may not detain individuals solely because of unlawful presence.").

[37] *See, e.g.*, DC Order, *supra* note 36 (public safety employees "shall not inquire about a person's immigration status . . . for the purpose of initiating civil enforcement of immigration proceedings that have no nexus to a criminal investigation").

requests for at least some categories of noncitizens.[38] Several states, including California, limit the extent to which local police can cooperate with detainer requests, and more than 400 counties have policies limiting cooperation with detainers.[39]

These policies also play an important role in preserving local law enforcement resources. For example, complying with ICE detainer requests can add staggering costs—in some cases, tens of millions of dollars annually.[40] Requiring localities to provide 48 hours' notice of release and access to ICE officials to all facilities where any individual is detained will have similar effects.[41]

---

[38] GARCIA & MANUEL, *supra* note 36, at 14.

[39] *See* California Transparency and Responsibility Using State Tools (TRUST) Act, Cal. Gov't Code § 7282.5 (West 2014) (prohibiting local law enforcement agencies from honoring ICE detainer requests for individuals without specific prior criminal convictions or charges as to which a judge has made a finding of probable cause); *see also* Omri and Preston, *supra* note 2; *ILCR Detainer Policies*, *supra* note 2.

[40] *See Legislative Threats to Undermine Community Safety Policies: The Costs of Entangling Local Policing and Immigration Law*, NAT'L IMMIGRANT JUSTICE CTR. & NAT'L IMMIGRATION LAW CTR. (Aug. 2015), *available at* http://immigrantjustice.org/sites/immigrantjustice.org/files/201508_05_NIJC_NILC_EnforcementCosts.pdf.

[41] For the first time, in its opposition to Plaintiff's Motion for Preliminary Injunction, the government has now represented that the actual language of the notice condition included in Byrne JAG award grants thus far "make[s] clear that '[n]othing in th[ese] condition[s] shall be understood to authorize or require any recipient . . . to maintain (or detain) any individual in custody beyond the date and time the individual would have been released in the absence of this condition.'" Gov't Opp. at 20 (quoting Byrne JAG Program Grant Award for County of Greenville, SC, at ¶¶ 55-56 (attached as Ex. A to Hanson Decl.)). The government also represents that "[i]n the event that . . . the scheduled release date and time for an alien are such as not to permit the advance notice [of scheduled release] that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable.'" *Id.* The government's clarification of the notice condition appears to address *amici*'s Fourth Amendment concerns for now; however, the government errs in insisting that it could nonetheless condition federal funding on cooperation with ICE detainer requests in a way that would prolong a prisoner's period of incarceration. Numerous federal courts have found that continued detention based on a request from ICE subjects the detaining officer or jurisdiction to civil liability for a violation of the Fourth Amendment. *See, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 215-18 (1st Cir. 2015); *Miranda-Olivares v. Clackamas Cty.*, No. 12-cv-02317-ST, 2014 WL 1414305, at *10-11 (D. Or. Apr. 11, 2014); *Mendoza v. Osterberg*, No. 13CV65, 2014 WL 3784141, at *6 (D. Neb. July 31, 2014); *Villars v. Kubiatowski*, 45 F. Supp. 3d 791, 808 (N.D. Ill. 2014); *Uroza v. Salt Lake Cty.*, No. 11CV713DAK, 2013 WL 653968, at *5-6 (D. Ut. Feb. 21, 2013). Moreover, no federal constitutional or statutory authority confers on state and local officers the general power to make arrests for civil immigration

Communities carefully allocate resources such as funds, training, and officer duties to best serve local law enforcement needs; forced redistribution to immigration enforcement, including requiring notice and providing ICE access to detention facilities for the purposes of immigration enforcement, would siphon limited resources away from where they are most needed while simultaneously damaging community engagement and protection.[42]

Recent incidents in localities with policies limiting local involvement in federal immigration enforcement demonstrate the public safety benefits of such policies. For example, last year Los Angeles Police Department officers had an encounter with a suspected gang member that resulted in a vehicle chase, a foot pursuit, and shots fired. An undocumented immigrant helped police locate the suspect by providing a description and vehicle information.[43] In Tucson, Arizona, an undocumented man confronted and struggled with a man who tried to steal a car with children inside. The immigrant held the individual until police arrived, then cooperated with detectives in the follow-up investigation, resulting in charges of kidnapping, auto theft, and burglary.[44] These examples show why crime is statistically significantly lower in counties that limit local involvement in federal immigration enforcement, as by refusing to hold individuals in local custody at the request of ICE.[45]

---

violations. *See Arizona v. United States*, 567 U.S. 387, 407 (2012) (explaining that because it is generally "not a crime for a removable alien to remain present in the United States . . . [i]f the police stop someone on nothing more than possible removability, the usual predicate for an arrest is absent").

[42] *See* Letter from Law Enforcement Task Force to Hon. Trey Gowdy and Hon. Zoe Lofgren (July 20, 2015), *available at* https://immigrationforum.org/wp-content/uploads/2015/07/072015-LEITF-Letter-House.pdf.

[43] Chuck Wexler, *Commentary: Why Police Support Sanctuaries*, PHILA. INQUIRER, Mar. 10, 2017, http://www.philly.com/philly/opinion/20170310_Commentary__Why_police_support_sanctuaries.html.

[44] *Id.*

[45] Tom K. Wong, "The Effects of Sanctuary Policies on Crime and the Economy," CENTER FOR AMERICAN PROGRESS (Jan. 26, 2017), *available at* https://www.americanprogress.org/

The Byrne JAG conditions seek to wholly disrupt the policies that many communities, including the City of Chicago, have put in place specifically to ensure that immigrants do not fear interactions with local law enforcement, and to prevent diversion of resources from effective public safety efforts. Further, the conditions have the effect of preventing those communities that want to adopt such policies from moving forward. By forcing jurisdictions to provide notice of release dates and permit ICE unlimited access to detention facilities, and therefore further entangle themselves with federal immigration enforcement, the conditions reduce the ability of police and prosecutors to build trust with immigrant communities, leading to the underreporting of crime and greater victimization described above.

**CONCLUSION**

For the foregoing reasons, as well as the reasons set forth in Plaintiff's Motion, this Court should grant the preliminary injunction against the Byrne JAG conditions.

August 31, 2017                    Respectfully Submitted,

/s/ Chirag G. Badlani

Matthew J. Piers
Chirag G. Badlani
Caryn C. Lederer
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 West Madison St., Suite 4000
Chicago, IL 60602
Phone: (312) 580-0100

Joshua Geltzer
Daniel B. Rice*
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center

---

issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/ ("The results of the CEM analysis show that there are, on average, 35.5 fewer crimes per 10,000 people in sanctuary counties—a result that is highly statistically significant.").

600 New Jersey Avenue NW
Washington, DC 20001

*Not admitted in the District of Columbia; supervised by members of the D.C. bar.

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on August 31, 2017, I caused the foregoing Brief of Amici Curiae Current and Former Prosecutors and Law Enforcement Leaders in Support of Plaintiff's Motion for Preliminary Injunction to be filed electronically and that this document is available for viewing and downloading from the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Chirag G. Badlani
Chirag G. Badlani