## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

THE CITY OF CHICAGO,

                *Plaintiff,*

    v.                              Civil Action No. 1:17-cv-5720

JEFFERSON BEAUREGARD SESSIONS III,    Hon. Harry D. Leinenweber
Attorney General of the United States,

                **Defendant.**

## BRIEF OF AMICI CURIAE COUNTY OF SANTA CLARA, 36 ADDITIONAL CITIES, COUNTIES AND MUNICIPAL AGENCIES, THE U.S. CONFERENCE OF MAYORS, THE NATIONAL LEAGUE OF CITIES, THE NATIONAL ASSOCIATION OF COUNTIES, THE INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION, AND THE INTERNATIONAL CITY/COUNTY MANAGEMENT ASSOCIATION

## IN SUPPORT OF

## THE CITY OF CHICAGO'S MOTION FOR PRELIMINARY INJUNCTION

## INTRODUCTION

Amici are 37 cities, counties, and municipal agencies,[1] and five major associations of local governments and their officials: The United States Conference of Mayors, the National League of Cities, the National Association of Counties, the International Municipal Lawyers Association, and the International City/County Management Association.[2] Local governments bear responsibility for protecting the safety and welfare of our communities. Our law enforcement officials patrol our streets, operate our jails, investigate and prosecute crimes, and secure justice for victims. To fulfill these responsibilities, amici cities and counties must build and maintain the trust of our residents, regardless of their immigration status, and we must be able to adopt policies which foster that trust and meet our communities' unique needs.

Since January, President Trump and his Administration have targeted local jurisdictions, like the amici cities and counties, that have determined the needs of their communities are best met, and public safety is best secured, by limiting local involvement with the enforcement of federal

---

[1] The Metropolitan Area Planning Council is the Regional Planning Agency serving the people who live and work in the 101 cities and towns of Metropolitan Boston. *See* Massachusetts General Laws Ch. 40B Section 24. The agency provides extensive technical assistance to cities and towns in the Greater Boston region, and supports the ability of cities and towns to adopt and implement best practices for maintaining a productive relationship with all residents of their communities, regardless of their immigration status.

[2] The United States Conference of Mayors is the official non-partisan organization of cities with populations of 30,000 or more. There are 1,408 such cities in the country today. Each city is represented in the Conference by its chief elected official, the mayor. The National League of Cities ("NLC") is dedicated to helping city leaders build better communities. NLC is a resource and advocate for 19,000 cities, towns and villages, representing more than 218 million Americans. The National Association of Counties ("NACo") is the only national organization that represents county governments in the United States. Founded in 1935, NACo provides essential services to the nation's 3,069 counties through advocacy, education, and research. The International Municipal Lawyers Association ("IMLA") is owned by its more than 2,500 members and serves as an international clearinghouse for legal information and cooperation on municipal legal matters. IMLA's mission is to advance the responsible development of municipal law through education and advocacy by providing the collective viewpoint of local governments around the country on legal issues before courts nationwide. The International City/County Management Association ("ICMA") is a non-profit professional and educational organization with more than 11,000 members, the appointed chief executives and professionals who serve local governments throughout the world.

immigration law.  In one of his first acts upon taking office, President Trump issued an Executive Order ("Order") directing his Administration to deny federal funds to so-called "sanctuary" jurisdictions.  Executive Order 13768, §§ 2(c), 9(a).  Three months later, Judge William H. Orrick of the United States District Court for the Northern District of California granted a nationwide preliminary injunction barring enforcement of Section 9(a) of the Order.  *Cty. of Santa Clara v. Trump*, No. 17-CV-00574, *City & Cty. of San Francisco v. Trump*, No. 17-CV-00485, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017) (hereinafter *Santa Clara*).  Despite the injunction, the Department of Justice ("DOJ") is attempting yet again to deny federal funds to jurisdictions that choose to limit their participation in enforcing federal immigration law.

The DOJ's new conditions on the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program violate federal law, usurp local control over public safety policy, erode the community trust on which local law enforcement depends, and pose serious challenges for local governments like amici.  A nationwide preliminary injunction is required to prevent their enforcement and protect communities throughout the United States.

## BACKGROUND

Hundreds of local jurisdictions nationwide have concluded they can best promote the safety and well-being of their communities by limiting their involvement in immigration enforcement.  *See, e.g.*, Jasmine C. Lee, Rudy Omri, and Julia Preston, "What Are Sanctuary Cities," *New York Times* (Feb. 6, 2017), https://www.nytimes.com/interactive/2016/09/02/us/sanctuary-cities.html?mcubz=1. Although these jurisdictions are just as safe as – if not safer than, *see infra* at 10-11 – those that devote local resources to enforcing federal immigration law, President Trump has blamed them for "needless deaths" and promised to "end . . . [s]anctuary" jurisdictions by cutting off their federal funding. Transcript of Donald Trump's Immigration Speech, *The New York Times* (Sept. 1, 2016), https://www.nytimes.com/2016/09/02/us/politics/transcript-trump-immigration-speech.html.

2

On January 25, 2017, President Trump issued Executive Order 13768, which directed the Attorney General and the Secretary of Homeland Security to ensure that "sanctuary jurisdictions" do not receive any "[f]ederal funds." Executive Order 13768, §§ 2(c), 9(a). The White House made clear that the Order aimed to "end[] sanctuary cities" by stripping them of *all* federal funding. *See, e.g.*, Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6* (Feb. 1, 2017), https://www.whitehouse.gov/the-press-office/2017/02/01/press-briefing-press-secretary-sean-spicer-212017-6.

Shortly thereafter, the County of Santa Clara and the City and County of San Francisco filed related lawsuits challenging the Order and moved for a preliminary injunction barring its enforcement. At oral argument on the motions, DOJ attempted to walk back the Order's sweeping language by arguing the Order was merely an "exercise of the President's 'bully pulpit'" to exert political pressure on local government entities, and only applied narrowly to three specific federal grants (including Byrne JAG). *Santa Clara*, 2017 WL 1459081, at *1. The district court rejected this interpretation, finding it irreconcilable with the plain language of the Order, and issued a preliminary injunction in April prohibiting enforcement of Section 9(a)'s broad funding ban. *Id.* at *9.

Then, in May, the Attorney General issued a memorandum that purported to "conclusive[ly]" interpret the Executive Order, but merely restated the interpretation that DOJ lawyers had offered at oral argument. *Cty. of Santa Clara v. Trump*, No. 17-CV-00574, *City & Cty. of San Francisco v. Trump*, No. 17-CV-00485, 2017 WL 3086064, at *2 (N.D. Cal. July 20, 2017). The DOJ relied on this memorandum to seek reconsideration of the preliminary injunction order, but the district court rejected that attempt. *Id.* at *9. Thus, the Executive Order remains enjoined on the ground, among others, that Santa Clara and San Francisco are likely to succeed on their claims that the Order violates separation of powers principles, the Spending Clause, and the Fifth and Tenth Amendments to the Constitution. *Id.* at *21-26.

3

Barred from enforcing the President's directive to deny *all* federal funds to jurisdictions that limit involvement in immigration enforcement, the Attorney General has shifted to a grant-by-grant approach. On July 25, 2017, the Attorney General announced three conditions applicable to the Byrne JAG program that require recipients to: (1) "certify compliance with [8 U.S.C.] section 1373," which prohibits restrictions on the sharing of citizenship and immigration status information; (2) "permit personnel of [DHS] to access any detention facility in order to meet with an alien and inquire as to his or her right to be or remain in the United States" ("access condition"); and (3) "provide at least 48 hours advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien" ("notice condition"). Compl., Exs. B-D (Dkt. No.1). The DOJ has indicated that these conditions may be applied to other grants, U.S. Dep't of Justice, Office of Justice Programs, *Certifications of Compliance with 8 U.S.C. § 1373*, https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm, and has made local immigration enforcement a selection criterion for another federal grant program.[3]

The City of Chicago filed suit to challenge the Byrne JAG conditions on August 7, 2017. Soon thereafter, the DOJ again changed course and represented that the conditions announced on

---

[3] On August 3, 2017, the DOJ announced that to be selected for the Public Safety Partnership (PSP) program, local jurisdictions must "show a commitment to reducing crime stemming from illegal immigration." U.S. Dep't of Justice, Office of Public Affairs, Justice Department Announces that Commitment to Reducing Violent Crime Stemming from Illegal Immigration will be Required for Participation in Public Safety Partnership Program (Aug. 3, 2017), https://www.justice.gov/opa/pr/justice-department-announces-commitment-reducing-violent-crime-stemming-illegal-immigration. Applicants are now required to answer three questions regarding whether their jurisdiction has a policy or practice "designed to ensure that" (1) DHS has "access to any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or to remain in the United States"; (2) "correctional and detention facilities provide at least 48 hours advance notice, where possible, to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien"; and (3) "correctional and detention facilities will honor a written request from DHS to hold a foreign national for up to 48 hours beyond the scheduled release date, in order to permit DHS to take custody of the foreign national." *Id.*

July 25 – and subsequently included in the Fiscal Year 2017 Byrne JAG solicitations – were not

"actual" conditions, but "only advised prospective applicants regarding the *general tenor* of the

conditions." Def.'s Opp. To Pl.'s Mot. to Expedite Briefing Schedule, at 3 n.2 (Dkt. No. 28)

(emphasis added).  With its opposition to Chicago's preliminary injunction motion, DOJ has now

submitted a pair of award letters, dated August 23, 2017, that set forth what are purportedly the

"actual" conditions.  In these letters, the condition requiring 48 hours' notice to DHS before an

inmate is released from local custody has been modified to require notice "as early as practicable."

Declaration of Alan R. Hanson ("Hanson Decl."), Exs. A & B, ¶¶55-56 (Dkt. No. 32).  The letters

also state that the conditions do not "authorize or require any [Byrne JAG] recipient . . .  to maintain

(or detain) any individual in custody beyond the date and time the individual would have been

released in the absence of this condition."  *Id.*

## ARGUMENT

I.    **Local Officials Must Be Allowed to Adopt Law Enforcement Policies Tailored to the Needs and Unique Characteristics of Their Communities.**

Our nation's constitutional structure is premised on the notion that states and localities, as

the governments closest to the people, bear responsibility for protecting the health and safety of

their residents.  *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("health and safety . . . are

primarily, and historically, matters of local concern") (internal quotation marks and alterations

omitted).  Within the "structure and limitations of federalism," state and local governments possess

"great latitude under their police powers to legislate as to the protection of the lives, limbs, health,

comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotation

marks omitted).  This local control ensures that matters which "concern the lives, liberties, and

properties of the people" are determined "by governments more local and more accountable than a

distant federal bureaucracy."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

The duty to protect local residents from crime lies at the heart of the police power vested in

state and local jurisdictions. *See United States v. Morrison*, 529 U.S. 598, 618 (2000) (there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims"). In carrying out this duty, cities and counties possess – and must be allowed to exercise – broad discretion to develop and implement law enforcement and public safety policies tailored to the needs of their communities. *See United States v. Lopez*, 514 U.S. 549, 561 (1995).

This is a matter not only of constitutional law, but of sound law enforcement policy. Police chiefs and sheriffs nationwide have stated that "decisions related to how local law enforcement agencies allocate their resources, direct their workforce and define the duties of their employees to best serve and protect their communities must be left in the control of local governments." Major Cities Chiefs Ass'n, *Immigration Policy* (2013), https://www.majorcitieschiefs.com/pdf/news/2013_immigration_policy.pdf. Local control is no less critical when policy decisions concern enforcement of federal immigration law. *See id.* ("The decision to have local police officers perform the function and duties of immigration agents should be left to the local government[.]").

Amici share Chicago's judgment that local participation in federal immigration enforcement is detrimental to community safety. But one need not agree with Chicago's specific policy decisions – or those of the city and county amici – to agree these decisions should rest with the local entities tasked with keeping our communities safe. The International Association of Chiefs of Police ("IACP") has taken no position on whether local law enforcement agencies should engage in immigration enforcement. IACP, *Enforcing Immigration Law: The Role of State, Tribal and Local Law Enforcement*, 1, http://www.theiacp.org/portals/0/pdfs/publications/immigrationenforcementconf.pdf (hereinafter *Enforcing Immigration Law*). But the IACP is not neutral on *who* should decide whether local police do so. In its view, "local law enforcement's participation in immigration enforcement is an *inherently local* decision that *must* be made by a police

chief, working with their elected officials, community leaders and citizens." *Id.* at 1 (emphasis

added). Attempts to coerce participation by withholding federal funds are "unacceptable." *Id.* at 5.

In structuring the Byrne JAG program, Congress itself recognized the need for local control

over law enforcement policy. As Chicago has explained, the Byrne JAG program is a formula

grant,[4] available for use in eight broad areas, including law enforcement; prosecution and courts;

prevention and education; corrections and community corrections; drug treatment and enforcement;

planning, evaluation, and technology improvement; crime victim and witness programs; and mental

health. *See* 42 U.S.C. § 3751(a)(1). Congress structured the program in this manner to "give State

and local governments more flexibility to spend money for programs that work for them rather than

to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). Local jurisdictions,

including many of the amici, put these funds to diverse uses, reflecting both the varied law

enforcement needs of different communities and Congress's intent to preserve local discretion and

flexibility in Byrne JAG-funded law enforcement programs. For example:

- Iowa City, Iowa (population 74,398) uses Byrne JAG funds to promote traffic safety, to establish a search and rescue program aimed at individuals at risk for wandering, to partially fund a drug task force, and to purchase equipment.

- Monterey County, California (population 435,232) has used Byrne JAG funds to launch a Day Reporting Center that provides moderate-to-high-risk probationers with services designed to increase employment rates and reduce recidivism.

- Philadelphia, Pennsylvania (population 1,567,872) uses Byrne JAG funds to improve courtroom technology; invest in training programs for prosecutors; and support juvenile delinquency programs, reentry programs, and indigent defense services.

- Portland, Oregon (population 639,863) has used Byrne JAG funds to support its New Options for Women (NOW) program, which provides services to women who have experienced sexual exploitation while working in the commercial sex industry.

- Sacramento, California (population 493,025) uses Byrne JAG funds to support the ongoing maintenance and operation of its Police Department's helicopter program.

---

[4] A formula grant is a non-competitive grant in which funds are allocated based upon a statutory formula, without a competitive process. Department of Justice Programs, Grants 101, Overview of OJP Grants and Funding, Types of Funding, https://ojp.gov/grants101/typesoffunding.htm.

- San Francisco, California (population 870,887) uses Byrne JAG funds to operate a Youth Adult Court aimed at reducing recidivism for youth ages 18-25 by providing case management and other services that account for young adults' unique developmental needs.

If DOJ's new conditions are allowed to stand, local governments will be forced to choose between losing critical funding for these diverse programs or giving up control over inherently local law enforcement policies. Such a result would not only undermine the ability of local entities to enact policies reflecting the needs and unique characteristics of their communities, but also allow the executive branch to wield powers vested exclusively in Congress. Under the Spending Clause, only Congress – whose members are elected by and accountable to local communities – can place substantive conditions on federal funds. *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Incident to [its Article I spending] power, *Congress* may attach conditions on the receipt of federal funds[.]") (emphasis added). In the case of Byrne JAG funding, Congress chose to preserve local discretion, and DOJ has no authority to upend that decision.

## II. Policies Restricting Local Immigration Enforcement Promote Public Safety.

In exercising its discretion over local law enforcement policy, Chicago has made the considered judgment that devoting local resources to immigration enforcement would be detrimental to community safety. Compl., ¶¶ 2, 25. Chicago is not alone in this judgment. More than 600 counties and numerous cities – including many of the amici – have opted to limit their engagement in federal immigration enforcement efforts. Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy*, ¶ 12 (2017) (hereinafter "*Effects of Sanctuary Policies*") (identifying 608 counties coded by Immigration and Customs Enforcement ("ICE") as limiting involvement with immigration enforcement), https://www.americanprogress. org/issues/immigration/reports/2017/01/26/297366/the-effects-of-sanctuary-policies-on-crime-and-the-economy/; Immigrant Legal Resource Center, *Detainer Policies*, https://www.ilrc.org/detainer-policies (listing city and county policies to decline detainer requests).

The policies of these counties and cities are themselves diverse, reflecting the varied needs and judgments of each jurisdiction.[5]

Policies that restrict local entanglement with ICE reflect the judgment of local governments and law enforcement agencies that community trust in local law enforcement is vital to the work of public safety. Local law enforcement agencies rely upon all community members – regardless of immigration status – to report crimes, serve as witnesses, and assist in investigations and prosecutions. *See, e.g.,* Chuck Wexler, "Police chiefs across the country support sanctuary cities because they keep crime down," *Los Angeles Times* (Mar. 6, 2017), http://www.latimes.com/ opinion/op-ed/la-oe-wexler-sanctuary-cities-immigration-crime-20170306-story.html. Immigrants – again, regardless of immigration status – are less likely to commit crimes than native U.S. citizens. *See, e.g.*, Cato Institute, *Criminal Immigrants: Their Numbers, Demographics, and Countries of Origin*, 1 & n.4, 2 (Mar. 15, 2017), https://object.cato.org/sites/cato.org/files/pubs/pdf/immigration_brief-1.pdf. But "[t]he moment [immigrant] victims and witnesses begin to fear that their local police will deport them, cooperation with their police then ceases." *Border Insecurity: The Rise of MS-13 and Other Transnational Criminal Organizations*, Hearing before the Committee on Homeland Security and Governmental Affairs of the United States Senate (May 24, 2017) (statement of J. Thomas Manger, Chief of Police, Montgomery County, Maryland). Indeed, in the experience of amici, even the *perception* that local law enforcement is assisting in immigration enforcement can erode trust, disrupt lines of communication, and make law enforcement's job much more difficult.

Recent data bear this out. Since President Trump took office and promised to ramp up

---

[5] *See, e.g.*, County of Santa Clara, Bd. of Supervisors Policy No. 3.54, https://www.sccgov.org/ sites/bos/Legislation/BOS-Policy-Manual/Documents/BOSPolicyCHAP3.pdf; Houston Police Dep't, Immigration Policy Questions and Answers, http://www.houstontx.gov/police/pdfs/immigration_facts.pdf; King County Code § 2.15.010-2.15.020, http://aqua.kingcounty.gov/council/clerk/code/05_Title_2.pdf ; Tucson Police Dep't Gen. Orders, Gen. Order 2300, https://www.tucsonaz.gov/files/police/general-orders/2300IMMIGRATION.pdf.

deportations, Latinos have reported fewer crimes relative to reports by non-Latinos.  Rob Arthur,

*Latinos In Three Cities Are Reporting Fewer Crimes Since Trump Took Office* (May 18, 2017) (analyzing data

from Dallas, Denver, and Philadelphia), https://fivethirtyeight.com/features/latinos-report-fewer-

crimes-in-three-cities-amid-fears-of-deportation/.  Disturbingly, some jurisdictions have identified

declines specifically in reports of sexual assault and domestic violence.  *Id.*[6]  Local police chiefs have

attributed these declines to community members' increased fear that interactions with law

enforcement could lead to their deportation, or the deportation of a family member.  *Id.*; *see also supra*

at 10 n.6.  Indeed, 50% of foreign-born individuals and 67% of undocumented individuals surveyed

reported being less likely to offer information about crimes to law enforcement for fear that officers

will inquire about their or others' immigration status.  Nik Theodore, Dep't of Urban Planning and

Policy, University of Chicago, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration

Enforcement*, 5-6 (2013), http://www.policylink.org/sites/default/files/INSECURE_

COMMUNITIES_REPORT_FINAL.PDF.

    Local policies that limit entanglement with ICE help mitigate these fears, facilitate

engagement with immigrant communities, and ultimately improve public safety by ensuring that

those who commit crimes are brought to justice.  Contrary to President Trump and Attorney

General Sessions' unsupported rhetoric, research has shown that policies limiting cooperation with

federal immigration authorities are associated with *lower* crime rates – on average, 35.5 fewer crimes

per 10,000 people.  *Effects of Sanctuary Policies*, ¶ 16.  The association is even stronger in large

metropolitan areas: counties with large, urban centers that limit local involvement with ICE

---

[6] *See also* Brooke A. Lewis, "HPD chief announces decrease in Hispanics reporting rape and violent crimes
compared to last year," *Houston Chronicle* (Apr. 6, 2017), http://www.chron.com/news/houston-
texas/houston/article/HPD-chief-announces-decrease-in-Hispanics-11053829.php; James Queally, "Latinos
are reporting fewer sexual assaults amid a climate of fear in immigrant communities, LAPD says," *Los Angeles
Times* (Mar. 21, 2017), http://www.latimes.com/local/lanow/la-me-ln-immigrant-crime-reporting-drops-
20170321-story.html.

experience 65.4 fewer crimes per 10,000 people than similar counties that do not limit such involvement. *Id.*, ¶ 15.

If the new Byrne JAG conditions are not enjoined, jurisdictions like Chicago and some of the amici will be compelled to make choices that undermine public safety: either abandon non-entanglement policies that increase community trust and lower crime rates, or lose funding for critical law enforcement programs. This is not a choice that cities and counties should have to make, and, as Chicago has demonstrated, it is not one that DOJ has the legal authority to impose.

## III. The Byrne JAG Conditions Have Created Uncertainty and Operational Challenges for Jurisdictions Nationwide.

Since President Trump's Executive Order punishing sanctuary jurisdictions was issued, the DOJ's position on immigration-related funding conditions has become a constantly moving target. *See supra* at 3-5. The new Byrne JAG conditions are surrounded by an untenable level of uncertainty and pose operational challenges for jurisdictions that rely on this funding.

*Notice Condition.* As announced by the Attorney General and described in the FY 2017 solicitations, the new notice condition required Byrne JAG recipients to "provide *at least* 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody." Compl., Ex. C & Ex. D at 30 (emphasis added). This created serious constitutional and operational concerns for local jurisdictions, including some amici, that operate detention facilities whose populations are primarily – or exclusively – *unsentenced* individuals held in custody pending resolution of criminal charges or transfer to another facility. *See* Bureau of Justice Statistics, *Jail Inmates in 2015*, at 5 tbl. 4 (2016), https://www.bjs.gov/content/pub/pdf/ji15.pdf (63% of jail inmates nationwide are unsentenced).

Unsentenced inmates typically do not have a "scheduled release date and time" that can be determined 48 hours in advance, and many are in custody for less than 48 hours before they post bail or are ordered released. For this reason, the Attorney General's announcement and the FY

2017 solicitation created confusion and concern that the notice condition may have been intended to require local jurisdictions to *affirmatively continue to detain* unsentenced inmates *after* they would otherwise be released in order to provide sufficient notice to DHS – a practice that could violate those inmates' Fourth Amendment rights and subject local jurisdictions to significant liability. *See, e.g.*, *Orellana v. Nobles Cty.*, 230 F. Supp. 3d 934, 946 (D. Minn. 2017); *Mendia v. Garcia*, No. 10-CV-03910-MEJ, 2016 WL 2654327, at *6-7 (N.D. Cal. May 10, 2016); *Morales v. Chadbourne*, 996 F. Supp. 2d 19, 39 (D.R.I. 2014); *Miranda-Olivares v. Clackamas Cty.*, No. 3:12-cv-02317, 2014 WL 1414305 at *9-11 (D. Or. Apr. 11, 2014).

DOJ now represents that this condition requires notice only "as early as practicable," and does not require any locality to hold an inmate beyond the time he or she would otherwise be released. Def.'s Opp. to Pl.'s Mot. for Preliminary Injunction, 20 (Dkt. No. 32); Hanson Decl., Exs. A & B, ¶¶55-56. Even assuming DOJ adheres to this latest articulation of the condition, it nonetheless presents operational concerns: for agencies that detain arrestees and unsentenced individuals, there are likely to be many instances in which giving *any* advance notice is impracticable. It also conflicts with the local laws or policies of some amici, which have limited their responses to ICE notification requests for the reasons discussed in Section II, *supra*. Moreover, given DOJ's inconsistent position, amici remain concerned about how this condition will be enforced in practice.

*Access Condition.* The award letters submitted by DOJ with its opposition to Chicago's preliminary injunction motion require Byrne JAG recipients to have a policy or practice in place to ensure that federal agents "in fact are given access" to a local "correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States." Hanson Decl., Exs. A & B, ¶56(1)(A). The award letter does not explain what "access" "in fact" means, leaving jurisdictions to guess at what they must do to comply and, in some cases, whether compliance is

consistent with state law. In California, state law requires local agencies to provide a written consent form prior to any interview with ICE that explains the purpose of the interview, that the interview is voluntary, and that the inmate may decline to be interviewed or choose to be interviewed only with his or her attorney present. Cal. Gov't Code § 7283.1(a). In other jurisdictions, inmates must be permitted to have an attorney present during any interview with federal immigration officials. *See* D.C. Code § 24-211.07(d)(1). Because it is unclear how DOJ will ultimately decide to enforce or interpret the access condition, the condition creates concern and confusion for local jurisdictions that wish to receive Byrne JAG funding while fully complying with state law.

Whether to allow ICE to operate inside city and county detention facilities is an inherently local decision that should be left to local governments and local law enforcement officials. *See Enforcing Immigration Law* at 1. Local agencies are responsible for maintaining order and security within jails and other detention facilities, and they must retain the discretion to decide how that responsibility is best fulfilled. Some jurisdictions have made the judgment that permitting ICE to operate in local detention facilities interferes with correctional operations – for example, by increasing fear among inmates and decreasing their trust of correctional staff – and is not in the best interests of staff, inmates, or the broader community. *See, e.g.*, Cook County Code § 46-37(b); County of Santa Clara, Bd. of Supervisors Policy No. 3.54, https://www.sccgov.org/sites/bos/ Legislation/BOS-Policy-Manual/Documents/BOSPolicyCHAP3.pdf.[7] Moreover, local officials have already expressed concern that ICE's practice of arresting immigrants at courthouses will deter

---

[7] *See also* Jon Murray, The Denver Post, "Denver elevates immigration stance with an ordinance that advocates hail as supportive but ICE calls 'dangerous'" (Aug. 28, 2017), http://www.denverpost.com/ 2017/08/28/denver-elevates-immigration-stance-no-asking-about-status-but-limited-info-sharing-includes- jail-release-notifications (describing new ordinance that bars ICE agents from accessing secure areas in jails for inmate interviews, among other provisions); Denver City Council, Legislation, File No. 17-0940, https://denver.legistar.com/LegislationDetail.aspx?ID=3128614&GUID=3A568876-8302-4856-AFA4- F505A637FFD9&Options=&Search= (providing status and text of the Public Safety Enforcement Priorities Act).

immigrants from appearing in court to answer charges, thereby endangering prosecutions. *See, e.g.,* James Queally, "ICE agents make arrests at courthouses, sparking backlash from attorneys and state supreme court," *Los Angeles Times* (Mar. 16, 2017), http://www.latimes.com/local/lanow/la-me-ln-ice-courthouse-arrests-20170315-story.html. Immigrant inmates who see ICE operating in local jails or detention facilities may assume that ICE is permitted in other government buildings, such as courthouses, and may be more likely to abscond, denying victims the opportunity for justice.

*Section 1373.* Finally, the Trump Administration has created uncertainty over how it intends to enforce requirements that federal grant recipients comply with 8 U.S.C. § 1373. On its face, section 1373 addresses only state and local restrictions on the sharing of information on citizenship or immigration status with ICE or other governmental entities; the statute does not mandate that state and local governments collect this information, or impose any additional requirements. *See* 8 U.S.C. § 1373. Nonetheless, the Administration has repeatedly suggested that a broad range of local policies – including policies limiting compliance with ICE detainer requests – do not comply with section 1373. *See* U.S. Dep't of Justice, Office of Public Affairs, *Attorney General Sessions Delivers Remarks on Sanctuary Policies* (Aug. 16, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-sanctuary-policies (suggesting that Miami-Dade County is "now in full compliance" following its decision to begin honoring detainer requests); Compl., Ex. C (section 1373 "generally bars restrictions on communications" between local agencies and DHS).

After requiring 10 jurisdictions, including Chicago and Philadelphia, to document their compliance with section 1373, DOJ still has not informed all jurisdictions whether it believes they comply. Compl. ¶ 68; Mem. Of Law in Supp. of Pl.'s Mot. for Preliminary Injunction, at 24 (Dkt. No. 23). DOJ's failure to provide a clear interpretation of section 1373 has created uncertainty, and suggests that it reads section 1373 more broadly than the plain language can support – leaving jurisdictions to wonder what position DOJ will take once it begins enforcing the new Byrne JAG

conditions. Local jurisdictions may not lawfully be placed in this position. *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (even where Congress imposes conditions on receipt of federal funds, "it must do so unambiguously" and cannot leave a grant recipient "unable to ascertain what is expected of it").

## CONCLUSION

By structuring the Byrne JAG program as a broad formula grant, Congress recognized the need for local discretion over law enforcement programs, and created a (non-competitive) source of funding on which local jurisdictions should be able to rely. The new conditions imposed by Attorney General Sessions upend congressional intent. Instead of preserving flexibility for local operations, the new conditions constrain local choices and require localities to adopt federally mandated policies that will make their communities *less* safe. Instead of preserving a reliable stream of funding, DOJ's shifting positions force localities to guess at whether DOJ will deem them eligible for funding – and whether they will be able to comply with the conditions on that funding if they accept it. A nationwide injunction is needed to halt DOJ's unlawful effort to impose these conditions on local jurisdictions and to protect the safety of communities across the country.

Dated:  August 31, 2017              Respectfully Submitted,

COUNTY OF SANTA CLARA
JAMES R. WILLIAMS,
County Counsel

By: _____/s Laura S. Trice_____
    Laura S. Trice
    Lead Deputy County Counsel

    Laura S. Trice (*pro hac vice* pending)
    Kavita Narayan (*pro hac vice* pending)
    OFFICE OF THE COUNTY COUNSEL
    70 West Hedding Street, East Wing, 9th Floor
    San Jose, CA 95110-1770
    (408) 299-5900

By: _____/s Brian C. Haussmann_____
    Brian C. Haussmann
    Local Counsel for the County of Santa Clara

    Caesar A. Tabet (ARDC # 6196308)
    Brian C. Haussmann (ARDC # 6283054)
    John M. Fitzgerald (ARDC # 6282859)
    TABET DIVITO & ROTHSTEIN LLC
    209 S. LaSalle St., 7th Floor
    Chicago, IL  60604
    (312) 762-9450

*Attorneys for Amicus Curiae County of Santa Clara*

*Full List of Amici Curiae and*
*Additional Counsel for Amici Curiae Provided Below*

16

*List of Amici Curiae*

The County of Santa Clara, California; the City of Austin, Texas; the City of Cambridge, Massachusetts; the City of Chelsea, Massachusetts; the City and County of Denver, Colorado; the District of Columbia; El Paso County, Texas; the City of Houston, Texas; the International City/County Management Association; the International Municipal Lawyers Association; the City of Iowa City, Iowa; the City of Ithaca, New York; King County, Washington; the City of Lawrence, Massachusetts; the City of Los Angeles, California; the City of Madison, Wisconsin; the City of Menlo Park, California; the Metropolitan Area Planning Council; the National Association of Counties; the National League of Cities; the City of New York, New York; the City of Oakland, California; the City of Philadelphia, Pennsylvania; the City of Pittsburgh, Pennsylvania; the City of Portland, Oregon; the City of Providence, Rhode Island; the City of Rochester, New York; the City of Sacramento, California; the City of Salinas, California; the City and County of San Francisco, California; the City of San José, California; the City of Santa Ana, California; the County of Santa Cruz, California; the City of Santa Fe, New Mexico; the City of Seattle, Washington; the City of Somerville, Massachusetts; the County of Sonoma, California; the City of Syracuse, New York; Travis County, Texas; the City of Tucson, Arizona; the City of Union City, New Jersey; The United States Conference of Mayors; and the City of West Hollywood, California.

*Additional Counsel for Amici Curiae*

Anne L. Morgan
City Attorney, City of Austin
P.O. Box 1546
Austin, TX 78767-1546

*Attorney for the City of Austin, Texas*

Cheryl Watson Fisher
City Solicitor
City of Chelsea Law Department
500 Broadway, Room 307
Chelsea, MA 02150

*Attorney for the City of Chelsea, Massachusetts*

Karl A. Racine
Attorney General, District of Columbia
One Judiciary Square
441 4th Street NW, Suite 1100 South
Washington, DC 20001

*Attorney for the District of Columbia*

Nancy E. Glowa
City Solicitor, City of Cambridge
City Hall
795 Massachusetts Avenue
Cambridge, MA 02139

*Attorney for the City of Cambridge, Massachusetts*

Kristin M. Bronson
City Attorney, City and County of Denver
1437 Bannock Street, Room 353
Denver, CO 80202

*Attorney for the City and County of Denver, Colorado*

Jo Anne Bernal
El Paso County Attorney
500 E. San Antonio, Suite 503
El Paso, TX 79901

*Attorney for El Paso County, Texas*

Ronald C. Lewis
City Attorney, City of Houston
900 Bagby, 4th Floor
Houston, TX 77002

*Attorney for the City of Houston, Texas*

Charles W. Thompson, Jr.
Executive Director, General Counsel
International Municipal Lawyers Association
51 Monroe Street, Suite 404
Rockville, MD 20850

*Attorney for the International Municipal Lawyers Association*

Eleanor M. Dilkes
City Attorney, City of Iowa City
410 E. Washington St.
Iowa City, IA 52240

*Attorney for the City of Iowa City, Iowa*

Aaron O. Lavine
City Attorney, City of Ithaca
108 E. Green St.
Ithaca, NY 14850

*Attorney for the Mayor of Ithaca, New York*

Dan Satterberg
King County Prosecuting Attorney
516 Third Avenue, W400
Seattle, WA 98104

*Attorney for King County, Washington*

Charles Boddy
City Attorney, City of Lawrence
200 Common Street
3rd Floor, Room 306
Lawrence, MA 01840

*Attorney for the City of Lawrence, Massachusetts*

Michael N. Feuer
City Attorney, City of Los Angeles
200 N. Main Street, 800 CHE
Los Angeles, CA 90012

*Attorney for the City of Los Angeles, California*

Michael P. May
City Attorney, City of Madison
210 Martin Luther King Jr. Blvd, Room 401
Madison, WI 53703

*Attorney for the City of Madison, Wisconsin*

William L. McClure
City Attorney, City of Menlo Park
1100 Alma Street, Suite 210
Menlo Park, CA 94025

*Attorney for the City of Menlo Park, California*

Jennifer R. García
General Counsel
60 Temple Place, 6th Floor
Boston, MA 02111

*Attorney for the Metropolitan Area Planning Council*

Zachary W. Carter
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

*Attorney for the City of New York, New York*

Barbara J. Parker
City Attorney, City of Oakland
One Frank H. Ogawa Plaza, Sixth Floor
Oakland, CA 94612

*Attorney for the City of Oakland, California*

18

Sozi Pedro Tulante
City Solicitor
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

*Attorney for the City of Philadelphia, Pennsylvania*

Tracy Reeve
City Attorney, City of Portland
430 City Hall
1221 SW 4th Avenue
Portland, OR 97204

*Attorney for the City of Portland, Oregon*

Brian F. Curran
Corporation Counsel, City of Rochester
30 Church St., Room 400A
Rochester, NY 14614

*Attorney for the City of Rochester, New York*

Christopher A. Callihan
City Attorney, City of Salinas
200 Lincoln Avenue
Salinas, CA 93901-2639

*Attorney for the City of Salinas, California*

Richard Doyle
City Attorney, City of San José
200 East Santa Clara St., 16th Floor
San José, CA 95113

*Attorney for the City of San José, California*

Lourdes Sánchez Ridge
City Solicitor & Chief Legal Officer,
City of Pittsburgh
313 City-County Building
414 Grant Street
Pittsburgh, PA 15219

*Attorney for the City of Pittsburgh, Pennsylvania*

Jeffrey Dana
City Solicitor, City of Providence
444 Westminster Street, Suite 220
Providence, RI 02903

*Attorney for the City of Providence, Rhode Island*

James Sanchez
City Attorney, City of Sacramento
915 I Street, Fourth Floor
Sacramento, CA 95814

*Attorney for the City of Sacramento, California*

Dennis J. Herrera
City Attorney, City and County of San Francisco
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

*Attorney for the City and County of San Francisco, California*

Sonia R. Carvalho
City Attorney, City of Santa Ana
20 Civic Center Plaza, M-29
P.O. Box 1988
Santa Ana, CA 92702

*Attorney for the City of Santa Ana, California*

Dana McRae
County Counsel, County of Santa Cruz
701 Ocean Street, Room 505
Santa Cruz, CA 95060

*Attorney for the County of Santa Cruz, California*

Peter S. Holmes
City Attorney, City of Seattle
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7097

*Attorney for the City of Seattle, Washington*

Bruce D. Goldstein
County Counsel, County of Sonoma
575 Administration Drive, Suite 105A
Santa Rosa, CA 95403

*Attorney for the County of Sonoma, California*

David A. Escamilla, County Attorney
Sherine E. Thomas, Assistant County Attorney
Travis County Attorney's Office
P.O. Box 1748
Austin, TX 78767

*Attorneys for Travis County, Texas*

Krystle Nova
Corporation Counsel
Scarinci Hollenbeck, LLC
1100 Valley Brook Avenue
Lyndhurst, NJ 07071

*Attorney for the City of Union City, New Jersey*

Kelley Brennan
City Attorney, City of Santa Fe
P.O. Box 909
Santa Fe, NM 87501

*Attorney for the City of Santa Fe, New Mexico*

Francis X. Wright, Jr.
City Solicitor, City of Somerville
93 Highland Avenue
Somerville, MA 02143

*Attorney for the City of Somerville, Massachusetts*

Joseph Fahey
Corporation Counsel
City of Syracuse Department of Law
233 E. Washington St., 300 City Hall
Syracuse, NY 13202

*Attorney for the City of Syracuse, New York*

Michael Rankin
City Attorney, City of Tucson
P.O. Box 27210
Tucson, AZ 85726-7210

*Attorney for the City of Tucson, Arizona*

Michael Jenkins
City Attorney, City of West Hollywood
JENKINS & HOGIN, LLP
Manhattan Towers
1230 Rosecrans Avenue, Suite 110
Manhattan Beach, CA 90266

*Attorney for the City of West Hollywood, California*

20

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of Brief of Amici Curiae County of Santa Clara, 36 Additional Cities, Counties and Municipal Agencies, The U.S. Conference of Mayors, the National League of Cities, the National Association of Counties, the International Municipal Lawyers Association, and the International City/County Management Association in Support of the City of Chicago's Motion for Preliminary Injunction was served on August 31, 2017 via this Court's ECF filing system, whereupon all counsel of record were served.

/s Brian C. Haussmann