**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| THE CITY Of CHICAGO, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| vs. | ) | Civil Action No.1:17-cv-5720 |
| | ) | |
| JEFFERSON BEAUREGARD SESSIONS | ) | Hon. Harry D. Leinenweber |
| III, Attorney General of the United States, | ) | |
| | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |
| | ) | |

_____

**BRIEF OF *AMICI CURIAE* NATIONAL IMMIGRANT JUSTICE CENTER, ET
AL. IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION**

_____

Mark Fleming
Katherine E. Melloy Goettel
National Immigrant Justice Center
208 S. LaSalle Street, Suite 1300
Chicago, Illinois 60604
Tel: (312) 660-1628

Spencer E. W. Amdur
Cody H. Wofsy
American Civil Liberties
Union Foundation—
Immigrants' Rights Project
39 Drumm St., 4th Floor
San Francisco, CA 94111
Tel: (415) 343-1198

*Counsel for Amici*

## INTEREST OF *AMICI CURIAE*

*Amici curiae*, listed in an appendix in Ex. A to this brief, respectfully submit this brief in support of the City of Chicago. *Amici* include immigration-focused civil rights and legal organizations, who litigate and advocate on behalf of the individuals and communities who are the ultimate targets of the policies being challenged in this case. *Amici* have a substantial, shared interest in the Court's resolution of Chicago's claims. This Court will decide issues that have a direct impact on the "welcoming city" laws and policies that *Amici* have campaigned for in states and municipalities across the country. These policies promote public safety, foster trust between law enforcement and immigrant communities, and ensure that limited law enforcement resources are allocated to local public-safety priorities. After years of advocating for these policies and litigating against Immigration and Customs Enforcement (ICE) for its efforts to conscript local law enforcement, *Amici* are well-positioned to explain the broader legal and policy context surrounding the Department of Justice's (DOJ) new and unprecedented Byrne JAG funding conditions.

## SUMMARY OF THE ARGUMENT

*Amici* submit this brief to explain the recent history of federal efforts to coerce local police to help enforce federal immigration law, of which DOJ's new Byrne JAG conditions are the latest chapter. This historical backdrop is critical to understanding the federal-local dynamics in which "welcoming city" laws like Chicago's arise. These policies restore local autonomy, focus law enforcement resources on serving local needs, and promote effective policing strategies that foster trust between police and the communities they serve.

For the past decade, federal officials have employed a number of means to co-opt the work of local police to further federal immigration priorities, often to the detriment of local interests. These attempts have taken many forms, from browbeating to outright compulsion. Nonetheless, hundreds of communities and law enforcement officials across the country have asserted their constitutional right to local autonomy, *see Printz v. United States*, 521 U.S. 898 (1997), and refused to lend their services to federal deportation efforts. In response, federal efforts to coerce local assistance have accelerated in recent months, leading to DOJ's new JAG conditions.

These federal efforts at coercion are deeply offensive to "the etiquette of federalism," *United States v. Lopez*, 514 U.S. 549, 583 (1995) (Kennedy, J., concurring), and to the individual liberties that federal structure is meant to protect. *See Gregory v. Ashcroft*, 501 U.S. 452, 458-59 (1991). Those federalist principles—and the federal government's ongoing campaign against them—provide crucial context for the claims in this case, including the question of whether Congress has delegated to DOJ the authority to use federal criminal-justice funds as a means to bully local police into taking actions they have determined would hurt their own communities. *Amici* urge the Court to enjoin DOJ's newly-invented JAG conditions.

## ARGUMENT

### I.     ICE'S EXPANDING USE OF LOCAL CRIMINAL JUSTICE SYSTEMS

For decades, federal immigration agents' interactions with local law enforcement agencies (LEAs) were sporadic and ad hoc.  But starting in 2006, ICE began to systematically target individuals encountered by LEAs and to use local criminal justice systems as a "force multiplier" for civil immigration enforcement.  One program ICE uses is called the "Criminal Alien Program" (CAP), in which ICE agents closely monitor state and local prisons and jails to identify individuals who may be deportable.  By April 2016, "CAP officers were monitoring 100% of federal and state prisons, a total of over 4,300 facilities."[1]

The scale of local conscription began to increase dramatically in 2008, when ICE rolled out a fingerprint-sharing program called Secure Communities.  Through Secure Communities, every time an LEA sends an individual's fingerprints to the FBI to check for any criminal warrants and history, those fingerprints and booking information (including country of birth and citizenship, if collected) automatically is shared with ICE to check for possible removability.[2] ICE championed the program as a "force-multiplier" by which it could "leverage" local police forces nationwide.[3]

---

[1] Congressional Research Service, "Interior Immigration Enforcement: Criminal Alien Programs," at 10 (Sept. 8, 2016), *available at* https://fas.org/sgp/crs/homesec/R44627.pdf.

[2] ICE, "Secure Communities: Standard Operating Procedures" (2009), *available at* https://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf; In July 2011, DOJ and DHS started their "Foreign/Unknown Place of Birth No-Match" initiatives by which Secure Communities fingerprint checks would now be affirmatively sent to the ICE Law Enforcement Support Center (LESC), staffed by CAP officers, if the person's fingerprints did not match a set in the DHS databases and the booking records indicated an unknown or foreign place of birth. *See Makowski v. United States*, Case No. 12-5265 (N.D. Ill.), Dkt. 30-3, ¶ 10 n. 2.

[3] ICE, Press Release, *Secretary Napolitano and ICE Assistant Secretary Morton Announce That the Secure Communities Initiative Identified More Than 111,000 Criminal Aliens in Its First*

ICE originally sold the program as voluntary.[4] The State of Illinois initially entered into a Memorandum of Agreement (MOA) with ICE to share information through Secure Communities.[5] However, on May 4, 2011, citing serious concerns that the program was disproportionately targeting individuals with limited or no criminal histories, Illinois Governor Pat Quinn, sought to terminate the state's MOA. [Ex. B.] Instead of honoring Illinois' decision, ICE reversed course and decided to force the state to participate in Secure Communities.[6] In August 2011, ICE informed every state that Secure Communities was now mandatory—despite its explicit prior representations that the program was optional—forcing all LEAs nationwide to contribute to civil immigration enforcement if they wanted access to the FBI's criminal database, which is an essential tool for law enforcement. [Ex. C.][7] The FBI and ICE have forced this mandatory fingerprint and information sharing, despite the legal concerns it raises under the National Crime Prevention and Privacy Compact, 42 U.S.C. §§ 14611-14616, and the Tenth Amendment.

---

*Year* (Nov. 12, 2009), *available at* https://www.dhs.gov/news/2009/11/12/secure-communities-initiative-identified-more-111000-criminal-aliens-its-first-year; *Supra* note 2.

[4] *See supra* note 2; ICE, FOIA Library, "Secure Communities-Memorandums of Agreement," *available at* https://www.ice.gov/foia/library.

[5] ICE, FOIA Library, MOA between ICE and Illinois State Police (dated Nov. 2, 2009), *available at* https://www.ice.gov/doclib/foia/secure_communities-moa/r_illinois_11-2-09.pdf.

[6] Elise Foley, *DHS Overrides State, Says Illinois Must Share Fingerprint Data For Deportations*, Huff. Post (May 6, 2011), *available at* http://www.huffingtonpost.com/2011/05/06/dhs-secure-communities-illinois_n_858528.html.

[7] Elise Foley, *Secure Communities Agreements Canceled, Participation Still Required*, Huff. Post (Aug. 5, 2011), *available at* http://www.huffingtonpost.com/entry/secure-communities-update-department-of-homeland-security_n_919651.html.

Because states and localities cannot effectively opt out of Secure Communities, every time local police arrest a person, that person's fingerprints are run through federal immigration databases. Regardless of "welcoming city" laws, the FBI and ICE receive the fingerprints and booking information (which includes birth and citizenship information, if collected)[8] for every person brought into custody in the United States. The program has involuntarily transformed local officers across the country into frontline immigration agents. By February 28, 2015, when ICE's public reporting ended, ICE had screened over 47 million LEA fingerprint checks.[9]

## II.  THE PROLIFERATION OF ICE DETAINERS

Once federal officials learn of a person in a state or local jail through CAP or Secure Communities, they ask the jail to hold the person. ICE's principal tool for seeking the custody of an individual in local custody has been the immigration detainer. A detainer is a checkbox form that requests advance notice of release and asks LEAs detain the person for up to an additional 48 hours after local detention authority expires (for reasons such as posting of bail, dismissal of charges, or completion of sentence).[10] [Ex. D.] ICE lodges these detention requests despite having acknowledged in litigation that the detainer does not in fact authorize the civil arrest. *Gonzalez v. ICE*, Case No. 13-4466 (C.D. Cal.), *consolidated with Roy v. Los Angeles Sheriff's Dep't*, 12-9012 (C.D. Cal.), Dkt. 272-1, ¶¶ 64-65, 162 [hereinafter "*Gonzalez*, Dkt. 272-1"]; *see Lunn v. Commonwealth*, 78 N.E.3d 1143, 1146 (Mass. 2017) ("There is no Federal statute that

---

[8] This is the same information that DOJ now claims is not shared due to "welcoming city" laws, requiring the new JAG condition certifying compliance with 8 U.S.C. § 1373.

[9] ICE, "Secure Communities Nationwide Interoperability Statistics-Year to Date FY2015" (Feb. 28, 2015), *available at* https://www.ice.gov/sites/default/files/documents/FOIA/2015/sc_stats_YTD2015.pdf.

[10] Until June 2015, the immigration detainer form requested detention for up to 48 hours, excluding weekends and holidays, thus up to 5 days.

5

confers on State officers the power to make [an arrest based on an immigration detainer].");
*Villars v. Kubiatowski*, 45 F.Supp.3d 791, 807(N.D. Ill. 2014) ("[N]owhere does [8 C.F.R. §
287.7(d)] authorize the detention of an alien for 48 hours *after local custody over the detainee
would otherwise end.*") (emphasis in original).

Over the last decade, the number of detainers sent to local jails has skyrocketed. In FY
2005, ICE issued 7,090 detainers; by FY 2012, that number had shot up by a factor of 40, to
276,181.[11] As a result, law enforcement could no longer credibly say that contact with them
would not lead to immigration consequences. Immigrant communities across the country began
to live in fear of their own police.

ICE stoked this fear by placing detainers on people with little to no criminal record.
According to ICE's own data, nearly half of all detainers in 2012 targeted people with no
criminal record at all, and almost two-thirds targeted people with very minor offenses, if any,
such as traffic offenses.[12] In Cook County (which accounts for most Chicago detainers), a full
*95 percent* of ICE detainers were issued against individuals with no criminal convictions.[13]
Detainers were also expensive for local governments themselves, because ICE refused to

---

[11] Transactional Record Access Clearinghouse (TRAC), "Detainer Use Stabilizes Under Priority
Enforcement Program," Tbl. 1 (Jan. 21, 2016), *available at*
http://trac.syr.edu/immigration/reports/413/. In November 2014, DHS announced the Priority
Enforcement Program (PEP), which continued the Secure Communities fingerprint and
information-sharing but limited the categories of individuals that ICE could subject to detainers.
Accordingly, the number of detainers issued to LEAs in 2015 and 2016 declined. The Trump
administration has eliminated the PEP restrictions, such that ICE's detainer use has again
climbed. TRAC, "Use of ICE Detainers Obama v. Trump" (Aug. 30, 2017), *available at*
http://trac.syr.edu/immigration/reports/479/.

[12] TRAC, "Few ICE detainers Target Serious Criminals," Tbl. 3 (Sept. 17. 2013), *available at*
http://trac.syr.edu/immigration/reports/330/.

[13] TRAC, "Targeting of ICE Detainers Varies Widely by State and by Facility," Tbl. 3 (Feb. 11,
2014), *available at* http://trac.syr.edu/immigration/reports/343/.

reimburse them for the cost of detention, *see* 8 C.F.R. § 287.7(e), and because localities faced

steep civil liability when ICE made mistakes, such as issuing detainers for U.S. citizens.  *See,*

*e.g.*, *Morales v. Chadbourne*, 235 F. Supp. 3d 388 (D.R.I. 2017); *Miranda-Olivares v.*

*Clackamas Cty.*, 2014 WL 1414305 (D. Or. Apr. 11, 2014); *Gonzalez Goodman v. Penzone*,

Case No. 16-4388, Dkt. 32-1 (D. Ariz. filed Dec. 14, 2016).

Despite these problems, ICE carefully cultivated the perception that they were

mandatory, even though a mandate to detain a person would have been a blatant violation of the

anti-commandeering rule. *See Printz*, 521 U.S. at 931-32 & n. 15 (federal government cannot

force even "a minimal and only temporary" regulatory burden on local officers); *New York v.*

*United States*, 505 U.S. 144 (1992) (federal government cannot force states to regulate).  Despite

the clarity of that rule, ICE wrote on the detainer request form, "This request flows from federal

regulation 8 C.F.R. 287.7, which provides that a law enforcement agency 'shall maintain custody

of an alien' once a detainer has been issued by DHS." [Ex. E (Dec. 2011 version).][14]  In fact, the

regulation provided no such command, only a time limit.  8 C.F.R. § 287.7(d).  But even though

many sheriffs and police chiefs understood the detainer to be a command, ICE declined to

correct the record until years later.  *Rios-Quiroz v. Williamson County, Tenn.*, Case No. 11-1168

(M.D. Tenn.), Dkt. No. 40 & 41 (federal judge requests ICE file an amicus brief regarding its

_____

[14] The version in use from 1997 through 2010 also included language that indicated that the
detainer was mandatory. [Ex. F].  ICE has changed the detainer form multiple times since 2010
due to repeated court defeats or conceded constitutional problems.  For example, from 1997
through 2012, ICE's detainer forms permitted an ICE agent to request detention based solely on
the "initiation of an investigation" in clear violation of the Fourth Amendment.  *Morales v.*
*Chadbourne*, 996 F.Supp.2d 19, 29 (D. R.I. 2014), *aff'd* 793 F.3d 208 (1st Cir. 2015) ("One
needs to look no further than the detainer itself to determine that there was no probable cause to
support its issuance. . . . The fact that an investigation had been initiated is not enough to
establish probable cause because the Fourth Amendment does not permit seizures for mere
investigations.").  ICE data on immigration detainers show that between October 2011 and
January 2013, ICE based seventy-four percent of detainers requests on the "initiation of an
investigation." *Supra* note 13, Tbl. 1.

position on whether detainers are mandatory; ICE declines the judge's request); *see* Defts'

Answer, *Jimenez Moreno*, Case No. 11-5452, Dkt. 61, ¶ 24 (N.D. Ill. Dec. 27, 2012) (ICE

concedes detainers are voluntary); *see Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014)(holding

detainers are voluntary).

### III.   ICE'S ENLISTMENT OF LOCAL POLICE HAS ERODED COMMUNITY POLICING STRATEGIES.

Not surprisingly, the threat of immigration enforcement injected into every police

encounter has had deleterious effects on community policing. For example, a 2012 University of

Illinois-Chicago (UIC) survey found that 44% of Latinos (including U.S. citizens and

documented immigrants) reported "they are less likely to contact police officers if they have

been the victim of a crime because they fear that police officers will use this interaction as an

opportunity to inquire into their immigration status or that of people they know."[15]  That number

rose to 70% for undocumented immigrants surveyed.[16]  Even ICE's "Task Force on Secure

Communities" warned that the federal-local collaboration ushered in by Secure Communities

was "disrupting police-community relationships that are important to public safety and national

security."[17]  The President's Task Force on 21st Century Policing went further in recommending

that in the strong interest of community policing, "[t]he U.S. Department of Homeland Security

should terminate the use of the state and local criminal justice system, including through

---

[15] UIC, Nik Theodore, INSECURE COMMUNITIES: LATINO PERCEPTIONS OF POLICE INVOLVEMENT IN IMMIGRATION ENFORCEMENT, at i, 5 (May 2013), *available at* http://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF.

[16] *Id.*

[17] Homeland Security Advisory Council, "Task Force on Secure Communities: Findings and Recommendations," Ch. IV (Sept. 2011), *available at* https://www.dhs.gov/xlibrary/assets/hsac-task-force-on-secure-communities.pdf.

detention, notification, and transfer requests, to enforce civil immigration laws against civil and nonserious criminal offenders."[18]  Yet ICE continues to issue thousands of immigration detainers monthly to LEAs, close to 70% against individuals with minor or no criminal records.[19]  And, the entanglement of local police in civil immigration enforcement continues to harm community policing strategies.[20]

It is against this backdrop that in 2012 Chicago amended its Welcoming City ordinance to restore the historic and constitutional line between the criminal justice system and civil immigration enforcement.  *See Arizona v. United States*, 567 U.S. 387, 407 (2012) ("[I]t is not a crime for a removable alien to remain present in the United States. If the police stop someone based on nothing more than possible removability, the usual predicate for an arrest is absent."); *see Lunn*, 78 N.E.3d at 1146 ("There is no Federal statute that confers on State officers the power to make [an arrest based on an immigration detainer]."); *Arias v. Rogers,* 676 F.2d 1139, 1142-43 (7th Cir. 1982) (explaining that the Fourth Amendment and "the immigration laws, specifically 8 U.S.C. § 1357(a)(2)[,] . . . require[] that an alien arrested without a warrant 'be taken without unnecessary delay before an'" immigration judge, who functions as the equivalent

---

[18] Dep't of Justice, The President's Task Force on 21st Century Policing, Final Report, 1.9 Recommendation (May 2015), *available at* https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

[19] TRAC, "Reforms of ICE Detainer Program Largely Ignored by Field Officers" (Aug. 9, 2016), *available at* http://trac.syr.edu/immigration/reports/432/; TRAC, "Use of ICE Detainers Obama v. Trump" (Aug. 30, 2017), *available at* http://trac.syr.edu/immigration/reports/479/.

[20] Five Thirty Eight, "Latinos In Three Cities Are Reporting Fewer Crimes Since Trump Took Office" (May 18, 2017), *available at* https://fivethirtyeight.com/features/latinos-report-fewer-crimes-in-three-cities-amid-fears-of-deportation/.

to a "committing magistrate in a criminal proceeding").[21]  The Welcoming City Ordinance, and its companion Cook County ordinance, protect local resources, ensure that residents' constitutional rights are not violated, and foster community policing by assuring residents that interactions with police will not lead to deportation.

IV.  **DOJ's New Byrne JAG Immigration Conditions Are Part of a Larger Escalation in Federal Efforts to Coerce Local Immigration Assistance.**

In recent months, the Executive Branch has stepped up its attempts to impel local jurisdictions to help deport their residents.  During his first week in office, President Trump signed Executive Order 13768, "Enhancing Public Safety in the Interior of the United States."[22] That Order states that the Attorney General and DHS Secretary:

> shall ensure that [sanctuary jurisdictions] are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. . . . The Attorney General shall take appropriate enforcement action against any entity . . . which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

This was a dire threat, because states and localities receive billions of dollars in federal funding each year.  But it was also a dubious threat, because the spending power is Congress's, U.S. Const. art. I, § 8, cl. 1, and because the Supreme Court has been clear that the federal government cannot use financial leverage to railroad states and localities into enforcing federal priorities.  *See NFIB v. Sebelius*, 567 U.S. 519, 575-85 (2015).

When cities sued, and the government was confronted with the unlawfulness of the Order's sheer breadth, DOJ took the position that in fact the Order only applied to law

---

[21] *See also Jimenez Moreno v. Napolitano*, Case No. 11-5452 (N.D. Ill.), Dkt. 219, ¶¶ 18-19 (ICE concession that detainers are never supported by a judicial determination of probable cause, whether before in the form of a warrant or promptly after a detainer arrest).

[22] The White House, "Executive Order 13768: Enhancing Public Safety in the Interior of the United States" (Jan. 25, 2017), *available at* https://www.whitehouse.gov/the-press-office/2017/01/25/presidential-executive-order-enhancing-public-safety-interior-united.

enforcement grant programs (which is hard to reconcile with its text), that the federal government would not seek to place new conditions on any federal funds, and that compliance with 8 U.S.C. § 1373 was already required to receive federal funds. *Santa Clara v. Trump*, -- F. Supp.3d --, 2017 WL 1459081, at *7 (N.D. Cal. Apr. 25, 2017), *reconsideration denied*, *Santa Clara v. Trump*, -- F. Supp.3d --, 2017 WL 3086064, at *1-2 (N.D. Cal. July 20, 2017). Indeed, the DOJ "argued that to the extent the Order directs the Attorney General and Secretary to newly condition federal funds on compliance with Section 1373, it could not lawfully do so and so it does not." *Santa Clara*, 2017 WL 1459081, at *7. The court, nevertheless, correctly found that the federal government's new interpretation of the Executive Order was "not legally plausible" and preliminarily enjoined it. *Santa Clara*, 2017 WL 3086064, at *1.

The Trump administration has tried to bully cities and states in other ways as well. In May, DOJ demanded legal memoranda from a number of localities—including both Chicago and Cook County—to explain that they complied with Section 1373.[23] DOJ made this demand without issuing any guidance of its own to explain what, exactly, it understood Section 1373 to require. To date, DOJ has provided no such clarification, despite a constant barrage of threats tied to the statute. Instead, the Attorney General has held press conferences in which he has strongly implied that Section 1373 prohibits anti-detainer policies.[24] This is, of course, not a plausible reading of the statute's text, which says nothing about detainers, only discrete

---

[23] *See* Dep't of Justice, *Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373* (Apr. 21, 2017), *available at* https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373.

[24] *See, e.g.*, Dep't of Justice, Justice News, *Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions*, Washington D.C. (Mar. 27, 2017), *available at* https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

11

information-sharing about immigration status and citizenship. *See Steinle v. San Francisco*, 230 F.Supp. 3d 994, 1015 (N.D. Cal. 2017). DOJ has admitted as much in this litigation.[25]

ICE has similarly badgered local officials beyond anything the law supports. The ICE Director has implausibly threatened criminal prosecution against officials who do not volunteer their officers to help him round up their residents.[26] And, beginning in March, ICE began publishing a weekly report of cherry-picked data about jurisdictions that had declined detainers in the previous week, all without acknowledging the many costs associated with detainers that would lead a local official to make the legitimate (and constitutionally protected) choice to turn them down.[27] ICE was forced to discontinue this policy after widespread outrage from law enforcement, and after it become clear that its data was wildly inaccurate.[28]

The Trump administration is apparently undaunted by its failed efforts to hector, threaten, and trick localities into signing up for its deportation force.[29] Within two weeks of the denial of

---

[25] *See* Deft's Opp. Mem., Dkt. 32, at 1, 5.

[26] Stephen Dinan, *ICE chief wants to slap smuggling charges on leaders of sanctuary cities*, Wash. Times (July 26, 2017), *available at http://www.washingtontimes.com/news/2017/jul/26/thomas-homan-ice-chief-says-immigrant-sanctuaries-/.*

[27] *See* Dep't of Homeland Sec., Press Release, *DHS Releases U.S. Immigration and Customs Enforcement Declined Detainer Outcome Report* (Mar. 20, 2017), *available at* https://www.dhs.gov/news/2017/03/20/dhs-releases-us-immigration-and-customs-enforcement-declined-detainer-outcome-report.

[28] Ron Nixon, *Trump Administration Halts Reports on Immigration Cooperation*, N.Y. Times (Apr. 10, 2017), *available at* https://www.nytimes.com/2017/04/10/us/politics/trump-administration-immigration.html?_r=0.

[29] *See* David Post, *The "Sanctuary Cities" Executive Order: Putting the Bully Back into "Bully Pulpit"*, Wash. Post (May 2, 2017), *available at* https://www.washingtonpost.com/news/volokh-conspiracy/wp/2017/05/02/the-sanctuary-cities-executive-order-putting-the-bully-back-into-bully-pulpit/?utm_term=.844e58710403.

its motion for reconsideration in *Santa Clara*, in which DOJ represented that it would not impose new conditions on grants, DOJ turned around and issued the FY 2017 Byrne JAG Program application materials, which added three new immigration conditions—48 hours' notice of release, access to local jails and detention centers, and certified compliance with 8 U.S.C. § 1373.[30] These conditions find no basis in law.[31]

First, DOJ cannot point to any statutory provision in the INA that forms basis for the "notice" and "access" requirements.[32] If Congress wanted to empower DOJ to use JAG funds as pure leverage to force localities to adopt separate policies, it would at least need to do so with unmistakable clarity. Here, Congress has merely confirmed that Office of Justice Programs (OJP) has the same authority the Attorney General has always had to include routine "special conditions" in grant documents, to ensure that grantees comply with *existing* conditions. *See* 42 U.S.C. § 3712(a)(6). DOJ's interpretation of that provision would augur a vast expansion in agencies' authority to wield federal funds as a weapon to force states and localities to adopt new substantive policies of the federal government's choosing. The result would be a genuine threat to the rights of the communities *Amici* serve, whose local governments could be turned against them at the whim of federal enforcement agencies.[33]

---

[30] Dep't of Justice, Office of Justice Programs, "Edward Byrne Memorial Justice Assistance Grant Program: FY 2017 Local Solicitation," at 29-30 (released Aug. 3, 2017), *available at* https://www.bja.gov/Funding/JAGLocal17.pdf.

[31] The immigration conditions also contradict DOJ's representation in *Santa Clara* that it would not seek to place new conditions on federal funds. *Santa Clara*, 2017 WL 3086064, at *1.

[32] Plf's P.I. Mem., Dkt. 23, at 7; *supra* note 30, at 30; Deft's Opp. Mem., Dkt. 32, at 18-19. (citing to INA provisions that expressly require *consent* from state and local government, *Lunn*, 78 N.E.3d at 1159-60).

[33] It was also not unreasonable for the City of Chicago to be concerned that the "notice" condition was a backdoor attempt to require extending detention based on warrantless detainer

Second, despite its representations in the *Santa Clara* litigation, *see Santa Clara*, 2017 WL 1459081, at \*7, *reconsideration denied*, *Santa Clara*, 2017 WL 3086064, at \*1-2, DOJ is now for the *first time* requiring certification of compliance with 8 U.S.C. § 1373 as a condition of a Byrne JAG grant award.[34] It was not until July 7, 2016, after the FY 2016 Byrne JAG application deadline, that OJP imposed compliance with 8 U.S.C. § 1373 as a condition for Byrne JAG grant awards. [Ex. G.][35] This condition, too, is invented from whole cloth. In the many decades that DOJ has provided criminal-justice funds to localities, neither Congress nor the Executive Branch has ever considered any kind of immigration enforcement to be an "applicable" conditions. As DOJ's many specious efforts to tie Section 1373 to detainers make clear, this new JAG condition is really about punishing jurisdictions that seek, for sound public policy reasons, to limit their participation with immigration detainers.[36]

---

requests. In previous written guidance regarding requests for notification of release, DHS has been consistently clear that it would like notice 48-hours in advance *if possible*. ICE, Detainer Policy, "Guidance for Completing I-247A" (April 2017), *available at* https://www.ice.gov/detainer-policy. The DOJ's Byrne JAG Solicitation materials noticeably left out the words "if possible." *Supra* note 30, at 30. It was only once confronted with the present litigation that DOJ has now publicly backed down from the plain reading of its new "notice" condition, quoting extensively from the previously nonpublic Byrne JAG Grant Award for the County of Greenville, SC for its official interpretation. Def's Opp Memo., Dkt. 32, at 20.

[34] *Supra* note 30, at 20, 22.

[35] DOJ, Office of Justice Programs, "Edward Byrne Memorial Justice Assistance Grant (JAG) Program: FY 2016 Local Solicitation," at 1 (released May 16, 2017), *available at* https://www.bja.gov/funding/JAGLocal16.pdf.

[36] Compl. at ¶ 70, San Francisco v. Trump, Case No. 17-485, Dkt. 1 (N.D. Cal. Jan. 31, 2017); Compl. at ¶ 131, Santa Clara v. Trump, Case No. 17-574, Dkt. 1 (N.D. Cal. Feb. 3, 2017).

## V.    CONCLUSION

DOJ's unprecedented addition of immigration conditions to Byrne JAG is just the latest chapter in the Executive Branch's aggressive attempts to coerce and conscript local law enforcement over the last ten years.  *Amici* ask the Court to enjoin and hold unlawful these conditions to preserve trust between law enforcement and immigrant communities.


Dated:  August 31, 2017                    Respectfully submitted,


                                    **By:**    /s/   Mark Fleming

                                        Mark Fleming
                                        Kate Melloy Goettel
                                        NATIONAL IMMIGRANT JUSTICE CENTER
                                        208 South LaSalle Street, Suite 1300
                                        Chicago, Illinois 60604
                                        Telephone: (312) 660-1370
                                        Facsimile: (312) 660-1505
                                        mfleming@heartlandalliance.org
                                        kgoettel@heartlandalliance.org


                                        Spencer E. W. Amdur
                                        Cody H. Wofsy
                                        AMERICAN CIVIL LIBERTIES UNION
                                        FOUNDATION—IMMIGRANTS' RIGHTS
                                        PROJECT
                                        39 Drumm Street, 4th Floor
                                        San Francisco, CA 94111
                                        Tel: (415) 343-1198
                                        samdur@aclu.org
                                        cwofsy@aclu.org


                                        *Counsel for Amici*

15

## CERTIFICATE OF SERVICE

I, Mark Fleming, hereby certify that on August 31, 2017, I caused a true and correct copy of the foregoing Brief of Amici Curiae National Immigrant Justice Center, et al. in Support of Plaintiff's Motion for Preliminary Injunction to be filed and served on all participants in this case via the court's CM/ECF system.

Dated:  August 31, 2017                     Respectfully submitted,


                                            By:    /s/  Mark Fleming
                                                   Mark Fleming
                                                   National Immigrant Justice Center
                                                   208 South LaSalle Street, Suite 1300
                                                   Chicago, Illinois 60604
                                                   Telephone: (312) 660-1370
                                                   Facsimile: (312) 660-1505
                                                   mfleming@heartlandalliance.org

16