UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **THE CITY OF CHICAGO,**<br><br>　　　　　　　　　　*Plaintiff,*<br><br>　　　v.<br><br>**JEFFERSON BEAUREGARD SESSIONS III,**<br>**Attorney General of the United States**<br><br>　　　　　　　　　　*Defendant.* | Civil Action No. 1:17-cv-5720<br>Hon. Harry D. Leinenweber |

**MEMORANDUM OF LAW IN SUPPORT OF CHICAGO'S MOTION FOR PARTIAL RECONSIDERATION**

Chicago seeks partial reconsideration of this Court's decision on the City's motion for a preliminary injunction based on new evidence that was first made available to the City only yesterday morning. That evidence is a letter from the Department of Justice (the "Department") to the City (the "Letter," attached as Exhibit A to the Holtzblatt Declaration) offering a stark new interpretation of 8 U.S.C. § 1373 that departs from the position the Attorney General took before the Court earlier in this litigation and erodes critical bases for this Court's decision with respect to Section 1373 compliance. The Letter contradicts the Attorney General's prior representation to this Court that 8 U.S.C. § 1373 imposes no affirmative obligations on Chicago and for the first time attempts to extend Section 1373 to City policy governing whether and under what circumstances to notify federal officials of the release date or custody status of individuals held by the City. This Court had relied on the Attorney General's repeated assurances that Section 1373 imposes no affirmative obligations on Chicago and that Section 1373 in no way authorizes the Department's "notice" condition in determining that Chicago is unlikely to succeed on its claim that Section 1373 violates constitutional anti-commandeering principles. The Attorney General's new positions call

this Court's decision on the Section 1373 condition into question and thus warrant reconsideration as to that ruling.

## BACKGROUND AND ARGUMENT

In Chicago's complaint initiating this lawsuit, the City explained that the Department had "contradicted itself in a bid to interpret Section 1373," stating on the one hand that "Section 1373 requires no affirmative action by States and local governments," Complaint ¶ 117 (citing U.S. Dep't of Justice, Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373, at 1 (2016), https://tinyurl.com/y8e4j8es), but on the other that "States and local governments may need to provide affirmative instruction to employees to be in compliance," *id.* (citing Memorandum from Michael E. Horowitz, Inspector Gen., U.S. Dep't of Justice, to Karol V. Mason, Assistant Attorney Gen., Office of Justice Programs, U.S. Dep't of Justice, Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients 6 (May 31, 2016), https://tinyurl.com/y9rpwge4).

In its motion for a preliminary injunction, Chicago sought to enjoin the Section 1373 condition as a violation of Tenth Amendment anti-commandeering principles, in part because, based on the Department's prior statements, the City understood that Section 1373 could be used to impose an affirmative obligation on the City. *See* PI Mem. at 20-21, Dkt. No. 23; *see also, e.g.*, *Printz v. United States*, 521 U.S. 898, 935 (1997) (the federal government cannot "command the States' officers . . . to administer or enforce a federal regulatory program"). During the hearing on the City's motion, this Court repeatedly sought to clarify whether the Attorney General understood Section 1373 to impose any affirmative obligations on the City. In response to the Court's questions, the Attorney General disclaimed, in clear terms, that there were any such obligations, explaining that "the current administration very much believes in the 10th Amendment and separation of powers, and so affirmative obligations to actually go and employ the regulatory system would be one thing,

but 1373 doesn't require that at all." *E.g.*, Oral Arg. Tr. 59:7-11; *see also id.* 51:4-9 ("Section 1373 . . . just bars the City from having a policy that bars itself the reporting of that information.").

This Court further questioned the Attorney General about whether Section 1373 authorized the Department's "notice" condition. The Attorney General responded by expressly assuring the Court that "1373 does not specifically authorize" federal authorities to insist on receiving notice "before [a] person is released" from the City's custody. Oral Arg. Tr. 54:6-12.

This Court held that Chicago had not shown a likelihood of success on the merits because the Court concluded that "only *affirmative* demands on states constitute a violation of the Tenth Amendment," and "[r]ead literally, Section 1373 imposes no affirmative obligation on local governments," as the Attorney General had insisted at the hearing. *Id.* at 34-35 (emphasis added). The Court recognized, however, that Section 1373 might still "practically limit the ability of state and local governments to decline to administer or enforce a federal regulatory program" in a manner that was in considerable tension—and perhaps even outright conflict—with *Printz* and the Tenth Amendment. *Id.* at 34. The Court further emphasized, presumably also relying on the Attorney General's representations during the hearing, what it understood to be Section 1373's limited scope: prohibiting localities "only from directly restricting the voluntary exchange of *immigration information* with the INS." *Id.* at 29 (emphasis added).

On October 12, Chicago received the Letter from the Department announcing its preliminary determination that Chicago was not in compliance with Section 1373 and would thus be ineligible for Byrne JAG funding.[1] Though preliminary as to Chicago's compliance with Section 1373, the Letter announces a final, definitive, and expansive new interpretation of Section 1373,

---

[1] As recounted in Chicago's Complaint, Dkt. No. 1, ¶¶ 3-4, 44-54, on April 21, 2017, the Department sought a certification from Chicago that the City was in compliance with Section 1373, and Chicago so certified on June 30, 2017. *See* Ex. A, Complaint, Dkt. No. 1-1 (Siskel Mem. to Office of Justice Programs, U.S. Dep't of Justice).

under which policies that prohibit the sharing of information *other than immigration status information* are nevertheless within Section 1373's ambit, and in which Chicago is required to *affirmatively instruct* its employees that they may cooperate with federal immigration authorities in order to be considered in compliance with the statute.

First, the Letter addresses Section 42 of Chicago's Welcoming City Ordinance ("WCO"), which provides that no City agency or agent shall "expend their time responding to [U.S. Immigration and Customs Enforcement ("ICE")] inquiries or communicating with ICE regarding a person's *custody status* or *release date*." Chi. Mun. Code § 2-173-42 (emphasis added). The Letter asserts without elaboration that Section 42 "restricts the sharing of information regarding immigration status in violation of 8 U.S.C. § 1373(a)." Letter at 1. This is the first indication that the Department believes that a person's "custody status" and "release date" are "information regarding *immigration status*."

The Letter does not explain how, as a matter of statutory interpretation or basic common sense, the information-sharing restricted by Section 42 of the WCO regarding a person's "custody status" and "release date" qualifies as "information regarding . . . citizenship or immigration status" under Section 1373(a). Information about whether a person is in custody and, if so, his or her expected date of release indicate nothing about that person's immigration status. Immigration status is plainly a different category of information than generic facts about a person's detention and date of release. As the Northern District of California just recently explained, "no plausible reading of 'information regarding … citizenship or immigration status' encompasses the release date of an undocumented inmate." *Steinle v. City and County of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).

Next, the Letter says that Sections 20 and 30 of the WCO, which restrict information sharing regarding immigration status when such sharing is not required by state or federal law, "may

4

violate 8 U.S.C. § 1373, depending on how [the City] interprets and applies them." Letter at 1. The Letter then notes the Department's preferred interpretations and asks that the City certify that it has adopted them. But it also goes one step further, stating that even if the City has adopted a permissible interpretation as a matter of law, it will "violate[] section 1373[]" if it does not follow the Department's instructions regarding how to implement that law by "communicat[ing] [the Department's preferred] interpretation to its officers and employees." *Id.* at 2. According to the Letter, then, Chicago must do more than *not restrict* information sharing; it must *affirmatively instruct* its employees that they are free to cooperate with federal immigration authorities in enforcing federal immigration law by sharing immigration status (and presumably, release date and custody) information. In other words, it must, directly contrary to the Attorney General's representations to this Court, comply with an "affirmative obligation[] to actually go and employ the regulatory system." Oral Arg. Tr. 59:7-11.

The Letter, thus, contradicts the premises on which this Court's decision was based in two ways. *First*, the Letter requires Chicago to take affirmative action by mandating that the City affirmatively "communicate" with its employees that they are free to enforce federal immigration law on the City's time and dime, by sharing immigration status information with federal authorities. This revelation that the Department construes Section 1373 to place affirmative demands on Chicago is not only at odds with the Attorney General's representations to this Court and the bases for the Court's decision*, see* PI Op. 35, it also makes plain why Section 1373 violates the Constitution. As the Supreme Court emphasized in *Printz*, an instruction to take affirmative action is no less commandeering because it requires "discrete, ministerial tasks." 521 U.S. at 929. Even activities that are limited in scope place local governments "in the position of taking the blame for" a federal policy and thereby reduce the accountability of the federal government—a key justification for the anti-commandeering rule. *Id.* at 929. The Letter goes well beyond challenging any restriction

5

Chicago may have placed on its employees sharing information covered by Section 1373, to demand that City use its own voice to endorse employees' use of City time and resources to enforce federal immigration law.

*Second*, the Letter makes plain that the Department will seek to use the Section 1373 condition far more expansively than previously disclosed, to require not only cooperation in the sharing of immigration status information, but also information concerning general custody status and release dates (and presumably other information unrelated to immigration status). On this apparent reading, Section 1373 would not merely prevent local governments from controlling their own employees as to one particular activity (namely, sharing immigration status information), but would instead tie local governments' hands while their employees' time and energy is taken up by all manner of requests made by federal immigration officials. Such a strategy for inducing local officers to enforce federal law against the wishes of the City violates anti-commandeering principles. *See County of Santa Cruz v. Gonzales*, 2008 WL 3892019, at *3 (N.D. Cal. 2008) (unlawful commandeering where federal government "deliberately seek[s] to frustrate the state's ability" to implement its own policy and the "effect of [that] concerted effort … would be to require state officials to enforce [federal law]"); *see also Conant v. Walters*, 309 F.3d 629, 645-646 (9th Cir. 2002) (Kozinski, J., concurring) (commandeering where the federal government "deliberately undermines" State policy in "a backdoor attempt to 'control or influence the manner in which the States regulate private parties'" (quoting *Reno v. Condon*, 528 U.S. 141, 150 (2000))). And by expansively restricting the City's authority to control its own employees, it strikes at the heart of the City's sovereignty. *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign."); *Romero v. United States*, 883 F. Supp. 1076, 1087 (W.D. La. 1994) ("[T]he ability to control its law enforcement officers, methods of law enforcement and law enforcement funding priorities are

6

necessary elements of any sovereign's ability to maintain public order."); *see also Oklahoma v. U.S. Civil Serv. Comm'n*, 153 F.2d 280, 282 (10th Cir. 1946) ("It is the prerogative of a state to create and maintain officers of government according to its own choice, free from interference by the United States.").

Reconsideration may be "appropriate … in those rare instances in which … new evidence of which the parties could not have been aware comes to light after submission of the matter to the court." *Bodenstab v. J.R. Blank & Assocs., Inc.*, No. 88 Civ. 6125, 1991 WL 33647, at *1 (N.D. Ill. Mar. 8, 1991) (granting reconsideration); *see also, e.g., Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1269–70 (7th Cir. 1996) (motion for reconsideration appropriate to consider "newly discovered evidence"). This is one of those instances. This Court should grant partial reconsideration of its decision on the preliminary injunction motion as to the Section 1373 condition in light of the Letter, and should hold, on reconsideration, that the Attorney General has strayed too far into the domain of state and local governments.[2]

| | |
|---|---|
| October 13, 2017 | Respectfully Submitted, |
| | By /s/ Edward N. Siskel |
| JAMIE S. GORELICK (*pro hac vice*) | EDWARD N. SISKEL |
| DAVID W. OGDEN (*pro hac vice*) | Corporation Counsel of the City of Chicago |
| ARI HOLTZBLATT (*pro hac vice*) | |
| ARI SAVITZKY (*pro hac vice*) | JUSTIN A. HOUPPERT |
| MOLLY JENNINGS (*pro hac vice*) | Assistant Corporation Counsel |
| BRIDGET FAHEY* (*pro hac vice*) | SCOTT D. SPEARS |
| WILMER CUTLER PICKERING HALE | Assistant Corporation Counsel |
| AND DORR LLP | 121 N. LaSalle Street, Suite 600 |
| 1875 Pennsylvania Avenue NW | Chicago, IL 60602 |
| Washington, DC 20006 | (312) 744-0220 |
| (202) 663-6000 | edward.siskel@cityofchicago.org |

---

[2] For the avoidance of doubt, Chicago does not waive any additional arguments challenging the Letter's legal premises and conclusions, including that the Department's expansive new legal interpretation of Section 1373 is wrong, and that the Department's attempt to enforce that interpretation is *ultra vires* and unlawful.

<div style="column-count:2">

DEBO P. ADEGBILE (*pro hac vice*)
WILMER CUTLER PICKERING HALE
   AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*\* Admitted to practice only in Colorado.
Supervised by members of the firm who are members of the District of Columbia Bar*

ANDREW W. WORSECK
Chief Assistant Corporation Counsel
30 N. LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-0220

RONALD S. SAFER
MATTHEW C. CROWL
NICK KAHLON
LAURA KLEINMAN
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700

*Attorneys for the City of Chicago*

</div>

8

## CERTIFICATE OF SERVICE

On the 13th day of October, 2017, I electronically filed the foregoing brief using the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by that system.

/s/ Edward N. Siskel
EDWARD N. SISKEL