# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE UNITED STATES CONFERENCE OF MAYORS; CITY OF CHICAGO,<br><br>Plaintiffs,<br>v.<br><br>JEFFERSON BEAUREGARD SESSIONS III,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 17-CV-5720<br><br>Honorable Harry D. Leinenweber |

**<u>DECLARATION OF TOM COCHRAN</u>**

I, Tom Cochran, declare as follows:

1. I am the Chief Executive Officer and Executive Director of the United States Conference of Mayors (the "Conference"). In that role, I serve as the chief administrative officer of the Conference, oversee the day-to-day operations of the Conference, and direct its staff. I have served the Conference in that capacity since 1987.

2. I submit this declaration in support of the Conference's motion for a preliminary injunction. I have personal knowledge of each of the matters stated herein, and if called to testify would testify consistent with this declaration.

**<u>The Conference and Its Members</u>**

3. The Conference is a non-profit association organized under the laws of Illinois and with its offices in the District of Columbia.

4. The Conference was formed in 1932, during the midst of the Great Depression, when the nation's cities were close to bankruptcy and their residents were largely unemployed and without access to sufficient food, housing, law enforcement and other necessities. In response to

the appeals of mayors across the country, Congress created a $300 million federal assistance program for cities, marking the first time in the nation's history that federal relief was provided directly to cities. A few weeks later, the Conference was founded to coordinate cities' interactions with the federal government.

5. Today the Conference is the official non-partisan organization of United States cities with populations of 30,000 or more. As such, the Conference represents the interests of over 1,400 cities in the United States, including cities in the Northern District of Illinois and in almost every other jurisdiction in the country. Over 150 million Americans reside in these cities.

6. The primary roles of the Conference are to promote the development of an effective national city and metro-area-focused policy, to strengthen federal-city relationships, to ensure that federal policy meets urban needs, to provide mayors with leadership and management tools that allow them to do their jobs better, and to create a forum in which mayors can share ideas, information and best practices, and through which cities can coordinate on shared policy goals.

7. Conference members speak with a united voice on organizational policies and goals. Mayors contribute to the development of national urban policy by serving on one or more of the conference's standing committees or in another leadership role.

8. A true and correct list of member cities whose mayors are currently serving in leadership roles is attached as Exhibit A to this declaration. As reflected on Exhibit A, member cities whose mayors are currently serving in a leadership role are located across the country, in 34 states and the District of Columbia.

**The Conference's Members Rely Upon Byrne JAG Funding.**

9. The Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program is a federal formula grant program that was established in 2006 to provide federal funding directly

to states and municipalities to help those local jurisdictions with important local law enforcement objectives. *See* Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162.

10. Since 2006, most of the Conference's members have applied for and received Byrne JAG grant funds. Indeed, many Conference members have applied for and received funds in each of the program's 11 years of operation.

11. For example, of the 82 member cities (including the District of Columbia) whose mayors are currently serving in a Conference leadership role, 71 cities have been directly allocated funds for the Fiscal Year 2017 Byrne JAG program. (*See* Ex. A.) These include small cities such as Lima, Ohio, a city of approximately 38,000 residents that has been allocated $35,866 in funds, and Beaverton, Oregon, a city of approximately 89,000 residents that has been allocated $13,700 in funds.[1] (*Id.*) It also includes large cities, such as Houston, Texas, a city of over 2 million residents that has been allocated $1,668,542 in funds; Los Angeles, California, a city of almost 3.8 million residents that has been allocated $1,555,265 in funds; and New York, New York, a city of over 8.1 million residents that has been allocated $4,120,447 in funds. Together, these 71 Conference member cities have been directly allocated over $21.5 million in Byrne JAG funds for the Fiscal Year 2017. (*Id.*)

12. Still other Conference members receive Byrne JAG funds indirectly through grants made to the states. These are typically smaller cities that receive a small share of the total Byrne JAG funds allocated. In Fiscal Year 2017, for example, the Office of Justice Programs will not make direct grants to cities that, under the Byrne JAG formula, would receive less than $10,000. (*See* https://www.bja.gov/funding/JAGLocal16.pdf, at p. 9 (last visited October 18, 2017).) This

[1] Fund allocations are posted by the Department of Justice, Office of Justice Programs, and are available at https://www.bja.gov/Programs/jag/17jagallocations.html (last visited October 17, 2017.)

includes numerous of the Conference's member cities. For example, Conference member Piscataway, New Jersey receives funds through a grant made directly to the State of New Jersey that is then shared among its municipalities.

13. Still other Conference members receive Byrne JAG funds indirectly through grants made to counties or other subdivisions of state and local governments.

14. Most of the Conference's members are allocated Byrne JAG funds, either directly or indirectly through a state or countywide grant.

15. In my role for the Conference, my staff and I work closely with our member mayors on policy matters relating to the Byrne JAG program. In that role, I am privy to the many and diverse uses to which Conference members put Byrne JAG funds. These include, for example, the following Conference members:

a. Chicago, Illinois has used Byrne JAG funds to support projects ranging from critical law enforcement equipment and overtime to community policing outreach and engagement.

b. Iowa City, Iowa uses Byrne JAG funds to promote traffic safety, to establish a search and rescue program aimed at individuals at risk for wandering, to partially fund a drug task force, and to purchase equipment.

c. Los Angeles, California uses Byrne JAG funds for its Community Law Enforcement and Recovery (CLEAR) program, which aims to reduce gang violence in the city and rehabilitate communities that have experienced significant crime. The program promotes and funds special criminal investigative units, an aggressive vertical prosecutorial program, probation and parole officers, youth intervention organizations, and schools.

d. New Orleans, Louisiana has used Byrne JAG funds on gun violence reduction initiatives, alternatives to incarceration for municipal court, diversion programs for eligible defendants with mental illness, pre-trial and probation advocacy, domestic violence monitoring court, and technology upgrades including body cameras and audio surveillance equipment for its police force.

e. New York, New York uses Byrne JAG funds to support a wide range of programs, including efforts to improve the collection, organization and evaluation of criminal justice data, a specialized unit that investigates illegal

hotels, building violations and illegal adult establishments, initiatives to reduce the number of people with mental and behavioral needs who cycle through the criminal justice system by connecting them with interventions and services, special programs to support the prosecution of drug sellers who traffic large quantities of narcotics, and initiatives to ensure the safety of students and reduce crime in schools. In addition, the City's five District Attorneys use Byrne JAG funds to support many programs, including the Kings County Drug Treatment Alternative-to-Prison program, which diverts hundreds of nonviolent offenders to community-based residential drug treatment programs, and the New York County Cybercrime and Identity Theft Bureau, which protects the public and institutions from organized cybercrime and identity theft schemes.

f. Piscataway, New Jersey has used Byrne JAG funds for a variety of technology equipment, including outfitting patrol cars with mobile video recorders, a license plate recognitions system, traffic radar systems and body cameras.

g. Portland, Oregon has used Byrne JAG funds to support its New Options for Women (NOW) program, which provides services to women who have experienced sexual exploitation while working in the commercial sex industry.

h. Providence, Rhode Island uses Byrne JAG funds to pay personnel to conduct targeted enforcement patrols and to contract with Family Service of Rhode Island for the services of a part-time Bilingual Police Liaison.

i. Sacramento, California uses Byrne JAG funds to support the ongoing maintenance and operations of its Police Department's helicopter program.

16. Many other Conference members receive Byrne JAG funds and use them for still different, but no less critical, law enforcement purposes. These members include, as further examples, cities as diverse as Cambridge, MA; Washington, D.C.; Denver, CO; Houston, TX; Iowa City, IA; Menlo Park, CA; Ithaca, NY; Madison, WI; Oakland, CA; Rochester, NY; Salinas, CA; San Jose, CA; Philadelphia, PA; Pittsburgh, PA; Santa Ana, CA; Seattle, WA; Santa Fe, NM; Sommerville, MA; Syracuse, NY; and Tucson, AZ. They also include those member cities listed separately on Exhibit A, and many other cities like them.[2]

[2] The Office of Justice Programs has published additional examples of program successes in varied jurisdictions, including in additional Conference member cities. *See* https://www.bja.gov/SuccessStoryList.aspx (last visited October 17, 2017).

17. Without Byrne JAG funds, the Conference's members would have to shut down some, or all, of these programs, change their staffing, scope, or goals, or divert funds from other policing objectives to sustain them.

**The Conference and Its Members Have Long Promoted a Policy of Cooperation Between Local Law Enforcement and Immigrants in Their Cities.**

18. The Conference's member cities are home to immigrant populations that are both recent arrivals and multigenerational families. The Conference proudly recognizes that cities are diverse, multicultural centers, and that their diversity reflects core American values, fosters economic prosperity and opportunity, enriches cities' cultures, and keeps our nation competitive and strong.

19. In addition, the Conference and its members recognize that immigrant populations are necessary and critical to effective local law enforcement, over which the Conference believes each individual city should have discretion and control.

20. For example, in exercising its discretion over local law enforcement policy, Conference member Chicago has made the considered judgment that devoting local resources to civil immigration enforcement would be detrimental to community safety, and that concerns for safety are best addressed by promoting a policy of cooperation between local law enforcement and immigrants. This policy judgment is codified in Chicago's "Welcoming City Ordinance." *See* Chicago Municipal Code § 2-173.

21. Many of the Conference's other members have adopted similar policies. These include, for example, Gary, Indiana; Los Angeles, California; New York, New York; Philadelphia, Pennsylvania; and Providence, Rhode Island.[3]

[3] Gary -- Ordinance No. 9100;
Los Angeles -- LAPD Intradepartmental Correspondence Dated July 3, 2014 (available at https://www.ilrc.org/detainer-policies);

22. These policies are rooted in the considered judgment of each city that restricting entanglement with federal immigration enforcement will secure and enhance the community's trust in local law enforcement, which is vital to the work of public safety in these cities. Local law enforcement relies upon all community members – regardless of immigration status – to report crimes, serve as witnesses, and assist in investigations and prosecutions. Indeed, in the experience of the Conference and many of its members, even the *perception* that local law enforcement is assisting in immigration enforcement can erode trust, disrupt lines of communication, and make law enforcement's job much more difficult.

**The Conference Opposes Punitive "Sanctuary Jurisdiction" Policies Such as Those Challenged in this Action.**

23. The Conference has for years opposed attempts by the federal government to penalize cities that adopt policies such as those cited above. In 2015, for example, the Conference opposed Senate Bill 2146, the "Stop Sanctuary Policies and Protect Americans Act," which proposed to deny Community Development Block Grants and other federal aid to cities that adopted policies like those identified above. The Conference did so because in its estimation, shifting the federal responsibility of enforcing civil immigration law to local governments diverts critical resources from their law enforcement agencies, compromises public safety, and hinders local police department policies designed to encourage all police to work with immigrant communities to prevent and solve crimes. The Conference has continued to oppose similar legislation, none of which has passed Congress.

New York – Admin. Law N.Y. § 14-154 (available at https://www.ilrc.org/sites/default/files/resources/nyc.pdf);
Philadelphia – Executive Order No. 16 (available at https://www.ilrc.org/detainer-policies);
Providence – Resolution of the City Council (available at https://www.ilrc.org/sites/default/files/resources/providence_resolution.pdf).

24. More recently, Conference members met from June 23-26, 2017 for this year's annual meeting. The annual meeting was attended by over 250 mayors from cities across the country, including those from nearly every state and the Commonwealth of Puerto Rico. A true and correct copy of a list of mayors registered to attend the annual meeting is attached as Exhibit B to this declaration.

25. At the annual meeting, the Conference's members adopted three resolutions recognizing the importance of immigrants to their communities, supporting immigrant rights, standing against policies that target immigrant communities and opposing the current Administration's punitive sanctuary city policies.

26. The adoption of a resolution is the principal means by which the Conference speaks on matters of policy. Each year, the Conference shares its adopted resolutions with Congress and the President of the United States.

27. The Conference passes resolutions only after careful study and consideration. Each resolution must first be adopted by a standing committee of members devoted to considering similar issues and then be presented to the full membership in attendance at the annual meeting for consideration, debate and a vote.

28. On May 25, 2017, the mayor of Austin, Texas proposed one of three resolutions devoted to immigration matters, titled "Opposing Punitive Sanctuary Jurisdiction Policies." This resolution was advanced by the standing committee on Criminal and Social Justice, and it was passed by the membership on June 26, 2017. A true and correct copy of this resolution is attached as Exhibit C to this declaration.

29. This resolution reflected the Conference members' considered judgment that, among other things:

a. Many local jurisdictions have made the determination that their local law enforcement efforts and personnel have neither the authority, the priority, nor the resources to serve as immigration enforcement officers;

b. Trust between local law enforcement and the communities they serve is critical to preventing, solving, and prosecuting crimes, and many jurisdictions have made the determination that having local law enforcement officers serve as immigration officers would break that trust;

c. Many local jurisdictions and authorities do not have the law enforcement resources to act as immigration officers at the expense of their local and state law enforcement priorities; and

d. Cities and other local government entities need to have the discretion to make individualized determinations relative to local values, expenditure of resources, priorities, and liabilities assumed, all taking into account:

   i. Immigrants residing in our nation's cities must be able to trust the police and all of city government and that their 4th Amendment rights will be guaranteed; and

   ii. The efforts of local law enforcement to build trust and supportive relationships with all communities, including immigrant communities, is essential to preventing and prosecuting crime and helping victims.

(Exhibit C at 1-2.)

30. Accordingly, the Conference resolved to:

a. Urge the Administration to repeal Executive Order 13768 and its overly broad and uncertain definition of what constitutes a "sanctuary jurisdiction";

b. Oppose punitive "sanctuary jurisdiction" policies that limit local control and discretion;

c. Urge Congress, the Administration, and states to pursue immigration enforcement policies that recognize that local law enforcement has limited resources and community trust is critical to local law enforcement and the safety of our communities;

d. Oppose federal and state policies that commandeer local law enforcement or require local authorities to (i) violate, or be placed at risk of violating, a person's 4th Amendment rights, or (ii) Otherwise assist federal immigration authorities beyond what is determined by local policy.

(Exhibit C at 2.)

31. The Conference and its members passed two additional resolutions urging the Administration to respect local law enforcement choices and the policy choices of cities in interacting with their immigrant communities.

32. First, on June 26, 2017, the Conference passed a resolution "Supporting Immigrants, Refugees, and Asylum Seekers and Standing Against Discriminatory or Harmful Policies that Target These Vulnerable Communities." A true and correct copy of this resolution is attached as Exhibit D to this declaration.

33. This resolution recognized that cities across America are home to immigrant populations that are both recent arrivals and multigenerational families, that those immigrants contribute to their cities in important ways, and that the administration has nonetheless antagonized and intimidated those communities through executive orders and by threatening punitive actions against so-called "sanctuary cities" like those challenged in this action. (Ex. D at 1.) The Conference thus resolved to call on Congress to act against policies that discriminate against and target immigrants, and to oppose "the administration's efforts to hold immigrants hostage as bargaining chips to threaten withholding federal funding from cities across the nation." (*Id.*)

34. Second, on June 26, 2017, the Conference passed a resolution "Supporting Immigrant Rights." A true and correct copy of this resolution is attached as Exhibit E to this declaration.

35. This resolution recognized that the United States has always been a nation of immigrants, that it is enriched by the diversity of immigrants, that our cities are diverse, multicultural centers that reflect core American values and that foster economic prosperity, and that data has shown that so-called "sanctuary cities" are both stronger economically and safer than other cities. (Ex. E at 1.) In addition, the resolution recognized that the federal government has

recently sought to restrict funding to sanctuary jurisdictions, coerce and compel cities and their employees to comply with federal immigration detainer requests and to prolong the detention of suspected aliens in the custody of local law enforcement officials, and that this undermines mayors' ability to ensure the safety of their communities by eroding trust between local law enforcement and city residents. (*Id.* at 1-2.) The Conference thus resolved to "call[] for an end to unconstitutional federal funding threats to states and local governments in an effort to coerce and compel them into implementing federal immigration law," and to "urge members of Congress to withdraw legislation that attempts to cut local law enforcement funding necessary to ensure the safety of our communities." (*Id.*)

36. Each of these resolutions passed with a wide majority of the Conference members present for the annual meeting. In fact, after conclusion of a vote on a proposed resolution that passes, a member mayor who attended the vote may request to be recorded as having voted "No" on that specific resolution. Only five mayors of the over 250 mayors in attendance at the annual meeting recorded such a vote as to any of these three resolutions.

37. These policies reflect the considered, collective judgment of the Conference and its members that local law enforcement should not be coerced, through the threat of defunding critical law enforcement programs, into engaging in federal civil immigration enforcement, particularly at the cost of alienating city residents and hindering the prevention and prosecution of serious, often violent, crimes. To put it simply, doing so will make cities across the country less safe.

**The Attorney General's Conditions are Inconsistent with Conference Policy and the Law Enforcement Priorities of the Conference's Members.**

38. Notwithstanding the Conference and its members' policy judgment on these critical matters affecting local law enforcement and community safety, the Department of Justice ("DOJ") and the Attorney General have attempted to coerce the Conference's members into agreeing to

three conditions of receiving Byrne JAG funds for the fiscal year 2017. Under these conditions, Conference members must agree to (1) "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act;" (2) "permit personnel of the [DHS] to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States;" and (3) certify compliance with 8 U.S.C. § 1373, which prohibits localities from restricting officers from sharing information regarding "citizenship or immigration status" with federal authorities. (*See* Conference Complaint, ¶¶ 46-57, Ex. E at 30.)

39. Even after the Court granted a preliminary injunction against the first two of these three conditions, the DOJ and Attorney General have continued their attempts to coerce the Conference's members into assisting in federal immigration enforcement. On September 15, 2017, the Court granted Chicago's motion for a preliminary injunction as to the first two of these three challenged conditions (the "notice" and "access" conditions), finding that the Attorney General lacked statutory authority to impose them on grant applicants. (*See* Docket ("Dkt.") 78.) The Court denied Chicago's motion as to the third condition (regarding Section 1373) on the basis that, while Section 1373 restricts the ability of localities to prohibit officials from assisting in a federal program, "it does not *require* officials to assist in the enforcement of a federal program." (Dkt. 78 at 33 (Court's emphasis).)

40. On October 11, 2017, the DOJ sent letters to four of the Conference's member cities including, in addition to Chicago, New Orleans, New York and Philadelphia. True and correct copies of these letters are attached as group Exhibit F to this declaration. In the letters, DOJ makes

clear that it *will require* cities and their officers to affirmatively assist in federal immigration enforcement as a condition of receiving Byrne JAG funds. DOJ does so by (1) interpreting Section 1373 to require that officers be permitted to share not just information regarding "immigration status," but also to give advance notice of an alien, or suspected alien's, release from custody, and (2) requiring these cities to affirmatively communicate DOJ's interpretation of Section 1373 to each of its officers, and to certify to DOJ that it has done so.

41. By attempting to force cities to provide notice to federal immigration authorities of any suspected alien with whom local law enforcement comes into contact and unlimited access to local law enforcement facilities to conduct custodial interrogations of suspected aliens, and to affirmatively require local law enforcement officers to communicate immigration status, custody status and release dates to federal officers, the Conference submits that the Attorney General has overstepped his statutory and Constitutional authority. If permitted to continue insisting upon such conditions, the Attorney General will leave the Conference's members with an unacceptable choice: forego federal law enforcement funds allocated to them by Congress and needed for critical local equipment, training and programming, or submit to the Attorney General's conditions and, in doing so, jeopardize their residents' and officers' safety.

42. No Conference member should have to make that choice. Accordingly, I submit this declaration in support of the Conference's motion to preliminarily enjoin the Attorney

General from imposing these unauthorized and unlawful conditions on the Conference's members.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on October 19 2017.

By: Tom Cochran

Tom Cochran



Scanned by CamScanner