UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **THE CITY OF CHICAGO,**<br><br>*Plaintiff,*<br><br>v.<br><br>**JEFFERSON BEAUREGARD SESSIONS III,**<br>**Attorney General of the United States**<br><br>*Defendant.* | Civil Action No. 1:17-cv-5720<br>Hon. Harry D. Leinenweber |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL RECONSIDERATION**

The Attorney General's position regarding the requirements of Section 1373—set forth for the first time in his October letter to Chicago—would impose new, affirmative responsibilities on the City. His response brief only feints at explaining why that new interpretation does not undercut this Court's prior decision on the City's preliminary injunction motion and necessitates reconsideration. Instead, the Attorney General spends most of his brief arguing points that the City did not raise and that are irrelevant to the ultimate disposition of this motion. He has identified no valid reason the Court should not grant the relief Chicago has requested.

Most importantly, the Attorney General ignores how we got here. When first confronted with the question whether Section 1373 imposes affirmative requirements on cities during argument on the City's motion for a preliminary injunction, the Attorney General brushed aside any such concern, assuring the Court that "affirmative obligations to actually go and employ the regulatory system would be one thing, but 1373 doesn't require that at all." Sept. 11, 2017 Tr. at 59:7-11. Relying on the Attorney General's representation, the Court concluded that "[r]ead literally, Section 1373 imposes no affirmative obligation on local governments," Dkt. 78, at 34, and instead "restricts

the ability of localities to prohibit state or local officials from assisting a federal program." *Id.* at 33. The "distinction between an affirmative obligation and a proscription" was crucial to this Court's determination that Chicago was unlikely to succeed on its constitutional challenge to Section 1373, as the Court concluded that "only affirmative demands on states constitute a violation of the Tenth Amendment." Dkt. 78, at 30-33. Because the Court read Section 1373 to impose no such affirmative demands, the Court concluded that the statute was "consistent with the constitutional principles enunciated in *New York* and *Printz*," two hallmark decisions of the Supreme Court's federalism canon. Dkt. 78, at 33.

But the Attorney General's position shifted after the Court issued its decision. On October 11, 2017, the Department of Justice issued a letter to Chicago that announced a broad interpretation of Section 1373 at odds with the Attorney General's earlier statements. Dkt. 103-1.[1] With his new interpretation, the Attorney General (1) announced that Section 1373 imposes an affirmative obligation on Chicago to instruct its employees that they may cooperate with federal immigration authorities, and (2) expanded the categories of information to which Section 1373 applies to encompass information other than immigration status information—namely, information about whether an individual non-citizen is in custody and the date he or she will be released. *Id.*[2] On these

---

[1] The Attorney General's position is not helped by his contention that imposing an affirmative communication requirement pursuant to Section 1373 is "not novel" (Opp. at 9) because it follows a suggestion from the 2016 Department of Justice guidance document. Rather, to the extent that this reflects a prior interpretation by the Department, that simply puts the Attorney General's representations to this Court in starker relief, especially given his prior efforts during the hearing on Chicago's motion to disclaim the very interpretation he now seeks to impose on the City. *See* Dkt. 101, at 2-3.

[2] Although not relevant to the disposition of this motion, the Attorney General spends significant space in his response (Opp. at 8-9, 10-12) elaborating a tortured—and unsustainable—interpretation of "immigration status" information as including a detained individual's "custody status and release date." He says that "immigration status" includes whether a person is "*not lawfully present* in the United States," Opp. at 11 (citing 8 U.S.C. § 1357(g)(10)(a)) (emphasis in original), and then asserts that "present" means "being in a certain place and not elsewhere." *Id.* (citing Webster's New

two points—concerning what Section 1373 requires—the Letter staked out a final view, though the Letter noted that the Department's determination about whether Chicago complies with those requirements was still preliminary. The Letter thus made crystal clear that the Attorney General believes Section 1373 imposes far broader obligations on cities than he previously admitted to this Court.[3]

When a "newly discovered" and "significant" fact arises after an order has issued, a Rule 59(e) motion is the proper vehicle to call that fact to the Court's attention. *Am. Soc'y of Media Photographers, Inc. v. Google, Inc.*, No. 13 C 408, 2013 WL 4953796 at *1 (N.D. Ill. Sept. 12, 2013); *see also Bodenstab v. J.R. Blank & Assocs., Inc.*, No. 88 C 6125, 1991 WL 33647 (N.D. Ill. Mar. 8, 1991). The October letter, sent after the Court ruled on Chicago's motion for a preliminary injunction, is "significant," because it demonstrates that the Attorney General's operative understanding of Section 1373—*i.e.*, the understanding that he will impose on Chicago absent injunctive relief— reaches beyond the bounds of what this Court has suggested are the constitutional limits on federal government authority and beyond the bounds that the Attorney General represented to this Court in

---

International Dictionary (2d ed. 1958)). Thus, he says, "immigration status" must refer to any "place" an alien is residing, and the length of time that alien is expected to remain there. But the word "present" cannot be shorn so brazenly from its context. Whether a person is or is "not lawfully present" within the meaning of section 1357(g)(10)(a) depends not on whether the person is present in a specific place, such as the City of Chicago, or even more specifically in one of its lock-up facilities, but on whether he or she is "present *in the United States*." Chicago reserves its right to elaborate on this and the many other defects with the Attorney General's erroneous construction of "immigration status"—and to seek a declaration that the City complies with Section 1373, *see* Dkt. 1 ¶¶ 136-41—at the proper juncture.

[3] Chicago submitted a response to the Department's Letter on October 27, 2017, which reaffirmed the City's compliance with Section 1373. *See* Second Holtzblatt Decl. Ex. A. While expressly reserving all current and future objections to the Department's new communication requirement, Chicago indicated that it had instructed its department heads "to share with their officers and employees Chicago's interpretation of the WCO and explanation of its compliance with Section 1373" in the interest of reaching an expeditious resolution to this issue. *Id.* at 3.

defending Section 1373's constitutionality. Reconsideration should be granted as to the denial of preliminary injunctive relief with respect to Section 1373.

**I.  USING SECTION 1373 TO REQUIRE AFFIRMATIVE ACTION, AS THE ATTORNEY GENERAL NOW SEEKS TO DO, REVEALS ITS CONSTITUTIONAL INVALIDITY**

The Attorney General does not, and cannot, contest this Court's conclusion that affirmative burdens on cities give rise to commandeering harms, nor does he deny that his new requirement necessitates affirmative action by Chicago. His principal defense is to try to downplay the significance of his affirmative requirement, characterizing it as "merely … advis[ing] [City] personnel about what federal law allows." Opp. at 9. But there is a critical difference between withholding restrictions on employee cooperation with federal officials (as this Court construed Section 1373 to require) and affirmatively instructing employees that they are free on the City's time and dime to assist in enforcing federal immigration law (as the Department's letter now requires). As the Attorney General surely knows, employees are far more likely to act when their employer affirmatively points out that they are free to do so than when the employer silently leaves that choice to the employees' own election. Even assuming that requiring Chicago not to restrict its employees is constitutional, forcing it to affirmatively grant permission to its police officers to help enforce federal law is not. State and local governments can act "only through [their] officers and agents." *Nevada v. Hicks*, 533 U.S. 353, 365 (2001) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)). Thus, personnel decisions—including decisions about how personnel interact with the federal government—are "decision[s] of the most fundamental sort" for Chicago. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).

Moreover, the Attorney General's suggestion that a supposed ambiguity in the Welcoming City Ordinance triggers this new affirmative obligation to instruct the City's employees (Opp. at 9) only illustrates the extraordinary breadth of his interpretation of Section 1373. As Chicago has maintained throughout this litigation, Section 1373's bar on "prohibit[ing]" or "in any way

4

restrict[ing]" information-sharing cannot be constitutionally understood to require cities to take affirmative steps to combat the theoretical risk that an employee might mistakenly think such information sharing is prohibited. *See, e.g.* Dkt. 69, at 9-10. Such an interpretation would turn what this Court has characterized as mere prohibition into an extraordinary sword that the Executive could wield (as it has already begun to do) to require cities to take a vast range of *affirmative* actions at the federal government's "direction." *New York v. United States*, 505 U.S. 144, 176-177 (1992) (holding that a federal program under which States were required to regulate "pursuant to Congress' instructions" was "inconsistent with the federal structure of our Government established by the Constitution").

Further, to the extent the Attorney General intended to suggest that there was a *de minimis* exception to the rule against commandeering, that suggestion directly contradicts Supreme Court precedent. Indeed, the Attorney General entirely fails to respond to *Printz v. United States*, which the City cited for its clear instruction that a directive by the federal government is no less commandeering because the required activities are "discrete, ministerial tasks." 521 U.S. 898, 929 (1997). Instead, the Attorney General cites the Court's statement in *Reno v. Condon* that a "State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity." Opp. at 9-10 (citing 528 U.S. 141, 150-51 (2000)). But *Reno* is inapposite. The law at issue in *Reno* did not regulate States *as States* at all, and thus did not implicate the same federalism concerns; instead, it regulated *all* participants in a private "interstate market for personal information," 528 U.S. at 150 n.3, who sold a particular category of "personal information to individuals and businesses." *Id.* at 143. This included States that happened to own databases and participate in the market. *Id.* at 151 (law applied to the entire "universe of entities that participate as suppliers to the market for motor vehicle information"). *Reno* turned on the fact that the law at issue in no way sought "'to control or influence the manner in which States

5

regulate private parties'" and so "d[id] not" regulate States "in their sovereign capacity." *Id.* at 150-151 (quoting *South Carolina v. Baker*, 485 U.S. 505, 514-515 (1988)). The case thus stands for the unremarkable proposition that it is not commandeering to require States participating in private markets to comply with otherwise valid federal rules for those markets.

Section 1373, by contrast, targets the purely public domain of "immigration law enforcement," S. Rep. No. 104-249, at 19 (1996). The "whole *object* of the law is to direct the functioning" of State and local governments acting in their sovereign capacity to define and safeguard rights and entitlements of their residents and to control the actions of their employees. *Printz*, 521 U.S. at 932. Unlike the law at issue in *Reno*, Section 1373 indisputably does "seek[] to control or influence the manner in which States regulate private parties" by inducing "state officials to assist in the enforcement of federal statutes." *Reno*, 528 U.S. at 150-151. *Reno* does not change this Court's conclusion that requiring affirmative action by States and cities constitutes commandeering, and it does not provide a basis for departing from *Printz*'s instruction that the size or ministerial nature of the required task does not diminish the constitutional significance of the federal government's intrusion into State sovereignty.

Thus, the Attorney General's interpretation runs head-long into the rule this Court elaborated for identifying unconstitutional commandeering. If Section 1373 means what the Attorney General says it means, and authorizes him to mandate affirmative action by cities and States, then under this Court's earlier reasoning, the City is entitled to a preliminary injunction prohibiting the Attorney General from imposing the Section 1373 condition.

## II.   THE ATTORNEY GENERAL OFFERS NO OTHER BASIS TO DEFEAT CHICAGO'S MOTION

Rather than grapple with the impact of the Department's recent letter on Chicago's longstanding Tenth Amendment arguments, the Attorney General suggests that this Court should ignore the issue. First, he asserts that Chicago's Tenth Amendment claims fail "because conditions

on federal funding do not amount to commandeering." Opp. at 5-6. That argument is no more persuasive now than it was when the Attorney General unsuccessfully made it in opposing Chicago's motion for a preliminary injunction. *See* Dkt. 32, at 13-14. As this Court has already explained, "Section 1373 must pass constitutional muster," Dkt. 78, at 25, and if it does not, it cannot be enforced against Chicago, through a Byrne JAG certification or otherwise. *See also id.* at 25-35 (analyzing whether Section 1373 violates the rule against commandeering). And for good reason. The Attorney General claims authority to enforce Section 1373 against Byrne JAG applicants on the theory that Section 1373 qualifies as an "applicable Federal law" with which Byrne JAG applicants must certify compliance. *See* 34 U.S.C. § 10153(a)(5)(D). But Section 1373 cannot qualify as an "applicable Federal law" because it is unconstitutional for the reasons stated above: "an unconstitutional act is *not a law* and can neither confer a right or immunity nor operate to supersede any existing valid law." *Chi., Indianapolis, & Louisville Ry. Co. v. Hackett*, 228 U.S. 559, 566 (1912) (emphasis added); *see also Branch v. Smith*, 538 U.S. 254, 281 (2003) (unconstitutional state law was "a legal nullity" and so was irrelevant to a provision directing action "as state law requires").

Next, the Attorney General simultaneously complains that Chicago's motion comes both too early, because the October letter was just "preliminary," Opp. at 1, 6-7, and too late, because Chicago could have made these arguments in its original motion for a preliminary injunction, Opp. at 4, 9, 12. Neither is true. Unlike his preliminary determination that Chicago does not comply with Section 1373, the Attorney General's interpretation of Section 1373 is entirely final. Neither the Letter nor anything in his response suggests that he may reconsider that interpretation based on any information provided by Chicago. And his suggestion that this motion comes too late ignores that the timing of Chicago's motion for reconsideration was driven entirely by the timing of the Attorney General's letter evaluating Chicago's prior submission certifying compliance with Section 1373. Once Chicago received that letter it moved expeditiously for reconsideration—just one day later.

7

Finally, the Attorney General suggests (Opp. at 2, 4) that Chicago filed its reconsideration motion for purposes of delaying his motion for a stay pending appeal in the Seventh Circuit, but that suggestion is similarly unfounded. The Department took three-and-a-half months to evaluate the City's submission, which Chicago submitted on June 30; once Chicago received the Attorney General's letter, it notified the Court and sought reconsideration the *next day*.[4] The Attorney General then sought (and obtained) a full ten days to respond to Chicago's motion, never proposing (as he now erroneously claims) a shorter briefing schedule than this Court entered. *See* Oct. 17, 2017 Tr. at 4:19-24. Any delay caused by the need to apprise the Court of the new positions announced in the Department's letter is thus wholly attributable to the Attorney General, not Chicago. And to the extent the Attorney General's complaint is that Chicago notified the Seventh Circuit that it temporarily lacks jurisdiction, that complaint is misplaced because Chicago (and the Attorney General, for that matter) was obligated to inform the Seventh Circuit that this motion might raise a jurisdictional defect. *See Espineuva v. Garrett*, 895 F.2d 1164, 1166 (7th Cir. 1990).

## CONCLUSION

The Court should reconsider its conclusion that Section 1373 is not unconstitutional and, upon reconsideration, issue a preliminary injunction prohibiting the Attorney General from enforcing the Section 1373 condition.

| | |
|---|---|
| October 30, 2017 | Respectfully Submitted, |
| | By /s/ Edward N. Siskel |
| | EDWARD N. SISKEL |
| | Corporation Counsel of the City of Chicago |

---

[4] Although the letter is dated October 11, Chicago did not receive it until October 12.

JAMIE S. GORELICK (*pro hac vice*)
DAVID W. OGDEN (*pro hac vice*)
ARI HOLTZBLATT (*pro hac vice*)
ARI SAVITZKY (*pro hac vice*)
MOLLY JENNINGS (*pro hac vice*)
BRIDGET FAHEY\* (*pro hac vice*)
WILMER CUTLER PICKERING HALE
   AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

DEBO P. ADEGBILE (*pro hac vice*)
WILMER CUTLER PICKERING HALE
   AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*\* Admitted to practice only in Colorado.
Supervised by members of the firm who are members
of the District of Columbia Bar.*

JUSTIN A. HOUPPERT
Assistant Corporation Counsel
SCOTT D. SPEARS
Assistant Corporation Counsel
121 N. LaSalle Street, Suite 600
Chicago, IL 60602
(312) 744-0220
edward.siskel@cityofchicago.org

ANDREW W. WORSECK
Chief Assistant Corporation Counsel
30 N. LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-0220

RONALD S. SAFER
MATTHEW C. CROWL
NICK KAHLON
LAURA KLEINMAN
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700

*Attorneys for the City of Chicago*

9

## CERTIFICATE OF SERVICE

On the 30th day of October, 2017, I electronically filed the foregoing brief using the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by that system.

/s/ Edward N. Siskel
EDWARD N. SISKEL