# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| THE CITY OF CHICAGO,<br><br>       *Plaintiff*,<br><br> *v.*<br><br>JEFF SESSIONS, Attorney General of the United States,<br><br>       *Defendant*. | Civil Action No. 1:17-cv-05720<br><br>Hon. Harry D. Leinenweber |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS

DATED: January 3, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
Assistant Director

ARJUN GARG
W. SCOTT SIMPSON
Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 305-8613
Fax: (202) 616-8470
E-Mail: arjun.garg@usdoj.gov

*Counsel for Defendant*

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

LEGAL STANDARD................................................................................................... 2

ARGUMENT ............................................................................................................... 2

    I.    The City Does Not Challenge Final Agency Action That Is Judicially Reviewable. .... 2

    II.    The City's Ultra Vires and Separation of Powers Claims Fail Because the Challenged Conditions Are Authorized by Statute. ....................................................... 5

    III.  The Challenged Conditions Are Consistent with the Spending Clause. ........................ 9

    IV.  The Challenged Conditions Do Not Commandeer the City. ....................................... 15

    V.    The Court Should Decline the City's Request for a Declaration That the City Complies with 8 U.S.C. § 1373. .................................................................................. 17

    VI.  The Challenged Conditions Are Not Arbitrary or Capricious. ................................... 21

    VII. The City's Notice-and-Comment Claim Fails............................................................. 23

    VIII. The City's Paperwork Reduction Act Claim Fails. .................................................... 23

CONCLUSION.......................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Abbs v. Sullivan*,
963 F.2d 918 (7th Cir. 1992) .................................................................. 4

*A.G. Edwards & Sons, Inc. v. Pub. Bldg. Comm'n of St. Clair Cty.*,
921 F.2d 118 (7th Cir. 1990) ................................................................ 17

*Alegent Health-Immanuel Med. Ctr. v. Sebelius*,
34 F. Supp. 3d 160 (D.D.C. 2014) ....................................................... 24

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*,
809 F.2d 979 (3d Cir. 1986) ................................................................... 5

*Arizona v. United States*,
567 U.S. 387 (2012) ............................................................ 1, 11, 16, 23

*Barbour v. Wash. Metro. Area Transit Auth.*,
374 F.3d 1161 (D.C. Cir. 2004) ............................................................. 9

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*,
45 F.3d 493 (D.C. Cir. 1995) ................................................................. 8

*Bennett v. Spear*,
520 U.S. 154 (1997) ............................................................................... 3

*Charles v. Verhagen*,
220 F. Supp. 2d 955 (W.D. Wis. 2002) ............................................... 10

*Charles v. Verhagen*,
348 F.3d 601 (7th Cir. 2003) ...................................................... 9, 10, 14

*Charlton Mem'l Hosp. v. Sullivan*,
816 F. Supp. 50 (D. Mass. 1993) ........................................................... 3

*Citizens for Appropriate Rural Roads v. Foxx*,
815 F.3d 1068 (7th Cir. 2016) ........................................................... 3, 4

*City of New York v. United States*,
179 F.3d 29 (2d Cir. 1999) .................................................................. 16

*Clinton v. City of New York*,
524 U.S. 417 (1998) ........................................................................................... 5

*Commodity Futures Trading Comm'n v. Monex Deposit Co.*,
824 F.3d 690 (7th Cir. 2016) ............................................................................ 4

*Dean v. United States*,
556 U.S. 568 (2009) .......................................................................................... 20

*Dep't of Treasury v. Fed. Labor Relations Auth.*,
494 U.S. 922 (1990) ........................................................................................... 8

*Diamond v. Chakrabarty*,
447 U.S. 303 (1980) ......................................................................................... 14

*DKT Mem'l Fund Ltd. v. AID*,
887 F.2d 275 (D.C. Cir. 1989) .......................................................................... 5

*Duvall v. Atty. Gen. of U.S.*,
436 F.3d 382 (3d Cir. 2006) ............................................................................ 10

*Elward v. Electrolux Home Prods., Inc.*,
214 F. Supp. 3d 701 (N.D. Ill. 2016) ............................................................. 19

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) .................................................................................... 21, 22

*Freilich v. Bd. of Directors of Upper Chesapeake Health, Inc.*,
142 F. Supp. 2d 679 (D. Md. 2001) ............................................................... 16

*FTC v. Standard Oil Co. of Cal.*,
449 U.S. 232 (1980) ........................................................................................... 4

*Geinosky v. City of Chicago*,
675 F.3d 743 (7th Cir. 2012) ............................................................................ 2

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ......................................................................................... 16

*Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*,
570 F.3d 811 (7th Cir. 2009) ............................................................................ 2

*Harris Cty. Tex. v. MERSCORP Inc.*,
791 F.3d 545 (5th Cir. 2015) .......................................................................... 19

*Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*,
   140 F. Supp. 3d 1123 (D.N.M. 2015) ..................................................... 3

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ..................................................................... 23

*Mayweathers v. Newland*,
   314 F.3d 1062 (9th Cir. 2002) ............................................................ 9

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
   567 U.S. 519 (2012) ................................................................. 15, 16

*Nat'l Wildlife Fed'n v. Snow*,
   561 F.2d 227 (D.C. Cir. 1976) .......................................................... 23

*New York v. United States*,
   505 U.S. 144 (1992) ..................................................................... 9

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ...................................................................... 4

*Padilla v. Kentucky*,
   559 U.S. 356 (2010) .................................................................... 10

*Pozzie v. U.S. Dep't of Hous. & Urban Dev.*,
   48 F.3d 1026 (7th Cir. 1995) ........................................................... 21

*Printz v. United States*,
   521 U.S. 898 (1997) .................................................................... 16

*Rattlesnake Coal. v. EPA*,
   509 F.3d 1095 (9th Cir. 2007) ........................................................... 4

*Reno v. Condon*,
   528 U.S. 141 (2000) .................................................................... 16

*Rivas v. Martin*,
   781 F. Supp. 2d 775 (N.D. Ind. 2011) ................................................... 13

*Robbins v. U.S. Bureau of Land Mgmt.*,
   438 F.3d 1074 (10th Cir. 2006) .......................................................... 3

*S. Dakota v. Dole*,
   483 U.S. 203 (1987) ............................................................... passim

*Sierra Club v. Atlanta Reg'l Comm'n,*
   255 F. Supp. 2d 1319 (N. D. Ga. 2002) .................................................................. 23

*Smith v. Office of Civilian Health & Med. Program of Uniformed Servs.,*
   97 F.3d 950 (7th Cir. 1996) ................................................................................... 21

*Steffel v. Thompson,*
   415 U.S. 452 (1974) .............................................................................................. 18

*Stone v. INS,*
   514 U.S. 386 (1995) ................................................................................................ 7

*Sutton v. Providence St. Joseph Med. Ctr.,*
   192 F.3d 826 (9th Cir. 1999) ................................................................................ 24

*Thomas v. City of Peoria,*
   580 F.3d 633 (7th Cir. 2009) ................................................................................ 13

*Tozzi v. EPA,*
   148 F. Supp. 2d 35 (D.D.C. 2001) ....................................................................... 24

*U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.,*
   844 F.2d 1087 (4th Cir. 1988) ................................................................................ 8

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.,*
   484 U.S. 365 (1988) .............................................................................................. 20

*United States v. Odneal,*
   565 F.2d 598 (9th Cir. 1977) .................................................................................. 8

*United States v. Salerno,*
   481 U.S. 739 (1987) .............................................................................................. 16

*Wilton v. Seven Falls Co.,*
   515 U.S. 277 (1995) ........................................................................................ 17, 18

## Statutes, Regulations, and Ordinances

Municipal Code of Chicago § 2-173-042 ................................................................. 13, 19

5 C.F.R. § 1320.3(f) ..................................................................................................... 25

5 U.S.C. § 553(a) ........................................................................................................ 23

5 U.S.C. § 701(a) ....................................................................................................... 24

5 U.S.C. § 704 .............................................................................................................. 3

5 U.S.C. § 706(2) ......................................................................................................... 3

8 U.S.C. § 1226 ..................................................................................................... passim

8 U.S.C. § 1227(a) ................................................................................................ 10, 22

8 U.S.C. § 1231(a) ...................................................................................................... 11

8 U.S.C. § 1252c ........................................................................................................ 11

8 U.S.C. § 1324(c) ...................................................................................................... 11

8 U.S.C. § 1357(g) ......................................................................................... 11, 19, 23

8 U.S.C. § 1373 ..................................................................................................... passim

18 U.S.C. § 1913 ......................................................................................................... 14

28 U.S.C. § 530C(a) ..................................................................................................... 5

28 U.S.C. § 2201(a) .................................................................................................... 17

31 U.S.C. § 1352 ......................................................................................................... 14

34 U.S.C. § 10101 ......................................................................................................... 5

34 U.S.C. § 10102(a) ........................................................................................... 5, 6, 23

34 U.S.C. § 10110 ......................................................................................................... 5

34 U.S.C. § 10152(a) ................................................................................................... 10

34 U.S.C. § 10153(a) ......................................................................................... 1, 5, 7, 8

34 U.S.C. § 10154 ......................................................................................................... 3

34 U.S.C. § 10444(7) .................................................................................................... 6

41 U.S.C. § 4712 ......................................................................................................... 15

44 U.S.C. § 3512 ................................................................................................... 24, 25

## **Other Authorities**

DOJ Reauthorization Act of 2005,
   Pub. L. No. 109-162, 119 Stat. 2960 (2006) ................................................................. 6

H.R. Rep. No. 104-469 (1996) ......................................................................................20

H.R. Rep. No. 109-233 (2005) ........................................................................................6

Joint Resolution Making Continuing Appropriations of FY 1985,
   Pub. L. No. 98-473, 98 Stat. 1837 (1984) ..................................................................... 6

**INTRODUCTION**

The City of Chicago has adopted local policies of non-cooperation that frustrate the federal government's ability to remove criminal aliens from the country. In this suit, the City now seeks to obstruct federal prerogatives additionally by blocking the Department of Justice from conditioning the receipt of *federal dollars* under the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program") on cooperation in immigration-related law enforcement.

The Department notified applicants that Fiscal Year ("FY") 2017 Byrne JAG awards will include three conditions requiring modest cooperation with federal law enforcement prerogatives in the immigration setting. Those conditions will require grantees to (1) have a policy of providing the U.S. Department of Homeland Security ("DHS") with advance notice of the scheduled release date of certain individuals held in state or local correctional facilities (the "notice condition"); (2) have a policy permitting federal agents to access state or local correctional facilities for certain immigration enforcement purposes (the "access condition"); and (3) comply with a federal statute, 8 U.S.C. § 1373, that prohibits state and local government and law enforcement entities or officials from restricting certain communications with DHS (the "compliance condition"). *See* Request for Judicial Notice ("RJN") Ex. A (2017 Greenville Award) ¶¶ 53, 55, 56.

The call for intergovernmental law enforcement cooperation embodied in these three conditions follows from recognition that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012). And the conditions are consonant with the Byrne JAG Program's purposes of ensuring that grantees "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require" and undertake "appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (5). The City's suit nevertheless attacks the prospective imposition of these conditions, and seeks a declaration that the City complies with Section 1373.

The Complaint warrants dismissal in its entirety. The City's claims fail on the threshold ground that they prematurely seek to preempt the Department's administrative processes. On their merits, the City's claims fail because they contravene clear statutory language authorizing the Department to condition Byrne JAG funding; ignore the close relationship between the grant conditions, federal law enforcement prerogatives, and the purposes of the Byrne JAG Program; and otherwise suffer from various legal defects. At bottom, the City cannot sustain its counterintuitive theory that Byrne JAG applicants can insist on their entitlement to a federal law enforcement grant even as they refuse to provide basic cooperation in immigration enforcement, which the Department has identified as a federal priority and which plainly intersects with criminal justice under the framework of the Immigration and Nationality Act ("INA").

## LEGAL STANDARD

"Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Id*. In deciding a motion to dismiss, a court may consider "the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).[1]

## ARGUMENT

**I.     The City Does Not Challenge Final Agency Action That Is Judicially Reviewable.**

Irrespective of how the City's claims are styled in the Complaint, all claims challenging imposition of the three conditions are brought under the Administrative Procedure Act ("APA"). The APA governs review of agency action that is alleged to be "arbitrary, capricious, an abuse of

---

[1]     Concurrent with filing this motion, the Department submits a Request for Judicial Notice that attaches various documents for the Court's consideration in adjudicating this motion.

discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdictions, authority, or limitations[.]" 5 U.S.C. § 706(2)(A)-(C). Except for Count Five seeking a declaration regarding compliance with 8 U.S.C. § 1373, all the City's claims come within the APA's scope. *See, e.g.*, *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1085 (10th Cir. 2006) ("We review Robbins' due process claim against the [agency] under the framework set forth in the APA."); *Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 140 F. Supp. 3d 1123, 1170 (D.N.M. 2015) ("The presence of a constitutional claim does not take a court's review outside of the APA, however—§ 706(2)(B) specifically contemplates adjudication of constitutional issues . . . ."); *Charlton Mem'l Hosp. v. Sullivan*, 816 F. Supp. 50, 51 (D. Mass. 1993) (constitutional claims in APA case "cannot so transform the case that it ceases to be primarily a case involving judicial review of agency action").

"In the context of judicial review under the APA, a challenge to agency conduct is ripe only if it is filed after the final agency action." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016) (citing 5 U.S.C. § 704). To qualify as "final agency action" under 5 U.S.C. § 704, "the action must mark the consummation of the agency's decisionmaking process" and also "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

The Complaint does not identify a final agency action that allows APA review. The City sued before seeing the text of the actual conditions, and even now the Department has not yet acted on the City's FY 2017 Byrne JAG application. The City might never receive any FY 2017 award (irrespective of conditions that could have been attached to it), or an award to the City might not contain at least some of the challenged conditions. And by statute there is an administrative review-and-reconsideration process to be followed before "finally disapprov[ing]" the City's FY 2017 Byrne JAG application, until which time there is no final agency action. 34 U.S.C. § 10154.

Accordingly, no final agency action has been taken against the City. *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007) (no "final agency action until [agency] completes its review of the grant application and decides [whether] to disburse the appropriated funds"). As concerns the City's challenge to the conditions, there has been no consummation of the Department's decisionmaking process, no determination of rights or obligations, and no legal consequence that flows. *Cf. Citizens*, 815 F.3d at 1079 (affirming dismissal because "a challenge to agency conduct is ripe only if it is filed after the final agency action" insofar as the challenge otherwise "rests upon contingent future events that may not occur as anticipated, or that may not occur at all"). The City's claims improperly attempt to preempt the administrative process that would create such finality: "A challenge to administrative action . . . falls outside the grant of jurisdiction in . . . the Administrative Procedure Act when the only harm the challenger seeks to avert is the inconvenience of having to go through the administrative process before obtaining a definitive declaration of his legal rights." *Abbs v. Sullivan*, 963 F.2d 918, 927 (7th Cir. 1992).

It is for good reason that "[t]he propriety of an agency's action is reviewed after the final administrative decision." *Commodity Futures Trading Comm'n v. Monex Deposit Co.*, 824 F.3d 690, 692 (7th Cir. 2016). "The principal purpose of the APA['s] limitations . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004). "[T]he effect of the judicial review sought by [the City] is likely to be interference with the proper functioning of the agency and a burden for the courts." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980) (finding no final agency action, and cautioning that APA review is not "a means of turning prosecutor into defendant before adjudication concludes"). The City's claims challenging imposition of the three conditions falter on this threshold ground, apart from the failure of those claims on their merits.

4

## II.     The City's Ultra Vires and Separation of Powers Claims Fail Because the Challenged Conditions Are Authorized by Statute.

Counts One and Two of the Complaint respectively allege that the challenged conditions are ultra vires, *see* Compl. ¶¶ 76-85 (Dkt. No. 1), and violate the Constitution's separation of powers, *see id.* ¶¶ 86-93.  Both theories rest fundamentally on the City's incorrect view that Congress has not authorized the Department to impose these conditions.  *See id.* ¶¶ 78, 83, 90-92.

Congress of course may delegate to the Executive Branch the authority to attach conditions on funding.  *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money."); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent."); *DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

Relevant to administration of the Byrne JAG Program, Congress authorized the Department to "plac[e] special conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id.*, and to ensure that grantees "comply with . . . all other applicable Federal laws."  *Id.* § 10153(a)(5)(D).  These capacious delegations of authority empower the Department to impose the challenged conditions to promote intergovernmental law enforcement cooperation, so that grantee policies do not impair federal policies.

A.     The Attorney General has "final authority over all functions, including any grants" made by the Department's Office of Justice Programs ("OJP"), which administers the Byrne JAG Program.  *Id.* § 10110.  Under the Attorney General's authority, an Assistant Attorney General ("AAG") heads OJP.  *See id.* § 10101; 28 U.S.C. § 530C(a)(4).  In setting forth the duties and

5

functions of the AAG, Congress stated that the AAG is to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id*. § 10102(a)(6). A plain reading of the statutory text indicates that the AAG's power must *include*, at a minimum, the power to "plac[e] special conditions on all grants" administered by OJP. The breadth of the AAG's statutory power is reinforced by the AAG's authority to "determin[e] priority purposes for formula grants." *Id*. Confirming the statute's plain text, a report accompanying the enactment of this language stated that the provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005).

Indeed, the particular statutory language at issue here—the authority for "placing special conditions on all grants, and determining priority purposes for formula grants"—was added *as part of the very same legislation that created the Byrne JAG Program*. *See* DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006), § 1152(b) (adding language to subsection (a)(6)); *id*. § 1111 (creating Byrne JAG Program). Prior to that 2006 enactment, the provision stated only that the AAG for OJP "exercise[s] such other powers and functions as may be vested in the Assistant Attorney General pursuant to this title or by delegation of the Attorney General." Joint Resolution Making Continuing Appropriations for FY 1985, Pub. L. No. 98-473, § 603, 98 Stat. 1837 (1984). The organic statute enacted in 2002 for the head of a separate Department grant-making component, by comparison, continues to contain substantially the same, more limited language as Section 10102 earlier used to contain, without the additional "special conditions" and "priority purposes" powers that Congress elected to bestow with respect to OJP. *See* 34 U.S.C. § 10444(7) (providing only that Director of Violence Against Women Office "[e]xercis[es] such other powers and functions as may be vested in the Director pursuant to this subchapter or by

delegation of the Attorney General"). This context confirms that Congress did intend the "special conditions" and "priority purposes" language to confer distinctive and meaningful power. "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995).

The challenged conditions come comfortably within the fonts of delegated power in Section 10102(a)(6). Pursuant to this authority, the AAG may prioritize formula grants, like the Byrne JAG Program, for jurisdictions that cooperate with federal authorities in achieving federal law enforcement priorities, including removal of criminal aliens under immigration law.

**B.** Independent of the authority conferred in Section 10102(a)(6), a separate source of authority further supports the compliance condition. Underscoring the Byrne JAG Program's emphasis on intergovernmental cooperation so that grantee policies do not impair federal policies, the Department has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). Section 1373 is, of course, a federal law. According to the City, however, it "is not an 'applicable' law." Compl. ¶ 83. The City contends that the phrase "applicable Federal laws" refers only to "laws that regulate the conduct of federal grant recipients *as grant recipients*." *Id.*

The City's straightjacketed interpretation of this statutory text is inconsistent with a plain reading of the statute. The relevant statutory language provides that a Byrne JAG applicant "shall submit an application . . . in such form as the Attorney General may require," to "include . . . [a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(a). Congress's decision to empower the Attorney General to determine the form of Byrne JAG applications renders the most natural reading of this provision as a delegation to the Attorney General to determine whether a particular federal law constitutes an "applicable Federal law[]."

*Id*. If Congress had intended to limit the term "applicable Federal laws" as referencing only statutes of the kind that the City suggests, it could have done so expressly. Instead, under this power, the Department may condition Byrne JAG grants if it gives notice, as it provided here for Section 1373, that it has determined that a federal law is "applicable."

Rather than the City's narrow construction, courts have broadly interpreted the term "applicable laws." *See, e.g.*, *Dep't of Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 930 (1990) (interpreting statutory term "applicable laws" as "laws outside the Act"); *see also Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (noting that "all applicable laws" is "not reasonably or fairly susceptible to an interpretation that does not encompass compliance with state and federal tax laws"); *U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*, 844 F.2d 1087, 1094-95 (4th Cir. 1988) (finding statutory requirement that Executive Branch managers follow "applicable laws" to exclude federal agency circulars but to reach laws made by Congress); *United States v. Odneal*, 565 F.2d 598, 600 (9th Cir. 1977) (statutory reference to "all applicable federal laws" granted "very broad statutory authority").

Instead of "applicable Federal laws" being cabined artificially to those laws that "regulate grantees as grantees" or "mention federal grants or funds," Compl. ¶ 83, a natural and coherent reading is that "applicable Federal laws" refers simply to the corpus of federal laws that actually do apply, independently, to Byrne JAG grantees. (8 U.S.C. § 1373 is, of course, one such law.) Here, it is important to bear in mind the context of the Byrne JAG Program, where all grantees are state and local jurisdictions rather than private individuals or entities. The limitation in Section 10153(a)(5)(D) to "applicable Federal laws" accordingly restricts the Department from requiring certification of compliance with, for example, federal tax laws that by their terms apply to private individuals rather than to the state and local jurisdictions that the Byrne JAG Program contemplates as grantees. It is entirely sensible for Congress to have used the word "applicable"

in Section 10153(a)(5)(D) with this meaning tailored to the class of potential grantees, and there is nothing implausible about Congress expecting a recipient of federal funds to certify its compliance with a federal law where the recipient is—independent of receiving those federal funds—already obligated to comply with that federal law.

## III.    The Challenged Conditions Are Consistent with the Spending Clause.

Count Three of the Complaint contends that the challenged conditions violate the Spending Clause because allegedly they are not germane to the Byrne JAG Program, *see* Compl. ¶¶ 97-102, would induce Fourth Amendment violations, *see id.* ¶¶ 103-12, are ambiguous, *see id.* ¶¶ 113-18, and are coercive, *see id.* ¶¶ 119-23.  Each of these contentions is wrong.

**A.**    In *Dole*, the Supreme Court stated that "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citation omitted).  Courts have generally found that the relatedness showing does not pose a difficult hurdle.  The Supreme Court in *Dole* upheld conditioning receipt of federal highway funds on the only loosely-related requirement that a state adopt a minimum drinking age of twenty-one.  *See id.* at 208.  Only "some relationship" is necessary between spending conditions and "the purpose of the federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992).  The Ninth Circuit thus rejects "an exacting standard for relatedness," *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002), and the D.C. Circuit observes that the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds."  *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The Seventh Circuit explored relatedness in a case where state prison officials challenged a requirement to abide by a federal statute as a condition of federal corrections funding.  *See Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003).  The state officials argued that "there must be a particularized relationship between a condition's subject matter and the underlying

federal grant to which the condition attaches." *Charles v. Verhagen*, 220 F. Supp. 2d 955, 963-64 (W.D. Wis. 2002). The district court rejected that argument, and the Seventh Circuit affirmed that decision, explaining that a challenged condition and the funding program need only "share[] the same goal," which, there, was "the goal of [prisoner] rehabilitation." *Charles*, 348 F.3d at 609.

The grant conditions at issue here satisfy the relatedness requirement. The Byrne JAG Program's organic statute specifies that Byrne JAG funds are designed to provide resources "for criminal justice," to support programs including law enforcement, prosecution, crime prevention, and corrections. 34 U.S.C. § 10152(a)(1). These goals are also reflected in the responsibilities of the AAG, which involve "maintain[ing] liaison" and disseminating information regarding "criminal justice." *Id*. § 10102(a)(1), (2). Contrary to the City's view that the Byrne JAG Program's goal is to promote "local flexibility," Compl. ¶ 99, the program's overall goals are much broader: to support and strengthen law enforcement and criminal justice.[2] And as the Department has stated, the challenged conditions emanate from the "top priority of reducing violent crime" and "long-established cooperative principles among law enforcement agencies." Dkt. No. 1-2.

Immigration enforcement, which the conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that a conviction for any of a wide array of criminal offenses renders an alien removable from this country. *See* 8 U.S.C. § 1227(a)(2). Indeed, "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes." *Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006); *see also Padilla v. Kentucky*, 559 U.S. 356,

---

[2]     The City cannot generate a relatedness problem with reference to the particular uses to which the City elects to put its Byrne JAG funds. *See* Compl. ¶¶ 98, 100 (challenging conditions' relatedness to City's use of funds for "patrol cars," "community programs," and "law enforcement equipment"). That framing incorrectly focuses on the local interest in how the grant is used in the locality, instead of the "federal interest in particular national projects or programs." *Dole*, 483 U.S. at 207. Moreover, the reach of the conditions is limited "to the 'program or activity' that is funded (in whole or in part) by this award." RJN Ex. A (2017 Greenville Award) ¶¶ 55, 56; *see also id*. ¶ 53 (substantially the same language).

360 (2010) (observing that "deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes" (citation omitted)).  Once removed, a criminal alien who has committed a removable offense—*e.g.*, an aggravated felony, domestic violence, child abuse, or certain firearm offenses—is no longer present in this country with the potential to re-offend.

The Immigration and Nationality Act ("INA") also repeatedly contemplates cooperation among state and local officers and federal officials on immigration enforcement.  *See, e.g.*, 8 U.S.C. § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); 8 U.S.C. § 1324(c) (authorizing state and local officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); 8 U.S.C. § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States).  Under authorities such as these, "state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408.

Furthermore, insofar as the INA contemplates the federal detention of certain aliens upon their release from state or local custody, *see* 8 U.S.C. § 1226(c), the conditions can be understood as seeking to ensure that a state or local grantee's law enforcement activities will not impair the law enforcement activities of the federal government.  Congress has mandated that certain aliens who have committed criminal offenses be taken into federal custody pending removal proceedings, but only "when the alien is released" from state custody.  *Id*. § 1226(c)(1).  With respect to incarcerated aliens subject to a final removal order, the INA establishes a "removal period" of 90 days that begins with the date of the alien's release.  *Id.* § 1231(a)(1)(B).  It is crucial to this cooperative law enforcement framework that states and localities respond to requests for release date information, allow federal agents to have access to detainees in their custody, and avoid restricting communication with DHS of information regarding immigration status.

Given that the INA expressly contemplates local law enforcement activity with respect to immigration law enforcement, it is perfectly germane and appropriate for the Department to condition grant funding to promote this purpose. Even the City's own Complaint reflects that immigration enforcement bears some relationship to criminal justice, because the City connects its local immigration enforcement policies to the City's crime rates. *See* Compl. ¶¶ 2, 28. Accordingly, because there is some relationship between the conditions and the Byrne JAG Program's goals, the conditions satisfy the constitutional relatedness requirement.

**B.** The Spending Clause does not authorize conditions that "induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. The City alleges that the notice and access conditions require the City to hold detainees in City custody longer than the Fourth Amendment permits. *See* Compl. ¶¶ 103-12. That contention is refuted by the plain text of the notice and access conditions, which were released after the City filed its Complaint. The conditions make clear that "[n]othing in th[ese] condition[s] shall be understood to authorize or require any recipient . . . to maintain (or detain) any individual in custody beyond the date and time the individual would have been released in the absence of this condition." RJN Ex. A (2017 Greenville Award) ¶¶ 55-56. The conditions also clarify that "[i]n the event that . . . the scheduled release date and time for an alien are such as not to permit the advance notice [of scheduled release] that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable." *Id*. The fully articulated conditions explicitly contravene the City's Fourth Amendment concerns, and the Constitution neither forbids DHS employees from accessing detention facilities nor forbids local government employees from providing DHS with certain detainee release information. The City's theory thus lacks merit.[3]

---

[3] Even aside from the constitutionally valid language of the conditions, there is no Fourth Amendment problem with a locality cooperating with a federal request to detain an alien after *(cont'd . . .)*

**C.**    Another limitation on the spending power is that when the federal government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted).  The City claims that all three conditions "are ambiguous as to what is expected of grant recipients in Chicago's position."  Compl. ¶ 114.  The City made that contention, however, without first seeing the text of the actual conditions.

As an initial matter, the Department has, in each of the challenged conditions that appears in the award document for a prospective grantee to consider accepting, invited submission of "[a]ny questions about the meaning or scope of this condition . . . before award acceptance."  RJN Ex. A (2017 Greenville Award) ¶¶ 53, 55, 56.  The City's assertion of ambiguity in this litigation comes before the City has availed itself of the invitation for administrative consultation.

With respect to the notice and access conditions, the alleged ambiguity, *see* Compl. ¶¶ 115-16, is predicated once again on the City's mistaken contemplation of Fourth Amendment problems due to prolonged detentions that do not in fact exist under the actual conditions.  *See supra* at 12.  The City moreover complained that it was unsure which detention facilities would be covered by the access condition, *see id.* ¶ 116, but the coverage of "correctional facilities" as used in the actual text of the conditions is defined therein.  *See* RJN Ex. A (2017 Greenville Award) ¶¶ 55, 56.

As to the compliance condition, the City remarkably complains of supposed unconstitutional ambiguity concerning the City's obligations under a statute with which the City

---

*(. . . cont'd)* a jail term has ended to facilitate an orderly transfer to DHS custody for removal proceedings. "[A]rrests for violations of purely civil laws are common enough . . . ." *Thomas v. City of Peoria*, 580 F.3d 633, 638 (7th Cir. 2009).  And "[w]hen someone is arrested and detained without a warrant, it is presumptively reasonable for that person to be detained up to 48 hours . . . ." *Rivas v. Martin*, 781 F. Supp. 2d 775, 780 (N.D. Ind. 2011).  Immigration arrests premised on detainers are supported by administrative warrants.  *See* 8 U.S.C. § 1226(a); RJN Ex. B (ICE Policy No. 10074.2) §§ 2.4, 5.2.  Indeed, the City permits such detentions under certain circumstances.  *See* Municipal Code of Chicago § 2-173-042(c) (allowing cooperation with immigration detention request when detainee is a felon or known gang member).

has been required to comply for over twenty years (entirely independent of any Byrne JAG award condition), and for which the City provided a certification of its compliance in the FY 2016 grant cycle.  *See* Compl. ¶ 117; Dkt No. 1-1.  The City moreover acknowledges, yet discounts, that the Department issued public guidance on the requirements of Section 1373 that explains, in part:

> Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information.  Rather, the statute prohibits government entities and officials from taking action to prohibit or in any way restrict the maintenance or intergovernmental exchange of such information, including through written or unwritten policies or practices.

> Your personnel must be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials.

RJN Ex. C (Guidance Regarding Compliance with 8 U.S.C. 1373).  The Complaint does not explain what is ambiguous about that.  "Broad general language is not necessarily ambiguous when congressional objectives require broad terms."  *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980).  Moreover, the Department has now given the City additional guidance via a preliminary assessment of the City's compliance with Section 1373.  *See* RJN Ex. D (Preliminary Assessment).

To the extent there is any uncertainty at the margins of Section 1373's requirements, *see* Compl. ¶ 118, such a penumbra does not make the compliance condition unconstitutionally ambiguous.  Indeed, "the exact nature of the conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required."  *Charles*, 348 F.3d at 607 (citation omitted).  The City does not complain about other Byrne JAG conditions requiring compliance with restrictions on lobbying under 18 U.S.C. § 1913 and 31 U.S.C. § 1352, RJN Ex. A (2017 Greenville Award) ¶ 19; compliance with "federal appropriations statutes" generally, *id*. ¶ 20; reporting of evidence of violations of the False

Claims Act, *id*. ¶ 21; and compliance with prohibitions on reprisal under 41 U.S.C. § 4712, *id*. ¶ 23. All those statutes on which unchallenged conditions are predicated could have some zone of uncertainty at the margin. The Section 1373 compliance condition presents no special problem of ambiguity that creates a constitutional infirmity. The City's ambiguity theory thus fails.

**D.** Grant conditions may not be "so coercive as to pass the point at which pressure turns into compulsion." *Dole*, 483 U.S. at 211 (citation omitted). The Supreme Court instructs that "courts should not conclude that [an enactment] is unconstitutional on this ground unless the coercive nature of an offer is unmistakably clear," *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 681 (2012) (opinion of Scalia, Kennedy, Thomas & Alito, JJ.), such as where a state risks losing "over *10 percent* of a State's overall budget" if it declines to adopt certain conditions. *Id*. at 582 (emphasis added). The City cannot plausibly claim that the amount of funding available to the City under the Byrne JAG Program meets that constitutional threshold. For an FY 2017 Byrne JAG award, up to $2,201,634 is available to be awarded via the City's application. *See* RJN Ex. E (2017 Illinois Local JAG Allocations). The City's proposed budget for 2017 was $9.81 billion. *See* RJN Ex. F (City of Chicago 2017 Budget Overview) at 17. With the funds at issue constituting a maximum of 0.022% of the City's budget, the claim of coercion fails.

**IV. The Challenged Conditions Do Not Commandeer the City.**

The City alleges in Count Four of the Complaint that each of the challenged conditions would commandeer the City in violation of the Tenth Amendment. *See* Compl. ¶¶ 124-35. But this case involves a grant that the City is free to accept or reject, not any federal mandate that directly regulates the City. The relevant question here is not whether the grant conditions, if they were federally-compelled obligations of the City, would infringe the Tenth Amendment. A "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S.

at 210.  Instead, the only pertinent constitutional question presented is whether the grant conditions

are a valid exercise of the Spending Clause power.  In that context, the federal government "may

offer funds to the States, and may condition those offers on compliance with specified conditions.

These offers may well induce the States to adopt policies that the Federal Government itself could

not impose."  *NFIB*, 567 U.S. at 537.  Because the City may simply decline to participate in the

Byrne JAG Program, the City's commandeering claim has no purchase here.

To any extent that the City nevertheless could proceed with its claim that 8 U.S.C. § 1373,

as an independent statutory mandate, is "facially unconstitutional" under a commandeering theory,

Compl. ¶ 133, the City cannot meet its burden to show that "no set of circumstances exists under

which the [Section 1373] would be valid."  *United States v. Salerno*, 481 U.S. 739, 745 (1987).

"The Government of the United States has broad, undoubted power over the subject of

immigration and the status of aliens."  *Arizona*, 567 U.S. at 394.  "As long as it is acting within the

powers granted it under the Constitution, Congress may impose its will on the States" and "may

legislate in areas traditionally regulated by the States."  *Gregory v. Ashcroft*, 501 U.S. 452, 459-

60 (1991).  And courts "begin with the time-honored presumption that [a statute] is a constitutional

exercise of legislative power."  *Reno v. Condon*, 528 U.S. 141, 148 (2000) (citation omitted).

The Second Circuit rejected a Tenth Amendment facial challenge to Section 1373 of the

kind the City raises here.  *See City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

The Tenth Amendment does not give states and localities "an untrammeled right to forbid all

voluntary cooperation by state or local officials with particular federal programs," particularly in

the information sharing context.  *Id*. at 34-35; s*ee also Printz v. United States*, 521 U.S. 898, 918

(1997) (contrasting federal statutes that "require only the provision of information to the Federal

Government" with those that "force[] participation of the States' executive in the actual

administration of a federal program"); *Freilich v. Bd. of Directors of Upper Chesapeake Health,*

*Inc.*, 142 F. Supp. 2d 679, 697 (D. Md. 2001) ("This Court has found no case" holding that a statutory command to report information for a federal data bank "commandeers the state.").  The City's commandeering theory is especially diminished here because the conditions allow a grantee to use awarded funds to cover the grantee's costs incurred in implementing the conditions.  *See* RJN Ex. A (2017 Greenville Award) ¶¶ 53, 55, 56.

Because the City challenges conditions attached to a grant that can be declined, and because the City moreover cannot show that 8 U.S.C. § 1373 as an independent statutory obligation is facially unconstitutional, the City's commandeering claim warrants dismissal.[4]

## V. The Court Should Decline the City's Request for a Declaration That the City Complies with 8 U.S.C. § 1373.

Count Five of the Complaint seeks a declaration that the City complies with 8 U.S.C. § 1373.  *See* Compl. ¶¶ 136-41.  The Court should exercise its discretion to decline the City's invitation for declaratory relief.  If the Court were to reach this claim, the City is not entitled to the requested declaration because the City's allegations suggest a violation of Section 1373.

**A.** Under the Declaratory Judgment Act, courts "*may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a) (emphasis added).  "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites."  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995); *see also A.G. Edwards & Sons, Inc. v. Pub. Bldg. Comm'n of St. Clair Cty.*, 921 F.2d 118, 120 (7th Cir. 1990) (noting "wide discretion" for abstention).

---

[4] As to the notice condition, the commandeering claim fails for the further reason that it inaccurately alleges that "[c]ompliance with the notice condition would require Chicago to hold detainees longer than it currently does" and thereby force the City to "reorganize the manner in which [it] has chosen to balance its Fourth Amendment obligations against its interest in effective law enforcement."  Compl. ¶ 127.  The condition does not require a grantee to hold a person in custody longer than the grantee otherwise would have.  *See supra* at 12.

"[T]he propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Wilton*, 515 U.S. at 287 (citation omitted); *see also id*. at 288 (focusing on "considerations of practicality and wise judicial administration"). Under the circumstances here, the Court should decline to exercise declaratory jurisdiction.

First, declaratory jurisdiction—which is available to test the legality of a course of conduct prior to its implementation to avoid legal jeopardy—is inappropriate because the City seeks to test the legality of policies that have already been adopted. The jeopardy the City seeks to avoid via a declaration of rights already exists. A declaratory judgment, by contrast, "is an alternative to pursuit of the arguably illegal activity." *Steffel v. Thompson*, 415 U.S. 452, 480 (1974).

Second, declaratory relief would preempt the administrative process the Department is presently conducting regarding the City's Section 1373 compliance. In that process, the City has provided its explanation regarding whether it complies, *see* Dkt. No. 1-1, the Department has responded with a "preliminary assessment" that expressly disclaims "final agency action," *see* RJN Ex. D, the City has responded further, *see* RJN Ex. G, and the Department has yet to render its final assessment. The Court prudently should wait for that process to complete itself, rather than intervening prematurely in an unripe dispute. The federal government has not requested a declaration that the City violates Section 1373, and the Court should not take up that question absent an enforcement action by the United States, which has also not occurred. As this Court stated in an earlier opinion in this case, the Department "has yet to make a determination about Chicago's eligibility for funds" and if the Department "makes a final determination that Chicago is eligible for 2017 Byrne JAG funds, then no harm accrues to Chicago." Dkt. No. 125 at 10.

Third, the City pursues declaratory relief without identifying an underlying cause of action. "It is well established that the Declaratory Judgment Act does not create an independent cause of

action.  It provides only an additional form of relief."  *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 708 (N.D. Ill. 2016) (citation omitted).  The City does not identify a right of action, in Section 1373 or elsewhere, to seek a declaration that the City complies with Section 1373.  *Cf. Harris Cty. Tex. v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) ("The Counties do not contend that [the governing statute] itself creates a private right of action.  Instead, the Counties believe that the Declaratory Judgment Act provides a right to relief because there is an 'actual controversy.'  This argument is flawed because the Declaratory Judgment Act alone does not create a federal cause of action.").  Declaratory relief is thus unavailable.

**B.**      If the Court nonetheless were to consider declaratory relief, the Court should find that the City's claim fails.  The City alleges that its agencies and agents generally are prohibited from "expending their time responding to [U.S. Customs and Immigration Enforcement ("ICE")] inquiries or communicating with ICE regarding a person's custody status or release date."  Compl. ¶ 26.b (citing Municipal Code of Chicago § 2-173-042).  Such a policy suggests the City violates Section 1373(a) by restricting the sharing of "information regarding . . . immigration status."[5]

Custody status and release dates are covered under Section 1373.  The INA provides that the "immigration status of any individual" specifically "includ[es] . . . that a particular alien *is not lawfully present* in the United States."  8 U.S.C. § 1357(g)(10)(a) (emphasis added).  "Present" means "being in a certain place and not elsewhere," Webster's New International Dictionary (2d ed. 1958), so the fact that an alien is in custody for a specific duration (in a certain place and not elsewhere) fits within the INA's contemplation of immigration status.

Moreover, "information regarding . . . immigration status" is necessarily a broader category than "immigration status" itself.  Comparison of subsections within Section 1373 demonstrates

---

[5]      The Department emphasizes that it has not made its final determination about the City's compliance with 8 U.S.C. § 1373, which turns on this and other City policies as well as the City's practices and conduct in implementing those policies—a subject on which the Department has not at this time taken discovery.

that Congress used the broader "information regarding" formulation deliberately. *Compare* 8 U.S.C. § 1373(a) (concerning "information regarding . . . immigration status") *with* 8 U.S.C. § 1373(c) (discussing "immigration status" but omitting the broader "information regarding" formulation). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Dean v. United States*, 556 U.S. 568, 573 (2009) (citation omitted). Indeed, the House Report accompanying the legislation stated that Section 1373 was intended "to give State and local officials the authority to communicate with the [Immigration and Naturalization Service] regarding the *presence, whereabouts, and activities* of illegal aliens." H.R. Rep. No. 104-469, pt. 1, at 277 (1996) (emphasis added).

Custody and release information falls within the sweep of "information regarding . . . immigration status" that Congress intended under Section 1373(a). Indeed, it is relevant to the federal government's statutory duties, enacted at the same time as Section 1373, to "take into custody any alien who" has committed certain offenses, 8 U.S.C. § 1226(c)(1)(A), and to "take into custody any alien who . . . is inadmissible . . . when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation," 8 U.S.C. § 1226(c)(1)(D). Section 1373(a) is sensibly read to reach information that assists the federal government in carrying out its statutory responsibilities under the same Act. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

Thus, if the Court were to entertain the City's request for a declaration of compliance with Section 1373, the claim fails because the Complaint in at least one way suggests that the City violates the statute: by restricting the sharing of custody status and release dates.

20

**VI.    The Challenged Conditions Are Not Arbitrary or Capricious.**

Count Six of the Complaint claims that the challenged conditions are arbitrary or capricious in violation of the APA.  *See* Compl. ¶ 145.  If the conditions are statutorily authorized and comport with the Spending Clause, however, it is unclear how "arbitrary or capricious" scrutiny could otherwise limit the Department's broad discretion.  In any event, "[t]he 'arbitrary or capricious' standard of review is a deferential one which presumes that agency actions are valid as long as the decision is supported by a 'rational basis.'"  *Pozzie v. U.S. Dep't of Hous. & Urban Dev.*, 48 F.3d 1026, 1029 (7th Cir. 1995) (citation omitted); *see also Smith v. Office of Civilian Health & Med. Program of Uniformed Servs.*, 97 F.3d 950, 955 (7th Cir. 1996) (standard is "highly deferential, monitoring only for glaring mistakes-obvious wrongness").  The Supreme Court directs a "narrow standard of review" under which "a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted).

Here, the City's claim fails because "the agency's reasons for" imposing the challenged conditions "were entirely rational."  *Id.* at 517.  The imposition of the challenged conditions is understandable as a result of a May 2016 report by the Department's Office of Inspector General ("OIG") finding deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States."  RJN Ex. H (OIG Memorandum) at 1-2 n.1.  The 2016 OIG report advised that "the information we have learned to date during our recent work about the present matter differs significantly from what OIG personnel found nearly 10 years ago" in a 2007 audit when federal immigration authorities had back then "commented favorably to the OIG with respect to cooperation and information flow they received from the seven selected jurisdictions" that were examined.  *Id.*  The OIG report focused on Chicago, among other jurisdictions, in reaching its conclusions about the changed state of affairs in 2016.  *See id.* at 5-6.

21

In the FY 2016 grant cycle, the Department under the prior Administration introduced a requirement to certify compliance with Section 1373. *See* Dkt. No. 1-1 (discussing "Special Condition #52 of the FY 2016 Byrne JAG grant received by the City of Chicago" and pertinent guidance issued by the Department in July 2016 and October 2016).

For the FY 2017 cycle, the Department maintained the compliance condition and added the notice and access conditions, and publicly offered a sound explanation for all three conditions. The Department's July 25, 2017 "Backgrounder on Grant Requirements," attached to the City's Complaint, states the conditions have a "goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe." Dkt. No. 1-3. The Backgrounder notes that some jurisdictions have "refus[ed] to cooperate with federal immigration authorities in information sharing about illegal aliens who commit crimes," and states that the conditions will "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement." *Id.* The three conditions are "common-sense measures," *id.*, and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521.

Immigration enforcement undoubtedly relates to criminal justice. As discussed above, *see supra* at 10-11, numerous federal statutes expressly tie these two subjects together—most centrally inasmuch as a conviction for any of a wide array of criminal offenses renders an alien removable from this country, *see* 8 U.S.C. § 1227(a)(2), and thus no longer present here with the potential to re-offend. Accordingly, a July 25, 2017 press release by the Attorney General, accompanying the Backgrounder and also attached to the City's Complaint, stated opposition to policies that "protect illegal aliens who have committed crimes," and an intent to encourage jurisdictions "to change their policies and partner with federal law enforcement to remove criminals." Dkt. No. 1-2.

The conditions thus rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress contemplates in immigration enforcement.  *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12 ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations.").

## VII.   The City's Notice-and-Comment Claim Fails.

Count Six additionally alleges the Department violated the APA by not following notice-and-comment rulemaking procedures before imposing the challenged grant conditions.  *See* Compl. ¶ 144.  But the APA expressly exempts from such procedures any "matter relating to . . . grants."  5 U.S.C. § 553(a)(2).  Where Section 553(a)(2) applies, the notice-and-comment rulemaking requirement "has no application."  *Lincoln v. Vigil*, 508 U.S. 182, 196 (1993).

"The exception for public grants includes all federally supported . . . grants-in-aid programs under which the federal government makes payment to state and local governments."  *Sierra Club v. Atlanta Reg'l Comm'n*, 255 F. Supp. 2d 1319, 1345 (N. D. Ga. 2002).  For example, where challenged regulations concerned "the timing and number of public hearings to be held before building a federal [grant-in]-aid highway," the D.C. Circuit accepted the agency's view of those regulations "as relating to grants, and therefore within the . . . exemption from notice and comment rulemaking."  *Nat'l Wildlife Fed'n v. Snow*, 561 F.2d 227, 229 (D.C. Cir. 1976).  Here, too, imposing the challenged grant conditions does not require notice-and-comment rulemaking.

## VIII.   The City's Paperwork Reduction Act Claim Fails.

Count Seven of the Complaint alleges violations of the Paperwork Reduction Act ("PRA") in connection with the FY 2017 Certification of Compliance with 8 U.S.C. § 1373 that is part of the FY 2017 Byrne JAG solicitation.  *See* Compl. ¶¶ 147-155.  Congress enacted the PRA to

23

"control the amount of paperwork the federal government can require of private businesses, educational institutions, federal contractors, state and local governments and individuals." *Alegent Health-Immanuel Med. Ctr. v. Sebelius*, 34 F. Supp. 3d 160, 170 (D.D.C. 2014).

The City asserts that the Certification of Compliance, which the City identifies as pages 37-38 of Exhibit D to the Complaint, is a "collection of information" within the meaning of the PRA and implementing regulations, for which the Department was required first to publish a 60-day notice in the Federal Register. *See* Compl. ¶¶ 149-151. The City also argues that the Certification displays no OMB control number as contemplated by the PRA. *See id.* ¶ 154. On these grounds, the City contends it is not required to submit the Certification and that the City's failure to do so cannot be a basis for denying FY 2017 Byrne JAG funds to the City. *See id.* ¶ 155.

As an initial point, the City's claim fails because "federal courts that have addressed the PRA have confirmed what the plain language of the statute already makes clear: the PRA may be raised as a *defense* to an agency action, but *does not create* a private cause of action." *Alegent*, 34 F. Supp. 3d at 170 (citing *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 844 (9th Cir. 1999); *Tozzi v. EPA*, 148 F. Supp. 2d 35, 43 (D.D.C. 2001)). The PRA states that "[t]he protection provided by this section may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto." 44 U.S.C. § 3512(b). The City, by contrast, impermissibly uses the PRA as "a sword to persuade the Court to find the [Department] in violation of the PRA." *Alegent*, 34 F. Supp. 3d at 170. The City does not rescue its PRA theory by framing its claim under the APA, because the APA provides no relief where another statute precludes judicial review, as the PRA does here. *See* 5 U.S.C. § 701(a)(1).

Moreover, the City is incorrect in alleging that the Department failed to post a Federal Register notice. This theory reflects the City's misunderstanding of the process under which the

Department issued the FY 2017 Byrne JAG solicitation. OMB guidance allows agencies to comply with the PRA by submitting a "generic Information Collection Request" that secures OMB "approval of a plan for conducting more than one information collection." RJN Ex. I (OMB Memorandum on Generic Clearances under the PRA) at 2. Under that authority, the Department issued the FY 2017 Byrne JAG solicitation, including the Certification, based on updating an OMB-approved template solicitation for which notice was given in the Federal Register. *See* RJN Ex. J (Notice of OMB Action); RJN Ex. K (OMB Information Collection Request Listing).

Additionally, the FY 2017 Byrne JAG solicitation does "display a valid [OMB] control number," 44 U.S.C. § 3512, on the first page in the top right corner near the title of the document. *See* Dkt. No. 1-4 at 1 (stamped "OMB No. 1121-0329" and "Approval Expires 12/31/2018"). This manner of "display" is consistent with regulation, which does not require stamping the OMB control number on each page of the solicitation. *See* 5 C.F.R. § 1320.3(f)(1)-(2). The City's theory apparently rests on construing the Certification as a document separate from the solicitation rather than a part of the solicitation, and arguing that the Certification pages do not themselves bear the OMB control number. That construction is wrong. Indeed, the City's own submission to the Court treated the FY 2017 Byrne JAG solicitation, including the Certification, as a single document. *See* Dkt. No. 1-4. This Certification exists only as part of the solicitation's process for FY 2017 Byrne JAG awards, and the solicitation's table of contents shows that the Certification is part of the solicitation. *See id.* at 3-4. The City's PRA claim thus fails as a matter of law.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss the Complaint in its entirety.

DATED:  January 3, 2018        Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
Assistant Director

*/s/ Arjun Garg*_____
ARJUN GARG
W. SCOTT SIMPSON
Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 305-8613
Fax: (202) 616-8470
E-Mail: arjun.garg@usdoj.gov

*Counsel for Defendant*