# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

**THE CITY OF CHICAGO,**

*Plaintiff,*

*v.*

**JEFFERSON BEAUREGARD SESSIONS III,**
**Attorney General of the United States**

*Defendant.*

Civil Action No. 1:17-cv-5720
Hon. Harry D. Leinenweber

## COMBINED OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

ARGUMENT ................................................................................................................... 2

I.  DISMISSAL SHOULD BE DENIED AND SUMMARY JUDGMENT ENTERED
    ON THE GROUNDS THAT THE CONDITIONS ARE UNLAWFUL AND
    THAT CHICAGO COMPLIES WITH § 1373 ..................................................... 2

    A.  Standard Of Review ................................................................................ 2

    B.  The Attorney General's Decision To Impose The Notice, Access, And
        Compliance Conditions Is Final .............................................................. 3

    C.  All Three Conditions Are Ultra Vires And Violate Separation Of Powers ........ 4

        1.  The notice and access conditions are ultra vires ................................ 4

        2.  The compliance condition is ultra vires ........................................... 6

        3.  The Court should enter a permanent nationwide injunction ............. 9

    D.  Chicago Is Entitled To A Declaratory Judgment That It Complies With
        Section 1373 ........................................................................................ 10

        1.  A declaratory judgment is proper in this case ................................ 11

        2.  Chicago complies with section 1373 ............................................. 13

II. THE COURT SHOULD DENY DISMISSAL OF CHICAGO'S REMAINING
    CLAIMS ............................................................................................................. 18

    A.  Standard Of Review ............................................................................. 18

    B.  The Conditions Fail To Satisfy The Spending Clause's Requirements ........ 18

        1.  Each condition is ambiguous and fails to give a prospective Byrne JAG
            recipient sufficient notice of what would be required of it ................ 18

        2.  None of the conditions is germane to the purposes of the program .......... 20

        3.  The conditions are coercive ........................................................ 22

        4.  The notice and access conditions would require the City to violate the
            Fourth Amendment ................................................................... 23

    C.  The Attorney General Acted Arbitrarily And Capriciously In Adopting The
        Conditions ........................................................................................... 24

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Amoco Production Co. v. Village of Gambell,*
  480 U.S. 531 (1987) .................................................................................................................9

*Arizona v. United States,*
  567 U.S. 387 (2012) ...............................................................................................................21

*Arlington Central School District Board of Education v. Murphy,*
  548 U.S. 291 (2006) ...............................................................................................................19

*Branch v. Smith,*
  538 U.S. 254 (2003) .................................................................................................................8

*Charles v. Verhagen,*
  348 F.3d 601 (7th Cir. 2003) .................................................................................................19

*Ciarpaglini v. Norwood,*
  817 F.3d 541 (7th Cir. 2016) .................................................................................................23

*Circuit City Stores, Inc. v. Adams,*
  532 U.S. 105 (2001) .................................................................................................................7

*City of Arlington v. FCC,*
  133 S. Ct. 1863 (2013) .............................................................................................................4

*City of Los Angeles v. McLaughlin,*
  865 F.2d 1084 (9th Cir. 1989) .................................................................................................5

*City of Philadelphia v. Sessions,*
  2017 WL 5489476 (E.D. Pa. Nov. 15, 2017) (appeal filed Jan. 18, 2018) .................4, 7, 21, 22

*City of Seattle v. Trump,*
  2017 WL 4700144 (W.D. Wash. Oct. 19, 2017) ...................................................................12

*Conant v. Walters,*
  309 F.3d 629 (9th Cir. 2002) ...................................................................................................9

*County of Santa Clara v. Trump,*
  267 F. Supp. 3d 1201 (N.D. Cal. 2017) .............................................................................12, 22

*FCC v. Fox Television Stations,*
  556 U.S. 502 (2009) ...............................................................................................................25

*FTC v. Standard Oil Co. of California,*
  449 U.S. 232 (1980) .................................................................................................................4

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ...........................................................................................................7

*Gordon v. Holder*,
  721 F.3d 638 (D.C. Cir. 2013) ......................................................................................10

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) ...........................................................................................................7

*Illinois ex rel. Barra v. Archer Daniels Midland Co.*,
  704 F.2d 935 (7th Cir. 1983) ........................................................................................11

*In re Aiken County*,
  725 F.3d 255 (D.C. Cir. 2013) ........................................................................................4

*Klinger v. Conan Doyle Estate*,
  988 F. Supp. 2d 879 (N.D. Ill. 2013), *aff'd*, 755 F.3d 496 (7th Cir. 2014) ...................2

*Kreg Therapeutics, Inc v. VitalGo, Inc.*,
  2013 WL 1286681 (N.D. Ill. Mar. 28, 2013) .............................................................10

*Louisana Public Service Commission v. FCC*,
  476 U.S. 355 (1986) ...........................................................................................................4

*Marshall County Health Care Authority v. Shalala*,
  988 F.2d 1221 (D.C. Cir. 1993) ......................................................................................2

*Medical Assurance Co. v. Hellman*,
  610 F.3d 371 (7th Cir. 2010) ........................................................................................13

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ........................................................................................10

*Meridian Mutual Insurance Co. v. Meridian Insurance Group, Inc.*,
  128 F.3d 1111 (7th Cir. 1997) ......................................................................................10

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ...........................................................................................................9

*Motor Vehicle Manufacturers Ass'n of U.S. v. State Farm Mutual Auto. Insurance Co.*,
  463 U.S. 29 (1983) ...........................................................................................................24

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) .........................................................................................................19

*National Cable & Telecommunications Ass'n v. Brand X Internet Services*,
  545 U.S. 967 (2005) .........................................................................................................25

iii

*New York v. United States,*
    505 U.S. 144 (1992) ................................................................................ 8, 10, 15

*Pennhurst State School & Hospital v. Halderman,*
    451 U.S. 1 (1981) ............................................................................................ 19

*Pioneer Trail Wind Farm, LLC v. FERC,*
    798 F.3d 603 (7th Cir. 2015) ......................................................................... 24

*Printz v. United States,*
    521 U.S. 898 (1997) ....................................................................................... 15

*Rempfer v. Sharfstein,*
    583 F.3d 860 (D.C. Cir. 2009) ......................................................................... 2

*Reno v. Condon,*
    528 U.S. 141 (2000) ....................................................................................... 15

*Ruisard v. Village of Glen Ellyn,*
    939 N.E.2d 1048 (Ill. App. Ct. 2010) ............................................................ 14

*Saldivar v. Sessions,*
    877 F.3d 812 (9th Cir. 2017) ......................................................................... 16

*Schurz Communications v. FCC,*
    982 F.2d 1043 (7th Cir. 1992) ................................................................. 24, 25

*Sefick v. Gardner,*
    164 F.3d 370 (7th Cir. 1998) ......................................................................... 23

*Shadid v. Sims,*
    40 N.E.3d 347 (Ill. App. Ct. 2015) ................................................................ 14

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ..................................................................... 20, 21, 22, 23

*Steinle v. City & County of San Francisco,*
    230 F. Supp. 3d 994 (N.D. Cal. 2017) .......................................................... 16

*Sturgeon v. Bratton,*
    95 Cal. Rptr. 3d 718 (Ct. App. 2009) ............................................................ 18

*Super Products Corp. v. D P Way Corp.,*
    546 F.2d 748 (7th Cir. 1976) ......................................................................... 12

*Train v. City of New York,*
    420 U.S. 35 (1975) ........................................................................................... 4

*Tula-Rubio v. Lynch,*
    787 F.3d 288 (5th Cir. 2015) .................................................................................16

*U.S. Army Corps of Engineers v. Hawkes Co.,*
    136 S. Ct. 1807 (2016) ...........................................................................................3

*Village of Sugar Grove v. FDIC,*
    2011 WL 3876935 (N.D. Ill. Sept. 1, 2011) ........................................................18

*Ward v. Rock Against Racism,*
    491 U.S. 781 (1989) .............................................................................................14

*Western Illinois Home Health Care, Inc. v. Herman,*
    150 F.3d 659 (7th Cir. 1998) ..................................................................................3

*Whitman v. American Trucking Ass'n,*
    531 U.S. 457 (2001) ...............................................................................................6

*Willis v. City of Chicago,*
    999 F.2d 284 (7th Cir. 1993) ................................................................................23

*Wisconsin v. Ho-Chunk Nation,*
    512 F.3d 921 (7th Cir. 2008) ................................................................................12

*Zero Zone, Inc. v. U.S. Department of Energy,*
    832 F.3d 654 (7th Cir. 2016) ................................................................................24

## CONSTITUTIONAL PROVISIONS, STATUTES, RULES, AND REGULATIONS

U.S. Const. art. I, § 8, cl. 1 ...............................................................................................4

U.S. Const. amend. IV ....................................................................................................23

U.S. Const. amend. X .......................................................................................................8

5 U.S.C.
    § 704 .......................................................................................................................3
    § 706 .................................................................................................................2, 24
    § 1501 ...................................................................................................................25

8 U.S.C.
    § 1182(a)(9)(B)(ii) ...............................................................................................17
    § 1226 ...................................................................................................................17
    § 1281(b) ..............................................................................................................17
    § 1357(g)(10) .......................................................................................................16
    § 1367(a)(2) ..........................................................................................................17
    § 1373 ............................................................................................................*passim*

20 U.S.C. § 1681(a) ........................................................................................................25

29 U.S.C. § 794(a) ................................................................................................................25

34 U.S.C.
    § 10102(a)(6) ..............................................................................................................5, 6
    § 10152(a)(1) ............................................................................................................5, 21
    § 10153 ...................................................................................................................5, 6, 7
    § 10156(d)(2)(A) ...........................................................................................................5
    § 10157(b) ......................................................................................................................5
    § 10228(c) ....................................................................................................................25
    § 10446(e)(3) .................................................................................................................4
    § 11181 *et seq.* .............................................................................................................25
    § 12291(b)(13) .............................................................................................................25
    § 20110(b) ...................................................................................................................25

42 U.S.C.
    § 2000d .....................................................................................................................6, 25
    § 4332 ..........................................................................................................................25
    § 4604(c) ......................................................................................................................25
    § 6102 ........................................................................................................................6, 25

54 U.S.C.
    § 306108 ......................................................................................................................25
    § 312502(b)(1) .............................................................................................................25

Fed. R. Civ. P. 41 ..............................................................................................................18

Fed. R. Civ. P. 56 ................................................................................................................3

2 C.F.R. § 200.203 ...............................................................................................................4

Municipal Code of Chicago, Ill. § 2-173-020 ..............................................................13, 18

Municipal Code of Chicago, Ill. § 2-173-030 ...................................................................13

Municipal Code of Chicago, Ill. § 2-173-042 ...................................................................16

## OTHER AUTHORITIES

Executive Order No. 13,768 .........................................................................................12, 22

H.R. Rep. No. 109-233 (2005) ......................................................................................5, 20

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) ...................................................7

Chicago filed this lawsuit to preserve its access to critical law enforcement funding and to end the Attorney General's assault on longstanding welcoming policies, such as those embodied in Chicago's Welcoming City Ordinance ("WCO"), which law enforcement experts around the country agree are essential to public safety. Since Chicago filed suit, the assault on Chicago's welcoming policies has only escalated. The Attorney General responded to this Court's preliminary injunction against the notice and access conditions by refusing to issue Byrne JAG awards to *any* jurisdiction throughout the country. And he has sought to expand the reach of § 1373 to target the same policies this Court's injunction had protected—effectively substituting § 1373 for the enjoined notice condition. In his reading, § 1373 now requires *not only* that Chicago avoid restricting its employees from sharing citizenship and immigration status information with the federal government, *but also* that Chicago not restrict sharing *any* information concerning a detainee that might conceivably assist federal immigration officials in carrying out their duties. And beyond the negative restrictions imposed by the statute, the Attorney General claims that § 1373 mandates that Chicago *affirmatively* instruct its employees that they are free to cooperate with federal immigration officials by sharing such information. He has also encumbered millions of dollars beyond the Byrne JAG program, refusing to release a COPS Hiring Program grant already awarded to Chicago to hire two dozen police officers until the Attorney General is satisfied that Chicago complies with his ever-changing interpretation of § 1373.

The Attorney General's campaign against Chicago continues to pose the same untenable choices: submit, cede sovereign control over City officers, and damage its residents' trust; or refuse, and not only lose critical Byrne JAG (and other) funds but also risk potential and costly enforcement litigation. It is thus critically important to resolve this controversy, and expeditiously.

To bring this suit to a speedy resolution—and to expedite the release of Byrne JAG (and COPS) funding—Chicago cross-moves for summary judgment on the invalidity of the new

conditions and Chicago's compliance with § 1373. The legality of the conditions is a purely legal question, and one that this Court has already answered. And Chicago's compliance with § 1373 for purposes of this litigation can be determined based on the City's ordinances and Chicago Police Department ("CPD") directives, which are already before the Court. Given the limited scope of relevant facts, it does not serve the interests of justice to delay final judgment months or years when this dispute can be resolved now.

Chicago thus requests summary judgment, and denial of dismissal, on two grounds: *First*, that the notice, access, and compliance conditions are unlawful; and *second*, that Chicago complies with § 1373. Chicago also seeks denial of the motion to dismiss the remaining claims but submits that granting summary judgment to the City will make it unnecessary to address those claims.

## ARGUMENT

## I. DISMISSAL SHOULD BE DENIED AND SUMMARY JUDGMENT ENTERED ON THE GROUNDS THAT THE CONDITIONS ARE UNLAWFUL AND THAT CHICAGO COMPLIES WITH § 1373

### A. Standard Of Review

Challenges to agency action "not in accordance with law," 5 U.S.C. § 706(2), present only "a question of law" concerning "the legal conclusion to be drawn about the agency action." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). Thus, in the agency review context, there is often "no real distinction . . . between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). A motion for summary judgment arguing that agency action was *ultra vires* or otherwise unlawful requires no factfinding, but simply asks whether the agency action was permissible under existing law. Similarly, summary judgment on a declaratory-judgment claim is appropriate where "'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Klinger v. Conan Doyle Estate*, 988 F. Supp. 2d 879, 884-885 (N.D. Ill. 2013), *aff'd*, 755 F.3d 496

(7th Cir. 2014). A motion for summary judgment may be filed "at any time." Fed. R. Civ. P. 56(b).

**B.** **The Attorney General's Decision To Impose The Notice, Access, And Compliance Conditions Is Final**

Despite having appealed this Court's preliminary injunction and asked the Seventh Circuit to uphold the notice and access conditions, the Attorney General now argues (at 2-4) that his decision is actually unreviewable because DOJ has not taken any "final agency action." That is incorrect.

For agency action to be "final," it must both "'mark the consummation of the agency's decisionmaking process'" and "'be [an action] by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 136 S. Ct. 1807, 1813 (2016); *see* 5 U.S.C. § 704. "'The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties.'" *W. Ill. Home Health Care, Inc. v. Herman*, 150 F.3d 659, 662 (7th Cir. 1998).

The Attorney General's decision to impose the three conditions on Byrne JAG funds is both unequivocal and triggers important legal and practical consequences. It is therefore reviewable. The FY2017 Byrne JAG solicitation states definitively that FY2017 awards "will include" the three conditions. SUMF ¶¶ 22. And a sworn declaration the Attorney General submitted to this Court confirms that every FY2017 award will contain conditions identical to those in the Binghamton and Greenville awards, which include all three conditions. SUMF ¶ 27; *see also* Dkt. 32 at 21 (asserting that those awards contain "the *final language* of th[e] conditions" for *all* grantees (emphasis added)). The Attorney General's assertion now that "an award to the City *might not* contain at least some of the challenged conditions" is therefore disingenuous. Dkt. 139 at 3 (emphasis added).

Moreover, the conditions set the substantive terms under which grant recipients, like Chicago, must operate—forcing Chicago either to forfeit funding it has received for over a decade or agree to conditions that would require repealing the WCO. And the conditions' announcement effectively dictated whether state and local governments could or should even apply for funds at

all—as DOJ recognized by "strongly encourag[ing] prospective applicants to review" the conditions "**prior** to submitting an application." SUMF ¶ 22; *see also* 2 C.F.R. § 200.203 (grant notification must "includ[e] sufficient information to help an applicant make an informed decision about *whether to submit* an application" (emphasis added)). By any measure, then, the decision to impose the conditions is a "'definitive'" agency statement with a "'direct and immediate effect on the day-to-day business' of the complaining part[y]." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980). As Judge Baylson concluded, the decision is therefore "final and ripe" for judicial review. *See City of Philadelphia v. Sessions*, 2017 WL 5489476, at *25 (E.D. Pa. Nov. 15, 2017) (appeal filed Jan. 18, 2018).

### C. All Three Conditions Are *Ultra Vires* And Violate Separation Of Powers

No statutory authority permits the Attorney General to supplement the conditions Congress required Byrne JAG recipients to meet. That lack of authority is dispositive: an agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). And "when [agencies] act improperly, no less than when they act beyond their jurisdiction, what they do is *ultra vires*." *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013). Because each condition is *ultra vires* and violates separation of powers, the Court should deny the Attorney General's motion to dismiss Counts One and Two, and enter summary judgment for Chicago on those counts.[1]

#### 1. The notice and access conditions are *ultra vires*

The Attorney General has no authority to impose substantive policy conditions of his own creation on Byrne JAG grantees. Unlike statutes that authorize the Attorney General to "impose reasonable conditions on grant awards," *e.g.*, 34 U.S.C. § 10446(e)(3), the Byrne JAG statute creates a

---

[1] The *ultra vires* imposition of spending conditions by the Executive necessarily violates separation of powers principles. The Constitution gives Congress, not the Executive, the Spending power. U.S. Const. art. I, § 8, cl. 1. Executive officials therefore cannot unilaterally "refuse to spend . . . funds" that have been appropriated by Congress "for a particular project or program." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Train v. City of New York*, 420 U.S. 35, 44 (1975).

formula grant, mandating that the Attorney General "shall allocate" funds to local governments, *id.*
§ 10156(d)(2)(A), "in accordance with" a formula based on population and crime statistics, *id.*
§ 10152(a)(1). Formula grants "are not awarded at the discretion of a state or federal agency, but are
awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th
Cir. 1989). The Byrne JAG statute accordingly gives the Attorney General only limited authority,
such as the power to specify the "form" of the application, 34 U.S.C. § 10153, and to "reserve *not
more* than 5 percent" of the program's total funds to combat "extraordinary increases in crime" or
"mitigate significant programmatic harm," *id.* § 10157(b) (emphasis added). Congress adopted this
formula-driven, locally responsive approach to achieve an overarching objective: to "give State and
local governments more flexibility to spend [federal] money for programs that work for them rather
than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). The Attorney
General's claimed conditioning authority conflicts with Congress's express instructions and goals.

The Attorney General does not disagree but once again "appears to concede" that no
provision of the Byrne JAG statute authorizes the notice and access conditions. *See* Dkt. 78 at 13.
Instead, he claims that the conditions are authorized by a general provision contained in a *different*
subchapter concerning the "duties and functions" of the Assistant Attorney General ("AAG")—
34 U.S.C. § 10102(a)(6). This court rejected the Attorney General's misplaced reliance on that
provision when it granted preliminary injunctive relief; it should now grant permanent relief.[2]

Section 10102(a)(6) does not independently vest any authority in the AAG. That section
authorizes the AAG to "exercise such other powers and functions as may be vested in [him]
pursuant to this chapter or by delegation of the Attorney General, including placing special

---

[2] The only new argument in the motion to dismiss is that the language giving the AAG authority to "plac[e] special conditions on all grants" was added as part of the legislation creating the Byrne JAG program. The source of this language does not change the plain meaning of the statutory text, which the Court has previously construed. Dkt. 78 at 17-18. Nor does it undermine this Court's conclusions regarding the superfluities the Attorney General's reading creates. *Id.* at 14-16.

conditions on all grants, and determining priority purposes for formula grants." Its language demonstrates "that any authority of the [AAG] to place special conditions on grants must flow either from the [underlying grant] statute itself or from a delegation of power independently possessed by the Attorney General." Dkt. 78 at 18.

The Attorney General's contrary view both "renders superfluous the explicit statutory authority Congress gave . . . to impose conditions on other" grant programs within the same chapter as the Byrne JAG program, *id.* at 14, and conflicts with the discretion-*limiting* provisions described above that are in the Byrne JAG statute itself. Interpretative principles and reason alike preclude the notion that Congress would use a minor amendment to an ancillary provision it grouped with clauses describing bureaucratic functions of a sub-cabinet post to confer limitless power to impose conditions on *all* DOJ grant programs. Congress does not "alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001); *see also* Dkt. 78 at 17. The notice and access conditions are therefore *ultra vires*.

## 2. The compliance condition is *ultra vires*

For these same reasons, § 10102(a)(6) cannot be read to authorize the compliance condition. And the Attorney General is no more persuasive in locating authority for that condition in the Byrne JAG statute's requirement that applicants certify compliance with "all other applicable federal laws." 34 U.S.C. § 10153(a)(5)(D). In that provision, Congress did not make the Byrne JAG statute a compliance mechanism for "all Federal laws," but only "*applicable* Federal laws." "Applicable" refers to the laws that Congress itself made applicable to federal grantees—*i.e.*, statutes that by their express terms govern recipients of federal funds. *E.g.*, 42 U.S.C. § 2000d (nondiscrimination condition for "any program or activity receiving Federal financial assistance"); *id.* § 6102 (same, for age discrimination). Because § 1373 contains no provision authorizing enforcement of its provisions

6

through administration of any federal grant program, it is not an "applicable Federal law."[3]

The surrounding context of the phrase "all other applicable federal laws" confirms this interpretation. Section 10153(a)(5)(D) requires applicants to certify compliance "with all provisions of this part *and all other* applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D) (emphasis added). The statute therefore uses a specific term ("all provisions of this part") followed by a residual term ("all other applicable Federal laws."). When Congress uses this formulation, it intends the residual term to be limited by the qualities of the specific term. *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001) (term "any other class of work" should be "controlled and defined by reference to" the preceding terms, "seamen" and "railroad employees"). Here, the specific term imposes requirements only on federal grantees; it follows that the residual term—"*other* applicable Federal laws"—must similarly be limited to federal statutes that expressly apply to federal grantees.

This Court previously agreed that Chicago's construction of "other applicable laws" is "plausible," but ultimately read the provision to refer to all federal laws that might govern Chicago. Dkt. 78 at 21. For the reasons above, Chicago respectfully urges the Court to reconsider that conclusion. Moreover, because the broader reading of "applicable" raises serious federalism concerns, this Court should adopt Chicago's narrower reading, which is, after all, "plausible." *See also Philadelphia*, 2017 WL 5489476, at *29 (describing question as a "close call"). When Congress "intends to alter the usual constitutional balance between the States and the Federal Government," it must make its intent to do so "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460-461 (1991) (quotation marks omitted). This need for clear authority is most essential where federal policy threatens to interfere with "the States' police power." *Gonzales v.*

---

[3] Indeed, Congress has repeatedly *declined* to enact legislation to do just that. *E.g.*, Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015). And as discussed further below, *see infra* p. 25, before imposing the § 1373 compliance condition, DOJ itself limited Byrne JAG certification to federal laws that Congress expressly authorized to be enforced as a condition on federal funds.

*Oregon*, 546 U.S. 243, 274 (2006). Because "applicable" can bear at least two plausible readings, Congress did not express sufficiently clear intent to extend that provision beyond statutes expressly tied to federal funds.

And beyond the import of "applicable," there is another reason that § 1373 does not qualify as an "applicable Federal law": § 1373 violates Tenth Amendment anti-commandeering principles and is therefore facially unconstitutional. *Cf. Branch v. Smith*, 538 U.S. 254, 281 (2003) (unconstitutional state law "a legal nullity" and so could not be applied under the phrase "as state law requires"). This Court previously recognized that § 1373 comes at least close to transgressing the Tenth Amendment because the statute "may practically limit the ability of state and local governments to decline to administer or enforce a federal regulatory program" and "may effectively thwart policymakers' ability to extricate their state or municipality from involvement in a federal program." Dkt. 78 at 34-35. This Court nonetheless concluded that § 1373 was not unconstitutional because existing precedent establishes that only "affirmative demands on states constitute a violation of the Tenth Amendment" and "[r]ead literally, Section 1373 imposes no affirmative obligations on local governments." *Id.*[4]

Importantly, however, the Supreme Court has also recognized that the federal government may not limit a city or state's power to *decline* participation in a federal program, as § 1373 does. In *New York v. United States*, the Court rejected part of a federal program under which the States lacked a "critical alternative" to participation: they could "not decline to administer the federal program." 505 U.S. 144, 177 (1992). Section 1373 intrudes on local sovereignty in precisely the same way: governments must choose either to (1) assist in federal immigration enforcement or (2) run police departments without controlling their employees' communications with ICE. It thus forecloses *New*

---

[4] As explained in more detail below, *see infra* p. 11, the Attorney General has now expanded his interpretation of § 1373 to impose affirmative obligations on local governments. That new interpretation would result in unconstitutional commandeering.

*York*'s "critical alternative": the option of non-participation in the federal program. *See also Conant v. Walters*, 309 F.3d 629, 646 (9th Cir. 2002) (Kozinski, J., concurring) ("[P]reventing the state from repealing an existing law is no different from forcing it to pass a new one[.]").  Because § 1373 violates anti-commandeering principles, it cannot constitute an "applicable Federal law."

### 3.   The Court should enter a permanent nationwide injunction

Because the challenged conditions are unlawful, the Court should permanently enjoin the Attorney General from imposing them on Byrne JAG grantees.  Under *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-157 (2010), the Court may issue permanent injunctive relief if the moving party demonstrates:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law . . . are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

This is "essentially" the same standard as for a preliminary injunction, except a preliminary injunction requires "a likelihood of success on the merits rather than actual success."  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987).  Thus, in entering the preliminary injunction, this Court has "essentially" considered these factors and resolved them in Chicago's favor.  That preliminary determination is correct.  As shown above, Chicago has established actual success on the merits—all three conditions are *ultra vires*.  The remaining *Monsanto* factors are also satisfied.

The material facts have not changed.  *First*, absent permanent injunctive relief, the City remains subject to an untenable choice:  forgo necessary Byrne JAG funds or accede to the Attorney General's conditions by repealing the WCO and risking the trust of the City's immigrant communities.  *See* SUMF ¶ 11.  A forced choice between compliance with unlawful conditions on the one hand and violating the law on the other constitutes irreparable harm.  *See* Dkt. 78 at 37.

*Second*, only an injunction can prevent the loss of trust between the City and its residents that would result from its compliance with the Attorney General's conditions.  As the Court has

explained, once the City's reputation as a "Welcoming City" is lost, essential trust with immigrant communities "cannot be repaired through an award of money damages." Dkt. 78 at 37.[5]

*Third*, the balance of equities heavily favors granting a permanent injunction. Chicago's residents have a vital interest in ensuring the safety of their city. They have made a reasoned decision, through their elected leaders, that their interest is best served by promoting strong relations between local law enforcement and immigrant communities. The City also has an abiding interest in protecting itself against unwanted federal pressure. *See New York*, 505 U.S. at 181 ("'federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'"). And "enforcement of an unconstitutional law is always contrary to the public interest." *See Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *see also Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). The Attorney General can make no comparable showing of harm. *Cf.* Dkt. 78 at 37-38.

*Finally*, permanent injunctive relief, like the preliminary relief, should be nationwide in scope. The City challenges a single, integrated federal policy promulgated under a uniform, nationwide formula grant program, and "the Attorney General's authority, or lack thereof, will not vary by jurisdiction." Dkt. 98 at 5. Thus, no reason exists "to think that the legal issues present in this case are restricted to Chicago," Dkt. 78 at 41, and the Attorney General does not even claim they are.

### D. Chicago Is Entitled To A Declaratory Judgment That It Complies With Section 1373

The Attorney General has combined a growing drumbeat of threats to enforce § 1373 against Chicago with vague and shifting interpretations of the statute. The objective of these threats is clear from a speech he delivered shortly after Chicago filed this lawsuit: "requir[ing]" Chicago to

---

[5] The requirements of irreparable harm and absence of an adequate remedy at law "tend to merge" such that an injury is "irreparable when it is of such a nature that the injured party cannot be compensated in damages or when damages cannot be measured by any pecuniary standard." *Kreg Therapeutics, Inc v. VitalGo, Inc.*, 2013 WL 1286681, at *18 (N.D. Ill. Mar. 28, 2013); *see also Meridian Mut. Ins. Co. v. Meridian Ins. Grp., Inc.*, 128 F.3d 1111, 1120 (7th Cir. 1997).

"reorder[] [its] law enforcement practice," he declared, is "exactly the point!" SUMF ¶ 26. Chicago now seeks a declaration that it complies with § 1373 to lift the legal and budgetary uncertainty that the Attorney General's threats have caused.

### 1. A declaratory judgment is proper in this case

The Attorney General does not dispute that this case presents a live controversy over the City's compliance with § 1373. Nor does he question this Court's power to rule on Chicago's claim for declaratory relief. Rather, he argues only that the Court should exercise "discretion" not to do so. Dkt. 139 at 17-19. The Court should reject that request.

The purpose of a declaratory judgment is to settle legal issues "to avoid debilitating legal uncertainty." *Ill. ex rel. Barra v. Archer Daniels Midland Co.*, 704 F.2d 935, 940-941 (7th Cir. 1983). The need for such relief here is acute, and growing. Prior to Chicago's suit, the Attorney General demanded that Chicago's "chief legal officer" certify "under penalty of perjury" and "criminal prosecution" that the City complies with § 1373, SUMF ¶ 22. That demand alone made declaratory relief necessary, given § 1373's inherent ambiguity. *See infra* p. 19. And since then, the Attorney General has refused to commit to a single interpretation of § 1373, making it impossible for Chicago to definitively answer that demand without the aid of a declaratory judgment. For example, the Attorney General has alternately argued both that § 1373 imposes no affirmative requirements, Dkt. 76 at 59, and that it does impose affirmative demands, *see* Dkt. 139 at 14. And his interpretation of "information regarding citizenship or immigration status" has evolved over the course of this litigation to encompass a detainee's whereabouts, custody status, and release dates. *See* Dkt. 139 at 19-20; Dkt. 103-1, *see also infra* p. 16-17. Chicago is entitled to declaratory relief to remove the deep uncertainty that these shifting legal positions have created.

The Attorney General makes three arguments why this court should exercise its "discretion" to withhold declaratory relief. Each misses the mark. *First*, contrary to the Attorney General's

11

suggestion (at 18), the dispute in this case is not about the legality of past conduct. The dispute is whether Chicago's *ongoing conduct* complies with § 1373. Courts regularly issue declaratory judgments regarding the legal implications of ongoing behavior. *See, e.g., Super Prods. Corp. v. D P Way Corp.*, 546 F.2d 748 (7th Cir. 1976); *Cty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201, 1218 (N.D. Cal. 2017); *City of Seattle v. Trump*, 2017 WL 4700144, at *7 (W.D. Wash. Oct. 19, 2017).

*Second*, the Attorney General contends that declaratory relief would preempt the DOJ's ongoing assessment regarding Chicago's § 1373 compliance. But that argument ignores the Attorney General's demand that the City certify compliance *now* under threat of future criminal prosecution or civil litigation. What's more, the President has ordered the Attorney General to take "appropriate enforcement action against any entity that violates [§] 1373," Executive Order No. 13,768, § 9(a), which the Attorney General has interpreted to mean filing civil preemption actions against jurisdictions he believes violate § 1373, *see* Request for Judicial Notice ("RJN") Ex. K at 2, 8, 22. The City needs declaratory relief precisely because DOJ's ongoing "administrative process" is a moving target that involves a continually evolving understanding of what DOJ believes is required under § 1373 and because the threat Chicago faces is not limited to that process but extends as well to potential civil preemption litigation.

*Finally*, the Attorney General is wrong to assert that Chicago has failed to "identify an underlying cause of action" for declaratory relief. Dkt. 139 at 18. It is the "*presumed suit by the declaratory judgment defendant*"—not the plaintiff—that is litigated in a declaratory judgment action. *See Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 935 (7th Cir. 2008) (emphasis added). Both in this case, Dkt. 139 at 18, and in other parallel suits, RJN Ex. K, the Attorney General has made clear that he could bring civil preemption actions against jurisdictions to enforce § 1373. It is this "Damoclean threat of impending litigation which a harassing adversary might brandish" that "[t]he remedy made

available by the Declaratory Judgment Act" was designed to relieve. *Med. Assur. Co. v. Hellman*, 610 F.3d 371, 377 (7th Cir. 2010).

### 2. Chicago complies with section 1373

This Court should grant summary judgment on Count Five because Chicago complies with § 1373. Chicago does not prevent or restrict its police officers from sharing citizenship or immigration status information with federal officials, exchanging it with other governmental entities, or otherwise maintaining it.[6] Section 1373 requires nothing more. To the extent § 1373 is read to require Chicago to affirmatively communicate that non-restriction internally (which it does not), Chicago has done that too. Chicago is therefore entitled to a declaration of compliance.

#### a. Chicago has no policy preventing its police officers from sharing immigration-status information with federal officials or exchanging that information with other governmental entities

Three provisions of the WCO, and one CPD Special Order implementing the WCO, reveal Chicago's policies concerning sharing citizenship or immigration-status information with federal immigration officials or other governmental entities.[7]

*WCO Sections 020 and 030*: Section 020 of the WCO prohibits any City "agent or agency" from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or immigration status of any person unless such inquiry or investigation is required by . . . federal regulation." Municipal Code of Chicago, Ill. ("MCC") § 2-173-020. Section 030 of the WCO prohibits any "agent or agency" from "disclos[ing] information regarding the citizenship or immigration status of any person" in the absence of legal process or written consent, "[e]xcept as otherwise provided under applicable federal law." MCC § 2-173-030.

---

[6] The Attorney General admits that the compliance condition is "limited 'to the "program or activity" that is funded (in whole or in part)'" by the Byrne JAG award. Dkt. 139 at 10 n.2. Proof of compliance by any City agency—other than CPD—is therefore beyond the scope of the parties' dispute.

[7] There are no other relevant ordinances or policies. SUMF ¶ 10.

Neither provision violates § 1373. Section 020 does not govern intergovernmental information sharing at all. Rather, it restricts officers from "investigat[ing]" the status of "any person"—*i.e.*, from questioning suspects, witnesses, crime victims, or other private individuals about immigration status—which is a limit that DOJ guidance concedes falls outside § 1373. RJN Ex. I at 5 ("[§] 1373 does not impose . . . the affirmative obligation to collect information from private individuals regarding their immigration status."). And both provisions contain express savings clauses that prevent any conflict with § 1373: Where § 1373 requires that Chicago not "prohibit" or "restrict" sharing immigration-status information, § 1373 triggers the savings clauses and lifts any restriction that would otherwise apply. Thus, as Chicago's Corporation Counsel has explained, neither provision "prohibit[s] or restrict[s] the sharing of citizenship or immigration status information with other units of government." SUMF ¶ 34. That definitive construction of City law by the City's chief legal officer is reasonable, and should be afforded deference. *See Shadid v. Sims*, 40 N.E.3d 347, 350 (Ill. App. Ct. 2015); *Ruisard v. Vill. of Glen Ellyn*, 939 N.E.2d 1048, 1061 (Ill. App. Ct. 2010); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 795-796 (1989).

Although conceding that each WCO provision can be read to not restrict or prohibit inter-governmental information sharing, the Attorney General and DOJ have previously argued that the provisions are ambiguous and that § 1373 therefore requires Chicago to affirmatively instruct City employees that they are free to assist federal immigration officials by sharing citizenship and immigration status information. SUMF ¶¶ 31, 43. That is incorrect. As this Court has explained, "[r]ead literally, Section 1373 imposes *no affirmative obligations* on local governments." Dkt. 78 at 34. It "prohibits prohibitions"—nothing more. *Id.* at 32. That is clear from the text of the statute, which describes only negative obligations: a locality "may not prohibit, or in any way restrict [inter-governmental sharing of certain information]." 8 U.S.C. § 1373(a). And that construction is also compelled by the Tenth Amendment, which counsels against reading a federal statute to

14

affirmatively "command the States' officers . . . to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also Reno v. Condon*, 528 U.S. 141, 151 (2000) (federal government may not affirmatively "require state officials to assist in the enforcement of federal statutes regulating private individuals"); Dkt. 78 at 34-35 (although "Section 1373 may implicate the logic underlying the *Printz* decision," it is constitutional *insofar* as it imposes no "affirmative demands"). Both plain text and the canon of constitutional avoidance therefore preclude reading § 1373 to force Chicago to affirmatively grant permission to its police officers to help enforce federal immigration law. *See New York*, 505 U.S. at 170 (invoking the avoidance canon to reject a statutory construction that "would . . . 'upset the usual constitutional balance of federal and state powers'").

In any event, Chicago has fulfilled the affirmative obligation that the Attorney General incorrectly argues § 1373 requires. In October 2017, the Corporation Counsel informed all agency heads that Chicago "does not have a law or policy that prohibits or restricts any Chicago entity or official from sending to, or receiving from, [ICE], information regarding the citizenship or immigration status, lawful or unlawful, of any individual" and that Chicago "does not prohibit or in any way restrict any person or agency from sending to, or requesting or receiving from, [ICE], information regarding the immigration status, lawful or unlawful, of any individual."[8] SUMF ¶ 48. That memorandum attached a letter from Chicago to DOJ containing the Corporation Counsel's definitive and extensive interpretation of the WCO. *Id.* Accordingly, neither Section 020 nor Section 030 of the WCO creates any conflict with § 1373.

*WCO Section 042 and CPD Special Order S06-14-03*: WCO Section 042, which the Attorney General has also challenged (at 19-20), comports with § 1373 as well. Section 042

---

[8] Chicago objected to making this communication at the time, but agreed to do so "in the interest of resolving this issue." SUMF ¶ 47. Chicago continues to believe the communication requirement constituted unlawful commandeering, for the reasons above. *See supra* p. 14-15.

15

prohibits CPD officers from spending on-duty time "responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date" unless those officers are "acting pursuant to a legitimate law enforcement purpose that is unrelated to the enforcement of a civil immigration law." MCC § 2-173-042(b)(1)(C); *see also* RJN Ex. F (CPD Special Order S06-14-03, implementing WCO Section 042). Because Section 042 restricts the sharing of "custody status or release date" information only and does not apply to the sharing of anyone's "citizenship or immigration status," it does not even implicate § 1373, much less violate it.

The Attorney General nonetheless contends (at 19) that Section 042 violates § 1373 because "information regarding . . . immigration status" includes an individual's "[c]ustody status and release dates." But "no plausible reading of 'information regarding . . . citizenship or immigration status' encompasses the release date of an undocumented inmate." *Steinle v. City & Cty. of S.F.*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017). Immigration "status" as that term is used in federal immigration law simply refers to the "states or conditions that an alien may possess under the INA." *Saldivar v. Sessions*, 877 F.3d 812, 817 (9th Cir. 2017); *Tula-Rubio v. Lynch*, 787 F.3d 288, 293 (5th Cir. 2015) (similar). It thus covers, *e.g.*, a person's status as a lawful permanent resident or as an undocumented immigrant, not his or her status as a detainee held by Chicago.

The Attorney General's principal argument is that because 8 U.S.C. § 1357(g)(10) makes "unlawful presence" relevant to an individual's immigration status, and because a dictionary defines "present" as "being in a certain place and not elsewhere," a person's presence in any particular location—including, but not limited to, police custody—qualifies as that person's "immigration status." Dkt. 139 at 19. But § 1357(g)(10) refers not to "presence" alone, but to "*unlawful* presence." (emphasis added). It is concerned, in other words, not with *all* presence anywhere in Chicago or the United States, but only with that type of presence that would cause a person's status to be "*unlawful.*" And the INA clearly delineates the circumstances in which a person's presence is "unlawful,"

defining "unlawful presence" as presence "after the expiration of the period of stay authorized by the Attorney General or . . . without being admitted or paroled." 8 U.S.C. § 1182(a)(9)(B)(ii). Because custody status or release date are not relevant to whether a person has overstayed a visa or entered the country illegally, such information cannot plausibly be swept into the term "unlawful presence," let alone the term "immigration status."

The Attorney General further argues that use of the introductory phrase "information regarding" in concert with "immigration status" broadens § 1373 to encompass any "information that assists the federal government in carrying out its statutory responsibilities" under the INA, including, he argues, the responsibility set by 8 U.S.C. § 1226(c) to take into custody certain "criminal aliens" upon their release from law-enforcement custody. Dkt. 139 at 19-20.[9] But that is not the language Congress used in the statute. Rather than broadly link the "information" covered by § 1373 to the federal government's long litany of immigration enforcement duties, Congress enacted a statute focused on two specific types of information: "immigration status" and "citizenship." It did not, for example, target "any information likely to lead to [the] apprehension" of an "alien crewman" who has "illegally landed in the United States," 8 U.S.C. § 1281(b), or "any information which relates to an alien," *id.* § 1367(a)(2). At most, then, the term "information regarding" might encompass information that materially bears on an individual's immigration status—such as, as just explained, whether a person overstayed a visa or entered the country illegally. Because the Attorney General cannot explain how the statutory duties he invokes make "custody status" or "release date" information materially relevant to immigration status or citizenship, such information cannot qualify as "information regarding . . . immigration status."

---

[9] The Attorney General suggests that 8 U.S.C. § 1226 imposes a duty to "take into custody *any* alien." Dkt. 139 at 20 (emphasis added). The full text of Section 1226, however, is clear that a duty attaches only with regard to specified "criminal aliens." 8 U.S.C. § 1226(c)(A)-(D) (listing categories of aliens whom the Attorney General is directed to "take into custody").

        **b.**      **Chicago has no policy that prohibits or restricts CPD officers from "maintaining" immigration-status information**

None of Chicago's policies addresses the "maintenance" of immigration-status information. At most, they address collection of such information; the WCO, for example, prevents City officials and employees from investigating an individual's immigration status except in certain specified situations. *See* MCC § 2-173-020. These policies, however, do not affect whether CPD "maintains" immigration-status information once it is collected. *See Sturgeon v. Bratton*, 95 Cal. Rptr. 3d 718, 731 (Ct. App. 2009) (limited collection of immigration-status information does not "prohibit or in any way restrict" "maintenance" of such information).

## II.    THE COURT SHOULD DENY DISMISSAL OF CHICAGO'S REMAINING CLAIMS

The Attorney General also argues that Chicago's Spending Clause, Commandeering, and APA claims should be dismissed. Those arguments need not be addressed if the Court grants Chicago the summary relief requested above, but to the extent the Court entertains them, they fail.[10]

### A.    Standard Of Review

The only "purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint." *Vill. of Sugar Grove v. FDIC*, 2011 WL 3876935, at *2 (N.D. Ill. Sept. 1, 2011). If a motion to dismiss for failure to state a claim does not provide a legally sound basis to dismiss, the motion must be denied. *See id.*

### B.    The Conditions Fail To Satisfy The Spending Clause's Requirements

#### 1.    Each condition is ambiguous and fails to give a prospective Byrne JAG recipient sufficient notice of what would be required of it

The Byrne JAG program, like other Spending Clause legislation, operates "in the nature of a

---

[10] Chicago also brought APA claims asserting that the Attorney General should have used notice-and-comment procedures and violated the Paperwork Reduction Act. Compl. ¶¶ 144, 147-155. It now withdraws those claims, without prejudice to its right to reassert them at a later time. *See* Fed. R. Civ. P. 41(a)(1).

contract," whereby grantees receive federal funds and, in exchange, agree to comply with federally imposed conditions. *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) (internal quotation marks omitted). For those conditions to be legitimate, recipients must be able to "exercise their choice knowingly." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The federal government cannot impose conditions if a recipient "is unable to ascertain what is expected of it" ahead of time. *Id.* Each of the three conditions the Attorney General seeks to impose fails that requirement.

With respect to the compliance condition, DOJ has taken the position that grantees must certify compliance with its ever-shifting and expansive interpretations of what § 1373 requires.[11] Far from mitigating ambiguities in the statute, *cf.* Dkt. 139 at 13-14, DOJ's interpretations—together with the Attorney General's positions in this litigation—make the condition indecipherable. As explained above, the Attorney General has stated during this litigation both that § 1373 imposes no affirmative obligations, and that it does. *See supra* p. 11. And he now takes the position that "information regarding . . . immigration status" is a boundless phrase that includes an alien's precise physical location—and, indeed, all "information that assists the federal government in carrying out its statutory responsibilities." Dkt. 139 at 20-21. Given these positions, a city official is unable to "clearly understand," *see Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), what qualifies as "information regarding . . . immigration status," let alone whether the compliance condition imposes any affirmative obligations with respect to that information.[12]

Nor do the notice and access conditions provide grantees with adequate notice of the "consequences of their participation." *Pennhurst*, 451 U.S. at 17. As with the compliance condition,

---

[11] *See* RJN Ex. V (DOJ's October 2017 "Preliminary Assessment").

[12] The Attorney General's, and DOJ's, shifting interpretations of § 1373, distinguish this case from *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003), on which the Attorney General relies to argue that "indeterminate" funding conditions are unobjectionable, so long as the recipients understand that compliance with that condition will be required. That case involved a static condition, which is far different from the standards here, which the Attorney General has refused to conclusively and consistently define.

the Attorney General's behavior during this litigation has rendered the notice and access conditions unintelligible. In defending against Chicago's preliminary injunction motion, the Attorney General stated that the notice and access conditions will not be imposed as articulated in the grant solicitation, but that different versions of those conditions will apply. *See* Dkt. 32 at 20-21. And he now says that Chicago's conditions might be different in some other unspecified way. Dkt. 139 at 12. Given DOJ's shifting representations regarding what will be required under the notice and access conditions, a prospective grantee cannot realistically be expected to understand the consequences of its participation in the program. Furthermore, both conditions are entirely dependent on the future exercise of discretion by federal agents outside of DOJ: Notice is required before the release of any alien any time "DHS requests such notice," and any "personnel of [DHS]" must be permitted access to "any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien)." RJN Ex. T at 30. Whether DHS will be cabined by any standards in exercising that discretion is a mystery. In particular, it is unclear what support DHS personnel will need to provide (if any) to show that an individual is an alien or "believed to be an alien." This is no mere "indetermina[cy]" in terms, *see* Dkt. 139 at 14—these conditions turn *entirely* on the significant and unbounded discretion of actors outside DOJ's control.

### 2. None of the conditions is germane to the purposes of the program

Conditions imposed under the Spending Clause must be related to the federal interest in the project or program to which they are attached. *South Dakota v. Dole*, 483 U.S. 203, 207-208 (1987). The challenged conditions are not only *unrelated* to the goals of the Byrne JAG program, but they *undermine* them. Congress enacted the Byrne JAG statute "to give State and local governments more flexibility to spend [federal] money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005) (emphasis added). That purpose is reflected in the program's structure. Rather than impose substantive conditions on localities, the

statute affords recipients flexibility to use program funds for any of eight broadly defined purposes. *See* 34 U.S.C. § 10152(a)(1). The conditions the Attorney General now seeks to impose do violence to the program's goal of supporting flexible, locally driven policing and crime-reduction policies because they prevent Chicago from receiving its Congressionally dictated allocation of funding unless it yields to the Attorney General's policies.

The Attorney General does not contest that the conditions are unrelated (and, in fact antithetical) to the purpose of providing local governments with flexibility to spend Byrne JAG funds. Instead, he argues that the relevant federal interest is a substantially broader one: to "provide resources for 'criminal justice.'" Dkt. 139 at 10. This misses the mark. The inquiry into "relatedness" must focus on the federal interest in the "particular national projects or programs" to which the conditions are attached. *Dole*, 483 U.S. at 207. As discussed, the Byrne JAG program promotes the federal government's broader interest in "criminal justice" *by supporting flexible, locally driven projects and policies*. That interest is the relevant benchmark under the Supreme Court's precedents. *See Philadelphia*, 2017 WL 5489476, at *48, *49 (purpose of Byrne JAG is to "enhance[] *local* criminal justice" and to provide money for municipalities to "use . . . as they see fit").

Even crediting the promotion of "criminal justice" as the proper touchstone, the conditions still fail the relatedness requirement because federal immigration law and immigration status have nothing to do with the enforcement of local criminal laws. *See Philadelphia*, 2017 WL 5489476, at *21. Most fundamentally, immigration enforcement is an area of civil, not criminal, law. Furthermore, criminal laws are enforced equally against all individuals regardless of their immigration status. And while the Byrne JAG program provides funding to support enforcement of *local* criminal laws, "immigration regulation and enforcement are federal functions." Dkt. 78 at 28 (citing *Arizona v. United States*, 567 U.S. 387, 396-397 (2012)). The Attorney General responds that criminal law sometimes bears on immigration law. Dkt. 139 at 10-11. But the fact that criminal law

21

enforcement may affect immigration status does not establish that the inverse is also true. If it were otherwise, one could invert the facts of *Dole* to reach the absurd conclusion that a program aimed at reducing alcohol abuse could require States to construct highways in a certain way. *See also, e.g.*, *Philadelphia*, 2017 WL 5489476, at *48 ("[W]hile criminal law bears enormously on voting rights, voting laws don't appear to have any impact on the criminal justice system."). Conditions related to the enforcement of federal, civil immigration law are thus unrelated to the promotion of local criminal law enforcement and cannot be sustained under the Spending Clause.

### 3. The conditions are coercive

The Spending Clause also prohibits grant conditions that are "so coercive as to pass the point at which pressure turns into compulsion" and thereby commandeer the States. *Dole*, 483 U.S. at 211 (internal quotation marks omitted). Here, the conditions require Chicago to either accept an unlawful grant condition or surrender substantial funds to which it would otherwise be entitled. The Attorney General argues that these conditions cannot be coercive because the amount of money Chicago stands to lose from the Byrne JAG program is small relative to Chicago's budget. Dkt. 139 at 15. But more than the just Byrne JAG funds are at stake: The Attorney General has already refused to release millions of dollars that Chicago was *already awarded* via the COPS Hiring Program. And there is no reason to think that the Attorney General will stop there—indeed, the President issued a (now enjoined) order stating that the Attorney General "shall ensure" that any jurisdiction deemed to be a "sanctuary jurisdiction" does not receive *any* Federal money, Executive Order No. 13,768, § 9. *See Cty. of Santa Clara v. Trump*, 267 F. Supp. 3d 1201 (N.D. Cal. 2017). The Attorney General's calculus therefore drastically underestimates the coercive force of his actions.

In any event, the amount of money at stake is not the only feature that renders these conditions coercive. The Attorney General imposed these conditions at the last minute. That significantly increased the coercive force of his threat to withhold funding, as Chicago had already

22

nearly completed its 2018 budget at the time the conditions were announced, and did not have time to replace or adequately plan around the possibility of losing federal funds that it has received every year since the Byrne JAG program was created. *See* RJN Ex. W at 48-49. For all of those reasons, the conditions imposed amount to impermissible compulsion.

### 4. The notice and access conditions would require the City to violate the Fourth Amendment

As initially written, the notice and access conditions violate the Spending Clause for the additional reason that they demanded unconstitutional action of recipients like Chicago. *See Dole*, 483 U.S. at 210. The FY2017 local solicitation required recipients to "provide *at least* 48 hours' advance notice" of an "alien's" release whenever DHS requests such notice, and to allow ICE on-demand access to any "detention facility" to interrogate anyone suspected of being a non-citizen. RJN Ex. T at 30 (emphasis added). To comply, grantees would have no choice but to prolong detentions without probable cause, thereby violating the Fourth Amendment. *See Willis v. City of Chicago*, 999 F.2d 284, 288-289 (7th Cir. 1993). Aware of that infirmity, the Attorney General has rewritten the notice and access conditions: Relying on award documents for other jurisdictions, the Attorney General now claims that recipients will be required to provide notice only "as early as practicable," and that neither condition will require recipients to detain individuals "beyond the date and time the individual would have been released." Dkt. 139 at 12. At the same time, the Attorney General refuses to admit that he has reached any final decision with regard to Chicago's grant application and any attached conditions. *See id.* at 3. His equivocation does not carry his "heavy burden" of demonstrating that the original notice and access conditions "cannot reasonably be expected" to appear in Chicago's award documents. *Ciarpaglini v. Norwood*, 817 F.3d 541, 545 (7th Cir. 2016). In the absence of unequivocal evidence that the original conditions will not be imposed, Chicago remains entitled to an injunction restraining the Attorney General from imposing those conditions on its FY2017 JAG funds. *See Sefick v. Gardner*, 164 F.3d 370, 372 (7th Cir. 1998).

### C. The Attorney General Acted Arbitrarily And Capriciously In Adopting The Conditions

The Attorney General's decision to impose the three challenged conditions falls well short of the reasoned decisionmaking required under the APA and accordingly must be set aside as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). The Attorney General principally defends his actions by characterizing arbitrary and capricious review as nothing more than a rubber-stamp. *See* Dkt. 139 at 21-22. That is wrong: "While deferential, these standards are not toothless." *Pioneer Trail Wind Farm, LLC v. FERC*, 798 F.3d 603, 608 (7th Cir. 2015). At a minimum, the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The Attorney General has failed this requirement for three independent reasons.

*First*, an agency acts arbitrarily or capriciously when it "'entirely fail[s] to consider an important aspect of the problem.'" *Zero Zone, Inc. v. U.S. Dep't of Energy*, 832 F.3d 654, 668 (7th Cir. 2016). In its June 2017 § 1373 certification, Chicago explained that residents will be less willing to cooperate with CPD if Chicago is forced to repeal the WCO and to enforce federal immigration law. *See* RJN Ex. O at 2. But the documents the Attorney General identifies as justifying the new conditions (a press release and backgrounder) nowhere mention these concerns. *See* Dkt. 139 at 21-22; RJN Exs. R, S. This failure to address a "substantial objection[] to [his] approach" renders his actions arbitrary and capricious. *Schurz Commc'ns v. FCC*, 982 F.2d 1043, 1050 (7th Cir. 1992).

*Second*, the Attorney General failed to provide a reasoned explanation for his actions. *See Schurz*, 982 F.2d at 1049. The Attorney General's press release explains that he imposed the new conditions to further the DOJ's "top priority of reducing violent crime." RJN Ex. R. But neither the press release nor the accompanying backgrounder contain a shred of evidence supporting that claim. *See* RJN Exs. R, S. In fact, available data supports the *opposite* conclusion: at least one study

has "f[ound] no support" for the argument that "sanctuary policies lead to increased crime." *Jennings* Decl. Ex. B at 24 (cited at Compl. ¶ 28); *see also id.* Ex. A at 6 (cited at Compl. ¶ 29). Those documents fail to show that the Attorney General's actions represent a reasonable response to the problem. *See Schurz*, 982 F.2d at 1049.

*Finally*, the Attorney General's obligation to provide a reasoned explanation also "demands[s] that [he] display awareness that [he] *is* changing position" and that he "show that there are good reasons for the new policy." *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009). But the Attorney General did not acknowledge that, in conditioning Byrne JAG funding on a certification of compliance with § 1373, he was departing from historical practice of conditioning Byrne JAG funds only on certifications related to laws expressly applicable to recipients of federal funds. *See* RJN Ex. T at 41. (conditioning funds on compliance with statutes universally (besides § 1373) tied to federal funding).[13] Such "[u]nexplained inconsistenc[ies]" are arbitrary and capricious. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005).

## CONCLUSION

For the reasons stated above, Chicago respectfully requests that the Court grant its cross-motion for summary judgment and deny the Attorney General's motion to dismiss.

---

[13] *See also* 29 U.S.C. § 794(a) (applying to "any program or activity receiving Federal financial assistance"); 20 U.S.C. § 1681(a) ("any educational program or activity receiving Federal financial assistance"); 42 U.S.C. § 6102 ("any program or activity receiving Federal financial assistance"); 34 U.S.C. § 10228(c) ("in connection with any programs or activity funded in whole or in part with funds made available under this chapter"); *id.* § 20110(b) ("Each recipient of sums under this chapter."); *id.* § 11181 *et seq.* (setting forth general administrative provisions for certain DOJ funding programs); *id.* § 12291(b)(13) (setting forth conditions for Violence Against Women Act grants); 42 U.S.C. § 4332 (applying to "major Federal action funded under a program of grants to States"); *id.* § 4604(c) (agency may "withhold [its] approval of any Federal financial assistance"); *id.* § 2000d ("under any program or activity receiving Federal financial assistance"); 54 U.S.C. § 306108 (requiring certain actions "prior to the approval of the expenditure of any Federal funds"); *id.* § 312502(b)(1) (requiring certain actions in connection with Federal "financial assistance"); 5 U.S.C. § 1501(4) (applying to any "individual employed by a State or local agency whose principal employment is in connection with an activity which is financed in whole or in part by loans or grants made by the United States").

January 31, 2018

JAMIE S. GORELICK (*pro hac vice*)
DAVID W. OGDEN (*pro hac vice*)
ARI HOLTZBLATT (*pro hac vice*)
ARI SAVITZKY (*pro hac vice*)
MOLLY JENNINGS (*pro hac vice*)
BRIDGET FAHEY* (*pro hac vice*)
JACK STARCHER** (*pro hac vice* pending)
JOSHUA ABBUHL (*pro hac vice* pending)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

DEBO P. ADEGBILE (*pro hac vice*)
ADRIEL I. CEPEDA DERIEUX (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Admitted to practice only in Colorado.*
*Supervised by members of the firm who are members*
*of the District of Columbia Bar*
** *Admitted to practice only in Colorado.*
*Supervised by members of the firm who are members*
*of the District of Columbia Bar*

Respectfully Submitted,

By  /s/ Edward N. Siskel
EDWARD N. SISKEL
Corporation Counsel of the City of Chicago

JUSTIN A. HOUPPERT
Assistant Corporation Counsel
SCOTT D. SPEARS
Assistant Corporation Counsel
121 N. LaSalle Street, Suite 600
Chicago, IL 60602
(312) 744-0220
edward.siskel@cityofchicago.org

ANDREW W. WORSECK
Chief Assistant Corporation Counsel
30 N. LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-0220

RONALD S. SAFER
MATTHEW C. CROWL
NICK KAHLON
TAL CHAIKEN
LAURA KLEINMAN
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700

*Attorneys for the City of Chicago*

**CERTIFICATE OF SERVICE**

On the 31st day of January, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system.  Counsel for all parties are registered CM/ECF users and will be served by that system.

/s/  Edward N. Siskel
EDWARD N. SISKEL