## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THE CITY OF CHICAGO,

                              *Plaintiff*,

    *v.*

JEFF SESSIONS, Attorney General of the
United States,

                              *Defendant*.

Civil Action No. 1:17-cv-05720

Hon. Harry D. Leinenweber

## COMBINED REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT, AND RULE 56(d) REQUEST FOR DISCOVERY

DATED: February 28, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
Assistant Director

ARJUN GARG
W. SCOTT SIMPSON
Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 305-8613
Fax: (202) 616-8470
E-Mail: arjun.garg@usdoj.gov

*Counsel for Defendant*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.    The City Does Not Challenge Final Agency Action That Is Judicially Reviewable. .... 2

    II.   The Challenged Conditions Are Authorized by Statute. ................................................ 4

    III.  The Challenged Conditions Are Consistent with the Spending Clause. ...................... 12

    IV.  The Challenged Conditions Do Not Commandeer the City. ........................................ 17

    V.   The Challenged Conditions Are Not Arbitrary or Capricious. .................................... 18

    VI.  The City Is Not Entitled to a Declaration That It Complies with 8 U.S.C. § 1373. ..... 20

CONCLUSION ................................................................................................................... 24

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Abbs v. Sullivan*,
 963 F.2d 918 (7th Cir. 1992)................................................................................ 4

*Acker v. EPA*,
 290 F.3d 892 (7th Cir. 2002)................................................................................ 4

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
 570 U.S. 205 (2013) ............................................................................................ 17

*Ali v. Fed. Bureau of Prisons*,
 552 U.S. 214 (2008) .............................................................................................. 8

*Arizona v. United States*,
 567 U.S. 387 (2012) ............................................................................................ 19

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
 548 U.S. 291 (2006) .............................................................................................. 6

*Bennett v. Spear*,
 520 U.S. 154 (1997) ......................................................................................... 2, 3

*Benning v. Georgia*,
 391 F.3d 1299 (11th Cir. 2004).......................................................................... 15

*Califano v. Yamasaki*,
 442 U.S. 682 (1979) ............................................................................................ 12

*Charles v. Verhagen*,
 348 F.3d 601 (7th Cir. 2003)............................................................................... 15

*Citizens for Appropriate Rural Roads v. Foxx*,
 815 F.3d 1068 (7th Cir. 2016).............................................................................. 4

*City of New York v. United States*,
 179 F.3d 29 (2d Cir. 1999)................................................................................. 18

*Davis v. Michigan Dep't of Treasury*,
 489 U.S. 803 (1989) ............................................................................................ 21

*Ethridge v. Harbor House Rest.*,
 861 F.2d 1389 (9th Cir. 1988).............................................................................. 2

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ................................................................................................ 19

*Gonzales v. Oregon*,
  546 U.S. 243 (2006) ................................................................................................ 10

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991) .............................................................................................. 9-10

*Hillshire Brands Co. v. Travelers Cas. & Sur. Co.*,
  2016 WL 6892885 (N.D. Ill. Nov. 23, 2016) ........................................................ 23

*Impro Prods., Inc. v. Block*,
  722 F.2d 845 (D.C. Cir. 1983) ................................................................................. 2

*Jerome Milton, Inc. v. FTC*,
  734 F. Supp. 1416 (N.D. Ill. 1990) ...................................................................... 3, 4

*King v. Cooke*,
  26 F.3d 720 (7th Cir. 1994) ................................................................................... 23

*Laskowski v. Spellings*,
  546 F.3d 822 (7th Cir. 2008) ................................................................................. 11

*Lockhart v. United States*,
  546 U.S. 142 (2005) ................................................................................................. 9

*Los Angeles Haven Hospice, Inc. v. Sebelius*,
  638 F.3d 644 (9th Cir. 2011) ................................................................................. 12

*Madsen v. Women's Health Ctr., Inc.*,
  512 U.S. 753 (1994) ............................................................................................... 12

*Mayweathers v. Newland*,
  314 F.3d 1062 (9th Cir. 2002) ............................................................................... 16

*McKenzie v. City of Chicago*,
  118 F.3d 552 (7th Cir. 1997) ........................................................................... 10, 11

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010) ............................................................................................... 11

*Nashville, Chattanooga & St. Louis Ry. v. Browning*,
  310 U.S. 362 (1940) ............................................................................................... 23

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) ............................................................................................................ 18

*Pozzie v. U.S. Dep't of Hous. & Urban Dev.,*
    48 F.3d 1026 (7th Cir. 1995) ............................................................................................ 18

*Printz v. United States,*
    521 U.S. 898 (1997) .......................................................................................................... 18

*Rattlesnake Coal. v. EPA,*
    509 F.3d 1095 (9th Cir. 2007) ........................................................................................... 3

*Reno v. Condon,*
    528 U.S. 141 (2000) .......................................................................................................... 16

*S. Dakota v. Dole,*
    483 U.S. 203 (1987) ..................................................................................................... 6, 17

*Smith v. Office of Civilian Health & Med. Program of Uniformed Servs.,*
    97 F.3d 950 (7th Cir. 1996) ............................................................................................. 18

*Steinle v. San Francisco,*
    230 F. Supp. 3d 994 (N.D. Cal. 2017) ........................................................................... 22

*Stone v. INS,*
    514 U.S. 386 (1995) ............................................................................................................ 7

*Texas v. United States,*
    523 U.S. 296 (1998) .......................................................................................................... 21

*U.S. Dep't of Def. v. Meinhold,*
    510 U.S. 939 (1993) .......................................................................................................... 12

*United States v. Elkins,*
    683 F.3d 1039 (9th Cir. 2012) ......................................................................................... 14

*United States v. Kebodeaux,*
    570 U.S. 387 (2013) .......................................................................................................... 14

*United States v. Outboard Marine Corp.,*
    104 F.R.D. 405 (N.D. Ill. 1984) ........................................................................................ 2

*United States v. Wise,*
    370 U.S. 405 (1962) ............................................................................................................ 9

*Van Wyhe v. Reisch*,
   581 F.3d 639 (8th Cir. 2009) ................................................................... 15-16

*Virginia Soc'y for Human Life, Inc. v. FEC*,
   263 F.3d 379 (4th Cir. 2001) ..................................................................... 12

*W. Fuels-Illinois, Inc. v. ICC*,
   878 F.2d 1025 (7th Cir. 1989) .................................................................... 19

*Warth v. Seldin*,
   422 U.S. 490 (1975) .................................................................................. 10

## **Statutes**

Municipal Code of Chicago § 2-173-042 ......................................................... 21

5 U.S.C. § 551 ......................................................................................... 2, 3

5 U.S.C. § 553 ........................................................................................... 20

5 U.S.C. § 704 ............................................................................................ 3

8 U.S.C. § 1226 ................................................................................... 14, 19, 22

8 U.S.C. § 1227 ..................................................................................... 13, 19

8 U.S.C. § 1231 ...................................................................................... 14, 22

8 U.S.C. § 1252 ........................................................................................... 14

8 U.S.C. § 1324 ........................................................................................... 14

8 U.S.C. § 1357 ...................................................................................... 14, 19

8 U.S.C. § 1373 ..................................................................................... *passim*

28 U.S.C. § 510 ............................................................................................ 6

28 U.S.C. § 530C ........................................................................................ 5-6

34 U.S.C. § 10101 ......................................................................................... 5

34 U.S.C. § 10102 .................................................................................. *passim*

34 U.S.C. § 10110 ......................................................................................... 5

34 U.S.C. § 10152 ........................................................................................ 13

34 U.S.C. § 10153 ............................................................................................. *passim*

34 U.S.C. § 10154 ..................................................................................................... 20

34 U.S.C. § 10156 ....................................................................................................... 5

34 U.S.C. § 10157 ....................................................................................................... 5

34 U.S.C. § 10202 ....................................................................................................... 8

34 U.S.C. § 10251 ........................................................................................... 13, 14, 19

34 U.S.C. § 20901 ..................................................................................................... 14

34 U.S.C. § 20927 ..................................................................................................... 14

DOJ Reauthorization Act of 2005,
    Pub. L. No. 109-162, 119 Stat. 2960 (2006) ........................................................ 6

## **Regulations**

2 C.F.R. § 200.203(c)(2) ........................................................................................... 15

28 C.F.R. pt. 18 ....................................................................................................... 20

28 C.F.R. § 66.12 ....................................................................................................... 7

Federal Support for Local Law Enforcement Equipment Acquisition
    Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015) ................................. 7

## **Rules**

Fed. R. Civ. P. 41 ....................................................................................................... 2

Fed. R. Civ. P. 56 ............................................................................................... 20, 23

## **Other Authorities**

H.R. Rep. No. 109-233 (2005) ......................................................................... 1, 7, 13

H.R. Rep. No. 104-469 (1996) ................................................................................. 22

S. Rep. No. 104-249 (1996) ..................................................................................... 22

## INTRODUCTION

Law enforcement in this country is a cooperative endeavor. Criminal acts often implicate the jurisdiction of more than one agency, and thus local, state, and federal officials work together in a variety of ways to fight crime and ensure public safety. Not surprisingly, then, federal law often contemplates, and is premised upon, such cooperation. This is true for the Immigration and Nationality Act, and it is true for the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program"). Both statutes explicitly contemplate and encourage effective law enforcement by promoting cooperation between the Federal Government on the one hand and local and state governments on the other. Unfortunately, the City of Chicago has in recent years adopted policies of non-cooperation that frustrate information-sharing with federal immigration authorities. And in this suit, the City seeks to further that stance by claiming that the Federal Government cannot condition its own law enforcement grants on such cooperation—even when an express statutory purpose of that funding is to promote cooperation.

Grant conditions are a traditional aspect of participation in the Byrne JAG Program, and there is no legal infirmity in the U.S. Department of Justice's imposition of the three conditions that the City challenges. To further information-sharing, those conditions require Byrne JAG Program grantees to comply with 8 U.S.C. § 1373, to give federal immigration authorities access to the City's detention facilities to meet with aliens, and to give those authorities "as much advance notice as practicable" before releasing an alien. The conditions are consistent not only with statutes governing the Byrne JAG Program, *see* 34 U.S.C. §§ 10102(a)(6), 10153(a), but also with legislative history confirming that the Department is empowered to "place special conditions on all grants and to determine priority purposes for formula grants," H.R. Rep. No. 109-233, at 101 (2005). And as a threshold matter, the City does not challenge final agency action so as to bring a proper challenge to the imposition of the conditions. There is moreover no merit to the City's

claims that the conditions violate the Spending Clause or the Tenth Amendment, nor is imposition of the conditions arbitrary or capricious because the conditions are rationally targeted at furthering the Byrne JAG Program's goals of advancing criminal justice and public safety. Finally, the City's request for a declaration that the City complies with 8 U.S.C. § 1373 is unripe and moreover fails in light of City policy that on its face appears non-compliant; in all events, the City's leap to summary judgment proceedings on that claim is premature before any discovery has commenced of the City's information-sharing practices. For all of these reasons, this case warrants dismissal in its entirety, and the City's cross-motion for partial summary judgment should be denied.[1]

## ARGUMENT

## I.     The City Does Not Challenge Final Agency Action That Is Judicially Reviewable.

Inasmuch as the City's claims challenging the imposition of the three conditions arise under the APA, they fail as a matter of law because the City does not challenge final agency action. *See* MTD at 2-4. As a preliminary matter, "[f]or there to be 'final' agency action, there must, of course, be 'agency action,'" as defined by 5 U.S.C. § 551(13). *Impro Prods., Inc. v. Block*, 722 F.2d 845, 848-49 (D.C. Cir. 1983). Once an appropriate "agency action" is identified, finality is reached only when the action in question (1) "marks the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

---

[1]      Rather than attempting a futile defense of Counts Six and Seven of the Complaint, alleging claims under the APA's notice-and-comment rulemaking provisions and the Paperwork Reduction Act, *see* Mem. of Law in Support of Def.'s Mot. to Dismiss ("MTD") (Dkt. No. 139) at 23-25, the City abandons those claims. *See* Pl.'s Br. (Dkt. No. 152) at 18 n.10. The City purports under Federal Rule of Civil Procedure 41(a)(1)(A)(i) to voluntarily dismiss each of those claims without prejudice, *see id.*, but this attempt to withdraw certain claims while persisting with other claims is ineffective, because the Rule does not allow a plaintiff "to dismiss, unilaterally, a single claim from a multi-claim complaint." *Ethridge v. Harbor House Rest.*, 861 F.2d 1389, 1392 (9th Cir. 1988) (collecting cases); *see also United States v. Outboard Marine Corp.*, 104 F.R.D. 405, 414 (N.D. Ill. 1984) (finding that "this procedure may be used only to dismiss entire actions, not to dismiss only one of several claims against a defendant"). The City's abandoned claims under Counts Six and Seven of the Complaint therefore should be dismissed with prejudice.

The City fails to identify an "agency action" within the meaning of the APA, much less one that is "final." As relevant here, the APA defines "agency action" as "the whole or a part" of, *inter alia*, agency "relief . . . or [the] denial thereof," 5 U.S.C. § 551(13), and "relief," in turn, as including an agency "grant of money [or] assistance," *id*. § 551(11)(A). Comporting with these definitions, in the context of agency grant-making in particular, "the congressional appropriation to [an agency] of funds for a particular project *does not constitute a final agency action* by the [agency] until the [agency] has *reviewed a grant application and decided to disburse the funds*." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007) (emphasis added). As there is no dispute that the Department has not yet determined whether to grant FY 2017 Byrne JAG funds to the City, or deny its pending application, it follows that there is, as of yet, no final agency action for this Court to review.

The City erroneously attempts to treat a preliminary, interlocutory step in the grant-making process—an announcement of intent to impose the challenged conditions—as though it were the final step. *See* Pl.'s Br. at 3. Rather than the City's premature challenge, "[a] preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action." 5 U.S.C. § 704. Only an FY 2017 award to the City that contains the challenged conditions, not an announcement of intent that is "tentative or interlocutory," *Bennett*, 520 U.S. at 177, marks the consummation of the agency's decisionmaking process. No such award has been made to the City. The City responds by asserting its belief that it is inevitable that the conditions will be imposed on any FY 2017 Byrne JAG award to the City, *see* Pl.'s Br. at 3, but "[s]imilar arguments have often been rejected in the case law." *Jerome Milton, Inc. v. FTC*, 734 F. Supp. 1416, 1421 (N.D. Ill. 1990). "[T]he unlikelihood of any change in position by the agency upon the culmination of the administrative process is not ground for reviewing otherwise non-final agency action concerning the merits of the dispute." *Id*. "To allow

3

judicial review whenever the final outcome appears to be predictable would completely decimate the finality rule and destroy the judicial review process contemplated by Congress." *Id.*

Precisely because the challenged conditions have not actually been imposed on the City in an FY 2017 Byrne JAG award, the City cannot have suffered legal consequences from the imposition of the conditions, nor have rights or obligations been determined. The City suggests that "the conditions' announcement effectively dictated whether state and local governments could or should even apply for funds all." Pl.'s Br. at 3-4. But this response ignores that (a) the announcement of intended conditions "did not impose upon [the City] any sanction or administrative penalty," *Acker v. EPA*, 290 F.3d 892, 894-95 (7th Cir. 2002); (b) the City *did* submit an FY 2017 application notwithstanding its objection to the announced conditions; (c) even the inclusion of the conditions in an FY 2017 award to the City will not bind the City to those conditions unless the City then accepts the award; and (d) the administrative process of applying for an award is not the type of burden associated with final agency action, *see Abbs v. Sullivan*, 963 F.2d 918, 927 (7th Cir. 1992) (an APA claim is improper where "the only harm the challenger seeks to avert is the inconvenience of having to go through the administrative process before obtaining a definitive declaration of his legal rights"). The City's premature claims challenging the imposition of the conditions thus falter on the threshold ground that "[i]n the context of judicial review under the APA, a challenge to agency conduct is ripe only if it is filed after the final agency action." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016).

## II.     The Challenged Conditions Are Authorized by Statute.

The City's claims that the challenged conditions are ultra vires and violate the Constitution's separation of powers fail because they rest fundamentally on the City's incorrect view that Congress has not authorized the Department to impose these conditions. *See* MTD at 5-9. The conditions come within the Department's authority granted by Congress to "plac[e] special

conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id*., and to ensure that grantees "comply with . . . all other applicable Federal laws," *id*. § 10153(a)(5)(D). The City's counter-arguments are unpersuasive, and even if the Court were to find that the Department lacks statutory authority for any of the conditions, the City's requested nationwide injunction would be improper.

**A.** The City first argues that the challenged conditions cannot be authorized by statute because the Byrne JAG Program provides for formula grants rather than discretionary grants. *See* Pl.'s Br. at 4-5. But this argument confuses conditions on grant *eligibility*—such as the conditions at issue here—with the *formula* for allocating funds to eligible recipients. Although deviation from the statutory formula for allocating funds among eligible jurisdictions is not permitted except in limited circumstances, *see* 34 U.S.C. §§ 10156-10157, the amount of a jurisdiction's award under that formula is unrelated to whether it has demonstrated its eligibility to receive the funds by complying with conditions authorized by statute. And these conditions of eligibility do less to mandate a "one size fits all" approach than, for example, a Byrne JAG condition that for years has prohibited using award funds to purchase items on a Prohibited Expenditure List that includes various types of equipment and weapons that some law enforcement agencies might otherwise have wanted to acquire. *See* Request for Judicial Notice ("RJN") Ex. A ("2017 Greenville Award") (Dkt. No. 140-1) ¶ 45.

The City also attempts to discount 34 U.S.C. § 10102(a)(6) as "an ancillary provision" concerning "bureaucratic functions of a sub-cabinet post." Pl.'s Br. at 6. But the Assistant Attorney General for the Department's Office of Justice Programs ("OJP") is appointed by the President, subject to Senate confirmation, and answerable to the Attorney General's supervision. *See* 34 U.S.C. § 10101. And the Attorney General has "final authority over all functions, including any grants . . . made . . . for the Office of Justice Programs." *Id*. § 10110; *see also* 28 U.S.C. §

530C(a)(4). Placement of the "special conditions" and "priority purposes" powers in the organic statute for OJP, and their investiture in OJP's head (subject to the Attorney General's final authority), comports with those powers' importance and breadth.

The City also suggests that the Department's view of 34 U.S.C. § 10102(a)(6) would confer on the Department "limitless power" to impose grant conditions. Pl.'s Br. at 6. But in exercising its delegated authority to impose "special conditions on" and "determin[e] priority purposes for" Byrne JAG grants, 34 U.S.C. § 10102(a)(6), the Department must adhere to the Spending Clause. While Spending Clause authority is undoubtedly "broad," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), it is "of course not unlimited," *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citation omitted). A grant condition must, for example, be germane, non-coercive, and consistent with any independent constitutional requirement. *See id*. at 207-08. Moreover, the Department's conditioning power is self-limiting in practice, because extremism in imposing conditions will cause prospective recipients to reject the grant rather than accept the condition. In addition to those limits, Congress judiciously vested these powers in Senate-confirmed Departmental officers, including the nation's chief law enforcement officer.

Most centrally, the City contends that 34 U.S.C. § 10102(a)(6) is not itself a grant of authority, but only refers to authority that may be granted elsewhere. *See* Pl.'s Br. at 5-6. But the authority to "plac[e] special conditions on all grants, and [to] determin[e] priority purposes for formula grants" was added as part of the same legislation that created the Byrne JAG Program. *See* DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, § 1152(b), 119 Stat. 2960 (2006) (adding language to subsection (a)(6)); *id*. § 1111 (creating Byrne JAG Program). The City does not explain why Congress would have added that language, if not to confer the authority described. Another law *already* authorized the Attorney General to delegate the performance of his functions. *See* 28 U.S.C. § 510. The City's interpretation of the amendment thus seemingly gives no practical

effect to either the "special condition" or "priority purpose" powers. Yet the legislative history for Section 10102(a)(6) reiterates the broad language of the statute, explaining that the new provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants." H.R. Rep. No. 109-233, at 101 (2005). And "[w]hen Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995).[2]

The City's cramped reading of 34 U.S.C. § 10102(a)(6) moreover does not comport with historical practice under which the Department has, without objection, imposed special conditions on Byrne JAG awards to promote the Department's law enforcement and public safety goals. Without any tie to a specific statutory direction, the Department has, for example, imposed conditions related to information-sharing and privacy protection, *see* 2017 Greenville Award ¶ 28; human subjects research, *see id.* ¶ 31; and training, *see id.* ¶¶ 34-35. Other special conditions historically imposed on Byrne JAG awards have been inspired by Executive Branch prerogatives, and in some instances resulted in *subsequent* congressional codification. One such condition, which prohibits use of Byrne JAG funds to purchase military-style equipment, relates in part to an Executive Order issued by President Obama in 2015. *See id.* ¶ 45; Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015). Since 2012, other conditions have required that recipients comply with specific national standards when purchasing body armor, and (b) institute a "mandatory wear"

---

[2]     The City may attempt to argue that "special conditions" should be understood to mean a particular type of special conditions imposed on "high-risk" grantees under a general Department regulation, 28 C.F.R. § 66.12, that was in effect between 1988 and 2014. But the statutory "special conditions" authorization contains no language referencing, incorporating, or otherwise limiting its application to the regulation. And the regulation did not purport to describe the universe of appropriate special conditions applicable to all types of grantees under a variety of programs. It is unclear why the only type of special conditions authorized under the Byrne JAG Program would be those applicable to high-risk grantees, nor is it clear that Congress looked to this regulation in any respect when it enacted the statutory language. Moreover, this reading of "special conditions" still leaves unexplained the complementary power to "determin[e] priority purposes" for formula grants like the Byrne JAG Program, as the Department may do for non-formula, discretionary grants. That power independently allows for conditions that further the Department's priorities in issuing a grant.

policy for any purchased armor. *See id.* ¶¶ 40-41. While those conditions have now been codified by Congress, *see* 34 U.S.C. §§ 10202(c)(1)(B), (C), they originated as exercises of the authority to impose special conditions. And the Assistant Attorney General has imposed an "American-made" requirement for body armor purchases, something Congress did not choose to codify. *See id.* ¶ 41. The City's theory, which empties 34 U.S.C. § 10102(a)(6) of practical effect, does not account for such other Byrne JAG conditions beyond the ones challenged in this lawsuit.

**B.** The City argues that 34 U.S.C. § 10153(a)(5)(D) does not confer authority to impose a condition requiring compliance with 8 U.S.C. § 1373 because, according to the City, the statutory authority to require compliance with "all other applicable Federal laws" refers only to those federal "statutes that by their express terms govern recipients of federal funds" and Section 1373 is not such a law. Pl.'s Br. at 6. The City raised no such challenge when this condition was first imposed on the City in the FY 2016 grant cycle, and has no persuasive challenge now.

Section 10153(a)(5)(D) is properly read to refer to the corpus of federal laws that independently do apply to Byrne JAG grantees—recognizing that such grantees are state and local jurisdictions (not private individuals and entities) as to whom some federal laws are inapplicable. If Congress had intended to limit the term "applicable Federal laws" as referencing only statutes of the kind that the City suggests, it could have done so expressly without requiring resort to the attempts at straightjacketed statutory interpretation that the City offers. The City's invocation of the *ejusdem generis* canon, *see* Pl.'s Br. at 7, fails because the structure of the phrase "all provisions of this part and all other applicable Federal laws" in Section 10153(a)(5)(D) "is disjunctive, with one specific and one general category, not . . . a list of specific items separated by commas and followed by a general or collective term." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Instead, the prefatory language "all other" in Section 10153(a)(5)(D) connotes that "applicable Federal laws" has a broader reach than the artificial limit that the City ascribes. The City offers

8

no response to case law demonstrating that courts repeatedly have broadly interpreted the reach of similar statutory language.  *See* MTD at 8.

The City also attempts to understand Section 10153(a)(5)(D) by referring to recent, failed legislation seeking to tie federal funding to compliance with Section 1373, *see* Pl.'s Br. at 7 n.3, but the Court should "decline to read any meaning into" such later legislative efforts, as "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Lockhart v. United States*, 546 U.S. 142, 146-47 (2005) (quotation omitted); *see also United States v. Wise*, 370 U.S. 405, 411 (1962) ("The interpretation placed upon an existing statute by a subsequent group of Congressmen who are promoting legislation and who are unsuccessful has no persuasive significance here.").  The City points to 2015 legislation proposing a permanent congressional mandate to withhold Byrne JAG funds for non-compliance with Section 1373; the different issue in this case, by contrast, is whether Congress, in prior legislation it actually enacted, gave the Department discretion to determine when to impose such a condition on Byrne JAG funds—and it is plausible that Congress preferred simply to stop at maintaining discretion and deferring to the judgment of the nation's chief law enforcement agency.

The City also gains nothing from suggesting that the Department cannot have the power it claims because allegedly the Department has not previously demanded that Byrne JAG grantees comply with federal laws beyond those governing grantees.  *See* Pl.'s Br. at 7 n.3.  Where the statutory text naturally encompasses such authority, the contention that the Department has not previously exercised that authority does not rebut that the authority nevertheless exists.

The City ventures even further astray in suggesting that the Department's reading of Section 10153(a)(5)(D) alters the state-federal balance and "raises serious federalism concerns." *Id*. at 7.  Whereas the issue here is an exercise of the Spending Clause power, the City cites cases addressing efforts to directly regulate state and local activities.  *See Gregory v. Ashcroft*, 501 U.S.

452, 457-64 (1991) (absent a clear statement a federal statute would not be construed to invalidate state mandatory retirement age for state judges); *Gonzales v. Oregon*, 546 U.S. 243, 248-49, 274-75 (2006) (concluding that the Controlled Substances Act did not allow the Attorney General to prohibit doctors from prescribing regulated drugs for use in physician-assisted suicide under state law permitting the procedure). A funding condition requiring compliance with an existing federal law that already applies to a state or locality does not alter the federal-state framework—especially because the state or locality is entirely free to refuse the funding rather than accept the condition. At bottom, the City has no answer to the conclusion that the Department's power under Section 10153(a)(5)(D) sensibly reflects a congressional expectation that a recipient of federal funds may be required to certify its compliance with a federal law where the recipient is already obligated independently to comply with that federal law. *See* MTD at 9.

**C.** Because the Department is authorized under Section 10102(a)(6) and Section 10153(a)(5)(D) to impose the challenged conditions, the City's ultra vires and separation of powers claims warrant dismissal as a matter of law. But even if the Court were to conclude that a condition lacks statutory authorization, the City's request for a permanent nationwide injunction is improper.[3] *See* Pl.'s Br. at 10. An injunction extending to entities other than the City of Chicago would violate principles of Article III standing and limitations on a court's equitable authority.

It is fundamental that "plaintiffs lack standing to seek—and the district court therefore lacks authority to grant—relief that benefits third parties." *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997); *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art. III judicial power exists only to redress or otherwise to protect against injury to the complaining party, even

---

[3] The City contends that the standard for permanent injunctive relief is satisfied here based on essentially the same considerations that the City believes supported a preliminary injunction. *See* Pl.'s Br. at 9-10. The Department respectfully contends that those considerations did not then and do not now establish the required showing for the extraordinary remedy of an injunction. *See* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. (Dkt. No. 32).

though the court's judgment may benefit others collaterally."). "The general rule is that a plaintiff has standing to sue only for injuries to his *own* interests that can be remedied by a court order." *Laskowski v. Spellings*, 546 F.3d 822, 825 (7th Cir. 2008) (emphasis in original).

In *McKenzie*, the Seventh Circuit reversed an injunction that precluded the City of Chicago from operating a demolition program with respect to entities other than the plaintiffs. The district court had concluded "that it was appropriate to enjoin the entire program, despite the lack of class certification, in order to prevent the City from violating the Constitution." *McKenzie*, 118 F.3d at 555. But that conclusion "assume[d] an affirmative answer to the question at issue: whether a court may grant relief to non-parties. The right answer is no." *Id.* The Seventh Circuit held that "the injunction exceeded the district judge's powers under Article III of the Constitution." *Id.* at 555 n.*. Because the plaintiff's "interests c[ould] be protected by an injunction that prevents the City from demolishing their properties," the district court was wrong to "enjoin the entire program, despite the lack of class certification." *Id.* at 555. Where no class has been certified, no justiciable controversy exists when the injury to the actual plaintiffs has been remedied. *See id.* (where "a class has not been certified, the only interests at stake are those of the named plaintiffs"); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 163 (2010) (plaintiffs "d[id] not represent a class, so they could not seek to enjoin [an agency order] on the ground that it might cause harm to other parties"). Rather, in that scenario, the standing requirements of Article III preclude a court from granting relief that is not directed to remedying the injury asserted by the plaintiff.

Under these principles, the City does not have standing to seek an injunction broader than necessary to remedy its own asserted injury. The City properly does not claim that an injunction that extends to all grant applicants is necessary to remedy the City's claimed harm, which is based entirely on the imposition of conditions on the City itself. This Court at most may grant relief to the City, but has no authority to extend its ruling to jurisdictions across the country.

Apart from Article III requirements, the requested nationwide injunction would transgress fundamental limitations on a court's exercise of its equitable powers. Equitable principles require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (granting stay of Armed-Forces-wide injunction except as to individual plaintiff). Because the City is the only grant applicant in this lawsuit, and an injunction limited to the City provides the City with full relief, an injunction applying to other jurisdictions would exceed the Court's equitable authority. *See Virginia Soc'y for Human Life, Inc. v. FEC*, 263 F.3d 379, 393 (4th Cir. 2001); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011).

A finding that a condition is facially invalid would not entitle the City to a nationwide injunction, because that linkage improperly conflates the scope of the City's legal argument with the scope of relief necessary to remedy the City's alleged injury. And such an injunction moreover would reflect an unfair asymmetry: insofar as the City prevails, the Court would issue relief that might have been appropriate if a class of all grant applicants had been certified; but insofar as the Federal Government prevails, it gains none of the benefits of prevailing in a class action, such as foreclosing other applicants from bringing suit on the same legal grounds urged here by the City.

Because of Article III and equitable limits on the scope of injunctions, any injunction that the Court might enter here should not extend beyond the City as the sole plaintiff in this action.

## III.    The Challenged Conditions Are Consistent with the Spending Clause.

The challenged conditions satisfy the Spending Clause's requirements that they be germane to the Byrne JAG Program, comport with independent constitutional requirements of the Fourth Amendment, provide adequate notice, and are not coercive. *See* MTD at 9-15. The City opposes dismissal on these grounds, but does not itself seek summary judgment on this claim.

12

**A.**      The grant conditions at issue here satisfy the relatedness requirement.  The City overreaches in its insistence that germaneness for the Byrne JAG Program requires exclusive focus on "supporting flexible, locally driven policing and crime-reduction policies" and enforcement of local (as distinct from federal) laws.  *See* Pl.'s Br. at 20-21.  Such unalloyed deference to purely local prerogatives and issues is self-evidently misplaced, as the Byrne JAG statute directs no such thing and under the City's theory it is unclear how *any* conditions on these federal funds would be constitutionally viable.[4]  Focusing on the statute, the text specifies that grant funds are designed to provide resources "for criminal justice," 34 U.S.C. § 10152(a)(1), defined broadly as "activities pertaining to *crime prevention, control, or reduction*, or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to *apprehend criminals*, . . . activities of courts having criminal jurisdiction, and *related agencies*," *id*. § 10251(a)(1) (emphases added).

By comparison, the challenged conditions relate only to aliens who have either committed crimes or are suspected of having committed crimes.  State and local cooperation with the Federal Government through the provision of basic information and access allows for effective enforcement of federal immigration law against aliens who are criminals or suspected criminals— and thus makes communities safer.  The authorization in the Immigration and Nationality Act ("INA") to remove aliens who commit any of a wide array of criminal offenses, *see* 8 U.S.C. § 1227(a)(2), is part and parcel of law enforcement and criminal justice, if for no other reason than that removal is one of the means by which the Federal Government protects the public and prevents recidivism by criminal aliens.  And even if that basic point were not enough, numerous other INA provisions also intertwine these two subjects, and/or contemplate cooperation among state and

---

[4]      Even the legislative history cited by the City talks only of "more flexibility" for State and local governments, not all-embracing local flexibility that leaves no room for federal prerogatives.  *See* Pl.'s Br. at 20 (quoting H.R. Rep. No. 109-233, at 89 (2005)).

local officers and federal officials on immigration enforcement. *See* MTD at 11 (discussing 8 U.S.C. §§ 1226(c), 1231(a)(1)(B), 1252c, 1324(c), 1357(g)).

Beyond supporting the Byrne JAG Program's criminal justice purposes with respect to "efforts to prevent, control, or reduce crime or to apprehend criminals" by "related agencies," 34 U.S.C. § 10251(a)(1), the conditions also comport with the Byrne JAG Program's purposes of ensuring that grantees undertake "appropriate coordination with affected agencies" and "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require." *Id*. § 10153(a)(4), (5)(C). The challenged conditions thus directly advance statutory purposes of the Byrne JAG Program, and easily clear the low bar for constitutionally-sufficient relatedness. *See* MTD at 9-10 (discussing legal standard).

The City also responds that immigration enforcement is a civil matter and thus not sufficiently related to criminal justice. *See* Pl.'s Br. at 21-22. This argument fails to account for the federal Sex Offender Registration and Notification Act ("SORNA"), 34 U.S.C. § 20901 et seq., which is also "a civil regulatory scheme rather than a criminal one." *United States v. Elkins*, 683 F.3d 1039, 1044-45 (9th Cir. 2012). Notwithstanding SORNA's civil nature, compliance with SORNA is directly tied to Byrne JAG funding. *See* 34 U.S.C. § 20927(a); *United States v. Kebodeaux*, 570 U.S. 387, 398 (2013) (observing approvingly that SORNA "used Spending Clause grants to encourage States to adopt its uniform definitions and requirements"). The Spending Clause's relatedness inquiry thus plainly allows for the linkage of civil and criminal subject areas.

**B.** The City requests that the Court enjoin conditions that have never existed for any Byrne JAG award, on the ground that such hypothetical conditions allegedly would violate the Fourth Amendment if they ever were to be imposed. *See* Pl.'s Br. at 23. To state that request is to defeat it. The City does not dispute that the text of the notice and access conditions that actually have been imposed on initial FY 2017 Byrne JAG awards raises no Fourth Amendment problem.

14

*See* MTD at 12. Instead, the City focuses on shorthand descriptions the Department employed when previewing its intent to impose those notice and access conditions. *See* Pl.'s Br. at 23. The City offers no explanation for its leap characterizing those shorthand descriptions offered for preview purposes as somehow "the original notice and access conditions" themselves. *Id*. Those shorthand descriptions were never suggested as the actual text of the forthcoming conditions, nor have those descriptions ever actually been imposed as conditions on any Byrne JAG award. The shorthand descriptions were not themselves grant conditions, akin to those contained in actual award documents; rather, they were merely a preview designed to "help an applicant make an informed decision about whether to submit an application." 2 C.F.R. § 200.203(c)(2). The City's attempt to leverage the voluntary cessation doctrine, *see* Pl.'s Br. at 23, thus fails—speculation about recurrence is misplaced because there was never an occurrence in the first place.[5]

**C.** The challenged conditions meet the Spending Clause's notice requirement. *See* MTD at 13-15. The City has no response to the point that its premature claim of ambiguity arises before the City has availed itself of administrative consultation that the Byrne JAG Program invites. *See id.* at 13-15. Nor does the City persuasively refute case law showing that nitpicking about alleged uncertainty at the margins of the conditions' requirements is not the type of ambiguity that raises a constitutional problem. *See Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) ("[T]he exact nature of the conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required."); *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper."); *Van*

---

[5] The City's argument assumes that these hypothetical conditions would create a Fourth Amendment problem, but that is not necessarily so. *See* MTD at 12 n.3.

*Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (finding notice requirement satisfied even where condition "provides a pliable standard"); *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (finding notice requirement satisfied even where condition required compliance with a "standard [that] is perhaps unpredictable because it has resulted in different determinations in different courts"). Under the applicable inquiry, the City cannot sustain its insistence that the compliance condition does not give fair notice when it asks the City to comply with a federal statute that has independently governed the City for over twenty years and whose meaning is for the courts, not the Department of Justice or the City, to decide.[6] As to the notice and access conditions, the applicable inquiry also makes inconsequential the City's criticism that the notice and access conditions involve the "discretion of actors outside DOJ's control." Pl.'s Br. at 20.[7]

> **D.** The City cannot plausibly claim that the amount of funding available to the City under the Byrne JAG Program—constituting a maximum of 0.022% of the City's budget for FY

---

[6] The City offers a canard in repeatedly alleging that the Department has taken inconsistent positions in this litigation on what Section 1373 requires. *See* Pl.'s Br. at 8 n.4, 11, 19. As the Department has explained in earlier briefing, *see* Dkt. No. 110 at 8-9, long before this litigation commenced the Department had already articulated its view that state and local governments are obligated to inform personnel, in the face of apparently contrary state or local law, of the protection afforded by Section 1373. The City cannot plausibly suggest that it can comply with Section 1373 only by assuring that it has adopted a certain interpretation of ambiguous City law, without also informing City personnel that they are not, in fact, prohibited from sharing information regarding immigration status with the Federal Government. Had the City not enacted laws that otherwise appear to restrict information-sharing in violation of Section 1373, there would be no need for the City to act to clarify the ambiguity the City has itself introduced. Nor, contrary to the City's view, *see* Pl.'s Br. at 8 n.4, 14-15, does unconstitutional commandeering occur when, because of a jurisdiction's own ambiguous policies, it becomes necessary for the jurisdiction merely to advise its personnel about what federal law allows—which is far from conscripting states and localities into immigration enforcement efforts. *See Reno v. Condon*, 528 U.S. 141, 150 (2000) (rejecting commandeering challenge even though state argued that federal statute "requires the State's employees to learn and apply the Act's substantive restrictions" and Supreme Court agreed that federal statute's "provisions will require time and effort on the part of state employees"). "Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." *Id*. at 150-51 (citation omitted).

[7] The City's allegation that the Department has given "shifting representations" because the preview descriptions of the notice and access conditions are only shorthand for the fully-articulated notice and access conditions, *see* Pl.'s Br. at 20, is another canard. *See supra* at 15.

16

2017—meets the constitutional threshold of coerciveness. *See* MTD at 15. The City thus resorts to alleging coerciveness based on the imposition of a condition requiring compliance with Section 1373 in an entirely different grant program that is nowhere mentioned in the City's Complaint and as to which the Complaint seeks no relief. *See* Pl.'s Br. at 22.[8]

And it is difficult to understand the City's suggestion that the three challenged conditions—one of which had already existed from the FY 2016 cycle, and all of which were previewed in July 2017 for the FY 2017 cycle—are coercive because they were introduced "at the last minute" in relation to the City's "2018 budget" process. *Id*. at 22. The City cites its own 2018 "budget calendar," but that document shows that "[a]dditions or changes to the [City's] proposed budget are considered" as late as "November/December" of 2017—several months after the City became aware of the prospect of the challenged conditions (and even the text of actual conditions) on FY 2017 Byrne JAG awards. Dkt. No. 157-23 at 49.

## IV. The Challenged Conditions Do Not Commandeer the City.

The challenged conditions do not commandeer the City in violation of the Tenth Amendment. *See* MTD at 15-17. The City's opposition nowhere addresses the threshold point that a Tenth Amendment analysis is inapposite here because this case involves a grant that the City is free to accept or reject, not any federal mandate that directly regulates the City. *See id*. at 15-16. A "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S. at 210; *see also Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013) ("As a general matter, if a party objects to a condition on the receipt of federal funding, its

---

[8]    Funding at stake to the City under that other grant program (which is not even a part of this lawsuit) is, according to the City, limited to $3.125 million. *See* Pl.'s Statement of Undisputed Material Facts (Dkt. No. 153) ¶ 50. That amount is still nowhere near coercive when measured against the City's FY 2017 budget of $9.81 billion. *See* MTD at 15.

recourse is to decline the funds."). That point alone disposes of the City's commandeering claim. Indeed, the City has abandoned its commandeering theory as to the notice and access conditions.

The City seeks nevertheless to attack Section 1373 as an independent statutory mandate, but the City's charge that the statute is "facially unconstitutional" fails on its own merits. Pl.'s Br. at 8. The City argues that Section 1373 improperly limits the City's power to decline participation in a federal program. *See id.* But the Tenth Amendment does not give states and localities "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs," particularly in the information-sharing context. *City of New York v. United States*, 179 F.3d 29, 34-35 (2d Cir. 1999). Merely protecting the transmission of information to federal authorities does not "compel the State[] to enact or administer a federal regulatory program" or to "act on the Federal Government's behalf." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 575, 620 (2012) (citation omitted); *see also Printz v. United States*, 521 U.S. 898, 918 (1997) (contrasting federal statutes that "require only the provision of information to the Federal Government" with those that "force[] participation of the States' executive in the actual administration of a federal program").

## V.      The Challenged Conditions Are Not Arbitrary or Capricious.

The challenged conditions are not arbitrary or capricious, because they relate rationally to the Byrne JAG Program's purposes. *See* MTD at 21-23.[9] The "arbitrary or capricious" inquiry is "highly deferential" to the agency, *Smith v. Office of Civilian Health & Med. Program of Uniformed Servs.*, 97 F.3d 950, 955 (7th Cir. 1996), and turns on whether the challenged decision "is supported by a 'rational basis.'" *Pozzie v. U.S. Dep't of Hous. & Urban Dev.*, 48 F.3d 1026, 1029 (7th Cir. 1995) (citation omitted). Under this "narrow standard of review," the City's claim

---

[9]      The City does not respond at all to the Department's initial point that, if the conditions are statutorily authorized and comport with the Spending Clause, it is unclear how "arbitrary or capricious" scrutiny could otherwise limit the Department's broad discretion. *See* MTD at 21.

fails because the Department's "reasons for" imposing the challenged conditions "were entirely rational." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513, 517 (2009) (citation omitted).

The challenged conditions easily meet the rational basis standard because they support the Byrne JAG Program's criminal justice purposes with respect to "efforts to prevent, control, or reduce crime or to apprehend criminals" by "related agencies," 34 U.S.C. § 10251(a)(1), by facilitating federal efforts to remove criminal aliens. Once removed, an alien who has committed a removable criminal offense is undeniably no longer present in this country with the potential to re-offend. *See* 8 U.S.C. § 1227(a)(2) (providing that a criminal conviction for any of a wide array of criminal offenses renders an alien removable). The conditions also rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress contemplates in immigration enforcement, *see* 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona v. United States*, 567 U.S. 387, 411-12 (2012) ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations.").

The City contends that this rationale—reducing crime based on information-sharing that supports immigration enforcement to remove criminal aliens—does not fully consider the issue and lacks supporting evidence. *See* Pl.'s Br. at 24-25. But the Department found it is "common-sense" that facilitating removal to eliminate the threat of recidivism by criminal aliens "help[s] keep our communities safe," Dkt. No. 1-3, and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521; *see also W. Fuels-Illinois, Inc. v. ICC*, 878 F.2d 1025, 1030 (7th Cir. 1989) ("We give great deference to an agency's predictive judgments about areas that are within the agency's field of discretion and expertise." (citation omitted)). The

City's apparent expectation that the Department should have issued a comprehensive supporting study for the conditions also ignores that Congress did not intend to encumber agencies with burdensome procedural prerequisites for determining grant conditions; to the contrary, Congress expressly exempted "grants" from the APA's ordinary notice-and-comment rulemaking procedures. 5 U.S.C. § 553(a)(2); *see* MTD at 23.

The City additionally suggests that the imposition in FY 2017 of a condition requiring compliance with Section 1373 is an unexplained "depart[ure] from historical practice." Pl.'s Br. at 25. But that condition is not "changing position" or creating a "new policy" at all, *id.*, because the condition had already been implemented previously in FY 2016 Byrne JAG awards under the prior Administration, without any objection by the City or any other grantee.

## VI. The City Is Not Entitled to a Declaration That It Complies with 8 U.S.C. § 1373.

The Court should decline jurisdiction over the City's request to be declared compliant with Section 1373, and that request in any event fails because the City's allegations suggest a violation of Section 1373. *See* MTD at 17-20. Even if the Court were not to dismiss the claim at this time, the Department contends—pursuant to Federal Rule of Civil Procedure 56(d), and in reliance on the affidavit submitted herewith—that summary judgment for the City on this claim would be premature before any discovery has been taken as to the City's information-sharing practices.

**A.** The Court should decline to exercise jurisdiction over the City's Declaratory Judgment Act claim. *See* MTD at 17-19. The most central reason is that the claim is premature. The Department has been conducting an administrative process with the City regarding Section 1373 compliance and has yet to render its final assessment. *See id.* at 18. With respect to the City's FY 2017 application, even after the Department were to make any determination to reject it on the basis that the City violates Section 1373, the City would have an opportunity to appeal that determination administratively. *See* 34 U.S.C. § 10154; *see generally* 28 C.F.R. pt. 18. The

Department could decide, either upon considering the City's existing submissions, or upon considering any administrative appeal, that the City does not violate Section 1373 and that Byrne JAG funds will not be withheld on that basis. Accordingly, the City's request for a declaration "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted). As this Court stated in an earlier opinion in this case, the Department "has yet to make a determination about Chicago's eligibility for funds" and if the Department "makes a final determination that Chicago is eligible for 2017 Byrne JAG funds, then no harm accrues to Chicago." Dkt. No. 125 at 10.

**B.**     The City's claim for declaratory relief fails in any event because City policy on its face suggests that the City violates Section 1373. *See* MTD at 19-20. The City does not dispute that Municipal Code of Chicago § 2-173-042 restricts the City's agencies and agents from sharing a person's custody status or release date with federal immigration authorities. The City instead contends incorrectly that "information regarding . . . immigration status" under Section 1373 does not cover custody release information. *See* Pl.'s Br. at 16-17.[10]

The City's response attempts to ignore the overall scheme of the INA in relation to aliens who have committed, or are suspected of, state or local crimes—which is crucial to understanding Section 1373. A "fundamental canon of statutory construction" is that "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 561 U.S. 803, 809 (1989). Under the INA, immigration authorities

---

[10]     The City offers an irrelevant discussion of its view that Section 1373 violates the Tenth Amendment to the degree that the statute requires the City, in the face of ambiguously-worded City policies that create doubt, to instruct City employees that they are free to assist federal immigration officials by sharing information as contemplated by Section 1373. *See* Pl.'s Br. at 14-15. That legal issue is not properly before the Court for review, because there is no live controversy insofar as the City acknowledges that it has already acted to inform its employees that Section 1373's protections continue to apply notwithstanding the ambiguity of certain City policies that might be read to suggest otherwise. *See id.* at 15. Regardless, the City's self-incurred obligation to provide such clarification to its personnel poses no problem of unconstitutional commandeering. *See supra* at 16 n.6.

may not, except in limited circumstances, "remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," 8 U.S.C. § 1231(a)(4); the immigration removal period "begins on . . . the date the alien is released from [state or local criminal] detention," *id*. § 1231(a)(1)(B)(iii); and federal immigration custody must begin "when the alien is released" from criminal custody, *id*. § 1226(c)(1) (emphasis added). The City does not, and cannot, deny that protecting the exchange of information with federal immigration authorities regarding a removable alien's custody status and release date helps ensure that those authorities will be able to timely take custody of the alien, as required by the INA, upon release from state or local custody.[11] That is the principal object of Section 1373.

The City also wholly ignores legislative history that harmonizes with the above-described statutory context and contradicts the City's interpretation. That history expressly affirms that Section 1373 "give[s] State and local officials the authority to communicate with [federal immigration authorities] regarding the *presence, whereabouts, and activities* of illegal aliens." H.R. Rep. No. 104-469, pt. 1, at 277 (1996) (emphasis added). Other legislative history admonished "[t]hose who are reluctant to enforce the immigration laws," and declared, in reference specifically to what became Section 1373, that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." S. Rep. No. 104-249, at 7, 19-20 (1996). Section 1373 thus is motivated by the principle that "[e]ffective immigration law enforcement requires a cooperative effort between all levels of government." *Id*. at 19. Such cooperation is what the City now seeks to eschew.

---

[11] The City relies on *Steinle v. San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017), regarding the scope of information covered by Section 1373. *See* Pl.'s Br. at 16. The court in that case did not, however, have the benefit of the Federal Government's briefing on this issue.

**C.**     If the Court does not at this time dismiss the City's claim for a declaration that the City complies with Section 1373, the Department requests pursuant to Federal Rule of Civil Procedure 56(d) that the Court defer summary judgment proceedings on this claim pending an opportunity to take discovery of the City's information-sharing practices.  Rule 56(d) "is intended as a safeguard against a premature grant of summary judgment" and courts "construe the rule liberally."  *King v. Cooke*, 26 F.3d 720, 726 (7th Cir. 1994).  "Courts are generally lenient in granting Rule 56(d) motions when the party has been diligent during any previous discovery and especially so when discovery has not yet commenced," as is the case here.  *Hillshire Brands Co. v. Travelers Cas. & Sur. Co.*, 2016 WL 6892885, at *1 (N.D. Ill. Nov. 23, 2016).

No Rule 26(f) conference has been held in this matter, no Rule 16 scheduling order has been issued, initial disclosures have not been exchanged, and discovery has not commenced. Having moved to dismiss the City's claim for declaratory relief as facially inadequate, the Department has not as yet sought to take discovery on that claim, and doing so would be inefficient before the motion to dismiss is decided.  Though the Department's litigation decisions presumably will be shaped by the Court's ruling on the motion to dismiss, the affidavit of counsel submitted herewith provides a non-exhaustive explanation of factual development that the Department currently anticipates undertaking through discovery if this claim survives dismissal.

Most centrally, discovery is necessary because the City's compliance with Section 1373 turns not only on the face of the City's policies, but also on the City's actual practices and conduct in implementing those policies.  Further factual development would be required before an adjudication could be made that the City's practices, beyond the face of the City's policies, comply with Section 1373.  *See Nashville, Chattanooga & St. Louis Ry. v. Browning*, 310 U.S. 362, 369 (1940) ("It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it.

23

Settled state practice . . . can establish what is state law.").  Importantly, Section 1373 speaks not only to enacted local policies, but also to any restriction on information-sharing by any "entity or official."  The City's claim entitles the Department to explore, beyond what is promulgated as official policy, the day-to-day reality of what is understood and practiced among the rank-and-file.

The evidentiary material submitted by the City in support of summary judgment demonstrates that there can be divergence between the City's official policy and City personnel's working understanding.  The City submits a declaration by a veteran police Lieutenant averring that "[i]t is our engrained practice not" to "ask for or investigate a person's immigration status" and that "cooperation . . . with immigrant communities would be materially damaged if the Chicago Police Department were to begin investigating peoples' immigration status."  Hannigan Decl. (Dkt. No. 155) ¶¶ 4-5.  Yet the Chicago Police Department's Special Order S06-14-03 (Dkt. No. 157-6) provides in Section V.C that "Department members may seek information on immigration status during the course of an investigation" under certain circumstances.  Just as this declaration indicates a working practice that may diverge from what City policy facially contemplates, discovery is needed to explore whether other such discrepancies exist that go to the City's compliance with Section 1373.

The record that the City has unilaterally compiled for adjudication of summary judgment on this claim is, accordingly, inadequate to make any comprehensive declaratory ruling that the City complies with Section 1373.  The Department suggests that, as in the ordinary course of litigation, the Court should first resolve the motion to dismiss this claim, then allow discovery on the claim if it survives dismissal, and only then adjudicate summary judgment on the claim.

## CONCLUSION

For the reasons stated herein and in the Department's opening brief, the Complaint should be dismissed in its entirety and the City's motion for partial summary judgment warrants denial.

DATED:  February 28, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

JOHN R. LAUSCH, JR.
United States Attorney

JOHN R. TYLER
Assistant Director

 /s/ Arjun Garg
ARJUN GARG
W. SCOTT SIMPSON
Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 305-8613
Fax: (202) 616-8470
E-Mail: arjun.garg@usdoj.gov

*Counsel for Defendant*