**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

THE CITY OF CHICAGO,

*Plaintiff,*

v.

JEFFERSON BEAUREGARD SESSIONS III,
Attorney General of the United States

*Defendant.*

Civil Action No. 1:17-cv-5720
Hon. Harry D. Leinenweber

**CHICAGO'S MOTION FOR LEAVE TO CITE SUPPLEMENTAL AUTHORITY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR DECISION PURSUANT TO LOCAL RULE 78.5**

Plaintiff City of Chicago respectfully moves for leave to cite the Supreme Court's May 14, 2018 decision in *Murphy v. National Collegiate Athletic Association*, No. 16-476 (attached as Ex. 1) ("*NCAA*"), in support of its Motion for Partial Summary Judgment and Opposition to the Attorney General's Motion to Dismiss (Dkt Nos. 150, 152). *NCAA* bears directly on Chicago's *ultra vires* and Tenth Amendment claims against the 8 U.S.C. § 1373 compliance condition by confirming that negative restrictions, just like affirmative demands, violate constitutional anti-commandeering principles when they prevent state and local governments from declining to enforce a federal regulatory program.

Combined with the Seventh Circuit's recent affirmance of this Court's preliminary injunction against the notice and access conditions, *see Sessions v. City of Chicago*, 888 F.3d 272 (7th Cir. 2018), the Supreme Court's decision in *NCAA* leaves no doubt that Chicago is entitled to summary judgment in its favor as to all three challenged conditions. *See* Dkt. Nos. 150, 152. Notwithstanding these decisions, however, the Attorney General has declined to make Byrne JAG awards to Chicago and hundreds of Byrne JAG applicants across the Nation, thus impounding hundreds of millions of

dollars in critical local law enforcement funding. Because the Attorney General appears intent on continuing to withhold all funding until this case is resolved, Chicago respectfully requests pursuant to Local Rule 78.5 that the Court either decide Chicago's Motion for Summary Judgment on the papers or set the motion for argument at a time convenient for the Court in the coming weeks.

In support of this Motion, Chicago states as follows:

## I.     The Supreme Court's Decision in *Murphy v. NCAA*

In ruling on Chicago's preliminary injunction motion, this Court recognized that Section 1373 "may implicate the logic underlying" the Tenth Amendment anti-commandeering principles by "effectively thwart[ing] policymakers' ability to extricate their state or municipality from involvement in a federal program." Dkt. 78 at 34-35. This Court nonetheless hesitated to find Section 1373 unconstitutional because the "literal text" of Section 1373 can be characterized "as a prohibition that requires no affirmative state action." *Id.* at 33-34. And under "current case law," this Court opined, "only affirmative demands on states [can] constitute a violation of the Tenth Amendment." *Id.* at 35. Accordingly, absent "an expansion of the law" by "a higher court," this Court declined to hold that Section 1373 violates the Tenth Amendment. *Id.*

A "higher court" has now addressed that exact issue. On Monday, the Supreme Court of the United States issued its decision in *Murphy v. National Collegiate Athletic Association*, No. 16-476 (May 14, 2018), which clarifies that anti-commandeering principles prevent the federal government from issuing direct orders to state and local governments regardless of whether those orders command affirmative action or impose negative prohibitions. All parties agreed in *NCAA* that the federal government cannot "compel a State to enact legislation," but respondents and the United States as amicus curiae argued that "prohibiting a State from enacting new laws is another matter." *NCAA*, slip op. 18. Thus, citing *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997), respondents argued that "commandeering occurs only when Congress

goes beyond precluding state action and affirmatively commands it." *NCAA*, slip op. 18 (internal quotation marks omitted). The Supreme Court squarely rejected that argument, explaining that the "distinction" between "precluding" state action and "affirmatively command[ing]" it is "empty." *Id.* at 18-19. "It was a matter of happenstance," the Court explained, "that the laws challenged in *New York* and *Printz* commanded 'affirmative' action as opposed to imposing a prohibition." *Id.* at 19. But "[t]he basic principle"—that Congress cannot directly regulate how state and local governments exercise their sovereign authority—"applies in either event." *Id.*

*NCAA* thus clarifies that prohibitions implicate anti-commandeering principles just as much as affirmative demands. The key question is whether Congress has "issu[ed] direct orders" to state and local governments that seek to control those governments' "sovereign authority to 'regulate their own citizens.'" *NCAA*, slip op. 19, 20 (quoting *Reno v. Condon*, 528 U.S. 141, 151 (2000)). As this Court has already recognized, Congress does just that though Section 1373: it "mandates" that Chicago may not "control the scope of its officials' employment by limiting the extent of their paid time spent cooperating with the INS." Dkt. 78 at 34.

*NCAA* thus confirms that Section 1373 violates the Constitution. Section 1373 not only "implicate[s] the logic" of the anti-commandeering doctrine, Dkt. 78 at 34, but is invalid as a result of that logic. This Court should hold Section 1373 unconstitutional and grant summary judgment to Chicago against the Section 1373 compliance condition.

## II. Pursuant to Local Rule 78.5, Chicago Calls Its Summary Judgment Motion to the Court's Attention For Decision

Resolution of Chicago's pending motion for summary judgment is urgent. Despite telling this Court that he intended to distribute Byrne JAG awards by September 30, 2017, *see* Dkt. 28 at 2 (¶ 4), the Attorney General has refused to do so. More than seven-and-a-half months after that deadline the Attorney General continues to withhold funding from all but two of the nearly 1,000 jurisdictions that submitted Byrne JAG applications—thereby impounding hundreds of millions of

dollars in vital 2017 Byrne JAG funding. The Attorney General has also refused to release over $3 million in federal funding to Chicago from a second program—the COPS Hiring Program—until he is satisfied that Chicago complies with 8 U.S.C. § 1373. *See* Sachs Declaration ¶¶ 15-16, Dkt. 154. The Attorney General's continued refusal to release these funds has cut off funding that Chicago planned to use to expand ShotSpotter technology to two additional neighborhoods and to hire 25 additional police officers, *id.* ¶¶ 9, 11, 15, 16, and has similarly impeded projects that are critical to the public safety in hundreds of other jurisdictions across the country.

The Attorney General has blamed this Court's injunction for the Attorney General's decision to freeze Byrne JAG funding nationwide, apparently on the theory he must retain the ability to eventually impose the conditions if they "are ultimately determined to be lawful." *See* Defendant-Appellant's Motion for Partial Stay Pending Rehearing En Banc at 3, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. Apr. 27, 2018), Dkt. 118. Setting aside the question whether the Attorney General's decision to freeze funding is lawful, it is clear that the most expeditious way to induce a thaw is to resolve this litigation quickly—with an "ultimate[] determin[ation]" that the conditions are in fact *not* "lawful." The Supreme Court's decision in *NCAA*, taken together with the Seventh Circuit's conclusion that the notice and access conditions are unlawful, *see Sessions*, 888 F.3d 272, leaves no doubt that that is the correct resolution of this case: Chicago is entitled to summary judgment and an injunction barring the Attorney General from imposing any of the three challenged conditions.


WHEREFORE, Chicago respectfully requests leave to cite the attached *NCAA* opinion as supplemental authority in support of its Motion for Partial Summary Judgment and its Opposition to the Attorney General's Motion to Dismiss, and respectfully urges, pursuant to Local Rule 78.5, that this Court issue a decision in Chicago's favor on the papers or, in the alternative, that the Court

schedule a hearing for argument on the pending motions at a time convenient for the Court within the coming weeks.

May 18, 2018

Respectfully Submitted,

By /s/ Edward N. Siskel

JAMIE S. GORELICK (*pro hac vice*)
DAVID W. OGDEN (*pro hac vice*)
ARI HOLTZBLATT (*pro hac vice*)
ARI SAVITZKY (*pro hac vice*)
MOLLY JENNINGS (*pro hac vice*)
BRIDGET FAHEY* (*pro hac vice*)
JACK STARCHER (*pro hac vice*)
JOSHUA ABBUHL (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

DEBO P. ADEGBILE (*pro hac vice*)
ADRIEL I. CEPEDA DERIEUX (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Admitted to practice only in Colorado.*
*Supervised by members of the firm who are members*
*of the District of Columbia Bar*

EDWARD N. SISKEL
Corporation Counsel of the City of Chicago

JUSTIN A. HOUPPERT
Assistant Corporation Counsel
SCOTT D. SPEARS
Assistant Corporation Counsel
121 N. LaSalle Street, Suite 600
Chicago, IL 60602
(312) 744-0220
edward.siskel@cityofchicago.org

ANDREW W. WORSECK
Chief Assistant Corporation Counsel
30 N. LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-0220

RONALD S. SAFER
MATTHEW C. CROWL
NICK KAHLON
TAL CHAIKEN
LAURA KLEINMAN
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700

*Attorneys for the City of Chicago*

**CERTIFICATE OF SERVICE**

On the 18th day of May, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by that system.

/s/ Edward N. Siskel

Edward N. Siskel

(Slip Opinion)        OCTOBER  TERM,  2017        1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MURPHY, GOVERNOR OF NEW JERSEY, ET AL. *v.* NATIONAL COLLEGIATE ATHLETIC ASSN. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

No. 16–476.  Argued December 4, 2017—Decided May 14, 2018\*

The Professional and Amateur Sports Protection Act (PASPA) makes it unlawful for a State or its subdivisions "to sponsor, operate, advertise, promote, license, or authorize by law or compact . . . a lottery, sweepstakes, or other betting, gambling, or wagering scheme based . . . on" competitive sporting events, 28 U. S. C. §3702(1), and for "a person to sponsor, operate, advertise, or promote" those same gambling schemes if done "pursuant to the law or compact of a governmental entity," §3702(2).  But PASPA does not make sports gambling itself a federal crime.  Instead, it allows the Attorney General, as well as professional and amateur sports organizations, to bring civil actions to enjoin violations. §3703.  "Grandfather" provisions allow existing forms of sports gambling to continue in four States, §3704(a)(1)–(2), and another provision would have permitted New Jersey to set up a sports gambling scheme in Atlantic City within a year of PASPA's enactment, §3704(a)(3).

New Jersey did not take advantage of that option but has since had a change of heart.  After voters approved an amendment to the State Constitution giving the legislature the authority to legalize sports gambling schemes in Atlantic City and at horseracing tracks, the legislature enacted a 2012 law doing just that.  The NCAA and three major professional sports leagues brought an action in federal court against New Jersey's Governor and other state officials (hereinafter New Jersey), seeking to enjoin the law on the ground that it violates

——————
\*Together with No. 16–477, *New Jersey Thoroughbred Horsemen's Assn., Inc.* v. *National Collegiate Athletic Assn. et al.*, also on certiorari to the same court.

PASPA.  New Jersey countered that PASPA violates the Constitu-
tion's "anticommandeering" principle by preventing the State from
modifying or repealing its laws prohibiting sports gambling.  The
District Court found no anticommandeering violation, the Third Cir-
cuit affirmed, and this Court denied review.

  In 2014, the New Jersey Legislature enacted the law at issue in
these cases.  Instead of affirmatively authorizing sports gambling
schemes, this law repeals state-law provisions that prohibited such
schemes, insofar as they concerned wagering on sporting events by
persons 21 years of age or older; at a horseracing track or a casino or
gambling house in Atlantic City; and only as to wagers on sporting
events not involving a New Jersey college team or a collegiate event
taking place in the State.  Plaintiffs in the earlier suit, respondents
here, filed a new action in federal court.  They won in the District
Court, and the Third Circuit affirmed, holding that the 2014 law, no
less than the 2012 one, violates PASPA.  The court further held that
the prohibition does not "commandeer" the States in violation of the
Constitution.

*Held*:

  1. When a State completely or partially repeals old laws banning
sports gambling schemes, it "authorize[s]" those schemes under
PASPA.  Pp. 9–14.

    (a) Pointing out that one accepted meaning of "authorize" is
"permit," petitioners contend that any state law that has the effect of
permitting sports gambling, including a law totally or partially re-
pealing a prior prohibition, amounts to authorization.  Respondents
maintain that "authorize" requires affirmative action, and that the
2014 law affirmatively acts by empowering a defined group of entities
and endowing them with the authority to conduct sports gambling
operations.  They do not take the position that PASPA bans all modi-
fications of laws prohibiting sports gambling schemes, but just how
far they think a modification could go is not clear.  Similarly, the
United States, as *amicus*, claims that the State's 2014 law qualifies
as an authorization.  PASPA, it contends, neither prohibits a State
from enacting a complete repeal nor outlaws all partial repeals.  But
the United States also does not set out any clear rule for distinguish-
ing between partial repeals that constitute the "authorization" of
sports gambling and those that are permissible.  Pp. 10–11.

    (b) Taking into account the fact that all forms of sports gambling
were illegal in the great majority of States at the time of PASPA's
enactment, the repeal of a state law banning sports gambling not
only "permits" sports gambling but also gives those now free to conduct
a sports betting operation the "right or authority to act."  The inter-
pretation adopted by the Third Circuit and advocated by respondents

Cite as: 584 U. S. ____ (2018)          3

Syllabus

and the United States not only ignores the situation that Congress faced when it enacted PASPA but also leads to results that Congress is most unlikely to have wanted. Pp. 11–13.

(c) Respondents and the United States cannot invoke the canon of interpretation that a statute should not be held to be unconstitutional if there is any reasonable interpretation that can save it. Even if the law could be interpreted as respondents and the United States suggest, it would still violate the anticommandeering principle. Pp. 13–14.

2. PASPA's provision prohibiting state authorization of sports gambling schemes violates the anticommandeering rule. Pp. 14–24.

(a) As the Tenth Amendment confirms, all legislative power not conferred on Congress by the Constitution is reserved for the States. Absent from the list of conferred powers is the power to issue direct orders to the governments of the States. The anticommandeering doctrine that emerged in *New York* v. *United States,* 505 U. S. 144, and *Printz* v. *United States,* 521 U. S. 898, simply represents the recognition of this limitation. Thus, "Congress may not simply 'commandeer the legislative process of the States by directly compelling them to enact and enforce a federal regulatory program.'" *New York, supra,* at 161. Adherence to the anticommandeering principle is important for several reasons, including, as significant here, that the rule serves as "one of the Constitution's structural safeguards of liberty," *Printz, supra,* at 921, that the rule promotes political accountability, and that the rule prevents Congress from shifting the costs of regulation to the States. Pp. 14–18.

(b) PASPA's anti-authorization provision unequivocally dictates what a state legislature may and may not do. The distinction between compelling a State to enact legislation and prohibiting a State from enacting new laws is an empty one. The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event. Pp. 18–19.

(c) Contrary to the claim of respondents and the United States, this Court's precedents do not show that PASPA's anti-authorization provision is constitutional. *South Carolina* v. *Baker*, 485 U. S. 505; *Reno* v. *Condon*, 528 U. S. 141; *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264; *FERC* v. *Mississippi*, 456 U. S. 742, distinguished. Pp. 19–21.

(d) Nor does the anti-authorization provision constitute a valid preemption provision. To preempt state law, it must satisfy two requirements. It must represent the exercise of a power conferred on Congress by the Constitution. And, since the Constitution "confers upon Congress the power to regulate individuals, not States," *New York, supra*, at 177, it must be best read as one that regulates private

4    MURPHY *v.* NATIONAL COLLEGIATE ATHLETIC ASSN.

Syllabus

actors. There is no way that the PASPA anti-authorization provision can be understood as a regulation of private actors. It does not confer any federal rights on private actors interested in conducting sports gambling operations or impose any federal restrictions on private actors. Pp. 21–24.

3. PASPA's provision prohibiting state "licens[ing]" of sports gambling schemes also violates the anticommandeering rule. It issues a direct order to the state legislature and suffers from the same defect as the prohibition of state authorization. Thus, this Court need not decide whether New Jersey's 2014 law violates PASPA's anti-licensing provision. Pp. 24–25.

4. No provision of PASPA is severable from the provisions directly at issue. Pp. 26–30.

(a) Section 3702(1)'s provisions prohibiting States from "operat[ing]," "sponsor[ing]," or "promot[ing]" sports gambling schemes cannot be severed. Striking the state authorization and licensing provisions while leaving the state operation provision standing would result in a scheme sharply different from what Congress contemplated when PASPA was enacted. For example, had Congress known that States would be free to authorize sports gambling in privately owned casinos, it is unlikely that it would have wanted to prevent States from operating sports lotteries. Nor is it likely that Congress would have wanted to prohibit such an ill-defined category of state conduct as sponsorship or promotion. Pp. 26–27.

(b) Congress would not want to sever the PASPA provisions that prohibit a private actor from "sponsor[ing]," "operat[ing]," or "promot[ing]" sports gambling schemes "pursuant to" state law. §3702(2). PASPA's enforcement scheme makes clear that §3702(1) and §3702(2) were meant to operate together. That scheme—suited for challenging state authorization or licensing or a small number of private operations—would break down if a State broadly decriminalized sports gambling. Pp. 27–29.

(c) PASPA's provisions prohibiting the "advertis[ing]" of sports gambling are also not severable. See §§3702(1)–(2). If they were allowed to stand, federal law would forbid the advertising of an activity that is legal under both federal and state law—something that Congress has rarely done. Pp. 29–30.

832 F. 3d 389, reversed.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, THOMAS, KAGAN, and GORSUCH, JJ., joined, and in which BREYER, J., joined as to all but Part VI–B. THOMAS, J., filed a concurring opinion. BREYER, J., filed an opinion concurring in part and dissenting in part. GINSBURG, J., filed a dissenting opinion, in which SOTOMAYOR, J., joined, and in which BREYER, J., joined in part.

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 16–476 and 16–477

———————

PHILIP D. MURPHY, GOVERNOR OF NEW
JERSEY, ET AL., PETITIONERS

16–476       *v.*

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, ET AL.


NEW JERSEY THOROUGHBRED HORSEMEN'S
ASSOCIATION, INC., PETITIONER

16–477       *v.*

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 14, 2018]

JUSTICE ALITO delivered the opinion of the Court.

The State of New Jersey wants to legalize sports gambling at casinos and horseracing tracks, but a federal law, the Professional and Amateur Sports Protection Act, generally makes it unlawful for a State to "authorize" sports gambling schemes. 28 U. S. C. §3702(1). We must decide whether this provision is compatible with the system of "dual sovereignty" embodied in the Constitution.

## I

### A

Americans have never been of one mind about gambling,

and attitudes have swung back and forth.  By the end of
the 19th century, gambling was largely banned through-
out the country,[1] but beginning in the 1920s and 1930s,
laws prohibiting gambling were gradually loosened.

New Jersey's experience is illustrative.  In 1897, New
Jersey adopted a constitutional amendment that barred
all gambling in the State.[2]  But during the Depression, the
State permitted parimutuel betting on horse races as a
way of increasing state revenue,[3] and in 1953, churches
and other nonprofit organizations were allowed to host
bingo games.[4]  In 1970, New Jersey became the third
State to run a state lottery,[5] and within five years, 10
other States followed suit.[6]

By the 1960s, Atlantic City, "once the most fashionable
resort of the Atlantic Coast," had fallen on hard times,[7]
and casino gambling came to be seen as a way to revitalize
the city.[8]  In 1974, a referendum on statewide legalization
failed,[9] but two years later, voters approved a narrower
measure allowing casino gambling in Atlantic City alone.[10]
At that time, Nevada was the only other State with legal

---

[1] See Nat. Gambling Impact Study Comm'n, Final Report, p. 2–1
(1999) (Final Report); S. Durham & K. Hashimoto, The History of
Gambling in America 34–35 (2010).

[2] See *Atlantic City Racing Assn.* v. *Attorney General*, 98 N. J. 535,
539–541, 489 A. 2d 165, 167–168 (1985).

[3] See Note, The Casino Act: Gambling's Past and the Casino Act's
Future, 10 Rutgers-Camden L. J. 279, 287 (1979) (The Casino Act).

[4] *Id.*, at 288; see also N. J. Const., Art. 4, §7, ¶2(A); Bingo Licensing
Law, N. J. Stat. Ann. §5:8–24 *et seq.* (West 2012).

[5] See State Lottery Law, N. J. Stat. Ann. §5:9–1 *et seq.*; The Casino
Act, at 288; N. J. Const., Art. 4, §7, ¶2(C); Final Report, at 2–1.

[6] *Id.*, at 2–1.

[7] T. White, The Making of the President 1964, p. 275 (1965).

[8] See D. Clary, Gangsters to Governors 152–153 (2017) (Clary).

[9] See The Casino Act, at 289.

[10] See *ibid.*; N. J. Const., Art. 4, §7, ¶2(D).

Opinion of the Court

casinos,[11] and thus for a while the Atlantic City casinos had an east coast monopoly. "With 60 million people living within a one-tank car trip away," Atlantic City became "the most popular tourist destination in the United States."[12] But that favorable situation eventually came to an end.

With the enactment of the Indian Gaming Regulatory Act in 1988, 25 U. S. C. §2701 *et seq*., casinos opened on Indian land throughout the country. Some were located within driving distance of Atlantic City,[13] and nearby States (and many others) legalized casino gambling.[14] But Nevada remained the only state venue for legal sports gambling in casinos, and sports gambling is immensely popular.[15]

Sports gambling, however, has long had strong opposition. Opponents argue that it is particularly addictive and especially attractive to young people with a strong interest in sports,[16] and in the past gamblers corrupted and seriously damaged the reputation of professional and amateur sports.[17] Apprehensive about the potential effects of

——————

[11] Clary 146.

[12] *Id.*, at 146, 158.

[13] *Id.*, at 208–210.

[14] Casinos now operate in New York, Pennsylvania, Delaware, and Maryland. See American Gaming Assn., 2016 State of the States, p. 8, online at https://www.americangaming.org/sites/default/files/2016%20 State%20of%20the%20States_FINAL.pdf (all Internet materials as last visited May 4, 2018).

[15] See, *e.g.*, Brief for American Gaming Assn. as *Amicus Curiae* 1–2.

[16] See, *e.g.*, Final Report, at 3–10; B. Bradley, The Professional and Amateur Sports Protection Act—Policy Concerns Behind Senate Bill 474, 2 Seton Hall J. Sport L. 5, 7 (1992); Brief for Stop Predatory Gambling et al. as *Amici Curiae* 22–23.

[17] For example, in 1919, professional gamblers are said to have paid members of the Chicago White Sox to throw the World Series, an episode that was thought to have threatened baseball's status as the Nation's pastime. See E. Asinof, Eight Men Out: The Black Sox and

Opinion of the Court

sports gambling, professional sports leagues and the National Collegiate Athletic Association (NCAA) long opposed legalization.[18]

### B

By the 1990s, there were signs that the trend that had brought about the legalization of many other forms of gambling might extend to sports gambling,[19] and this sparked federal efforts to stem the tide. Opponents of sports gambling turned to the legislation now before us, the Professional and Amateur Sports Protection Act (PASPA). 28 U. S. C. §3701 *et seq.* PASPA's proponents argued that it would protect young people, and one of the bill's sponsors, Senator Bill Bradley of New Jersey, a former college and professional basketball star, stressed that the law was needed to safeguard the integrity of sports.[20] The Department of Justice opposed the bill,[21] but it was passed and signed into law.

PASPA's most important provision, part of which is directly at issue in these cases, makes it "unlawful" for a State or any of its subdivisions[22] "to sponsor, operate,

---

the 1919 World Series 5, 198–199 (1963). And in the early 1950s, the Nation was shocked when several college basketball players were convicted for shaving points. S. Cohen, The Game They Played 183–238 (1977). This scandal is said to have nearly killed college basketball. See generally C. Rosen, Scandals of '51: How the Gamblers Almost Killed College Basketball (1978).

[18]See Professional and Amateur Sports Protection, S. Rep. No. 102–248, p. 8 (1991); Hearing before the Subcommittee on Patents, Copyrights and Trademarks of the Senate Committee on the Judiciary, 102d Cong., 1st Sess., 21, 39, 46–47, 59–60, 227 (1991) (S. Hrg. 102–499) (statements by representatives of major sports leagues opposing sports gambling).

[19]S. Rep. No. 102–248, at 5.

[20]S. Hrg. 102–499, at 10–14.

[21]App. to Pet. for Cert. in No. 16–476, p. 225a.

[22]The statute applies to any "governmental entity," which is defined

Opinion of the Court

advertise, promote, license, or authorize by law or compact
. . . a lottery, sweepstakes, or other betting, gambling, or
wagering scheme based . . . on" competitive sporting
events. §3702(1). In parallel, §3702(2) makes it "unlaw-
ful" for "a person to sponsor, operate, advertise, or pro-
mote" those same gambling schemes[23]—but only if this is
done "pursuant to the law or compact of a governmental
entity." PASPA does not make sports gambling a federal
crime (and thus was not anticipated to impose a signifi-
cant law enforcement burden on the Federal Govern-
ment).[24] Instead, PASPA allows the Attorney General, as
well as professional and amateur sports organizations, to
bring civil actions to enjoin violations. §3703.

At the time of PASPA's adoption, a few jurisdictions
allowed some form of sports gambling. In Nevada, sports
gambling was legal in casinos,[25] and three States hosted
sports lotteries or allowed sports pools.[26] PASPA contains
"grandfather" provisions allowing these activities to con-
tinue. §3704(a)(1)–(2). Another provision gave New Jer-
sey the option of legalizing sports gambling in Atlantic
City—provided that it did so within one year of the law's

———————

as "a State, a political subdivision of a State, or an entity or organiza-
tion . . . that has governmental authority within the territorial bounda-
ries of the United States." 28 U. S. C. §3701(2).

[23] PASPA does not define the term "scheme." The United States has
not offered a definition of the term but suggests that it encompasses
only those forms of gambling having some unspecified degree of organi-
zation or structure. See Brief for United States as *Amicus Curiae* 28–
29. For convenience, we will use the term "sports gambling" to refer to
whatever forms of sports gambling fall within PASPA's reach.

[24] The Congressional Budget Office estimated that PASPA would not
require the appropriation of any federal funds. S. Rep. No. 102–248, at
10.

[25] *Ibid.*

[26] *Ibid.*; 138 Cong. Rec. 12973.

effective date. §3704(a)(3).[27]

New Jersey did not take advantage of this special option, but by 2011, with Atlantic City facing stiff competition, the State had a change of heart. New Jersey voters approved an amendment to the State Constitution making it lawful for the legislature to authorize sports gambling, Art. IV, §7, ¶2(D), (F), and in 2012 the legislature enacted a law doing just that, 2011 N. J. Laws p. 1723 (2012 Act).

The 2012 Act quickly came under attack. The major professional sports leagues and the NCAA brought an action in federal court against the New Jersey Governor and other state officials (hereinafter New Jersey), seeking to enjoin the new law on the ground that it violated PASPA. In response, the State argued, among other things, that PASPA unconstitutionally infringed the State's sovereign authority to end its sports gambling ban. See *National Collegiate Athletic Assn.* v. *Christie*, 926 F. Supp. 2d 551, 561 (NJ 2013).

In making this argument, the State relied primarily on two cases, *New York* v. *United States*, 505 U. S. 144 (1992), and *Printz* v. *United States*, 521 U. S. 898 (1997), in which we struck down federal laws based on what has been dubbed the "anticommandeering" principle. In *New York*, we held that a federal law unconstitutionally ordered the State to regulate in accordance with federal standards, and in *Printz*, we found that another federal statute unconstitutionally compelled state officers to enforce federal law.

Relying on these cases, New Jersey argued that PASPA is similarly flawed because it regulates a State's exercise

───────────

[27] Although this provision did not specifically mention New Jersey or Atlantic City, its requirements—permitting legalization only "in a municipality" with an uninterrupted 10-year history of legal casino gaming—did not fit anyplace else.

Opinion of the Court

of its lawmaking power by prohibiting it from modifying or repealing its laws prohibiting sports gambling. See *National Collegiate Athletic Assn.* v. *Christie*, 926 F. Supp. 2d, at 561–562. The plaintiffs countered that PASPA is critically different from the commandeering cases because it does not command the States to take any affirmative act. *Id.*, at 562. Without an affirmative federal command to *do* something, the plaintiffs insisted, there can be no claim of commandeering. *Ibid.*

The District Court found no anticommandeering violation, *id.*, at 569–573, and a divided panel of the Third Circuit affirmed, *National Collegiate Athletic Assn.* v. *Christie*, 730 F. 3d 208 (2013) (*Christie I*). The panel thought it significant that PASPA does not impose any affirmative command. *Id.*, at 231. In the words of the panel, "PASPA does not require or coerce the states to lift a finger." *Ibid.* (emphasis deleted). The panel recognized that an affirmative command (for example, "Do not repeal") can often be phrased as a prohibition ("Repeal is prohibited"), but the panel did not interpret PASPA as prohibiting the repeal of laws outlawing sports gambling. *Id.*, at 232. A repeal, it thought, would not amount to "authoriz[ation]" and thus would fall outside the scope of §3702(1). "[T]he lack of an affirmative prohibition of an activity," the panel wrote, "does not mean it is affirmatively authorized by law. The right to do that which is not prohibited derives not from the authority of the state but from the inherent rights of the people." *Id.*, at 232 (emphasis deleted).

New Jersey filed a petition for a writ of certiorari, raising the anticommandeering issue. Opposing certiorari, the United States told this Court that PASPA does not require New Jersey "to leave in place the state-law prohibitions against sports gambling that it had chosen to adopt prior to PASPA's enactment. To the contrary, New Jersey is free to repeal those prohibitions in whole or in

part."  Brief for United States in Opposition in *Christie* v. *National Collegiate Athletic Assn.*, O. T. 2013, No. 13–967 etc., p. 11.  See also Brief for Respondents in Opposition in No. 13–967 etc., p. 23 ("Nothing in that unambiguous language compels states to prohibit or maintain any existing prohibition on sports gambling").  We denied review. *Christie* v. *National Collegiate Athletic Assn.*, 573 U. S. ___ (2014).

Picking up on the suggestion that a partial repeal would be allowed, the New Jersey Legislature enacted the law now before us.  2014 N. J. Laws p. 602 (2014 Act).  The 2014 Act declares that it is not to be interpreted as causing the State to authorize, license, sponsor, operate, advertise, or promote sports gambling.  *Ibid.*  Instead, it is framed as a repealer.  Specifically, it repeals the provisions of state law prohibiting sports gambling insofar as they concerned the "placement and acceptance of wagers" on sporting events by persons 21 years of age or older at a horseracing track or a casino or gambling house in Atlantic City.  *Ibid.*  The new law also specified that the repeal was effective only as to wagers on sporting events not involving a New Jersey college team or a collegiate event taking place in the State.  *Ibid.*

Predictably, the same plaintiffs promptly commenced a new action in federal court.  They won in the District Court, *National Collegiate Athletic Assn.* v. *Christie,* 61 F. Supp. 3d 488 (NJ 2014), and the case was eventually heard by the Third Circuit sitting en banc.  The en banc court affirmed, finding that the new law, no less than the old one, violated PASPA by "author[izing]" sports gambling.  *National Collegiate Athletic Assn.* v. *Governor of N. J.*, 832 F. 3d 389 (2016) (case below).  The court was unmoved by the New Jersey Legislature's "artful[]" attempt to frame the 2014 Act as a repealer.  *Id.*, at 397.  Looking at what the law "actually does," the court concluded that it constitutes an authorization because it

Opinion of the Court

"selectively remove[s] a prohibition on sports wagering in a manner that permissively channels wagering activity to particular locations or operators." *Id.*, at 397, 401. The court disavowed some of the reasoning in the *Christie I* opinion, finding its discussion of "the relationship between a 'repeal' and an 'authorization' to have been too facile." 832 F. 3d, at 401. But the court declined to say whether a repeal that was more complete than the 2014 Act would still amount to an authorization. The court observed that a partial repeal that allowed only "*de minimis* wagers between friends and family would not have nearly the type of authorizing effect" that it found in the 2014 Act, and it added: "We need not . . . articulate a line whereby a partial repeal of a sports wagering ban amounts to an authorization under PASPA, *if indeed such a line could be drawn.*" *Id.*, at 402 (emphasis added).

Having found that the 2014 Act violates PASPA's prohibition of state authorization of sports gambling schemes, the court went on to hold that this prohibition does not contravene the anticommandeering principle because it "does not command states to take affirmative actions." *Id.*, at 401. We granted review to decide the important constitutional question presented by these cases, *sub nom. Christie* v. *National Collegiate Athletic Assn.*, 582 U. S. ___ (2017).

## II

Before considering the constitutionality of the PASPA provision prohibiting States from "author[izing]" sports gambling, we first examine its meaning. The parties advance dueling interpretations, and this dispute has an important bearing on the constitutional issue that we must decide. Neither respondents nor the United States, appearing as an *amicus* in support of respondents, contends that the provision at issue would be constitutional if petitioners' interpretation is correct. Indeed, the United

States expressly concedes that the provision is unconstitutional if it means what petitioners claim.  Brief for United States 8, 19.

## A

Petitioners argue that the anti-authorization provision requires States to maintain their existing laws against sports gambling without alteration.  One of the accepted meanings of the term "authorize," they point out, is "permit."  Brief for Petitioners in No. 16–476, p. 42 (citing Black's Law Dictionary 133 (6th ed. 1990); Webster's Third New International Dictionary 146 (1992)).  They therefore contend that any state law that has the effect of permitting sports gambling, including a law totally or partially repealing a prior prohibition, amounts to an authorization.  Brief for Petitioners in No. 16–476, at 42.

Respondents interpret the provision more narrowly.  They claim that the *primary* definition of "authorize" requires affirmative action.  Brief for Respondents 39.  To authorize, they maintain, means "'[t]o empower; to give a right or authority to act; to endow with authority.'"  *Ibid.* (quoting Black's Law Dictionary, at 133).  And this, they say, is precisely what the 2014 Act does: It empowers a defined group of entities, and it endows them with the authority to conduct sports gambling operations.

Respondents do not take the position that PASPA bans all modifications of old laws against sports gambling, Brief for Respondents 20, but just how far they think a modification could go is not clear.  They write that a State "can also repeal or enhance [laws prohibiting sports gambling] without running afoul of PASPA" but that it "cannot 'partially repeal' a general prohibition for only one or two preferred providers, or only as to sports-gambling schemes conducted by the state."  *Ibid.*  Later in their brief, they elaborate on this point:

"If, for example, a state had an existing felony prohi-

Opinion of the Court

bition on all lotteries, it could maintain the law, it could repeal the law, it could downgrade the crime to a misdemeanor or increase the penalty . . . . But if the state modified its law, whether through a new authorization or through an amendment partially repealing the existing prohibition, to authorize the state to conduct a sports lottery, that modified law would be preempted." *Id.*, at 31.

The United States makes a similar argument. PASPA, it contends, does not prohibit a State from enacting a complete repeal because "one would not ordinarily say that private conduct is 'authorized by law' simply because the government has not prohibited it." Brief for United States 17. But the United States claims that "[t]he 2014 Act's selective and conditional permission to engage in conduct that is generally prohibited certainly qualifies" as an authorization. *Ibid.* The United States does not argue that PASPA outlaws *all* partial repeals, but it does not set out any clear rule for distinguishing between partial repeals that constitute the "authorization" of sports gambling and those that are permissible. The most that it is willing to say is that a State could "eliminat[e] prohibitions on sports gambling involving wagers by adults or wagers below a certain dollar threshold." *Id.*, at 29.

B

In our view, petitioners' interpretation is correct: When a State completely or partially repeals old laws banning sports gambling, it "authorize[s]" that activity. This is clear when the state-law landscape at the time of PASPA's enactment is taken into account. At that time, all forms of sports gambling were illegal in the great majority of States, and in that context, the competing definitions offered by the parties lead to the same conclusion. The repeal of a state law banning sports gambling not only "permits" sports gambling (petitioners' favored definition);

12    MURPHY *v.* NATIONAL COLLEGIATE ATHLETIC ASSN.

Opinion of the Court

it also gives those now free to conduct a sports betting operation the "right or authority to act"; it "empowers" them (respondents' and the United States's definition).

The concept of state "authorization" makes sense only against a backdrop of prohibition or regulation. A State is not regarded as authorizing everything that it does not prohibit or regulate. No one would use the term in that way. For example, no one would say that a State "authorizes" its residents to brush their teeth or eat apples or sing in the shower. We commonly speak of state authorization only if the activity in question would otherwise be restricted.[28]

The United States counters that, even if the term "authorize," standing alone, is interpreted as petitioners claim, PASPA contains additional language that precludes that reading. The provision at issue refers to "authoriz[ation] *by law*," §3702(1) (emphasis added), and the parallel provision governing private conduct, §3702(2), applies to conduct done "pursuant to the law . . . of a governmental entity." The United States maintains that one "would not naturally describe a person conducting a sports-gambling operation that is merely left unregulated as acting 'pursuant to' state law." Brief for United States 18. But one might well say exactly that if the person previously was prohibited from engaging in the activity. ("Now that the State has legalized the sale of marijuana, Joe is able to sell the drug pursuant to state law.")

The United States also claims to find support for its interpretation in the fact that the authorization ban ap-

─────────────

[28] See, *e.g.*, A. McCullum, Vermont's legal recreational marijuana law: What you should know, USA Today Network (Jan. 23, 2018), online at https://www.usatoday.com/story/news/nation-now/2018/01/23/vermont-legal-marijuana-law-what-know/1056869001/ ("Vermont . . . bec[ame] the first [State] in the country to *authorize* the recreational use of [marijuana] by an act of a state legislature." (emphasis added)).

Opinion of the Court

plies to all "governmental entities." It is implausible, the United States submits, to think that Congress "commanded every county, district, and municipality in the Nation to prohibit sports betting." *Ibid.* But in making this argument, the United States again ignores the legal landscape at the time of PASPA's enactment. At that time, sports gambling was generally prohibited by state law, and therefore a State's political subdivisions were powerless to legalize the activity. But what if a State enacted a law enabling, but not requiring, one or more of its subdivisions to decide whether to authorize sports gambling? Such a state law would not itself authorize sports gambling. The ban on legalization at the local level addresses this problem.

The interpretation adopted by the Third Circuit and advocated by respondents and the United States not only ignores the situation that Congress faced when it enacted PASPA but also leads to results that Congress is most unlikely to have wanted. This is illustrated by the implausible conclusions that all of those favoring alternative interpretations have been forced to reach about the extent to which the provision permits the repeal of laws banning sports gambling.

The Third Circuit could not say which, if any, partial repeals are allowed. 832 F. 3d, at 402. Respondents and the United States tell us that the PASPA ban on state authorization allows complete repeals, but beyond that they identify no clear line. It is improbable that Congress meant to enact such a nebulous regime.

### C

The respondents and United States argue that even if there is some doubt about the correctness of their interpretation of the anti-authorization provision, that interpretation should be adopted in order to avoid any anti-commandeering problem that would arise if the provision

were construed to require States to maintain their laws prohibiting sports gambling.  Brief for Respondents 38; Brief for United States 19.  They invoke the canon of interpretation that a statute should not be held to be unconstitutional if there is any reasonable interpretation that can save it.  See *Jennings* v. *Rodriguez*, 583 U. S. ___, ___ (2018) (slip op., at 12).  The plausibility of the alternative interpretations is debatable, but even if the law could be interpreted as respondents and the United States suggest, it would still violate the anticommandeering principle, as we now explain.

### III
### A

The anticommandeering doctrine may sound arcane, but it is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States.  When the original States declared their independence, they claimed the powers inherent in sovereignty—in the words of the Declaration of Independence, the authority "to do all . . . Acts and Things which Independent States may of right do."  ¶32.  The Constitution limited but did not abolish the sovereign powers of the States, which retained "a residuary and inviolable sovereignty."  The Federalist No. 39, p. 245 (C. Rossiter ed. 1961).  Thus, both the Federal Government and the States wield sovereign powers, and that is why our system of government is said to be one of "dual sovereignty."  *Gregory* v. *Ashcroft*, 501 U. S. 452, 457 (1991).

The Constitution limits state sovereignty in several ways.  It directly prohibits the States from exercising some attributes of sovereignty.  See, *e.g.*, Art. I, §10.  Some grants of power to the Federal Government have been held to impose implicit restrictions on the States.  See, *e.g.*, *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328

Opinion of the Court

(2008); *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396 (2003). And the Constitution indirectly restricts the States by granting certain legislative powers to Congress, see Art. I, §8, while providing in the Supremacy Clause that federal law is the "supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," Art. VI, cl. 2. This means that when federal and state law conflict, federal law prevails and state law is preempted.

The legislative powers granted to Congress are sizable, but they are not unlimited. The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms. And conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States. The anticommandeering doctrine simply represents the recognition of this limit on congressional authority.

Although the anticommandeering principle is simple and basic, it did not emerge in our cases until relatively recently, when Congress attempted in a few isolated instances to extend its authority in unprecedented ways. The pioneering case was *New York* v. *United States*, 505 U. S. 144 (1992), which concerned a federal law that required a State, under certain circumstances, either to "take title" to low-level radioactive waste or to "regulat[e] according to the instructions of Congress." *Id.*, at 175. In enacting this provision, Congress issued orders to either the legislative or executive branch of state government (depending on the branch authorized by state law to take the actions demanded). Either way, the Court held, the provision was unconstitutional because "the Constitution does not empower Congress to subject state governments to this type of instruction." *Id.*, at 176.

Justice O'Connor's opinion for the Court traced this rule

to the basic structure of government established under the Constitution.  The Constitution, she noted, "confers upon Congress the power to regulate individuals, not States." *Id.*, at 166.  In this respect, the Constitution represented a sharp break from the Articles of Confederation.  "Under the Articles of Confederation, Congress lacked the authority in most respects to govern the people directly." *Id.*, at 163.  Instead, Congress was limited to acting "'only upon the States.'" *Id.*, at 162 (quoting *Lane County* v. *Oregon*, 7 Wall. 71, 76 (1869)).  Alexander Hamilton, among others, saw this as "'[t]he great and radical vice in . . . the existing Confederation.'" 505 U. S., at 163 (quoting The Federalist No. 15, at 108).  The Constitutional Convention considered plans that would have preserved this basic structure, but it rejected them in favor of a plan under which "Congress would exercise its legislative authority directly over individuals rather than over States." 505 U. S., at 165.

As to what this structure means with regard to Congress's authority to control state legislatures, *New York* was clear and emphatic.  The opinion recalled that "no Member of the Court ha[d] ever suggested" that even "a particularly strong federal interest" "would enable Congress to command a state government to enact *state* regulation." *Id.*, at 178 (emphasis in original).  "We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *Id.*, at 166.  "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id.*, at 161 (quoting *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 288 (1981)).  "Where a federal interest is sufficiently strong to cause Congress to legislate, it must do so directly; it may not conscript state governments as its agents." 505 U. S., at 178.

Opinion of the Court

Five years after *New York*, the Court applied the same principles to a federal statute requiring state and local law enforcement officers to perform background checks and related tasks in connection with applications for handgun licenses. *Printz*, 521 U. S. 898. Holding this provision unconstitutional, the Court put the point succinctly: "The Federal Government" may not "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.*, at 935. This rule applies, *Printz* held, not only to state officers with policymaking responsibility but also to those assigned more mundane tasks. *Id.*, at 929–930.

### B

Our opinions in *New York* and *Printz* explained why adherence to the anticommandeering principle is important. Without attempting a complete survey, we mention several reasons that are significant here.

First, the rule serves as "one of the Constitution's structural protections of liberty." *Printz*, *supra*, at 921. "The Constitution does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities." *New York*, *supra*, at 181. "To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals." *Ibid.* "'[A] healthy balance of power between the States and the Federal Government [reduces] the risk of tyranny and abuse from either front.'" *Id.*, at 181–182 (quoting *Gregory*, 501 U. S., at 458).

Second, the anticommandeering rule promotes political accountability. When Congress itself regulates, the responsibility for the benefits and burdens of the regulation is apparent. Voters who like or dislike the effects of the regulation know who to credit or blame. By contrast, if a State imposes regulations only because it has been commanded to do so by Congress, responsibility is blurred.

See *New York*, *supra*, at 168–169; *Printz*, *supra*, at 929–930.

Third, the anticommandeering principle prevents Congress from shifting the costs of regulation to the States.  If Congress enacts a law and requires enforcement by the Executive Branch, it must appropriate the funds needed to administer the program.  It is pressured to weigh the expected benefits of the program against its costs.  But if Congress can compel the States to enact and enforce its program, Congress need not engage in any such analysis.  See, *e.g.*, E. Young, Two Cheers for Process Federalism, 46 Vill. L. Rev. 1349, 1360–1361 (2001).

IV

A

The PASPA provision at issue here—prohibiting state authorization of sports gambling—violates the anticommandeering rule.  That provision unequivocally dictates what a state legislature may and may not do.  And this is true under either our interpretation or that advocated by respondents and the United States.  In either event, state legislatures are put under the direct control of Congress.  It is as if federal officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals.  A more direct affront to state sovereignty is not easy to imagine.

Neither respondents nor the United States contends that Congress can compel a State to enact legislation, but they say that prohibiting a State from enacting new laws is another matter.  See Brief for Respondents 19; Brief for United States 12.  Noting that the laws challenged in *New York* and *Printz* "told states what they must do instead of what they must not do," respondents contend that commandeering occurs "only when Congress goes beyond precluding state action and affirmatively commands it."  Brief for Respondents 19 (emphasis deleted).

Opinion of the Court

This distinction is empty. It was a matter of happenstance that the laws challenged in *New York* and *Printz* commanded "affirmative" action as opposed to imposing a prohibition. The basic principle—that Congress cannot issue direct orders to state legislatures—applies in either event.

Here is an illustration. PASPA includes an exemption for States that permitted sports betting at the time of enactment, §3704, but suppose Congress did not adopt such an exemption. Suppose Congress ordered States with legalized sports betting to take the affirmative step of criminalizing that activity and ordered the remaining States to retain their laws prohibiting sports betting. There is no good reason why the former would intrude more deeply on state sovereignty than the latter.

B

Respondents and the United States claim that prior decisions of this Court show that PASPA's anti-authorization provision is constitutional, but they misread those cases. In none of them did we uphold the constitutionality of a federal statute that commanded state legislatures to enact or refrain from enacting state law.

In *South Carolina* v. *Baker*, 485 U. S. 505 (1988), the federal law simply altered the federal tax treatment of private investments. Specifically, it removed the federal tax exemption for interest earned on state and local bonds unless they were issued in registered rather than bearer form. This law did not order the States to enact or maintain any existing laws. Rather, it simply had the indirect effect of pressuring States to increase the rate paid on their bearer bonds in order to make them competitive with other bonds paying taxable interest.

In any event, even if we assume that removal of the tax exemption was tantamount to an outright prohibition of the issuance of bearer bonds, see *id.*, at 511, the law would

simply treat state bonds the same as private bonds.  The anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage.

That principle formed the basis for the Court's decision in *Reno* v. *Condon*, 528 U. S. 141 (2000), which concerned a federal law restricting the disclosure and dissemination of personal information provided in applications for driver's licenses.  The law applied equally to state and private actors.  It did not regulate the States' sovereign authority to "regulate their own citizens." *Id.*, at 151.

In *Hodel*, 452 U. S., at 289, the federal law, which involved what has been called "cooperative federalism," by no means commandeered the state legislative process.  Congress enacted a statute that comprehensively regulated surface coal mining and offered States the choice of "either implement[ing]" the federal program "or else yield[ing] to a federally administered regulatory program." *Ibid.*  Thus, the federal law *allowed* but did not *require* the States to implement a federal program.  "States [were] not compelled to enforce the [federal] standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever." *Id.*, at 288.  If a State did not "wish" to bear the burden of regulation, the "full regulatory burden [would] be borne by the Federal Government." *Ibid.*

Finally, in *FERC* v. *Mississippi*, 456 U. S. 742 (1982), the federal law in question issued no command to a state legislature.  Enacted to restrain the consumption of oil and natural gas, the federal law directed state utility regulatory commissions to consider, but not necessarily to adopt, federal "'rate design' and regulatory standards." *Id.*, at 746.  The Court held that this modest requirement did not infringe the States' sovereign powers, but the Court warned that it had "never . . . sanctioned explicitly a federal command to the States to promulgate and enforce

laws and regulations." *Id.*, at 761–762. *FERC* was decided well before our decisions in *New York* and *Printz*, and PASPA, unlike the law in *FERC*, does far more than require States to *consider* Congress's preference that the legalization of sports gambling be halted. See *Printz*, 521 U. S., at 929 (distinguishing *FERC*).

In sum, none of the prior decisions on which respondents and the United States rely involved federal laws that commandeered the state legislative process. None concerned laws that directed the States either to enact or to refrain from enacting a regulation of the conduct of activities occurring within their borders. Therefore, none of these precedents supports the constitutionality of the PASPA provision at issue here.

## V

Respondents and the United States defend the anti-authorization prohibition on the ground that it constitutes a valid preemption provision, but it is no such thing. Preemption is based on the Supremacy Clause, and that Clause is not an independent grant of legislative power to Congress. Instead, it simply provides "a rule of decision." *Armstrong* v. *Exceptional Child Center, Inc.*, 575 U. S. ___, ___ (2015) (slip op., at 3). It specifies that federal law is supreme in case of a conflict with state law. Therefore, in order for the PASPA provision to preempt state law, it must satisfy two requirements. First, it must represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do. Second, since the Constitution "confers upon Congress the power to regulate individuals, not States," *New York*, 505 U. S., at 166, the PASPA provision at issue must be best read as one that regulates private actors.

Our cases have identified three different types of preemption—"conflict," "express," and "field," see *English* v. *General Elec. Co.*, 496 U. S. 72, 78–79 (1990)—but all of

them work in the same way: Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted.

This mechanism is shown most clearly in cases involving "conflict preemption." A recent example is *Mutual Pharmaceutical Co.* v. *Bartlett*, 570 U. S. 472 (2013). In that case, a federal law enacted under the Commerce Clause regulated manufacturers of generic drugs, prohibiting them from altering either the composition or labeling approved by the Food and Drug Administration. A State's tort law, however, effectively required a manufacturer to supplement the warnings included in the FDA-approved label. *Id.*, at 480–486. We held that the state law was preempted because it imposed a duty that was inconsistent—*i.e.*, in conflict—with federal law. *Id.,* at 493.

"Express preemption" operates in essentially the same way, but this is often obscured by the language used by Congress in framing preemption provisions. The provision at issue in *Morales* v. *Trans World Airlines, Inc.*, 504 U. S. 374 (1992), is illustrative. The Airline Deregulation Act of 1978 lifted prior federal regulations of airlines, and "[t]o ensure that the States would not undo federal deregulation with regulation of their own," *id.*, at 378, the Act provided that "no State or political subdivision thereof . . . shall enact or enforce any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any [covered] air carrier." 49 U. S. C. App. §1305(a)(1) (1988 ed.).

This language might appear to operate directly on the States, but it is a mistake to be confused by the way in which a preemption provision is phrased. As we recently explained, "we do not require Congress to employ a particular linguistic formulation when preempting state law." *Coventry Health Care of Mo., Inc.* v. *Nevils*, 581 U. S. ___,

Opinion of the Court

____–___ (2017) (slip op., at 10–11). And if we look beyond the phrasing employed in the Airline Deregulation Act's preemption provision, it is clear that this provision operates just like any other federal law with preemptive effect. It confers on private entities (*i.e.*, covered carriers) a federal right to engage in certain conduct subject only to certain (federal) constraints.

"Field preemption" operates in the same way. Field preemption occurs when federal law occupies a "field" of regulation "so comprehensively that it has left no room for supplementary state legislation." *R. J. Reynolds Tobacco Co.* v. *Durham County*, 479 U. S. 130, 140 (1986). In describing field preemption, we have sometimes used the same sort of shorthand employed by Congress in express preemption provisions. See, *e.g.*, *Oneok, Inc.* v. *Learjet, Inc.,* 575 U. S. ___, ___ (2015) (slip op., at 2) ("Congress has forbidden the State to take action in the *field* that the federal statute pre-empts"). But in substance, field preemption does not involve congressional commands to the States. Instead, like all other forms of preemption, it concerns a clash between a constitutional exercise of Congress's legislative power and conflicting state law. See *Crosby* v. *National Foreign Trade Council*, 530 U. S. 363, 372, n. 6 (2000).

The Court's decision in *Arizona* v. *United States*, 567 U. S. 387 (2012), shows how this works. Noting that federal statutes "provide a full set of standards governing alien registration," we concluded that these laws "reflect[] a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Id.*, at 401. What this means is that the federal registration provisions not only impose federal registration obligations on aliens but also confer a federal right to be free from any other registration requirements.

In sum, regardless of the language sometimes used by Congress and this Court, every form of preemption is

based on a federal law that regulates the conduct of private actors, not the States.

Once this is understood, it is clear that the PASPA provision prohibiting state authorization of sports gambling is not a preemption provision because there is no way in which this provision can be understood as a regulation of private actors. It certainly does not confer any federal rights on private actors interested in conducting sports gambling operations. (It does not give them a federal right to engage in sports gambling.) Nor does it impose any federal restrictions on private actors. If a private citizen or company started a sports gambling operation, either with or without state authorization, §3702(1) would not be violated and would not provide any ground for a civil action by the Attorney General or any other party. Thus, there is simply no way to understand the provision prohibiting state authorization as anything other than a direct command to the States. And that is exactly what the anticommandeering rule does not allow.

In so holding, we recognize that a closely related provision of PASPA, §3702(2), *does* restrict private conduct, but that is not the provision challenged by petitioners. In Part VI–B–2, *infra*, we consider whether §3702(2) is severable from the provision directly at issue in these cases.

## VI

Having concluded that §3702(1) violates the anti-commandeering doctrine, we consider two additional questions: first, whether the decision below should be affirmed on an alternative ground and, second, whether our decision regarding the anti-authorization provision dooms the remainder of PASPA.

## A

Respondents and the United States argue that, even if we disagree with the Third Circuit's decision regarding

Opinion of the Court

the constitutionality of the anti-authorization provision, we should nevertheless affirm based on PASPA's prohibition of state "licens[ing]" of sports gambling. Brief for Respondents 43, n. 10; Brief for United States 34–35. Although New Jersey's 2014 Act does not expressly provide for the licensing of sports gambling operations, respondents and the United States contend that the law effectively achieves that result because the only entities that it authorizes to engage in that activity, *i.e.*, casinos and racetracks, are already required to be licensed. *Ibid.*

We need not decide whether the 2014 Act violates PASPA's prohibition of state "licens[ing]" because that provision suffers from the same defect as the prohibition of state authorization. It issues a direct order to the state legislature.[29] Just as Congress lacks the power to order a state legislature not to enact a law authorizing sports gambling, it may not order a state legislature to refrain from enacting a law licensing sports gambling.[30]

## B

We therefore turn to the question whether, as petitioners maintain, our decision regarding PASPA's prohibition of the authorization and licensing of sports gambling operations dooms the remainder of the Act. In order for other PASPA provisions to fall, it must be "evident that

———————

[29] Even if the prohibition of state licensing were not itself unconstitutional, we do not think it could be severed from the invalid provision forbidding state authorization. The provision of PASPA giving New Jersey the option of legalizing sports gambling within one year of enactment applied only to casinos operated "pursuant to a comprehensive system of State regulation." §3704(a)(3)(B). This shows that Congress preferred tightly regulated sports gambling over total deregulation.

[30] The dissent apparently disagrees with our holding that the provisions forbidding state authorization and licensing violate the anticommandering principle, but it provides no explanation for its position.

[Congress] would not have enacted those provisions which are within its power, independently of [those] which [are] not." *Alaska Airlines, Inc.* v. *Brock,* 480 U. S. 678, 684 (1987) (internal quotation marks omitted). In conducting that inquiry, we ask whether the law remains "fully operative" without the invalid provisions, *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 509 (2010) (internal quotation marks omitted), but "we cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole," *Railroad Retirement Bd.* v. *Alton R. Co.*, 295 U. S. 330, 362 (1935). We will consider each of the provisions at issue separately.

### 1

Under 28 U. S. C. §3702(1), States are prohibited from "operat[ing]," "sponsor[ing]," or "promot[ing]" sports gambling schemes. If the provisions prohibiting state authorization and licensing are stricken but the prohibition on state "operat[ion]" is left standing, the result would be a scheme sharply different from what Congress contemplated when PASPA was enacted. At that time, Congress knew that New Jersey was considering the legalization of sports gambling in the privately owned Atlantic City casinos and that other States were thinking about the institution of state-run sports lotteries. PASPA addressed both of these potential developments. It gave New Jersey one year to legalize sports gambling in Atlantic City but otherwise banned the authorization of sports gambling in casinos, and it likewise prohibited the spread of state-run lotteries. If Congress had known that States would be free to authorize sports gambling in privately owned casinos, would it have nevertheless wanted to prevent States from running sports lotteries?

That seems most unlikely. State-run lotteries, which sold tickets costing only a few dollars, were thought more

Opinion of the Court

benign than other forms of gambling, and that is why they had been adopted in many States. Casino gambling, on the other hand, was generally regarded as far more dangerous. A gambler at a casino can easily incur heavy losses, and the legalization of privately owned casinos was known to create the threat of infiltration by organized crime, as Nevada's early experience had notoriously shown.[31] To the Congress that adopted PASPA, legalizing sports gambling in privately owned casinos while prohibiting state-run sports lotteries would have seemed exactly backwards.

Prohibiting the States from engaging in commercial activities that are permitted for private parties would also have been unusual, and it is unclear what might justify such disparate treatment. Respondents suggest that Congress wanted to prevent States from taking steps that the public might interpret as the endorsement of sports gambling, Brief for Respondents 39, but we have never held that the Constitution permits the Federal Government to prevent a state legislature from expressing its views on subjects of public importance. For these reasons, we do not think that the provision barring state operation of sports gambling can be severed.

We reach the same conclusion with respect to the provisions prohibiting state "sponsor[ship]" and "promot[ion]." The line between authorization, licensing, and operation, on the one hand, and sponsorship or promotion, on the other, is too uncertain. It is unlikely that Congress would have wanted to prohibit such an ill-defined category of state conduct.

### 2

Nor do we think that Congress would have wanted to

---

[31] See Clary 84–102.

sever the PASPA provisions that prohibit a private actor from "sponsor[ing]," "operat[ing]," or "promot[ing]" sports gambling schemes "pursuant to" state law. §3702(2). These provisions were obviously meant to work together with the provisions in §3702(1) that impose similar restrictions on governmental entities. If Congress had known that the latter provisions would fall, we do not think it would have wanted the former to stand alone.

The present cases illustrate exactly how Congress must have intended §3702(1) and §3702(2) to work. If a State attempted to authorize particular private entities to engage in sports gambling, the State could be sued under §3702(1), and the private entity could be sued at the same time under §3702(2). The two sets of provisions were meant to be deployed in tandem to stop what PASPA aimed to prevent: state legalization of sports gambling. But if, as we now hold, Congress lacks the authority to prohibit a State from legalizing sports gambling, the prohibition of private conduct under §3702(2) ceases to implement any coherent federal policy.

Under §3702(2), private conduct violates federal law only if it is permitted by state law. That strange rule is exactly the opposite of the general federal approach to gambling. Under 18 U. S. C. §1955, operating a gambling business violates federal law only if that conduct is illegal under state or local law. Similarly, 18 U. S. C. §1953, which criminalizes the interstate transmission of wagering paraphernalia, and 18 U. S. C. §1084, which outlaws the interstate transmission of information that assists in the placing of a bet on a sporting event, apply only if the underlying gambling is illegal under state law. See also 18 U. S. C. §1952 (making it illegal to travel in interstate commerce to further a gambling business that is illegal under applicable state law).

These provisions implement a coherent federal policy: They respect the policy choices of the people of each State

Opinion of the Court

on the controversial issue of gambling. By contrast, if
§3702(2) is severed from §3702(1), it implements a per-
verse policy that undermines whatever policy is favored by
the people of a State. If the people of a State support the
legalization of sports gambling, federal law would make
the activity illegal. But if a State outlaws sports gam-
bling, that activity would be lawful under §3702(2). We do
not think that Congress ever contemplated that such a
weird result would come to pass.

PASPA's enforcement scheme reinforces this conclusion.
PASPA authorizes civil suits by the Attorney General and
sports organizations but does not make sports gambling a
federal crime or provide civil penalties for violations. This
enforcement scheme is suited for challenging state author-
ization or licensing or a small number of private opera-
tions, but the scheme would break down if a State broadly
decriminalized sports gambling. It is revealing that the
Congressional Budget Office estimated that PASPA would
impose "no cost" on the Federal Government, see S. Rep.
No. 102–248, p. 10 (1991), a conclusion that would certainly
be incorrect if enforcement required a multiplicity of
civil suits and applications to hold illegal bookies and other
private parties in contempt.[32]

3

The remaining question that we must decide is whether
the provisions of PASPA prohibiting the "advertis[ing]" of
sports gambling are severable. See §§3702(1)–(2). If these
provisions were allowed to stand, federal law would forbid
the advertising of an activity that is legal under both

---

[32] Of course, one need not rely on the Senate Report for the com-
monsense proposition that leaving §3702(2) in place could wildly
change the fiscal calculus, "giv[ing] it an effect altogether different from
that sought by the measure viewed as a whole." *Railroad Retirement
Bd.* v. *Alton R. Co.*, 295 U. S. 330, 362 (1935).

federal and state law, and that is something that Congress has rarely done. For example, the advertising of cigarettes is heavily regulated but not totally banned. See Federal Cigarette Labeling and Advertising Act, 79 Stat. 282; Family Smoking Prevention and Tobacco Control Act, §§201–204, 123 Stat. 1842–1848.

It is true that at one time federal law prohibited the use of the mail or interstate commerce to distribute advertisements of lotteries that were permitted under state law, but that is no longer the case. See *United States* v. *Edge Broadcasting Co.*, 509 U. S. 418, 421–423 (1993). In 1975, Congress passed a new statute, codified at 18 U. S. C. §1307, that explicitly *exempts* print advertisements regarding a lottery lawfully conducted by States, and in *Greater New Orleans Broadcasting Assn., Inc.* v. *United States*, 527 U. S. 173, 176 (1999), we held that the First Amendment protects the right of a radio or television station in a State with a lottery to run such advertisements. In light of these developments, we do not think that Congress would want the advertising provisions to stand if the remainder of PASPA must fall.

For these reasons, we hold that no provision of PASPA is severable from the provision directly at issue in these cases.

*      *      *

The legalization of sports gambling is a controversial subject. Supporters argue that legalization will produce revenue for the States and critically weaken illegal sports betting operations, which are often run by organized crime. Opponents contend that legalizing sports gambling will hook the young on gambling, encourage people of modest means to squander their savings and earnings, and corrupt professional and college sports.

The legalization of sports gambling requires an important policy choice, but the choice is not ours to make.

Opinion of the Court

Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own. Our job is to interpret the law Congress has enacted and decide whether it is consistent with the Constitution. PASPA is not. PASPA "regulate[s] state governments' regulation" of their citizens, *New York*, 505 U. S., at 166. The Constitution gives Congress no such power.

The judgment of the Third Circuit is reversed.

*It is so ordered.*

Cite as: 584 U. S. ____ (2018) 1

THOMAS, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 16–476 and 16–477

_____

PHILIP D. MURPHY, GOVERNOR OF NEW
JERSEY, ET AL., PETITIONERS
16–476              *v.*
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, ET AL.

NEW JERSEY THOROUGHBRED HORSEMEN'S
ASSOCIATION, INC., PETITIONER
16–477              *v.*
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 14, 2018]

JUSTICE THOMAS, concurring.

I join the Court's opinion in its entirety. I write separately, however, to express my growing discomfort with our modern severability precedents.

I agree with the Court that the Professional and Amateur Sports Protection Act (PASPA) exceeds Congress' Article I authority to the extent it prohibits New Jersey from "authoriz[ing]" or "licens[ing]" sports gambling, 28 U. S. C. §3702(1). Unlike the dissent, I do "doubt" that Congress can prohibit sports gambling that does not cross state lines. *Post,* at 2 (opinion of GINSBURG, J.); see *License Tax Cases,* 5 Wall. 462, 470–471 (1867) (holding that Congress has "no power" to regulate "the internal commerce or domestic trade of the States," including the intrastate sale of lottery tickets); *United States* v. *Lopez,*

514 U. S. 549, 587–601 (1995) (THOMAS, J., concurring)
(documenting why the Commerce Clause does not permit
Congress to regulate purely local activities that have a
substantial effect on interstate commerce). But even
assuming the Commerce Clause allows Congress to pro-
hibit intrastate sports gambling "directly," it "does not
authorize Congress to regulate state governments' regula-
tion of interstate commerce." *New York* v. *United States*,
505 U. S. 144, 166 (1992). The Necessary and Proper
Clause does not give Congress this power either, as a law
is not "proper" if it "subvert[s] basic principles of federal-
ism and dual sovereignty." *Gonzales* v. *Raich*, 545 U. S. 1,
65 (2005) (THOMAS, J., dissenting). Commandeering the
States, as PASPA does, subverts those principles. See
*Printz* v. *United States*, 521 U. S. 898, 923–924 (1997).

Because PASPA is at least partially unconstitutional,
our precedents instruct us to determine "which portions of
the . . . statute we must sever and excise." *United States*
v. *Booker*, 543 U. S. 220, 258 (2005) (emphasis deleted).
The Court must make this severability determination by
asking a counterfactual question: "'Would Congress still
have passed' the valid sections 'had it known' about the
constitutional invalidity of the other portions of the stat-
ute?" *Id.,* at 246 (quoting *Denver Area Ed. Telecommuni-
cations Consortium, Inc.* v. *FCC*, 518 U. S. 727, 767 (1996)
(plurality opinion)). I join the Court's opinion because it
gives the best answer it can to this question, and no party
has asked us to apply a different test. But in a future
case, we should take another look at our severability
precedents.

Those precedents appear to be in tension with traditional
limits on judicial authority. Early American courts did
not have a severability doctrine. See Walsh, Partial Un-
constitutionality, 85 N. Y. U. L. Rev. 738, 769 (2010)
(Walsh). They recognized that the judicial power is, fun-
damentally, the power to render judgments in individual

THOMAS, J., concurring

cases. See *id.*, at 755; Baude, The Judgment Power, 96 Geo. L. J. 1807, 1815 (2008). Judicial review was a by-product of that process. See generally P. Hamburger, Law and Judicial Duty (2008); Prakash & Yoo, The Origins of Judicial Review, 70 U. Chi. L. Rev. 887 (2003). As Chief Justice Marshall famously explained, "[i]t is emphatically the province and duty of the judicial department to say what the law is" because "[t]hose who apply the rule to particular cases, must of necessity expound and interpret that rule." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). If a plaintiff relies on a statute but a defendant argues that the statute conflicts with the Constitution, then courts must resolve that dispute and, if they agree with the defendant, follow the higher law of the Constitution. See *id.,* at 177–178; The Federalist No. 78, p. 467 (C. Rossiter ed. 1961) (A. Hamilton). Thus, when early American courts determined that a statute was unconstitutional, they would simply decline to enforce it in the case before them. See Walsh 755–766. "[T]here was no 'next step' in which courts inquired into whether the legislature would have preferred no law at all to the constitutional remainder." *Id.*, at 777.

Despite this historical practice, the Court's modern cases treat the severability doctrine as a "remedy" for constitutional violations and ask which provisions of the statute must be "excised." See, *e.g., Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 329 (2006); *Booker, supra*, at 245; *Alaska Airlines, Inc.* v. *Brock*, 480 U. S. 678, 686 (1987). This language cannot be taken literally. Invalidating a statute is not a "remedy," like an injunction, a declaration, or damages. See Harrison, Severability, Remedies, and Constitutional Adjudication, 83 Geo. Wash. L. Rev. 56, 82–88 (2014) (Harrison). Remedies "operate with respect to specific parties," not "on legal rules in the abstract." *Id.*, at 85; see also *Massachusetts* v. *Mellon*, 262 U. S. 447, 488 (1923) (explaining that

4        MURPHY *v.* NATIONAL COLLEGIATE ATHLETIC ASSN.

THOMAS, J., concurring

the power "to review and annul acts of Congress" is "little more than the negative power to disregard an unconstitutional enactment" and that "the court enjoins . . . not the execution of the statute, but the acts of the official"). And courts do not have the power to "excise" or "strike down" statutes. See 39 Op. Atty. Gen. 22, 22–23 (1937) ("The decisions are practically in accord in holding that the courts have no power to repeal or abolish a statute"); Harrison 82 ("[C]ourts do not make [nonseverable] provisions inoperative . . . . Invalidation by courts is a figure of speech"); Mitchell, The Writ-of-Erasure Fallacy, 104 Va. L. Rev. (forthcoming 2018) (manuscript, at 4) ("The federal courts have no authority to erase a duly enacted law from the statute books"), online at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3158038 (as last visited May 11, 2018).

Because courts cannot take a blue pencil to statutes, the severability doctrine must be an exercise in statutory interpretation. In other words, the severability doctrine has courts decide how a statute operates once they conclude that part of it cannot be constitutionally enforced. See Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1333–1334 (2000); Harrison 88. But even under this view, the severability doctrine is still dubious for at least two reasons.

First, the severability doctrine does not follow basic principles of statutory interpretation. Instead of requiring courts to determine what a statute means, the severability doctrine requires courts to make "a nebulous inquiry into hypothetical congressional intent." *Booker*, *supra*, at 320, n. 7 (THOMAS, J., dissenting in part). It requires judges to determine what Congress would have intended had it known that part of its statute was unconstitutional.* But

––––––––

*The first court to engage in this counterfactual exploration of legislative intent was the Massachusetts Supreme Judicial Court in *Warren*

THOMAS, J., concurring

it seems unlikely that the enacting Congress had any intent on this question; Congress typically does not pass statutes with the expectation that some part will later be deemed unconstitutional. See Walsh 740–741; Stern, Separability and Separability Clauses in the Supreme Court, 51 Harv. L. Rev. 76, 98 (1937) (Stern). Without any actual evidence of intent, the severability doctrine invites courts to rely on their own views about what the best statute would be. See Walsh 752–753; Stern 112–113. More fundamentally, even if courts could discern Congress' hypothetical intentions, intentions do not count unless they are enshrined in a text that makes it through the constitutional processes of bicameralism and presentment. See *Wyeth* v. *Levine*, 555 U. S. 555, 586–588 (2009) (THOMAS, J., concurring in judgment). Because we have "'a Government of laws, not of men,'" we are governed by "legislated text," not "legislators' intentions"—and especially not legislators' *hypothetical* intentions. *Zuni Public School Dist. No. 89* v. *Department of Education*, 550 U. S. 81, 119 (2007) (Scalia, J., dissenting). Yet hypothetical intent is exactly what the severability doctrine turns on, at least when Congress has not expressed its fallback position in the text.

Second, the severability doctrine often requires courts to weigh in on statutory provisions that no party has standing to challenge, bringing courts dangerously close to issuing advisory opinions. See Stern 77; Lea, Situational Severability, 103 Va. L. Rev. 735, 788–803 (2017) (Lea). If one provision of a statute is deemed unconstitutional, the severability doctrine places every other provision at risk of

─────────

v. *Mayor and Aldermen of Charlestown*, 68 Mass. 84, 99 (1854). This Court adopted the *Warren* formulation in the late 19th century, see *Allen* v. *Louisiana*, 103 U. S. 80, 84 (1881), an era when statutory interpretation privileged Congress' unexpressed "intent" over the enacted text, see, *e.g., Church of Holy Trinity* v. *United States*, 143 U. S. 457, 472 (1892); *United States* v. *Moore*, 95 U. S. 760, 763 (1878).

6 MURPHY *v.* NATIONAL COLLEGIATE ATHLETIC ASSN.

THOMAS, J., concurring

being declared nonseverable and thus inoperative; our precedents do not ask whether the plaintiff has standing to challenge those other provisions. See *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 696–697 (2012) (joint dissent) (citing, as an example, *Williams* v. *Standard Oil Co. of La.*, 278 U. S. 235, 242–244 (1929)). True, the plaintiff had standing to challenge the unconstitutional part of the statute. But the severability doctrine comes into play only *after* the court has resolved that issue—typically the only live controversy between the parties. In every other context, a plaintiff must demonstrate standing for each part of the statute that he wants to challenge. See Lea 789, 751, and nn. 79–80 (citing, as examples, *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 733–734 (2008); *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 346, 350–353 (2006)). The severability doctrine is thus an unexplained exception to the normal rules of standing, as well as the separation-of-powers principles that those rules protect. See *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 101 (1998).

In sum, our modern severability precedents are in tension with longstanding limits on the judicial power. And, though no party in this case has asked us to reconsider these precedents, at some point, it behooves us to do so.

Cite as: 584 U. S. ____ (2018)          1

Opinion of BREYER, J.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 16–476 and 16–477

————

PHILIP D. MURPHY, GOVERNOR OF NEW
JERSEY, ET AL., PETITIONERS
16–476                 *v.*
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, ET AL.

NEW JERSEY THOROUGHBRED HORSEMEN'S
ASSOCIATION, INC., PETITIONER
16–477                 *v.*
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 14, 2018]

JUSTICE BREYER, concurring in part and dissenting in part.

I agree with JUSTICE GINSBURG that 28 U. S. C. §3702(2) is severable from the challenged portion of §3702(1). The challenged part of subsection (1) prohibits a State from "author[izing]" or "licens[ing]" sports gambling schemes; subsection (2) prohibits individuals from "spon-sor[ing], operat[ing], advertis[ing], or promot[ing]" sports gambling schemes "pursuant to the law . . . of a govern-mental entity." The first says that a State cannot author-ize sports gambling schemes under state law; the second says that (just in case a State finds a way to do so) sports gambling schemes that a State authorizes are unlawful under federal law regardless. As JUSTICE GINSBURG makes clear, the latter section can live comfortably on its

2    MURPHY *v.* NATIONAL COLLEGIATE ATHLETIC ASSN.

Opinion of BREYER, J.

own without the first.

Why would Congress enact both these provisions? The obvious answer is that Congress wanted to "keep sports gambling from spreading." S. Rep. No. 102–248, pp. 4–6 (1991). It feared that widespread sports gambling would "threate[n] to change the nature of sporting events from wholesome entertainment for all ages to devices for gambling." *Id.,* at 4. And it may have preferred that state authorities enforce state law forbidding sports gambling than require federal authorities to bring civil suits to enforce federal law forbidding about the same thing. Alternatively, Congress might have seen subsection (2) as a backup, called into play if subsection (1)'s requirements, directed to the States, turned out to be unconstitutional— which, of course, is just what has happened. Neither of these objectives is unreasonable.

So read, the two subsections both forbid sports gambling but §3702(2) applies federal policy directly to individuals while the challenged part of §3702(1) forces the States to prohibit sports gambling schemes (thereby shifting the burden of enforcing federal regulatory policy from the Federal Government to state governments). Section 3702(2), addressed to individuals, standing alone seeks to achieve Congress' objective of halting the spread of sports gambling schemes by "regulat[ing] interstate commerce directly." *New York* v. *United States*, 505 U. S. 144, 166 (1992). But the challenged part of subsection (1) seeks the same end indirectly by "regulat[ing] state governments' regulation of interstate commerce." *Ibid.* And it does so by addressing the States (not individuals) directly and telling state legislatures what laws they must (or cannot) enact. Under our precedent, the first provision (directly and unconditionally telling States what laws they must enact) is unconstitutional, but the second (directly telling individuals what they cannot do) is not. See *ibid.*

As so interpreted, the statutes would make New Jersey's

Opinion of BREYER, J.

victory here mostly Pyrrhic.  But that is because the only problem with the challenged part of §3702(1) lies in its means, not its end.  Congress has the constitutional power to prohibit sports gambling schemes, and no party here argues that there is any constitutional defect in §3702(2)'s alternative means of doing so.

I consequently join JUSTICE GINSBURG's dissenting opinion in part, and all but Part VI–B of the Court's opinion.

Cite as: 584 U. S. \_\_\_\_ (2018)          1

GINSBURG, J., dissenting

# SUPREME COURT OF THE UNITED STATES

————

Nos. 16–476 and 16–477

————

PHILIP D. MURPHY, GOVERNOR OF NEW
JERSEY, ET AL., PETITIONERS
16–476            *v.*
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, ET AL.


NEW JERSEY THOROUGHBRED HORSEMEN'S
ASSOCIATION, INC., PETITIONER
16–477            *v.*
NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, ET AL.

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE THIRD CIRCUIT

[May 14, 2018]

JUSTICE GINSBURG, with whom JUSTICE SOTOMAYOR
joins, and with whom JUSTICE BREYER joins in part,
dissenting.

The petition for certiorari filed by the Governor of New
Jersey invited the Court to consider a sole question: "Does
a federal statute that prohibits modification or repeal of
state-law prohibitions on private conduct impermissibly
commandeer the regulatory power of States in contraven-
tion of *New York* v. *United States*, 505 U. S. 144 (1992)?"
Pet. for Cert. in No. 16–476, p. i.

Assuming, *arguendo*, a "yes" answer to that question,
there would be no cause to deploy a wrecking ball destroy-
ing the Professional and Amateur Sports Protection Act
(PASPA) in its entirety, as the Court does today. Leaving
out the alleged infirmity, *i.e.,* "commandeering" state

GINSBURG, J., dissenting

regulatory action by prohibiting the States from "authoriz[ing]" and "licens[ing]" sports-gambling schemes, 28 U. S. C. §3702(1), two federal edicts should remain intact. First, PASPA bans States themselves (or their agencies) from "sponsor[ing], operat[ing], advertis[ing], [or] promot[ing]" sports-gambling schemes. *Ibid.* Second, PASPA stops private parties from "sponsor[ing], operat[ing], advertis[ing], or promot[ing]" sports-gambling schemes if state law authorizes them to do so. §3702(2).[1] Nothing in these §3702(1) and §3702(2) prohibitions commands States to do anything other than desist from conduct federal law proscribes.[2] Nor is there any doubt that Congress has power to regulate gambling on a nationwide basis, authority Congress exercised in PASPA. See *Gonzales* v. *Raich*, 545 U. S. 1, 17 (2005) ("Our case law firmly establishes Congress' power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce.").

Surely, the accountability concern that gave birth to the anticommandeering doctrine is not implicated in any federal proscription other than the bans on States' authorizing and licensing sports-gambling schemes. The concern triggering the doctrine arises only "where the Federal Government compels States to regulate" or to enforce federal law, thereby creating the appearance that state officials are responsible for policies Congress forced them to enact. *New York* v. *United States*, 505 U. S. 144, 168 (1992). If States themselves and private parties may not

––––––––––

[1] PASPA was not designed to eliminate any and all sports gambling. The statute targets sports-gambling *schemes*, *i.e.*, organized markets for sports gambling, whether operated by a State or by a third party under state authorization.

[2] In lieu of a flat ban, PASPA prohibits third parties from operating sports-gambling schemes only if state law permits them to do so. If a state ban is in place, of course, there is no need for a federal proscription.

GINSBURG, J., dissenting

operate sports-gambling schemes, responsibility for the proscriptions is hardly blurred. It cannot be maintained credibly that state officials have anything to do with the restraints. Unmistakably, the foreclosure of sports-gambling schemes, whether state run or privately operated, is chargeable to congressional, not state, legislative action.

When a statute reveals a constitutional flaw, the Court ordinarily engages in a salvage rather than a demolition operation: It "limit[s] the solution [to] severing any problematic portions while leaving the remainder intact." *Free Enterprise Fund* v. *Public Company Accounting Oversight Bd.*, 561 U. S. 477, 508 (2010) (internal quotation marks omitted). The relevant question is whether the Legislature would have wanted unproblematic aspects of the legislation to survive or would want them to fall along with the infirmity.[3] As the Court stated in *New York*, "[u]nless it is evident that the Legislature would not have enacted those provisions which are within its power, . . . the invalid part may be dropped if what is left is fully operative as a law." 505 U. S., at 186 (internal quotation marks omitted). Here, it is scarcely arguable that Congress "would have preferred no statute at all," *Executive Benefits Ins. Agency* v. *Arkison*, 573 U. S. ___, ___ (2014) (slip op., at 10), over one that simply stops States and private parties alike from operating sports-gambling schemes.

The Court wields an ax to cut down §3702 instead of using a scalpel to trim the statute. It does so apparently in the mistaken assumption that private sports-gambling schemes would become lawful in the wake of its decision.

––––––––––

[3] Notably, in the two decisions marking out and applying the anti-commandeering doctrine to invalidate federal law, the Court invalidated only the offending provision, not the entire statute. *New York* v. *United States*, 505 U. S. 144, 186–187 (1992); *Printz* v. *United States*, 521 U. S. 898, 935 (1997).

In particular, the Court holds that the prohibition on state "operat[ion]" of sports-gambling schemes cannot survive, because it does not believe Congress would have "wanted to prevent States from running sports lotteries" "had [it] known that States would be free to authorize sports gambling in privately owned casinos." *Ante,* at 26. In so reasoning, the Court shutters §3702(2), under which private parties are prohibited from operating sports-gambling schemes *precisely when state law authorizes them to do so.*[4]

This plain error pervasively infects the Court's severability analysis. The Court strikes Congress' ban on state "sponsor[ship]" and "promot[ion]" of sports-gambling schemes because it has (mistakenly) struck Congress' prohibition on state "operat[ion]" of such schemes. See *ante,* at 27. It strikes Congress' prohibitions on private "sponsor[ship]," "operat[ion]," and "promot[ion]" of sports-gambling schemes because it has (mistakenly) struck those same prohibitions on the States. See *ante,* at 27–28. And it strikes Congress' prohibition on "advertis[ing]" sports-gambling schemes because it has struck everything else. See *ante,* at 29–30.

*       *       *

In PASPA, shorn of the prohibition on modifying or repealing state law, Congress permissibly exercised its authority to regulate commerce by instructing States and private parties to refrain from operating sports-gambling schemes. On no rational ground can it be concluded that Congress would have preferred no statute at all if it could

_____

[4]As earlier indicated, see *supra,* at 2, direct federal regulation of sports-gambling schemes nationwide, including private-party schemes, falls within Congress' power to regulate activities having a substantial effect on interstate commerce. See *Gonzales* v. *Raich,* 545 U. S. 1, 17 (2005). Indeed, according to the Court, direct regulation is precisely what the anticommandeering doctrine requires. *Ante,* at 14–18.

GINSBURG, J., dissenting

not prohibit States from authorizing or licensing such schemes. Deleting the alleged "commandeering" directions would free the statute to accomplish just what Congress legitimately sought to achieve: stopping sports-gambling regimes while making it clear that the stoppage is attributable to federal, not state, action. I therefore dissent from the Court's determination to destroy PASPA rather than salvage the statute.