## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **THE CITY OF CHICAGO,** | |
| *Plaintiff,* | |
| v. | Civil Action No. 1:17-cv-5720 |
| | Hon. Harry D. Leinenweber |
| **JEFFERSON BEAUREGARD SESSIONS III,** | |
| **Attorney General of the United States** | |
| *Defendant.* | |

### CHICAGO'S REPLY IN SUPPORT OF MOTION FOR LEAVE TO CITE SUPPLEMENTAL AUTHORITY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND REQUEST FOR DECISION PURSUANT TO LOCAL RULE 78.5

The Attorney General agrees that *Murphy v. National Collegiate Athletic Association* ("*NCAA*"), 138 S. Ct. 1461 (2018), is relevant and argues only that it is not controlling here. In so doing, he all but ignores the holding of *NCAA* on which Chicago principally relies: Congress can unconstitutionally commandeer state and local officials by imposing either an affirmative obligation or a negative prohibition. That holding directly implicates this Court's analysis of the Section 1373 compliance condition in its decision on Chicago's motion for a preliminary injunction, and it is determinative as to Chicago's pending motion for summary judgment on that condition. The Attorney General's arguments to the contrary are meritless. Indeed, Judge Baylson rejected those same arguments earlier this week, holding that *NCAA* supports the conclusion that the compliance condition violates the Tenth Amendment. Mem. Op. ("*Philadelphia* Op."), *City of Philadelphia v. Sessions*, No. 17-cv-3894 (E.D. Pa. June 6, 2018), ECF No. 224 at 58-65.

First, the Attorney General's suggestion (at 1) that the facial validity of 8 U.S.C. § 1373 is "not legitimately before the Court" is simply wrong. This Court already rejected similar arguments in ruling on Chicago's motion for preliminary injunction, when it in fact reached the merits of

Chicago's commandeering arguments. *See* Dkt. 78 at 25-26. As Chicago explained both then and repeatedly throughout the course of this litigation, Section 1373 is not an "applicable federal law" under Section 10153(a)(5)(D) because it is unconstitutional under the anticommandeering doctrine. *See, e.g.*, Dkt. 152 at 8. At bottom, the Attorney General cannot condition grant funding on compliance with an unconstitutional statute; accordingly, the question whether the Attorney General has the statutory authority to impose the compliance condition has always turned on whether Section 1373 is facially constitutional. Whether the Attorney General's imposition of the compliance condition is *also* unconstitutional under the Spending Clause, Resp. 2, is beside the point. *See also Philadelphia* Op. 61 (rejecting argument that "the Spending Clause provides the appropriate rubric of analyzing" Philadelphia's challenge to the compliance condition).

Second, despite the Attorney General's attempts to explain away the Supreme Court's holding, *NCAA* is directly on point and supports Chicago's motion for summary judgment. The Attorney General first claims (at 2-3) that Section 1373, unlike the Professional Amateur Sports Protection Act of 1992 ("PASPA"), does not compel the state to enforce a federal regulatory program. That is wrong. Section 1373 effectively requires local law enforcement agencies to participate in federal immigration enforcement. As this Court explained, by prohibiting local governments from directing their employees not to devote time towards assisting in enforcement of federal immigration priorities, Section 1373 can "effectively thwart policymakers' ability to extricate their state or municipality from involvement in a federal program." Dkt. 78 at 34-35; *see also New York v. United States*, 505 U.S. 144, 177-178 (1992) (federal statutes must provide States and localities with the option to "decline to administer the federal program").

The requirements imposed by Section 1373 implicate each of the purposes of the anticommandeering doctrine identified in *NCAA*. As an initial matter, Section 1373 enmeshes state and local law enforcement officers in federal immigration enforcement, with the effect of

"blurr[ing]" "responsibility for the benefits and the burdens of the regulation." *NCAA*, 138 S. Ct. at 1477. Chicago, like other cities and States around the country, has made the considered determination "that their local law enforcement efforts are handcuffed by … unbounded cooperation with immigration enforcement" because "persons who are here unlawfully—or who have friends or family members here unlawfully—might avoid contacting local police to report crimes as a witness or a victim if they fear that reporting will bring the scrutiny of the federal immigration authorities to their home." *Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018). Because Section 1373 prohibits Chicago from managing its own employees and requires the City to stand aside as its own law enforcement personnel carry out federal policies, Chicago is rightly concerned that residents will hold the City accountable for the enforcement of those federal policies. *See Printz v. United States*, 521 U.S. 898, 930 (1997) (imposing federal policy by commandeering local governments means local governments are "put in the position of taking the blame for [a federal policy's] burdensomeness and for its defects"). Indeed, the Welcoming City Ordinance was motivated in significant part by Chicago's desire to make clear to its residents that Chicago employees generally do not participate in the enforcement of federal civil immigration law. *See, e.g.* Dkt. 153 ¶¶ 5-7. In light of Section 1373's forced integration of local law enforcement into the federal immigration-enforcement apparatus, the federal government cannot be said to "retain[] full responsibility and accountability for its actions" under Section 1373. Resp. 2.

Section 1373 also contravenes the two other purposes of the anticommandeering doctrine highlighted in *NCAA* (neither of which the Attorney General even addresses): "prevent[ing] Congress from shifting the costs of regulation to the States" and "'reduc[ing] the risk of tyranny and abuse from either front.'" *NCAA*, 138 S. Ct. at 1477 (quoting *New York*, 505 U.S. at 181-182) (alterations omitted). Section 1373 expands the reach of federal immigration-enforcement agents by enabling their reliance on state and local law enforcement and preventing States and local

governments from redirecting their officers to local priorities. In so doing, it makes "tyranny and abuse" from an enlarged federal government more likely—and forces States and local governments to bear the costs of federal immigration enforcement (both monetary and non-monetary). *See Printz*, 521 U.S. at 930 ("By forcing state governments to absorb the financial burden of implementing a federal regulatory program, Members of Congress can take credit for 'solving' problems without having to ask their constituents to pay for the solutions with higher federal taxes.").

Third, the Attorney General is wrong to suggest (at 3-4) that Section 1373 is constitutional even after *NCAA* because it merely prevents States and local governments from interfering with the federal government's enforcement of federal law. As the Seventh Circuit noted in upholding this Court's preliminary injunction, Chicago's Welcoming City Ordinance "does not interfere in any way with the federal government's lawful pursuit of its civil immigration activities," and in fact the "federal government can and does freely operate in 'sanctuary' localities" like Chicago. *Sessions*, 888 F.3d at 281. As already discussed, far from interfering with federal enforcement of federal laws, Chicago has simply attempted to remove itself from the sphere of enforcing civil immigration law altogether. Section 1373, by contrast, requires local governments not just to refrain from interference, but to grin and bear it as the time and resources of their employees is devoted towards the enforcement of federal immigration priorities.[1]

Fourth, the Attorney General suggests that Section 1373 is distinguishable from *NCAA* because it simply involves "an information-access component of a regulatory scheme." Resp. 2. That suggestion is wrong for two reasons. First, as discussed above, Section 1373 does not impose a

---

[1] Nor is it relevant to the commandeering inquiry that the underlying federal regulatory program at issue here touches on immigration policy. To be sure, the federal government can preempt States and local governments from enacting their own conflicting immigration policies. *See Arizona v. United States*, 132 S. Ct. 2492, 2506-2507 (2012). But the federal government may preempt local action only through the lawful exercise of federal power. And the constraints on federal power imposed by the Constitution's Federalist design apply with full force "[n]o matter how powerful the federal interest involved." *New York*, 505 U.S. at 178.

mere "information-access" requirement on state and local governments; rather, it prevents state and local governments from controlling their employees, and effectively requires state and local governments to permit employees to use paid time to pursue enforcement of federal immigration laws. Second, even considering Section 1373 as an "information-access" rule, such rules are not categorically immune from anticommandeering principles. No case has ever recognized that such an exception for information-access rules exists. *Printz*, the case the Attorney General cites for this supposed exception, suggested only that such an exception *might* exist for some subset of information-access rules. 521 U.S. at 918. And *Printz* itself makes clear that any exception for information-access rules would not apply to "information that belongs to the State and that is available to [law enforcement officers] only in their official capacity." *Id.* at 932 n.17; *see also Philadelphia* Op. 64 (rejecting Attorney General's "reli[ance] on dicta from *Printz*"). That is precisely the type of information Section 1373 requires cities and States to permit their law-enforcement officers to provide. Indeed, according to the Attorney General, such "information regarding … immigration status" includes an expansive swath of government-held information, including custody status, custody location, and release date. *See* Dkt. 139 at 19-20.

> *Reno v. Condon*, 528 U.S. 141 (2000) does not help the federal government. *Reno* involved a law that "applied equally to state and private actors" who controlled databases containing personal information provided in applications for driver's licenses. *NCAA*, 138 S. Ct. at 1479. That law neither "appl[ied] solely to States" nor sought to regulate the States as "States in their sovereign capacity"; it merely "regulate[d] the States as the owners of data bases." *Reno*, 528 U.S. at 142, 146, 151; *see also NCAA*, 138 S. Ct. at 1479. As the Court explained in *NCAA*, "the basis for" the decision in *Reno* was the "principle" that "[t]he anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." *Id.* at 1478. This case presents the opposite situation: Section 1373 is directed *specifically* to State and local

governments and seeks to alter one of the core aspects of their sovereignty, namely the ability to direct their officers or employees in the performance of their official duties.  *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  *Reno* is inapposite.  *See also Philadelphia* Op. 63 (the Attorney General's "reliance on *Reno* to support the constitutionality of Section 1373 is misplaced").

Finally, the Attorney General suggests (at 5) that this Court can disregard *NCAA*'s holding that there is no distinction between a positive demand and a negative prohibition because "that observation was not the fulcrum of the Court's decision."  But contrary to the Attorney General's suggestion, that holding *was* central to the Court's decision.  Both the United States and Respondents argued that the fact that PASPA merely prohibited certain state action immunized it against the anticommandeering rule.  The Court squarely rejected that contention and repeatedly emphasized that statutes imposing affirmative obligations and those imposing negative prohibitions are equally capable of offending anticommandeering principles.  *See, e.g.*, *NCAA*, 138 S. Ct. at 1477, 1478, 1479-1480.  The Court's holding that PASPA's provision "prohibiting state authorization of sports gambling … violates the anticommandeering rule" was thus at the heart of the Court's decision.  And in any event, that holding—whether or not the "fulcrum of the Court's decision"—bears directly on this Court's Tenth Amendment analysis, and its conclusion that "under current case law, … only affirmative demands on states constitute a violation of the Tenth Amendment." Dkt. 78 at 35.  In the absence of that limitation to affirmative demands, this Court stated at the preliminary injunction phase that Section 1373 would "implicate the logic" underlying the anticommandeering doctrine.  *Id.* at 34.  Now that "a higher court" has affirmed this Court's intuition and clearly expanded anticommandeering doctrine to reach negative prohibitions, this Court should declare Section 1373 unconstitutional and grant summary judgment in Chicago's favor as to the compliance condition.

June 7, 2018

JAMIE S. GORELICK (*pro hac vice*)
DAVID W. OGDEN (*pro hac vice*)
ARI HOLTZBLATT (*pro hac vice*)
ARI SAVITZKY (*pro hac vice*)
MOLLY JENNINGS (*pro hac vice*)
BRIDGET FAHEY* (*pro hac vice*)
JACK STARCHER (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

DEBO P. ADEGBILE (*pro hac vice*)
ADRIEL I. CEPEDA DERIEUX (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Admitted to practice only in Colorado.*
*Supervised by members of the firm who are members*
*of the District of Columbia Bar*

Respectfully Submitted,

By  /s/ Edward N. Siskel
EDWARD N. SISKEL
Corporation Counsel of the City of Chicago

JUSTIN A. HOUPPERT
Assistant Corporation Counsel
SCOTT D. SPEARS
Assistant Corporation Counsel
121 N. LaSalle Street, Suite 600
Chicago, IL 60602
(312) 744-0220
edward.siskel@cityofchicago.org

ANDREW W. WORSECK
Chief Assistant Corporation Counsel
30 N. LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-0220

RONALD S. SAFER
MATTHEW C. CROWL
NICK KAHLON
TAL CHAIKEN
LAURA KLEINMAN
RILEY SAFER HOLMES & CANCILA LLP
Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700

*Attorneys for the City of Chicago*

**CERTIFICATE OF SERVICE**

On the 7th day of June, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system.  Counsel for all parties are registered CM/ECF users and will be served by that system.

/s/  Edward N. Siskel

EDWARD N. SISKEL