## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

THE CITY OF CHICAGO,

        *Plaintiff,*

    v.

JEFFERSON BEAUREGARD SESSIONS III,
Attorney General of the United States

        *Defendant.*

Civil Action No. 1:17-cv-5720
Hon. Harry D. Leinenweber

## CHICAGO'S MOTION FOR LEAVE TO CITE SUPPLEMENTAL AUTHORITY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff City of Chicago respectfully moves for leave to cite the recent decision in *United States v. California*, No. 18-CV-490 (E.D. Cal. July 5, 2018) (attached as Ex. 1) ("*California*"), in support of its pending Motion for Partial Summary Judgment and Opposition to the Attorney General's Motion to Dismiss (Dkt Nos. 150, 152). The *California* court's recent decision on the United States' motion for a preliminary injunction addresses several key issues relevant to this Court's consideration of Chicago's motion for summary judgment, including Chicago's argument that the Section 1373 compliance condition is *ultra vires* and unlawful because Section 1373 violates the Tenth Amendment, and Chicago's argument that the City is in any event entitled to a declaratory judgment that it complies with Section 1373.

In support of this Motion, Chicago states as follows:

## I.    Section 1373 Is "Highly Suspect" After *Murphy v. NCAA*

In *California*, the United States sued the State of California, and sought to preliminarily enjoin California Senate Bill 54, which—similar to Chicago's Welcoming City Ordinance—prevents state law enforcement agencies from sharing certain information with federal officials for civil immigration enforcement purposes. The United States argued that Section 1373 preempts Senate

Bill 54. California countered that, after *Murphy v. National Collegiate Athletic Association* ("*NCAA*"), 138 S. Ct. 1461 (2018), Section 1373 is unconstitutional under the Tenth Amendment's anticommandeering doctrine. Like the district court in *City of Philadelphia v. Sessions*, 2018 WL 2725503, --- F. Supp. 3d --- (E.D. Pa. June 6, 2018), the *California* court agreed that Section 1373 "dictate[s] what states may and may not do, in contravention of the Tenth Amendment." Ex. 1 at 35. The court therefore found the "constitutionality of Section 1373" to be "highly suspect" and denied the United States' motion for a preliminary injunction—although it also declined to conclusively resolve the constitutionality of Section 1373 because it found that, even assuming Section 1373 is constitutional, the challenged California statute did not conflict with it. *Id.* at 35-36; *see also infra* Part II.

Between the *California* decision and the previous decision in the *Philadelphia* case, two courts have now concluded that, after *NCAA*, it is clear that anticommandeering principles reach negative prohibitions as well as affirmative obligations, and that Section 1373 imposes precisely that kind of impermissible prohibition on state and local governments. On that same basis, this Court should hold that Section 1373 is unconstitutional because it "dictate[s] what states may and may not do, in contravention of the Tenth Amendment." Ex. 1 at 35.

## II. The Attorney General's Reading of Section 1373 Is Contrary To The Plain Meaning of the Statute

As noted above, the district court in *California* declined to conclusively resolve the constitutionality of Section 1373 because it concluded that the United States' expansive reading of Section 1373 is untenable as a statutory matter. The United States argued—as it has in this case— that Section 1373's reference to "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" includes a virtually boundless category of information, included "information such as release dates and addresses." Ex. 1 at 37; *cf.* Dkt. 139 at 19-20. The *California* court again agreed with the *Philadelphia* decision, holding that "the plain meaning of Section 1373

limits its reach to information strictly pertaining to immigration status (*i.e.*, what one's immigration status is) and does not include information like release date and addresses." Ex. 1 at 38-39; *see Philadelphia*, 2018 WL 2725503, at *34. The United States' contrary reading, the court concluded, contravened the natural reading of the statutory text and "would know no bounds." Ex. 1 at 29.

As we explained in our motion for summary judgment, that interpretation of Section 1373 is correct. Dkt. 152 at 15-17. And under that interpretation, Chicago is entitled to a declaratory judgment that it complies with Section 1373.

WHEREFORE, Chicago respectfully requests leave to cite the attached *California* opinion as supplemental authority in support of its Motion for Partial Summary Judgment and its Opposition to the Attorney General's Motion to Dismiss.

July 13, 2018

JAMIE S. GORELICK (*pro hac vice*)
DAVID W. OGDEN (*pro hac vice*)
ARI HOLTZBLATT (*pro hac vice*)
ARI SAVITZKY (*pro hac vice*)
MOLLY JENNINGS (*pro hac vice*)
BRIDGET FAHEY* (*pro hac vice*)
JACK STARCHER (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
(202) 663-6000

DEBO P. ADEGBILE (*pro hac vice*)
ADRIEL I. CEPEDA DERIEUX (*pro hac vice*)
WILMER CUTLER PICKERING HALE
    AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

*Admitted to practice only in Colorado.*
*Supervised by members of the firm who are members*

Respectfully Submitted,

By  /s/ Edward N. Siskel
EDWARD N. SISKEL
Corporation Counsel of the City of Chicago

JUSTIN A. HOUPPERT
Assistant Corporation Counsel
SCOTT D. SPEARS
Assistant Corporation Counsel
121 N. LaSalle Street, Suite 600
Chicago, IL 60602
(312) 744-0220
edward.siskel@cityofchicago.org

ANDREW W. WORSECK
Chief Assistant Corporation Counsel
30 N. LaSalle Street, Suite 1230
Chicago, IL 60602
(312) 744-0220

RONALD S. SAFER
MATTHEW C. CROWL
NICK KAHLON
TAL CHAIKEN
LAURA KLEINMAN
RILEY SAFER HOLMES & CANCILA LLP

*of the District of Columbia Bar*

Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700

*Attorneys for the City of Chicago*

**CERTIFICATE OF SERVICE**

On the 13th day of July, 2018, I electronically filed the foregoing brief using the Court's CM/ECF system. Counsel for all parties are registered CM/ECF users and will be served by that system.

/s/  Edward N. Siskel

Edward N. Siskel

# Exhibit 1

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11   THE UNITED STATES OF AMERICA,       No.  2:18-cv-490-JAM-KJN

12            Plaintiff,

13       v.                              **ORDER RE: THE UNITED STATES OF
                                         AMERICA'S MOTION FOR PRELIMINARY**
14   STATE OF CALIFORNIA, et al.,        **INJUNCTION**

15            Defendants.

16

17               I.   INTRODUCTION

18       Before this Court is the United States of America's

19   ("Plaintiff" or "United States") Motion for a Preliminary

20   Injunction ("Motion").  Plaintiff seeks an Order from this Court

21   enjoining enforcement of certain provisions of three laws enacted

22   by the State of California ("Defendant" or "California")[1] through

23   Assembly Bill 103 ("AB 103"), Assembly Bill 450 ("AB 450") and

24   Senate Bill 54 ("SB 54").  Specifically, Plaintiff requests that

25   this Court preliminarily enjoin the following provisions of

26   _____

27   [1] Because Edmund Gerald Brown Jr., Governor of California, and
     Xavier Becerra, Attorney General of California, are sued in their
     official capacities only, the Court will address all three named
28   defendants as "California" or "Defendant."

                                  1

1    California law: (1) California Government Code Section 12532 (as

2    added by AB 103); (2) California Government Code Sections 7285.1

3    and 7285.2 and California Labor Code Sections 90.2 and 1019.2 as

4    applied to private employers only (as added by AB 450); and (3)

5    California Government Code Sections 7284.6(a)(1)(C),

6    7284.6(a)(1)(D), and 7284.6(a)(4) (as added by SB 54).  Plaintiff

7    claims that these statutes violate the Supremacy Clause of the

8    United States Constitution, Art. VI, cl.2, and are invalid.

9    Compl., ECF No. 1, ¶¶ 61, 63 & 65.  Plaintiff argues that federal

10   law preempts each provision because, in the area of immigration

11   enforcement, California "lacks the authority to intentionally

12   interfere with private citizens' [and state and local employees']

13   ability to cooperate voluntarily with the United States or to

14   comply with federal obligations."  Motion for Preliminary

15   Injunction ("Mot."), ECF No. 2-1, at 2.

16       Plaintiff also contends that California "has no authority to

17   target facilities holding federal detainees pursuant to a federal

18   contract for an inspection scheme to review the 'due process'

19   afforded during arrest and detention."  Id.  Accordingly,

20   Plaintiff implores this Court to enjoin these state law

21   provisions because they "stand as an obstacle to the

22   accomplishment and execution of the full purposes and objectives

23   of Congress and are therefore preempted by federal law."  Id. at

24   3 (citations omitted).

25       Defendant vigorously opposes Plaintiff's motion for a

26   preliminary injunction, see Opp'n, ECF No. 74, contending that

27   these three state laws properly "allocate the use of limited law-

28   enforcement resources, provide workplace protections, and protect

1   the rights of [California's] residents." Id. at 1. Defendant

2   further argues that these statutes "are consistent with

3   applicable federal law and do not interfere with the federal

4   government's responsibility over immigration." Id. Defendant

5   claims that it "acted squarely within its constitutional

6   authority when it enacted the law[s] [the United States seeks to

7   enjoin] here[.]" Id. None of the state laws, according to

8   Defendant, "conflict[] with federal law or undermine[] the

9   federal government's authority or ability to undertake

10  immigration enforcement and all are consistent with the

11  legislative framework [of the immigration laws and regulations]."

12  Id.

13      This Motion presents unique and novel constitutional issues.

14  The Court must answer the complicated question of where the

15  United States' enumerated power over immigration ends and

16  California's reserved police power begins. The Court must also

17  resolve the issue of whether state sovereignty includes the power

18  to forbid state agents and private citizens from voluntarily

19  complying with a federal program. Plaintiff's Motion requires

20  this Court to carefully examine the purposes and principles of

21  the federalist system—a system, established by the Constitution,

22  of dual sovereignty between the States and the Federal Government

23  whose principal benefit may be "a check on abuses of government

24  power." Gregory v. Ashcroft, 501 U.S. 452, 458 (1991).

25      Deciding these critical issues requires this Court to

26  determine the proper balance between the twin powers of

27  California and the United States. The law is clear that so long

28  as the Federal Government is acting within the powers granted to

1  it under the Constitution, Congress may impose its will on the

2  States.  Id. at 460.  However, if Congress is going to preempt or

3  interfere with the decision of the people of California, "it is

4  incumbent upon [this Court] to be certain of [Congress's] intent

5  before finding that federal law overrides" the constitutional

6  balance of federal and state powers.  Id. (citation omitted).

7     If Congress intends to alter the usual constitutional
       balance between the States and Federal Government it
8      must make its intention to do so unmistakably clear in
       the language of the statute. . . . Congress should make
9      its intention clear and manifest if it intends to pre-
       empt the historic powers of [the State].
10

11  Id. at 460-61 (quoting Atascadero State Hosp. v. Scanlon, 473

12  U.S. 234, 242 (1985)) (quotation marks omitted).

13     Applying these well-established principles of law to the

14  present Motion, and as explained in detail below, this Court

15  finds that AB 103, SB 54, and the employee notice provision of AB

16  450 are permissible exercises of California's sovereign power.

17  With respect to the other three challenged provisions of AB 450,

18  the Court finds that California has impermissibly infringed on

19  the sovereignty of the United States.  Plaintiff's Motion is

20  therefore denied in part and granted in part.

21                II.   Legal Standards

22     A.   Preliminary Injunction Standard

23     Plaintiff moves the Court to enjoin enforcement of the

24  challenged state laws.  Before the Court can grant the requested

25  relief, Plaintiff must establish—as to each challenged law—that

26  it is likely to succeed on the merits of its claim, that it is

27  likely to suffer irreparable harm in the absence of preliminary

28  relief, that the balance of the equities tips in its favor, and

1   that an injunction is in the public interest.  Winter v. Nat.

2   Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  In the Ninth

3   Circuit, an injunction may also be proper "if there is a

4   likelihood of irreparable injury to plaintiff; there are serious

5   questions going to the merits; the balance of hardships tips

6   sharply in favor of the plaintiff; and the injunction is in the

7   public interest."  M.R. v. Dreyfus, 697 F.3d 706, 725 (9th Cir.

8   2012).

9       Here, however, the nature of the requested relief increases

10  Plaintiff's burden.  An order enjoining the enforcement of state

11  laws would alter the status quo and thus qualifies as a mandatory

12  injunction.  Tracy Rifle & Pistol LLC v. Harris, 118 F. Supp. 3d

13  1182, 1194 (E.D. Cal. 2015).  Plaintiff must establish that the

14  law and facts clearly favor its position, not simply that it is

15  likely to succeed on its claims.  See Garcia v. Google, Inc., 786

16  F.3d 733, 740 (9th Cir. 2015).

17      B.   Supremacy Clause

18      In the United States, "both the National and State

19  Governments have elements of sovereignty the other is bound to

20  respect."  Arizona v. United States, 567 U.S. 387, 398 (2012).

21  The Constitution establishes the balance between these sovereign

22  powers and the Nation's dual structure.  The Supremacy Clause

23  declares that the "Constitution, and the Laws of the United

24  States which shall be made in Pursuance thereof . . . shall be

25  the supreme Law of the Land; and the Judges in every State shall

26  be bound thereby[.]"  U.S. Const. Art. VI, cl. 2.  The Tenth

27  Amendment limits the powers of the United States to those which

28  the Constitution delegates, reserving the remaining powers to the

1    States.  U.S. Const. amend. X ("The powers not delegated to the

2    United States by the Constitution, nor prohibited by it to the

3    States, are reserved to the States respectively, or to the

4    people.").  Thus, rather than wielding a plenary power to

5    legislate, Congress may only enact legislation under those powers

6    enumerated in the Constitution.  See Murphy v. Nat'l Collegiate

7    Athletic Ass'n, 138 S. Ct. 1461, 1476 (2018) ("The Constitution

8    confers on Congress not plenary legislative power but only

9    certain enumerated powers."); United States v. Morrison, 529 U.S.

10   598, 607 (2000) ("Every law enacted by Congress must be based on

11   one or more of its powers enumerated in the Constitution.").

12       The United States' broad power over "the subject of

13   immigration and the status of aliens" is undisputed.  Arizona,

14   567 U.S. at 394.[2]  "But the Court has never held that every state

15   enactment which in any way deals with aliens is a regulation of

16   immigration and thus per se pre-empted by this constitutional

17   power, whether latent or exercised."  DeCanas v. Bica, 424 U.S.

18   351, 355 (1976) superseded by statute on other grounds as

19   recognized in Arizona, 567 U.S. at 404.

20            1.   Obstacle Preemption

21       Where Congress has the power to enact legislation it has the

22   power to preempt state law, even in areas traditionally regulated

23   by the States.  See Arizona, 567 U.S. at 399; Gregory, 501 U.S.

24   at 460.  Courts recognize three types of preemption: express

25   ─────────────────
     [2] Unless quoting from another source, this Court will use the
26   term "immigrant" when referring to "any person not a citizen or
     national of the United States."  Cf. 8 U.S.C § 1101(a)(3)
27   (defining "alien").  For persons who have not obtained lawful
     immigration or citizenship status, the Court will use the term
28   "undocumented immigrants."

1   preemption, field preemption, and conflict preemption.

2   Plaintiff's preemption argument is primarily premised on the most

3   enigmatic member of this doctrinal family, "obstacle" preemption—

4   a species of conflict preemption.

5       Conflict preemption is found in cases where it is physically

6   impossible to comply with both federal and state regulations or

7   in cases where the "challenged state law 'stands as an obstacle

8   to the accomplishment and execution of the full purposes and

9   objectives of Congress.' " Arizona, 567 U.S. at 399–400 (quoting

10  Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).  "What is a

11  sufficient obstacle is a matter of judgment, to be informed by

12  examining the federal statute as a whole and identifying its

13  purpose and intended effects."  Crosby v. Nat'l Foreign Trade

14  Council, 530 U.S. 363, 373 (2000).  The Court must examine and

15  consider the entire scheme of the federal statute, including

16  those elements expressed and implied.  Id.  "If the purpose of

17  the act cannot otherwise be accomplished—if its operation within

18  its chosen field else must be frustrated and its provisions be

19  refused their natural effect—the state law must yield to the

20  regulation of Congress within the sphere of its delegated power."

21  Id. at 373 (quoting Savage v. Jones, 225 U.S. 501, 533 (1912)).

22      There is a strong presumption against preemption when

23  Congress legislates in an area traditionally occupied by the

24  States.  Chinatown Neighborhood Ass'n v. Harris, 794 F.3d 1136,

25  1141 (9th Cir. 2015).  The Court presumes " 'the historic police

26  powers of the States' are not superseded 'unless that was the

27  clear and manifest purpose of Congress.' " Arizona, 567 U.S. at

28  400 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230

1   (1947)); see Rice, 331 U.S. at 230 (When Congress legislates in a

2   "field which the States have traditionally occupied[,] [] we

3   start with the assumption that the historic police powers of the

4   States were not to be superseded by the Federal Act unless that

5   was the clear and manifest purpose of Congress.").  Such purpose

6   must be "unmistakably clear in the language of the statute,"

7   Gregory, 501 U.S. at 460 (quoting Atascadero State Hosp. v.

8   Scanlon, 473 U.S. 234 (1985)), as must the presence of an

9   obstacle.  Chinatown Neighborhood Ass'n, 794 F.3d at 1141 ("[T]he

10  California statute cannot be set aside absent 'clear evidence' of

11  a conflict."); see also Savage, 225 U.S. at 533 (1912) ("In other

12  words, [the intent to supersede the State's exercise of its

13  police power] is not to be implied unless the act of Congress,

14  fairly interpreted, is in actual conflict with the law of the

15  state.").  "Mere possibility of inconvenience" is not a

16  sufficient obstacle—the repugnance must be "so direct and

17  positive that the two acts cannot be reconciled or consistently

18  stand together."  See Goldstein v. California, 412 U.S. 546, 554—

19  55 (1973) (quoting The Federalist No. 32, p. 243 (B. Wright ed.

20  1961)); Kelly v. Washington ex rel. Foss Co., 302 U.S. 1, 10

21  (1937).

22      The Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101

23  et seq., is "the comprehensive federal statutory scheme for

24  regulation of immigration and naturalization."  DeCanas, 424 U.S.

25  at 353.  Congress has amended and supplemented the scheme over

26  the years by passing statutes like the Immigration Reform and

27  Control Act ("IRCA") and the Illegal Immigration Reform and

28  Immigrant Responsibility Act ("IIRIRA" or "IIRAIRA"), among

1   others.  Plaintiff argues that the INA, as amended, preempts the

2   state laws challenged in this case.  Mot. at 2-3, 11-32.

3            2.   Intergovernmental Immunity

4        The Supremacy Clause gives rise to another doctrine

5   restricting States' power: the doctrine of intergovernmental

6   immunity.  Under this line of precedent, a State may not regulate

7   the United States directly or discriminate against the Federal

8   Government or those with whom it deals.  North Dakota v. United

9   States, 495 U.S. 423, 435 (1990) (plurality op.).  "Since a

10  regulation imposed on one who deals with the Government has as

11  much potential to obstruct governmental functions as a regulation

12  imposed on the Government itself, the Court has required that the

13  regulation be one that is imposed on some basis unrelated to the

14  object's status as a Government contractor or supplier, that is,

15  that it be imposed equally on other similarly situated

16  constituents of the State."  North Dakota, 495 U.S. at 437-38.

17  The doctrine protects private entities and individuals even when

18  the burdens imposed upon them are not then passed on to the

19  Federal Government.  See Davis v. Michigan Dep't of Treasury, 489

20  U.S. 803, 814-15, 817 (1989) (finding a state tax system that

21  favored state retirees over federal retirees violated

22  intergovernmental immunity even though the tax arguably did not

23  interfere with the Federal Government's ability to perform its

24  governmental functions) (citing Phillips Chem. Co. v. Dumas

25  Indep. Sch. Dist., 361 U.S. 376, 387 (1960)).  Though the

26  doctrine finds its most comfortable repose in tax cases, courts

27  have extended its reach to other contexts.  See, e.g., North

28  Dakota, 495 U.S. 423 (analyzing North Dakota's liquor control

                                9

1    regulations); Boeing Co. v. Movassaghi, 768 F.3d 832 (9th Cir.

2    2014) (analyzing a California law governing cleanup of a federal

3    nuclear site); In re Nat'l Sec. Agency Telecomms. Records Litig.,

4    633 F. Supp. 2d 892 (N.D. Cal. 2007) (analyzing state

5    investigations into telecommunication carriers that concerned the

6    alleged disclosures of customer records to the NSA).

7        A targeted regulation is not invalid simply because it

8    distinguishes between the two sovereigns.  "The State does not

9    discriminate against the Federal Government and those with whom

10   it deals unless it treats someone else better than it treats

11   them." North Dakota, 495 U.S. at 437–38 (quoting Washington v.

12   United States, 460 U.S. 536, 544–545 (1983)).  Accordingly, a

13   regulation should not be struck down unless it burdens the

14   Federal Government (or those dealing with the Federal Government)

15   more so than it does others.  North Dakota, 495 U.S. at 439

16   (finding a regulatory regime that did not disfavor the Federal

17   Government could not be considered to discriminate against it).

18   Furthermore, a regulation will survive if significant differences

19   between the two classes justify the burden.  Davis, 489 U.S. at

20   815–17.  "The relevant inquiry is whether the inconsistent []

21   treatment is directly related to, and justified by, significant

22   differences between the two classes."  Id. at 816 (citation and

23   quotation marks omitted).

24       C.   Tenth Amendment

25       The Tenth Amendment limits Congress's legislative authority

26   to those powers enumerated in the Constitution.  Absent from this

27   list of powers "is the power to issue direct orders to the

28   governments of the States."  Murphy, 138 S. Ct. at 1476.  Thus,

1   in addition to erecting a higher wall against preemption, the

2   Tenth Amendment restrains Congress's ability to impose its will

3   upon the States directly.

4        The Supreme Court's so-called "anticommandeering" doctrine

5   recognizes this check on Congressional power.  Congress may not

6   directly compel States to enact a regulation or enforce a federal

7   regulatory program, conscript state officers for such purpose, or

8   prohibit a State from enacting laws.  See New York v. United

9   States, 505 U.S. 144, 188 (1992) ("The Federal Government may not

10  compel the States to enact or administer a federal regulatory

11  program."); Printz v. United States, 521 U.S. 898, 935 (1997)

12  ("Today we hold that Congress cannot circumvent that prohibition

13  by conscripting the State's officers directly."); Murphy, 138 S.

14  Ct. at 1478 ("The PASPA provision at issue here—prohibiting state

15  authorization of sports gambling—violates the anticommandeering

16  rule. That provision unequivocally dictates what a state

17  legislature may and may not do.").  Even requiring state officers

18  to perform discrete, ministerial tasks violates the doctrine.

19  Printz, 521 U.S. at 929-30.

20       The reasons behind the anticommandeering doctrine are

21  several.  See Murphy, 138 S. Ct. at 1477 (Part III-B).  First,

22  the rule reflects "the Constitution's structural protections of

23  liberty."  Printz, 521 U.S. at 921.  By balancing power between

24  the sovereigns, it prevents the accumulation of excessive power

25  and "reduce[s] the risk of tyranny and abuse from either front."

26  Gregory, 501 U.S. at 458.  Second, the doctrine prevents Congress

27  from passing the costs and burdens of implementing a federal

28  program onto the States.  Printz, 521 U.S. at 930.  Third, the

11

1   doctrine promotes accountability; it ensures that blame for a

2   federal program's burdens and defects falls on the responsible

3   government.  Id. ("And it will likely be the [state chief law

4   enforcement officers], not some federal official, who will be

5   blamed for any error (even one in the designated federal

6   database) that causes a purchaser to be mistakenly rejected.").

7   These reasons, among others, counsel that courts must adhere to

8   the strictures of the rule even where a Congressional act serves

9   important purposes, is most efficiently effectuated through state

10  officers, or places a minimal burden upon the State.  Id. at 932.

11  "It is the very principle of separate state sovereignty that such

12  a law offends, and no comparative assessment of the various

13  interests can overcome that fundamental defect."  Id.

III.   OPINION

A.   Likelihood of Success on the Merits

1.   Assembly Bill 103

17      Approved by the Governor and filed with the Secretary of

18  State on June 27, 2017, Assembly Bill 103 added Section 12532 to

19  the California Government Code and directs the Attorney General

20  to review and report on county, local, and private locked

21  detention facilities in which noncitizens are housed or detained

22  for purposes of civil immigration proceedings in California.

23  Cal. Gov't Code § 12532.  It directs the Attorney General to

24  conduct a review of such facilities by March 1, 2019.  Cal. Gov't

25  Code § 12532(b).  This review must include a review of the

26  conditions of confinement, the standard of care and due process

27  provided to the individuals housed or detained in the facilities,

28  and the circumstances around their apprehension and transfer to

1  the facility.  Cal. Gov't Code § 12532(b)(1).  Additionally—by

2  the same deadline—the Attorney General must provide a

3  comprehensive report of his findings to the Legislature, the

4  Governor, and the public.  Cal. Gov't Code § 12532(b)(2).  In

5  furtherance of this objective, the Attorney General "shall be

6  provided all necessary access for the observations necessary to

7  effectuate [these] reviews . . . , including, but not limited to,

8  access to detainees, officials, personnel, and records."  Cal.

9  Gov't Code § 12532(c).

10      Plaintiff argues that this review and reporting requirement

11  interferes with the Federal Government's exclusive authority in

12  the area of immigrant detention.  Mot. at 18-19.  Because the

13  decision whether to pursue removal is entrusted to the Federal

14  Government's discretion, California's efforts to assess the

15  process afforded to immigrant detainees poses an obstacle,

16  Plaintiff contends, to administering the federal immigration

17  scheme.  Id. at 19-20.  "Federal law," it argues, "does not

18  contemplate any role for the facility itself, or for states and

19  localities, in determining which aliens are properly subject to

20  detention or the terms and conditions of that detention."  Id. at

21  18.

22      Defendant responds that the Legislature passed AB 103 in

23  reaction to growing concerns of egregious conditions in

24  facilities housing civil detainees.  Opp'n at 6 (citing Decl. of

25  Holly Cooper and Def. RFJN, Exh. K (Office of Inspector General,

26  Management Alert on Issues Requiring Immediate Action at the Theo

27  Lacy Facility in Orange, California, OIG-17-43-MA, March 6,

28  2017)).  Several amici echo these concerns.  See See Br. for

1  Nat'l Health Law Program, et al., as Amici Curiae, ECF No. 104;

2  Br. for Immigrant Legal Res. Ctr., et al., as Amici Curiae, ECF

3  No. 126; Br. for Nat'l Immigr. Law Ctr., et al., as Amici Curiae,

4  ECF No. 136.  Defendant argues the review and reporting AB 103

5  requires fall well within the Attorney General's broad

6  constitutional powers to enforce state laws and conduct

7  investigations relating to subjects under his jurisdiction.

8  Opp'n at 6 (citing Cal. Const. art. V, § 13; Cal. Gov't Code

9  § 11180).  Rather than enacting a new regulatory scheme or

10 imposing substantive requirements, AB 103 "simply authorizes

11 funding" to address issues the Attorney General already has the

12 authority to review in response to increased concerns in this

13 area.  Id. at 7, 30; June 20, 2018, Hearing Transcript

14 ("Trans."), ECF No. 189, at 25:2-13.

15     The Court finds no indication in the cited portions of the

16 INA that Congress intended for States to have no oversight over

17 detention facilities operating within their borders.  See 8

18 U.S.C. § 1231(g)(1)-(2); 8 U.S.C. § 1103(a)(11).  Indeed, the

19 detention facility contracts Defendant provided to the Court

20 expressly contemplate compliance with state and local law.

21 Melton Decl., Exhs. M-S (filed under seal), ECF No. 81.  These

22 contracts demonstrate that California retains some authority over

23 the detention facilities.  Contrary to Plaintiff's

24 characterization, AB 103's review process does not purport to

25 give California a role in determining whether an immigrant should

26 be detained or removed from the country.  The directive

27 contemplates increased transparency and a report that may serve

28 as a baseline for future state or local action.  At this point,

14

1   what that future action might be is subject to speculation and

2   conjecture.

3       The review and reporting requirement contemplated in AB 103

4   is different from the state licensing requirements struck down in

5   Leslie Miller and Gartrell.  See Leslie Miller, Inc. v. Arkansas,

6   352 U.S. 187, 190 (1956); Gartrell Const. Inc. v. Aubry, 940 F.2d

7   437 (9th Cir. 1991).  In Leslie Miller, the Supreme Court held

8   that an Arkansas statute imposing licensing requirements on a

9   federal contractor interfered with the federal government's power

10  to select contractors and schedule construction, and therefore

11  conflicted with the federal law regulating procurement.  352 U.S.

12  at 190.  Thirty-five years later, the Ninth Circuit upheld an

13  injunction of a similar licensing requirement as applied to a

14  federal contractor in California.  Gartrell, 940 F.2d at 438.  It

15  found that the Federal Government already considered many of the

16  factors involved in the State's licensing determination during

17  its own "responsibility" determination and held that, under

18  Leslie Miller, the licensing requirement was preempted.  Id. at

19  438–41.  The Circuit reasoned: "Because the federal government

20  made a direct determination of Gartrell's responsibility,

21  California may not exercise a power of review by requiring

22  Gartrell to obtain state licenses."  Id. at 441.

23      Unlike state licensing regulations, AB 103 does not impose

24  any substantive requirements upon detention facilities.  For all

25  its bark, the law has no real bite.  It directs the Attorney

26  General to channel an authority he already wields to an issue of

27  recent State interest.  The facility need only provide access for

28  these reviews, which is of little or no consequence.  Given the

15

1    Attorney General's power to conduct investigations related to

2    state law enforcement—a power which Plaintiff concedes, Trans. at

3    15:11-16:5—the Court does not find this directive in any way

4    constitutes an obstacle to the federal government's enforcement

5    of its immigration laws or detention scheme.

6        There is, however, one federal regulation that might

7    directly conflict with Government Code Section 12532(c).  Under 8

8    C.F.R. § 236.6, no one—including state or local government

9    entities or any privately operated detention facility—who obtains

10   information relating to any detainee, "shall disclose or

11   otherwise permit to be made public the name of, or other

12   information relating to, such detainee."  It continues:

> Such information shall be under the control of the
> Service and shall be subject to public disclosure only
> pursuant to the provisions of applicable federal laws,
> regulations and executive orders. Insofar as any
> documents or other records contain such information,
> such documents shall not be public records. This
> section applies to all persons and information
> identified or described in it, regardless of when such
> persons obtained such information, and applies to all
> requests for public disclosure of such information,
> including requests that are the subject of proceedings
> pending as of April 17, 2002.

20   8 C.F.R. § 236.6 (Information regarding detainees).

21       According to Plaintiff, this regulation establishes that

22   information regarding detainees belongs solely to the Federal

23   Government and that facilities violate the regulation by turning

24   such information over to the Attorney General.  Mot. at 22; Reply

25   at 9.  For additional support, Plaintiff quotes the supplementary

26   information published with the rule in the Federal Register,

27   wherein the Immigration and Naturalization Service explained that

28   "the rule guarantees that information regarding federal detainees

1    will be released under a uniform federal scheme rather than the

2    varying laws of the fifty states."  68 Fed. Reg. 4364, 4366 (Jan.

3    29, 2003).

4         Defendant counters that there is no conflict because the

5    regulation prohibits only the public disclosure of information

6    about detainees, not disclosure to other government entities.

7    Opp'n at 30-31.  Because the Attorney General "conducts these

8    reviews in his capacity as the chief law officer of the State,"

9    and "not as a member of the public," Defendant maintains there is

10   no conflict.  Id.  Defendant points out that AB 103, on its face,

11   does not provide for disclosure of detainee information to the

12   public.  Id.  Further, such disclosure is unlikely because "much

13   if not all" of the information in question remains confidential

14   under state law.  Id.

15        The Court agrees with Defendant that there is no conflict

16   apparent on the face of Section 12532(c).  The federal regulation

17   at issue is most naturally read to prohibit public disclosures of

18   information, not the provision of information to other

19   governmental entities or law enforcement.  8 C.F.R. § 236.6.  The

20   information published in the Federal Register supports this

21   interpretation.  68 Fed. Reg. 4364 , 4364 ("Summary: This final

22   rule governs the public disclosure . . . of the name and other

23   information relating to any immigration detainee[.]"), 4365

24   ("These provisions plainly authorize the Attorney General . . .

25   to provide by regulation that persons housing INS detainees on

26   behalf of the federal government shall not publicly disclose the

27   names and other information regarding those detainees."), 4367

28   ("Executive Order 13132[:] . . . This rule merely pertains to the

1   public disclosure of information concerning Service detainees

2   . . . .  In effect, the rule will relieve state or local

3   government entities of responsibility for the public release of

4   information relating to any immigration detainee being housed or

5   otherwise maintained or provided service on behalf of the

6   Service.  Instead, the rule reserves that responsibility to the

7   Service with regard to all Service detainees.").  Plaintiff's

8   cited cases do not broaden the scope of the rule; each case

9   concerned public disclosure of detainee information, not the

10  provision of information to another government entity.  See Voces

11  De La Frontera, Inc. v. Clarke, 373 Wis. 2d 348 (2017) (finding

12  records concerning detainees statutorily exempt from disclosure

13  under Wisconsin's public records law); Comm'r of Corr. v. Freedom

14  of Info. Comm'n, 307 Conn. 53 (2012) (finding former detainee's

15  records exempt from Connecticut's Freedom of Information Act);

16  ACLU of New Jersey v. Cnty. of Hudson, 352 N.J. Super. 44 (2002)

17  (finding § 236.6 preempts New Jersey's Right-to-Know Law to the

18  extent it requires public disclosure of information regarding INS

19  detainees).

20      Plaintiff nevertheless contends that California's Attorney

21  General is a member of the public as contemplated by the

22  regulation.  But Plaintiff did not identify, and the Court is

23  unaware of, any judicial decision interpreting the regulation to

24  restrict information sharing with government entities or law

25  enforcement.  The regulation contemplates that such information

26  would fall into the hands of state and local government entities

27  through their contractual relationships with the federal

28  government.  In light of the California Attorney General's role

18

1    in state law enforcement, and without any authority to the

2    contrary, the Court does not find a conflict, express or implied,

3    between the access required under Government Code Section

4    12532(c) and 8 C.F.R. § 236.6.

5         Finally, the Court finds AB 103 is not invalid under the

6    doctrine of intergovernmental immunity.  Plaintiff argues the law

7    violates this doctrine because it imposes a review scheme on

8    facilities contracting with the federal government, only.  This

9    characterization is valid.  However, the burden placed upon the

10   facilities is minimal and Plaintiff's evidence does not show

11   otherwise.  See Homan Decl. at ¶ 60 (summarily stating that the

12   inspections are burdensome).  Importantly, the review appears no

13   more burdensome than reviews required under California Penal Code

14   §§ 6030, 6031.1.  Thus, even if AB 103 treats federal contractors

15   differently than the State treats other detention facilities,

16   Plaintiff has not shown the State treats other facilities better

17   than those contractors.  North Dakota, 495 U.S. at 437-38 ("The

18   State does not discriminate against the Federal Government and

19   those with whom it deals unless it treats someone else better

20   than it treats them.").

21        Plaintiff is not likely to succeed on the merits of this

22   claim. Its motion for a preliminary injunction as to AB 103 is

23   denied.

24             2.   Assembly Bill 450

25        The regulation of employment traditionally falls within the

26   States' police power:

27   ///

28   ///

1         States possess broad authority under their police
        powers to regulate the employment relationship to
2         protect workers within the State. Child labor laws,
        minimum and other wage laws, laws affecting
3         occupational health and safety, and workmen's
        compensation laws are only a few examples.

4

5 DeCanas v. Bica, 424 U.S. 351, 356 (1976) (decision superseded by

6 statute).

7      AB 450 imposes various requirements on public and private

8 employers with respect to immigration worksite enforcement

9 actions.  2017 Cal. Stat., ch. 492 (A.B. 450).  It prohibits

10 employers from providing voluntary consent to an immigration

11 enforcement agent to enter nonpublic areas of a place of labor or

12 to access, review, or obtain the employer's employee records.

13 Cal. Gov't Code §§ 7285.1, 7285.2.  It requires employers to

14 provide notice to their employees of any impending I-9 (or other

15 employment record) inspection within 72 hours of receiving notice

16 of that inspection.  Cal. Lab. Code § 90.2.  Lastly, AB 450

17 prohibits employers from reverifying the employment eligibility

18 of current employees when not required by federal law.  Cal. Lab.

19 Code § 1019.2.  As passed, AB 450 states that its provisions are

20 severable.  2017 Cal. Stat., ch. 492, Sec. 6 (A.B. 450).

21      Plaintiff challenges AB 450 as applied to private employers

22 only,  Compl. ¶¶ 35, 61, Trans. at 10:2-19, arguing that the

23 above-noted additions to state law pose an obstacle to

24 immigration enforcement objectives under the Immigration Reform

25 and Control Act ("IRCA") and the INA.

26      "Congress enacted IRCA as a comprehensive framework for

27 'combatting the employment of illegal aliens.' "  Arizona, 567

28 U.S. at 404.  IRCA imposes criminal sanctions on employers who

1   knowingly hire, recruit, refer, or continue to employ

2   unauthorized workers, but does not impose criminal sanctions on

3   employees.  8 U.S.C. § 1324a; Arizona, 567 U.S. at 404–07 ("The

4   correct instruction to draw from the text, structure, and history

5   of IRCA is that Congress decided it would be inappropriate to

6   impose criminal penalties on aliens who seek or engage in

7   unauthorized employment.").  The statute authorizes the Attorney

8   General to establish procedures for complaints and

9   investigations.  8 U.S.C. § 1324a(e)(1).  It also confers

10   authority upon immigration officers and administrative law judges

11   to be given "reasonable access to examine evidence of any person

12   or entity being investigated" and to compel by subpoena the

13   attendance of witnesses and the production of evidence.  8 U.S.C.

14   § 1324a(e)(2).

15      The Supreme Court has found IRCA preempts additional

16   penalties on employers (via express preemption) and criminal

17   sanctions on unauthorized workers for seeking or performing work

18   (via conflict preemption).  Arizona, 567 U.S. 387.  Courts have

19   held IRCA does not preempt: a provision of Arizona law allowing

20   suspension and revocation of businesses licenses based on

21   employing unauthorized workers, Chamber of Commerce of U.S. v.

22   Whiting, 563 U.S. 582 (2011); an Arizona law requiring that every

23   employer verify the employment eligibility of hired employees

24   through the E-Verify system, id. (as amended by IIRIRA); and

25   various labor protections, with some limits on the damages an

26   unlawfully employed immigrant is entitled to receive, see, e.g.,

27   Salas v. Sierra Chem. Co., 59 Cal.4th 407 (2014) (holding the

28   State's extension of employee protections to all workers

1   regardless of immigration status is preempted only to the extent

2   it authorizes lost pay awards for any period after an employer

3   discovers the employee's ineligibility to work in the United

4   States).

5               a.   <u>Prohibitions on Consent</u>

6        The Court finds AB 450's prohibitions on consent, Cal. Gov't

7   Code §§ 7285.1, 7285.2., troubling due to the precarious

8   situation in which it places employers.  Trans. at 92:9-18.

9   Despite that concern, the question before the Court is limited to

10  Plaintiff's Supremacy Clause claim and the relationship between

11  the State and the Federal Government.

12       Plaintiff's preemption argument rests on the notion that

13  Congress presumed immigration enforcement officers could gain

14  access to worksites by consent of the employer.  Mot. at 11-13.

15  Plaintiff contends the entire enforcement scheme is premised on

16  this authority.   <u>Id.</u>

17       Defendant does not dispute that immigration enforcement

18  agents could, prior to AB 450, gain access to nonpublic areas of

19  a worksite through employer consent.   In enacting AB 450, the

20  state legislators acknowledged that immigration officers could do

21  so under existing law.   <u>See</u> Pl. Exh. J (Senate Judiciary

22  Committee Report), ECF No. 171-10.  But, Defendant argues, the

23  entry and access provisions do not conflict with IRCA because

24  "IRCA was not intended to diminish states' labor protections."

25  Opp'n at 26.  Because AB 450 permits entry and access pursuant to

26  judicial warrant (or subpoena, for documents), or when otherwise

27  required by federal law, Defendant claims the law does not deny

28  the "reasonable access to examine evidence" required under IRCA.

1    See 8 U.S.C. § 1324a(e)(2).

2         The arguments are wanting on both sides.  By attempting to

3    narrow the Court's focus to the criminal penalties at issue under

4    IRCA, Defendant fails to acknowledge that immigration enforcement

5    officers might also seek to investigate civil violations of the

6    immigration laws or pursue investigative activities outside of

7    IRCA's provisions.  As Plaintiff pointed out at the June 20,

8    2018, hearing on its Motion, Trans. at 114:20–115:11, IRCA added

9    new sections to the already existing law governing immigration

10   enforcement activities; Defendant did not address any of these

11   other grants of power.  Further, Defendant cites no authority for

12   its proposition that AB 450's judicial warrant requirement and

13   savings clause together constitute "reasonable access" under

14   IRCA.  Irrespective of the State's interest in protecting

15   workers, the Court finds that the warrant requirement may impede

16   immigration enforcement's investigation of employers or other

17   matters within their authority to investigate.

18        Even though these two subsections of AB 450 interfere with

19   immigration enforcement's historical practices, the Court

20   hesitates to find the statutes preempted.  In preemption

21   analysis, the Court presumes " 'the historic police powers of the

22   States' are not superseded 'unless that was the clear and

23   manifest purpose of Congress.' " Arizona, 567 U.S. at 400.  Laws

24   governing labor relations and the workplace generally fall within

25   the States' police powers.  Congress has not expressly authorized

26   immigration officers to enter places of labor upon employer

27   consent, nor has Congress authorized immigration enforcement

28   officers to wield authority coextensive with the Fourth

1    Amendment.  Although Plaintiff's cited cases show instances of

2    immigration enforcement lawfully exercising its investigative

3    authority in accordance with the Fourth Amendment, none of these

4    cases establish that Congress has expressly or impliedly granted

5    immigration enforcement agents such authority.  See I.N.S. v.

6    Delgado, 466 U.S. 210 (1984) (noting that the federal immigration

7    officers were lawfully present at a worksite because they

8    obtained either a warrant or the employer's consent to their

9    entry); Zepeda v. I.N.S., 753 F.2d 719, 725 (9th Cir. 1983)

10   (explaining that Congress, by authorizing the INS "to interrogate

11   any alien or person believed to be an alien as to his right to be

12   or to remain in the United States" without a warrant, authorized

13   the INS "to question aliens to the fullest extent permissible

14   under the [F]ourth [A]mendment") (citing 8 U.S.C. § 1357(a)(1));

15   Int'l Molders & Allied Workers' Local Union No. 164 v. Nelson,

16   799 F.2d 547 (9th Cir. 1986) (striking part of an injunction

17   order that required every INS warrant to "contain a specific

18   description of each suspect to be questioned and be based on

19   'probable cause to believe that such person is an illegal

20   alien' " because it misstated the standard for non-detentive

21   questioning").  Nor do these cases show consent to be an

22   essential pillar of the enforcement regime.  Certainly, obstacle

23   preemption may be "implied," but precedent counsels against

24   reading Congressional "presumptions" or "assumptions" into the

25   statutes without a more robust record than that presently before

26   the Court.

27       Ultimately, however, the Court need not resolve the

28   preemption issue because Plaintiff is likely to succeed on its

1 Supremacy Clause claim under the intergovernmental immunity

2 doctrine. The doctrine applies in these circumstances even

3 though the laws regulate employers and not the Federal Government

4 directly. See Davis, 489 U.S. at 814, 817; Phillips Chem. Co.,

5 361 U.S. at 387 (holding that state taxes imposed on lessees of

6 federal land were invalid where those taxes were more burdensome

7 than taxes imposed on lessees of state land). For those

8 employers who choose to allow immigration enforcement agents to

9 enter or access documents, AB 450 imposes significant and

10 escalating fines. See Cal. Gov't Code § 7285.1(b) (subjecting

11 employers to a fine of $2,000 to $5,000 for a first violation and

12 $5,000 to $10,000 for each subsequent violation); Cal. Gov't Code

13 § 7285.2(b) (same). These fines inflict a burden on those

14 employers who acquiesce in a federal investigation but not on

15 those who do not.

16 Defendant argues the application of the doctrine in these

17 circumstances would expand its reach. It notes that the

18 intergovernmental immunity cases evaluating indirect

19 discrimination have typically concerned laws that imposed burdens

20 on entities contracting with, or supplying something to, the

21 Federal Government, thus "dealing" with the United States in an

22 economic sense. Trans. at 93:1–95:6.

23 The Court is not convinced that the term "deal" is

24 circumscribed in the manner Defendant suggests. As in other

25 intergovernmental immunity cases, the imposition of civil fines

26 (like the imposition of taxes) turns on whether an employer

27 chooses to work with federal immigration enforcement. These

28 fines are a clear attempt to "meddl[e] with federal government

1    activities indirectly by singling out for regulation those who

2    deal with the government." See In re NSA, 633 F. Supp. 2d at

3    903.  The Court does not find Defendant's argument that the law

4    is neutral convincing.  Opp'n at 29 (arguing the law applies to

5    "any person or entity seeking to enforce the civil immigration

6    laws, whether federal, state, or local").  Given that immigration

7    enforcement is the province of the Federal Government, it demands

8    no stretch of reason to see that Government Code Sections 7285.1

9    and 7285.2, in effect, target the operations of federal

10   immigration enforcement.

11       The Court finds that a law which imposes monetary penalties

12   on an employer solely because that employer voluntarily consents

13   to federal immigration enforcement's entry into nonpublic areas

14   of their place of business or access to their employment records

15   impermissibly discriminates against those who choose to deal with

16   the Federal Government.  The law and facts clearly support

17   Plaintiff's claim as to these two subsections and Plaintiff is

18   likely to succeed on the merits.

19                       b.   Notice Requirement

20       AB 450 also added a provision to the California Labor Code

21   requiring employers to provide notice to their employees "of any

22   inspections of I-9 Employment Eligibility Verification forms or

23   other employment records conducted by an immigration agency

24   within 72 hours of receiving notice of the inspection."  Cal.

25   Lab. Code § 90.2(a)(1).  It specifies the contents of the

26   requisite notice and instructs employers to provide a copy of the

27   inspection notice to any employee upon reasonable request.  Id.

28   § 90.2(a)(1)-(3).

1        Labor Code Section 90.2 also requires employers to provide

2   each current, affected employee with the results of the

3   inspection within 72 hours of receipt, including any obligations

4   of the employer and affected employee arising from the results.

5   Id. § 90.2(b).  The statute defines an "affected employee" as "an

6   employee identified by the immigration agency inspection results

7   to be an employee who may lack work authorization, or an employee

8   whose work authorization documents have been identified by the

9   immigration agency inspection to have deficiencies."  Id.

10  § 90.2(b)(2).  Employers are subject to civil penalties for

11  violations, except that the section "does not require a penalty

12  to be imposed upon an employer or person who fails to provide

13  notice to an employee at the express and specific direction or

14  request of the federal government."  Id. § 90.2(c).

15       Plaintiff argues that this notice provision stands as an

16  obstacle to the implementation of federal law by aiming to thwart

17  immigration regulation.  Reply at 5.  "Obviously," it argues,

18  investigations "will be less effective if the targets of the

19  investigations are warned ahead of time and kept abreast of the

20  status of the United States' enforcement efforts."  Mot. at 17.

21       This argument convolutes the purposes of IRCA enforcement

22  actions.  IRCA primarily imposes obligations and penalties on

23  employers, not employees.  See 8 U.S.C. § 1324a.  The new

24  California Labor Code section only requires employers to provide

25  notice to employees if the employer itself has received notice of

26  an impending inspection.  The "targets" of the investigation have

27  thus already been "warned."  Pursuant to federal regulations,

28  employers are to be given at least three business days' notice

1   prior to an I-9 inspection.  See 8 C.F.R. § 274a.2(b)(2)(ii).

2   The state law merely extends this prior notice to employees.

3   Given IRCA's focus on employers, the Court finds no indication—

4   express or implied—that Congress intended for employees to be

5   kept in the dark.

6       The Court declines to adopt Plaintiff's cynical view of the

7   law.  As amici point out, notice provides employees with an

8   opportunity to cure any deficiencies in their paperwork or

9   employment eligibility.  See Br. for Cal. Labor Fed'n, et al., as

10  Amici Curiae, ECF No. 134.  Federal law affords such a courtesy

11  to employers; the Court does not view an extension of that

12  courtesy to employees as an attempt to thwart IRCA's goals.

13      The notice provision also does not violate the

14  intergovernmental immunity doctrine.  Unlike the prohibitions on

15  consent, violations of this provision do not turn on the

16  employer's choice to "deal with" (i.e., consent to) federal law

17  enforcement.  An employer is not punished for its choice to work

18  with the Federal Government, but for its failure to communicate

19  with its employees.  This requirement does not readily fit into

20  the contours of the intergovernmental immunity doctrine and

21  application would stretch the doctrine beyond its borders.  The

22  Court thus finds no merit to Plaintiff's Supremacy Clause claim

23  as to California Labor Code Section 90.2.  Plaintiff's motion for

24  a preliminary injunction as to this subdivision of AB 450 is

25  denied.

26              c.   Reverification Prohibition

27      California Labor Code Section 1019.2 limits an employer's

28  ability to reverify an employee's employment eligibility when not

1   required by law:

2       Except as otherwise required by federal law, a public
        or private employer, or a person acting on behalf of a
3       public or private employer, shall not reverify the
        employment eligibility of a current employee at a time
4       or in a manner not required by Section 1324a(b) of
        Title 8 of the United States Code.
5

6   Cal. Lab. Code § 1019.2(a).  An employer that violates this

7   subsection is subject to a civil penalty of up to $10,000.  Id.

8   § 1019.2(b)(1).  The law should not be "interpreted, construed,

9   or applied to restrict or limit an employer's compliance with a

10  memorandum of understanding governing the use of the federal E-

11  Verify system."  Id. § 1019.2(c).

12      Under IRCA, an employer faces liability for continuing to

13  employ an immigrant in the United States knowing that the

14  immigrant is (or has become) unauthorized with respect to such

15  employment.  8 U.S.C. § 1324a(2).  Plaintiff argues that this

16  continuing obligation to avoid knowingly employing an

17  unauthorized immigrant worker conflicts with California's

18  prohibition on reverification.  Mot. at 17–18 (citing New El Rey

19  Sausage Co., Inc. v. I.N.S., 925 F.2d 1153 (9th Cir. 1991)).

20  Defendant responds that there is no obstacle because the state

21  law contains an express savings clause for instances where

22  reverification is required by federal law and does not limit an

23  employer's compliance with a memorandum of understanding

24  governing the use of the federal E-Verify system.  Opp'n at 26–

25  28.

26      The Court finds Plaintiff is likely to succeed on the merits

27  of this claim, with the caveat that a more complete evidentiary

28  record could impact the Court's analysis at a later stage of this

1   litigation.  Neither party provided the Court with much

2   information on how the verification system currently works in

3   practice and how the new law does or does not change those

4   practices.  Based on a plain reading of the statutes, the

5   prohibition on reverification appears to stand as an obstacle to

6   the accomplishment of Congress's purpose in enacting IRCA.  See

7   Arizona, 567 U.S. at 399–400.  Congress could have chosen to tie

8   employer liability to instances when an employer fails to verify

9   employment eligibility when required to do so by federal law.

10  Instead, Congress broadened liability to encompass situations

11  when an employer knows one of its immigrant employees is or has

12  become unauthorized to work and continues to employ them.  In a

13  single act, Congress premised criminal sanction on an employer's

14  subjective knowledge and established a system through which

15  employers could verify compliance with the law.  As the Ninth

16  Circuit explained in New El Rey Sausage Co.:

17          The inclusion in the statute of section 1324a(b)'s
            verification system demonstrates that employers, far
18          from being allowed to employ anyone except those whom
            the government had shown to be unauthorized, have an
19          affirmative duty to determine that their employees are
            authorized. This verification is done through the
20          inspection of documents. Notice that these documents
            are incorrect places the employer in the position it
21          would have been if the alien had failed to produce the
            documents in the first place: it has failed to
22          adequately ensure that the alien is authorized.

23  925 F.2d at 1158.  Prohibiting employers from reverifying

24  employment eligibility complicates the subjective element of the

25  crime; e.g., could an employer who might otherwise be found to

26  "know" that one of its employees lacks authorization find shelter

27  behind the state law because it could not confirm its suspicion?

28  The law frustrates the system of accountability that Congress

30

1    designed.

2         Based on the authority and evidence before the Court at this

3    juncture, which clearly support Plaintiff's claim, the Court

4    finds Plaintiff is likely to succeed on the merits of its

5    Supremacy Clause claim against California Labor Code Section

6    1019.2(a).

7              3.   Senate Bill 54

8         SB 54 added several subsections to the California Government

9    Code.  Plaintiff seeks to enjoin three of these subsections.  The

10   first two challenged by Plaintiff prohibit state law enforcement

11   agencies from sharing  certain information for immigration

12   enforcement purposes:

13        (a) California law enforcement agencies shall not:

14        (1) Use agency or department moneys or personnel to
          investigate, interrogate, detain, detect, or arrest
15        persons for immigration enforcement purposes, including
          any of the following:
16
          . . .
17
          (C) Providing information regarding a person's release
18        date or responding to requests for notification by
          providing release dates or other information unless
19        that information is available to the public, or is in
          response to a notification request from immigration
20        authorities in accordance with Section 7282.5.
          Responses are never required, but are permitted under
21        this subdivision, provided that they do not violate any
          local law or policy.
22
          (D) Providing personal information, as defined in
23        Section 1798.3 of the Civil Code, about an individual,
          including, but not limited to, the individual's home
24        address or work address unless that information is
          available to the public.
25

26   Cal. Gov't Code § 7284.6(a)(1)(C) & (D).  Subsection (e) contains

27   a savings clause expressly exempting the exchange of information

28   pursuant to 8 U.S.C. §§ 1373 and 1644.  Cal. Gov't Code

31

1   § 7284.6(e).

2       Plaintiff also challenges the subsection limiting transfers

3   of individuals to immigration authorities:

4       (a) California law enforcement agencies shall not:

5       . . .

6       (4) Transfer an individual to immigration authorities
        unless authorized by a judicial warrant or judicial
7       probable cause determination, or in accordance with
        Section 7282.5.
8

9   Cal. Gov't Code § 7284.6(a)(4).  California Government Code

10  Section 7282.5 defines the circumstances in which law enforcement

11  officials have discretion to cooperate with immigration

12  authorities as referenced in subparagraphs (a)(1)(C) and (a)(4)

13  above, i.e., convictions for certain offenses.

14                  a.   <u>Direct Conflict with Section 1373</u>

15      The primary, and most direct, conflict Plaintiff identifies

16  is that between the information sharing provisions and 8 U.S.C.

17  § 1373 ("Section 1373").[3]  Section 1373(a) bars States from

18  prohibiting, or in any way restricting, "any government entity or

19  official from sending to, or receiving from, the Immigration and

20  Naturalization Service <u>information regarding the citizenship or</u>

21  <u>immigration status, lawful or unlawful, of any individual.</u>"

22  (emphasis added).  Arguing for a broad interpretation of the

23  phrase "information regarding the citizenship or immigration

24  status, lawful or unlawful, of any individual," Plaintiff

25  contends the prohibitions on sharing release dates and home and

26

27  _____
    [3] In its Complaint, Plaintiff identifies another statute, 8
    U.S.C. § 1644, that contains the same prohibition as Section
28  1373(a).  Plaintiff does not discuss Section 1644 in its Motion.

1  work addresses violates Section 1373.

2      Defendant argues that Section 1373 is unconstitutional under

3  the Supreme Court's recent holding in Murphy.   138 S. Ct. 1461

4  (2018); see Supp. Br., ECF No. 156.   The Court in Murphy held

5  that Congress cannot dictate what a state legislature may and may

6  not do, "as if federal officers were installed in state

7  legislative chambers and were armed with the authority to stop

8  legislators from voting on any offending proposals."   Id. at

9  1482.   The decision clarified that the Court's anticommandeering

10 precedent extends to prohibitions on state legislative action.

11 Section 1373 does just what Murphy proscribes: it tells States

12 they may not prohibit (i.e., through legislation) the sharing of

13 information regarding immigration status with the INS or other

14 government entities.

15     Plaintiff argues that Murphy's holding—and the

16 anticommandeering rule generally—does not reach statutes

17 requiring information sharing between government entities.   Reply

18 at 17-22.   Plaintiff points to a number of federal statutes that

19 require States to convey information to the Federal Government.

20 Reply at 19 n.14.   For additional support, it cites Reno v.

21 Condon for the principle that a regulation on States as the

22 owners of databases does not violate the Tenth Amendment.   Reply

23 at 18; 528 U.S. 141 (2000).   Plaintiff also notes that the Printz

24 opinion distinguished federal laws regulating the provision of

25 information to the federal government from regulations requiring

26 forced participation of the States in administering a federal

27 program.

28     Reno v. Condon involved a constitutional challenge to the

1    Driver's Privacy Protection Act ("DPPA"), which bars States from

2    disclosing a driver's personal information without the driver's

3    consent.  528 U.S. 141 (2000); see 18 U.S.C. § 2721(a) ("A State

4    department of motor vehicles, and any officer, employee, or

5    contractor thereof, shall not knowingly disclose or otherwise

6    make available to any person or entity personal information . . .

7    about any individual obtained by the department in connection

8    with a motor vehicle record[.]").  The Supreme Court held the

9    provision does not run afoul of the Tenth Amendment:

10           [T]he DPPA does not require the States in their
             sovereign capacity to regulate their own citizens.  The
11           DPPA regulates the States as the owners of data bases.
             It does not require the South Carolina Legislature to
12           enact any laws or regulations, and it does not require
             state officials to assist in the enforcement of federal
13           statutes regulating private individuals.  We
             accordingly conclude that the DPPA is consistent with
14           the constitutional principles enunciated in New York
             and Printz.
15

16   Id. at 150.  The Court rejected South Carolina's argument that

17   the DPPA is unconstitutional for its exclusive regulation of the

18   States, finding the Act to be generally applicable but not

19   deciding whether general applicability is required to survive

20   constitutional scrutiny.   Id.

21       Plaintiff's second source of support is dicta from Printz.

22   521 U.S. 898 (1997).  The Printz Court evaluated a federal

23   statute that required state law enforcement officers to assist in

24   administering a federal regulatory scheme.  In describing the

25   issues to be resolved, Justice Scalia wrote:

26           The Government points to a number of federal statutes
             enacted within the past few decades that require the
27           participation of state or local officials in
             implementing federal regulatory schemes. . . . [Some of
28           these statutes], which require only the provision of

                                  34

1
2
3

information to the Federal Government, do not involve
the precise issue before us here, which is the forced
participation of the States' executive in the actual
administration of a federal program.

4   Id. at 918.  Justice Scalia expressly distinguished the laws

5   under consideration in Printz from laws that require the

6   provision of information to the Federal Government.  Thus, Printz

7   left open the question of whether required information sharing

8   could constitute commandeering.

9       Defendant would have this Court follow the lead of the

10  district court in City of Philadelphia v. Sessions.  No. 17-3894,

11  2018 WL 2725503 (E.D. Pa. June 6, 2018).  That court rejected

12  Plaintiff's same—or substantially similar—arguments and found

13  Section 1373 unconstitutional under Murphy.  Id. at *28-33.  It

14  held that "on their face, [Section 1373(a) and (b)] regulate

15  state and local government entities and officials, which is fatal

16  to their constitutionality under the Tenth Amendment."  Id. at

17  *32.  The district court distinguished Reno, explaining that Reno

18  did not involve a "statute that commanded state legislatures to

19  enact or refrain from enacting state law."  Id. (noting the

20  Murphy Court's discussion of Reno).  It also refused to put much

21  weight in the cited dicta from Printz, finding that Printz's

22  holding supports the court's conclusion as to Section 1373.

23      The Court finds the constitutionality of Section 1373 highly

24  suspect.  Like the district court in City of Philadelphia, the

25  Court reads Section 1373 to dictate what states may and may not

26  do, in contravention of the Tenth Amendment.  The more critical

27  question, however, is whether required information sharing

28  constitutes commandeering at all.  Printz left this question

1    open.

2         One view, which amici, the California Partnership to End

3    Domestic Violence and the Coalition for Humane Immigrant Rights,

4    articulate, is that the context of the information sharing

5    affects the commandeering inquiry.  See Br. for Cal. P'ship to

6    End Domestic Violence and the Coal. for Humane Immigrant Rights,

7    as Amici Curiae, ECF No. 182.  Amici argue "purely ministerial

8    reporting requirements" might not constitute commandeering, but

9    "forced information sharing, where it facilitates the on-the-

10   ground, day-to-day administration of a federal program, runs

11   afoul of the anti-commandeering rule."  Id. at 7.  They argue

12   that "none of [the] examples [Plaintiff cites to show that

13   Congress frequently calls on states to share relevant

14   information] remotely resembles a system of state officers

15   performing daily services for immigration agents."  Id. at 8.

16   The Court agrees—cautiously, because these other provisions were

17   not heavily briefed—that the information sharing provisions cited

18   in footnote 14 of Plaintiff's Reply do not appear to approximate

19   the level of state and local law enforcement integration into

20   federal immigration enforcement operations seen in this context.

21        Whether the constitutionality of an information sharing

22   requirement is absolute or whether it turns on how much the

23   requirement effectively integrates state law enforcement into a

24   federal regime is an interesting, and seemingly open,

25   constitutional question that may prove dispositive in another

26   case.  Here, however, the Court need not reach a definitive

27   answer because the Court finds no direct conflict between SB 54

28   and Section 1373.

1       The state statute expressly permits information sharing in

2   accordance with Section 1373.  Cal. Gov't Code § 7284.6(e).  The

3   functionality of this clause depends on whether Section 1373 is

4   construed broadly to encompass information such as release dates

5   and addresses or narrowly to include only one's immigration

6   status or citizenship (i.e., category of presence in the United

7   States, and whether an individual is a U.S. citizen, and if not,

8   the country of citizenship).  See City of Philadelphia, 2018 WL

9   2725503, at *35.

10      Two district courts have held that Section 1373 must be

11  interpreted narrowly.  In Steinle v. City & Cnty. of San

12  Francisco, the district court explained:

13          Nothing in 8 U.S.C. § 1373(a) addresses information
            concerning an inmate's release date. The statute, by
14          its terms, governs only "information regarding the
            citizenship or immigration status, lawful or unlawful,
15          of any individual." 8 U.S.C. § 1373(a).  If the
            Congress that enacted the Omnibus Consolidated
16          Appropriations Act of 1997 (which included § 1373(a))
            had intended to bar all restriction of communication
17          between local law enforcement and federal immigration
            authorities, or specifically to bar restrictions of
18          sharing inmates' release dates, it could have included
            such language in the statute. It did not, and no
19          plausible reading of "information regarding . . .
            citizenship or immigration status" encompasses the
20          release date of an undocumented inmate. Because the
            plain language of the statute is clear on this point,
21          the Court has no occasion to consult legislative
            history.
22

23  230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).  Plaintiff urges the

24  Court to limit its reliance on Steinle, which involved a

25  negligence claim and in which the United States did not appear as

26  a party.  But, the district court in City of Philadelphia—a case

27  in which the United States did appear—agreed with the Steinle

28  court's analysis and concluded that the United States' broad

37

1   interpretation "is simply impossible to square with the statutory

2   text."  2018 WL 2725503, at *34.

3       Both district courts rejected the analysis in <u>Bologna v.</u>

4   <u>City & Cnty. of San Francisco</u>, the principal case Plaintiff cites

5   for persuasive value.  192 Cal. App. 4th 429, 438-40 (Ct. App.

6   2011).  In analyzing a tort claim similar to the claim at issue

7   in <u>Steinle</u>, the California Appellate Court characterized Section

8   1373 as invalidating "all restrictions on the voluntary exchange

9   of immigration information between federal, state and local

10  government entities and officials and federal immigration

11  authorities."  <u>Id.</u> at 438.  The <u>Steinle</u> court expressly disavowed

12  this interpretation:

13      This Court is not bound by the state court's
        interpretation of federal law, and respectfully
14      disagrees with the <u>Bologna</u> court's characterization of
        the scope of § 1373(a).  "As [the Supreme Court has]
15      repeatedly held, the authoritative statement is the
        statutory text, not the legislative history or any
16      other extrinsic material. Extrinsic materials have a
        role in statutory interpretation only to the extent
17      they shed a reliable light on the enacting
        Legislature's understanding of otherwise ambiguous
18      terms."  <u>Exxon Mobil Corp. v. Allapattah Servs., Inc.</u>,
        545 U.S. 546, 568 (2005).  The Ninth Circuit has
19      explained in some detail why the Constitution does not
        permit giving legislative effect to language found only
20      in congressional reports that is not consistent with
        the language of a statute itself: The principle that
21      committee report language has no binding legal effect
        is grounded in the text of the Constitution and in the
22      structure of separated powers the Constitution created.
        . . . Treating legislative reports as binding law also
23      undermines our constitutional structure of separated
        powers, because legislative reports do not come with
24      the traditional and constitutionally-mandated political
        safeguards of legislation.
25

26  <u>Steinle</u>, 230 F. Supp. 3d at 1014-15; <u>see</u> <u>City of Philadelphia</u>,

27  2018 WL 2725503, at *35 (disagreeing with <u>Bologna</u>).

28      The Court agrees with its fellow district courts that the

1    plain meaning of Section 1373 limits its reach to information

2    strictly pertaining to immigration status (i.e. what one's

3    immigration status is) and does not include information like

4    release dates and addresses.  See Carson Harbor Vill., Ltd. v.

5    Unocal Corp., 270 F.3d 863, 878 (9th Cir. 2001) ("It is

6    elementary that the meaning of a statute must, in the first

7    instance, be sought in the language in which the act is framed,

8    and if that is plain, . . . the sole function of the courts is to

9    enforce it according to its terms.") (citation omitted).

10        A contrary interpretation would know no bounds.  The phrase

11    could conceivably mean "everything in a person's life."  See Br.

12    for City & Cnty. of San Francisco, as Amicus Curiae, ECF No. 112;

13    see also State ex rel. Becerra v. Sessions, 284 F. Supp. 3d 1015,

14    1035 (N.D. Cal. 2018) ("Under the INA, almost every bit of

15    information about an individual could be relevant to status,

16    particularly with respect to the right to asylum or as a defense

17    to removal.").  If Congress intended the statute to sweep so

18    broadly, it could have used broader language or included a list

19    to define the statute's scope.  See, e.g., 8 U.S.C. § 1367(a)(2)

20    (prohibiting immigration enforcement officers from "permit[ting]

21    the use by or disclosure to anyone . . . of any information which

22    relates to an alien who is the beneficiary of an application for

23    relief under [certain sections of the INA]").  One cannot

24    naturally read "information regarding immigration status" to

25    include the types of information Plaintiff now seeks to

26    incorporate.  While an immigrant's release date or home address

27    might assist immigration enforcement officers in their endeavors,

28    neither of these pieces of information have any bearing on one's

1   immigration or citizenship status.

2          The parties offer competing precedent to aid the Court in

3   interpreting the term "regarding." In Roach, the Ninth Circuit

4   cautioned courts to refrain from interpreting the words "relate

5   to," in an express preemption provision, too broadly. Roach v.

6   Mail Handlers Ben. Plan, 298 F.3d 847 (9th Cir. 2002). The

7   Circuit explained:

8          [I]n the context of a similarly worded preemption
       provision in the Employee Retirement Income Security
9          Act (ERISA), the Supreme Court has explained that the
       words "relate to" cannot be taken too literally. "If
10         'relate to' were taken to extend to the furthest
       stretch of its indeterminacy, then for all practical
11         purposes pre-emption would never run its course, for
       'really, universally, relations stop nowhere.' "
12         Instead, "relates to" must be read in the context of
       the presumption that in fields of traditional state
13         regulation "the historic police powers of the States
       [are] not to be superseded by [a] Federal Act unless
14         that was the clear and manifest purpose of Congress."

15  Id. at 849-50 (citations omitted). Plaintiff urges the Court to,

16  instead, focus on the Supreme Court's more recent interpretation

17  of the term "respecting" in Lamar, Archer & Cofrin, LLP v.

18  Appling. 138 S. Ct. 1752 (2018) (interpreting a provision in the

19  Bankruptcy Code excepting debts obtained by fraud from

20  discharge); Reply at 16. In Appling, the Court read the word

21  "respecting" to have a broadening effect, instructing the Court

22  to read the relevant text expansively. Id. at 1760. The Supreme

23  Court also observed that a limiting construction would

24  effectively read the term "respecting" out of the statute. Id.

25  at 1761.

26         The Court finds the law in Appling sufficiently distinct

27  from the law at issue here to limit the decision's instructional

28  value. The Appling Court was not called upon to determine the

1    preemptive effect of a federal statute and thus did not have

2    presumptions against preemption to factor into its analysis.

3    Further, the Appling Court held that "a statement about a single

4    asset can be a 'statement respecting the debtor's financial

5    condition.' "  Id. at 1757.  It reasoned, "[a] single asset has a

6    direct relation to and impact on aggregate financial condition,

7    so a statement about a single asset bears on a debtor's overall

8    financial condition[.]"  Id. at 1761.  In contrast, as noted

9    above, a person's address or release date has no direct relation

10   to one's immigration or citizenship status.

11       Unlike the law in Appling, a narrow reading of the phrase

12   "regarding immigration status" does not read "regarding" out of

13   the statute.  Plaintiff makes a similar argument by noting the

14   omission of the term "regarding" in Section 1373(c) as compared

15   to subsection (a).  Mot. at 28.  Section 1373(c) governs the

16   obligation of federal immigration authorities in responding to

17   inquiries from other government entities, and an official record

18   of a person's citizenship or immigration status is presumably

19   within their control.  Opp'n at 12–13; Br. for City and Cnty. of

20   San Francisco, as Amicus Curiae, at 9.  Subsection (a) is

21   directed toward government entities and their officers, who might

22   possess information pertaining to an individual's immigration

23   status but not hold an official record.  The phrase "information

24   regarding" thus serves a purpose even when the statute is read

25   narrowly.

26       In any event, neither Roach nor Appling involved a provision

27   like the one at issue in this case.  The Court is convinced,

28   based on the analysis above, that "information regarding

41

1   immigration or citizenship status" does not include an

2   immigrant's release date or home and work addresses.  Section

3   1373 and the information sharing provisions of SB 54 do not

4   directly conflict.

5                    b.   Obstacle Preemption

6        Apart from any direct conflict with Section 1373, Plaintiff

7   argues that "the structure of the INA makes clear that states and

8   localities are required to allow a basic level of information

9   sharing" and cooperation with immigration enforcement.  Mot. at

10  24.  Plaintiff points to 8 U.S.C. § 1226(c)(1), a law that

11  requires "mandatory detention" for certain immigrants after their

12  release from criminal custody.  It also cites 8 U.S.C. § 1231,

13  which instructs the Attorney General to remove an immigrant

14  within a period of 90 days after the immigrant has been ordered

15  removed.  8 U.S.C. § 1231(a)(1)(A).  For certain immigrants,

16  detention during the removal period is mandatory.  8 U.S.C. §

17  1231(a)(2).  With some exceptions "the Attorney General may not

18  remove an [immigrant] who is sentenced to imprisonment until the

19  [immigrant] is released from imprisonment.  Parole, supervised

20  release, probation, or possibility of arrest or further

21  imprisonment is not a reason to defer removal."  8 U.S.C. §

22  1231(a)(4)(A).

23       Plaintiff argues that SB 54 undermines the system Congress

24  designed.  Mot. at 25.  The limits on information sharing and

25  transfers prevent or impede immigration enforcement from

26  fulfilling its responsibilities regarding detention and removal

27  because officers cannot arrest an immigrant upon the immigrant's

28  release from custody and have a more difficult time finding

                                  42

1    immigrants after the fact without access to address information.

2    Id. at 25-27.  It contends that limiting adherence to transfer

3    requests affords undocumented immigrants an opportunity to

4    abscond.  Plaintiff also points out that the subset of crimes for

5    which SB 54 permits cooperation do not match the crimes under

6    federal law that may serve as the predicate for removability or

7    crimes for which detention is mandatory.  Id. at 26.

8    Additionally, it argues that requiring a judicial warrant or

9    judicial finding of probable cause is irreconcilable with the

10   INA, which establishes a system of civil administrative warrants

11   as the basis for immigration arrest and removal.  Id. at 30.

12       The Court disagrees and instead finds that California's

13   decision not to assist federal immigration enforcement in its

14   endeavors is not an "obstacle" to that enforcement effort.

15   Plaintiff's argument that SB 54 makes immigration enforcement far

16   more burdensome begs the question: more burdensome than what?

17   The laws make enforcement more burdensome than it would be if

18   state and local law enforcement provided immigration officers

19   with their assistance.  But refusing to help is not the same as

20   impeding.  If such were the rule, obstacle preemption could be

21   used to commandeer state resources and subvert Tenth Amendment

22   principles.  Federal objectives will always be furthered if

23   states offer to assist federal efforts.  A state's decision not

24   to assist in those activities will always make the federal object

25   more difficult to attain than it would be otherwise.  Standing

26   aside does not equate to standing in the way.

27       Though not analyzing an obstacle preemption claim, the

28   Seventh Circuit recently expressed a similar view with respect to

1    decisions to withhold assistance.  See City of Chicago v.

2    Sessions, 888 F.3d 272 (7th Cir. 2018).  The Circuit explained:

3          [T]he Attorney General repeatedly characterizes the
           issue as whether localities can be allowed to thwart
4          federal law enforcement.  That is a red herring.
           First, nothing in this case involves any affirmative
5          interference with federal law enforcement at all, nor
           is there any interference whatsoever with federal
6          immigration authorities. The only conduct at issue here
           is the refusal of the local law enforcement to aid in
7          civil immigration enforcement through informing the
           federal authorities when persons are in their custody
8          and providing access to those persons at the local law
           enforcement facility. Some localities might choose to
9          cooperate with federal immigration efforts, and others
           may see such cooperation as impeding the community
10         relationships necessary to identify and solve crimes.
           The choice as to how to devote law enforcement
11         resources—including whether or not to use such
           resources to aid in federal immigration efforts—would
12         traditionally be one left to state and local
           authorities.
13

14   City of Chicago, 888 F.3d at 282 (analyzing conditions imposed on

15   federal grants).  This common-sense distinction militates against

16   adopting Plaintiff's perspective of the laws.

17        The Court is also wary of finding preemption in the absence

18   of a "clear and manifest purpose of Congress" to supersede the

19   States' police powers.  See Arizona, 567 U.S. at 400.  California

20   has not crossed over into the exclusively federal realm of

21   determining who may enter and remain within the United States.

22   SB 54 only governs the activities of the State's own law

23   enforcement agencies.  Although Congress clearly intends its

24   immigration laws to exclusively regulate the subject of

25   immigration and the activities of federal immigration enforcement

26   officers, the Court sees no clear indication that Congress

27   intended to displace the States' regulation of their own law

28   enforcement agencies.

                                44

1    Despite Plaintiff's urgings, this case does not mirror

2    _Arizona v. United States_.  567 U.S. 387 (2012).  Arizona sought

3    to impose additional rules and penalties upon individuals whom

4    Congress had already imposed extensive, and exclusive,

5    regulations.  SB 54 does not add or subtract any rights or

6    restrictions upon immigrants.  Immigrants subject to removal

7    remain subject to removal.  SB 54, instead, directs the

8    activities of state law enforcement, which Congress has not

9    purported to regulate.  Preemption is inappropriate here.

10    The Court's reluctance to glean such a purpose from the

11    cited statutes is amplified because Congress indicated awareness

12    that state law might be in tension with federal objectives and

13    decided to tolerate those competing interests.  See _Bonito Boats,_

14    _Inc. v. Thunder Craft Boats, Inc._, 489 U.S. 141, 166–67 (1989)

15    ("The case for federal pre-emption is particularly weak where

16    Congress has indicated its awareness of the operation of state

17    law in a field of federal interest, and has nonetheless decided

18    to stand by both concepts and to tolerate whatever tension there

19    is between them.") (citation and quotation marks omitted); _see_

20    _also_ _Wyeth v. Levine_, 555 U.S. 555, 575 (2009) (quoting _Bonito_

21    _Boats_ and finding that a plaintiff's failure-to-warn claims were

22    not preempted by federal law).

23    First, in the portions of the INA where Congress provided

24    for cooperation between state and federal officials, it

25    conditioned cooperation on compliance with state law.  For

26    instance, 8 U.S.C. § 1252c(a) authorizes state and local law

27    enforcement officials to arrest and detain certain immigrants "to

28    the extent permitted by relevant State and local law."

1    Subsection (b) imposes an obligation on the Attorney General to

2    cooperate with states in providing information that would assist

3    state and local law enforcement, but does not impose any

4    corollary obligations on state or local law enforcement.

5    Similarly, 8 U.S.C. § 1357(g) authorizes the Attorney General to

6    enter into agreements with the State to perform immigration

7    officer functions, but only "to the extent consistent with State

8    and local law."  These conditions on cooperation indicate that

9    Congress did not intend to preempt state law in this area.

10        Second, the primary mechanism—a "detainer"—by which

11   immigration enforcement agents solicit release dates, transfers,

12   and detention is a "request."  See 8 C.F.R. § 287.7(a); Mot. at

13   25 ("To effectuate the INA's provisions, DHS issues an

14   'immigration detainer[.]' ").  Even detainers soliciting

15   "temporary detention" have been found to be a non-mandatory

16   "request," despite the use of the word "shall" in the governing

17   provision.  8 C.F.R. § 287.7(d); see Galarza v. Szalczyk, 745

18   F.3d 634, 640 (3d Cir. 2014) ("[N]o provisions of the [INA]

19   authorize federal officials to command local or state officials

20   to detain suspected aliens subject to removal."); see also

21   Miranda-Olivares v. Clackamas Cnty., No. 3:12-CV-02317-ST, 2014

22   WL 1414305, at *7 (D. Or. Apr. 11, 2014) (following Galarza and

23   noting that the Ninth Circuit has interpreted detainer letters,

24   in the habeas corpus context, to be advisory in nature, not

25   imposing—or even allowing—a warden to hold a detainee at the end

26   of his term of imprisonment) (citing Garcia v. Taylor, 40 F.3d

27   299 (9th Cir. 1994)).  The voluntary nature of any response to

28   these requests demonstrates that the federal government has not

1    supplanted state discretion in this area.

2        Congress's deliberate decision to condition enforcement

3    cooperation on consistency with state law, and the primary

4    mechanism by which immigration officials seek law enforcement

5    assistance being merely a "request," counsels against implied

6    preemption in this area.  A clear and manifest purpose to preempt

7    state law is absent from these provisions.

8        Plaintiff argues that "Congress could have authorized the

9    federal government to take custody of aliens immediately, without

10   regard to the status of state criminal enforcement," Reply at 22–

11   23, and that because it did not, the Court can infer that

12   Congress intended states to cooperate with immigration law

13   enforcement.  The Court does not find such inference warranted.

14   The Court can just as readily infer that Congress recognized the

15   States' sovereign power to enforce their criminal laws and

16   thought interference would upset the balance in powers.  See Def.

17   Reply to MTD at 1 ("It is not Congress that offers California the

18   'opportunity' to enforce state criminal laws[;] it is a right

19   inherent in California's sovereignty.").  Furthermore, it is

20   often the case that an immigrant is not deemed removable or

21   inadmissible until after they have been convicted of a crime.  In

22   these cases, state process is a predicate to federal action.

23       The Ninth Circuit's holding in Preap does not require a

24   different outcome.  Preap v. Johnson, 831 F.3d 1193 (9th Cir.

25   2016) cert. granted sub nom. Nielsen v. Preap, 138 S. Ct. 1279

26   (2018).  The Preap court held that the INA's mandatory detention

27   provision only applies in cases when immigrants are "promptly"

28   detained after being released from custody.  Id. at 1197.  Preap

1   does not, however, require contemporaneous transfer for the

2   mandatory detention provision to apply.  And, a longer delay in

3   securing custody does not preclude detention. It just makes

4   detention a discretionary decision rather than a mandatory

5   obligation.  See id. at 1201; 8 U.S.C. § 1226.  The Court finds

6   that the operational challenges immigration enforcement agencies

7   may have faced following the Preap decision do not alter the

8   Court's conclusions with respect to Congress's clear and manifest

9   purpose.

10      The Court further finds that Tenth Amendment and

11  anticommandeering principles counsel against preemption.  Though

12  responding to requests for information and transferring

13  individuals to federal custody may demand relatively little from

14  state law enforcement, "[t]he issue of commandeering is not one

15  of degree[.]"  Galarza, 745 F.3d at 644; see Printz, 521 U.S. at

16  932 ("But where, as here, it is the whole object of the law to

17  direct the functioning of the state executive, and hence to

18  compromise the structural framework of dual sovereignty, such a

19  'balancing' analysis is inappropriate.  It is the very principle

20  of separate state sovereignty that such a law offends, and no

21  comparative assessment of the various interests can overcome that

22  fundamental defect.").  Under Printz, even enlisting state

23  officers to perform discrete, ministerial tasks constitutes

24  commandeering.  Thus, it is highly unlikely that Congress could

25  have made responses to requests seeking information and/or

26  transfers of custody mandatory.  See Cnty. of Santa Clara v.

27  Trump, 250 F. Supp. 3d 497, 534 (N.D. Cal. 2017), ("The Executive

28  Order uses coercive means in an attempt to force states and local

48

1    jurisdictions to honor civil detainer requests, which are

2    voluntary 'requests' precisely because the federal government

3    cannot command states to comply with them under the Tenth

4    Amendment.") (focusing on requests for detention).

5        The <u>Printz</u> Court outlined several reasons why commandeering

6    is problematic, which parallel California's concerns in enacting

7    SB 54.  The Court noted that commandeering shifts the costs of

8    program implementation from the Federal Government to the states.

9    <u>Printz</u>, 521 U.S. at 930.  The California Legislature enacted SB

10   54, in part, to divert California's resources away from

11   supporting the Federal Government's enforcement efforts.  It

12   stated:

13       (d) Entangling state and local agencies with federal
         immigration enforcement programs diverts already
14       limited resources and blurs the lines of accountability
         between local, state, and federal governments.

15

16       . . .

17       (f) This chapter seeks to ensure effective policing, to
         protect the safety, well-being, and constitutional
18       rights of the people of California, and to direct the
         state's limited resources to matters of greatest
19       concern to state and local governments.

20   Cal. Gov't Code § 7284.2 (Legislative findings and declarations).

21   Defendant contends that working with immigration enforcement

22   diverts resources from the States' priorities.  Opp'n at 15–16;

23   <u>see e.g.</u>, Hart Decl., ECF No. 75-3, at 4 ("[W]e are often faced

24   with staffing shortages that make even processing the additional

25   paperwork related to detainers difficult.").

26       The <u>Printz</u> Court also explained that "even when States are

27   not forced to absorb the costs of implementing a federal program,

28   they are still put in the position of taking the blame for its

                                   49

1    burdensomeness and for its defects."   521 U.S. at 930 ("And it

2    will likely be the CLEO, not some federal official, who will be

3    blamed for any error (even one in the designated federal

4    database) that causes a purchaser to be mistakenly rejected.").

5         Here, when California assists federal immigration

6    enforcement in finding and taking custody of immigrants, it risks

7    being blamed for a federal agency's mistakes, errors, and

8    discretionary decisions to pursue particular individuals or

9    engage in particular enforcement practices.   Under such a regime,

10   federal priorities dictate state action, which affects the

11   State's relationship with its constituency and that

12   constituency's perception of its state government and law

13   enforcement.   Indeed, Defendant and amici highlight the impact

14   these perceptions have on the community's relationship with local

15   law enforcement. See Cal. Gov't Code § 7284.2 ("This trust is

16   threatened when state and local agencies are entangled with

17   federal immigration enforcement, with the result that immigrant

18   community members fear approaching police when they are victims

19   of, and witnesses to, crimes, seeking basic health services, or

20   attending school, to the detriment of public safety and the well-

21   being of all Californians."); Br. for Current and Former

22   Prosecutors and Law Enforcement Leaders, as Amici Curiae, ECF No.

23   127; Br. for City of Los Angeles, as Amicus Curiae, ECF No. 128;

24   Br. for Cnty. of Los Angeles, et al., as Amici Curiae, ECF No.

25   129.

26        Plaintiff discounts Defendant's interest in extracting

27   itself from immigration enforcement, but fails to confront

28   California's primary concern: the impact that state law

1    enforcement's entanglement in immigration enforcement has on

2    public safety.  The historic police powers of the State include

3    the suppression of violent crime and preservation of community

4    safety.  In this power inheres the authority to structure and

5    influence the relationship between state law enforcement and the

6    community it serves.  The ebb of tensions between communities and

7    the police underscores the delicate nature of this relationship.

8    Even perceived collaboration with immigration enforcement could

9    upset the balance California aims to achieve.  It is therefore

10   entirely reasonable for the State to determine that assisting

11   immigration enforcement in any way, even in purportedly passive

12   ways like releasing information and transferring custody, is a

13   detrimental use of state law enforcement resources.

14        However, because Congress has not required states to assist

15   in immigration enforcement—and has merely made the option

16   available to them—this case presents a unique situation.  As

17   Judge Orrick observed in State ex rel. Becerra v. Sessions: "No

18   cited authority holds that the scope of state sovereignty

19   includes the power to forbid state or local employees from

20   voluntarily complying with a federal program."  284 F. Supp. 3d

21   1015, 1035 (N.D. Cal. 2018).  The Second Circuit in City of New

22   York concluded a state could not do so.  City of New York v.

23   United States, 179 F.3d 29, 35 (2nd Cir. 1999) ("We therefore

24   hold that states do not retain under the Tenth Amendment an

25   untrammeled right to forbid all voluntary cooperation by state or

26   local officials with particular federal programs.").

27   Nevertheless, the Supreme Court's holding in Murphy undercuts

28   portions of the Second Circuit's reasoning and calls its

1   conclusion into question.  Compare City of New York, 179 F.3d at

2   35 (distinguishing Section 1373 from the laws in Printz and New

3   York because the Section does not compel state and local

4   governments to enact or administer any federal regulatory program

5   or conscript them into federal service) with Murphy, 138 S. Ct.

6   at 1478 (holding the anticommandeering rule applies to

7   Congressional prohibitions on state actions in addition to

8   commands to take affirmative actions).  Further, the Second

9   Circuit's broad proclamations may be limited to the specific City

10  Executive Order at issue, procedural posture, and record in that

11  case.  See Br. for Admin. L., Const. L., Crim. L., and Immigr. L.

12  Scholars, as Amici Curiae, ECF No. 132, at 13 (distinguishing

13  City of New York).  Regardless, the City of New York holding is

14  not binding on this Court.

15       The Court finds that a Congressional mandate prohibiting

16  states from restricting their law enforcement agencies'

17  involvement in immigration enforcement activities—apart from,

18  perhaps, a narrowly drawn information sharing provision—would

19  likely violate the Tenth Amendment.  See City of Chicago v.

20  Sessions, 888 F.3d 272, 282 (7th Cir. 2018) (stating, in dicta:

21  "The choice as to how to devote law enforcement resources—

22  including whether or not to use such resources to aid in federal

23  immigration efforts—would traditionally be one left to state and

24  local authorities."); Koog v. United States, 79 F.3d 452, 460

25  (5th Cir. 1996) ("Whatever the outer limits of state sovereignty

26  may be, it surely encompasses the right to set the duties of

27  office for state-created officials and to regulate the internal

28  affairs of governmental bodies.").  The Tenth Amendment analysis

1   in Murphy supports this conclusion.   Murphy, 138 S. Ct. at 1478

2   (a prohibition on state legislation violates the

3   anticommandeering rule), 1481 ("[P]reemption is based on a

4   federal law that regulates the conduct of private actors, not

5   States."); see New York, 505 U.S. at 166 ("[T]he Framers

6   explicitly chose a Constitution that confers upon Congress the

7   power to regulate individuals, not States.").   If Congress lacks

8   the authority to direct state action in this manner, then

9   preemption cannot and should not be used to achieve the same

10  result.   The Supremacy Clause requires courts to hold federal law

11  supreme when Congress acts pursuant to one of its enumerated

12  powers; those powers do not include the authority to dictate a

13  state's law enforcement policies.

14       Having concluded that California may restrict the assistance

15  its law enforcement agencies provide immigration enforcement, the

16  Court finds California's choice to cooperate in certain

17  circumstances permissible.   See Cal. Gov't Code § 7284.6(a)(1)(C)

18  (allowing California law enforcement agencies to provide

19  information regarding a person's release date when that person

20  has been convicted of certain crimes), § 7284(a)(4) (permitting

21  California law enforcement agencies to transfer individuals to

22  immigration authorities when authorized by a judicial warrant or

23  judicial probable cause determination, or when the individual has

24  been convicted of certain crimes).   As the Seventh Circuit

25  explained:

26       [F]or the persons most likely to present a threat to
         the community, City law enforcement authorities will
27       cooperate with ICE officials even in "sanctuary"
         cities.  The decision to coordinate in such
28       circumstances, and to refuse such coordination where

                                    53

1   　the threat posed by the individual is lesser, reflects
2   　the decision by the state and local authorities as how
    　best to further the law enforcement objectives of their
3   　communities with the resources at their disposal.

4   City of Chicago, 888 F.3d at 281.  While the Court, again,

5   acknowledges that City of Chicago involved different claims than

6   those presented here, the Court agrees with the assessment.  Just

7   as the State may restrict the assistance its law enforcement

8   officers provide immigration enforcement, the State may choose to

9   outline exceptions to that rule in accordance with its own law

10  enforcement priorities and concerns.  For example, California is

11  concerned with the monetary liability law enforcement agencies

12  may face if they maintain custody of an individual for purposes

13  of transfer without a judicial warrant or probable cause

14  determination justifying that custody.  See Roy v. Cnty. of Los

15  Angeles, No. CV 12-09012-AB (FFMx), 2018 WL 914773, at *22-24

16  (C.D. Cal. Feb. 7, 2018) ("The LASD officers have no authority to

17  arrest individuals for civil immigration offenses, and thus,

18  detaining individuals beyond their date for release violated the

19  individuals' Fourth Amendment rights."); Br. for States and the

20  District of Columbia, as Amici Curiae, ECF No. 139 ("SB 54's

21  [warrant requirement] is a reasonable way to protect the state

22  and its law enforcement agencies from monetary liability for

23  unlawfully detaining individuals requested to be transferred to

24  federal immigration authorities after their period of state

25  custody expires.").  The California Legislature expressed this

26  concern when it passed SB 54:

27   　State and local participation in federal immigration
    　enforcement programs also raises constitutional
28   　concerns, including the prospect that California

54

1    residents could be detained in violation of the Fourth
2    Amendment to the United States Constitution, targeted
     on the basis of race or ethnicity in violation of the
     Equal Protection Clause, or denied access to education
3    based on immigration status. See Sanchez Ochoa v.
     Campbell, et al. (E.D. Wash. 2017) 2017 WL 3476777;
4    Trujillo Santoya v. United States, et al. (W.D. Tex.
     2017) 2017 WL 2896021; Moreno v. Napolitano (N.D. Ill.
5    2016) 213 F. Supp. 3d 999; Morales v. Chadbourne (1st
     Cir. 2015) 793 F.3d 208; Miranda-Olivares v. Clackamas
6    County (D. Or. 2014) 2014 WL 1414305; Galarza v.
     Szalczyk (3d Cir. 2014) 745 F.3d 634.
7

8    Cal. Gov't Code § 7284.2(e).  Because California's directive to

9    its law enforcement agencies is not preempted, the Court finds

10   its determination to make certain exceptions to the rule also

11   survives preemption analysis.

12                  c.   Intergovernmental Immunity

13        The intergovernmental immunity doctrine has no clear

14   application to SB 54.  SB 54 regulates state law enforcement; it

15   does not directly regulate federal immigration authorities.

16        Plaintiff argues the information sharing and transfer

17   restrictions "apply only to requests made by federal entities[.]"

18   Mot. at 31.  It claims that although "the statute defines

19   'immigration authorities' to include, in addition to federal

20   officers, 'state, or local officers, employees or persons

21   performing immigration enforcement functions,' it also defines

22   'immigration enforcement' to mean 'any and all efforts to

23   investigate, enforce, or assist in the investigation or

24   enforcement of any federal civil immigration law, and also

25   includes any and all efforts to investigate, enforce, or assist

26   in the investigation or enforcement of any federal criminal

27   immigration law that penalizes a person's presence in, entry, or

28   reentry to, or employment in, the United States.' "  Id. (citing

                                   55

1   the definitions in Cal. Gov't Code § 7284.4).

2        The Court is not convinced that the intergovernmental

3   immunity doctrine extends to the State's regulation over the

4   activities of its own law enforcement and decision to restrict

5   assistance with some federal endeavors.  None of the cases cited

6   in the parties' briefs involve an analogous regulation.  The

7   preemption analysis above thus counsels against expanding the

8   doctrine to the present situation.  North Dakota v. United

9   States, 495 U.S. 423, 435 (1990) ("The Court has more recently

10  adopted a functional approach to claims of governmental immunity,

11  accommodating of the full range of each sovereign's legislative

12  authority and respectful of the primary role of Congress in

13  resolving conflicts between the National and State

14  Governments.").

15       Even if the doctrine might arguably apply to this situation,

16  Plaintiff has not shown it is likely to succeed on this claim.

17  First, Plaintiff has not shown that the laws uniquely burden

18  federal immigration authorities.  The information sharing

19  provisions permit sharing when the information is available to

20  the public.  Cal. Gov't Code § 7284.6(a)(1)(C)-(D).  Plaintiff

21  has not identified any examples of similarly situated authorities

22  (i.e., civil law enforcement agencies) that the State treats

23  better than it does federal immigration authorities.  And while

24  the Court agrees with Plaintiff that "federal, state, or local

25  officer[s] . . . performing immigration enforcement functions"

26  boils down to federal immigration enforcement, see Cal. Gov't

27  Code § 7284.4, the Court finds the discrimination—if any—is

28  justified by California's choice to divert its resources away

1    from assisting immigration enforcement efforts.  As explained in

2    detail above, the purported "burden" here is California's

3    decision not to help the Federal government implement its

4    immigration enforcement regime.  The State retains the power to

5    make this choice and the concerns that led California to adopt

6    this policy justify any differential treatment that results.

7         For all of the reasons set forth in Part III.A.3 of this

8    Order, the Court finds that Plaintiff is not likely to succeed on

9    the merits of its SB 54 claim and its motion for a preliminary

10   injunction as to this statute is denied.

11        B.   Preliminary Injunction Equitable Factors

12        Each party submitted evidence showing hardships to their

13   sovereign interests and their constituencies should the Court

14   fail to decide this Motion in their favor.  See Exhs. to Mot. and

15   Reply, ECF Nos. 2-2-5, 46, 171-1-25, 173, 178; Exhs. to Opp'n,

16   ECF Nos. 75, 78, 81, 83.  Many of the amici curiae also

17   identified harms that would befall themselves or their

18   constituencies because of this Court's Order.  The parties'

19   interests largely hang in balance, each seeking to vindicate what

20   it—and its supporters—view as critical public policy objectives.

21   These harms are not susceptible to remediation through damages;

22   each side faces much more than mere economic loss.  See Ariz.

23   Dream Act Coal. v. Brewer, 757 F.3d 1053, 1068 (9th Cir. 2014)

24   ("Irreparable harm is traditionally defined as harm for which

25   there is no adequate legal remedy, such as an award of

26   damages.").

27        "[A]n alleged constitutional infringement will often alone

28   constitute irreparable harm."  United States v. Arizona, 641 F.3d

1    339, 366 (9th Cir. 2011) (citation omitted), rev'd in part on

2    other grounds, 567 U.S. 387 (2012). "It is clear that it would

3    not be equitable or in the public's interest to allow the state

4    to violate the requirements of federal law . . . . In such

5    circumstances, the interest of preserving the Supremacy Clause is

6    paramount." Id. (quoting Cal. Pharmacists Ass'n v. Maxwell-

7    Jolly, 563 F.3d 847, 852-53 (9th Cir. 2009)); see Am. Trucking

8    Ass'ns, Inc. v. City of Los Angeles, 559 F.3d 1046, 1059-60 (9th

9    Cir. 2009) ("Similarly, while we do not denigrate the public

10   interest represented by the Ports, that must be balanced against

11   the public interest represented in [Congress's] decision to

12   deregulate the motor carrier industry, and the Constitution's

13   declaration that federal law is to be supreme.").

14       For the state laws which the Court found no likelihood that

15   Plaintiff will succeed on its claims—California Government Code

16   Sections 12532 (AB 103), 7284.6(a)(1)(C) & (D), and 7284.6(a)(4)

17   (SB 54), and California Labor Code Section 90.2 (AB 450)—no

18   injunction will issue. "Because it is a threshold inquiry, when

19   a plaintiff has failed to show the likelihood of success on the

20   merits, [the Court] need not consider the remaining three

21   Winter elements." Garcia v. Google, Inc., 786 F.3d 733, 740 (9th

22   Cir. 2015) (citation and quotation marks omitted). The Court

23   will not find an irreparable injury where it has not found an

24   underlying constitutional infringement. See Goldie's Bookstore,

25   Inc. v. Super. Ct. of Cal., 739 F.2d 466, 472 (9th Cir. 1984)

26   ("In this case, however, the constitutional claim is too tenuous

27   to support our affirmance on [the] basis [of irreparable

28   harm].").

1    As to California Government Code Sections 7285.1 and 7285.2

2  and California Labor Code Section 1019.2, the Court presumes that

3  Plaintiff will suffer irreparable harm based on the

4  constitutional violations identified above.  The equitable

5  considerations favor an injunction in such circumstances.  <u>See</u>

6  <u>United States v. Alabama</u>, 691 F.3d 1269, 1301 (11th Cir. 2012)

7  ("The United States suffers injury when its valid laws in a

8  domain of federal authority are undermined by impermissible state

9  regulations.  Frustration of federal statutes and prerogatives

10  are not in the public interest, and we discern no harm from the

11  state's nonenforcement of invalid legislation.").  The Court

12  therefore enjoins enforcement of these provisions as to private

13  employers, as set forth in the Order below.

14       C.    <u>Conclusion</u>

15    This Court has gone to great lengths to explain the legal

16  grounds for its opinion.  This Order hopefully will not be viewed

17  through a political lens and this Court expresses no views on the

18  soundness of the policies or statutes involved in this lawsuit.

19  There is no place for politics in our judicial system and this

20  one opinion will neither define nor solve the complicated

21  immigration issues currently facing our Nation.

22    As noted in the Introduction to this Order, this case is

23  about the proper application of constitutional principles to a

24  specific factual situation.  The Court reached its decision only

25  after a careful and considered application of legal precedent.

26  The Court did so without concern for any possible political

27  consequences.  It is a luxury, of course, that members of the

28  other two branches of government do not share.  But if there is

1  going to be a long-term solution to the problems our country

2  faces with respect to immigration policy, it can only come from

3  our legislative and executive branches.  It cannot and will not

4  come from piecemeal opinions issued by the judicial branch.

5  Accordingly, this Court joins the ever-growing chorus of Federal

6  Judges in urging our elected officials to set aside the partisan

7  and polarizing politics dominating the current immigration debate

8  and work in a cooperative and bi-partisan fashion toward drafting

9  and passing legislation that addresses this critical political

10  issue.  Our Nation deserves it.  Our Constitution demands it.

11                              IV.   ORDER

12      For the reasons set forth above, the Court DENIES IN PART

13  AND GRANTS IN PART Plaintiff's Motion for Preliminary Injunction.

14      The Court DENIES Plaintiff's Motion to enjoin California

15  Government Code Sections 12532, 7284.6(a)(1)(C) & (D), and

16  7284.6(a)(4), and California Labor Code Section 90.2.

17      The Court GRANTS Plaintiff's Motion and preliminarily

18  enjoins the State of California, Governor Brown, and Attorney

19  General Becerra from enforcing California Government Code

20  Sections 7285.1 and 7285.2 and California Labor Code Section

21  1019.2(a)&(b) as applied to private employers.

22      IT IS SO ORDERED.

23  Dated: July 4, 2018

24

25                              _____
                                JOHN A. MENDEZ,
                                UNITED STATES DISTRICT JUDGE
26

27

28