**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 17-CV-5720 |
| | ) | |
| JEFFERSON BEAUREGARD SESSIONS | ) | Honorable Harry D. Leinenweber |
| III, Attorney General of the United States | ) | |
| | ) | |
| Defendant. | ) | |

**THE UNITED STATES CONFERENCE OF MAYORS' AND THE CITY OF
EVANSTON'S MOTION FOR
<u>REASSIGNMENT OF CASE AS RELATED</u>**

The United States Conference of Mayors (the "Conference") and the City of Evanston,

Illinois (Evanston), plaintiffs in *City of Evanston and The United States Conference of Mayors v.*

*Jefferson Beauregard Sessions III, in his official capacity as Attorney General of the United States*,

Case No. 18-cv-4853 ("*City of Evanston*"), hereby move this Honorable Court, pursuant to

Northern District of Illinois Local Rule 40.4, to reassign that case to this Court's calendar because

it is related to *City of Chicago v. Jefferson Beauregard Sessions III, Attorney General of the United*

*States*, Case No. 17-CV-5720 ("*City of Chicago*"), a case currently pending before this Honorable

Court. In support of this motion, the Conference and Evanston respectfully state as follows:

## I. INTRODUCTION AND BACKGROUND

1. The Conference is the official non-partisan organization of U.S. cities with

populations of 30,000 or more. There are over 1,400 such cities in the country today. Each city

is represented in the Conference by its chief elected official, the Mayor. Conference members

speak with a united voice on organizational policies and goals, and they adopt policy positions that

collectively represent the views of the nation's mayors. The Conference adopted policies opposing punitive sanctuary jurisdiction policies, such as those challenged in the *City of Chicago* case.

2.      Evanston, a municipal corporation and home rule unit of government organized and existing under the constitution and laws of the State of Illinois, is a Conference member. Evanston was incorporated in 1857, and is home to approximately 74,895 residents, including a vibrant immigrant community. Evanston has longstanding policies promoting cooperation between immigrant communities and local law enforcement that are threatened by the conditions challenged in the *City of Chicago* case.

3.      On August 7, 2017, the City of Chicago ("Chicago"), one of the Conference's members, filed an action seeking declaratory and injunctive relief. *See* Complaint for Injunctive and Declaratory Relief from the *City of Chicago* case attached hereto as **Exhibit 1**. The *City of Chicago* case was assigned to this Court's calendar.

4.      In its complaint, Chicago sought to invalidate three unauthorized and unconstitutional conditions concerning federal immigration enforcement that the Attorney General placed on the receipt of federal law enforcement funds under the Edward Byrne Memorial Justice Assistance Grant program ("Byrne JAG"). *Id.*

5.      On August 10, 2017, Chicago moved for a preliminary injunction to enjoin the challenged conditions. *City of* Chicago, Dkt. 21, 22.

6.      On August 31, 2017, the Conference joined an *amicus curiae* brief in support of Chicago's motion for a preliminary injunction. *City of Chicago*, Dkt. 51.

7.      On September 15, 2017, the Court granted Chicago's motion for a preliminary injunction as to two of the three challenged conditions (the "notice" and "access" conditions),

finding that the Attorney General lacked the statutory authority to impose them on Byrne JAG applicants. *Chicago*, Dkt. 78. The Court's preliminary injunction applied nationwide. *Id.*

8. On September 26, 2017, the Attorney General filed a motion to stay the preliminary injunction. *City of Chicago*, Dkt. 80. On that same date, the Attorney General also filed a notice of appeal with the Seventh Circuit. *City of Chicago*, Dkt. 85.

9. On September 28, 2017, counsel for the Conference appeared at the presentment of the Attorney General's motion to stay and alerted the Court that the Conference intended to seek leave to intervene in the *City of Chicago* case.

10. On October 6, 2017, the Conference filed a motion to intervene in the *City of Chicago* case. *Chicago*, Dkt. 91.

11. On November 16, 2017, the Court denied the Conference's motion to intervene. *City of Chicago*, Dkt. 125. The Court ruled: "Intervention here is premature: The interests of the Conference's member cities are currently protected via the nationwide injunction, and its members' interests have so far been given voice via the *amicus curiae* device. Unless and until the status of the nationwide injunction changes, there is no reason to permit an intervention that will further complicate this litigation." *Id.* at 30-31.

12. On January 3, 2018, the Attorney General filed a motion to dismiss Chicago's complaint in its entirety. *City of Chicago*, Dkt. 137.

13. On January 31, 2018, Chicago filed a motion for partial summary judgment against the Attorney General, arguing that: (a) that the new "notice" and "access" conditions imposed by the Attorney General on the Byrne JAG were unlawful; and (b) that Chicago complied with the requirements under 8 U.S.C. § 1373. *City of Chicago*, Dkt. 150.

14.     On April 19, 2018, the Seventh Circuit affirmed the Court's grant of a nationwide preliminary injunction.

15.     On May 2, 2018, the Attorney General filed a petition for rehearing *en banc* with the Seventh Circuit regarding the geographic scope of the preliminary injunction.

16.     On June 4, 2018, the Seventh Circuit granted the Attorney General's petition for rehearing *en banc* with respect to the geographic scope of the preliminary injunction.

17.     On June 26, 2018, the Seventh Circuit issued an order staying the Court's preliminary injunction as to geographic areas outside the City of Chicago pending disposition of the issue by the *en banc* court.

18.     On July 16, 2018, the Conference and Evanston filed the *City of Evanston* case in the Northern District of Illinois, Eastern Division.  *See* Complaint for Injunctive and Declaratory Relief from the *City of Evanston* case attached hereto as **Exhibit 2**.  The *City of Evanston* case has been assigned to the calendar of the Honorable Charles R. Norgle, Sr.

## II.  GROUNDS FOR REASSIGNMENT

### A.  The *City of Evanston* case is related to the *City of Chicago* case.

19.     Local Rule 40.4(a) provides that "[t]wo or more civil cases may be related if one or more of the following conditions are met: (1) the cases involve the same property; (2) the cases involve some of the same issues of fact or law; (3) the cases grow out of the same transaction or occurrence; or (4) in class action suits, one or more of the classes involved in the cases is or are the same." L.R. 40.4(a). To be deemed related, the cases need satisfy only one of the four criteria set out in Local Rule 40.4(a).  *Helferich Patent Licensing, L.L.C. v. New York Times Co.*, No. 1:10-cv-04387, 2012 WL 1368193, at *2 (N.D. Ill. Apr. 19, 2012).  Additionally, "[l]ocal Rule 40.4(a) does not require exact congruence in facts and issues between two cases in order for them to be

related; rather, it simply requires that the two cases share "*some of the same* issues of facts or law." *Id.* (citations omitted) (emphasis in original).

20.     The *City of Evanston* case and the *City of Chicago* case "involve some of the same issues of fact or law."  L.R. 40.4(a)(2).  In fact, both cases involve the exact same issues of law, namely whether the three unauthorized and unconstitutional conditions concerning federal immigration enforcement that the Attorney General placed on the receipt of federal law enforcement funds under the Byrne JAG program are lawful.  (*See generally* Exhibits 1 and 2.)

21.     The *City of Evanston* and the *City of Chicago* cases also "grow out of the same transaction or occurrence."  L.R. 40.4(a)(3).  Both cases grow out of the Attorney General's imposition of the three unauthorized conditions to the Byrne JAG.

22.     Accordingly, because the *City of Evanston* and the *City of Chicago* cases involve "some of the same issues of fact or law" and "grow out of the same transaction or occurrence," the cases are related under L.R. 40.4(a).

**B.  The conditions for reassignment under Local Rule 40.4(b) are also met.**

23.     In addition to requiring that the two cases be related, Local Rule 40.4 requires that each of the following criteria be met before a case may be reassigned: (1) both cases must be pending in the same court; (2) "the handling of both cases by the same judge is likely to result in a substantial saving of judicial time and effort; (3) the earlier case has not progressed to the point where designating a later filed case as related would be likely to delay the proceedings in the earlier case substantially; and (4) the cases are susceptible of disposition in a single proceeding."  L.R. 40.4(b).  Here, all four conditions are met.

24.     First, both cases are pending in the Northern District of Illinois.

25.     Second, the handling of both cases is likely to result in a substantial saving of judicial time and effort because both cases involve some of the same facts and law, namely the facts and law surrounding the unauthorized conditions.  If the *City of Chicago* and the *City of Evanston* cases are assigned to different judges, those judges will be unnecessarily called upon to resolve the exact same set of issues.  They will also be required to address the same motions, hearings, and trials.  It will be a waste of limited judicial resources to have two judges engaged on these two substantially similar cases.  This is especially true here, where both cases deal with significant constitutional issues.  This Court is already intimately familiar with these complex issues.  L.R. 40.4(b)(2); *Helferich Patent Licensing, L.L.C.*, 2012 WL 1368193, at *3 (stating "[i]t would be a waste of limited judicial resources to require two judges to expend the time and effort necessary to understand the technical and factual issues involved in both cases when it could simply be handled by one judge.").

26.     Third, the earlier case, the *City of Chicago* case, has not progressed to the point where designating a later filed case as related would likely delay the proceedings in the earlier case substantially.   Both a motion to dismiss and a motion for partial summary judgment remain pending in the *City of Chicago* case.  In addition, several other issues remain outstanding.  The *City of Chicago* case has not progressed to a point where designating the *City of Evanston* case as related would delay the proceedings in the *City of Chicago* case in any material way.

27.     Fourth, both "cases are susceptible of disposition in a single proceeding." L.R. 40.4(b)(4).  "This rule does not require that the cases be exactly identical. Rather, for this condition to be met, both actions must involve fundamentally similar claims and defenses that will likely be amenable to dispositive treatment in unified proceedings." *Helferich Patent Licensing, L.L.C.*, 2012 WL 1368193, at *3 (citations and internal quotations omitted). Indeed, "[r]eassignment does

not require that the two cases be bound together, proceeding in unison for all purposes. In fact, reassignment does not even require the cases to be disposed of at the same time; they merely need to be *susceptible* to disposition at the same time." *Id.* As discussed above, both cases involve fundamentally the same claims and defenses and will likely be amenable to dispositive treatment in unified proceedings. This is true for three discrete reasons: (1) plaintiffs' claims in both cases are nearly identical (*See* Exhibits 1 and 2); (2) plaintiffs in both cases seek the exact same sort of relief (*id.*); and (3) the Attorney General's defenses will fundamentally be similar in both cases. Accordingly, the two cases are susceptible of disposition in a single proceeding.

28.     Finally, assignment is needed here even though the Attorney General has not answered the complaint or filed a motion to dismiss in the *City of Evanston* case because the Conference and Evanston imminently intend to seek preliminary injunctive relief. Thus, the assignment is needed to avoid wasting time and judicial resources. Furthermore, the complaint for injunctive and declaratory relief in the *City of Evanston* case is virtually identical to the complaint for injunctive and declaratory relief the Conference previously attached to its motion to intervene in the *City of Chicago* case. In responding to that motion, the Attorney General did not argue that intervention was improper because the issues raised in the pleading differed in any material way from the issues raised by Chicago in its pleading. Accordingly, there is no just reason for delay in resolving this motion.

29.     Because the *City of Chicago* case and the *City of Evanston* case are related under L.R. 40.4(a), and meet all of the conditions for reassignment under L.R. 40.4(b), the Conference's and Evanston's motion for reassignment of the *City of Evanston* case to this Court's calendar should be granted.

WHEREFORE, The United States Conference of Mayors and the City of Evanston, Illinois, plaintiffs in *City of Evanston and The United States Conference of Mayors v. Jefferson Beauregard Sessions III, in his official capacity as Attorney General of the United States*, Case No. 18-cv-4853, respectfully request that this Court grant their Motion for Reassignment of that case to this Honorable Court's calendar as related to *The City of Chicago v. Jefferson Beauregard Sessions III, Attorney General of the United States*, Case No. 17-CV-5720.

Dated: July 17, 2018

Respectfully submitted,

CITY OF EVANSTON and THE UNITED STATES CONFERENCE OF MAYORS

By:  /s Brian C. Haussmann_____
       Counsel for the United States Conference of Mayors

Brian C. Haussmann
John M. Fitzgerald
Kate O'Brien
Kyle A. Cooper
TABET DIVITO & ROTHSTEIN LLC
209 South LaSalle Street, 7th Floor
Chicago, IL  60604
Telephone: (312) 762-945
bhaussmann@tdrlawfirm.com
jfitzgerald@tdrlawfirm.com
kobrien@tdrlawfirm.com
kcooper@tdrlawfirm.com

By: /s/  Michelle L. Masoncup_____
        Counsel for City of Evanston

Michelle L. Masoncup
Corporation Counsel
Law Department
City of Evanston
2100 Ridge Avenue
Evanston, IL 60201
Telephone: (847) 448-8009
mmasoncup@cityofevanston.org

8

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

THE CITY OF CHICAGO,

*Plaintiff,*

*v.*

JEFFERSON BEAUREGARD SESSIONS III,
Attorney General of the United States

*Defendant.*

Civil Action No. 1:17-cv-5720

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiff the City of Chicago hereby alleges as follows:

### INTRODUCTION

1.      Chicago brings this action to enjoin the Attorney General of the United States from imposing sweeping new conditions on an established federal grant program—the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG")—that has for years provided crucial support for law enforcement in Chicago and other cities. These new conditions—which would give federal officials the power to enter city facilities and interrogate arrestees at will and would force the City to detain individuals longer than justified by probable cause, solely to permit federal officials to investigate their immigration status—are unauthorized and unconstitutional. These new conditions also fly in the face of longstanding City policy that promotes cooperation between local law enforcement and immigrant communities, ensures access to essential city services for all residents, and makes all Chicagoans safer. Neither federal law nor the United

-1-

States Constitution permits the Attorney General to force Chicago to abandon this critical local policy.

2.     Since the 1980s, the City has directed its police officers to prioritize local law enforcement and public safety rather than diverting time, attention, and resources to investigating residents' immigration status.  Now codified as the Welcoming City Ordinance, this policy promotes public safety by ensuring that no city resident or visitor, regardless of immigration status, is afraid to cooperate with law enforcement, report criminal activity to the police, testify as a witness in court, or seek help as a victim of crime; and by ensuring that police officers focus on criminal activity occurring in Chicago instead of federal civil immigration infractions.  The Welcoming City Ordinance represents a clear, concerted, and smart policy choice in favor of inclusion and strong relations between the community and law enforcement.  Chicago, its residents, and its leaders have stood behind that choice for over a generation.

3.     The federal government's aggressive and escalating efforts to force Chicago and other cities, counties, and States to adhere to federal priorities began during the current President's first week in office, with an executive order targeting so-called sanctuary cities—*i.e.*, cities that have exercised their basic right to self-government by focusing their resources on enforcement of local laws rather than on policing federal civil immigration violations.  The executive order commanded federal agencies to withhold funds from these cities unless they changed their policies.  After a court enjoined enforcement of much of that order, the Department of Justice (the "Department" or "DOJ") singled out Chicago and eight other cities by demanding, on pain of losing their funding under last year's Byrne JAG program, that they certify compliance with 8 U.S.C. § 1373 ("Section 1373"), a federal statute that bars local

governments from restricting the sharing of immigration status information with federal immigration agents.

4.      Chicago complied.  In fact, Chicago officials simply do not collect immigration status information in the first place, and thus there is no information for the City to share (or restrict from sharing).  Moreover, if Chicago officials happen to come across immigration status information, they are not restricted from sharing it with federal officials.  Accordingly, because it is in fact in compliance, Chicago certified its compliance with Section 1373 in late June without conceding that the federal government could constitutionally condition Byrne JAG funding on compliance with that provision.  In response to Chicago's and other cities' good-faith effort, the Department issued an ominous press statement indicating that it believes some cities that certified compliance with Section 1373 are in violation of that statute.  But the Department did not identify those jurisdictions, or explain why they are not in compliance.

5.      Then, in late July 2017, the Department announced via press release that the FY 2017 Byrne JAG application would include two *additional* intrusive grant conditions.  These new conditions would require Chicago (1) to detain its own residents and others at federal immigration officials' request, in order to give the federal government a 48-hour notice window prior to an arrestee's release; and (2) to give federal immigration officials unlimited access to local police stations and law enforcement facilities in order to interrogate any suspected non-citizen held there, effectively federalizing all of the City's detention facilities.  On top of this, the Department has demanded yet *another* certification of compliance with Section 1373—but this time under the cloud of confusion caused by the Department's aforementioned statements.

6.      The FY 2017 Byrne JAG application is due on September 5, 2017 and requires compliance with all three of these conditions.

7.     These conditions are inconsistent with the Byrne JAG statute itself, with the limitations imposed by the Constitution's Spending Clause and the Fourth Amendment, and with basic separation of powers principles.  Compliance with the conditions would require Chicago to violate Illinois law.  And it would undermine public safety and effective policing in the City and upend Chicago's Welcoming City policy.

8.     The executive branch of the federal government may not arrogate to itself the powers that our Constitution reserves to Congress, on the one hand, or to state and local governments on the other.  It may not unilaterally concoct and import into the Byrne JAG program sweeping new policy conditions that were never approved (and indeed were considered and rejected) by Congress and that would federalize local jails and police stations, mandate warrantless detentions in order to investigate for federal civil infractions, sow fear in local immigrant communities, and ultimately make the people of Chicago less safe.  Nor may it continue to insist that Chicago certify compliance with Section 1373 even as it withholds clear guidance about the City's prior certifications while implying that it does not accept them, or others like them, for some unarticulated reason.

9.     The Department puts Chicago in an untenable position, with the clock winding down: agree, by September 5, 2017, to accept the Department's new unconstitutional grant conditions, which would wipe away policies that have built trust and cooperation between law enforcement and immigrant communities over the decades; or stand on its rights and forfeit crucial funds that it and the eleven other jurisdictions on whose behalf it submits Byrne JAG applications have counted on for more than a decade to provide critical (and, at times, lifesaving) equipment to Chicago Police officers and critical services to Chicago residents.

-4-

10.     Chicago thus brings this action to avoid that impending harm and to prevent the Department from imposing unlawful and counterproductive conditions on the Byrne JAG program that would override local judgments about how best to enforce the law and protect the community.  Chicago seeks a declaration that it complies with Section 1373 and that the Department's immigration-related conditions on Byrne JAG funding are unlawful, as well as an injunction preventing those conditions from being included in the FY 2017 Byrne JAG application or in future applications, thereby ensuring that Chicago's longstanding Welcoming City Ordinance can remain in full effect.

## PARTIES

11.     Plaintiff Chicago is a municipal corporation and home rule unit organized and existing under the constitution and laws of the State of Illinois.  Chicago was incorporated in 1837, is the third largest city in the United States, and is home to almost 3 million residents, including a diverse array of immigrant communities.

12.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States.  He is sued in his official capacity.  The Attorney General is the federal official in charge of the United States Department of Justice, which took and threatens imminently to take the governmental actions at issue in this lawsuit.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346.  The Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

14.     Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(e)(1) because substantial events giving rise to this action occurred therein and because Chicago resides therein and no real property is involved in this action.

## FACTUAL ALLEGATIONS

## I.    CHICAGO HAS OPERATED UNDER ITS WELCOMING CITY POLICY FOR DECADES

15.    Chicago is one of America's great cities, a metropolis of almost 3 million people that has attracted migrants and immigrants of different races, nationalities, and creeds to the shores of Lake Michigan for nearly two centuries, seeking good jobs and better futures for themselves and their children.

16.    Chicago's diverse population requires a public safety strategy that takes into account the needs of all the City's residents.  One aspect of that strategy—Chicago's Welcoming City Ordinance—has developed over the past few decades to address the needs and concerns of the City's residents.

17.    The first formal iteration of the current policy was announced by then-Mayor Harold Washington in March 1985 in Executive Order 85-1, which provided that "all residents of the City of Chicago, regardless of nationality or citizenship, shall have fair and equal access to municipal benefits, opportunities and services."  To ensure this equal access, the Order stated that City officials would not "request information about or otherwise investigate or assist in the investigation of the citizenship or residency status of any person" unless required by other law to do so.

18.    Mayor Richard M. Daley reiterated this policy upon taking office in April 1989.  His Executive Order 89-6 similarly emphasized that all Chicago residents "shall have fair and equal access to municipal benefits, opportunities and services" and prohibited City agents and agencies from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or residency status of any person unless such inquiry or investigation is required by statute, ordinance, federal regulation or court decision."

-6-

19.     In 2006, the Chicago City Council unanimously incorporated the policies of the 1985 and 1989 executive orders into the City's Municipal Code by enacting the Welcoming City Ordinance in response to increased pressure from the federal government to assist in immigration enforcement.  The City Council was concerned by the suggestion that Chicago should "expend limited local resources on traditionally federal functions."  Furthermore, the City Council noted that "requiring, or even promoting, local enforcement of immigration laws" would both "give[] rise to an increased threat of immigrant and minority profiling and harassment" and "cause a chilling effect on crime prevention and solving if both witnesses and victims are called upon to weigh a need to cooperate with local authorities against a fear of deportation, thereby undermining long-standing efforts to engender trust and cooperation between law enforcement officials and immigrant communities."

20.     Like the executive orders that preceded it, the 2006 Ordinance prohibited City "agent[s]" and "agenc[ies]" from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or residency status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision." It also barred disclosure of "information regarding the citizenship or residency status of any person unless required to do so by legal process or such disclosure has been authorized in writing by the individual to whom such information pertains."

21.     In 2012, Mayor Rahm Emmanuel and the Chicago City Council expanded the Welcoming City Ordinance to address increasing federal requests that Chicago detain individuals suspected of immigration-related offenses.  Also known as "immigration detainers" or "immigration holds," these requests issued by U.S. Immigration and Customs Enforcement ("ICE") ask that local law enforcement "maintain custody" of a targeted individual for up to "48

hours, excluding Saturdays, Sundays, and holidays in order to permit assumption of custody by the Department [of Homeland Security ("DHS")]."  8 C.F.R. § 287.7(d).

 22. The expanded Welcoming City Ordinance provides that undocumented individuals will be detained at the federal government's request only when Chicago has an independent reason to believe they might pose a threat to public safety: for example, if they have an outstanding criminal warrant, have been convicted of a felony, are a defendant in a criminal case where judgment has not been entered and a felony charge is pending, or have been identified as a known gang member.

 23. This expansion responded in part to concerns that "undocumented Chicagoans who have not been convicted of a serious crime and are not wanted on a criminal warrant" might be denied "basic protections" in the face of an ICE detainer request.[1]

 24. These concerns have proven to be well founded.  Since the Welcoming City Ordinance was expanded in 2012, many courts have held that detaining persons for additional time solely because of an ICE detainer request is unconstitutional or otherwise unlawful.  *County of Santa Clara v. Trump*, Nos. 17-cv-00574-WHO & 17-cv-00485-WHO, 2017 WL 1459081, at *4 (N.D. Cal. Apr. 25, 2017) ("Several courts have held that it is a violation of the Fourth Amendment for local jurisdictions to hold suspected or actual removable aliens subject to civil detainer requests because [such] requests are often not supported by an individualized determination of probable cause that a crime has been committed."); *see, e.g.*, *Morales v. Chadbourne*, 793 F.3d 208, 214-218 (1st Cir. 2015); *Galarza v. Szalczyk*, 745 F.3d 634, 643-645 (3d Cir. 2014).  Indeed, apparently recognizing that such detentions are likely illegal, United States Senators Jeff Flake and John McCain recently introduced legislation that would

---

[1] *See* Press Release, Office of the Mayor, City of Chicago, Mayor Emanuel Introduces Welcoming City Ordinance 1 (July 10, 2012), https://tinyurl.com/yb6pzhhy.

"indemnify local law enforcement entities for complying" with ICE detainers. *See* S. 1039, 115th Cong. (2017); *see id.* § 2 ("[T]he Federal Government shall be responsible to pay for the costs of any legally cognizable injuries to third parties resulting from the issuance and execution of [immigration] detainers.").

25. The 2012 Welcoming City Ordinance reflects the Chicago City Council's findings that (1) "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems," (2) "assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all [of the City's] residents," and (3) "[t]he cooperation of the City's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire City." Chicago Municipal Code § 2-173-005.

26. In its current form, the Welcoming City Ordinance, codified as Chapter 2-173 of the Chicago Municipal Code, contains four key prohibitions relevant to this lawsuit.

    a. Subject to certain exceptions for certain criminal suspects and gang members,[2] Section 2-173-042 prohibits City "agent[s]" or "agenc[ies]" from "arrest[ing], detain[ing] or continu[ing] to detain a person solely on the belief that the person is not present legally in the United States, or that the person has committed a civil immigration violation," or doing so "based upon an immigration detainer, when such immigration detainer is based solely on a violation of a civil immigration law."

---

[2] Specifically, and as noted above, the Section 2-173-042 restrictions do not apply if the subject of the ICE investigation "(1) has an outstanding criminal warrant; (2) has been convicted of a felony in any court of competent jurisdiction; (3) is a defendant in a criminal case in any court of competent jurisdiction where a judgment has not been entered and a felony charge is pending; or (4) has been identified as a known gang member."

    b.     Subject to the same exceptions, as well as an exception for "legitimate law enforcement purpose[s] . . . unrelated to the enforcement of a civil immigration law," Section 2-173-042 also prohibits City "agent[s]" or "agenc[ies]" from, "while on duty, expend[ing] their time responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date," or from "permit[ting] ICE agents access to a person being detained by, or in the custody of, the agency or agent" or "permit[ting] ICE agents use of agency facilities for investigative interviews or other investigative purpose."

    c.     Section 2-173-020 prohibits City "agent[s]" or "agenc[ies]" from "request[ing] information about or otherwise investigat[ing] or assist[ing] in the investigation of the citizenship or immigration status of any person unless such inquiry or investigation is required by Illinois State Statute, federal regulation, or court decision."

    d.     Section 2-173-030 prohibits City "agent[s]" or "agenc[ies]" from "disclos[ing] information regarding the citizenship or immigration status of any person" unless "otherwise provided under applicable federal law," the City is "required to do so by legal process," or "such disclosure has been authorized in writing by the individual to whom such information pertains."

27.    These and other provisions of the Welcoming City Ordinance play a vital role in strengthening the relationship between Chicago's government, its police force, and its immigrant communities. This relationship is built city block by city block, and it is essential that Chicago's police officers have the flexibility they need to engage the immigrant communities in their crime-fighting initiatives without projecting a constant threat of deportation.

## II. THE ADMINISTRATION ATTACKS SO-CALLED "SANCTUARY CITIES" AND TARGETS THE CITY OF CHICAGO

28.     The City's Welcoming City policies are sound.  In fact, as one study found, "crime is statistically significantly lower in sanctuary counties compared to nonsanctuary counties . . . controlling for population characteristics."[3]  Indeed, as a broad coalition of police chiefs explained recently, "build[ing] trusting and supportive relations with immigrant communities . . . is essential to reducing crime and helping victims."[4]

29.     The idea that policies like Chicago's encourage or facilitate crime is simply a "[m]yth": "[S]tudies have found no support for the idea that immigrants are responsible for more crime" or that "sanctuary policies lead to increased crime."[5]

30.     Despite the soundness of Chicago's policies—and despite the City's inherent right to decide its own law enforcement priorities and strategies—the Trump Administration has singled out Chicago and other so-called sanctuary jurisdictions for criticism.  In his first week in office, President Trump issued Executive Order 13768, which threatened to deny federal grants and take enforcement actions against such jurisdictions.  Purporting to "inform the public regarding the public safety threats associated with sanctuary jurisdictions," President Trump ordered DHS to publish weekly lists of any municipalities that refused to comply with detainer requests, together with lists of any undocumented immigrants arrested—but not necessarily convicted—for any non-immigration offenses.[6]  This executive order was later enjoined in large

---

[3] Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy* 6 (2017), http://tinyurl.com/y75lsykd (emphasis added).
[4] Press Release, Major Cities Chiefs Ass'n, U.S. Mayors, Police Chiefs Concerned with Sanctuary Cities Executive Order (Jan. 25, 2017), http://tinyurl.com/y8zqhypw.
[5] Benjamin Gonzalez et al., *The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration*, 53 Urb. Aff. Rev. (forthcoming 2017) (manuscript at 9-10, 18-24), http://tinyurl.com/y8hb9fnc.
[6] *See* Alan Gomez, *Trump Pressures 'Sanctuary Cities' That Won't Hold Undocumented Immigrants*, USA Today (Mar. 20, 2017, 6:14 PM ET), http://tinyurl.com/yctkoj9e.

part by a federal court for violating numerous provisions of the Constitution. *See County of Santa Clara*, 2017 WL 1459081, at *21-*29.

31.     Just last month, President Trump spoke of "predators and criminal aliens who poison our communities with drugs and prey on innocent young people," avowing that these "animals" "will find no safe haven anywhere in our country."[7]  He added: "[T]hey're not being protected any longer, folks.  And that is why my administration is launching a nationwide crackdown on sanctuary cities."[8]

32.     Attorney General Sessions, without any factual basis, has also labeled sanctuary jurisdictions a "clear and ongoing threat to public safety."[9]  He recently announced, for instance, that "'sanctuary' policies make all of us less safe because they intentionally undermine our laws and protect illegal aliens who have committed crimes"; he even suggested that they "encourage . . . human trafficking."[10]  And he has insisted that "cities with these policies have more violent crime on average than those that don't."[11]

33.     The Administration's rhetoric is divorced from reality.  As explained above, the City's policies are a sound approach to reducing crime, building trust with immigrant

---

[7] *See* Maya Oppenheim, *Donald Trump Brands Illegal Immigrant Gang Members 'Animals' Who 'Slice and Dice' Young Beautiful Girls*, Indep. (July 26, 2017), http://tinyurl.com/y986sguu.
[8] *Id.*; *see also* Pete Williams, *Attorney General Sessions Raises Stakes for Sanctuary Cities*, NBC News (July 25, 2017, 8:49 PM ET), http://tinyurl.com/yb3rzza8 (President Trump declaring that cities should be sanctuaries "for law-abiding Americans," "not for criminals and gang members that we want the hell out of our country").
[9] Press Release, U.S. Dep't of Justice, Statement by Attorney General Jeff Sessions on the U.S. Immigration and Customs Enforcement Declined Detainer Outcome Report (Mar. 20, 2017), http://tinyurl.com/ybrrnf8g.
[10] *See* Michelle Mark, *The Trump Administration Just Toughened Its Crackdown on 'Sanctuary Cities,'* Bus. Insider (July 25, 2017, 6:42 PM), http://tinyurl.com/yb29dpob.
[11] *See* Michelle Ye Hee Lee, *Attorney General Jeff Sessions's Claim That 'Criminals Take Notice' of Cities with Sanctuary Policies*, Wash. Post (July 17, 2017), http://tinyurl.com/ycwho7u5; *see also* Press Release, Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy (quoting Attorney General Sessions as saying that sanctuary policies "put the lives and well-being of their residents at risk" and "give sanctuary to criminals, not to law-abiding Americans").

communities, and enhancing cooperation with law enforcement. Indeed, the authors of the very study cited by Attorney General Sessions have squarely rejected his position, saying he misrepresented their work.[12]

34.     Meanwhile, Congress has also considered legislation that would penalize cities for seeking to set their own law enforcement priorities. *See* Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) (proposing funding cuts for any sanctuary jurisdiction that violates Section 1373 or "prohibits any government entity or official from complying with a detainer"). Notably, however, Congress has *never passed* any such legislation authorizing the executive branch to impose any penalty on local jurisdictions based on their refusal to comply with detainer or other immigration enforcement requests.

## III.   THE ADMINISTRATION SEEKS TO USE CONDITIONS ON THE BYRNE JAG PROGRAM, A CRITICAL SOURCE OF FUNDS FOR CHICAGO, TO DICTATE CITY POLICING STRATEGY

35.     With Congress having declined to authorize the executive branch to override Welcoming City-style policies, and courts having blocked the executive branch's effort to do so through executive order, the Trump Administration has sought to expand its limited role in administering an existing congressional program, the Byrne JAG program, in an attempt to pressure cities and other local governments to abandon their policies.

36.     Congress established the Byrne JAG program in 2005 to serve as the primary source of federal criminal justice funding for States and localities. The goal of the program is to allow State and local governments the "flexibility to spend money for programs that work for

---

[12] *See* Miriam Valverde, *Jeff Sessions Cites Study on Sanctuary Cities, Researchers Say He Misrepresented It*, PolitiFact (July 24, 2017, 10:35 AM), http://tinyurl.com/y7ohqtz6; *see also* Loren Collingwood & Benjamin Gonzalez-O'Brien, *Jeff Sessions Used Our Research to Claim That Sanctuary Cities Have More Crime. He's Wrong*, Wash. Post (July 14, 2017), http://tinyurl.com/y8rwvwbz (objecting that author's "findings have been so misrepresented" by the Justice Department).

them rather than to impose a 'one size fits all' solution" for local policing. *See* H.R. Rep. No. 109-233, at 89 (2005).[13]

37.     To that end, the Byrne JAG is structured as a formula grant, awarding funds to all eligible grantees according to a prescribed formula. *See* 42 U.S.C. § 3755(d)(2)(A) (providing that the Attorney General "shall allocate to each unit of local government" funds consistent with the established formula).  The Byrne JAG distribution formula for States is a function of population and violent crime. *See id.* § 3755(a).  The formula for local governments, in turn, is a function of the State's allocation and the ratio of violent crime in the locality to violent crime in the State. *See id.* § 3755(d).

38.     Unlike discretionary grants, which agencies award on a competitive basis subject to agency discretion, "formula grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula." *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).  States and local governments are entitled to their share of the formula allocation as long as their proposed programs meet at least one of eight broadly defined goals, *see* 42 U.S.C. § 3751(a)(1)(A)-(H) (listing eligible programs ranging from general law enforcement to technology to mental health), and their applications contain a series of statutorily required certifications and attestations. *See id.* § 3752(a).

39.     The statute nowhere authorizes the Department to create new substantive conditions on grant funds.  Indeed, doing so would upend Congress's formula approach for distributing funds based on population and violent crime, instead allocating grants using criteria invented by the Department. *See Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990) ("Where Congress prescribes the form in which an agency may exercise its

---

[13] The Byrne JAG program was created in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006), which in turn amended the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197.

authority, . . . we cannot elevate the goals of an agency's action, however reasonable, over that prescribed form.").

40.     Chicago has received Byrne JAG funds since 2005, the year the program began, and every year since.  In FY 2016, Chicago received $2.33 million through the Byrne JAG program.

41.     Chicago has used Byrne JAG funds to support projects ranging from critical law enforcement equipment and overtime to community policing outreach and engagement.  Since FY 2005, for instance, Chicago has spent approximately $33 million in Byrne JAG funds to buy nearly 1,000 police vehicles.  Several of those projects have extended across multiple grant years, including the Force for Good program, which began in 2011 and helps not-for-profit organizations meet community needs.  Recognizing that creating safe neighborhoods is impossible unless government and communities work together, the Force for Good program provides capacity-building support to over 80 not-for-profit organizations that operate in neighborhoods experiencing high rates of violent crime in order to help improve their ability to provide services such as emergency shelter, food, and clothing; youth mentoring and structured activities in safe places; job training and placement; conflict resolution; and activities to strengthen community cohesion and resilience.  Without Byrne JAG funds, Chicago would have to shut down some or all of these programs, change their staffing, scope, or goals, or else divert funds from other policing objectives to sustain them.

42.     Additionally, eleven other localities depend on Chicago's Byrne JAG application for the funds they receive through the program each year.  Because Chicago's costs of preventing and investigating violent crimes far outstrip those of the surrounding jurisdictions—including those of Cook County, in which it sits—42 U.S.C. § 3755(d)(4) obligates Chicago to file a Byrne

JAG application on behalf of not only itself but also those other, neighboring communities. Accordingly, each year Cook County, the Village of Bellwood, the City of Calumet, the City of Chicago Heights, the Town of Cicero, the Village of Dolton, the City of Evanston, the City of Harvey, the Village of Maywood, the Village of Riverdale, and the Village of Skokie rely on Chicago's application to receive their own Byrne JAG funds.

43.     Until now, the Department has never questioned Chicago's ability to achieve the programmatic goals for Byrne JAG funds because of the City's approach to improving law enforcement through respect for and collaboration with immigrant communities.

### A.     THE DEPARTMENT OF JUSTICE REQUIRES CHICAGO TO CERTIFY COMPLIANCE WITH SECTION 1373 AS A CONDITION OF RECEIVING BYRNE JAG FUNDING

44.     For over a decade, the Department administered the Byrne JAG program as Congress intended: funding critical local law enforcement initiatives without once seeking to leverage that funding to conscript local agencies to enforce federal immigration law.  But that changed in late 2016 when, for the first time, DOJ required grantees to "undertake a review to validate [their] compliance with 8 U.S.C. § 1373" as a condition of receiving FY 2016 Byrne JAG funds.

45.     On April 21, 2017, the Department sent letters to Chicago and eight other jurisdictions seeking submission of "documentation to [the Department's Office of Justice Programs ("OJP")] that validates that your jurisdiction is in compliance with 8 U.S.C. § 1373." The letter indicated that the "documentation must be accompanied by an official legal opinion from counsel that adequately supports the validation and must be submitted to OJP no later than June 30, 2017."[14]

---

[14] *See* Letter from Alan R. Hanson, Acting Assistant Attorney Gen., U.S. Dep't of Justice, to Eddie T. Johnson, Superintendent of Police, Chi. Police Dep't (Apr. 21, 2017), https://tinyurl.com/y7t4mxxy.

46.     Section 1373, the statute for which DOJ sought certification, prohibits state and local entities from "prohibit[ing], or in any way restrict[ing]" their entities and officials from "sending," "requesting," "receiving," "maintaining," or "requesting" citizenship or immigration status information from or to federal immigration enforcement authorities.

47.     Section 1373 imposes no affirmative obligation on state or local entities to collect immigration status information; does not require state or local entities to take any specific actions upon receiving immigration status information absent a request for that information; does not address detainer requests or release-date notification requests; and does not require state or local entities to act in a manner inconsistent with the United States Constitution or other federal law.

48.     The Byrne JAG authorizing statute requires a "certification" that "the applicant will comply with all provisions of this part and all other applicable Federal laws."  42 U.S.C. § 3752(a)(5)(D).  OJP indicated that it considers "all other applicable Federal laws" to encompass Section 1373.

49.     Chicago replied to the Department's letter on June 30, 2017, explaining how and why it complies with Section 1373.  *See* Memorandum from Edward Siskel, Corporation Counsel, City of Chicago, to Tracey Trautman, Acting Director, Bureau of Justice Assistance, Office of Justice Programs, U.S. Dep't of Justice (June 30, 2017) (attached as Ex. A).

50.     Chicago's letter explained that the City, as a general rule, does not collect citizenship or immigration status information from its residents.  Both the Welcoming City Ordinance and Chicago Police Department policy bar the City from doing so.  *See* Chicago Municipal Code § 2-173-020; Chicago Police Department Special Order S06-14-03.  Chicago therefore does not "restrict" or "prohibit" its employees from taking any actions with regard to

information covered by this non-collection policy: The City cannot prohibit or restrict the sharing of information it does not possess. *See* Ex. A at 2-5.

51.    The letter further explained that when the City's officers or agents do happen to possess citizenship or immigration status information, the Welcoming City Ordinance expressly permits them to share this information with federal immigration enforcement officials. Although the Ordinance prohibits disclosure of citizenship or immigration status information in response to requests from private parties, it expressly permits such disclosure as "provided under applicable federal law." One such "applicable federal law" is Section 1373. The Welcoming City Ordinance thus does not restrict city officers and employees from responding to requests from federal immigration enforcement officials. *See* Ex. A. at 5-6.

52.    A few days after receiving certifications from Chicago and the other targeted jurisdictions, the Department issued a press release suggesting that some jurisdictions' certifications might be found insufficient: "It is not enough to assert compliance, the jurisdictions must actually be in compliance." The press release further indicated that the Department was "in the process of reviewing" the certifications and planned to "examine these claims carefully." Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

53.    Despite generally expressing skepticism about the certifications of some unspecified jurisdictions and even though the deadline to submit Byrne JAG applications for FY 2017 is less than a month away, the Department has not communicated any particular concerns to Chicago or, on information and belief, to any of the other eight jurisdictions.

54.    The FY 2017 grant application will require Chicago to again certify compliance with Section 1373—but this time, it must do so after DOJ purports to impose new requirements

that reach well beyond the statute, discussed below, and under a cloud of uncertainty created by DOJ's increasingly aggressive positions.  Furthermore, the FY 2017 application requires certifications by both Chicago's chief legal officer and its chief executive.  Although Chicago is confident that it complies with Section 1373 and has certified as such, DOJ's public statements concerning the Section 1373 certifications it has received to date make it unclear whether DOJ will agree that Chicago's existing certification is satisfactory under DOJ's interpretation of the law.

### B. THE DEPARTMENT OF JUSTICE ANNOUNCES TWO ADDITIONAL UNLAWFUL CONDITIONS FOR THE FY 2017 BYRNE JAG PROGRAM

55.     In late July 2017, shortly before the Byrne JAG application for FY 2017 was set to go online, the Department suddenly announced significant changes to the Byrne JAG application process in a two-paragraph press release and accompanying press "backgrounder" document.  *See* Press Release, U.S. Dep't of Justice, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017), https://tinyurl.com/y9ttqhsl (attached as Ex. B); U.S. Dep't of Justice, Backgrounder on Grant Requirements, https://tinyurl.com/ycfgbgl4 (attached as Ex. C).

56.     These changes, announced with virtually no analysis or explanation and no opportunity for public notice and comment, apply to the FY 2017 grant application, which is due on September 5, 2017.  *See* U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant Program: FY 2017 Local Solicitation (2017), https://tinyurl.com/ya535xua (attached as Ex. D).

57.     Both changes would countermand the Welcoming City Ordinance and require a reordering of law enforcement practice in Chicago to accommodate a major new role for federal immigration enforcement.

58. *The "notice" condition:* First, the Department will require grant applicants to "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." Ex. D at 30. This policy directly conflicts with the City's longstanding Welcoming City Ordinance (Section 2-173-042(a), (b)(1)(C)), would effectively require compliance with detainer requests even in the absence of any probable cause, and would sow fear and mistrust as between immigrant communities and law enforcement.

59. *The "access" condition:* Second, the Department will require grant applicants to "permit personnel of the [DHS] to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States." Ex. D at 30. The Department has not defined "correctional" or "detention" facility,[15] but the requirement appears to mandate that federal immigration agents be given unprecedented and unfettered access to local law enforcement facilities and to any person being held there. This policy directly conflicts with the City's longstanding Welcoming City Ordinance (Section 2-173-042(b)(1)(A)-(B)), would interfere with the administration of local police stations and lockups, including the investigations of criminal activity that routinely take place there, and would sow fear and mistrust as between immigrant communities and law enforcement.

---

[15] As explained elsewhere, Chicago operates only temporary "lockup" facilities, in which individuals are briefly detained prior to release or their appearances in Cook County court for probable cause proceedings. It is not at all clear whether these temporary facilities are "detention facilities" within the meaning of this condition. Nor is it clear whether Chicago can comply with this condition without impeding the timely and orderly administration of probable cause hearings in the Cook County courts. Timely and orderly administration of such hearings is necessary as a matter of both constitutional law and public safety.

60.     The City of Chicago does not itself operate jails or long-term detention facilities. The City detains arrestees in 18 temporary police "lockup" facilities, used for immediate post-arrest holding and processing, as well as post-arrest investigation. Arrestees not released on their own recognizance generally are transported by the Chicago Police Department the next morning to the Circuit Court of Cook County for probable cause proceedings or to Cook County detention facilities. Thus, as a matter of practice and procedure, the City itself infrequently detains individuals for more than 24 hours.

61.     Moreover, in compliance with the Supreme Court's ruling in *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), Chicago Police Department regulations require that individuals arrested without a warrant be released or transferred to Cook County court "without unnecessary delay," but "[u]nder no circumstances . . . any later than 48 hours from the time of arrest." Chicago Police Department General Order G06-01 § II(C).

62.     These regulations are also informed by Chicago's obligations under state law. The Illinois Code of Criminal Procedure requires that any arrested person in lockup be taken "without unnecessary delay" to a judge. Ill. Code Crim. Proc. § 109-1(a). The Illinois Administrative Code additionally specifies that "[t]he maximum period of detention in a jail should not normally exceed 48 hours" and that "[n]o minor shall be detained in a municipal lockup for more than six hours." Ill. Admin. Code §§ 720.30, 720.150.

63.     As a practical matter, then, Chicago can comply with the Department's new notice condition and provide DHS with 48 hours of lead time prior to arrestees' release only if the City detains arrestees for longer than they would otherwise be held in the City's custody, which implicates constitutional, state-law, fiscal, logistical, and other legal concerns. In particular, the prolonged detention caused by the notification requirement would force the City to

potentially violate both arrestees' Fourth Amendment rights to be free of unreasonable seizures and state law, putting Chicago at risk of liability under the civil rights laws.

64.     The Department imposed these new notice and access conditions without any explanation, reasoning, or opportunity for exchange with local governments or law enforcement. The Department's press release makes perfunctory mention of community safety and criminal behavior.  *See* Ex. B.  But it fails to explain how it arrived at these new conditions or what alternatives it may have considered.  The press release is silent as to the purposes of the Byrne JAG program and in what ways the newly imposed notice or access conditions (or for that matter the Section 1373 condition) are related to, let alone serve to advance, the interests of the Byrne JAG program.  And it fails to provide local law enforcement any guidance as to how the conditions will operate in practice.

65.     In fact, these conditions have no legal basis.  The Department has not pointed to any statutory authority for imposing these conditions on Byrne JAG applicants.  To be sure, the authorizing legislation requires program applicants to certify that they will "comply with all . . . applicable Federal laws."  42 U.S.C. § 3752(a)(5)(D).  But even stretching that provision to cover Section 1373—a construction the City has never endorsed as a lawful interpretation, *see* Ex. A at 1 n.1—the Department has made no effort to identify any federal law requiring "at least 48 hours' advance notice" before the City releases an alien in its custody, or any law requiring local police departments to allow DHS officials to access detention facilities.

66.     These conditions also represent a sharp break with core constitutional principles. In our constitutional order, "the National Government possesses only limited powers; the States and the people retain the remainder."  *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 533 (2012).  Federalism "secures to citizens the liberties that derive from the diffusion of

sovereign power." *Id.* at 536 (quoting *New York v. United States*, 505 U.S. 144, 181 (1992)). Because of its intimate connection to liberty, our federalist design is protected by constitutional limits on undue federal encroachment on state and local autonomy.  And separation of powers principles also operate as independent restraints on cooperative federalism arrangements like the Byrne JAG program.  The Constitution gives the spending power to Congress, not the Executive Branch.  Federal agencies therefore may not invent funding conditions out of whole cloth.

## IV.    THE DEPARTMENT OF JUSTICE'S UNLAWFUL NEW CONDITIONS WILL INJURE CHICAGO, FORCING THE CITY TO CHOOSE BETWEEN VITAL LAW ENFORCEMENT FUNDING AND ITS CONSTITUTIONAL RIGHTS

67.    The Administration's unlawful actions pose a threat of imminent harm to Chicago.  Its Byrne JAG application for FY 2017 is due in just 29 days—on September 5, 2017. For over ten years, the City has routinely applied for and received those funds, which have gone toward police vehicle purchases, law enforcement equipment, and community crime-prevention programs.  This year, however, the Department's actions loom over the City's decisionmaking process.

68.    After demanding that Chicago certify and justify its compliance with Section 1373, the Department cryptically announced that "[s]ome" jurisdictions "potentially violate" Section 1373, without indicating which certifications it found lacking and without identifying any particular defect.[16]  This uncertainty has clouded the City's ability to apply for critical law enforcement funds that it has relied upon for over a decade.

69.    The two new conditions that the Department just announced are equally if not more harmful.  The notice condition would require the City to detain individuals longer than it otherwise would, potentially violating the individuals' Fourth Amendment rights and state law

---

[16] Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

and thereby expose the City to liability; the access condition would demand that the City open its lockup facilities to federal officials without regard to local detention needs.

70.     Just as fundamentally, complying with the new conditions would undermine public safety in Chicago.  The Welcoming City Ordinance assists effective policing by building trust between law enforcement officers and the immigrant community.  Conversely, policing suffers when members of that community, whatever their immigration status, do not feel free to report crimes, assist in investigations, or testify as witnesses.  The Department's insistence that Chicago give immigration enforcement agents on-demand access to its detention facilities in order to investigate potential civil immigration violations, and that Chicago detain individuals solely so that they can be investigated for possible civil immigration violations, would undermine crucial public trust, cut local law enforcement efforts off at the knees, and make everyone in Chicago less safe.

71.     The Department has thus put Chicago to an impossible choice: sacrifice its sovereignty and its residents' safety by acceding to unlawful funding demands that will undermine community-officer trust and cooperation built over decades; or forfeit crucial monies on which it has relied for more than a decade to fund essential policing operations.  And if the City chooses the latter, the City will not be the only jurisdiction to lose out on critical funding. The eleven neighboring jurisdictions that depend on Chicago's Byrne JAG application for their own Byrne JAG funding will lose their funding as well.

72.     Worse still, the Department has required Chicago to make its decision under extreme time pressure.  Chicago's FY 2017 application is due in just 29 days.

73.     As that deadline swiftly approaches, Chicago faces the prospect of a severe federal incursion on its sovereignty.  Sovereignty implies self-determination—a government's

ability to select and implement policies of its own choosing. But in a little under a month, Chicago will be denied that most basic right: Instead of focusing (as it always has) on the best interests of its residents and officers, Chicago will soon be required to revise basic law enforcement policy decisions in order to suit the demands of the Department. When a municipality is forced to desert its concerted policy choices under the influence of the federal government's coercive power, it suffers a deep and irreparable injury to its sovereignty.

74.     Moreover, whichever decision Chicago ultimately makes, its residents and police force will be immediately and irreparably harmed. If Chicago submits to the Department's demands, it will forfeit decades' worth of trust and goodwill that its police force has built in the communities it serves. And as those decades of experience show, that kind of trust, once lost, is lost forever. Alternatively, if Chicago asserts its right to determine its own policy and refuses to certify compliance with the Department's new and unlawful conditions, it (and the eleven other jurisdictions who depend on Chicago's application for their Byrne JAG funds) will forever forfeit the FY 2017 Byrne JAG grant monies—monies that are critical to Chicago's community policing operation and that purchase essential and life-saving equipment for Chicago and its neighboring jurisdictions. Indeed, the FY 2017 Byrne JAG application itself makes clear that if Chicago refuses the federal government's demands and thus declines to submit an application by September 5, it will miss out on that year's funds. Ex. D at 28 (explaining that untimely applications will not be considered). Moreover, the Byrne JAG statue's grant formula indicates that those forfeited funds will be divvied up and parceled out to other jurisdictions around the country, impossible for Chicago and its neighboring communities to later reclaim. See 42 U.S.C. § 3755 (providing the formula for dividing each year's total grant funds). And even if Chicago and its neighbors could later claw back those funds, the damage would have already been done in

the months or years their police forces and residents will have spent without access to crucial equipment and services.

75.     The Department cannot force Chicago to choose between its right to make smart policing decisions for itself as an exercise of municipal sovereignty and its right to receive formula grant funds that Congress has allocated to it.

## COUNT ONE: ULTRA VIRES

76.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

77.     The Department of Justice may exercise only authority conferred by statute.  *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires").

78.     The Department lacks statutory authority to condition Byrne JAG funds on the new notice and access conditions.  Indeed, such authority is at odds with the text, structure, and purpose of the Byrne JAG statute.

79.     The text of the Byrne JAG statute recognizes no authority for DOJ to impose additional substantive grant conditions on Byrne JAG funds.  In fact, Congress has repeatedly demonstrated its ability (when it so desires) to expressly confer agency discretion to add substantive conditions to federal grants.  In the same statute that includes the Byrne JAG grant, the Omnibus Crime Control and Safe Streets Act of 1968, Congress created a different grant program that expressly authorized administering agencies to impose reasonable grant conditions. *See* 42 U.S.C. § 3796gg-1(e)(3) (Attorney General may "impose reasonable conditions on grant awards . . . ."); *see also Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 341 (2005) (courts will not "lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply" especially where Congress has done so in the "same statute").  And

Congress has expressly conferred such authority in other federal grant programs. *See, e.g.*, 47 U.S.C. § 1204(b)(2) (Under Secretary of Commerce can "establish such conditions . . . as may be appropriate to ensure the efficiency and integrity of the grant program"); 25 U.S.C. § 1652(b) (similar); 42 U.S.C. § 2850-2(b) (similar).

80. It did not do so with the Byrne JAG program. Rather, the Byrne JAG statute expressly gives the Attorney General a limited ministerial authority to specify the "form" of the application, 42 U.S.C. § 3752(a) (requiring jurisdictions to submit an application containing the enumerated components "in such form as the Attorney General may require"), but omits any authorization to add additional substantive conditions to that application. Congress's decision to confer discretion over form, but not substance, should be respected. *Russello v. United States*, 464 U.S. 16, 23-24 (1983) ("Congress acts intentionally and purposely in the disparate inclusion or exclusion of statutory text.").

81. The Department's purported authority to promulgate the new notice and access conditions is also contradicted by the formula-grant structure of the Byrne JAG program. Byrne JAG funds are distributed across States and localities based on their population and relative levels of violent crime. *See* 42 U.S.C. § 3755(d)(2)(A). The formula-based approach makes States and localities eligible to receive their formula-specified share as long as they comply with the grant's administrative requirements and propose using funds in at least one of eight broadly defined programmatic areas. *See* 42 U.S.C. § 3751(a)(1)(A)-(H) (noting that grants can be used for "any one or more of the following programs" and then listing areas ranging from "[l]aw enforcement" to "[d]rug treatment" to "[m]ental health"); *id.* § 3752(a)(6)(B) (requiring applications to "include a description of how the State will allocate funding within and among [those uses]"). If DOJ had the authority to impose new substantive conditions on all grantees,

-27-

the effect would be to contradict Congress's formula and reallocate funds to jurisdictions that adopted DOJ's preferred policy.

82. It would also contradict the fundamental purpose of the JAG program: to give States and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89.

83. Moreover, the Department also lacks statutory authority to condition Byrne JAG funds on compliance with Section 1373. The Byrne JAG statute's requirement that grantees comply with "all applicable Federal laws" does not confer authority on DOJ to condition Byrne JAG funding on Section 1373 compliance, because Section 1373 is not an "applicable" law here. The phrase "all applicable Federal laws" in the Byrne JAG statute refers to the host of laws that regulate the conduct of federal grant recipients *as grant recipients*.[17] It does not refer to every section of the U.S. Code that could possibly apply to a state or local government. Section 1373 does not regulate grantees as grantees nor do its terms mention federal grants or funds.

84. As a direct and proximate result of these unlawful conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds and shut down the programs they support.

85. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Attorney General is without authority to impose the notice, access, and Section

---

[17] *See, e.g.*, 41 U.S.C. § 4712(a)(1) ("An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds . . . ."); 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.").

1373 conditions for FY 2017 Byrne JAG funds, an order that those conditions be set aside, and an injunction preventing those conditions from going into effect.

## COUNT TWO: SEPARATION OF POWERS

86. Plaintiff incorporates by reference the allegations of the preceding paragraphs.

87. The Constitution vests the spending power in Congress, not the President. U.S. Const. art. I § 8, cl. 1; *see Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (line-item veto violates constitutional separation of powers principles); *County of Santa Clara*, 2017 WL 1459081, at *21-*22.

88. The President "does not have unilateral authority to refuse to spend . . . funds" that have already been appropriated by Congress "for a particular project or program." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Train v. City of New York*, 420 U.S. 35, 44 (1975) (the Executive lacked discretion to spend less than the full amount of funds authorized by Congress under the Federal Water Pollution Contract Act Amendments of 1972).

89. Imposing a new condition on a federal grant program amounts to refusing to spend money appropriated by Congress unless that condition is satisfied.

90. The notice condition was not imposed by Congress, but rather by the Department in issuing the FY 2017 Byrne JAG application. Therefore, the notice condition amounts to improper usurpation of Congress's spending power by the Executive Branch.

91. The access condition was not imposed by Congress, but rather by the Department in issuing the FY 2017 Byrne JAG application. Therefore, the access condition amounts to improper usurpation of Congress's spending power by the Executive Branch.

92. The Section 1373 condition was not imposed by Congress, but rather by the Department in issuing its Office of Justice Programs guidance and the FY 2016 and FY 2017

-29-

Byrne JAG applications.  Therefore, the Section 1373 condition amounts to improper usurpation of Congress's spending power by the Executive Branch.

93.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the notice, access, and Section 1373 conditions for the FY 2017 Byrne JAG violate the constitutional principle of separation of powers and impermissibly arrogate to the executive branch power that is reserved to the legislative branch, as well as an injunction preventing those conditions from going into effect.

## COUNT THREE: SPENDING CLAUSE

94.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

95.    In any event, Congress could not have authorized the immigration conditions here because they do not satisfy the additional requirements of the Spending Clause.

96.    Accordingly, those requirements must be enjoined.  *National Fed'n of Indep. Bus.*, 567 U.S. at 585 (to "fully remed[y]" a Spending Clause violation, the federal government must be barred from withholding "funds for failure to comply with the [unconstitutional] requirements").

### A.    The Department's Three Immigration-Related Conditions Are Not Germane To The Byrne JAG Funds It Has Received For Over A Decade

97.    Conditions on spending grants must be "relevant to [the] federal interest" in the particular grant program.  *Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275, 295 (1958); *accord South Dakota v. Dole*, 483 U.S. 203, 207-208 & n.3 (1987) (conditions must be "reasonably related," or "germane[]," to the particular program).  This nexus requirement ensures that the federal government does not use spending conditions to regulate state and local governments beyond the contours of the spending program itself.  *See also N. Ill. Chapter of Associated*

*Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir. 2005) ("Conditions on spending may become regulation if they affect conduct other than the financed project.").

98.     The notice and access conditions are not relevant to the federal interest in the Byrne JAG funds Chicago receives.  Chicago uses those funds for the purchase of replacement vehicles for worn-out police patrol cars, funding the Force for Good program, and law enforcement equipment.  Information concerning when detainees will be released from lockup and policies respecting access for federal immigration agents bear no relevance to the acquisition of safe and effective patrol cars, community programs, or other uses to which Chicago puts Byrne JAG funds.

99.     The notice and access conditions also are not relevant to the federal interest in the Byrne JAG program more generally.  The central objectives of the Byrne JAG program are (1) to ensure that funds are distributed across the country in a way that accounts for population and violent crime, *see* 42 U.S.C. § 3755, and (2) to "give State and local governments more flexibility to spend [federal] money for programs that work for them rather than to impose a 'one size fits all' solution," H.R. Rep. No. 109-233, at 89.  The conditions do not support those goals; indeed, they undermine them.  The conditions virtually guarantee that cities across the country that have used the local flexibility promoted by the Byrne JAG program to innovate police-immigrant relations will not receive their share of Byrne JAG formula funds.  And, by their very nature, the broadly applicable, locally indifferent conditions contradict Congress's express rejection of a "one size fits all" approach to federal law enforcement funding.  Conditions that undermine Congress's goals cannot satisfy the constitutional nexus requirement.

100.    The Section 1373 condition is not relevant to the federal interest in the Byrne JAG funds Chicago receives.  Information sharing with federal officials regarding an individual's

immigration status bears no connection to the replacement vehicles for worn-out police patrol cars, support for the Force for Good program, or the acquisition of new law enforcement equipment.

101.    The Section 1373 condition also is not relevant to the federal interest in the Byrne JAG program more generally.  As with the other conditions, it actively undermines Congress's goals of dispersing funds across the country, targeting funds to combat violent crime, and respecting local judgment in setting law enforcement strategy.  The Section 1373 condition would in effect rewrite Congress's formula and mandate a "one size fits all" approach to local policies regarding immigration status.

102.    All three immigration-related conditions are therefore not germane to the Byrne JAG funding Chicago receives or to the Byrne JAG program generally.

### B.    The Department's Notice And Access Conditions Would Impermissibly Induce Unconstitutional Activities

103.    The Spending Clause additionally prohibits the federal government from imposing spending conditions in order to "induce the States to engage in activities that would themselves be unconstitutional."  *Dole*, 483 U.S. at 210.

104.    The notice and access conditions require Chicago to inject unreasonable delays into its existing booking, charging, and release processes in violation of the Fourth Amendment. With regard to the notice condition in particular, providing DHS with 48 hours' advance notice of an arrestee's release from Chicago's custody would require the City to presumptively violate the Fourth Amendment every time it arrested a possible non-citizen without a warrant; the only way Chicago could provide the requested notice is by holding those arrestees longer than *McLaughlin*'s presumptively reasonable 48 hours.  *See* 500 U.S. at 56.  Holding an individual for longer than 48 hours without probable cause is only reasonable where the government

-32-

"demonstrate[s] the existence of an emergency or other extraordinary circumstance" justifying the delay. *Lopez v. City of Chicago*, 464 F.3d 711, 714 (7th Cir. 2006). Extended detention in order to provide release notifications to DHS qualifies as neither "extraordinary" nor an "emergency." *See Arizona v. United States*, 567 U.S. 387, 413 (2012) ("[D]elay[ing] the release of some detainees for no reason other than to verify their immigration status . . . would raise constitutional concerns.").

105.    Independent of *McLaughlin*'s 48-hour presumption, the notice condition would require detention beyond the period authorized by the Fourth Amendment in many instances. A warrantless arrest initially reasonable for Fourth Amendment purposes becomes unreasonable once the task that occasioned the original seizure is complete. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *United States v. Jacobsen*, 466 U.S. 109, 124 (1984) ("[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment."). Detaining an arrestee beyond the period justified by the probable cause supporting the initial arrest requires independent probable cause to justify continued seizure. *See Morales*, 793 F.3d at 218; *Miranda-Olivares*, 2014 WL 1414305, at *9.

106.    Nearly all of Chicago's arrestees who are released from the City's custody are released within 24 hours. Holding arrestees for 48 hours in order to comply with the notice condition would require Chicago to hold individuals longer than required by the fact of their initial arrest, and would thus require independent probable cause.

107.    Probable cause to detain any person must be measured on an individual basis. Plainly, Chicago would not have probable cause to detain every known or suspected non-citizen for the 48-hour period DOJ seeks. Yet the notice condition is not limited to situations where there exists probable cause sufficient to extend the detention. The notice condition states only

-33-

that jurisdictions receiving Byrne JAG funding are required to hold suspected non-citizens "when DHS requests such notice." Ex. D at 30. Complying with the notice condition any time DHS "requests" such notice without regard to probable cause exists to justify continued detention would violate the Fourth Amendment.

108.     The notice condition seeks to require grant recipients to engage in unconstitutional activity and is therefore impermissible under the Spending Clause.

109.     The access condition would similarly require Chicago to hold individuals longer than necessitated by the initial probable cause finding supporting their arrests in at least some circumstances. Permitting DHS to question suspected non-citizens in Chicago's custody would inevitably require an extension of the detention period beyond that justified by the fact of arrest; at least some of those custodial interviews would interfere with Chicago's existing booking and release process.

110.     Any extension to the detention period constitutes a subsequent seizure that must be independently supported by probable cause. *See Morales*, 793 F.3d at 218; *Miranda-Olivares*, 2014 WL 1414305, at *9. Unless Chicago has independent probable cause sufficient to justify continued detention, it cannot extend the period of arrest to allow such questioning. *See Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015); *Arizona*, 567 U.S. at 387; *Muehler v. Mena*, 544 U.S. 93, 101 (2005).

111.     The access condition is not limited to those situations in which there exists probable cause sufficient to extend the detention. Instead, it requires Chicago to permit DHS personnel to access "any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien)" without articulating a limiting principle. Ex. D at 30.

112.    The access condition seeks to require grant recipients to engage in unconstitutional activity and is therefore impermissible under the Spending Clause.

## C.    The Department's Three Immigration-Related Conditions Are Unconstitutionally Ambiguous

113.    Federal restrictions on state and local funding must also be articulated "unambiguously" so that the recipient can "voluntarily and knowingly accept[]" Congress's terms. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16-17 (1981). Under *Pennhurst*, grant conditions are not "unambiguous[]" if the recipient "is unable to ascertain what is expected of it." *Id.*; *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("[Recipients] cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" (quoting *Pennhurst*, 451 U.S. at 17)).

114.    All three immigration-related conditions are ambiguous as to what is expected of grant recipients in Chicago's position, particularly given Chicago's Welcoming City Ordinance and other relevant policies and practices.

115.    The notice condition is ambiguous because, as explained in detail already, it would require Chicago to engage in presumptively unconstitutional behavior. This condition forces grantees to (a) decide whether DOJ intends the condition to be read consistent with the Constitution, and assuming so, (b) decide for themselves how the condition could be complied with *without* raising constitutional difficulties. Requiring grantees to embark on careful constitutional analysis of federal grant conditions does not give grantees appropriate notice of what is "expected of" them.

116.    The access condition is ambiguous because, as drafted, Chicago cannot discern what "detention facilities" it must permit federal agents to access. Specifically, it is not clear whether "detention facility" encompasses the holding cells operated by the Chicago Police

Department.  Nor is it clear how the City should proceed when, given the very brief nature of

most detentions, it is impossible to grant ICE access to a detainee because doing so would

interfere with the Police Department's internal practices and unduly delay a detainee's release

from custody.  *Cf. McLaughlin*, 500 U.S. at 56 (Fourth Amendment prohibits "unreasonable

delay" in releasing arrestees held without a judicial determination of probable cause).

117.    The Section 1373 condition is also ambiguous, and the Department's guidance

documents and other actions have only added to the confusion.  For instance, the statute uses

sweeping language with no discernable limiting principle—*i.e.*, barring agencies from

"prohibit[ing], or *in any way* restrict[ing]" the sharing, maintenance, or exchange of immigration

status information.  And the Department has added to the difficulties State and localities would

have in discerning the scope of that bar by suggesting without explanation that Section 1373

implicates a wide range of state and local governance practices from formal laws to informal

cultural norms.  At other times, the Department has actively contradicted itself in a bid to

interpret Section 1373.  For instance, it has stated both that Section 1373 requires no affirmative

action by States and local governments, U.S. Dep't of Justice, Office of Justice Programs

Guidance Regarding Compliance with 8 U.S.C. § 1373, at 1 (2016), https://tinyurl.com/y8e4j8es,

and that States and local governments may need to provide affirmative instruction to employees

to be in compliance, Memorandum from Michael E. Horowitz, Inspector Gen., U.S. Dep't of

Justice, to Karol V. Mason, Assistant Attorney Gen., Office of Justice Programs, U.S. Dep't of

Justice, Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373

by Grant Recipients 6 (May 31, 2016), https://tinyurl.com/y9rpwge4 ("[W]e have concerns that

unless city employees were made explicitly aware that the local ordinance did not limit their

legal authority to respond to such ICE requests, employees likely would be unaware of their legal authority to act inconsistently with the local ordinance.").

118.    Finally, many interpretations of Section 1373 would raise serious constitutional concerns.  Where a grant recipient must resolve tension between the Constitution and an informal interpretation announced by an agency in a guidance document to ascertain what is expected of it, the condition cannot be characterized as unambiguous.

## D.    The Department's Three Immigration-Related Conditions Are Unconstitutionally Coercive

119.    The Spending Clause further prohibits grant conditions that are "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211 (citation omitted).

120.    As a direct and proximate result of the notice, access, and Section 1373 conditions, Chicago is forced to either accept an unlawful and unconstitutional grant condition or forego Byrne JAG funds.

121.    The loss of Byrne JAG funds would strain the Chicago Police Department's budget resources for replacing failing and inoperable patrol cars needed to provide a public presence and respond to emergency calls, and would curtail community outreach and engagement programs, such as the Chicago Police Department's Force for Good program.

122.    All three immigration-related conditions therefore threaten financial consequences that exceed the point at which pressure turns to constitutionally impermissible compulsion.

123.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the three immigration-related conditions for the FY 2017 Byrne JAG violate the Constitution's Spending Clause as well as an injunction preventing those conditions from going into effect.

## COUNT FOUR: COMMANDEERING

124.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

125.    The Tenth Amendment prohibits the federal government from "requir[ing]" States and localities "to govern according to Congress's instructions," *New York*, 505 U.S. at 162, or "command[ing] the States' officers . . . to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997).

126.    Where the "whole object" of a provision of a federal statute is to "direct the functioning" of state and local governments, that provision is unconstitutional, *Printz*, 521 U.S. at 932, and must be enjoined, *id.* at 935; *New York*, 505 U.S. at 186-187.  That description precisely fits each of the three immigration-related conditions.

127.    The notice condition seeks to fundamentally reorganize the manner in which Chicago has chosen to balance its Fourth Amendment obligations against its interest in effective law enforcement.  Compliance with the notice condition would require Chicago to hold detainees longer than it currently does and would, at bottom "command the States' officers . . . to administer or enforce a federal regulatory program," *Printz*, 521 U.S. at 935.

128.    The notice condition therefore impermissibly commandeers local governments and cannot be validly imposed on Byrne JAG funding recipients.

129.    The access condition requires a fundamental restructuring of Chicago Police Department procedures and functions in order to accommodate on-demand access to detainees by federal agents.  This federalization of bedrock local government functions violates the Tenth Amendment's anti-commandeering principle.  State and local governments can define their sovereignty only "[t]hrough the structure of [their] government, and the character of those who exercise government authority." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  Instituting an open-door policy for federal immigration officials to enter local facilities and interrogate local

detainees displaces Chicago's exercise of its fundamental police powers and compromises local political and law enforcement officials' ability freely to direct the City's law enforcement strategies and priorities.

130.    The access condition therefore impermissibly commandeers local governments and cannot be validly imposed on Byrne JAG funding recipients.

131.    Congress enacted Section 1373 on the belief that "[e]ffective immigration law enforcement requires a cooperative effort between all levels of government."  S. Rep. No. 104-249, at 19 (1996).  Specifically, Congress sought to ensure that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies" could be used to enforce federal law.  *Id.* at 19-20.  In doing so, it sought to "require [state and local officers] to provide information that belongs to the State and is available to them only in their official capacity"—in other words, to engage in unconstitutional commandeering.  *Printz*, 521 U.S. at 932 n.17.

132.    Further, Section 1373 prohibits state and local governments from engaging in a core aspect of governing: controlling the actions of their own employees.  States and local governments can act "only through [their] officers and agents."  *Nevada v. Hicks*, 533 U.S. 353, 365 (2001) (quoting *Tennessee v. Davis*, 100 U.S. 257, 263 (1879)).  Thus, personnel decisions—including decisions about how personnel interact with the federal government—are "decision[s] of the most fundamental sort" for Chicago.  *Gregory*, 501 U.S. at 460.  Statutes like Section 1373—which require state officers to follow federal directives and usurp the state-level policymaking process—break the chain of accountability for state-level officers.

133.    Section 1373 is therefore facially unconstitutional and cannot be validly imposed on Byrne JAG recipients as "applicable Federal law[]."  42 U.S.C. § 3752(5)(D).

134.    As a direct and proximate result of these unconstitutional conditions, Chicago will be forced to accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds and shut down or materially alter the programs they support.

135.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the three immigration-related grant conditions the Department has sought to impose on FY 2017 Byrne JAG program participants violate the Tenth Amendment as well as an injunction preventing those conditions from going into effect.

## COUNT FIVE: DECLARATORY JUDGMENT THAT CHICAGO COMPLIES WITH SECTION 1373

136.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

137.    Chicago has certified compliance with Section 1373 and provided an accompanying legal analysis describing the basis for the City's certification.  DOJ guidance indicates that the statue does not impose an affirmative obligation on state or local entities to collect information from private individuals regarding their immigration status.  *See* U.S. Dep't of Justice, Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373, at 1 (2016), https://tinyurl.com/y8e4j8es ("Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information.").  Section 20 of Chicago's Welcoming City Ordinance and Chicago Police Department Special Order S06-14-03 establish a general policy of not collecting immigration status information unless such collection is required by state or federal law, a judicial decision, or as part of anticipated litigation.  Because Chicago cannot restrict the sharing of information it does not collect, the City's policy of non-collection renders it necessarily compliant with Section 1373 for all cases covered by the non-collection policy.

138.     Where City officials or agents do incidentally come to possess immigration status information, the City has no policy restricting the sharing of such information contrary to Section 1373 because Section 30 of the Welcoming City Ordinance contains a "saving clause" that limits the disclosure of an individual's citizenship or immigration status information "[e]xcept as otherwise provided by applicable federal law."  In the context of the Welcoming City Ordinance, "applicable federal law" includes Section 1373 to whatever extent Section 1373 and any individual federal request made pursuant to that provision is a lawful and constitutional exercise of federal authority.

139.     Chicago has received no formal notification regarding the acceptability of that certification but the Department has indicated that certifications from at least some jurisdictions are likely to be rejected.  *See* Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

140.     While Chicago is confident it complies with Section 1373, DOJ's conduct has sown confusion and created the impression that the federal government believes otherwise, notwithstanding Chicago's legal analysis.  Chicago is reluctant to certify compliance with the Section 1373 in its FY 2017 Byrne JAG application, which is due imminently, until the Department affirms that the City's prior certification is acceptable.

141.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that it complies with Section 1373.

## COUNT SIX: ADMINISTRATIVE PROCEDURE ACT (FAILURE TO USE NOTICE AND COMMENT PROCEDURES; ARBITRARY AND CAPRICIOUS)

142.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

143.     In addition to lacking statutory and constitutional authority to impose the immigration-related conditions, the conditions were adopted without using notice-and-comment procedures and are arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

144.     DOJ's decision to condition Byrne JAG funds on compliance with the notice, access, and Section 1373 conditions is a legislative rule that "impose[s] obligations . . . on private interests." *Associated Builders & Contractors, Inc. v. Reich*, 922 F. Supp. 676, 681 (D.D.C. 1996).  It is therefore subject to the APA's requirement that legislative rules be enacted through notice and comment rulemaking procedures.  *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1204 (2015); *see also* 42 U.S.C. § 3754 ("The Attorney General shall issue rules to carry out this part.").  DOJ issued the Section 1373 compliance condition through a guidance document and the notice and access conditions through a press release and subsequent inclusion by fiat in the grant solicitation.  Those steps do not comply with notice and comment procedures. *See* 5 U.S.C. § 553.

145.     All three conditions are also arbitrary and capricious because DOJ failed to rely on reasoned decisionmaking and, to the extent it cited reasons at all, those reasons are contradicted by evidence.  Among other things, DOJ "relied on factors which Congress has not intended it to consider," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), by, for example, evaluating grant applicants on the basis of their immigration policies rather than on their compliance with expressly enumerated statutory application requirements.  *See* 42 U.S.C. § 3752(a)(1)-(5).  It "entirely failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, including but not limited to the policing challenges created by alienating and inducing fear in immigrant communities.  It

"offered an explanation for its decision that runs counter to the evidence before the agency," *id.*, including the evidence submitted by nine jurisdictions in their Section 1373 certification letters indicating that Welcoming City-style policies promote rather than detract from effective policing. Indeed, when the Attorney General referred to one study in the press that showed that such policies lead to higher crime, *the study's own authors said he was misrepresenting their work*.

146.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the three immigration-related conditions for the FY 2017 Byrne JAG funds are in violation of the APA as well as an injunction preventing those conditions from going into effect.

## COUNT SEVEN: ADMINISTRATIVE PROCEDURE ACT (PAPERWORK REDUCTION ACT)

147.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

148.    DOJ additionally issued the new conditions "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

149.    The FY 2017 Certification of Compliance with Section § 1373 attached to the FY 2017 Byrne JAG application, *see* Ex. D. at 37-38, is a "collection of information" within the meaning of the Paperwork Reduction Act and implementing regulations. *See* 44 U.S.C. § 3502; 5 C.F.R. § 1320.3(h) ("[A] certification would likely involve the collection of 'information' if an agency conducted or sponsored it . . . to monitor . . . compliance with regulatory standards.").

150.    The Paperwork Reduction Act bars federal agencies, including the Department, from "conduct[ing] or sponsor[ing] a collection of information" unless that agency has provided "60-day[s] notice in the Federal Register" and "otherwise consult[ed] with members of the public and affected agencies" to, *inter alia*, "evaluate whether the proposed collection of

information is necessary for the proper performance of the functions of the agency." 44 U.S.C. §§ 3506(c)(2), 3507(a)(1); 5 C.F.R. § 1320.10.

151.     The Department has not published a Paperwork Reduction Act Notice in the Federal Register relevant to the FY 2017 Certification of Compliance with Section 1373.

152.     The Paperwork Reduction Act and implementing regulations further provide that that "no person shall be subject to any penalty for failing to comply with a collection of information" if the relevant collection of information does not display "a currently valid OMB control number" or if the agency "fails to inform" the person responding to the collection of information "that such person is not required to respond to the collection of information unless it displays a currently valid OMB control number." 44 U.S.C. § 3512; 5 C.F.R. § 1320.6; *see also Center for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 244 F.3d 144, 149 (D.C. Cir. 2001) (where agency "did not get prior approval from OMB" for an information collection covered by the Paperwork Reduction Act, agency "had no authority to enforce the information request").

153.     The protection provided by the Paperwork Reduction Act "may be raised in the form of a complete defense, bar, or otherwise at any time during the agency administrative process or judicial action applicable thereto." 44 U.S.C. § 3512(b).

154.     The FY 2017 Certification of Compliance with Section 1373 displays no OMB control number, and Chicago has not been informed that it is not required to submit the FY 2017 Certification of Compliance.

155.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Chicago is entitled to a declaration that it is not required to submit a FY 2017 Certification of Compliance with Section 1373 and that its failure to do so cannot the basis for denying it FY 2017 Byrne JAG funds.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

a)      Declare that all three immigration-related conditions for the FY 2017 Byrne JAG

are unlawful and that Chicago complies with 8 U.S.C. § 1373;

b)      Enjoin the Department of Justice from enforcing the notice, access, or Section

1373 conditions for the FY 2017 Byrne JAG and retain jurisdiction to monitor the Department's

compliance with this Court's judgment; and

c)      Grant such other relief as this Court may deem proper.

August 7, 2017.                                 Respectfully Submitted,

|  |  |
|---|---|
| | EDWARD N. SISKEL |
| JAMIE S. GORELICK (*pro hac* vice pending) | Corporation Counsel of the City of |
| DAVID W. OGDEN (*pro hac vice* pending) | Chicago |
| ARI HOLTZBLATT (*pro hac vice* pending) | BENNA R. SOLOMON |
| ARI SAVITZKY (*pro hac vice* pending) | Deputy Corporation Counsel |
| MOLLY JENNINGS (*pro hac vice* pending) | JUSTIN A. HOUPPERT |
| BRIDGET FAHEY* (*pro hac vice* pending) | Assistant Corporation Counsel |
| WILMER CUTLER PICKERING HALE | SCOTT D. SPEARS |
|     AND DORR LLP | Assistant Corporation Counsel |
| 1875 Pennsylvania Avenue NW | 121 N. LaSalle Street, Suite 600 |
| Washington, DC 20006 | Chicago, IL 60602 |
| (202) 663-6000 | (312) 744-0220 |
| | |
| DEBO P. ADEGBILE (*pro hac vice* pending) | By  /s/ Andrew W. Worseck |
| WILMER CUTLER PICKERING HALE | ANDREW W. WORSECK |
|     AND DORR LLP | Chief Assistant Corporation Counsel |
| 7 World Trade Center | 30 N. LaSalle Street, Suite 1230 |
| 250 Greenwich Street | Chicago, IL 60602 |
| New York, NY 10007 | (312) 744-0220 |
| (212) 230-8800 | andrew.worseck@cityofchicago.org |
| | |
| * Admitted to practice only in Colorado. | MATTHEW C. CROWL |
| Supervised by members of the firm who | NICK KAHLON |
| are members of the District of Columbia | LAURA KLEINMAN |
| Bar | RILEY SAFER HOLMES & CANCILA LLP |

-45-

Three First National Plaza
70 West Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700


*Attorneys for the City of Chicago*

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CITY OF EVANSTON and THE UNITED
STATES CONFERENCE OF MAYORS,

                    Plaintiffs,

      v.

JEFFERSON BEAUREGARD SESSIONS III,
in his official capacity as Attorney General of
the United States,

                  Defendant.

Case No. 18-cv-4853

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

The United States Conference of Mayors (the "Conference") and the City of Evanston,
Illinois ("Evanston") (collectively, "Plaintiffs"), for their complaint against defendant Jefferson
Beauregard Sessions III ("Defendant" or the "Attorney General"), state as follows:

### INTRODUCTION

1.      The Conference and Evanston bring this action to stop the federal government's
aggressive and escalating effort to force cities into becoming the deportation arm of the federal
government. The Conference and Evanston seek to enjoin the Attorney General of the United
States from imposing three sweeping and unlawful conditions on the Edward Byrne Memorial
Justice Assistance Grant Program ("Byrne JAG")—an established federal grant program that
provides crucial support for law enforcement in hundreds of cities nationwide.

2.      The Department seeks to impose three conditions on the fiscal year ("FY") 2017
Byrne JAG funds under a cloud of uncertainty created by the Department's increasingly
aggressive positions. As a condition of receiving FY 2017 Byrne JAG funds, the Department
requires that: (1) cities give the Department of Homeland Security ("DHS"), which includes U.S.
Immigration and Customs Enforcement ("ICE"), 48 hours' notice, or at least as much notice "as

practicable" prior to releasing any alien in custody to allow ICE to take custody of that individual (the "notice condition"); (2) cities give DHS officials unlimited access to local law enforcement facilities to interrogate any suspected non-citizen held there, effectively federalizing city facilities (the "access condition"); and (3) the chief legal officer of each local government certify compliance with 8 U.S.C. § 1373 ("Section 1373"), a federal statute that purports to bar local governments from restricting the sharing of immigration status information with the federal government (the "compliance condition").

3.      These three conditions are unauthorized and unconstitutional. The conditions also fly in the face of longstanding and diverse policies in Evanston and other Conference member cities that promote cooperation between immigrant communities and local law enforcement, ensure access to essential services for all residents, and make residents safer. Compliance with the conditions would require many applicants to violate local law, undermine public safety and effective policing in the cities, and undermine the cities' policy choices. Neither federal law nor the United States Constitution permits the Attorney General to dictate local policy by imposing unauthorized conditions on a critical source of local government funding.

4.      The Department's newly imposed conditions on Byrne JAG funds are also directly at odds with Conference policy resolutions, which collectively represent the views of the nation's mayors. In 2017 and 2018, the Conference adopted policy resolutions addressed to the federal government's efforts to force localities to engage in federal immigration enforcement. The resolutions called for: (a) an end to unconstitutional funding threats to cities in an effort to coerce and compel them into implementing federal immigration law; (b) the end of the Department's unconstitutionally broad interpretation of Section 1373; and (c) the award of Byrne JAG funds to municipalities without the imposition of unconstitutional conditions.

5.       Because of the Department's imposition of the notice, access, and compliance conditions, Evanston and the Conference's other member cities face a Hobson's choice: agree to accept the Department's unconstitutional grant conditions or stand on their rights and forfeit crucial Byrne JAG funds.

6.       The Conference and Evanston seek a declaration that the Department's compliance, notice, and access conditions on Byrne JAG funding are unlawful. The Conference and Evanston also seek an injunction preventing the Department from imposing the notice, access, and compliance conditions on FY 2017 Byrne JAG funds, and from including the conditions in future applications and award documents.

## PARTIES

7.       Plaintiff The United States Conference of Mayors is a non-profit association organized under the laws of Illinois and with its offices in the District of Columbia. As the official non-partisan organization of United States cities with populations of 30,000 or more, the Conference represents the interests of over 1,400 cities in the United States. This includes numerous cities in this federal district and in every other jurisdiction in the country. Nearly 150 million people reside in these cities.

8.       Plaintiff Evanston is a municipal corporation and home rule unit of government organized and existing under the constitution and laws of the State of Illinois. Evanston was incorporated in 1857, and is home to approximately 74,895 residents, including a vibrant immigrant community.

9.       Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States. He is sued in his official capacity. The Attorney General is the federal official in charge of the United States Department of Justice, which took, and threatens imminently to take, the governmental actions at issue in this lawsuit.

## JURISDICTION AND VENUE

10.    The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346. The Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5 U.S.C. §§ 702, 705, 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

11.    Venue is proper in the Northern District of Illinois under 28 U.S.C. § 1391(e). Defendant is a United States officer being sued in his official capacity. Evanston resides in this judicial district and substantial events giving rise to this action occurred in this judicial district. The Conference consents to adjudication of these issues in this district.

## FACTUAL ALLEGATIONS

### A.    The Byrne JAG program provides critical funds to cities.

12.    Congress established the Byrne JAG program in 2005 to serve as the primary source of federal criminal justice funding for states and localities. The Office of Justice Programs ("OJP") within the Department oversees the program.

13.    The goal of the Byrne JAG program is to allow states and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing. *See* H.R. Rep. No. 109-233, at 89 (2005).[1] To that end, the Byrne JAG program is structured as a formula grant, which awards funds to all eligible grantees according to a prescribed formula. *See* 34 U.S.C. § 10156(d)(2)(A) (providing that the Attorney General "shall allocate to each unit of local government" funds consistent with the established formula).

---

[1] The Byrne JAG program was created in the Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006), which in turn amended the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197.

14. Byrne JAG funds are distributed across states and localities based on their population and relative levels of violent crime. The Byrne JAG distribution formula for states is a function of population and violent crime. 34 U.S.C. § 10156(a). The formula for local governments is a function of the state's allocation and the ratio of violent crime in the locality to violent crime in the state. *Id.* § 10156(d).

15. The formula-based approach entitles cities to their share of the Byrne JAG formula allocation so long as their proposed programs meet at least one of eight broadly defined goals, *see* 34 U.S.C. § 10152(a)(1)(A)-(H) (listing eligible programs such as general law enforcement, prevention and education, drug treatment, and mental health), and their applications contain a series of statutorily required certifications and attestations. *Id.* § 10153(a).

**B. The Conference was formed to address the intersection of federal and local policy and has resolved to oppose the Attorney General's actions.**

16. In 1932, during the midst of the Great Depression, the nation's cities were close to bankruptcy and their residents were largely unemployed and without access to sufficient food, housing, law enforcement, and other necessities. In response to the appeals of mayors across the country, Congress created a $300 million federal assistance program for cities, marking the first time in the nation's history that federal relief was provided directly to cities. A few weeks later, the Conference was founded to coordinate its cities' interactions with the federal government.

17. Today the Conference's member cities are home to immigrant populations that are both recent arrivals and multigenerational families. The Conference proudly recognizes that cities are diverse, multicultural centers, and that their diversity reflects core American values, fosters economic prosperity and opportunity, enriches cities' cultures, and keeps our nation competitive and strong.

-5-

18.     The Conference's primary roles include promoting the development of effective national city and metro-area-focused policy; strengthening federal-city relationships; ensuring that federal policy meets urban needs; providing mayors with leadership and management tools that allow them to do their jobs better; and creating a forum in which mayors share ideas, information, and best practices, and through which cities coordinate on shared policy goals.

19.     Conference members speak with a united voice on organizational policies and goals. Mayors contribute to the development of national urban policy by serving on one or more of the Conference's standing committees or in another leadership role. A list of member cities whose mayors currently serve in leadership roles is attached as **Exhibit A** to this complaint.

20.     The adoption of a resolution is the principal means by which the Conference speaks on matters of policy. The policy positions adopted at the annual meeting collectively represent the views of the nation's mayors.

21.     Conference members met from June 23-26, 2017 for the 2017 annual meeting. The meeting was attended by over 250 mayors from cities across the country, including those from nearly every state and the Commonwealth of Puerto Rico.

22.     At the annual meeting, the Conference's members passed three resolutions recognizing the importance of immigrants to their communities, supporting immigrant rights, standing against policies that target immigrant communities, and opposing the administration's punitive welcoming city policies.

23.     First, the Conference passed a resolution titled "Opposing Punitive Sanctuary Jurisdiction Policies." (A true and correct copy of this resolution is attached as **Exhibit B** to this complaint.)

24.     This resolution reflected the Conference members' considered judgment that,

among other things:

(a)     Many local jurisdictions determined that their local law enforcement efforts and personnel have neither the authority, the priority, nor the resources to serve as immigration enforcement officers;

(b)     Trust between local law enforcement and the communities they serve is critical to preventing, solving, and prosecuting crimes, and many jurisdictions determined that having local law enforcement officers serve as immigration officers would break that trust;

(c)     Many local jurisdictions and authorities lack the law enforcement resources to act as immigration officers at the expense of local law enforcement priorities; and

(d)     Cities and other local government entities must have the discretion to make individualized determinations relative to local values, expenditure of resources, priorities, and liabilities assumed, all taking into account that immigrants residing in the nation's cities must be able to trust all of city government that their Fourth Amendment rights will be guaranteed, and that local law enforcement efforts to build trust and supportive relationships with all communities are essential to preventing and prosecuting crime and helping victims.

(Ex. B at 1-2.)

25.     Accordingly, the Conference resolved to:

(a)     Oppose punitive sanctuary jurisdiction policies that limit local control and discretion;

(b)     Urge Congress, the administration, and states to pursue immigration enforcement policies that recognize that local law enforcement has limited resources and community trust is critical to local law enforcement and community safety; and

(c)     Oppose federal and state policies that commandeer local law enforcement or require local authorities to (i) violate, or be placed at risk of violating, a person's Fourth Amendment rights; (ii) expend limited resources to act as immigration agents; or (iii) otherwise assist federal immigration authorities beyond what is determined by local policy.

(*Id.* at 2-3.)

26.     Second, the Conference passed a resolution titled "Supporting Immigrants,

Refugees and Asylum Seekers and Standing Against Discriminatory and Harmful Policies that

Target These Vulnerable Communities." (A true and correct copy of this resolution is attached as **Exhibit C** to this complaint.) This resolution recognized that cities across America are home to immigrant populations, including recent arrivals and multigenerational families; that immigrants contribute to cities in important ways; and that the administration has nonetheless antagonized and intimidated immigrant communities through executive orders and by threatening punitive actions against welcoming cities. (Ex. C at 1.) The Conference thus resolved to call on Congress to act against policies that discriminate against and target immigrants, and to oppose "the Administration's efforts to hold immigrants hostage as bargaining chips to threaten withholding federal funding from cities across the nation." (*Id.* at 1-2.)

27.    Third, the Conference passed a resolution titled "Supporting Immigrant Rights." (A true and correct copy of this resolution is attached as **Exhibit D** to this complaint.) This resolution recognized that the United States is enriched by the diversity of immigrants; that cities are diverse, multicultural centers that reflect core American values and foster economic prosperity; and that data shows that welcoming cities are stronger economically and safer than other cities. (Ex. D at 1.) In addition, the resolution recognized that the federal government seeks to restrict funding to welcoming jurisdictions and coerce cities into becoming the deportation arm of the federal government, which undermines mayors' abilities to ensure community safety by eroding trust between local law enforcement and residents. (*Id.* at 1-2.) The Conference thus resolved to "call for an end to unconstitutional federal funding threats to states and local governments in an effort to coerce and compel them into implementing federal immigration law," and to "urge members of Congress to withdraw legislation that attempts to cut local law enforcement funding necessary to ensure the safety of our communities." (*Id.* at 2.)

28.     From June 8-11, 2018, Conference members met in Boston for this year's annual meeting. More than 240 mayors from cities across the country attended, including those from nearly every state and the Commonwealth of Puerto Rico.

29.     At the 2018 annual meeting, the Conference's members adopted an additional resolution, titled "Opposing Unconstitutional Requirements Placed on Byrne JAG Funding and Urging the Immediate Awarding of FY 2017 Byrne JAG Grants." (A true and correct copy of this resolution is attached as **Exhibit E** to this complaint.) The resolution stated that cities "will not be bullied, intimidated or coerced into making a false choice between grants with offensive conditions attached, on the one hand, and our values as welcoming cit[ies] and the principles of community policing, on the other." (Ex. E at 1.) The resolution recognized that the Department does not have the authority to impose new conditions on a grant program created by Congress and "cannot commandeer local law enforcement to carry out federal immigration law functions." (*Id.* at 2.) The Conference resolved to call on the Department "to award Byrne JAG funds to municipalities without imposing additional unconstitutional conditions." (*Id.* at 3.)

30.     Each of these resolutions passed with a wide majority of the Conference members present for the annual meetings. In fact, after conclusion of a vote on a proposed resolution that passes, a member mayor who attended the vote may request to be recorded as having voted "No" on that specific resolution. Only five mayors in attendance at the annual meeting recorded a no vote as to any of the three 2017 resolutions. Only one mayor in attendance at the 2018 annual meeting recorded a no vote as to the 2018 resolution.

### C.     Conference members rely on Byrne JAG funds.

31.     Many Conference members rely on Byrne JAG funds for critical law enforcement needs in their cities. (*See, e.g.*, Ex. A.) As such, the Conference has long supported the Byrne

JAG program. [2] Over the past decade, Conference members have routinely applied for and received those funds.

32.     Evanston, a Conference member, first received Byrne JAG funds in 2009 and has received funds every year since. Evanston uses Byrne JAG funds to train officers through the Police Learning Institute, pay personnel, and to purchase equipment. In FY 2016, Evanston received $14,685 through the Byrne JAG program.

33.     Evanston receives its Byrne JAG funds through the application submitted by Chicago, Illinois. Because Chicago's costs of preventing and investigating violent crimes exceed those of surrounding jurisdictions, 34 U.S.C. § 10156(d)(4) obligates Chicago to file a Byrne JAG application on behalf of itself and other, neighboring communities, including Evanston.

34.     Many of the Conference's members use Byrne JAG funds for diverse purposes, reflecting both the varied law enforcement needs of different communities and Congress's intent to preserve local discretion and flexibility in Byrne JAG-funded law enforcement programs. These include, for example, the following Conference members:

(a)     Iowa City, Iowa (population 74,398) uses Byrne JAG funds to promote traffic safety, to establish a search and rescue program aimed at individuals at risk for wandering, to partially fund a drug task force, and to purchase equipment.

(b)     Los Angeles, California (population 3,792,621) uses Byrne JAG funds for its Community Law Enforcement and Recovery (CLEAR) program, which aims to reduce gang violence in the city and rehabilitate communities that experienced significant crime. The program promotes and funds special criminal investigative units, an aggressive vertical prosecutorial program, probation and parole officers, youth intervention organizations, and schools.

(c)     New Orleans, Louisiana (population 391,495) uses Byrne JAG funds on gun violence reduction initiatives, alternatives to incarceration for municipal court, diversion programs for eligible defendants with mental illness, pre-trial and probation advocacy, domestic violence monitoring court, and technology

---

[2] *See* The U.S. Conference of Mayors, Public Safety First Resolution, June 2012, *available at* http://www.greenandhealthyhomes.org/sites/default/files/AdoptedResolutionsFull1.pdf.

upgrades including body cameras and audio surveillance equipment for its police force.

(d)    New York, New York (population 8,175,133) uses Byrne JAG funds to support a wide range of programs, including efforts to improve the collection, organization and evaluation of criminal justice data; a specialized unit that investigates illegal hotels, building violations, and illegal adult establishments; initiatives to reduce the number of people with mental and behavioral needs who cycle through the criminal justice system by connecting them with interventions and services; and initiatives to ensure the safety of students and reduce crime in schools. In addition, the City's five District Attorneys use Byrne JAG funds to support many programs, including the Kings County Drug Treatment Alternative-to-Prison program, which diverts hundreds of nonviolent offenders to community-based residential drug treatment programs, and the New York County Cybercrime and Identity Theft Bureau, which protects the public and institutions from organized cybercrime and identity theft schemes.

(e)    Portland, Oregon (population 639,863) has used Byrne JAG funds to support its New Options for Women (NOW) program, which provides services to women who experienced sexual exploitation while working in the commercial sex industry.

(f)    Providence, Rhode Island (population 178,042) uses Byrne JAG funds to pay personnel to conduct targeted enforcement patrols and to contract with Family Service of Rhode Island for the services of a part-time Bilingual Police Liaison.

(g)    Sacramento, California (population 493,025) uses Byrne JAG funds to support the ongoing maintenance and operations of its Police Department's helicopter program.

35.    Many other Conference members receive Byrne JAG funds and use them for still different, but no less critical, law enforcement purposes. These members include cities listed separately on Exhibit A, and many other cities like them.

**D.    The Conference, Evanston, and other Conference members promote policies of cooperation between local law enforcement and immigrants.**

36.    In exercising its discretion over local law enforcement policy, Evanston made the considered judgment that devoting local resources to immigration enforcement would be detrimental to community safety, and that concerns for safety are best addressed by promoting a

policy of cooperation between local law enforcement and immigrants. This policy judgment is codified in Evanston's "Welcoming City Ordinance." *See* Evanston City Code § 1-22.

37.     Evanston's Welcoming City Ordinance reflects the Evanston City Council's findings that "the cooperation of all persons, both documented citizens and those without documentation status, is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems" and that one of Evanston's "most important goals is to enhance the City's relationship with the immigrant communities." *Id.* § 1-22-2.

38.     In its current form, the Welcoming City Ordinance, codified as Chapter 22 of the Evanston City Code, contains several key provisions relevant to this lawsuit, including:

(a)     Subject to certain exceptions, no Evanston agent or agency shall "[s]top, arrest, search, detain or continue to detain a person solely on the belief that the person is not present legally in the United States, or that the person has committed a civil immigration violation." §1-22-10(A)(1).

(b)     Subject to certain exceptions, no Evanston agent or agency shall "[d]etain, or continue to detain, a person based upon an immigration detainer, when such immigration detainer is based solely on a violation of a civil immigration law." § 1-22-10(A)(3).

(c)     Nothing in section 1-22-10 "prohibits communication between federal agencies or officials and law enforcement or officials." §1-22-10(D).

(d)     Except as otherwise provided by federal law, no Evanston agent or agency shall disclose citizenship or immigration status information "unless required to do so by legal process or such disclosure has been authorized in writing by the individual to whom such information pertains." § 1-22-8.

39.     These and the other provisions of the Welcoming City Ordinance play a vital role in strengthening the relationship between Evanston's government, its police force, and its immigrant community. It is essential that Evanston's police officers have the flexibility needed to engage the immigrant community in their crime-fighting initiatives without projecting a constant threat of deportation.

-12-

40.     Evanston is not alone. Many other Conference members have adopted similar policies. These include, for example, Gary, Indiana; Los Angeles, California; New Orleans, Louisiana; New York, New York; Philadelphia, Pennsylvania; and Providence, Rhode Island.[3]

41.     Welcoming city policies and similar policies are sound. One study found that "crime is statistically significantly lower in sanctuary counties compared to nonsanctuary counties . . . controlling for population characteristics."[4] Indeed, a broad coalition of police chiefs explained that "build[ing] trusting and supportive relations with immigrant communities . . . is essential to reducing crime and helping victims."[5]

42.     Welcoming city policies are rooted in the judgment that restricting entanglement with ICE secures and enhances community trust in local law enforcement. Local law enforcement relies upon all community members (regardless of immigration status) to report crimes, serve as witnesses, and assist in investigations and prosecutions. Indeed, in the Conference members' experience, even the perception that local law enforcement is assisting in immigration enforcement can erode trust, disrupt lines of communication, and make law enforcement's job much more difficult.

---

[3] Gary – Ordinance No. 9100; The Los Angeles Police Department & Federal Immigration Enforcement: Frequently Asked Questions, *available at* http://assets.lapdonline.org/assets/pdf/immigrationfaq.pdf; New Orleans – New Orleans Police Department Operations Manual, Chapter 41.6.1, *available at* https://www.nola.gov/getattachment/NOPD/NOPD-Consent-Decree/Chapter-41-6-1-Immigration-Status-approval.pdf/; New York – Executive Order Nos. 34 and 41, *available at* https://www1.nyc.gov/assets/immigrants/downloads/pdf/eo-34.pdf and https://www1.nyc.gov/assets/immigrants/downloads/pdf/eo-41.pdf; Philadelphia – Executive Order No. 16, *available at* https://www.ilrc.org/sites/default/files/resources/2016-01_philadelphia_pep_order.pdf; Providence – Resolution of the City Council, *available at* https://www.ilrc.org/sites/default/files/resources/providence_resolution.pdf.
[4] Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy* 6 (2017), http://tinyurl.com/y75lsykd.
[5] Press Release, Major Cities Chiefs Ass'n, U.S. Mayors, Police Chiefs Concerned with Sanctuary Cities Executive Order (Jan. 25, 2017), http://tinyurl.com/y8zqhypw.

43.     For these reasons, the Conference has for years opposed the federal government's attempts to penalize cities that adopt welcoming city policies such as those cited above. In 2015, for example, the Conference opposed Senate Bill 2146, the "Stop Sanctuary Policies and Protect Americans Act," which proposed to deny Community Development Block Grants and other federal aid to cities that adopted policies like those identified above.

44.     Shifting the federal responsibility of enforcing civil immigration law to local governments diverts critical resources from their law enforcement agencies, compromises public safety, and hinders local police department policies. The Conference continues to oppose similar legislation when proposed (none of which Congress passed).

**E.      The Department imposed three unlawful conditions on FY 2017 Byrne JAG funds.**

45.     For over a decade, the Department administered the Byrne JAG program as Congress intended: funding critical local law enforcement initiatives without seeking to leverage funding to conscript local agencies to enforce federal immigration law. But now the Department seeks to impose three conditions on FY 2017 Byrne JAG funds under a cloud of uncertainty created by the Department's increasingly aggressive positions: (1) the notice condition; (2) the access condition; and (3) the compliance condition. Each condition is unauthorized and unlawful.

**1.      The notice condition**

46.     The FY 2017 Byrne JAG solicitation stated that the awards would be conditioned on grant applicants providing "at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act." (A true and correct copy of the U.S. Dep't of Justice, Edward Byrne Memorial Justice Assistance Grant

-14-

Program FY 2017 Local Solicitation is attached as **Exhibit F** and is available at https://www.bja.gov/Funding/JAGLocal17.pdf. The quoted language is found at page 30.)

47.     The FY 2017 Byrne JAG award documents, which the Department recently sent jurisdictions around the country, revise and expand on what the notice condition entails. From the date a city accepts the award and throughout the time of the award's performance, each city must have in place an "ordinance, -rule, -regulation, -policy, or -practice . . . designed to ensure that, when a local-government (or local-government-contracted) correctional facility receives from DHS a formal written request . . . that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and – as early as practicable . . . provide the requested notice to DHS." (A true and correct copy of the Department's sample award document is attached as **Exhibit G** and is available at https://www.bja.gov/Jag/SampleAwardDocument/. The quoted language is found at page 19.) The award document specifies that DHS currently requests notice "as early as practicable (at least 48 hours, if possible)." (Ex. G at 18.)

**2.     The access condition**

48.     The FY 2017 Byrne JAG solicitation stated that the awards would also be conditioned on grant applicants permitting "personnel of the [DHS] to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States." (Ex. F at 30.) The requirement appears to mandate that federal immigration agents be given unprecedented and unfettered access to local law enforcement facilities and to any person being held there.

49.     The FY 2017 Byrne JAG award documents revise and expand on what the notice condition entails. From the date a city accepts the award and throughout the time of the award's performance, each city must have in place an "ordinance, -rule, -regulation, -policy, or -practice .

-15-

. . designed to ensure that [any, not just DHS] agents of the United States are given access [to] a local-government (or local-government-contracted) correctional facility" to permit the federal "agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States." (Ex. G at 19.)

### 3.   The compliance condition

50.   The FY 2017 Byrne JAG solicitation stated that to validly accept an award, a local government must certify compliance with Section 1373. In fact, the application required certifications by both a city's chief legal officer and its chief executive. (Ex. F at 22-23.)

51.   Section 1373 provides that state and local entities may not "prohibit, or in any way restrict" their entities and officials from sending or receiving citizenship or immigration status information from or to DHS. 8 U.S.C. § 1373(a). Section 1373 further states that no person or agency may "prohibit, or in any way restrict" state and local entities from sending, requesting, or receiving immigration status information from or to DHS; maintaining immigration status information; or exchanging immigration status information with other entities. 8 U.S.C. § 1373(b).

52.   The FY 2017 Byrne JAG award documents revise and expand on what the compliance condition entails. The compliance condition is set forth in three separate award conditions— Conditions 52, 53, and 54. Condition 52 requires a local government to submit a certification of compliance with Section 1373 signed by the chief legal officer. (Ex. G at 15.) Condition 53 requires ongoing compliance with Section 1373, and requires subrecipients (*i.e.*, those who receive their funds through another applicant) to certify compliance with Section 1373. (*Id.* at 16.)

**F.    The conditions are ambiguous, arbitrary, and without justification.**

53.    The Department imposed the notice, access, and compliance conditions without any explanation, reasoning, or opportunity for exchange with local governments or law enforcement. In early July 2017, after demanding that cities justify their compliance with Section 1373, the Department cryptically announced that "[s]ome" jurisdictions "potentially violate" Section 1373, without indicating which certifications it found lacking and without identifying any defect.[6]

54.    In late July 2017, shortly before the Byrne JAG application for FY 2017 was set to go online, the Department suddenly announced significant changes to the Byrne JAG application process in a two-paragraph press release and accompanying press "backgrounder" document.[7] The Department's press release failed to explain how the Department arrived at the new conditions or what alternatives it considered. The press release was silent as to the Byrne JAG program's purpose and how the notice, access, and compliance conditions relate to, let alone serve to advance, the program's interests. The Department also failed to provide any guidance as to how the conditions will operate in practice.

55.    The notice, access, and compliance conditions are ambiguous, leaving cities uncertain as to how to comply. The ambiguity threatens to induce unconstitutional action. For example, the notice condition would require cities to detain individuals longer than they otherwise would, potentially violating the individuals' Fourth Amendment rights and state law and thereby expose these cities to liability; the access condition would demand that cities open

---

[6] Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.
[7] *See* Press Release, U.S. Dep't of Justice, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017), https://tinyurl.com/y9ttqhsl; U.S. Dep't of Justice, Backgrounder on Grant Requirements, https://tinyurl.com/ycfgbgl4.

their facilities to federal officials without regard to local detention needs. Evanston Police Department regulations and those of many Conference member cities' police forces require that individuals arrested without a warrant be released or transferred to court without unnecessary delay, but in any event no later than 48 hours after arrest. *See, e.g.*, Evanston Police Department Policy Manual § 900.3. Such matters are also informed by the law of many states, which require that certain detainees be released within 48 hours. *See, e.g.*, Ill. Admin. Code §§ 720.30, 720.150.

56.     Just as fundamentally, complying with the notice and access conditions would undermine public safety. Welcoming city policies assist effective policing by building trust between law enforcement officers and the immigrant community. Conversely, policing suffers when community members, whatever their immigration status, do not feel free to report crimes, assist in investigations, or testify as witnesses. The Department's insistence that cities nationwide give immigration enforcement agents on-demand access to their detention facilities to investigate potential civil immigration violations, and that cities detain individuals solely so to allow the investigation of possible civil immigration violations, undermines crucial public trust, cuts local law enforcement efforts off at the knees, and makes everyone in these cities less safe.

**G.     The Department lacks any authority to impose the three conditions.**

57.     No legal basis exists for the three conditions. The Byrne JAG statute gives the Department no authority to impose the notice, access, and compliance conditions on Byrne JAG funds. Congress repeatedly demonstrates its ability (when it so desires) to expressly confer agency discretion to add substantive conditions to federal grants. In the same statute that includes the Byrne JAG grant, the Omnibus Crime Control and Safe Streets Act of 1968, Congress created a different grant program that expressly authorized administering agencies to impose reasonable grant conditions. *See* 34 U.S.C. § 10446(e)(3) (Attorney General may "impose

-18-

reasonable conditions on grant awards . . . ."). And Congress expressly conferred such authority in other federal grant programs. *See, e.g.*, 47 U.S.C. § 1204(b)(2) (Under Secretary of Commerce can "establish such conditions . . . as may be appropriate to ensure the efficiency and integrity of the grant program"); 25 U.S.C. § 1652(b) (similar).

58.     The Byrne JAG statute gives the Attorney General limited ministerial authority to specify the "form" of the application, 34 U.S.C. § 10153(A) (requiring jurisdictions to submit an application containing the enumerated components "in such form as the Attorney General may require"). However, the statute nowhere authorizes the Attorney General or the Department to impose additional substantive conditions to the application. Indeed, doing so would upend Congress's formula approach for distributing funds based on population and violent crime, and instead allocate grants using criteria invented by the Department.

59.     Although the Byrne JAG statute requires that grantees comply with "all applicable Federal laws," that phrase refers to the host of laws that regulate the conduct of federal grant recipients *as grant recipients*.[8] It does not refer to every section of the U.S. Code that could possibly apply to a state or local government. Section 1373 does not regulate grantees as grantees nor do its terms mention federal grants or funds. In fact, none of the three conditions concerns applicable federal requirements. Each condition addresses civil immigration

---

[8] *See, e.g.*, 41 U.S.C. § 4712(a)(1) ("An employee of a contractor, subcontractor, grantee, or subgrantee or personal services contractor may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds . . . ."); 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.").

enforcement, which is wholly inapplicable to criminal justice grants. In addition, there is no federal law requiring cities to provide ICE with "at least 48 hours' advance notice" before releasing anyone in custody, and no federal law requires local police departments to give DHS officials access to detention facilities.

60.     In fact, Congress considered, but did not pass, legislation that would penalize cities for seeking to set their own law enforcement priorities. *See* Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) (proposing funding cuts for any sanctuary jurisdiction that violates Section 1373 or "prohibits any government entity or official from complying with a detainer"). Notably, however, Congress never passed legislation authorizing the executive branch to impose any penalty on local jurisdictions based on the refusal to comply with detainer or other immigration enforcement requests.

61.     The notice, access, and compliance conditions represent a sharp break with past agency practice. The Department never before imposed any conditions of this nature on Byrne JAG funds.

62.     The three conditions also violate core constitutional principles. Separation of powers principles operate as independent restraints on cooperative federalism arrangements like the Byrne JAG program. The Constitution gives the spending power to Congress, not the executive branch. Federal agencies therefore may not invent funding conditions out of whole cloth.

63.     The notice, access, and compliance conditions also run afoul of the Tenth Amendment. The anti-commandeering principle ensures that the sovereign states are free to legislate as they see fit to promote the safety and welfare of their residents. The principle forbids

Congress to "unequivocally dictate[] what a state [or local] legislature may and may not do."
*Murphy v. NCAA*, 138 S. Ct. 1461, 1478 (2018).

64.     Section 1373 "unequivocally dictates" to cities that they may not promulgate
policies or regulations that prohibit local officials from sharing immigration status information
with federal officials. *Id.*; *see, e.g.*, *City of Philadelphia v. Sessions*, No. 17-3894, 2018 WL
2725503, at *28-33 (E.D. Pa. June 6, 2018); *accord United States v. California*, No. 2:18-cv-
490-JAM-KJN, 2018 WL 3301414, at *14 (E.D. Cal. July 5, 2018) ("The Court finds the
constitutionality of Section 1373 highly suspect.").

65.     The notice and access conditions "unequivocally dictate[]" to cities that they must
enact ordinances or policies concerning the administration of detention facilities and providing
advance notification to federal officials. The notice condition seeks to fundamentally reorganize
the way the Conference's members balance their Fourth Amendment obligations against their
interest in effective law enforcement. The access condition requires a fundamental restructuring
of police procedures and functions to accommodate on-demand access to detainees by federal
agents. The federalization of bedrock local government functions violates the Tenth
Amendment's anti-commandeering principle. *See Murphy*, 138 S. Ct. at 1477 ("The Federal
Government may not command the States' officers, or those of their political subdivisions, to
administer or enforce a federal regulatory program.") (quoting *Printz v. United States*, 521 U.S.
898, 935 (1997)).

   **H.     The Department's unlawful conditions will injure Evanston and the
           Conference's other members, forcing them to choose between vital law
           enforcement funding and their constitutional rights.**

66.     Evanston and the Conference's other members now face an impossible choice:
sacrifice their sovereignty and their residents' safety by acceding to unlawful funding demands
that will undermine community-officer trust and cooperation, or forfeit crucial monies used to

fund essential policing operations. The Department cannot force the Conference's members to choose between their right to exercise municipal sovereignty and their right to receive formula grant funds that Congress allocated to them.

67. The importance of Byrne JAG funds and the choice cities now face is underscored by the number of local governments challenging the conditions. In August 2017, the City of Chicago, a member of the Conference, filed a lawsuit challenging the three unauthorized and unconstitutional Byrne JAG conditions. *City of Chicago v. Sessions*, Case No. 17-cv-5720 (N.D. Ill.) (Leinenweber, J.) In addition to Chicago, the State of Illinois, City of Philadelphia, City and County of San Francisco, City of Los Angeles, State of California, and City of West Palm Beach filed lawsuits challenging the Byrne JAG conditions.[9]

68. On September 15, 2017, the district court granted Chicago's motion for a nationwide preliminary injunction as to the notice and access conditions because Chicago was likely to succeed on its claims that the Department lacked the authority to impose those conditions. *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 943, 951 (N.D. Ill. 2017) ("The notice and access conditions exceed statutory authority, and, consequently, the efforts to impose them violate the separation of powers doctrine and are *ultra vires*.").

69. On September 26, 2017, the Attorney General filed a motion to stay the nationwide preliminary injunction. *Chicago*, No. 17-cv-5720, Dkt. 80. Two days later, on September 28, 2017, counsel for the Conference appeared at the presentment of the Attorney General's motion to stay and alerted the court that the Conference intended to seek leave to

---

[9] *State of Illinois v. Sessions* (No. 18-cv-4791, N.D. Ill.); *City of Philadelphia v. Sessions* (No. 17-3894, E.D. Pa.); *City & County of San Francisco v. Sessions* (No. 17-4642, N.D. Cal.); *City of Los Angeles v. Sessions* (No. 17-7215, C.D. Cal.); *State of California v. Sessions* (No. 17-4701, N.D. Cal.); *City of West Palm Beach v. Sessions* (No.18-cv-80131, S.D. Fla.).

intervene in the case. The Conference filed its motion to intervene on October 6, 2017. *Id.*, Dkt. 91.

70.     On November 16, 2017, the district court denied the Conference's motion to intervene. At that time, the district court explained that the Conference "can represent the interests of its members who may suffer an impending injury caused by the defendant's acts." *Chicago*, 2017 WL 5499167, at *5 (N.D. Ill. Nov. 16, 2017). However, the court denied intervention because the nationwide injunction in place at the time protected the Conference's member cities' interests. *Id.* at *9-10 ("Unless and until the status of the nationwide injunction changes, there is no reason to permit an intervention that will further complicate this litigation.").

71.     On April 19, 2018, the United States Court of Appeals for the Seventh Circuit affirmed the district court's grant of a nationwide injunction as to the notice and access conditions. *City of Chicago v. Sessions*, 888 F.3d 272, 293 (7th Cir. 2018). The panel unanimously concluded that "the district court did not err in determining that the City established a likelihood of success on the merits of its contention that the Attorney General lacked the authority to impose the notice and access conditions on receipt of the Byrne JAG grants," and two of the three judges held that the district court "did not abuse its discretion in granting the nationwide preliminary injunction." *Id.*

72.     The Attorney General subsequently filed a petition for rehearing en banc as to the scope of the preliminary injunction. *Chicago*, No. 17-2991, Dkt. 119. Notably, the Attorney General did not request rehearing on the Seventh Circuit's decision that Chicago established a likelihood of success on its claims that the Attorney General lacked authority to impose the notice and access conditions.

73.     On June 4, 2018, the Seventh Circuit voted to partially rehear the case en banc "only as to the geographic scope of the preliminary injunction entered by the district court." *Chicago*, No. 17-2991, Dkt. 128. On June 26, 2018, the Court stayed the preliminary injunction issued by the district court "as to geographic areas in the United States beyond the City of Chicago pending the disposition of the case by the en banc court." *Chicago*, No. 17-2991, Dkt. 134.

74.     Even though the Attorney General did not appeal the Seventh Circuit's decision that Chicago was likely to succeed on the merits of its claims that the Attorney General lacks the authority to impose the notice and access conditions, the Department began issuing FY 2017 Byrne JAG award notification documents as soon as the Seventh Circuit stayed the preliminary injunction as to geographic areas outside the City of Chicago. A few hours after the Seventh Circuit stayed the nationwide injunction, on June 26, 2018, the Department issued FY 2017 Byrne JAG award notifications to Conference member cities. (*See* Ex. A.) Upon information and belief, the Department issued awards containing all three challenged conditions to hundreds of municipalities.[10]

75.     However, the Department continues to withhold FY 2017 Byrne JAG award documents from many Conference member cities, including the cities located within Illinois, Wisconsin, Indiana, California, Oregon, and Vermont. The Department's refusal to disperse the FY 2017 Byrne JAG funds to certain states and local governments adds confusion and uncertainty to the award process.

76.     The Department's imposition of the notice, access, and compliance conditions and its continued refusal to issue awards to certain cities pose a threat of imminent harm to Evanston

---

[10] *See* https://ojp.gov/funding/Explore/OJPAwardData htm.

and the Conference's other members. Without Byrne JAG funds, Evanston and the Conference's other members will have to shut down important local programs; change program staffing, scope, or goals; or divert funds from other policing objectives to sustain the programs.

77.     The Conference and Evanston, therefore, bring this action and seek to enjoin the Attorney General from imposing the unlawful conditions.

## COUNT ONE: ULTRA VIRES

78.     The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

79.     The Department of Justice may only exercise authority conferred by statute.

80.     The Department lacks statutory authority to condition Byrne JAG funds on the notice, access, and compliance conditions. Indeed, such authority is at odds with the text, structure, and purpose of the Byrne JAG statute.

81.     The Byrne JAG statute gives the Department no authority to impose additional substantive grant conditions on Byrne JAG funds. *City of Chicago v. Sessions*, 888 F.3d 272, 285 (7th Cir. 2018). The Department lacks statutory authority to impose the notice, access, and compliance conditions on Byrne JAG funds. The three conditions are not "applicable Federal law" and do not deal with the administration and spending of funds.

82.     The formula-grant structure of the Byrne JAG program also contradicts the Department's purported authority to promulgate the conditions. Unlike discretionary grants, which agencies award on a competitive basis subject to agency discretion, formula grants are awarded pursuant to a statutory formula. If the Department had the authority to impose new substantive conditions on all grantees, the effect would be to contradict Congress's formula and reallocate funds to jurisdictions that adopted the Department's preferred policy. It would also contradict Congress's intent to give states and local governments the "flexibility to spend money

for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005).

83.     As a direct and proximate result of these unlawful conditions, Evanston and the Conference's other members will be forced to accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds and shut down the programs the funds support.

84.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the Attorney General is without authority to impose the notice, access, and compliance conditions on FY 2017 Byrne JAG funds; and a permanent injunction preventing the conditions from going into effect.

## COUNT TWO: SEPARATION OF POWERS

85.     The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

86.     The Constitution vests the spending power in Congress, not the executive branch. U.S. Const. art. I § 8, cl. 1. Absent a statutory provision or express delegation, only Congress is entitled to attach conditions to federal funds.

87.     The executive branch "does not have unilateral authority to refuse to spend . . . funds" that Congress already appropriated "for a particular project or program." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Train v. City of New York*, 420 U.S. 35, 44 (1975). Imposing a new condition on a federal grant program amounts to refusing to spend money appropriated by Congress unless that condition is satisfied.

88.     The notice condition was not imposed by Congress, but rather by the Department in issuing the FY 2017 Byrne JAG application. Therefore, the notice condition amounts to improper usurpation of Congress's spending power by the executive branch.

-26-

89. The access condition was not imposed by Congress, but rather by the Department in issuing the FY 2017 Byrne JAG application. Therefore, the access condition amounts to improper usurpation of Congress's spending power by the executive branch.

90. The compliance condition was not imposed by Congress, but rather by the Department in issuing its OJP guidance and the FY 2016 and FY 2017 Byrne JAG applications. Therefore, the compliance condition amounts to improper usurpation of Congress's spending power by the executive branch.

91. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the notice, access, and compliance conditions for the FY 2017 Byrne JAG funds violate the constitutional principle of separation of powers and impermissibly arrogate to the executive branch power that is reserved to the legislative branch; and a permanent injunction preventing the conditions from going into effect.

## COUNT THREE: SPENDING CLAUSE

92. The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

93. Not only did Congress not authorize (expressly or impliedly) the notice, access, and compliance conditions; but Congress could not have authorized the conditions because they do not satisfy additional requirements of the Spending Clause.

94. *First*, the notice, access, and compliance conditions are not germane to the stated purposes of the Byrne JAG funds. None of the conditions are relevant to the federal interest in the Byrne JAG funds that Conference members receive or to the Byrne JAG program generally.

95. The notice and access conditions are not relevant to the federal interest in the Byrne JAG funds the Conference's members receive. Information about when detainees will be released, and policies related to access for federal agents bear no relevance to the purchase of

-27-

equipment, community programs, or other uses to which Conference members put Byrne JAG funds.

96. The compliance condition is not relevant to the federal interest in the Byrne JAG funds the Conference's members receive. Sharing information about immigration status with federal officials bears no connection to the purchase of equipment, community programs, or other uses to which Conference members put Byrne JAG funds.

97. The compliance, notice, and access conditions also are not relevant to the federal interest in the Byrne JAG program more generally. The conditions actively undermine Congress's goals of dispersing funds across the country, targeting funds to combat violent crime, and respecting local judgment in setting law enforcement strategy.

98. *Second*, the notice, access, and compliance conditions would impermissibly induce Byrne JAG recipients to engage in unconstitutional activity.

99. The Spending Clause prohibits the federal government from imposing spending conditions to "induce the States to engage in activities that would themselves be unconstitutional." *S. Dakota v. Dole*, 483 U.S. 203, 210 (1987). The three conditions seek to require Byrne JAG recipients to engage in unconstitutional activity, such as detaining individuals without probable cause in violation of the Fourth Amendment.

100. *Third*, the notice, access, and compliance conditions are unconstitutionally ambiguous.

101. Federal restrictions on state and local funding must be articulated unambiguously to allow the recipient to knowingly accept the conditions and ascertain what is expected.

102. The three conditions are ambiguous as to what is expected of grant recipients, particularly given Evanston's and other Conference members' welcoming city policies and other

relevant policies and practices. The conditions do not provide cities with notice to make a choice knowingly and cognizant of the consequences of their participation.

103.     Many interpretations of the three conditions raise serious constitutional concerns. Where a grant recipient must resolve tension between the Constitution and a federal agency's informal interpretation announced in a guidance document to ascertain what is expected of it, a condition cannot be characterized as unambiguous.

104.     The compliance condition is ambiguous, and many interpretations of the condition raise serious constitutional concerns. Section 1373 uses sweeping language with no discernable limiting principle. The Department added to the confusion by suggesting without explanation that Section 1373 implicates a wide range of state and local governance practices, from formal laws to informal cultural norms. In addition, the Department compounded the confusion by questioning the compliance of many jurisdictions with Section 1373 without deciding whether the Department believes those jurisdictions' policies comply.[11]

105.     **Fourth**, the notice, access, and compliance conditions are unconstitutionally coercive.

106.     The Spending Clause prohibits grant conditions that are "so coercive as to pass the point at which 'pressure turns into compulsion.'" *Dole*, 483 U.S. at 211 (citation omitted).

107.     As a direct and proximate result of the notice, access, and compliance conditions, the Conference's members are forced to either accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds. The three conditions threaten financial consequences that exceed the point at which pressure turns to constitutionally impermissible compulsion.

---

[11] Press Release, U.S. Dep't of Justice, Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions (July 6, 2017), http://tinyurl.com/ybdhf7vy.

108.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the notice, access, and compliance conditions for the FY 2017 Byrne JAG funds violate the Constitution's Spending Clause; and a permanent injunction preventing the conditions from going into effect.

### COUNT FOUR: COMMANDEERING

109.    The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

110.    The Tenth Amendment prohibits the federal government from requiring states and localities "to administer or enforce a federal regulatory program." *Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018). The anti-commandeering principle prevents the federal government from shifting the costs of regulation to states and local governments. *Id.* Where the "whole object" of a federal statutory provision is to "direct the functioning" of state and local governments, that provision is unconstitutional and must be enjoined. *Printz*, 521 U.S. at 932, 935; *New York v. United States*, 505 U.S. 144, 186-187 (1992). That description precisely fits each of the three conditions.

111.    When Congress enacted Section 1373, it sought to ensure that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies" could be used to enforce federal law. S. Rep. No. 104-249, at 19-20 (1996). In doing so, it sought to "require [state and local officers] to provide information that belongs to the State and is available to them only in their official capacity"—in other words, to engage in unconstitutional commandeering. *Printz*, 521 U.S. at 932 n.17.

112.    Further, Section 1373 prohibits state and local governments from engaging in a core aspect of governing: controlling the actions of their own employees. Compliance with Section 1373 results in the federal government commandeering cities by directing how city

-30-

personnel should act and handle data under local control to advance a federal program. In fact, the Department instructed that states and local governments may need to provide affirmative instruction to employees to comply.[12] Section 1373 requires local officers to follow federal directives and usurps the local policymaking process.

113.    The notice and access condition impermissibly commandeer cities and cannot be validly imposed on Byrne JAG funding recipients. The notice condition seeks to fundamentally reorganize not just how cities' officers spend their time, but also the way the Conference's members balance their Fourth Amendment obligations against their interest in effective law enforcement. The access condition requires a fundamental restructuring of police procedures and functions to accommodate on-demand access to detainees by federal agents.

114.    As a direct and proximate result of these unconstitutional conditions, the Conference's members will be forced to accept unlawful and unconstitutional grant conditions or forego Byrne JAG funds and shut down or materially alter the programs the funds support.

115.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the notice, access, and compliance conditions for the FY 2017 Byrne JAG funds violate the Tenth Amendment; and a permanent injunction preventing the conditions from going into effect.

### COUNT FIVE: ADMINISTRATIVE PROCEDURE ACT
### (Arbitrary and Capricious)

116.    The Conference and Evanston incorporate by reference the preceding paragraphs' allegations.

---

[12] *See* Memorandum from Michael E. Horowitz, Inspector Gen., U.S. Dep't of Justice, to Karol V. Mason, Assistant Attorney Gen., Office of Justice Programs, U.S. Dep't of Justice, Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients 6 (May 31, 2016), https://tinyurl.com/y9rpwge4.

117.    In addition to the Attorney General lacking statutory and constitutional authority to impose the notice, access, and compliance conditions, the conditions are arbitrary and capricious, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

118.    The Department's decision to condition FY 2017 Byrne JAG funds on compliance with the three conditions deviates from past agency practice without reasoned explanation or justification. The Department failed to rely on reasoned decision-making and, to the extent it cited reasons at all, those reasons are contradicted by evidence.

119.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, the Conference and Evanston are entitled to a declaration that the notice, access, and compliance conditions for the FY 2017 Byrne JAG funds violate the APA; and a permanent injunction preventing those conditions from going into effect.

## PRAYER FOR RELIEF

WHEREFORE, The United States Conference of Mayors and the City of Evanston pray that this Court:

a)    Declare that the notice, access, and compliance conditions for the FY 2017 Byrne JAG program are unlawful;

b)    Preliminarily and permanently enjoin the Attorney General from imposing the notice, access, and compliance conditions on FY 2017 Byrne JAG funds; and from imposing the notice, access, and compliance conditions on future Byrne JAG funds;

c)    Retain jurisdiction to monitor the Department's compliance with this Court's judgment;

d)    Award Plaintiffs their reasonable attorney fees, expenses, and costs as permitted by federal law, including the Administrative Procedure Act and 28 U.S.C. § 2412; and

e)    Grant such other relief as this Court may deem proper.

-32-

Dated: July 16, 2018                              Respectfully submitted,

THE UNITED STATES CONFERENCE OF
MAYORS and CITY OF EVANSTON


By: /s/ Brian C. Haussmann
      Counsel for the United States Conference of Mayors

         Brian C. Haussmann
         John M. Fitzgerald
         Katherine M. O'Brien
         Kyle A. Cooper
         TABET DIVITO & ROTHSTEIN LLC
         209 South LaSalle Street, 7th Floor
         Chicago, IL 60604
         Telephone: (312) 762-9450
         bhaussmann@tdrlawfirm.com
         jfitzgerald@tdrlawfirm.com
         kobrien@tdrlawfirm.com
         kcooper@tdrlawfirm.com


By: /s/ Michelle L. Masoncup
      Counsel for City of Evanston

         Michelle L. Masoncup
         Corporation Counsel
         Law Department
         City of Evanston
         2100 Ridge Avenue
         Evanston, IL 60201
         Telephone: (847) 448-8009
         mmasoncup@cityofevanston.org

# EXHIBIT A

# THE UNITED STATES CONFERENCE OF MAYORS

1620 EYE STREET, NORTHWEST
WASHINGTON, D.C. 20006
TELEPHONE (202) 293-7330
FAX (202) 293-2352
TDD (202) 293-9445
URL: www.usmayors.org/uscm

## 2018 ELECTED AND APPOINTED LEADERSHIP

| Mayor | City | State | Population | Received 2017 Byrne Grant Allocation? | Received 2017 Byrne Jag Award? |
|---|---|---|---|---|---|
| Mark Stodola | Little Rock | AR | 193,524 | Yes | Yes |
| John Giles | Mesa | AZ | 457,587 | Yes | No |
| Mark W. Mitchell | Tempe | AZ | 175,826 | Yes | Yes |
| Tom Tait | Anaheim | CA | 336,265 | Yes | No |
| Acquanetta Warren | Fontana | CA | 196,069 | Yes | No |
| Robert Garcia | Long Beach | CA | 462,257 | Yes | No |
| Eric Garcetti | Los Angeles | CA | 3,792,621 | Yes | No |
| Jill Techel | Napa | CA | 76,915 | Yes | No |
| Libby Schaff | Oakland | CA | 390,724 | Yes | No |
| Darrell Steinberg | Sacramento | CA | 466,488 | Yes | No |
| Kevin Falconer | San Diego | CA | 1,307,402 | Yes | No |
| Sam Liccardo | San Jose | CA | 945,942 | Yes | No |
| Pauline Russo Cutter | San Leandro | CA | 84,950 | Yes | No |
| Miguel A. Pulido | Santa Ana | CA | 324,528 | Yes | No |
| Gary Soiseth | Turlock | CA | 68,549 | Yes | No |
| Christopher L. Cabaldon | West Sacramento | CA | 48,744 | Yes | No |
| Michael B. Hancock | Denver | CO | 600,158 | Yes | No |
| Joe Ganim | Bridgeport | CT | 144,229 | Yes | Yes |
| Neil M. O'Leary | Waterbury | CT | 110,366 | Yes | Yes |
| Muriel Bowser | Washington | DC | 646,449 | Yes | Yes |
| Juan Carlos Bermudez | Doral | FL | 45,704 | No | na |
| Francis X. Suarez | Miami | FL | 399,457 | Yes | Yes |
| Oliver G. Gilbert, III | Miami Gardens | FL | 109,680 | Yes | Yes |
| Buddy Dyer | Orlando | FL | 238,300 | Yes | Yes |
| Frank C. Ortis | Pembroke Pines | FL | 154,750 | Yes | No |
| Rick Kriseman | St. Petersburg | FL | 244,769 | Yes | No |
| Bob Buckhorn | Tampa | FL | 335,709 | Yes | Yes |
| Keisha Lance Bottoms | Atlanta | GA | 420,003 | Yes | Yes |
| Hardie Davis, Jr. | Augusta | GA | 200,549 | Yes | Yes |
| Michael Bodker | Johns Creek | GA | 76,728 | No | na |
| Kirk Caldwell | Honolulu | HI | 991,788 | Yes | Yes |
| T.M. Franklin 'Frank' Cownie | Des Moines | IA | 203,433 | Yes | Yes |
| Roy D. Buol | Dubuque | IA | 57,637 | Yes | Yes |
| Chris Koos | Normal | IL | 52,497 | No | na |
| James Brainard | Carmel | IN | 79,191 | No | na |

| Name / Freeman-Wilson | City | State | 2013 Avg | Yes | Yes |
|---|---|---|---|---|---|
| Pete Buttigieg | South Bend | IN | 101,168 | Yes | No |
| Greg Fischer | Louisville | KY | 741,096 | Yes | Yes |
| Sharon Weston Broome | Baton Rouge | LA | 229,493 | Yes | No |
| Catherine Pugh | Baltimore | MD | 620,961 | Yes | Yes |
| Martin J. Walsh | Boston | MA | 617,594 | Yes | Yes |
| Jon Mitchell | New Bedford | MA | 95,072 | Yes | Yes |
| Mike Duggan | Detroit | MI | 713,777 | Yes | No |
| Bryan K. Barnett | Rochester Hills | MI | 70,995 | No | na |
| Elizabeth B. Kautz | Burnsville | MN | 61,747 | No | na |
| James B. Hovland | Edina | MN | 47,941 | No | na |
| Ardell F. Brede | Rochester | MN | 106,769 | Yes | No |
| Sylvester 'Sly' James, Jr. | Kansas City | MO | 459,787 | Yes | Yes |
| Miles Atkins | Mooresville | NC | 32,711 | No | na |
| J. Christian Bollwage | Elizabeth | NJ | 124,969 | Yes | No |
| Ras J. Baraka | Newark | NJ | 277,140 | Yes | No |
| Brian C. Wahler | Piscataway | NJ | 56,044 | No | na |
| Kenneth D. Miyagishima | Las Cruces | NM | 97,618 | Yes | Yes |
| Carolyn G. Goodman | Las Vegas | NV | 583,756 | Yes | Yes |
| Hillary Schieve | Reno | NV | 225,221 | Yes | Yes |
| Bill de Blasio | New York | NY | 8,175,133 | Yes | No |
| Nan Whaley | Dayton | OH | 141,359 | Yes | Yes |
| Lydia L. Mihalik | Findlay | OH | 41,202 | No | na |
| David J. Berger | Lima | OH | 38,771 | Yes | Yes |
| Denny Doyle | Beaverton | OR | 89,803 | Yes | No |
| Shane T. Bemis | Gresham | OR | 105,594 | Yes | No |
| James Kenney | Philadelphia | PA | 1,526,006 | Yes | No |
| William Peduto | Pittsburgh | PA | 305,704 | Yes | No |
| Jorge O. Elorza | Providence | RI | 178,042 | Yes | Yes |
| John Tecklenberg | Charleston | SC | 120,083 | No | Yes |
| Steve Benjamin | Columbia | SC | 129,272 | Yes | Yes |
| Joseph T. McElveen, Jr. | Sumter | SC | 40,524 | Yes | Yes |
| Kim McMillan | Clarksville | TN | 132,929 | Yes | Yes |
| Madeline Anne Rogero | Knoxville | TN | 178,874 | Yes | Yes |
| Jeff Williams | Arlington | TX | 365,438 | Yes | No |
| Steve Adler | Austin | TX | 790,390 | Yes | Yes |
| Mike Rawlings | Dallas | TX | 1,197,816 | Yes | Yes |
| Chris Watts | Denton | TX | 113,383 | Yes | No |
| Betsy Price | Fort Worth | TX | 792,727 | Yes | Yes |
| Sylvester Turner | Houston | TX | 2,099,451 | Yes | Yes |
| Harry LaRosiliere | Plano | TX | 259,841 | Yes | Yes |
| Jackie Biskupski | Salt Lake City | UT | 186,440 | Yes | Yes |
| Jenny Durkan | Seattle | WA | 608,660 | Yes | No |
| James J. Schmitt | Green Bay | WI | 104,057 | Yes | No |
| Paul R. Soglin | Madison | WI | 233,209 | Yes | No |

# EXHIBIT B



# THE UNITED STATES CONFERENCE OF MAYORS

1620 EYE STREET, NORTHWEST
WASHINGTON, D.C. 20006
TELEPHONE (202) 293-7330
FAX (202) 293-2352
TDD (202) 293-9445
URL: www.usmayors.org/uscm

**Adopted June 26, 2017**

**OPPOSING PUNITIVE SANCTUARY JURISDICTION POLICIES**

**WHEREAS,** many local jurisdictions have made the determination that their local law enforcement efforts and personnel have neither the authority, the priority, nor the resources to serve as immigration enforcement officers; and

**WHEREAS,** trust between local law enforcement and the communities they serve is critical to preventing, solving, and prosecuting crimes, and many jurisdictions have made the determination that having local law enforcement officers serve as immigration officers would break that trust; and

**WHEREAS,** local authorities cannot detain a person on the basis of an ICE warrantless or other civil detainer without exposing themselves to lawsuits under the 4th Amendment to the Constitution; and

**WHEREAS,** many local jurisdictions and authorities do not have the law enforcement resources to act as immigration officers at the expense of their local and state law enforcement priorities; and

**WHEREAS,** the 10th Amendment to the Constitution puts limits on the federal commandeering of state and local law enforcement personnel and resources; and

**WHEREAS,** President Trump issued Executive Order 13768, *Enhancing Public Safety in the Interior of the United States*, on January 25, 2017; and

**WHEREAS,** the Executive Order defines a sanctuary jurisdiction as one that does not comply with 8 U.S.C. 1373 or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of unspecified federal laws; and

**WHEREAS,** this definition for what constitutes a sanctuary jurisdiction,' subject to potential sanctions, is imprecise and susceptible to an ever increasingly broad definition; and

**WHEREAS,** Attorney General Jeff Sessions has recently issued a memorandum that indicates that while this definition of sanctuary jurisdiction currently only relates to willful violations of 8 USC §1373, but that the Administration also reserves the ability to broaden the definition and application of such jurisdictions; and

**WHEREAS,** the Appendix to the President's recently submitted FY18 Budget contains proposed legislation that would explicitly and statutorily broaden the application of the definition of sanctuary jurisdictions to include jurisdictions that did not comply with warrantless and civil detainer requests among other presently voluntary activity related to immigration enforcement; and

**WHEREAS,** several bills have been introduced in Congress that call for a punitive, sanctuary jurisdiction approach to local governments that do not act as immigration agents; and

**WHEREAS,** states, including Texas, have passed or are considering legislation that would compel cities and other local entities to act as immigration agents; and

**WHEREAS,** courts have ruled that immigration policy is a federal matter and that the states should refrain from setting immigration enforcement policy; and

**WHEREAS,** state lawmaking regarding immigration enforcement has and could lead to conflicting mandates for cities and local officials; and

**WHEREAS,** The United States Conference of Mayors recognizes that immigrants bring significant social, economic, and cultural benefits to communities nationwide, and mayors in cities big and small foster welcoming and secure cities for all residents, regardless of who they are or where they come from; and

**WHEREAS,** cities and other local government entities need to have the discretion to make individualized determinations relative to local values, expenditure of resources, priorities, and liabilities assumed, all taking into account that:

- Immigrants residing in our nation's cities must be able to trust the police and all of city government and that their 4th Amendment rights will be guaranteed; and

- The efforts of local law enforcement to build trust and supportive relationships with all communities, including immigrant communities, is essential to preventing and prosecuting crime and helping victims;

**NOW, THEREFORE, BE IT RESOLVED** that The United States Conference of Mayors:

- Urges the Administration to repeal Executive Order 13768 and its overly broad and uncertain definition of what constitutes a sanctuary jurisdiction; and

- Opposes punitive sanctuary jurisdiction' policies that limit local control and discretion, and

- Urges Congress, the Administration, and the states to pursue immigration enforcement policies that recognize that local law enforcement has limited resources and community trust is critical to local law enforcement and the safety of our communities; and

**BE IT FURTHER RESOLVED** that The United States Conference of Mayors opposes federal and state policies that commandeer local law enforcement or require local authorities to:

- Violate, or be placed at risk of violating, a person's 4th Amendment rights;

- Expend limited resources to act as immigration agents; or

- Otherwise assist federal immigration authorities beyond what is determined by local policy; and

**BE IT FURTHER RESOLVED** that The United States Conference of Mayors opposes state legislation and policies regarding immigration enforcement that are more harsh than federal law, especially those that place conflicting mandates on local government.

# EXHIBIT C



# THE UNITED STATES CONFERENCE OF MAYORS

1620 EYE STREET, NORTHWEST
WASHINGTON, D.C. 20006
TELEPHONE (202) 293-7330
FAX (202) 293-2352
TDD (202) 293-9445
URL: www.usmayors.org/uscm

**Adopted June 26, 2017**

## SUPPORTING IMMIGRANTS, REFUGEES AND ASYLUM SEEKERS AND STANDING AGAINST DISCRIMINATORY AND HARMFUL POLICIES THAT TARGET THESE VULNERABLE COMMUNITIES

**WHEREAS**, America is recognized as a nation of immigrants; and

**WHEREAS**, as of 2015 America's immigrant population numbered 43.3 million people, or 13.5 percent of the total population; and

**WHEREAS**, in 2016 immigrants and their U.S. born children were estimated to number approximately 84.3 million people, or 27 percent of the overall U.S. population; and

**WHEREAS**, New York City, home to one of the nation's largest and most diverse immigrant communities, has an almost 40 percent foreign born population; increasing to an estimated 60 percent when including children of immigrants; and

**WHEREAS**, cities across America are home to immigrant populations that are both recent arrivals and multigenerational families who contribute to the local economy as consumers, business owners, laborers and job producers; and

**WHEREAS**, the Administration has demonstrated an ongoing antagonistic and intimidating temperament towards immigrant, refugee and asylum seeking communities; and

**WHEREAS**, this posture has been asserted through the issuing of executive orders seeking to impose stricter requirements on immigrant populations and hindering or blocking entirely the entry of immigrants from certain countries; and

**WHEREAS**, the Administration has further affirmed this position through the threatening of punitive actions against so called 'sanctuary cities; and

**WHEREAS**, the moniker "sanctuary cities" is an arbitrary term which has been utilized to demonize cities and threaten their critically needed federal funding streams,

**NOW, THEREFORE, BE IT RESOLVED**, The United States Conference of Mayors calls on Congress to take action to stand against policies that discriminate against and target immigrants, refugees and asylum seekers; and

**BE IT FURTHER RESOLVED**, that the Conference of Mayors opposes the Administration's efforts to hold immigrants hostage as bargaining chips to threaten withholding federal funding from cities across the nation.

# EXHIBIT D



# THE UNITED STATES CONFERENCE OF MAYORS

1620 EYE STREET, NORTHWEST
WASHINGTON, D.C. 20006
TELEPHONE (202) 293-7330
FAX (202) 293-2352
TDD (202) 293-9445
URL: www.usmayors.org/uscm

**Adopted June 26, 2017**

## SUPPORTING IMMIGRANT RIGHTS

**WHEREAS,** the United States has always been a country of immigrants, founded by immigrants, and enriched by a diversity of immigrants -- many of whom have come to the United States to escape religious persecution, war, genocide, and tyranny in hopes of sharing in freedom and prosperity through hard work; and

**WHEREAS,** The United States Conference of Mayors proudly recognizes our cities are diverse, multicultural centers that reflect core American values that foster economic prosperity and opportunity, and that our diversity keeps us competitive and makes America strong; and

**WHEREAS,** data have shown that economies are stronger in sanctuary cities from higher median household income, less poverty, and less reliance on public assistance to higher labor force participation, higher employment-to-population ratios, and lower unemployment; and

**WHEREAS,** data also show that sanctuary cities are safer cities - data indicate that crime is statistically significantly lower in sanctuary counties in large central metro counties, small metro counties, micropolitan counties, and noncore, rural counties; and

**WHEREAS,** legislation has been introduced to restrict economic development, transportation, and law enforcement funding to local governments; to indemnify unconstitutional detentions; and to further criminalize immigration and restrict immigrant's rights; and

**WHEREAS,** the Administration has enacted Executive Orders that ban travel and refugee programs from certain countries, that restrict federal funding to sanctuary jurisdictions, and that increase immigrant raids, detentions, and deportations; and

**WHEREAS,** our country was founded on the principle of federalism, where the federal government cannot compel or commandeer states and local governments into implementing or enforcing federal laws, including federal immigration law; and

**WHEREAS,** the federal government cannot compel states, counties, cities, or their employees to comply with federal immigration detainer requests, which have been repeatedly held, by both federal courts and executive agencies, to be voluntary and non-binding; and

**WHEREAS,** prolonged detention after an otherwise authorized release order, constitutes another arrest, and consequently a violation of the Fourth Amendment if not done pursuant to a probable cause or a valid warrant; and

**WHEREAS,** prolonged detentions in violation of the Fourth Amendment have repeatedly resulted in the detention and eventual deportation of both United States citizens and lawful immigrants; and

**WHEREAS,** mayors must ensure the safety of our communities, and consequently operate in a way that allows law enforcement to do its job; and

**WHEREAS,** immigration is a federal responsibility and cities should not be coerced or compelled into becoming the deportation arm of the federal government; and

**WHEREAS,** The United States Conference of Mayors recognizes that effective policing requires the cooperation and trust of all members of the community; when state and local officials are viewed as a threat or confused with federal immigration officers, that trust is undermined; and that by withholding critical funding and penalizing local jurisdictions for doing what we know will better protect our communities will only make these communities less safe,

**NOW, THEREFORE, BE IT RESOLVED,** mayors call for an end to unconstitutional federal funding threats to states and local governments in an effort to coerce and compel them into implementing federal immigration law and for the unlawful issuance of immigration detainer requests without probable cause and a warrant; and

**BE IT FURTHER RESOLVED,** mayors urge members of Congress to withdraw legislation that attempts to cut local law enforcement funding necessary to ensure the safety of our communities, indemnify conduct that violates the constitutional rights afforded to both United States citizens and immigrant populations, and further criminalizes immigration and infringes on the rights of immigrants; and

**BE IT FURTHER RESOLVED,** mayors urge Democratic and Republicans leaders in Congress to pass comprehensive bipartisan immigration reform, including create a pathway to citizenship for undocumented immigrants.

# EXHIBIT E



# THE UNITED STATES CONFERENCE OF MAYORS

1620 EYE STREET NORTHWEST
WASHINGTON, D.C. 20006
TELEPHONE (202) 293-7330
FAX (202) 293-2352
URL: www.usmayors.org

**Adopted June 11, 2018**

**Opposing Unconstitutional Requirements Placed on Byrne JAG Funding and Urging the Immediate Awarding of FY 2017 Byrne JAG Grants**

**WHEREAS,** Chicago is proud to be a leader in the legal fight against the U.S. Department of Justice, as immigrants and refugees from around the world have always looked to Chicago as a place where the American Dream is possible; and

**WHEREAS,** Chicago and other cities and counties will not be bullied, intimidated or coerced into making a false choice between grants with offensive conditions attached, on the one hand, and our values as a welcoming city and the principles of community policing, on the other; and

**WHEREAS,** in its recent opinion, the Seventh Circuit Court of Appeals reaffirmed that "The Attorney General in this case used the sword of federal funding to conscript state and local authorities to aid in federal civil immigration enforcement. But the power of the purse rests with Congress, which authorized the federal funds at issue and did not impose any immigration enforcement conditions on the receipt of such funds," and that "conditions on the receipt of critical law enforcement funds… have been imposed by the Attorney General without any authority in a manner that usurps the authority of Congress – made more egregious because Congress itself has repeatedly refused to pass bills with such restrictions;" and

**WHEREAS,** the District Court in Chicago ruled against the Attorney General in a legal battle that began in July 2017, after the Department of Justice published the application for the FY2017 Edward Byrne Memorial Justice Assistance Grant (JAG) program, which provides states and cities with federal funding to support local law enforcement efforts; and

**WHEREAS,** a majority of the judges also concluded that the conditions were properly enjoined on a nationwide basis because the "conditions on the receipt of critical law enforcement funds… have been imposed by the Attorney General without any authority in a manner that usurps the authority of Congress – made more egregious because Congress itself has repeatedly refused to pass bills with such restrictions;" and

**WHEREAS,** the ruling is the latest victory in a legal battle that began in July 2017, after the Department of Justice published the application for the FY2017 Edward Byrne Memorial Justice Assistance Grant (JAG) program, which provides states and cities with federal funding to support local law enforcement efforts; and

**WHEREAS,** over the years, Chicago has used Byrne JAG funds for a variety of purposes that benefit public safety, including the purchase of SWAT equipment, police vehicles, radios and tasers, and in FY 2016, the City of Chicago received $2.3 million in Byrne JAG funds; and

**WHEREAS,** unlike previous applications, in FY 2017 the Department required grantees to accept two new conditions in order to be eligible for grant funding and these conditions include unlimited access to local police stations and law enforcement facilities by U.S. Department of Homeland Security personnel to interrogate arrestees and prior notice to DHS of an arrestee's release, which would require detaining residents longer than is permissible under the Fourth Amendment of the United States Constitution; and

**WHEREAS,** in August 2017, Chicago filed suit against the Attorney General challenging the new conditions, and 37 cities, counties, and municipal agencies, and five major associations of local governments and their officials – The United States Conference of Mayors, the National League of Cities, the National Association of Counties, the International Municipal Lawyers Association, and the International City/County Management Association – filed an amicus brief in support of Chicago's suit; and

**WHEREAS,** because the Attorney General does not have the authority to add these requirements to a grant program created by Congress and cannot commandeer local law enforcement to carry out federal immigration law functions, in September Judge Harry D. Leinenweber of the Northern District of Illinois awarded the City of Chicago a nationwide preliminary injunction, a decision which was upheld by the Seventh Circuit Court of Appeals; and

**WHEREAS,** at the request of the City of Chicago, The U.S. Conference of Mayors filed a motion with the District Court to intervene in the case to assist in preserving the nationwide nature of the injunction and Judge Leinenweber found that the organization had standing to intervene, but that the motion was unnecessary because the nationwide injunction was sound; and

**WHEREAS,** a variety of stakeholders signed onto amicus briefs submitted to the Seventh Circuit Court of Appeals, including: Asian Americans Advancing Justice, Erie House, National Immigrant Justice Center, American Civil Liberties Union, Illinois Business Immigration Coalition, and the Anti-Defamation League; certain Members of Congress; current and former law enforcement leaders; administrative law, constitutional law, and immigration law scholars; the California State Legislature; the States of New York, California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, New Mexico, Oregon, Vermont, and Washington, and the District of Columbia; the County of Santa Clara, 23 additional cities, counties, and municipal agencies, and The U.S. Conference of Mayors, the National League of Cities, the International Municipal Lawyers Association, and the International City/County Management Association; and

**WHEREAS,** the Department of Justice has cited the issuance of the nationwide injunction as the reason for not awarding FY 2017 Byrne JAG grants,

**NOW, THEREFORE, BE IT RESOLVED,** that The U.S. Conference of Mayors calls on the President of the United States and the Department of Justice to stop making unconstitutional funding threats to state and local governments in an effort to coerce and compel them into implementing federal immigration law, to cease the unconstitutionally broad interpretation of 8 U.S.C. §1373, a federal statute that bars restrictions on federal-local sharing of immigration

status information, to stop issuing immigration detainer requests without probable cause and a warrant, and to award Byrne JAG funds to municipalities without imposing additional unconstitutional conditions; and

**BE IT FURTHER RESOLVED,** that The U.S. Conference of Mayors calls on the President of the United States and Congress to rescind or overturn Section 9(a) of Executive Order 13768 (Enhancing Public Safety in the Interior of the United States); and

**BE IT FURTHER RESOLVED,** that The U.S. Conference of Mayors commends the ruling by the Seventh Circuit Court of Appeals upholding the nationwide injunction and preventing the U.S. Department of Justice from imposing new conditions on a federal grant that provides critical crime prevention funds for community policing efforts and other public safety measures and urges the Department to release these much needed funds immediately.

# EXHIBIT F

OMB No. 1121-0329
Approval Expires 12/31/2018

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Assistance*



The U.S. Department of Justice (DOJ), Office of Justice Programs (OJP), Bureau of Justice Assistance (BJA) is seeking applications for the Edward Byrne Memorial Justice Assistance Grant (JAG) Program. This program furthers the Department's mission by assisting State, local, and tribal efforts to prevent or reduce crime and violence.

# Edward Byrne Memorial
# Justice Assistance Grant Program

## FY 2017 Local Solicitation

## Applications Due: September 5, 2017

### Eligibility

Only units of local government may apply under this solicitation. By law, for purposes of the JAG Program, the term "units of local government" includes a town, township, village, parish, city, county, borough, or other general purpose political subdivision of a state; or, it may also be a federally recognized Indian tribal government that performs law enforcement functions (as determined by the Secretary of the Interior). A unit of local government may be any law enforcement district or judicial enforcement district established under applicable State law with authority to independently establish a budget and impose taxes; for example, in Louisiana, a unit of local government means a district attorney or parish sheriff.

A JAG application is not complete, and a unit of local government may not receive award funds, unless the chief executive of the applicant unit of local government (e.g., a mayor) properly executes, and the unit of local government submits, the "Certifications and Assurances by Chief Executive of Applicant Government" attached to this solicitation as Appendix I.

In addition, as discussed further below, in order validly to accept a Fiscal Year (FY) 2017 JAG award, the chief legal officer of the applicant unit of local government must properly execute, and the unit of local government must submit, the specific certification regarding compliance with 8 U.S.C. § 1373 attached to this solicitation as Appendix II. (Note: this requirement does not apply to Indian tribal governments.) (The text of 8 U.S.C. § 1373 appears in Appendix II.)

Eligible allocations under JAG are posted annually on the JAG web page under "Funding."

# Deadline

Applicants must register in the OJP Grants Management System (GMS) prior to submitting an application under this solicitation. All applicants must register, even those that previously registered in GMS. Select the "Apply Online" button associated with the solicitation title. All registrations and applications are due by 5 p.m. eastern time on September 5, 2017.

This deadline does **not** apply to the certification regarding compliance with 8 U.S.C. § 1373. As explained below, a unit of local government (other than an Indian tribal government) may not validly accept an award unless that certification is submitted to the Office of Justice Programs (OJP) on or before the day the unit of local government submits the signed award acceptance documents.

For additional information, see How to Apply in Section D. Application and Submission Information.

# Contact Information

For technical assistance with submitting an application, contact the Grants Management System (GMS) Support Hotline at 888–549–9901, option 3, or via email at GMS.HelpDesk@usdoj.gov. The GMS Support Hotline operates 24 hours a day, 7 days a week, including on federal holidays.

An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline must email the National Criminal Justice Reference Service (NCJRS) Response Center at grants@ncjrs.gov **within 24 hours after the application deadline** in order to request approval to submit its application. Additional information on reporting technical issues appears under "Experiencing Unforeseen GMS Technical Issues" in How to Apply in Section D. Application and Submission Information.

For assistance with any other requirement of this solicitation, applicants may contact the NCJRS Response Center by telephone at 1–800–851–3420; via TTY at 301–240–6310 (hearing impaired only); by email at grants@ncjrs.gov; by fax to 301–240–5830, or by web chat at https://webcontact.ncjrs.gov/ncjchat/chat.jsp. The NCJRS Response Center hours of operation are 10:00 a.m. to 6:00 p.m. eastern time, Monday through Friday, and 10:00 a.m. to 8:00 p.m. eastern time on the solicitation close date. Applicants also may contact the appropriate BJA State Policy Advisor.

Funding opportunity number assigned to this solicitation: BJA-2017-11301

Release date: August 3, 2017

# Contents

A. Program Description ................................................................................................. 5

Overview ..................................................................................................................5

Program-Specific Information ...................................................................................5

Permissible uses of JAG Funds – In general ...........................................................5

Limitations on the use of JAG funds ........................................................................6

Required compliance with applicable federal laws....................................................8

BJA areas of emphasis .............................................................................................9

Goals, Objectives, and Deliverables ......................................................................10

Evidence-Based Programs or Practices ..................................................................10

B. Federal Award Information .................................................................................. 11

Type of Award.........................................................................................................11

Financial Management and System of Internal Controls ........................................12

Budget and Financial Information ...........................................................................13

Cost Sharing or Match Requirement.......................................................................14

Pre-Agreement Costs (also known as Pre-award Costs)........................................14

Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs..........14

Costs Associated with Language Assistance (if applicable) ...................................14

C. Eligibility Information ......................................................................................... 15

D. Application and Submission Information ............................................................. 15

What an Application Should Include ........................................................................15

How to Apply............................................................................................................26

E. Application Review Information .......................................................................... 28

Review Process ......................................................................................................28

F. Federal Award Administration Information............................................................ 29

Federal Award Notices ...........................................................................................29

Statutory and Regulatory Requirements; Award Conditions ..................................29

General Information about Post-Federal Award Reporting Requirements....................30

G. Federal Awarding Agency Contact(s) ................................................................ 31

H. Other Information ............................................................................................... 31

Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a) .....31

Provide Feedback to OJP ........................................................................................32

Application Checklist................................................................................................ 33

Appendix I .............................................................................................................. 35

3

Appendix II ........................................................................................ 37

Appendix III ....................................................................................... 39

Appendix IV ....................................................................................... 40

BJA-2017-11301

# Edward Byrne Memorial Justice Assistance Grant Program
# FY 2017 Local Solicitation
# CFDA #16.738

## A. Program Description

**Overview**

The Edward Byrne Memorial Justice Assistance Grant (JAG) Program is the primary provider of federal criminal justice funding to States and units of local government. BJA will award JAG Program funds to eligible units of local government under this FY 2017 JAG Program Local Solicitation. (A separate solicitation will be issued for applications to BJA directly from States.)

**Statutory Authority:** The JAG Program statute is Subpart I of Part E of Title I of the Omnibus Crime Control and Safe Streets Act of 1968. Title I of the "Omnibus Act" generally is codified at Chapter 26 of Title 42 of the United States Code; the JAG Program statute is codified at 42 U.S.C. §§ 3750-3758. See also 28 U.S.C. § 530C(a).

**Program-Specific Information**

**Permissible uses of JAG Funds – In general**

In general, JAG funds awarded to a unit of local government under this FY 2017 solicitation may be used to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of the following:

- Law enforcement programs
- Prosecution and court programs
- Prevention and education programs
- Corrections and community corrections programs
- Drug treatment and enforcement programs
- Planning, evaluation, and technology improvement programs
- Crime victim and witness programs (other than compensation)
- Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams

Under the JAG Program, units of local government may use award funds for broadband deployment and adoption activities as they relate to criminal justice activities.

**Limitations on the use of JAG funds**

*Prohibited and controlled uses of funds* – JAG funds may not be used (whether directly or indirectly) for any purpose prohibited by federal statute or regulation, including those purposes specifically prohibited by the JAG Program statute as set out at 42 U.S.C. § 3751(d):

(1) Any security enhancements or any equipment to any nongovernmental entity that is not engaged in criminal justice or public safety.

(2) Unless the Attorney General certifies that extraordinary and exigent circumstances exist that make the use of such funds to provide such matters essential to the maintenance of public safety and good order—

    (a) Vehicles (excluding police cruisers), vessels (excluding police boats), or aircraft (excluding police helicopters)
    (b) Luxury items
    (c) Real estate
    (d) Construction projects (other than penal or correctional institutions)
    (e) Any similar matters

For additional information on expenditures prohibited under JAG, as well as expenditures that are permitted but "controlled," along with the process for requesting approval regarding controlled items, refer to the JAG Prohibited and Controlled Expenditures Guidance. Information also appears in the JAG FAQs.

*Cap on use of JAG award funds for administrative costs* – A unit of local government may use up to 10 percent of a JAG award, including up to 10 percent of any earned interest, for costs associated with administering the award.

*Prohibition of supplanting; no use of JAG funds as "match"* – JAG funds may not be used to supplant State or local funds but must be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities. See the JAG FAQs on BJA's JAG web page for examples of supplanting.

Although supplanting is prohibited, as discussed under "What An Application Should Include," the leveraging of federal funding is encouraged.

Absent specific federal statutory authority to do so, JAG award funds may not be used as "match" for the purposes of other federal awards.

*Other restrictions on use of funds* – If a unit of local government chooses to use its FY 2017 JAG funds for particular, defined types of expenditures, it must satisfy certain preconditions:

▪ Body-Worn Cameras (BWC)
    A unit of local government that proposes to use FY 2017 JAG award funds to purchase BWC equipment or to implement or enhance BWC programs, must provide to OJP a certification(s) that the unit of local government has policies and procedures in place related to BWC equipment usage, data storage and access, privacy considerations, training, etc. The certification can be found at: https://www.bja.gov/Funding/BodyWornCameraCert.pdf.

6

A unit of local government that proposes to use JAG funds for BWC-related expenses will have funds withheld until the required certification is submitted and approved by OJP.

**The BJA BWC Toolkit provides model BWC policies and best practices to assist departments in implementing BWC programs.**

Apart from the JAG Program, BJA provides funds under the Body-Worn Camera Policy and Implementation Program (BWC Program). The BWC Program allows jurisdictions to develop and implement policies and practices required for effective program adoption and address program factors including the purchase, deployment, and maintenance of camera systems and equipment; data storage and access; and privacy considerations. Interested units of local government may wish to refer to the BWC web page for more information. Units of local government should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BWC Program.

- Body Armor
  Ballistic-resistant and stab-resistant body armor can be funded through the JAG Program, as well as through BJA's Bulletproof Vest Partnership (BVP) Program. The BVP Program is designed to provide a critical resource to local law enforcement through the purchase of ballistic-resistant and stab-resistant body armor. For more information on the BVP Program, including eligibility and application, refer to the BVP web page. Units of local government should note, however, that JAG funds may not be used as any part of the 50 percent match required by the BVP Program.

  Body armor purchased with JAG funds may be purchased at any threat level, make, or model from any distributor or manufacturer, as long as the body armor has been tested and found to comply with the latest applicable National Institute of Justice (NIJ) ballistic or stab standards. In addition, body armor purchased must be made in the United States.

  As is the case in the BVP Program, units of local government that propose to purchase body armor with JAG funds must certify that law enforcement agencies receiving body armor have a written "mandatory wear" policy in effect. FAQs related to the mandatory wear policy and certifications can be found at: https://www.bja.gov/Funding/JAGFAQ.pdf. This policy must be in place for at least all uniformed officers before any FY 2017 funding can be used by the unit of local government for body armor. There are no requirements regarding the nature of the policy other than it being a mandatory wear policy for all uniformed officers while on duty. The certification must be signed by the Authorized Representative and must be attached to the application if proposed as part of the application. If the unit of local government proposes to change project activities to utilize JAG funds to purchase body armor after the award is accepted, the unit of local government must submit the signed certification to BJA at that time. A mandatory wear concept and issues paper and a model policy are available by contacting the BVP Customer Support Center at vests@usdoj.gov or toll free at 1–877–758–3787. The certification form related to mandatory wear can be found at: www.bja.gov/Funding/BodyArmorMandatoryWearCert.pdf.

- DNA Testing of Evidentiary Materials and Upload of DNA Profiles to a Database

If JAG Program funds will be used for DNA testing of evidentiary materials, any resulting **eligible** DNA profiles must be uploaded to the Combined DNA Index System (CODIS, the national DNA database operated by the Federal Bureau of Investigation [FBI]) by a government DNA lab with access to CODIS. No profiles generated with JAG funding may be entered into any other non-governmental DNA database without prior express written approval from BJA.

In addition, funds may not be used for purchase of DNA equipment and supplies when the resulting DNA profiles from such technology are not accepted for entry into CODIS.

▪ Interoperable Communication
Units of local government (including subrecipients) that use FY 2017 JAG funds to support emergency communications activities (including the purchase of interoperable communications equipment and technologies such as voice-over-internet protocol bridging or gateway devices, or equipment to support the build out of wireless broadband networks in the 700 MHz public safety band under the Federal Communications Commission [FCC] Waiver Order) should review FY 2017 SAFECOM Guidance. The SAFECOM Guidance is updated annually to provide current information on emergency communications policies, eligible costs, best practices, and technical standards for State, local, tribal, and territorial grantees investing federal funds in emergency communications projects. Additionally, emergency communications projects should support the Statewide Communication Interoperability Plan (SCIP) and be coordinated with the fulltime Statewide Interoperability Coordinator (SWIC) in the State of the project. As the central coordination point for their State's interoperability effort, the SWIC plays a critical role, and can serve as a valuable resource. SWICs are responsible for the implementation of SCIP through coordination and collaboration with the emergency response community. The U.S. Department of Homeland Security Office of Emergency Communications maintains a list of SWICs for each of the States and territories. Contact OEC@hq.dhs.gov. All communications equipment purchased with FY 2017 JAG Program funding should be identified during quarterly performance metrics reporting.

In order to promote information sharing and enable interoperability among disparate systems across the justice and public safety communities, OJP requires the recipient to comply with DOJ's Global Justice Information Sharing Initiative guidelines and recommendations for this particular grant. Recipients must conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https://www.it.ojp.gov/gsp_grantcondition. Recipients must document planned approaches to information sharing and describe compliance to GSP and an appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

**Required compliance with applicable federal laws**
By law, the chief executive (e.g., the mayor) of each unit of local government that applies for an FY 2017 JAG award must certify that the unit of local government will "comply with all provisions of [the JAG program statute] and all other applicable Federal laws." To satisfy this requirement, each unit of local government applicant must submit two properly executed certifications using the forms shown in Appendix I and Appendix II.

All applicants should understand that OJP awards, including certifications provided in connection with such awards, are subject to review by DOJ, including by OJP and by the DOJ

Office of the Inspector General. Applicants also should understand that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in a certification submitted to OJP in support of an application may be the subject of criminal prosecution, and also may result in civil penalties and administrative remedies for false claims or otherwise. Administrative remedies that may be available to OJP with respect to an FY 2017 award include suspension or termination of the award, placement on the DOJ high risk grantee list, disallowance of costs, and suspension or debarment of the recipient.

## BJA areas of emphasis

BJA recognizes that there are significant pressures on local criminal justice systems. In these challenging times, shared priorities and leveraged resources can make a significant impact. As a component of OJP, BJA intends to focus much of its work on the areas of emphasis described below, and encourages each unit of local government recipient of an FY 2017 JAG award to join us in addressing these challenges:

- *Reducing Gun Violence* – Gun violence has touched nearly every State and local government in America. While our nation has made great strides in reducing violent crime, some municipalities and regions continue to experience unacceptable levels of violent crime at rates far in excess of the national average. BJA encourages units of local government to invest JAG funds in programs to combat gun violence, enforce existing firearms laws, and improve the process for ensuring that persons prohibited from purchasing guns are prevented from doing so by enhancing reporting to the FBI's National Instant Criminal Background Check System (NICS).

- *National Incident-Based Reporting System (NIBRS)* – The FBI has formally announced its intentions to establish NIBRS as the law enforcement crime data reporting standard for the nation. The transition to NIBRS will provide a more complete and accurate picture of crime at the national, State, and local levels. Once this transition is complete, the FBI will no longer collect summary data and will accept data only in the NIBRS format. Also, once the transition is complete, JAG award amounts will be calculated on the basis of submitted NIBRS data. Transitioning all law enforcement agencies to NIBRS is the first step in gathering more comprehensive crime data. BJA encourages recipients of FY 2017 JAG awards to use JAG funds to expedite the transition to NIBRS.

- *Officer Safety and Wellness* – The issue of law enforcement safety and wellness is an important priority for the Department of Justice. Preliminary data compiled by the National Law Enforcement Officers Memorial Fund indicates that there were 135 line-of-duty law enforcement deaths in 2016—the highest level in the past 5 years and a 10 percent increase from 2015 (123 deaths).

  Firearms-related deaths continued to be the leading cause of death (64), increasing 56 percent from 2015 (41). Of particular concern is that of the 64 firearms-related deaths, 21 were as a result of ambush-style attacks representing the highest total in more than two decades. Traffic-related deaths continued to rise in 2016 with 53 officers killed, a 10 percent increase from 2015 (48 deaths). Additionally, there were 11 job-related illness deaths in 2016, mostly heart attacks.

  BJA sees a vital need to focus not only on tactical officer safety concerns but also on health and wellness as they affect officer performance and safety. It is important for law enforcement to have the tactical skills necessary, and also be physically and mentally well, to perform, survive, and be resilient in the face of the demanding duties of the

9

profession. BJA encourages units of local government to use JAG funds to address these needs by providing training, including paying for tuition and travel expenses related to attending trainings such as VALOR training, as well as funding for health and wellness programs for law enforcement officers.

- *Border Security* – The security of United States borders is critically important to the reduction and prevention of transnational drug-trafficking networks and combating all forms of human trafficking within the United States (sex and labor trafficking of foreign nationals and U.S. citizens of all sexes and ages). These smuggling operations on both sides of the border contribute to a significant increase in violent crime and U.S. deaths from dangerous drugs. Additionally, illegal immigration continues to place a significant strain on federal, State, and local resources—particularly on those agencies charged with border security and immigration enforcement—as well as the local communities into which many of the illegal immigrants are placed. BJA encourages units of local government to use JAG funds to support law enforcement hiring, training, and technology enhancement in the area of border security.

- *Collaborative Prosecution* – BJA supports strong partnerships between prosecutors and police as a means to improve case outcomes and take violent offenders off the street. BJA strongly encourages State and local law enforcement to foster strong partnerships with prosecutors to adopt new collaborative strategies aimed at combating increases in crime, particularly violent crime. (BJA's "Smart Prosecution" Initiative is a related effort by OJP to promote partnerships between prosecutors and researchers to develop and deliver effective, data-driven, evidence-based strategies to solve chronic problems and fight crime.)

**Goals, Objectives, and Deliverables**
In general, the FY 2017 JAG Program is designed to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice. The JAG Local Program is designed to assist units of local government with respect to criminal justice.

As discussed in more detail below, a unit of local government that receives an FY 2017 JAG award will be required to prepare various types of reports and to submit data related to performance measures and accountability. The Goals, Objectives, and Deliverables are directly related to the JAG Progam accountability measures.

**Evidence-Based Programs or Practices**
OJP strongly emphasizes the use of data and evidence in policy making and program development in criminal justice, juvenile justice, and crime victim services. OJP is committed to:

- Improving the quantity and quality of evidence OJP generates
- Integrating evidence into program, practice, and policy decisions within OJP and the field
- Improving the translation of evidence into practice

OJP considers programs and practices to be evidence-based when their effectiveness has been demonstrated by causal evidence, generally obtained through one or more outcome evaluations. Causal evidence documents a relationship between an activity or intervention (including technology) and its intended outcome, including measuring the direction and size of a change, and the extent to which a change may be attributed to the activity or intervention.

Causal evidence depends on the use of scientific methods to rule out, to the extent possible, alternative explanations for the documented change. The strength of causal evidence, based on the factors described above, will influence the degree to which OJP considers a program or practice to be evidence-based. The OJP CrimeSolutions.gov website is one resource that applicants may use to find information about evidence-based programs in criminal justice, juvenile justice, and crime victim services.

A useful matrix of evidence-based policing programs and strategies is available through the Center for Evidence-Based Crime Policy at George Mason University. BJA offers a number of program models designed to effectively implement promising and evidence-based strategies through the BJA "Smart Suite" of programs, including Smart Policing, Smart Supervision, Smart Pretrial, Smart Defense, Smart Prosecution, Smart Reentry, and others (see: https://www.bja.gov/Programs/CRPPE/smartsuite.html). BJA encourages units of local government to use JAG funds to support these "smart on crime" strategies, including effective partnerships with universities, research partners, and non-traditional criminal justice partners.

**BJA Success Stories**
The BJA Success Stories web page features projects that have demonstrated success or shown promise in reducing crime and positively impacting communities. This web page will be a valuable resource for States, localities, territories, tribes, and criminal justice professionals that seek to identify and learn about JAG and other successful BJA-funded projects linked to innovation, crime reduction, and evidence-based practices. **BJA strongly encourages the recipient to submit success stories annually (or more frequently).**

If a unit of local government has a success story it would like to submit, it may be submitted through My BJA account, using "add a Success Story" and the Success Story Submission form. Register for a My BJA account using this registration link.

# B. Federal Award Information

BJA estimates that it will make up to 1,100 local awards totaling an estimated $83,000,000.

Awards of at least $25,000 are 4 years in length, and award periods will be from October 1, 2016 through September 30, 2020. Extensions beyond this period may be made on a case-by-case basis at the discretion of BJA and must be requested via GMS no less than 30 days prior to the grant end date.

Awards of less than $25,000 are 2 years in length, and award periods will be from October 1, 2016 through September 30, 2018. Extensions of up to 2 years can be requested for these awards via GMS **no less than 30 days prior to the grant end date**, and will be automatically granted upon request.

All awards are subject to the availability of appropriated funds and to any modifications or additional requirements that may be imposed by statute.

**Type of Award**
BJA expects that any award under this solicitation will be in the form of a grant. See Statutory and Regulatory Requirements; Award Conditions, under Section F. Federal Award Administration Information, for a brief discussion of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants.

JAG awards are based on a statutory formula as described below.

Once each fiscal year's overall JAG Program funding level is determined, BJA works with the Bureau of Justice Statistics (BJS) to begin a four-step grant award calculation process, which, in general, consists of:

(1) Computing an initial JAG allocation for each State, based on its share of violent crime and population (weighted equally).

(2) Reviewing the initial JAG allocation amount to determine if the State allocation is less than the minimum award amount defined in the JAG legislation (0.25 percent of the total). If this is the case, the State is funded at the minimum level, and the funds required for this are deducted from the overall pool of JAG funds. Each of the remaining States receive the minimum award plus an additional amount based on its share of violent crime and population.

(3) Dividing each State's final award amount (except for the territories and District of Columbia) between the State and its units of local governments at a rate of 60 and 40 percent, respectively.

(4) Determining unit of local government award allocations, which are based on their proportion of the State's 3-year violent crime average. If the "eligible award amount" for a particular unit of local government as determined on this basis is $10,000 or more, then the unit of local government is eligible to apply directly to OJP (under the JAG Local solicitation) for a JAG award. If the "eligible award amount" to a particular unit of local government as determined on this basis would be less than $10,000, however, the funds are not made available for a direct award to that particular unit of local government, but instead are added to the amount that otherwise would have been awarded to the State.

**Financial Management and System of Internal Controls**

Award recipients and subrecipients (including recipients or subrecipients that are pass-through entities[1]) must, as described in the Part 200 Uniform Requirements[2] as set out at 2 C.F.R. 200.303:

(a) Establish and maintain effective internal control over the Federal award that provides reasonable assurance that [the recipient (and any subrecipient)] is managing the Federal award in compliance with Federal statutes, regulations, and the terms and conditions of the Federal award. These internal controls should be in compliance with guidance in "Standards for Internal Control in the Federal Government" issued by the Comptroller General of the United States and the "Internal Control Integrated Framework", issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

(b) Comply with Federal statutes, regulations, and the terms and conditions of the Federal awards.

---

[1] For purposes of this solicitation, the phrase "pass-through entity" includes any recipient or subrecipient that provides a subaward ("subgrant") to carry out part of the funded award or program.
[2] The "Part 200 Uniform Requirements" refers to the DOJ regulation at 2 C.F.R Part 2800, which adopts (with certain modifications) the provisions of 2 C.F.R. Part 200.

12

(c) Evaluate and monitor [the recipient's (and any subrecipient's)] compliance with statutes, regulations, and the terms and conditions of Federal awards.

(d) Take prompt action when instances of noncompliance are identified including noncompliance identified in audit findings.

(e) Take reasonable measures to safeguard protected personally identifiable information and other information the Federal awarding agency or pass-through entity designates as sensitive or [the recipient (or any subrecipient)] considers sensitive consistent with applicable Federal, State, local, and tribal laws regarding privacy and obligations of confidentiality.

To help ensure that applicants understand the administrative requirements and cost principles, OJP encourages prospective applicants to enroll, at no charge, in the DOJ Grants Financial Management Online Training, available here.

**Budget and Financial Information**

*Trust Fund* – Units of local government may draw down JAG funds either in advance or on a reimbursement basis. To draw down in advance, a trust fund must be established in which to deposit the funds. The trust fund may or may not be an interest-bearing account. If subrecipients draw down JAG funds in advance, they also must establish a trust fund in which to deposit funds.

*Tracking and reporting regarding JAG funds used for State administrative costs* – As indicated earlier, a unit of local government may use up to 10 percent of a JAG award, including up to 10 percent of any earned interest, for costs associated with administering the award. Administrative costs (when utilized) must be tracked separately; a recipient must report in separate financial status reports (SF-425) those expenditures that specifically relate to each particular JAG award during any particular reporting period.

*No commingling* – Both the unit of local government recipient and all subrecipients of JAG funds are prohibited from commingling funds on a program-by-program or project-by-project basis. *For this purpose, use of the administrative JAG funds to perform work across all active awards in any one year is not considered comingling.*

*Disparate Certification* – In some cases, as defined by the legislation, a disparity may exist between the funding eligibility of a county and its associated municipalities. Three different types of disparities may exist:

- The first type is a zero-county disparity. This situation exists when one or more municipalities within a county are eligible for a direct award but the county is not; yet the county is responsible for providing criminal justice services (such as prosecution and incarceration) for the municipality. In this case, the county is entitled to part of the municipality's award because it shares the cost of criminal justice operations, although it may not report crime data to the FBI. This is the most common type of disparity.

- A second type of disparity exists when both a county and a municipality within that county qualify for a direct award, but the award amount for the municipality exceeds 150 percent of the county's award amount.

13

- The third type of disparity occurs when a county and multiple municipalities within that county are all eligible for direct awards, but the sum of the awards for the individual municipalities exceeds 400 percent of the county's award amount.

Jurisdictions certified as disparate must identify a fiscal agent that will submit a joint application for the aggregate eligible allocation to all disparate municipalities. The joint application must determine and specify the award distribution to each unit of local government and the purposes for which the funds will be used. When beginning the JAG application process, a Memorandum of Understanding (MOU) that identifies which jurisdiction will serve as the applicant or fiscal agent for joint funds must be completed and signed by the Authorized Representative for each participating jurisdiction. The signed MOU should be attached to the application. For a sample MOU, go to: www.bja.gov/Funding/JAGMOU.pdf.

**Cost Sharing or Match Requirement**
The JAG Program does not require a match.

For additional cost sharing and match information, see the DOJ Grants Financial Guide.

**Pre-Agreement Costs (also known as Pre-award Costs)**
Pre-agreement costs are costs incurred by the applicant prior to the start date of the period of performance of the grant award.

OJP does *not* typically approve pre-agreement costs. An applicant must request and obtain the prior written approval of OJP for any such costs. All such costs incurred prior to award and prior to approval of the costs are incurred *at the sole risk* of the applicant. (Generally, no applicant should incur project costs *before* submitting an application requesting federal funding for those costs.)

Should there be extenuating circumstances that make it appropriate for OJP to consider approving pre-agreement costs, the applicant may contact the point of contact listed on the title page of this solicitation for the requirements concerning written requests for approval. If approved in advance by OJP, award funds may be used for pre-agreement costs, consistent with the recipient's approved budget and applicable cost principles. See the section on "Costs Requiring Prior Approval" in the DOJ Grants Financial Guide for more information.

**Prior Approval, Planning, and Reporting of Conference/Meeting/Training Costs\**
OJP strongly encourages every applicant that proposes to use award funds for any conference-, meeting-, or training-related activity (or similar event) to review carefully—before submitting an application—the OJP and DOJ policy and guidance on approval, planning, and reporting of such events, available at: https://www.ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm.

OJP policy and guidance (1) encourage minimization of conference, meeting, and training costs; (2) require prior written approval (which may affect project timelines) of most conference, meeting, and training costs for cooperative agreement recipients, as well as some conference, meeting, and training costs for grant recipients; and (3) set cost limits, which include a general prohibition of all food and beverage costs.

**Costs Associated with Language Assistance (if applicable)**
If an applicant proposes a program or activity that would deliver services or benefits to individuals, the costs of taking reasonable steps to provide meaningful access to those services

14

or benefits for individuals with limited English proficiency may be allowable. Reasonable steps to provide meaningful access to services or benefits may include interpretation or translation services, where appropriate.

For additional information, see the "Civil Rights Compliance" section under "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2017 Awards" in the OJP Funding Resource Center.

# C. Eligibility Information

For information on eligibility, see the title page of this solicitation.

Note that, as discussed in more detail below, the certification regarding compliance with 8 U.S.C. § 1373 must be executed and submitted before a unit of local government (other than an Indian tribal government) can make a valid award acceptance. Also, a unit of local government may not receive award funds (and its award will include a condition that withholds funds) until it submits a properly executed "Certifications and Assurances by Chief Executive of Applicant Government."

# D. Application and Submission Information

**What an Application Should Include**
This section describes in detail what an application should include. An applicant should anticipate that if it fails to submit an application that contains all of the specified elements, it may negatively affect the review of its application; and, should a decision be made to make an award, it may result in the inclusion of award conditions that preclude the recipient from accessing or using award funds until the recipient satisfies the conditions and OJP makes the funds available.

An applicant may combine the Budget Narrative and the Budget Detail Worksheet in one document. If an applicant submits only one budget document, however, it must contain **both** narrative and detail information. Please review the "Note on File Names and File Types" under How to Apply to be sure applications are submitted in permitted formats.

OJP strongly recommends that applicants use appropriately descriptive file names (e.g., "Program Narrative," "Budget Detail Worksheet and Budget Narrative," "Timelines," "Memoranda of Understanding," "Résumés") for all attachments. Also, OJP recommends that applicants include résumés in a single file.

**In general, if a unit of local government fails to submit required information or documents, OJP either will return the unit of local government's application in the Grants Management System (GMS) for submission of the missing information or documents, or will attach a condition to the award that will withhold award funds until the necessary information and documents are submitted. (As discussed elsewhere in this solicitation, the certification regarding compliance with 8 U.S.C. § 1373—which is set out at Appendix II—will be handled differently. Unless and until that certification is submitted, the unit of local government (other than an Indian tribal government) will be unable to make a valid acceptance of the award.)**

15

1. **Information to Complete the Application for Federal Assistance (SF-424)**
   The SF-424 is a required standard form used as a cover sheet for submission of pre-applications, applications, and related information. GMS takes information from the applicant's profile to populate the fields on this form.

   To avoid processing delays, an applicant must include an accurate legal name on its SF-424. Current OJP award recipients, when completing the field for "Legal Name," should use the same legal name that appears on the prior year award document, which is also the legal name stored in OJP's financial system. On the SF-424, enter the Legal Name in box 5 and Employer Identification Number (EIN) in box 6 exactly as it appears on the prior year award document. An applicant with a current, active award(s) must ensure that its GMS profile is current. If the profile is not current, the applicant should submit a Grant Adjustment Notice updating the information on its GMS profile prior to applying under this solicitation.

   A new applicant entity should enter the Official Legal Name and address of the applicant entity in box 5 and the EIN in box 6 of the SF-424.

   **Intergovernmental Review:** This solicitation ("funding opportunity") **is** within the scope of Executive Order 12372, concerning State opportunities to coordinate applications for federal financial assistance. See 28 C.F.R. Part 30. An applicant may find the names and addresses of State Single Points of Contact (SPOCs) at the following website: https://www.whitehouse.gov/omb/grants_spoc/. If the State appears on the SPOC list, the applicant must contact the State SPOC to find out about, and comply with, the State's process under E.O. 12372. In completing the SF-424, an applicant whose State appears on the SPOC list is to make the appropriate selection in response to question 19 once the applicant has complied with its State E.O. 12372 process. (An applicant whose State does not appear on the SPOC list should answer question 19 by selecting the response that the "Program is subject to E.O. 12372 but has not been selected by the State for review.")

2. **Project Abstract**
   Applications should include a high-quality project abstract that summarizes the proposed project in 400 words or less. Project abstracts should be:

   - Written for a general public audience.
   - Submitted as a separate attachment with "Project Abstract" as part of its file name.
   - Single-spaced, using a standard 12-point font (Times New Roman) with 1-inch margins.
   - Include applicant name, title of the project, a brief description of the problem to be addressed and the targeted area/population, project goals and objectives, a description of the project strategy, any significant partnerships, and anticipated outcomes.
   - Identify up to 10 project identifiers that would be associated with proposed project activities. The list of identifiers can be found at www.bja.gov/funding/JAGIdentifiers.pdf.

3. **Program Narrative**
   The following sections **should** be included as part of the program narrative[3]:

   a. Statement of the Problem – Identify the unit of local government's strategy/funding priorities for the FY 2017 JAG funds, the subgrant award process and timeline, and a

---

[3] For information on subawards (including the details on proposed subawards that should be included in the application), see "Budget and Associated Documentation" under Section D. Application and Submission Information.

description of the programs to be funded over the grant period. Units of local government are strongly encouraged to prioritize the funding on evidence-based projects.

b. <u>Project Design and Implementation</u> – Describe the unit of local government's strategic planning process, if any, that guides its priorities and funding strategy. This should include a description of how the local community is engaged in the planning process and the data and analysis utilized to support the plan; it should identify the stakeholders currently participating in the strategic planning process, the gaps in the needed resources for criminal justice purposes, and how JAG funds will be coordinated with State and related justice funds.

c. <u>Capabilities and Competencies</u> – Describe any additional strategic planning/coordination efforts in which the units of local government participates with other criminal justice criminal/juvenile justice agencies in the State.

d. <u>Plan for Collecting the Data Required for this Solicitation's Performance Measures</u> – OJP will require each successful applicant to submit specific performance measures data as part of its reporting under the award (see "<u>General Information about Post-Federal Award Reporting Requirements</u>" in <u>Section F. Federal Award Administration Information</u>). The performance measures correlate to the goals, objectives, and deliverables identified under "<u>Goals, Objectives, and Deliverables</u>" in <u>Section A. Program Description</u>. Post award, recipients will be required to submit quarterly performance metrics through BJA's Performance Measurement Tool (PMT), located at: <u>https://bjapmt.ojp.gov</u>. The application should describe the applicant's plan for collection of all of the performance measures data listed in the JAG Program accountability measures at: <u>https://bjapmt.ojp.gov/help/jagdocs.html</u>.

BJA does not require applicants to submit performance measures data with their application. Performance measures are included as an alert that BJA will require successful applicants to submit specific data as part of their reporting requirements. For the application, applicants should indicate an understanding of these requirements and discuss how they will gather the required data, should they receive funding.

**Note on Project Evaluations**

An applicant that proposes to use award funds through this solicitation to conduct project evaluations should be aware that certain project evaluations (such as systematic investigations designed to develop or contribute to generalizable knowledge) may constitute "research" for purposes of applicable DOJ human subjects protection regulations. However, project evaluations that are intended only to generate internal improvements to a program or service, or are conducted only to meet OJP's performance measure data reporting requirements, likely do not constitute "research." Each applicant should provide sufficient information for OJP to determine whether the particular project it proposes would either intentionally or unintentionally collect and/or use information in such a way that it meets the DOJ regulatory definition of research that appears at 28 C.F.R. Part 46 ("Protection of Human Subjects").

Research, for the purposes of human subjects protection for OJP-funded programs, is defined as "a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge." 28 C.F.R. 46.102(d).

17

For additional information on determining whether a proposed activity would constitute research for purposes of human subjects protection, applicants should consult the decision tree in the "Research and the Protection of Human Subjects" section of the "Requirements related to Research" web page of the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2017" available through the OJP Funding Resource Center. Every prospective applicant whose application may propose a research or statistical component also should review the "Data Privacy and Confidentiality Requirements" section on that web page.

4. **Budget and Associated Documentation**

(a) **Budget Detail Worksheet**
A sample Budget Detail Worksheet can be found at www.ojp.gov/funding/Apply/Resources/BudgetDetailWorksheet.pdf. An applicant that submits its budget in a different format should use the budget categories listed in the sample budget worksheet. The Budget Detail Worksheet should break out costs by year.

For questions pertaining to budget and examples of allowable and unallowable costs, see the DOJ Grants Financial Guide.

(b) **Budget Narrative**
The Budget Narrative should thoroughly and clearly describe every category of expense listed in the proposed Budget Detail Worksheet. OJP expects proposed budgets to be complete, cost effective, and allowable (e.g., reasonable, allocable, and necessary for project activities). This narrative should include a full description of all costs, including administrative costs (if applicable).

An applicant should demonstrate in its Budget Narrative how it will maximize cost effectiveness of award expenditures. Budget narratives should generally describe cost effectiveness in relation to potential alternatives and the goals of the project. For example, a budget narrative should detail why planned in-person meetings are necessary, or how technology and collaboration with outside organizations could be used to reduce costs, without compromising quality.

The Budget Narrative should be mathematically sound and correspond clearly with the information and figures provided in the Budget Detail Worksheet. The narrative should explain how the applicant estimated and calculated all costs, and how those costs are necessary to the completion of the proposed project. The narrative may include tables for clarification purposes, but need not be in a spreadsheet format. As with the Budget Detail Worksheet, the Budget Narrative should describe costs by year.

(c) **Information on Proposed Subawards (if any), as well as on Proposed Procurement Contracts (if any)**
Applicants for OJP awards typically may propose to make "subawards." Applicants also may propose to enter into procurement "contracts" under the award.

Whether—for purposes of federal grants administrative requirements—a particular agreement between a recipient and a third party will be considered a "subaward" or instead considered a procurement "contract" under the award is determined by federal rules and applicable OJP guidance. It is an important distinction, in part because the

federal administrative rules and requirements that apply to "subawards" and procurement "contracts" under awards differ markedly.

In general, the central question is the relationship between what the third party will do under its agreement with the recipient and what the recipient has committed (to OJP) to do under its award to further a public purpose (e.g., services the recipient will provide, products it will develop or modify, research or evaluation it will conduct). If a third party will provide some of the services the recipient has committed (to OJP) to provide, will develop or modify all or part of a product the recipient has committed (to OJP) to develop or modify, or conduct part of the research or evaluation the recipient has committed (to OJP) to conduct, OJP will consider the agreement with the third party a subaward for purposes of federal grants administrative requirements.

This will be true **even if** the recipient, for internal or other non-federal purposes, labels or treats its agreement as a procurement, a contract, or a procurement contract. Neither the title nor the structure of an agreement determines whether the agreement—for purposes of federal grants administrative requirements—is a "subaward" or is instead a procurement "contract" under an award.

Additional guidance on the circumstances under which (for purposes of federal grants administrative requirements) an agreement constitutes a subaward as opposed to a procurement contract under an award is available (along with other resources) on the OJP Part 200 Uniform Requirements web page.

> **(1) Information on proposed subawards and required certification regarding 8 U.S.C. § 1373 from certain subrecipients**
>
> **General requirement for federal authorization of any subaward; statutory authorizations of subawards under the JAG Program statute**. Generally, a recipient of an OJP award may not make subawards ("subgrants") unless the recipient has specific federal authorization to do so. Unless an applicable statute or DOJ regulation specifically authorizes (or requires) particular subawards, a recipient must have authorization from OJP before it may make a subaward.
>
> **JAG subawards that are required or specifically authorized by statute (see 42 U.S.C. § 3751(a) and 42 U.S.C. § 3755) do not require prior approval to authorize subawards. This includes subawards made by units of local government under the JAG Program.**
>
> A particular subaward may be authorized by OJP because the recipient included a sufficiently detailed description and justification of the proposed subaward in the application as approved by OJP. If, however, a particular subaward is not authorized by federal statute or regulation and is not sufficiently described and justified in the application as approved by OJP, the recipient will be required, post award, to request and obtain written authorization from OJP before it may make the subaward.
>
> If an applicant proposes to make one or more subawards to carry out the federal award and program, and those subawards are not specifically authorized (or required) by statute or regulation, the applicant should: (1) identify (if known) the proposed subrecipient(s), (2) describe in detail what each subrecipient will do to carry out the federal award and federal program, and (3) provide a justification for the

19

subaward(s), with details on pertinent matters such as special qualifications and areas of expertise. Pertinent information on subawards should appear not only in the Program Narrative but also in the Budget Detail Worksheet and budget narrative.

**NEW** *Required certification regarding 8 U.S.C. § 1373 from any proposed subrecipient that is a unit of local government or "public" institution of higher education.* Before a unit of local government may subaward FY 2017 award funds to another unit of local government or to a public institution of higher education, it will be required (by award condition) to obtain a properly executed certification regarding compliance with 8 U.S.C. § 1373 from the proposed subrecipient. (This requirement regarding 8 U.S.C. § 1373 will not apply to subawards to Indian tribes). The specific certification the unit of local government must require from another unit of local government will vary somewhat from the specific certification it must require from a public institution of higher education. The forms will be posted and available for download at: https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.

**(2) Information on proposed procurement contracts (with specific justification for proposed noncompetitive contracts over $150,000)**

Unlike a recipient contemplating a subaward, a recipient of an OJP award generally does not need specific prior federal authorization to enter into an agreement that—for purposes of federal grants administrative requirements—is considered a procurement contract, **provided that** (1) the recipient uses its own documented procurement procedures and (2) those procedures conform to applicable federal law, including the Procurement Standards of the (DOJ) Part 200 Uniform Requirements (as set out at 2 C.F.R. 200.317 - 200.326). The Budget Detail Worksheet and budget narrative should identify proposed procurement contracts. (As discussed above, subawards must be identified and described separately from procurement contracts.)

The Procurement Standards in the (DOJ) Part 200 Uniform Requirements, however, reflect a general expectation that agreements that (for purposes of federal grants administrative requirements) constitute procurement "contracts" under awards will be entered into on the basis of full and open competition. If a proposed procurement contract would exceed the simplified acquisition threshold—currently, $150,000—a recipient of an OJP award may not proceed without competition, unless and until the recipient receives specific advance authorization from OJP to use a non-competitive approach for the procurement.

An applicant that (at the time of its application) intends—without competition—to enter into a procurement contract that would exceed $150,000 should include a detailed justification that explains to OJP why, in the particular circumstances, it is appropriate to proceed without competition. Various considerations that may be pertinent to the justification are outlined in the DOJ Grants Financial Guide.

**(d) Pre-Agreement Costs**
For information on pre-agreement costs, see Section B. Federal Award Information.

**5. Indirect Cost Rate Agreement (if applicable)**
Indirect costs may be charged to an award only if:

(a) The recipient has a current (that is, unexpired), federally approved indirect cost rate; or

(b) The recipient is eligible to use, and elects to use, the "de minimis" indirect cost rate described in the (DOJ) Part 200 Uniform Requirements, as set out at 2 C.F.R. 200.414(f).

**Note**: This rule does not eliminate or alter the JAG-specific restriction in federal law that charges for administrative costs may not exceed 10 percent of the award amount, regardless of the approved indirect cost rate.

An applicant with a current (that is, unexpired) federally approved indirect cost rate is to attach a copy of the indirect cost rate agreement to the application. An applicant that does not have a current federally approved rate may request one through its cognizant federal agency, which will review all documentation and approve a rate for the applicant entity, or, if the applicant's accounting system permits, applicants may propose to allocate costs in the direct cost categories.

For assistance with identifying the appropriate cognizant federal agency for indirect costs, please contact the OCFO Customer Service Center at 1–800–458–0786 or at ask.ocfo@usdoj.gov. If DOJ is the cognizant federal agency, applicants may obtain information needed to submit an indirect cost rate proposal at: www.ojp.gov/funding/Apply/Resources/IndirectCosts.pdf.

Certain OJP recipients have the option of electing to use the "de minimis" indirect cost rate. An applicant that is eligible to use the "de minimis" rate that wishes to use the "de minimis" rate should attach written documentation to the application that advises OJP of both: (1) the applicant's eligibility to use the "de minimis" rate, and (2) its election to do so. If an eligible applicant elects the "de minimis" rate, costs must be consistently charged as either indirect or direct costs, but may not be double charged or inconsistently charged as both. The "de minimis" rate may no longer be used once an approved federally-negotiated indirect cost rate is in place. (No entity that ever has had a federally approved negotiated indirect cost rate is eligible to use the "de minimis" rate.)

6. **Tribal Authorizing Resolution (if applicable)**
An applicant that proposes to provide direct services or assistance to residents on tribal lands should include in its application a resolution, a letter, affidavit, or other documentation, as appropriate, that demonstrates (as a legal matter) that the applicant has the requisite authorization from the tribe(s) to implement the proposed project on tribal lands.

OJP will not deny an application for an FY 2017 award for failure to submit such tribal authorizing resolution (or other appropriate documentation) by the application deadline, but a unit of local government will not receive award funds (and its award will include a condition that withholds funds) until it submits the appropriate documentation.

7. **Financial Management and System of Internal Controls Questionnaire (including applicant disclosure of high-risk status)**
Every unit of local government is to complete the OJP Financial Management and System of Internal Controls Questionnaire as part of its application. In accordance with the Part 200 Uniform Requirements as set out at 2 C.F.R. 200.205, federal agencies must have in place a framework for evaluating the risks posed by applicants before they receive a federal award.

21

8. **Applicant Disclosure of High Risk Status**

Applicants that are currently designated high risk by another federal grant making agency must disclose that status. For purposes of this disclosure, high risk includes any status under which a federal awarding agency provides additional oversight due to the applicant's past performance, or other programmatic or financial concerns with the applicant. If an applicant is designated high risk by another federal awarding agency, the applicant must provide the following information:

- The federal agency that currently designated the applicant as high risk
- Date the applicant was designated high risk
- The high risk point of contact at that federal awarding agency (name, phone number, and email address).
- Reasons for the high risk status, as set out by the federal awarding agency

OJP seeks this information to help ensure appropriate federal oversight of OJP awards. An applicant that is considered "high risk" by another federal awarding agency is not automatically disqualified from receiving an OJP award. OJP may, however, consider the information in award decisions, and may impose additional OJP oversight of any award under this solicitation (including through the conditions that accompany the award document).

9. **Disclosure of Lobbying Activities**

An applicant that expends any funds for lobbying activities is to provide all of the information requested on the form Disclosure of Lobbying Activities (SF-LLL).

10. **Certifications and Assurances by the Chief Executive of the Applicant Government**

A JAG application is not complete, and a unit of local government may not receive award funds, unless the chief executive of the applicant unit of local government (e.g., the mayor) properly executes, and the unit of local government submits, the "Certifications and Assurances by the Chief Executive of the Applicant Government" attached to this solicitation as Appendix I.

OJP will not deny an application for an FY 2017 award for failure to submit these "Certifications and Assurances by the Chief Executive of the Applicant Government" by the application deadline, but a unit of local government will not receive award funds (and its award will include a condition that withholds funds) until it submits these certifications and assurances, properly executed by the chief executive of the unit of local government (e.g., the mayor).

11. **Certification of Compliance with 8 U.S.C. § 1373 by the Chief Legal Officer of the Applicant Government**

The chief legal officer of an applicant unit of local government (e.g., the General Counsel) is to carefully review the "State or Local Government: FY 2017 Certification of Compliance with 8 U.S.C. § 1373" that is attached as Appendix II to this solicitation. If the chief legal officer determines that he or she may execute the certification, the unit of local government is to submit the certification as part of its application. (Note: this requirement does not apply to Indian tribal governments.)

As discussed further below, a unit of local government (other than an Indian tribal government) applicant will be *unable to make a valid award acceptance* of an FY 2017 JAG

award unless and until a properly executed certification by its chief legal officer is received by OJP on or before the day the unit of local government submits an executed award document.

## 12. Additional Attachments

### (a) Applicant Disclosure of Pending Applications

Each applicant is to disclose whether it has (or is proposed as a subrecipient under) any pending applications for federally funded grants or cooperative agreements that (1) include requests for funding to support the same project being proposed in the application under this solicitation and (2) would cover identical cost items outlined in the budget submitted to OJP as part of the application under this solicitation. The applicant is to disclose applications made directly to federal awarding agencies, and also applications for subawards of federal funds (e.g., applications to State agencies that will subaward ("subgrant") federal funds).

OJP seeks this information to help avoid any inappropriate duplication of funding. Leveraging multiple funding sources in a complementary manner to implement comprehensive programs or projects is encouraged and is not seen as inappropriate duplication.

Each applicant that has one or more pending applications as described above is to provide the following information about pending applications submitted within the last 12 months:

- The federal or State funding agency
- The solicitation name/project name
- The point of contact information at the applicable federal or State funding agency

| Federal or State Funding Agency | Solicitation Name/Project Name | Name/Phone/Email for Point of Contact at Federal or State Funding Agency |
|---|---|---|
| DOJ/Office of Community Oriented Policing Services (COPS) | COPS Hiring Program | Jane Doe, 202/000-0000; jane.doe@usdoj.gov |
| Health & Human Services/ Substance Abuse and Mental Health Services Administration | Drug-Free Communities Mentoring Program/ North County Youth Mentoring Program | John Doe, 202/000-0000; john.doe@hhs.gov |

Each applicant should include the table as a separate attachment to its application. The file should be named "Disclosure of Pending Applications." The applicant Legal Name on the application must match the entity named on the disclosure of pending applications statement.

23

Any applicant that does not have any pending applications as described above is to submit, as a separate attachment, a statement to this effect: "[Applicant Name on SF-424] does not have (and is not proposed as a subrecipient under) any pending applications submitted within the last 12 months for federally funded grants or cooperative agreements (or for subawards under federal grants or cooperative agreements) that request funding to support the same project being proposed in this application to OJP and that would cover identical cost items outlined in the budget submitted as part of this application."

**(b) Research and Evaluation Independence and Integrity (if applicable)**

If an application involves research (including research and development) and/or evaluation, the applicant must demonstrate research/evaluation independence and integrity, including appropriate safeguards, before it may receive award funds. The applicant must demonstrate independence and integrity regarding both this proposed research and/or evaluation, and any current or prior related projects.

Each application should include an attachment that addresses **both** i. and ii. below.

i. For purposes of this solicitation, each applicant is to document research and evaluation independence and integrity by including one of the following two items:

    a. A specific assurance that the applicant has reviewed its application to identify any actual or potential apparent conflicts of interest (including through review of pertinent information on the principal investigator, any co-principal investigators, and any subrecipients), and that the applicant has identified no such conflicts of interest—whether personal or financial or organizational (including on the part of the applicant entity or on the part of staff, investigators, or subrecipients)—that could affect the independence or integrity of the research, including the design, conduct, and reporting of the research.

OR

    b. A specific description of actual or potential apparent conflicts of interest that the applicant has identified—including through review of pertinent information on the principal investigator, any co-principal investigators, and any subrecipients—that could affect the independence or integrity of the research, including the design, conduct, or reporting of the research. These conflicts may be personal (e.g., on the part of investigators or other staff), financial, or organizational (related to the applicant or any subrecipient entity). Some examples of potential investigator (or other personal) conflict situations are those in which an investigator would be in a position to evaluate a spouse's work product (actual conflict), or an investigator would be in a position to evaluate the work of a former or current colleague (potential apparent conflict). With regard to potential organizational conflicts of interest, as one example, generally an organization would not be given an award to evaluate a project, if that organization had itself provided substantial prior technical assistance to that specific project or a location implementing the project (whether funded by OJP or other sources), because the organization in such an

24

instance might appear to be evaluating the effectiveness of its own prior work. The key is whether a reasonable person understanding all of the facts would be able to have confidence that the results of any research or evaluation project are objective and reliable. Any outside personal or financial interest that casts doubt on that objectivity and reliability of an evaluation or research product is a problem and must be disclosed.

ii.  In addition, for purposes of this solicitation, each applicant is to address possible mitigation of research integrity concerns by including, at a minimum, one of the following two items:

a.  If an applicant reasonably believes that no actual or potential apparent conflicts of interest (personal, financial, or organizational) exist, then the applicant should provide a brief narrative explanation of how and why it reached that conclusion. The applicant also is to include an explanation of the specific processes and procedures that the applicant has in place, or will put in place, to identify and prevent (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OR

b.  If the applicant has identified actual or potential apparent conflicts of interest (personal, financial, or organizational) that could affect the independence and integrity of the research, including the design, conduct, or reporting of the research, the applicant is to provide a specific and robust mitigation plan to address each of those conflicts. At a minimum, the applicant is expected to explain the specific processes and procedures that the applicant has in place, or will put in place, to identify and eliminate (or, at the very least, mitigate) any such conflicts of interest pertinent to the funded project during the period of performance. Documentation that may be helpful in this regard may include organizational codes of ethics/conduct and policies regarding organizational, personal, and financial conflicts of interest. There is no guarantee that the plan, if any, will be accepted as proposed.

OJP will assess research and evaluation independence and integrity based on considerations such as the adequacy of the applicant's efforts to identify factors that could affect the objectivity or integrity of the proposed staff and/or the applicant entity (and any subrecipients) in carrying out the research, development, or evaluation activity; and the adequacy of the applicant's existing or proposed remedies to control any such factors.

**(c) Local Governing Body Review**
Applicants must submit information via the Certification and Assurances by the Chief Executive (See Appendix I) which documents that the JAG application was made available for review by the governing body of the unit of local government, or to an organization designated by that governing body, for a period that was not less than 30

25

days before the application was submitted to BJA. The same Chief Executive Certification will also specify that an opportunity to comment on this application was provided to citizens prior to the application submission to the extent applicable law or established procedures make such opportunity available. In the past, this has been accomplished via submission of specific review dates; now OJP will only accept a chief executive's certification to attest to these facts. Units of local government may continue to submit actual dates of review should they wish to do so, in addition to the submission of the Chief Executive Certification.

**How to Apply**

An applicant must submit its application through the Grants Management System (GMS), which provides support for the application, award, and management of awards at OJP. Each applicant entity **must register in GMS for each specific funding opportunity.** Although the registration and submission deadlines are the same, OJP urges each applicant entity to **register promptly**, especially if this is the first time the applicant is using the system. Find complete instructions on how to register and submit an application in GMS at www.ojp.gov/gmscbt/. An applicant that experiences technical difficulties during this process should email GMS.HelpDesk@usdoj.gov or call 888–549–9901 (option 3), 24 hours every day, including during federal holidays. OJP recommends that each applicant **register promptly** to prevent delays in submitting an application package by the deadline.

**Note on File Types: GMS does not accept executable file types as application attachments**. These disallowed file types include, but are not limited to, the following extensions: ".com," ".bat," ".exe," ".vbs," ".cfg," ".dat," ".db," ".dbf," ".dll," ".ini," ".log," ".ora," ".sys," and ".zip."

Every applicant entity must comply with all applicable System for Award Management (SAM) and unique entity identifier (currently, a Data Universal Numbering System [DUNS] number) requirements. If an applicant entity has not fully complied with applicable SAM and unique identifier requirements by the time OJP makes award decisions, OJP may determine that the applicant is not qualified to receive an award and may use that determination as a basis for making the award to a different applicant.

All applicants should complete the following steps:

**1. Acquire a unique entity identifier (DUNS number).** In general, the Office of Management and Budget requires every applicant for a federal award (other than an individual) to include a "unique entity identifier" in each application, including an application for a supplemental award. Currently, a DUNS number is the required unique entity identifier.

A DUNS number is a unique nine-digit identification number provided by the commercial company Dun and Bradstreet. This unique entity identifier is used for tracking purposes, and to validate address and point of contact information for applicants, recipients, and subrecipients. It will be used throughout the life cycle of an OJP award. Obtaining a DUNS number is a free, one-time activity. Call Dun and Bradstreet at 866–705–5711 to obtain a DUNS number or apply online at www.dnb.com. A DUNS number is usually received within 1–2 business days.

**2. Acquire registration with the SAM.** SAM is the repository for certain standard information about federal financial assistance applicants, recipients, and subrecipients. All applicants for OJP awards (other than individuals) must maintain current registrations in the SAM database.

26

Each applicant must **update or renew its SAM registration at least annually** to maintain an active status. SAM registration and renewal can take as long as 10 business days to complete.

Information about SAM registration procedures can be accessed at https://www.sam.gov/.

**3. Acquire a GMS username and password**. New users must create a GMS profile by selecting the "First Time User" link under the sign-in box of the GMS home page. For more information on how to register in GMS, go to www.ojp.gov/gmscbt. Previously registered applicants should ensure, prior to applying, that the user profile information is up-to-date in GMS (including, but not limited to, address, legal name of agency and authorized representative) as this information is populated in any new application.

**4. Verify the SAM (formerly CCR) registration in GMS.** OJP requires each applicant to verify its SAM registration in GMS. Once logged into GMS, click the "CCR Claim" link on the left side of the default screen. Click the submit button to verify the SAM (formerly CCR) registration.

**5. Search for the funding opportunity on GMS.** After logging into GMS or completing the GMS profile for username and password, go to the "Funding Opportunities" link on the left side of the page. Select BJA and **FY 17 Edward Byrne Memorial Local Justice Assistance Grant (JAG) Program.**

**6. Register by selecting the "Apply Online" button associated with the funding opportunity title.** The search results from step 5 will display the "funding opportunity" (solicitation) title along with the registration and application deadlines for this solicitation. Select the "Apply Online" button in the "Action" column to register for this solicitation and create an application in the system.

**7. Follow the directions in GMS to submit an application consistent with this solicitation.** Once the application is submitted, GMS will display a confirmation screen stating the submission was successful. **Important:** In some instances, applicants must wait for GMS approval before submitting an application. OJP urges each applicant to submit its application **at least 72 hours prior** to the application due date.

**Note: Application Versions**
If an applicant submits multiple versions of the same application, OJP will review **only** the most recent system-validated version submitted.

**Experiencing Unforeseen GMS Technical Issues**
An applicant that experiences unforeseen GMS technical issues beyond its control that prevent it from submitting its application by the deadline may contact the GMS Help Desk or the SAM Help Desk (Federal Service Desk) to report the technical issue and receive a tracking number. The applicant is expected to email the NCJRS Response Center identified in the Contact Information section on the title page **within 24 hours after the application deadline** to request approval to submit its application after the deadline. The applicant's email must describe the technical difficulties, and must include a timeline of the applicant's submission efforts, the complete grant application, the applicant's DUNS number, and any GMS Help Desk or SAM tracking number(s).

**Note: OJP does not automatically approve requests to submit a late application.** After OJP reviews the applicant's request, and contacts the GMS Help Desk to verify the reported technical issues, OJP will inform the applicant whether the request to submit a late application

27

has been approved or denied. If OJP determines that the untimely application submission was due to the applicant's failure to follow all required procedures, OJP will deny the applicant's request to submit its application.

The following conditions generally are insufficient to justify late submissions to OJP solicitations:

- Failure to register in SAM or GMS in sufficient time (SAM registration and renewal can take as long as 10 business days to complete.)
- Failure to follow GMS instructions on how to register and apply as posted on the GMS website
- Failure to follow each instruction in the OJP solicitation
- Technical issues with the applicant's computer or information technology environment such as issues with firewalls

# E. Application Review Information

**Review Process**
OJP is committed to ensuring a fair and open process for making awards. BJA reviews the application to make sure that the information presented is reasonable, understandable, measurable, and achievable, as well as consistent with the solicitation. BJA will also review applications to help ensure that JAG program-statute requirements have been met.

Pursuant to the (DOJ) Part 200 Uniform Requirements, before awards are made, OJP also reviews information related to the degree of risk posed by applicants. Among other things, to help assess whether an applicant that has one or more prior federal awards has a satisfactory record with respect to performance, integrity, and business ethics, OJP checks whether the applicant is listed in SAM as excluded from receiving a federal award. In addition, if OJP anticipates that an award will exceed $150,000 in federal funds, OJP also must review and consider any information about the applicant that appears in the non-public segment of the integrity and performance system accessible through SAM (currently, the Federal Awardee Performance and Integrity Information System; "FAPIIS").

**Important note on FAPIIS:** An applicant, at its option, may review and comment on any information about itself that currently appears in FAPIIS and was entered by a federal awarding agency. OJP will consider any such comments by the applicant, in addition to the other information in FAPIIS, in its assessment of the risk posed by the applicant.

The evaluation of risks goes beyond information in SAM, however. OJP itself has in place a framework for evaluating risks posed by applicants. OJP takes into account information pertinent to matters such as—

1. Applicant financial stability and fiscal integrity
2. Quality of the management systems of the applicant, and the applicant's ability to meet prescribed management standards, including those outlined in the DOJ Grants Financial Guide
3. Applicant's history of performance under OJP and other DOJ awards (including compliance with reporting requirements and award conditions), as well as awards from other federal agencies

28

4. Reports and findings from audits of the applicant, including audits under the (DOJ) Part 200 Uniform Requirements
5. Applicant's ability to comply with statutory and regulatory requirements, and to effectively implement other award requirements

Absent explicit statutory authorization or written delegation of authority to the contrary, the Assistant Attorney General will make all final award decisions.

# F. Federal Award Administration Information

**Federal Award Notices**
OJP expects to issue award notifications by September 30, 2017. OJP sends award notifications by email through GMS to the individuals listed in the application as the point of contact and the authorizing official. The email notification includes detailed instructions on how to access and view the award documents, and steps to take in GMS to start the award acceptance process. GMS automatically issues the notifications at 9:00 p.m. eastern time on the award date.

**NOTE:** In order validly to accept an award under the FY 2017 JAG Program, a unit of local government (other than an Indian tribal government) must submit to GMS the certification by its chief legal officer regarding compliance with 8 U.S.C. § 1373, executed using the form that appears in Appendix II. (The form also may be downloaded at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.) Unless the executed certification either (1) is submitted to OJP together with the signed award document or (2) is uploaded in GMS no later than the day the signed award document is submitted, **OJP will reject as invalid** any submission by a unit of local government (other than an Indian tribal government) that purports to accept an award under this solicitation.

Rejection of an initial submission as an invalid award acceptance is not a denial of the award. Consistent with award requirements, once the unit of local government **does** submit the necessary certification regarding 8 U.S.C. § 1373, the unit of local government **will** be permitted to submit an award document executed by the unit of local government on or after the date of that certification.

Also, in order for a unit of local government applicant validly to accept an award under the FY 2017 JAG Program, an individual with the necessary authority to bind the applicant will be required to log in; execute a set of legal certifications and a set of legal assurances; designate a financial point of contact; thoroughly review the award, including **all** award conditions; and sign and accept the award. The award acceptance process requires physical signature of the award document by the authorized representative and the scanning of the fully executed award document (along with the required certification regarding 8 U.S.C. § 1373, if not already uploaded in GMS) to OJP.

**Statutory and Regulatory Requirements; Award Conditions**
If selected for funding, in addition to implementing the funded project consistent with the OJP-approved application, the recipient must comply with all award requirements (including all award conditions), as well as all applicable requirements of federal statutes and regulations (including those referred to in assurances and certifications executed as part of the application or in

connection with award acceptance, and administrative and policy requirements set by statute or regulation).

OJP strongly encourages prospective applicants to review information on post-award legal requirements generally applicable to FY 2017 OJP awards and common OJP award conditions **prior** to submitting an application.

Applicants should consult the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2017 Awards," available in the OJP Funding Resource Center. In addition, applicants should examine the following two legal documents, as each successful applicant must execute both documents in GMS before it may receive any award funds.

- Certifications Regarding Lobbying; Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements

- OJP Certified Standard Assurances (attached to this solicitation as Appendix IV)

The web pages accessible through the "Overview of Legal Requirements Generally Applicable to OJP Grants and Cooperative Agreements - FY 2017 Awards" are intended to give applicants for OJP awards a general overview of important statutes, regulations, and award conditions that apply to many (or in some cases, all) OJP grants and cooperative agreements awarded in FY 2017. Individual OJP awards typically also will include additional award conditions. Those additional conditions may relate to the particular statute, program, or solicitation under which the award is made; to the substance of the funded application; to the recipient's performance under other federal awards; to the recipient's legal status (e.g., as a for-profit entity); or to other pertinent considerations.

Individual FY 2017 JAG awards will include two new express conditions that, with respect to the "program or activity" that would be funded by the FY 2017 award, are designed to ensure that States and units of local government that receive funds from the FY 2017 JAG award: (1) permit personnel of the U.S. Department of Homeland Security (DHS) to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to be or remain in the United States and (2) provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the Immigration and Nationality Act.

Compliance with the requirements of the two foregoing new award conditions will be an authorized and priority purpose of the award. The reasonable costs (to the extent not reimbursed under any other federal program) of developing and putting into place statutes, rules, regulations, policies, or practices as required by these conditions, and to honor any duly authorized requests from DHS that is encompassed by these conditions, will be allowable costs under the award.

**General Information about Post-Federal Award Reporting Requirements**
A unit of local government recipient of an award under this solicitation will be required to submit the following reports and data:

<u>Required reports</u>. Recipients typically must submit quarterly financial status reports, semi-annual progress reports, final financial and progress reports, and, if applicable, an annual audit report in accordance with the (DOJ) Part 200 Uniform Requirements or specific award conditions. Future awards and fund drawdowns may be withheld if reports are delinquent. (In appropriate cases, OJP may require additional reports.)

Awards that exceed $500,000 will include an additional condition that, under specific circumstances, will require the recipient to report (to FAPIIS) information on civil, criminal, and administrative proceedings connected with (or connected to the performance of) either the OJP award or any other grant, cooperative agreement, or procurement contract from the federal government. Additional information on this reporting requirement appears in the text of the award condition posted on the OJP website at: https://ojp.gov/funding/FAPIIS.htm

<u>Data on performance measures</u>. In addition to required reports, each recipient of an award under this solicitation also must provide data that measure the results of the work done under the award. To demonstrate program progress and success, as well as to assist DOJ with fulfilling its responsibilities under GPRA and the GPRA Modernization Act of 2010, OJP will require State recipients to provide accountability metrics data. Accountability metrics data must be submitted through BJA's Performance Measurement Tool (PMT), available at https://bjapmt.ojp.gov. The accountability measures are available at: https://bjapmt.ojp.gov/help/jagdocs.html. (Note that if a law enforcement agency receives JAG funds from a State, the State must submit quarterly accountability metrics data related to training that officers have received on use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public.)

OJP may restrict access to award funds if a recipient of an OJP award fails to report required performance measures data in a timely manner.

# G. Federal Awarding Agency Contact(s)

For OJP contact(s), see the title page of this solicitation.

For contact information for GMS, see the title page.

# H. Other Information

**Freedom of Information Act and Privacy Act (5 U.S.C. § 552 and 5 U.S.C. § 552a)**
All applications submitted to OJP (including all attachments to applications) are subject to the federal Freedom of Information Act (FOIA) and to the Privacy Act. By law, DOJ may withhold information that is responsive to a request pursuant to FOIA if DOJ determines that the responsive information either is protected under the Privacy Act or falls within the scope of one of nine statutory exemptions under FOIA. DOJ cannot agree in advance of a request pursuant to FOIA not to release some or all portions of an application.

In its review of records that are responsive to a FOIA request, OJP will withhold information in those records that plainly falls within the scope of the Privacy Act or one of the statutory exemptions under FOIA. (Some examples include certain types of information in budgets, and names and contact information for project staff other than certain key personnel.) In appropriate

31

circumstances, OJP will request the views of the applicant/recipient that submitted a responsive document.

For example, if OJP receives a request pursuant to FOIA for an application submitted by a nonprofit or for-profit organization or an institution of higher education, or for an application that involves research, OJP typically will contact the applicant/recipient that submitted the application and ask it to identify—quite precisely—any particular information in the application that applicant/recipient believes falls under a FOIA exemption, the specific exemption it believes applies, and why. After considering the submission by the applicant/recipient, OJP makes an independent assessment regarding withholding information. OJP generally follows a similar process for requests pursuant to FOIA for applications that may contain law-enforcement sensitive information.

**Provide Feedback to OJP**
To assist OJP in improving its application and award processes, OJP encourages applicants to provide feedback on this solicitation, the application submission process, and/or the application review process. Provide feedback to OJPSolicitationFeedback@usdoj.gov.

**IMPORTANT:** This email is for feedback and suggestions only. OJP does **not** reply to messages it receives in this mailbox. A prospective applicant that has specific questions on any program or technical aspect of the solicitation **must** use the appropriate telephone number or email listed on the front of this solicitation document to obtain information. These contacts are provided to help ensure that prospective applicants can directly reach an individual who can address specific questions in a timely manner.

If you are interested in being a reviewer for other OJP grant applications, please email your résumé to ojppeerreview@lmsolas.com. (Do not send your résumé to the OJP Solicitation Feedback email account.) **Note:** Neither you nor anyone else from your organization or entity can be a peer reviewer in a competition in which you or your organization/entity has submitted an application.

# Application Checklist

## Edward Byrne Memorial Justice Assistance Grant (JAG) Program:

## FY 2017 Local Solicitation

This application checklist has been created as an aid in developing an application.

**What an Applicant Should Do:**

*Prior to Registering in GMS:*
\_\_\_\_\_ Acquire a DUNS Number                                                    (see page 27)
\_\_\_\_\_ Acquire or renew registration with SAM                          (see page 27)
*To Register with GMS*:
\_\_\_\_\_ For new users, acquire a GMS username and password*     (see page 27)
\_\_\_\_\_ For existing users, check GMS username and password* to ensure account access
                                                                                              (see page 27)
\_\_\_\_\_ Verify SAM registration in GMS                                      (see page 27)
\_\_\_\_\_ Search for correct funding opportunity in GMS              (see page 27)
\_\_\_\_\_ Select correct funding opportunity in GMS                    (see page 27)
\_\_\_\_\_ Register by selecting the "Apply Online" button associated with the funding opportunity
 title                                                                                        (see page 27)
\_\_\_\_\_ Read OJP policy and guidance on conference approval, planning, and reporting
available at ojp.gov/financialguide/DOJ/PostawardRequirements/chapter3.10a.htm
                                                                                              (see page 14)
\_\_\_\_\_ If experiencing technical difficulties in GMS, contact the NCJRS Response Center
                                                                                              (see page 2)

*Password Reset Notice – GMS users are reminded that while password reset capabilities exist,
this function is only associated with points of contact designated within GMS at the time the
account was established. Neither OJP nor the GMS Help Desk will initiate a password reset
unless requested by the authorized official or a designated point of contact associated with an
award or application.

**Overview of Post-Award Legal Requirements:**

\_\_\_\_\_ Review the "Overview of Legal Requirements Generally Applicable to OJP Grants and
Cooperative Agreements - FY 2017 Awards" in the OJP Funding Resource Center.

**Scope Requirement:**

\_\_\_\_\_ The federal amount requested is within the allowable limit(s) of the FY 2017 JAG
Allocations List as listed on BJA's JAG web page.

## What an Application Should Include:

_____ Application for Federal Assistance (SF-424)          (see page 16)
_____ Project Abstract          (see page 16)
_____ Program Narrative          (see page 17)
_____ Budget Detail Worksheet          (see page 18)
_____ Budget Narrative          (see page 18)
_____ Indirect Cost Rate Agreement (if applicable)          (see page 21)
_____ Tribal Authorizing Resolution (if applicable)          (see page 21)
_____ Financial Management and System of Internal Controls Questionnaire          (see page 22)
_____ Disclosure of Lobbying Activities (SF-LLL) (if applicable)          (see page 22)
_____ Certifications and Assurances by Chief Executive          (see page 22)
_____ Certification of Compliance with 8 U.S.C. § 1373 by Chief Legal Officer (Note: this requirement does not apply to Indian tribal governments.)          (see page 23)
_____ OJP Certified Standard Assurances          (see page 40)
_____ Additional Attachments
_____ Applicant Disclosure of Pending Applications          (see page 23)
_____ Research and Evaluation Independence and Integrity (if applicable)
         (see page 24)

34

# Appendix I

## Certifications and Assurances by the Chief Executive of the Applicant Government

## Template for use by *chief executive* of the "Unit of local government" (e.g., the mayor)

**Note**: By law, for purposes of the JAG Program, the term "unit of local government " includes a town, township, village, parish, city, county, borough, or other general purpose political subdivision of a state; or, it may also be a federally recognized Indian tribal government that performs law enforcement functions (as determined by the Secretary of the Interior). A unit of local government may be any law enforcement district or judicial enforcement district established under applicable State law with authority to independently establish a budget and impose taxes; for example, in Louisiana, a unit of local government means a district attorney or parish sheriff.

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

**Edward Byrne Justice Assistance Grant Program**
**FY 2017 Local Solicitation**

**Certifications and Assurances**
**by the Chief Executive of the Applicant Government**

On behalf of the applicant unit of local government named below, in support of that locality's application for an award under the FY 2017 Edward Byrne Justice Assistance Grant ("JAG") Program, and further to 42 U.S.C. § 3752(a), I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

1. I am the chief executive of the applicant unit of local government named below, and I have the authority to make the following representations on my own behalf and on behalf of the applicant unit of local government. I understand that these representations will be relied upon as material in any OJP decision to make an award, under the application described above, to the applicant unit of local government.

2. I certify that no federal funds made available by the award (if any) that OJP makes based on the application described above will be used to supplant local funds, but will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

3. I assure that the application described above (and any amendment to that application) was submitted for review to the governing body of the unit of local government (e.g., city council or county commission), or to an organization designated by that governing body, not less than 30 days before the date of this certification.

4. I assure that, before the date of this certification— (a) the application described above (and any amendment to that application) was made public; and (b) an opportunity to comment on that application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure made such an opportunity available.

5. I assure that, for each fiscal year of the award (if any) that OJP makes based on the application described above, the applicant unit of local government will maintain and report such data, records, and information (programmatic and financial), as OJP may reasonably require.

6. I certify that— (a) the programs to be funded by the award (if any) that OJP makes based on the application described above meet all the requirements of the JAG Program statute (42 U.S.C. §§ 3750-3758); (b) all the information contained in that application is correct; (c) in connection with that application, there has been appropriate coordination with affected agencies; and (d) in connection with that award (if any), the applicant unit of local government will comply with all provisions of the JAG Program statute and all other applicable federal laws.

7. I have examined certification entitled "State or Local Government: FY 2017 Certification of Compliance with 8 U.S.C. § 1373" executed by the chief legal officer of the applicant government with respect to the FY 2017 JAG program and submitted in support of the application described above, and I hereby adopt that certification as my own on behalf of that government.

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it "supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 42 U.S.C. § 3795a), and also may subject me and the applicant unit of local government to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____

Signature of Chief Executive of the Applicant Unit of
Local Government

_____

Date of Certification

_____

Printed Name of Chief Executive

_____

Title of Chief Executive

_____

Name of Applicant Unit of Local Government

36

# Appendix II

## State or Local Government:
## Certification of Compliance with 8 U.S.C. § 1373

**Template for use by the *chief legal officer* of the "Local Government" (e.g., the General Counsel)** (Note: this Certification is not required by Indian tribal government applicants.)

**Available for download at:**
https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

### State or Local Government: FY 2017 Certification of Compliance with 8 U.S.C. § 1373

On behalf of the applicant government entity named below, and in support of its application, I certify under penalty of perjury to the Office of Justice Programs ("OJP"), U.S. Department of Justice ("USDOJ"), that all of the following are true and correct:

(1) I am the chief legal officer of the State or local government of which the applicant entity named below is a part ("the jurisdiction"), and I have the authority to make this certification on behalf of the jurisdiction and the applicant entity (that is, the entity applying directly to OJP). I understand that OJP will rely upon this certification as a material representation in any decision to make an award to the applicant entity.

(2) I have carefully reviewed 8 U.S.C. § 1373(a) and (b), including the prohibitions on certain actions by State and local government entities, -agencies, and -officials regarding information on citizenship and immigration status. I also have reviewed the provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition … and Transfer of Functions"), pursuant to which references to the "Immigration and Naturalization Service" in 8 U.S.C. § 1373 are to be read, as a legal matter, as references to particular components of the U.S. Department of Homeland Security.

(3) I (and also the applicant entity) understand that the U.S. Department of Justice will require States and local governments (and agencies or other entities thereof) to comply with 8 U.S.C. § 1373, with respect to any "program or activity" funded in whole or in part with the federal financial assistance provided through the FY 2017 OJP program under which this certification is being submitted ("the FY 2017 OJP Program" identified below), specifically including any such "program or activity" of a governmental entity or -agency that is a subrecipient (at any tier) of funds under the FY 2017 OJP Program.

(4) I (and also the applicant entity) understand that, for purposes of this certification, "program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. § 2000d-4a), and that terms used in this certification that are defined in 8 U.S.C. § 1101 mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 42 U.S.C. § 901(a)(2)). Also, I understand that, for purposes of this certification, neither a "public" institution of higher education (i.e., one that is owned, controlled, or directly funded by a State or local government) nor an Indian tribe is considered a State or local government entity or -agency.

(5) I have conducted (or caused to be conducted for me) a diligent inquiry and review concerning both—

    (a) the "program or activity" to be funded (in whole or in part) with the federal financial assistance sought by the applicant entity under this FY 2017 OJP Program; and

    (b) any prohibitions or restrictions potentially applicable to the "program or activity" sought to be funded under the FY 2017 OJP Program that deal with sending to, requesting or receiving from, maintaining, or exchanging information of the types described in 8 U.S.C. § 1373(a) or (b), whether imposed by a State or local government entity, -agency, or -official.

(6) As of the date of this certification, neither the jurisdiction nor any entity, agency, or official of the jurisdiction has in effect, purports to have in effect, or is subject to or bound by, any prohibition or any restriction that would apply to the "program or activity" to be funded in whole or in part under the FY 2017 OJP Program (which, for the specific purpose of this paragraph 6, shall not be understood to include any such "program or activity" of any subrecipient at any tier), and that deals with either— (1) a government entity or -official sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. § 1373(a); or (2) a government entity or -agency sending to, requesting or receiving from, maintaining, or exchanging information of the types (and with respect to the entities) described in 8 U.S.C. § 1373(b).

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 42 U.S.C. § 3795a), and also may subject me and the applicant entity to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and §§ 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by USDOJ, including by OJP and by the USDOJ Office of the Inspector General.

_____    _____

Signature of Chief Legal Officer of the Jurisdiction    Printed Name of Chief Legal Officer

_____    _____

Date of Certification    Title of Chief Legal Officer of the Jurisdiction

_____

Name of Applicant Government Entity (i.e., the applicant to the FY 2017 OJP Program identified below)

*FY 2017 OJP Program:* **Byrne Justice Assistance Grant ("JAG") Program**

# Appendix III

## 8 U.S.C. § 1373 (as in effect on June 21, 2017)

### Communication between government agencies and the Immigration and Naturalization Service

#### (a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

#### (b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

(1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
(2) Maintaining such information.
(3) Exchanging such information with any other Federal, State, or local government entity.

#### (c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.


*See also* provisions set out at (or referenced in) 8 U.S.C. § 1551 note ("Abolition … and Transfer of Functions")

# Appendix IV

## OJP Certified Standard Assurances

OMB No. 1121-0140
Expires 5/31/2019

**U.S. DEPARTMENT OF JUSTICE**
**OFFICE OF JUSTICE PROGRAMS**

### CERTIFIED STANDARD ASSURANCES

On behalf of the Applicant, and in support of this application for a grant or cooperative agreement, I certify under penalty of perjury to the Office of Justice Programs (OJP), U.S. Department of Justice ("Department"), that all of the following are true and correct:

(1) I have the authority to make the following representations on behalf of myself and the Applicant. I understand that these representations will be relied upon as material in any OJP decision to make an award to the Applicant based on its application.

(2) I certify that the Applicant has the legal authority to apply for the federal assistance sought by the application, and that it has the institutional, managerial, and financial capability (including funds sufficient to pay any required non-federal share of project costs) to plan, manage, and complete the project described in the application properly.

(3) I assure that, throughout the period of performance for the award (if any) made by OJP based on the application—

(a) the Applicant will comply with all award requirements and all federal statutes and regulations applicable to the award;

(b) the Applicant will require all subrecipients to comply with all applicable award requirements and all applicable federal statutes and regulations; and

(c) the Applicant will maintain safeguards to address and prevent any organizational conflict of interest, and also to prohibit employees from using their positions in any manner that poses, or appears to pose, a personal or financial conflict of interest.

(4) The Applicant understands that the federal statutes and regulations applicable to the award (if any) made by OJP based on the application specifically include statutes and regulations pertaining to civil rights and nondiscrimination, and, in addition—

(a) the Applicant understands that the applicable statutes pertaining to civil rights will include section 601 of the Civil Rights Act of 1964 (42 U.S.C. § 2000d); section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); section 901 of the Education Amendments of 1972 (20 U.S.C. § 1681); and section 303 of the Age Discrimination Act of 1975 (42 U.S.C. § 6102);

(b) the Applicant understands that the applicable statutes pertaining to nondiscrimination may include section 815(c) of Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. § 3789d(c)); section 1407(e) of the Victims of Crime Act of 1984 (42 U.S.C. § 10604(e)); section 299A(b) of the Juvenile Justice and Delinquency Prevention Act of 2002 (42 U.S.C. § 5672(b)); and that the grant condition set out at section 40002(b)(13) of the Violence Against Women Act (42 U.S.C. § 13925(b)(13)) also may apply;

(c) the Applicant understands that it must require any subrecipient to comply with all such applicable statutes (and associated regulations); and

(d) on behalf of the Applicant, I make the specific assurances set out in 28 C.F.R. §§ 42.105 and 42.204.

(5) The Applicant also understands that (in addition to any applicable program-specific regulations and to applicable federal regulations that pertain to civil rights and nondiscrimination) the federal regulations applicable to the award (if any) made by OJP based on the application may include, but are not limited to, 2 C.F.R. Part 2800 (the DOJ "Part 200 Uniform Requirements") and 28 C.F.R. Parts 22 (confidentiality - research and statistical information), 23 (criminal intelligence systems), and 46 (human subjects protection).

(6) I assure that the Applicant will assist OJP as necessary (and will require subrecipients and contractors to assist as necessary) with the Department's compliance with section 106 of the National Historic Preservation Act of 1966 (54 U.S.C. § 306108), the Archeological and Historical Preservation Act of 1974 (54 U.S.C. §§ 312501-312508), and the National Environmental Policy Act of 1969 (42 U.S.C. §§ 4321-4335), and 28 C.F.R. Parts 61 (NEPA) and 63 (floodplains and wetlands).

(7) I assure that the Applicant will give the Department and the Government Accountability Office, through any authorized representative, access to, and opportunity to examine, all paper or electronic records related to the award (if any) made by OJP based on the application.

(8) I assure that, if the Applicant is a governmental entity, with respect to the award (if any) made by OJP based on the application—

(a) it will comply with the requirements of the Uniform Relocation Assistance and Real Property Acquisitions Act of 1970 (42 U.S.C. §§ 4601-4655), which govern the treatment of persons displaced as a result of federal and federally-assisted programs; and

(b) it will comply with requirements of 5 U.S.C. §§ 1501-1508 and 7324-7328, which limit certain political activities of State or local government employees whose principal employment is in connection with an activity financed in whole or in part by federal assistance.

I acknowledge that a materially false, fictitious, or fraudulent statement (or concealment or omission of a material fact) in this certification, or in the application that it supports, may be the subject of criminal prosecution (including under 18 U.S.C. §§ 1001 and/or 1621, and/or 42 U.S.C. § 3795a), and also may subject me and the Applicant to civil penalties and administrative remedies for false claims or otherwise (including under 31 U.S.C. §§ 3729-3730 and 3801-3812). I also acknowledge that OJP awards, including certifications provided in connection with such awards, are subject to review by the Department, including by OJP and by the Department's Office of the Inspector General.

# EXHIBIT G

| | | | |
|---|---|---|---|
| U.S. Department of Justice<br>Office of Justice Programs<br>**Bureau of Justice Assistance** | **Grant** | | PAGE 1 OF 20 |

| | |
|---|---|
| 1. RECIPIENT NAME AND ADDRESS (Including Zip Code) | 4. AWARD NUMBER: |
| | 5. PROJECT PERIOD: FROM  10/01/2016  TO  09/30/2020 |
| |     BUDGET PERIOD: FROM  10/01/2016  TO  09/30/2020 |
| | 6. AWARD DATE            7. ACTION |
| 2a. GRANTEE IRS/VENDOR NO. | 8. SUPPLEMENT NUMBER       Initial |
| |    00 |
| 2b. GRANTEE DUNS NO. | 9. PREVIOUS AWARD AMOUNT        $ 0 |
| 3. PROJECT TITLE | 10. AMOUNT OF THIS AWARD |
| | 11. TOTAL AWARD |

| |
|---|
| 12. SPECIAL CONDITIONS |
|    THE ABOVE GRANT PROJECT IS APPROVED SUBJECT TO SUCH CONDITIONS OR LIMITATIONS AS ARE SET FORTH<br>   ON THE ATTACHED PAGE(S). |

| |
|---|
| 13. STATUTORY AUTHORITY FOR GRANT |
|    This project is supported under FY17(BJA - JAG State and JAG Local) Title I of Pub. L. No. 90-351 (generally codified at 42 U.S.C. 3711 - 3797ff-5),<br>   including subpart 1 of part E (codified at 42 U.S.C. 3750 - 3758); see also 28 U.S.C. 530C(a). |

| |
|---|
| 14 . CATALOG OF DOMESTIC FEDERAL ASSISTANCE (CFDA Number) |
|    16.738 - Edward Byrne Memorial Justice Assistance Grant Program |

| |
|---|
| 15. METHOD OF PAYMENT |
|    GPRS |

| AGENCY APPROVAL | GRANTEE ACCEPTANCE |
|---|---|
| 16. TYPED NAME AND TITLE OF APPROVING OFFICIAL | 18. TYPED NAME AND TITLE OF AUTHORIZED GRANTEE OFFICIAL |
|   Alan R. Hanson<br><br>  Acting Assistant Attorney General | |
| 17. SIGNATURE OF APPROVING OFFICIAL | 19. SIGNATURE OF AUTHORIZED RECIPIENT OFFICIAL | 19A. DATE |
| *Alan R. Hanson* | | |

| AGENCY USE ONLY |
|---|

| 20. ACCOUNTING CLASSIFICATION CODES | 21. SDJUGT0339 |
|---|---|

| FISCAL<br>YEAR | FUND<br>CODE | BUD.<br>ACT. | DIV.<br>OFC. | REG. | SUB. | POMS | AMOUNT |
|---|---|---|---|---|---|---|---|
| X | B | DJ | 80 | 00 | 00 | | |

OJP FORM 4000/2 (REV. 5-87) PREVIOUS EDITIONS ARE OBSOLETE.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE  2  OF  20

PROJECT NUMBER | AWARD DATE

*SPECIAL CONDITIONS*

1.  Requirements of the award; remedies for non-compliance or for materially false statements

    The conditions of this award are material requirements of the award.  Compliance with any certifications or assurances
    submitted by or on behalf of the recipient that relate to conduct during the period of performance also is a material
    requirement of this award.

    Failure to comply with any one or more of these award requirements -- whether a condition set out in full below, a
    condition incorporated by reference below, or a certification or assurance related to conduct during the award period --
    may result in the Office of Justice Programs ("OJP") taking appropriate action with respect to the recipient and the
    award.  Among other things, the OJP may withhold award funds, disallow costs, or suspend or terminate the award.
    The Department of Justice ("DOJ"), including OJP, also may take other legal action as appropriate.

    Any materially false, fictitious, or fraudulent statement to the federal government related to this award (or concealment
    or omission of a material fact) may be the subject of criminal prosecution (including under 18 U.S.C. 1001 and/or 1621,
    and/or 42 U.S.C. 3795a), and also may lead to imposition of civil penalties and administrative remedies for false claims
    or otherwise (including under 31 U.S.C. 3729-3730 and 3801-3812).

    Should any provision of a requirement of this award be held to be invalid or unenforceable by its terms, that provision
    shall first be applied with a limited construction so as to give it the maximum effect permitted by law.  Should it be
    held, instead, that the provision is utterly invalid or -unenforceable, such provision shall be deemed severable from this
    award.

2.  Applicability of Part 200 Uniform Requirements

    The Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted
    and supplemented by DOJ in 2 C.F.R. Part 2800 (together, the "Part 200 Uniform Requirements") apply to this FY
    2017 award from OJP.

    The Part 200 Uniform Requirements were first adopted by DOJ on December 26, 2014.  If this FY 2017 award
    supplements funds previously awarded by OJP under the same award number (e.g., funds awarded during or before
    December 2014), the Part 200 Uniform Requirements apply with respect to all funds under that award number
    (regardless of the award date, and regardless of whether derived from the initial award or a supplemental award) that
    are obligated on or after the acceptance date of this FY 2017 award.

    For more information and resources on the Part 200 Uniform Requirements as they relate to OJP awards and subawards
    ("subgrants"), see the OJP website at https://ojp.gov/funding/Part200UniformRequirements.htm.

    In the event that an award-related question arises from documents or other materials prepared or distributed by OJP
    that may appear to conflict with, or differ in some way from, the provisions of the Part 200 Uniform Requirements, the
    recipient is to contact OJP promptly for clarification.

3.  Compliance with DOJ Grants Financial Guide

    The recipient agrees to comply with the DOJ Grants Financial Guide as posted on the OJP website (currently, the "2015
    DOJ Grants Financial Guide" available at https://ojp.gov/financialguide/DOJ/index htm), including any updated version
    that may be posted during the period of performance.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE 3 OF 20

PROJECT NUMBER

AWARD DATE

*SPECIAL CONDITIONS*

4.  Required training for Point of Contact and all Financial Points of Contact

Both the Point of Contact (POC) and all Financial Points of Contact (FPOCs) for this award must have successfully completed an "OJP financial management and grant administration training" by 120 days after the date of the recipient's acceptance of the award.  Successful completion of such a training on or after January 1, 2015, will satisfy this condition.

In the event that either the POC or an FPOC for this award changes during the period of performance, the new POC or FPOC must have successfully completed an "OJP financial management and grant administration training" by 120 calendar days after-- (1) the date of OJP's approval of the "Change Grantee Contact" GAN (in the case of a new POC), or (2) the date the POC enters information on the new FPOC in GMS (in the case of a new FPOC).  Successful completion of such a training on or after January 1, 2015, will satisfy this condition.

A list of OJP trainings that OJP will consider "OJP financial management and grant administration training" for purposes of this condition is available at https://www.ojp.gov/training/fmts.htm.  All trainings that satisfy this condition include a session on grant fraud prevention and detection.

The recipient should anticipate that OJP will immediately withhold ("freeze") award funds if the recipient fails to comply with this condition.  The recipient's failure to comply also may lead OJP to impose additional appropriate conditions on this award.

5.  Requirements related to "de minimis" indirect cost rate

A recipient that is eligible under the Part 200 Uniform Requirements and other applicable law to use the "de minimis" indirect cost rate described in 2 C.F.R. 200.414(f), and that elects to use the "de minimis" indirect cost rate, must advise OJP in writing of both its eligibility and its election, and must comply with all associated requirements in the Part 200 Uniform Requirements.  The "de minimis" rate may be applied only to modified total direct costs (MTDC) as defined by the Part 200 Uniform Requirements.

6.  Requirement to report potentially duplicative funding

If the recipient currently has other active awards of federal funds, or if the recipient receives any other award of federal funds during the period of performance for this award, the recipient promptly must determine whether funds from any of those other federal awards have been, are being, or are to be used (in whole or in part) for one or more of the identical cost items for which funds are provided under this award.  If so, the recipient must promptly notify the DOJ awarding agency (OJP or OVW, as appropriate) in writing of the potential duplication, and, if so requested by the DOJ awarding agency, must seek a budget-modification or change-of-project-scope grant adjustment notice (GAN) to eliminate any inappropriate duplication of funding.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**
**Grant**

PAGE 4 OF 20

| PROJECT NUMBER | | AWARD DATE | |
|---|---|---|---|

*SPECIAL CONDITIONS*

7.  Requirements related to System for Award Management and Universal Identifier Requirements

    The recipient must comply with applicable requirements regarding the System for Award Management (SAM), currently accessible at https://www.sam.gov/. This includes applicable requirements regarding registration with SAM, as well as maintaining the currency of information in SAM.

    The recipient also must comply with applicable restrictions on subawards ("subgrants") to first-tier subrecipients (first-tier "subgrantees"), including restrictions on subawards to entities that do not acquire and provide (to the recipient) the unique entity identifier required for SAM registration.

    The details of the recipient's obligations related to SAM and to unique entity identifiers are posted on the OJP web site at https://ojp.gov/funding/Explore/SAM.htm (Award condition: System for Award Management (SAM) and Universal Identifier Requirements), and are incorporated by reference here.

    This condition does not apply to an award to an individual who received the award as a natural person (i.e., unrelated to any business or non-profit organization that he or she may own or operate in his or her name).

8.  All subawards ("subgrants") must have specific federal authorization

    The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements for authorization of any subaward. This condition applies to agreements that -- for purposes of federal grants administrative requirements -- OJP considers a "subaward" (and therefore does not consider a procurement "contract").

    The details of the requirement for authorization of any subaward are posted on the OJP web site at https://ojp.gov/funding/Explore/SubawardAuthorization.htm (Award condition: All subawards ("subgrants") must have specific federal authorization), and are incorporated by reference here.

9.  Specific post-award approval required to use a noncompetitive approach in any procurement contract that would exceed $150,000

    The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements to obtain specific advance approval to use a noncompetitive approach in any procurement contract that would exceed the Simplified Acquisition Threshold (currently, $150,000). This condition applies to agreements that -- for purposes of federal grants administrative requirements -- OJP considers a procurement "contract" (and therefore does not consider a subaward).

    The details of the requirement for advance approval to use a noncompetitive approach in a procurement contract under an OJP award are posted on the OJP web site at https://ojp.gov/funding/Explore/NoncompetitiveProcurement.htm (Award condition: Specific post-award approval required to use a noncompetitive approach in a procurement contract (if contract would exceed $150,000)), and are incorporated by reference here.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE 5 OF 20

PROJECT NUMBER

AWARD DATE

*SPECIAL CONDITIONS*

10. Requirements pertaining to prohibited conduct related to trafficking in persons (including reporting requirements and OJP authority to terminate award)

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements (including requirements to report allegations) pertaining to prohibited conduct related to the trafficking of persons, whether on the part of recipients, subrecipients ("subgrantees"), or individuals defined (for purposes of this condition) as "employees" of the recipient or of any subrecipient.

The details of the recipient's obligations related to prohibited conduct related to trafficking in persons are posted on the OJP web site at https://ojp.gov/funding/Explore/ProhibitedConduct-Trafficking.htm (Award condition: Prohibited conduct by recipients and subrecipients related to trafficking in persons (including reporting requirements and OJP authority to terminate award)), and are incorporated by reference here.

11. Compliance with applicable rules regarding approval, planning, and reporting of conferences, meetings, trainings, and other events

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable laws, regulations, policies, and official DOJ guidance (including specific cost limits, prior approval and reporting requirements, where applicable) governing the use of federal funds for expenses related to conferences (as that term is defined by DOJ), including the provision of food and/or beverages at such conferences, and costs of attendance at such conferences.

Information on the pertinent DOJ definition of conferences and the rules applicable to this award appears in the DOJ Grants Financial Guide (currently, as section 3.10 of "Postaward Requirements" in the "2015 DOJ Grants Financial Guide").

12. Requirement for data on performance and effectiveness under the award

The recipient must collect and maintain data that measure the performance and effectiveness of work under this award. The data must be provided to OJP in the manner (including within the timeframes) specified by OJP in the program solicitation or other applicable written guidance. Data collection supports compliance with the Government Performance and Results Act (GPRA) and the GPRA Modernization Act of 2010, and other applicable laws.

13. OJP Training Guiding Principles

Any training or training materials that the recipient -- or any subrecipient ("subgrantee") at any tier -- develops or delivers with OJP award funds must adhere to the OJP Training Guiding Principles for Grantees and Subgrantees, available at https://ojp.gov/funding/ojptrainingguidingprinciples.htm.

14. Effect of failure to address audit issues

The recipient understands and agrees that the DOJ awarding agency (OJP or OVW, as appropriate) may withhold award funds, or may impose other related requirements, if (as determined by the DOJ awarding agency) the recipient does not satisfactorily and promptly address outstanding issues from audits required by the Part 200 Uniform Requirements (or by the terms of this award), or other outstanding issues that arise in connection with audits, investigations, or reviews of DOJ awards.

15. Potential imposition of additional requirements

The recipient agrees to comply with any additional requirements that may be imposed by the DOJ awarding agency (OJP or OVW, as appropriate) during the period of performance for this award, if the recipient is designated as "high-risk" for purposes of the DOJ high-risk grantee list.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE 6 OF 20

| PROJECT NUMBER | | AWARD DATE | |
|---|---|---|---|

*SPECIAL CONDITIONS*

16. Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 42

   The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 42, specifically including any applicable requirements in Subpart E of 28 C.F.R. Part 42 that relate to an equal employment opportunity program.

17. Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 54

   The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 54, which relates to nondiscrimination on the basis of sex in certain "education programs."

18. Compliance with DOJ regulations pertaining to civil rights and nondiscrimination - 28 C.F.R. Part 38

   The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable requirements of 28 C.F.R. Part 38, specifically including any applicable requirements regarding written notice to program beneficiaries and prospective program beneficiaries.  Part 38 of 28 C.F.R., a DOJ regulation, was amended effective May 4, 2016.

   Among other things, 28 C.F.R. Part 38 includes rules that prohibit specific forms of discrimination on the basis of religion, a religious belief, a refusal to hold a religious belief, or refusal to attend or participate in a religious practice. Part 38 also sets out rules and requirements that pertain to recipient and subrecipient ("subgrantee") organizations that engage in or conduct explicitly religious activities, as well as rules and requirements that pertain to recipients and subrecipients that are faith-based or religious organizations.

   The text of the regulation, now entitled "Partnerships with Faith-Based and Other Neighborhood Organizations," is available via the Electronic Code of Federal Regulations (currently accessible at https://www.ecfr.gov/cgi-bin/ECFR?page=browse), by browsing to Title 28-Judicial Administration, Chapter 1, Part 38, under e-CFR "current" data.

19. Restrictions on "lobbying"

   In general, as a matter of federal law, federal funds awarded by OJP may not be used by the recipient, or any subrecipient ("subgrantee") at any tier, either directly or indirectly, to support or oppose the enactment, repeal, modification, or adoption of any law, regulation, or policy, at any level of government.  See 18 U.S.C. 1913.  (There may be exceptions if an applicable federal statute specifically authorizes certain activities that otherwise would be barred by law.)

   Another federal law generally prohibits federal funds awarded by OJP from being used by the recipient, or any subrecipient at any tier, to pay any person to influence (or attempt to influence) a federal agency, a Member of Congress, or Congress (or an official or employee of any of them) with respect to the awarding of a federal grant or cooperative agreement, subgrant, contract, subcontract, or loan, or with respect to actions such as renewing, extending, or modifying any such award.  See 31 U.S.C. 1352.  Certain exceptions to this law apply, including an exception that applies to Indian tribes and tribal organizations.

   Should any question arise as to whether a particular use of federal funds by a recipient (or subrecipient) would or might fall within the scope of these prohibitions, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE 7 OF 20

PROJECT NUMBER

AWARD DATE

*SPECIAL CONDITIONS*

20. Compliance with general appropriations-law restrictions on the use of federal funds (FY 2017)

The recipient, and any subrecipient ("subgrantee") at any tier, must comply with all applicable restrictions on the use of federal funds set out in federal appropriations statutes. Pertinent restrictions, including from various "general provisions" in the Consolidated Appropriations Act, 2017, are set out at https://ojp.gov/funding/Explore/FY17AppropriationsRestrictions htm, and are incorporated by reference here.

Should a question arise as to whether a particular use of federal funds by a recipient (or a subrecipient) would or might fall within the scope of an appropriations-law restriction, the recipient is to contact OJP for guidance, and may not proceed without the express prior written approval of OJP.

21. Reporting potential fraud, waste, and abuse, and similar misconduct

The recipient, and any subrecipients ("subgrantees") at any tier, must promptly refer to the DOJ Office of the Inspector General (OIG) any credible evidence that a principal, employee, agent, subrecipient, contractor, subcontractor, or other person has, in connection with funds under this award-- (1) submitted a claim that violates the False Claims Act; or (2) committed a criminal or civil violation of laws pertaining to fraud, conflict of interest, bribery, gratuity, or similar misconduct.

Potential fraud, waste, abuse, or misconduct involving or relating to funds under this award should be reported to the OIG by-- (1) mail directed to: Office of the Inspector General, U.S. Department of Justice, Investigations Division, 950 Pennsylvania Avenue, N.W. Room 4706, Washington, DC 20530; (2) e-mail to: oig hotline@usdoj.gov; and/or (3) the DOJ OIG hotline: (contact information in English and Spanish) at (800) 869-4499 (phone) or (202) 616-9881 (fax).

Additional information is available from the DOJ OIG website at https://www.usdoj.gov/oig.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE  8  OF  20

| PROJECT NUMBER | | AWARD DATE | |
|---|---|---|---|

*SPECIAL CONDITIONS*

22. Restrictions and certifications regarding non-disclosure agreements and related matters

No recipient or subrecipient ("subgrantee") under this award, or entity that receives a procurement contract or subcontract with any funds under this award, may require any employee or contractor to sign an internal confidentiality agreement or statement that prohibits or otherwise restricts, or purports to prohibit or restrict, the reporting (in accordance with law) of waste, fraud, or abuse to an investigative or law enforcement representative of a federal department or agency authorized to receive such information.

The foregoing is not intended, and shall not be understood by the agency making this award, to contravene requirements applicable to Standard Form 312 (which relates to classified information), Form 4414 (which relates to sensitive compartmented information), or any other form issued by a federal department or agency governing the nondisclosure of classified information.

1. In accepting this award, the recipient--

a. represents that it neither requires nor has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

b. certifies that, if it learns or is notified that it is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.

2. If the recipient does or is authorized under this award to make subawards ("subgrants"), procurement contracts, or both--

a. it represents that--

(1) it has determined that no other entity that the recipient's application proposes may or will receive award funds (whether through a subaward ("subgrant"), procurement contract, or subcontract under a procurement contract) either requires or has required internal confidentiality agreements or statements from employees or contractors that currently prohibit or otherwise currently restrict (or purport to prohibit or restrict) employees or contractors from reporting waste, fraud, or abuse as described above; and

(2) it has made appropriate inquiry, or otherwise has an adequate factual basis, to support this representation; and

b. it certifies that, if it learns or is notified that any subrecipient, contractor, or subcontractor entity that receives funds under this award is or has been requiring its employees or contractors to execute agreements or statements that prohibit or otherwise restrict (or purport to prohibit or restrict), reporting of waste, fraud, or abuse as described above, it will immediately stop any further obligations of award funds to or by that entity, will provide prompt written notification to the federal agency making this award, and will resume (or permit resumption of) such obligations only if expressly authorized to do so by that agency.

U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE 9 OF 20



PROJECT NUMBER

AWARD DATE

*SPECIAL CONDITIONS*

23. Compliance with 41 U.S.C. 4712 (including prohibitions on reprisal; notice to employees)

The recipient (and any subrecipient at any tier) must comply with, and is subject to, all applicable provisions of 41 U.S.C. 4712, including all applicable provisions that prohibit, under specified circumstances, discrimination against an employee as reprisal for the employee's disclosure of information related to gross mismanagement of a federal grant, a gross waste of federal funds, an abuse of authority relating to a federal grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a federal grant.

The recipient also must inform its employees, in writing (and in the predominant native language of the workforce), of employee rights and remedies under 41 U.S.C. 4712.

Should a question arise as to the applicability of the provisions of 41 U.S.C. 4712 to this award, the recipient is to contact the DOJ awarding agency (OJP or OVW, as appropriate) for guidance.

24. Encouragement of policies to ban text messaging while driving

Pursuant to Executive Order 13513, "Federal Leadership on Reducing Text Messaging While Driving," 74 Fed. Reg. 51225 (October 1, 2009), DOJ encourages recipients and subrecipients ("subgrantees") to adopt and enforce policies banning employees from text messaging while driving any vehicle during the course of performing work funded by this award, and to establish workplace safety policies and conduct education, awareness, and other outreach to decrease crashes caused by distracted drivers.

25. Cooperating with OJP Monitoring

The recipient agrees to cooperate with OJP monitoring of this award pursuant to OJP's guidelines, protocols, and procedures, and to cooperate with OJP (including the grant manager for this award and the Office of Chief Financial Officer (OCFO)) requests related to such monitoring, including requests related to desk reviews and/or site visits. The recipient agrees to provide to OJP all documentation necessary for OJP to complete its monitoring tasks, including documentation related to any subawards made under this award. Further, the recipient agrees to abide by reasonable deadlines set by OJP for providing the requested documents. Failure to cooperate with OJP's monitoring activities may result in actions that affect the recipient's DOJ awards, including, but not limited to: withholdings and/or other restrictions on the recipient's access to award funds; referral to the DOJ OIG for audit review; designation of the recipient as a DOJ High Risk grantee; or termination of an award(s).

26. FFATA reporting: Subawards and executive compensation

The recipient must comply with applicable requirements to report first-tier subawards ("subgrants") of $25,000 or more and, in certain circumstances, to report the names and total compensation of the five most highly compensated executives of the recipient and first-tier subrecipients (first-tier "subgrantees") of award funds. The details of recipient obligations, which derive from the Federal Funding Accountability and Transparency Act of 2006 (FFATA), are posted on the OJP web site at https://ojp.gov/funding/Explore/FFATA htm (Award condition: Reporting Subawards and Executive Compensation), and are incorporated by reference here.

This condition, including its reporting requirement, does not apply to-- (1) an award of less than $25,000, or (2) an award made to an individual who received the award as a natural person (i.e., unrelated to any business or non-profit organization that he or she may own or operate in his or her name).



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE 10 OF 20

PROJECT NUMBER

AWARD DATE

*SPECIAL CONDITIONS*

27.  Use of program income

Program income (as defined in the Part 200 Uniform Requirements) must be used in accordance with the provisions of the Part 200 Uniform Requirements.  Program income earnings and expenditures both must be reported on the quarterly Federal Financial Report, SF 425.

28.  Justice Information Sharing

In order to promote information sharing and enable interoperability among disparate systems across the justice and public safety community, the recipient (and any subrecipient at any tier)  must comply with DOJ's Global Justice Information Sharing Initiative (DOJ's Global) guidelines and recommendations for this particular award. The recipient shall conform to the Global Standards Package (GSP) and all constituent elements, where applicable, as described at: https://it.ojp.gov/gsp_grantcondition. The recipient shall document planned approaches to information sharing and describe compliance to the GSP and appropriate privacy policy that protects shared information, or provide detailed justification for why an alternative approach is recommended.

29.  Avoidance of duplication of networks

To avoid duplicating existing networks or IT systems in any initiatives funded by BJA for law enforcement information sharing systems which involve interstate connectivity between jurisdictions, such systems shall employ, to the extent possible, existing networks as the communication backbone to achieve interstate connectivity, unless the recipient can demonstrate to the satisfaction of BJA that this requirement would not be cost effective or would impair the functionality of an existing or proposed IT system.

30.  Compliance with 28 C.F.R. Part 23

With respect to any information technology system funded or supported by funds under this award, the recipient (and any subrecipient at any tier) must comply with 28 C.F.R. Part 23, Criminal Intelligence Systems Operating Policies, if OJP determines this regulation to be applicable. Should OJP determine 28 C.F.R. Part 23 to be applicable, OJP may, at its discretion, perform audits of the system, as per the regulation. Should any violation of 28 C.F.R. Part 23 occur, the recipient may be fined as per 42 U.S.C. 3789g(c)-(d).  The recipient may not satisfy such a fine with federal funds.

31.  Protection of human research subjects

The recipient (and any subrecipient at any tier) must comply with the requirements of 28 C.F.R. Part 46 and all OJP policies and procedures regarding the protection of human research subjects, including obtainment of Institutional Review Board approval, if appropriate, and subject informed consent.

32.  Confidentiality of data

The recipient (and any subrecipient at any tier) must comply with all confidentiality requirements of 42 U.S.C. 3789g and 28 C.F.R. Part 22 that are applicable to collection, use, and revelation of data or information. The recipient further agrees, as a condition of award approval, to submit a Privacy Certificate that is in accord with requirements of 28 C.F.R. Part 22 and, in particular, 28 C.F.R. 22.23.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET**

**Grant**

PAGE 11 OF 20

PROJECT NUMBER [          ]    AWARD DATE [          ]

*SPECIAL CONDITIONS*

33. Verification and updating of recipient contact information

The recipient must verify its Point of Contact(POC), Financial Point of Contact (FPOC), and Authorized Representative contact information in GMS, including telephone number and e-mail address. If any information is incorrect or has changed, a Grant Adjustment Notice (GAN) must be submitted via the Grants Management System (GMS) to document changes.

34. Law enforcement task forces - required training

Within 120 days of award acceptance, each current member of a law enforcement task force funded with award funds who is a task force commander, agency executive, task force officer, or other task force member of equivalent rank, must complete required online (internet-based) task force training. Additionally, all future task force members must complete this training once during the period of performance for this award, or once every four years if multiple OJP awards include this requirement.

The required training is available free of charge online through the BJA-funded Center for Task Force Integrity and Leadership (www.ctfli.org). The training addresses task force effectiveness, as well as other key issues including privacy and civil liberties/rights, task force performance measurement, personnel selection, and task force oversight and accountability. If award funds are used to support a task force, the recipient must compile and maintain a task force personnel roster, along with course completion certificates.

Additional information regarding the training is available through BJA's web site and the Center for Task Force Integrity and Leadership (www.ctfli.org).

35. Required attendance at BJA-sponsored events

The recipient (and its subrecipients at any tier) must participate in BJA-sponsored training events, technical assistance events, or conferences held by BJA or its designees, upon BJA's request.

36. Justification of consultant rate

Approval of this award does not indicate approval of any consultant rate in excess of $650 per day. A detailed justification must be submitted to and approved by the OJP program office prior to obligation or expenditure of such funds.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**

Grant

PAGE  12  OF  20

PROJECT NUMBER                    AWARD DATE

*SPECIAL CONDITIONS*

37.  Compliance with National Environmental Policy Act and related statutes

Upon request, the recipient (and any subrecipient at any tier) must assist BJA in complying with the National Environmental Policy Act (NEPA), the National Historic Preservation Act, and other related federal environmental impact analyses requirements in the use of these award funds, either directly by the recipient or by a subrecipient. Accordingly, the recipient agrees to first determine if any of the following activities will be funded by the grant, prior to obligating funds for any of these purposes. If it is determined that any of the following activities will be funded by the award, the recipient agrees to contact BJA.

The recipient understands that this condition applies to new activities as set out below, whether or not they are being specifically funded with these award funds. That is, as long as the activity is being conducted by the recipient, a subrecipient, or any third party, and the activity needs to be undertaken in order to use these award funds, this condition must first be met. The activities covered by this condition are:

a. New construction;

b. Minor renovation or remodeling of a property located in an environmentally or historically sensitive area, including properties located within a 100-year flood plain, a wetland, or habitat for endangered species, or a property listed on or eligible for listing on the National Register of Historic Places;

c. A renovation, lease, or any proposed use of a building or facility that will either (a) result in a change in its basic prior use or (b) significantly change its size;

d. Implementation of a new program involving the use of chemicals other than chemicals that are (a) purchased as an incidental component of a funded activity and (b) traditionally used, for example, in office, household, recreational, or education environments; and

e. Implementation of a program relating to clandestine methamphetamine laboratory operations, including the identification, seizure, or closure of clandestine methamphetamine laboratories.

The recipient understands and agrees that complying with NEPA may require the preparation of an Environmental Assessment and/or an Environmental Impact Statement, as directed by BJA. The recipient further understands and agrees to the requirements for implementation of a Mitigation Plan, as detailed at https://bja.gov/Funding/nepa html, for programs relating to methamphetamine laboratory operations.

Application of This Condition to Recipient's Existing Programs or Activities:  For any of the recipient's or its subrecipients' existing programs or activities that will be funded by these award funds, the recipient, upon specific request from BJA, agrees to cooperate with BJA in any preparation by BJA of a national or program environmental assessment of that funded program or activity.

38.  Establishment of trust fund

If award funds are being drawn down in advance, the recipient (or a subrecipient, with respect to a subaward) is required to establish a trust fund account. (The trust fund may or may not be an interest-bearing account.) The fund, including any interest, may not be used to pay debts or expenses incurred by other activities beyond the scope of the Edward Byrne Memorial Justice Assistance Grant Program (JAG). The recipient also agrees to obligate the award funds in the trust fund (including any interest earned) during the period of performance for the award and expend within 90 days thereafter. Any unobligated or unexpended funds, including interest earned, must be returned to OJP at the time of closeout.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE 13 OF 20

| PROJECT NUMBER | | AWARD DATE | |
|---|---|---|---|

*SPECIAL CONDITIONS*

39. Prohibition on use of award funds for match under BVP program

JAG funds may be used to purchase vests for an agency, but they may not be used as the 50% match for purposes of the DOJ Bulletproof Vest Partnership (BVP) program.

40. Certification of body armor "mandatory wear" policies

The recipient agrees to submit a signed certification that all law enforcement agencies receiving body armor purchased with funds from this award have a written "mandatory wear" policy in effect. The recipient must keep signed certifications on file for any subrecipients planning to utilize funds from this award for ballistic-resistant and stab-resistant body armor purchases. This policy must be in place for at least all uniformed officers before any funds from this award may be used by an agency for body armor. There are no requirements regarding the nature of the policy other than it be a mandatory wear policy for all uniformed officers while on duty.

41. Body armor - compliance with NIJ standards

Ballistic-resistant and stab-resistant body armor purchased with JAG award funds may be purchased at any threat level, make or model, from any distributor or manufacturer, as long as the body armor has been tested and found to comply with applicable National Institute of Justice ballistic or stab standards and is listed on the NIJ Compliant Body Armor Model List (https://nij.gov/). In addition, ballistic-resistant and stab-resistant body armor purchased must be American-made. The latest NIJ standard information can be found here: https://nij.gov/topics/technology/body-armor/pages/safety-initiative.aspx.

42. Required monitoring of subawards

The recipient must monitor subawards under this JAG award in accordance with all applicable statutes, regulations, award conditions, and the DOJ Grants Financial Guide, and must include the applicable conditions of this award in any subaward. Among other things, the recipient is responsible for oversight of subrecipient spending and monitoring of specific outcomes and benefits attributable to use of award funds by subrecipients. The recipient agrees to submit, upon request, documentation of its policies and procedures for monitoring of subawards under this award.

43. Reporting requirements

The recipient must submit quarterly Federal Financial Reports (SF-425) and semi-annual performance reports through OJP's GMS (https://grants.ojp.usdoj.gov). Consistent with the Department's responsibilities under the Government Performance and Results Act (GPRA) and the GPRA Modernization Act of 2010, the recipient must provide data that measure the results of its work. The recipient must submit quarterly performance metrics reports through BJA's Performance Measurement Tool (PMT) website (www.bjaperformancetools.org). For more detailed information on reporting and other JAG requirements, refer to the JAG reporting requirements webpage. Failure to submit required JAG reports by established deadlines may result in the freezing of grant funds and future High Risk designation.

44. Required data on law enforcement agency training

Any law enforcement agency receiving direct or sub-awarded funding from this JAG award must submit quarterly accountability metrics data related to training that officers have received on the use of force, racial and ethnic bias, de-escalation of conflict, and constructive engagement with the public.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE  14  OF  20

| PROJECT NUMBER | | AWARD DATE | |
|---|---|---|---|

*SPECIAL CONDITIONS*

45.  Prohibited Expenditures List

Award funds may not be used for items that are listed on the Prohibited Expenditure List at the time of purchase or acquisition, including as the list may be amended from time to time. The Prohibited Expenditure List may be accessed here: https://www.bja.gov/funding/JAGControlledPurchaseList.pdf

46.  Controlled expenditures - prior written approval required

Award funds may not be used for items that are listed on the Controlled Expenditure List at the time of purchase or acquisition, including as the list may be amended from time to time, without explicit written prior approval from BJA. The Controlled Expenditure List, and instructions on how to request approval for purchase or acquisitions are set out at https://www.bja.gov/funding/JAGControlledPurchaseList.pdf

47.  Controlled expenditures - incident reporting

If an agency uses award funds to purchase or acquire any item on the Controlled Expenditure List at the time of purchase or acquisition, including as the list may be amended from time to time, the agency must collect and retain (for at least 3 years) certain information about the use of-- (1) any federally-acquired Controlled Equipment in the agency's inventory, and (2) any other controlled equipment in the same category as the federally-acquired controlled equipment in the agency's inventory, regardless of source; and the agency must make that information available to BJA upon request. Details about what information must be collected and retained are set out at https://ojp.gov/docs/LE-Equipment-WG-Final-Report.pdf.

48.  Sale of items on Controlled Expenditure List

Notwithstanding the provision of the Part 200 Uniform Requirements set out at 2 C.F.R. 200.313, no equipment listed on the Controlled Expenditure List that is purchased with award funds may be transferred or sold to a third party, except as described below:

a.  Agencies may transfer or sell any controlled equipment, except riot helmets and riot shields, to a Law Enforcement Agency (LEA) after obtaining prior written approval from BJA. As a condition of that approval, the acquiring LEA will be required to submit information and certifications to BJA as if it were requesting approval to use award funds for the initial purchase of items on the Controlled Expenditure List.

b.  Agencies may not transfer or sell any riot helmets or riot shields purchased under this award.

c.  Agencies may not transfer or sell any Controlled Equipment purchased under this award to non-LEAs, with the exception of fixed wing aircraft, rotary wing aircraft, and command and control vehicles. Before any such transfer or sale is finalized, the agency must obtain prior written approval from BJA. All law enforcement-related and other sensitive or potentially dangerous components, and all law enforcement insignias and identifying markings must be removed prior to transfer or sale.

The recipient must notify BJA prior to the disposal of any items on the Controlled Expenditure List purchased with award funds, and must abide by any applicable laws (including regulations) in such disposal.

49.  Prohibited or controlled expenditures - Effect of failure to comply

Failure to comply with an award condition related to prohibited or controlled expenditures may result in denial of any further approvals of controlled expenditures under this or other federal awards.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PROJECT NUMBER

AWARD DATE

*SPECIAL CONDITIONS*

50. Controlled expenditures - Standards

Consistent with recommendation 2.1 of Executive Order 13688, a law enforcement agency that acquires controlled equipment with award funds must adopt robust and specific written policies and protocols governing General Policing Standards and Specific Controlled Equipment Standards. General Policing Standards includes policies on (a) Community Policing; (b) Constitutional Policing; and (c) Community Input and Impact Considerations. Specific Controlled Equipment Standards includes policies specifically related to (a) Appropriate Use of Controlled Equipment; (b) Supervision of Use; (c) Effectiveness Evaluation; (d) Auditing and Accountability; and (e) Transparency and Notice Considerations. Upon OJP's request, the recipient must provide a copy of the General Policing Standards and Specific Controlled Equipment Standards, and any related policies and protocols.

51. Authorization to obligate (federal) award funds to reimburse certain project costs incurred on or after October 1, 2016

The recipient may obligate (federal) award funds only after the recipient makes a valid acceptance of the award. As of the first day of the period of performance for the award (October 1, 2016), however, the recipient may choose to incur project costs using non-federal funds, but any such project costs are incurred at the recipient's risk until, at a minimum-- (1) the recipient makes a valid acceptance of the award, and (2) all applicable withholding conditions are removed by OJP (via a Grant Adjustment Notice). (A withholding condition is a condition in the award document that precludes the recipient from obligating, expending, or drawing down all or a portion of the award funds until the condition is removed.)

Except to the extent (if any) that an award condition expressly precludes reimbursement of project costs incurred "at-risk," if and when the recipient makes a valid acceptance of this award and OJP removes each applicable withholding condition through a Grant Adjustment Notice, the recipient is authorized to obligate (federal) award funds to reimburse itself for project costs incurred "at-risk" earlier during the period of performance (such as project costs incurred prior to award acceptance or prior to removal of an applicable withholding condition), provided that those project costs otherwise are allowable costs under the award.

Nothing in this condition shall be understood to authorize the recipient (or any subrecipient at any tier) to use award funds to "supplant" State or local funds in violation of the recipient's certification (executed by the chief executive of the State or local government) that federal funds will be used to increase the amounts of such funds that would, in the absence of federal funds, be made available for law enforcement activities.

52. "Certification of Compliance with 8 U.S.C. 1373" required for valid award acceptance by a unit of local government

In order validly to accept this award, the applicant local government must submit the required "Certification of Compliance with 8 U.S.C. 1373" (executed by the chief legal officer of the local government). Unless that executed certification either-- (1) is submitted to OJP together with the fully-executed award document, or (2) is uploaded in OJP's GMS no later than the day the signed award document is submitted to OJP, any submission by a unit of local government that purports to accept the award is invalid.

If an initial award-acceptance submission by the recipient is invalid, once the unit of local government does submit the necessary certification regarding 8 U.S.C. 1373, it may submit a fully-executed award document executed by the unit of local government on or after the date of that certification.

For purposes of this condition, "local government" does not include any Indian tribes.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE  16  OF  20

PROJECT NUMBER

AWARD DATE

*SPECIAL CONDITIONS*

53.   Ongoing compliance with 8 U.S.C. 1373 is required

1. With respect to the "program or activity" funded in whole or part under this award (including any such "program or activity" of any subrecipient at any tier), throughout the period of performance for the award, no State or local government entity, -agency, or -official may prohibit or in any way restrict-- (1) any government entity or -official from sending or receiving information regarding citizenship or immigration status as described in 8 U.S.C. 1373(a); or (2) a government entity or -agency from sending, requesting or receiving, maintaining, or exchanging information regarding immigration status as described in 8 U.S.C. 1373(b).  For purposes of this award, any prohibition (or restriction) that violates this condition is an "information-communication restriction."

2. Certifications from subrecipients.  The recipient may not make a subaward to a State or local government or a "public" institution of higher education, unless it first obtains a certification of compliance with 8 U.S.C. 1373, properly executed by the chief legal officer of the jurisdiction or institution that would receive the subaward, using the appropriate form available at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.  Similarly, the recipient must require that no subrecipient (at any tier) may make a further subaward to a State or local government or a "public" institution of higher education, unless it first obtains a certification of compliance with 8 U.S.C. 1373, properly executed by the chief legal officer of the jurisdiction or institution that would receive the further subaward, using the appropriate OJP form.

3. The recipient's monitoring responsibilities include monitoring of subrecipient compliance with the requirements of this condition.

4. Allowable costs.  Compliance with these requirements is an authorized and priority purpose of this award.  To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated (including for authorized reimbursements) for the reasonable, necessary, and allocable costs (if any) that the recipient, or any subrecipient at any tier that is a State or local government or a "public" institution of higher education, incurs to implement this condition.

5. Rules of Construction

A. For purposes of this condition:

(1) "State" and "local government" include any agency or other entity thereof, but not any institution of higher education or any Indian tribe.

(2) A "public" institution of higher education is one that is owned, controlled, or directly funded by a State or local government.

(3) "Program or activity" means what it means under title VI of the Civil Rights Act of 1964 (see 42 U.S.C. 2000d-4a).

(4) "Immigration status" means what it means for purposes of 8 U.S.C. 1373 (Illegal Immigration Reform and Immigrant Responsibility Act of 1996); and terms that are defined in 8 U.S.C. 1101 (Immigration and Nationality Act) mean what they mean under that section 1101, except that the term "State" also shall include American Samoa (cf. 42 U.S.C. 901(a)(2)).

(5) Pursuant to the provisions set out at (or referenced in) 8 U.S.C. 1551 note ("Abolition … and Transfer of Functions"), references to the "Immigration and Naturalization Service" in 8 U.S.C. 1373 are to be read as references to particular components of the Department of Homeland Security (DHS).

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, any "public" institution of higher education, or any other entity (or individual) to violate any federal law, including any applicable civil rights or nondiscrimination law.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE 17 OF 20

| PROJECT NUMBER | | AWARD DATE | |
|---|---|---|---|

*SPECIAL CONDITIONS*

IMPORTANT NOTE: Any questions about the meaning or scope of this condition should be directed to OJP, before award acceptance.

54. Authority to obligate award funds contingent on compliance with 8 U.S.C. 1373; unallowable costs; obligation to notify

1. If the recipient is a State or local government--

A. The recipient may not obligate award funds if, at the time of the obligation, the "program or activity" of the recipient (or of any subrecipient at any tier that is a either a State or unit of local government or a "public" institution of higher education) that is funded in whole or in part with award funds is subject to any "information-communication restriction."

B. In addition, with respect to any project costs it incurs "at risk," the recipient may not obligate award funds to reimburse itself if -- at the time it incurs such costs -- the "program or activity" of the recipient (or of any subrecipient at any tier that is a either a State or unit of local government or a "public" institution of higher education) that would be reimbursed in whole or in part with award funds was subject to any "information-communication restriction."

C. Any drawdown of award funds by the recipient shall be considered, for all purposes, to be a material representation by the recipient to OJP that, as of the date the recipient requests the drawdown, the recipient and all subrecipients (regardless of tier) are in compliance with 8 U.S.C. 1373.

D. The recipient must promptly notify OJP (in writing) if the recipient, from its requisite monitoring of compliance with award conditions or otherwise, has credible evidence that indicates that the funded "program or activity" of the recipient, or of any subrecipient at any tier that is either a State or a local government or a "public" institution of higher education, may be subject to any "information-communication restriction." In addition, any subaward (at any tier) to a subrecipient that is either a State or a local government or a "public" institution of higher education must require prompt notification to the entity that made the subaward, should the subrecipient such credible evidence regarding an "information-communication restriction."

2. Any subaward (at any tier) to a subrecipient that is either a State or a local government or a "public" institution of higher education must provide that the subrecipient may not obligate award funds if, at the time of the obligation, the "program or activity" of the subrecipient (or of any further such subrecipient at any tier) that is funded in whole or in part with award funds is subject to any "information-communication restriction."

3. Absent an express written determination by DOJ to the contrary, based upon a finding by DOJ of compelling circumstances (e.g., a small amount of award funds obligated by the recipient at the time of a subrecipient's minor and transitory non-compliance, which was unknown to the recipient despite diligent monitoring), any obligations of award funds that, under this condition, may not be made shall be unallowable costs for purposes of this award. In making any such determination, DOJ will give great weight to evidence submitted by the recipient that demonstrates diligent monitoring of subrecipient compliance with the requirements set out in the award condition entitled "Ongoing compliance with 8 U.S.C. 1373 is required."

4. Rules of Construction

A. For purposes of this condition "information-communication restriction" has the meaning set out in the award condition entitled "Ongoing compliance with 8 U.S.C. 1373 is required."

B. Both the "Rules of Construction" and the "Important Note" set out in the award condition entitled "Ongoing compliance with 8 U.S.C. 1373 is required" are incorporated by reference as though set forth here in full.



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION SHEET**

**Grant**

PAGE  18  OF  20

PROJECT NUMBER | AWARD DATE

*SPECIAL CONDITIONS*

55. Required State-level rules or practices related to aliens; allowable costs

The following provisions apply to the recipient of this award, if the recipient is a State government, and also apply to any State-government subrecipient at any tier (whether or not the recipient is a State government).

1. Requirements

With respect to the "program or activity" that is funded (in whole or in part) by this award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award--

A. A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given to access any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

B. A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and -- as early as practicable (see para. 4.B. of this condition) -- provide the requested notice to DHS.

2. Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with the requirements of this condition.

3. Allowable costs

Compliance with these requirements is an authorized and priority purpose of this award. To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated (including for authorized reimbursements) for the reasonable, necessary, and allocable costs (if any) of-- (1) developing and putting into place statutes, rules, regulations, policies, and practices to satisfy this condition, and (2) permitting access as described in para. 1.A. above, and (3) honoring any request from DHS that is encompassed by para. 1.B. above.

4. Rules of construction

A. For purposes of this condition--

(1) the term "alien" means what it means under section 101 of the Immigration and Nationality Act (see 8 U.S.C. 1101(a)(3)).

(2) the term "correctional facility" means what it means under the Title I of the Omnibus Crime Control and Safe Streets Act of 1968 (see 42 U.S.C. 3791(a)(7)).

B. Nothing in this condition shall be understood to authorize or require any recipient, any subrecipient at any tier, any State or local government, or any other entity or individual to maintain (or detain) any individual in custody beyond the date and time the individual would have been released in the absence of this condition.

Current DHS practice is ordinarily to request advance notice of scheduled release "as early as practicable (at least 48 hours, if possible)." (See DHS Form I-247A (3/17)). In the event that (e.g., in light of the date DHS made such request) the scheduled release date and time for an alien are such as not to permit the advance notice that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE 19 OF 20

| PROJECT NUMBER | | AWARD DATE | |
|---|---|---|---|

*SPECIAL CONDITIONS*

NOTE: Current DHS practice is to use one form (DHS Form I-247A (3/17)) for two distinct purposes -- to request advance notice of scheduled release, and to request that an individual be detained for up to 48 hours AFTER the scheduled release. This condition imposes NO requirements as to such DHS requests for detention.

C. Both the "Rules of Construction" and the "Important Note" set out in the award condition entitled "Ongoing compliance with 8 U.S.C. 1373 is required" are incorporated by reference as though set forth here in full.

56.  Required local-government-level rules or practices related to aliens; allowable costs

The following provisions apply to the recipient of this award, if the recipient is a unit of local government, and also apply to any local-government subrecipient of this award at any tier (whether or not the recipient itself is a unit of local government).

1.  Requirements

With respect to the "program or activity" that is funded (in whole or in part) by this award, as of the date the recipient accepts this award, and throughout the remainder of the period of performance for the award--

A.  A local ordinance, -rule, -regulation, -policy, or -practice (or an applicable State statute, -rule, -regulation, - policy, or -practice) must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given access a local-government (or local-government-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

B.  A local ordinance, -rule, -regulation, -policy, or -practice (or an applicable State statute, -rule, -regulation, - policy, or -practice) must be in place that is designed to ensure that, when a local-government (or local-government-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and -- as early as practicable (see "Rules of Construction" incorporated by para. 4.B. of this condition) -- provide the requested notice to DHS.

2.  Monitoring

The recipient's monitoring responsibilities include monitoring of subrecipient compliance with the requirements of this condition.

3.  Allowable costs

Compliance with these requirements is an authorized and priority purpose of this award.  To the extent that such costs are not reimbursed under any other federal program, award funds may be obligated (including for authorized reimbursements) for the reasonable, necessary, and allocable costs (if any) of-- (1) developing and putting into place statutes, ordinances, rules, regulations, policies, and practices to satisfy this condition, (2) permitting access as described in para. 1.A. above, and (3) honoring any request from DHS that is encompassed by para. 1.B. above.

4.  Rules of construction

A.  The "Rules of Construction" and the "Important Note" set out in the award condition entitled "Ongoing compliance with 8 U.S.C. 1373 is required" are incorporated by reference as though set forth here in full.

B.  The "Rules of Construction" set out in the award condition entitled "Required State-level rules or practices related to aliens; allowable costs" are incorporated by reference as though set forth here in full.

OJP FORM 4000/2 (REV. 4-88)



U.S. Department of Justice
Office of Justice Programs
**Bureau of Justice Assistance**

**AWARD CONTINUATION
SHEET
Grant**

PAGE  20  OF  20

| PROJECT NUMBER | | AWARD DATE | |
|---|---|---|---|

*SPECIAL CONDITIONS*

57.  Use of funds for DNA testing; upload of DNA profiles

If award funds are used for DNA testing of evidentiary materials, any resulting eligible DNA profiles must be uploaded to the Combined DNA Index System ("CODIS," the DNA database operated by the FBI) by a government DNA laboratory with access to CODIS.

No profiles generated under this award may be entered or uploaded into any non-governmental DNA database without prior express written approval from BJA.

Award funds may not be used for the purchase of DNA equipment and supplies unless the resulting DNA profiles may be accepted for entry into CODIS.

58.  Encouragement of submission of "success stories"

BJA strongly encourages the recipient to submit annual (or more frequent) JAG success stories. To submit a success story, sign in to a My BJA account at https://www.bja.gov/Login.aspx to access the Success Story Submission form. If the recipient does not yet have a My BJA account, please register at https://www.bja.gov/profile.aspx. Once registered, one of the available areas on the My BJA page will be "My Success Stories." Within this box, there is an option to add a Success Story. Once reviewed and approved by BJA, all success stories will appear on the BJA Success Story web page at https://www.bja.gov/SuccessStoryList.aspx.

OJP FORM 4000/2 (REV. 4-88)