**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **THE CITY OF CHICAGO,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 17 C 5720** |
| **JEFFERSON BEAUREGARD SESSIONS III, Attorney General of the United States,** | **Judge Harry D. Leinenweber** |
| **Defendant.** | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case involves the overlap, and potential conflict, between core areas of state and federal power: the state's traditional police powers and the federal government's broad, undoubted power over immigration. In order to advance federal immigration policies, the Attorney General attached several new immigration-related conditions to a longstanding federal grant which provides funds to local and state police departments. Those immigration-related conditions conflict with Chicago's policy goals of promoting cooperation between local law enforcement and immigrant communities and ensuring access to essential city services for all city residents regardless of citizenship status. Chicago brought suit to enjoin the Attorney General from attaching those conditions to the grant funds.

Before the Court is the Attorney General's Motion to Dismiss the Complaint in its entirety and the City of Chicago's Partial Motion for Summary Judgment on Counts I, II, and V. The Court addresses both below.

## I. BACKGROUND

In addition to reciting here the most relevant facts, the Court also incorporates those facts previously described in its earlier ruling. *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 937-40 (N.D. Ill. 2017), *aff'd,* 888 F.3d 272 (7th Cir. 2018), *en banc reh'g granted and vacated in part by* Order, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128.

The dispute centers around the Edward Byrne Memorial Justice Assistance Grant (the "Byrne JAG grant"), a federal grant named after a fallen New York City police officer which awards funds to states and local jurisdictions to support criminal justice initiatives for personnel, equipment, training, and other community services. *See* 34 U.S.C. § 10152(a). The Byrne JAG program distributes grant funds by a statutorily-defined formula based on a state's population and the number of violent crimes reported within that jurisdiction in the past year. *See* 34 U.S.C. § 10156. To receive funds under the program, the would-be grantee must submit an application and comply with all conditions outlined

in the Solicitation document provided by the Attorney General. (*See* 34 U.S.C. § 10153; *see, e.g.*, FY 2017 Local Solicitation, Ex. T to Pl.'s Request for Judicial Notice, Dkt. No. 157-20.) The City of Chicago and its neighboring localities have received Byrne JAG funds every year since 2005. In 2016, Chicago used those funds to buy police vehicles and to support the efforts of non-profit organizations working in its high crime communities. (*See* Def.'s Resp. to Pl.'s Statement of Undisputed Material Facts ("Facts") ¶ 14, Dkt. No. 168; Sachs Decl. ¶ 4, Dkt. No. 154.) The funds at issue now were originally earmarked to be distributed in 2017, but this litigation ensued. Should Chicago receive those 2017 funds, the City intends to expand its use of "SpotShotter" acoustic surveillance technology, which allows officers to pinpoint the location of gun shots across the City and thus respond more quickly. (Def.'s Resp. to Pl.'s Facts ¶ 15, Dkt. No. 168.)

The grant conditions causing Chicago umbrage are related to federal immigration enforcement. In 2016, the Attorney General determined that various state and local policies of withholding information and other cooperation from federal immigration authorities were frustrating the federal government's immigration-related goals. (*See* May 31, 2016 Office of Inspector General Mem., Ex. H to Def.'s Request for Judicial Notice, Dkt. No. 140-8.)

Citing public safety concerns, the Attorney General announced that the Department of Justice ("DOJ") would award Byrne JAG grants only to localities that: share certain immigration-related information with federal immigration agencies, allow immigration agents access to local detention facilities, and provide notice before releasing certain undocumented individuals. (*See* DOJ Press Release, Ex. B to Compl., Dkt. No. 1-2.)  In this suit, Chicago challenges all three of these new conditions (hereafter, "the Conditions"):

1. The "Access Condition" requires that Byrne JAG recipients permit personnel of the U.S. Department of Homeland Security ("DHS") to access any detention facility to meet with undocumented immigrants and inquire as to their right to be or remain in the United States.

2. The "Notice Condition" requires that Byrne JAG recipients provide DHS at least 48 hours advance notice of the scheduled release date and time of an alien in the jurisdiction's custody whenever DHS requests such notice in order to take custody of the alien upon release. The Attorney General later amended this Condition to clarify that "[i]n the event that . . . the scheduled release date and time for an alien are such as not to permit the advance notice [of scheduled release] . . . it shall not be a violation of this condition to provide only as much advance notice as practicable."

3. The "Compliance Condition" requires that Byrne JAG recipients certify compliance with 8 U.S.C. § 1373, a federal statute that bars local governments from restricting the sharing of immigration status information with federal law enforcement.

- 4 -

(*See* FY 2017 Local Solicitation, Ex. T to Pl.'s Request for Judicial Notice, Dkt. No. 157-20; Example Byrne JAG award documents, Exs. F, G to Jennings Decl., Dkt. No. 158.) The Attorney General added the Notice and Access Conditions for the first time in FY 2017, but the Compliance Condition also applied the previous year. (Def.'s Resp. to Pl.'s Facts ¶¶ 17-18.)

According to Chicago, these Conditions conflict with longstanding City policy of ensuring access to essential city services regardless of a resident's citizenship status and of promoting cooperation between local law enforcement and immigrant communities. (*See* Compl. ¶ 1, Dkt. No. 1.) Chicago's local policies protecting immigrant rights date back to 1985, when they were first embodied in executive orders and then eventually codified. (Def.'s Resp. to Pl.'s Facts ¶¶ 4-8, Dkt. No. 168.) The City's Welcoming City Ordinance, enacted in 2012, encapsulates its current policy. (*Id.* ¶¶ 7-8.) Though Chicago's policy and others like it are commonly referred to as "sanctuary city policies," the Seventh Circuit has recognized the inaptness of that term. *See City of Chicago v. Sessions,* 888 F.3d at 281 (noting the term is "commonly misunderstood" and does not accurately describe the effect of such policies).)

The Welcoming City Ordinance reflects both the City's determination that effective police work relies on willing community assistance and its belief that the "cooperation of the city's immigrant communities is essential to prevent and solve crimes and maintain public order, safety and security in the entire city." Chicago, Ill. Muni. Code § 2-173-005. The City intended the Welcoming City Ordinance to clarify both the communications and enforcement relationship between the City and the federal government as well as the specific conduct City employees are prohibited from undertaking, given the City's view that such prohibited conduct would "significantly harm[] the city's relationship with immigrant communities." *Id.*

Specifically, the Ordinance prohibits all City agents and agencies from: requesting or disclosing information about an individual's immigration status, *id.* §§ 2-173-020, -030; detaining anyone based solely on their immigration status or an ICE detainer, *id.* § 2-173-042(a); and spending on-duty time "responding to ICE inquiries or communicating with ICE regarding a person's custody status or release date," unless the responding City employee is "acting pursuant to a legitimate law enforcement purpose that is unrelated to the enforcement of a civil immigration law," *id.* § 2-173-042(b). Notably, these prohibitions do not apply to certain

classes of potentially dangerous individuals, including known gang members and those with outstanding criminal warrants, felony convictions, or pending felony charges. *Id.* § 2-173-042(c); *see also* Chicago Police Department ("CPD")'s Special Order S06-14-03, Ex. F to Pl.'s Request for Judicial Notice, Dkt. No. 157 (reiterating the policies of the Welcoming City Ordinance and establishing rules for CPD officers in conformance therewith).

Chicago contends that the new Conditions put it in an untenable position, forcing the City either to accept the grant funds with the attached Conditions and—the City believes—lose the trust and cooperation of its immigrant communities *or* decline the grant and forgo much-needed funding for critical police resources and community services. (Compl. ¶ 9.) Chicago argues that the Constitution protects it from making this Hobson's choice.

To that end, Chicago brings a seven-count Complaint, alleging constitutional infirmities and unlawful agency action. (*See generally* Compl., Dkt. No. 1.) Counts I and II allege the Conditions are unconstitutional because the Byrne JAG statute does not provide the Attorney General statutory authority to impose them. Count III alleges the Conditions violate the Spending Clause. *Id.* Chicago's Count IV alleges that, independent of the Byrne JAG grant, Section 1373 is an impermissible federal

conscription of state power and is thus unconstitutional under the anticommandeering doctrine. *Id.* Next, Chicago charges in Count V's declaratory judgment claim that even if Section 1373 is constitutional, the City complies with it and deserves judgment to that effect. *Id.* In Count VI, the City alleges the Attorney General's decision to impose the Conditions was arbitrary and capricious and thus violated the Administrative Procedures Act ("APA"). *Id.* And finally, Count VII alleges violations of the Paperwork Reduction Act. *Id.*

After filing its Complaint, Chicago moved for a preliminary injunction as to all three Conditions. This Court found that Chicago was likely to succeed on its argument that the Attorney General lacked the statutory grant of authority to impose the Notice and Access Conditions and accordingly enjoined those Conditions nationwide. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 943. However, the Court refused to enjoin the third condition, the Compliance Condition, finding the City not likely to succeed in arguing either that the Attorney General lacked the authority to impose it or that Section 1373—again, the statute with which Chicago must certify compliance under this third Condition—is unconstitutional. *Id.* at 945-46. The Attorney General appealed.

The Seventh Circuit panel affirmed, agreeing that Chicago demonstrated a likelihood of success that the Byrne JAG statute does not grant the Attorney General the authority to impose the Notice and Access Conditions and approving this Court's corresponding issuance of the nationwide preliminary injunction. *See City of Chicago v. Sessions*, 888 F.3d 272, 287, 293 (7th Cir. 2018), *en banc reh'g granted and vacated in part by* Order, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128. The Attorney General petitioned the Seventh Circuit for rehearing *en banc*. *See* Def.'s Petition for Rehearing En Banc, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. Apr. 27, 2018), Dkt. No. 120. The Seventh Circuit granted the Attorney General's petition on the limited issue of the injunction's nationwide scope, thus vacating that portion of the panel opinion but leaving intact the finding that the Notice and Access Conditions are likely unlawful. *See En Banc* Order, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128.

Turning to the matters now before the Court: The Attorney General moves to dismiss Chicago's Complaint in its entirety, and Chicago cross-moves for partial summary judgment. The Attorney General moves to dismiss the Complaint on two grounds, raising challenges to both this Court's subject matter jurisdiction and to

- 9 -

the sufficiency of Chicago's Complaint. *See* Fed. R. Civ. P. 12(b)(1), (6). For its part, Chicago moves for summary judgment on only Counts I, II, and V. The City requests, first, a finding that all three Conditions are not authorized by the Byrne JAG statute and are thus *ultra vires* (Count I) and in violation of the separation of powers (Count II). With that request, the City urges the Court to reconsider its earlier-expressed belief that Chicago was not likely to succeed on this argument as to the Compliance Condition. Second, Chicago requests a declaratory judgment that, assuming the Compliance Condition is valid, the City complies with Section 1373 (Count V).

## II.  STANDARDS OF REVIEW

As already described, the Attorney General moves to dismiss both by challenging jurisdiction and by asserting that the Complaint fails to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(1), (6). To survive a 12(b)(1) motion, the plaintiff must carry the burden of providing sufficient evidence to establish a *prima facie* case for personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997). To survive a 12(b)(6) motion, the plaintiff must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and "give the

defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation and alteration omitted). On a 12(b)(6) motion, the reviewing court accepts all well-pleaded facts as true, *Alam v. Miller Brewing Co.*, 709 F.3d 662, 665-66 (7th Cir. 2013), and draws reasonable inferences in favor of the plaintiff, *Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 823 (7th Cir. 2014) (citation omitted). In doing so, the court may consider the "complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (citations omitted).

Chicago cross-moves for summary judgment, which is proper where the record shows no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(a). The moving party bears the burden of establishing the absence of any genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the Court construes all facts and reasonable inferences in the light most favorable to the nonmovant, *Bentrud v. Bowman, Heintz, Boscia & Vician, P.C.*, 794 F.3d 871, 874 (7th Cir. 2015) (quotation marks and citation

omitted).  In ruling on summary judgment, courts do not determine the truth of disputed matters.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

### III.  <u>DISCUSSION</u>

### A.  Jurisdiction

Before the Court turns to the merits of this dispute, it must address the threshold objection raised by the Attorney General in his 12(b)(1) motion.  In short, the Attorney General argues that because the DOJ has not yet reached a final decision on whether to award Chicago funds under the Byrne JAG grant, the DOJ has not yet consummated any "final agency action" that is ripe for judicial review. 5 U.S.C. § 704; *see Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1079 (7th Cir. 2016) ("In the context of judicial review under the APA, a challenge to agency conduct is ripe only if it is filed after the final agency action.").  Chicago responds that its lawsuit does not challenge the Attorney General's not-yet-finalized decision whether to *award* the funds, but rather the decision to attach the Conditions to the grant in the first instance.  The Court agrees with Chicago that this earlier determination is the one challenged by this suit. (*See* Compl. at 45 (requesting that this Court "[d]eclare that all three

- 12 -

immigration-related conditions for the FY 2017 Byrne JAG are unlawful").)

"[T]wo conditions must be satisfied for agency action to be 'final': First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted); *cf. Shanty Town Assocs. Ltd. v. EPA*, 843 F.2d 782, 788 (4th Cir. 1988) (evaluating EPA's imposition of conditions on a federal grant under the APA). Both of these conditions are clearly met here. The imposition of these Conditions by the Attorney General is far from "tentative"; Alan Hanson, the Acting Assistant Attorney General for the Office of Justice Programs at the DOJ, states in his declaration that every FY 2017 award—presumptively including the award Chicago seeks here—will include conditions identical to those attendant to the grant awards already handed out to Binghamton and Greenville, the only two cities to receive Byrne JAG funds thus far. (*See* Hanson Decl. ¶¶ 1, 5-6, Dkt. 32-1 ("[T]he award documents set[] out the various conditions . . . that *will apply* to the FY 2017 Byrne JAG award" (emphasis added)); *see also* Def.'s Resp. to Pl.'s Facts

¶ 27, Dkt. No. 168.)  Both of those awards explicitly require compliance with all three Conditions.  (*See* Example Byrne JAG Award Documents, Exs. F, G to Jennings Decl., Dkt. Nos. 158-6, 158-7.) Further, all FY 2017 awards, including Chicago's potential one, are awarded based on applications invited by that year's grant Solicitation, which clearly imposes the Conditions as well.  (FY 2017 Local Solicitation, Ex. T to Pl.'s Request for Judicial Notice, Dkt. No. 157-20; *see also* Def.'s Resp. to Pl.'s Facts ¶¶ 27-30, Dkt. No. 168.)  Thus, the Attorney General's attachment of the Conditions is the end result of his decision-making process on this score.  That satisfies the first requirement for finality under the APA.  *See Bennett*, 520 U.S. at 177-78.

The second requirement is met as easily as the first.  The Conditions attached to the Byrne JAG funds trigger important legal and practical consequences: They force Chicago to choose between accepting the award with the Conditions or forgoing the award in favor of maintaining the City's policy preferences.  *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 940 (finding the Notice and Access Conditions irreconcilable with Chicago's Welcoming City Ordinance); *see also Abbs v. Sullivan*, 963 F.2d 918, 926 (7th Cir. 1992) (finding agency action final where plaintiff faced "a dilemma: comply with a rule that harms [it] and that [it]

believe[s] to be invalid or violate the rule at the risk of incurring a heavy penalty" (citation omitted)). The second requirement is met, and the Court accordingly finds that the Attorney General's decision to impose the Conditions constitutes final agency action that is ripe for judicial review.

Finally, the Court notes that all of its sister courts in parallel cases have reached the same conclusion. *See, e.g.*, *City of Philadelphia v. Sessions,* No. 17-3894, 2018 WL 1305789, at *18-19 (E.D. Pa. Mar. 13, 2018) (finding the Attorney General's imposition of the Conditions on the Byrne JAG grant was final); *California ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015, 1030-31 (N.D. Cal. 2018) (same).

For reasons that will become clear, the Court considers Chicago's claims out of order.

## B. Anticommandeering Doctrine (Count IV)

The Attorney General moves to dismiss Count IV, in which Chicago alleges that Section 1373 unconstitutionally tramples upon the Constitution's anticommandeering doctrine by robbing local policymakers of the option to decline to administer the federal immigration programs Section 1373 supports. *See New York v. United States*, 505 U.S. 144, 177 (1992) (applying the anticommandeering doctrine to claims involving New York's forced participation in a

- 15 -

federal program); *see generally Printz v. United States*, 521 U.S. 898 (1997) (applying the anticommandeering doctrine to claims involving conscription of local officials). This Court previously held that Chicago was unlikely to succeed on this argument given that under then-current case law, "only affirmative demands" on states—as opposed to proscriptions—transgressed the Tenth Amendment. *City of Chicago v. Sessions*, 264 F. Supp. 3d at 949. Section 1373 imposes no affirmative demand on local governments, even though, in practical effect, the statute "may effectively thwart policymakers' ability to extricate their state or municipality from involvement in a federal program." *Id.* As such, this Court hesitated to expand the anticommandeering doctrine to a terrain that no higher court had yet seen fit to cover. But then, eight months after this Court's preliminary injunction ruling, the Supreme Court navigated that ground in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018).

*Murphy* concerned the Professional and Amateur Sports Protection Act ("PASPA"), a federal law that prevented states both from legalizing sports gambling and from repealing existing state laws prohibiting it. *Id.* at 1470-71. New Jersey passed a law partially repealing its gambling prohibition anyway, claiming it could do so because PASPA's edict to the contrary violated the

Constitution's anticommandeering principle. *Id.* at 1472. Before the Supreme Court, the *Murphy* respondents argued PASPA could not violate the Tenth Amendment because—much like this Court observed in its preliminary injunction ruling—the Supreme Court had only found such violations in cases where Congress went "beyond precluding state action and affirmatively command[ed] it." *Id.* at 1478. But the Court rejected this argument, finding the "distinction . . . empty." *Id.* It reasoned that regardless whether a federal law commands state action or precludes it, "[t]he basic principle that Congress cannot issue direct orders to state legislatures" still applies. *Id.* (alteration omitted). The reasoning highlights the Supreme Court's reluctance to rely on a distinction more reflective of sophisticated draftsmanship than substantive effect. Thus, PASPA, which "unequivocally dictate[d] what a state legislature may and may not do," was held to be unconstitutional. *Id.* That holding pulls the lynchpin from this Court's earlier Section 1373 constitutionality analysis and demands that this Court reconsider that statute with fresh eyes.

But before delving further into the anticommandeering analysis, the Court must first dispose of a threshold argument. The Attorney General argues that no anticommandeering claim exists here because compliance with Section 1373 is merely a condition on

grant funds which Chicago is free to refuse. This argument ignores that Section 1373 is an extant federal law with which Chicago must comply, completely irrespective of whether or not the City accepts Byrne JAG funding. And the City's Count IV clearly recites Chicago's anticommandeering challenge to the law *itself*, not to the law as a condition imposed on the grant. (*See Compl.* ¶¶ 132-135 "Section 1373 is . . . facially unconstitutional").) This distinction is important. No Tenth Amendment problem exists when a federal agency imposes grant conditions, because the Spending Clause empowers the federal government to offer funds in exchange for state action it could not otherwise demand. *See NFIB v. Sebelius*, 567 U.S. 519, 537 (2012) (observing that the federal government may award grant funding that "may well induce the States to adopt policies that the Federal Government itself could not impose" (citation omitted)); *South Dakota v. Dole*, 483 U.S. 203, 210 (1987) (finding a "Tenth Amendment limitation on congressional regulation of state affairs did not concomitantly limit the range of conditions legitimately placed on federal grants"). But Section 1373 is not a grant condition which Chicago may freely shirk. It is a federal law and as such may be challenged on an independent ground, as Chicago has here, notwithstanding that certifying

- 18 -

compliance with Section 1373 appears as a condition for Byrne JAG funding.

The Court now turns to the statute itself: Section 1373. Congress enacted Section 1373 in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act (included as part of the Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat 3009 (1996)). The Act is part of a comprehensive federal statutory scheme to regulate immigration. *See Arizona v. United States*, 567 U.S. 387, 401 (2012); *DeCanas v. Bica*, 424 U.S. 351, 353 (1976). In relevant part, Section 1373 provides:

(a) In general

Notwithstanding any other provision of Federal, State, or local law, **a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information** regarding the citizenship or immigration status, lawful or unlawful, of any individual.

(b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, **no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following** with respect to information regarding the immigration status, lawful or unlawful, of any individual:

> (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.
>
> (2) Maintaining such information.
>
> (3) Exchanging such information with any other Federal, State, or local government entity.

8 U.S.C. § 1373.

The Court's inquiry "begin[s] with the time-honored presumption that [a statute] is a constitutional exercise of legislative power." *Reno v. Condon*, 528 U.S. 141, 148 (2000) (internal quotation marks and citation omitted). But this presumption has limits. "While Congress has substantial powers to govern the Nation directly, including in areas of intimate concern to the States, the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York,* 505 U.S. at 162 (applying anticommandeering doctrine). Not all laws prohibiting state action are constitutionally problematic. In *Reno*, for example, the Court denied a Tenth Amendment challenge to a federal law restricting both state and private actors from disclosing or disseminating personal information provided in applications for driver's licenses. 528 U.S. at 151. That law did not "require the States in their sovereign capacity to regulate their own citizens," but rather permissibly regulated the States "as the

owners of data bases." *Id.* In contrast stands *Printz,* wherein the Court struck down a statute requiring state officials to perform background checks on prospective handgun purchasers. 521 U.S. at 935. There, the federal scheme did not apply with equal force to State and private actors; instead, the law commanded state officers—and only state officers—to administer and enforce a federal regulatory program. *Id.; see Travis v. Reno*, 163 F.3d 1000, 1003-04 (7th Cir. 1998).

The question under *Murphy, Reno,* and *Printz* is whether Section 1373 "evenhandedly regulates an activity in which both States and private actors engage," as opposed to regulating activities undertaken by government entities only, thus conscripting state action in the implementation of a federal scheme. *Murphy*, 138 S. Ct. at 1478. In other words, although the federal government may "pervasively regulate[] the states as marketplace participants," it may not "call[] on the states to use their sovereign powers as regulators of their citizens." *Travis v. Reno*, 163 F.3d 1000, 1004-05 (7th Cir. 1998). Section 1373 imposes two overlapping regulations: First, subsection (a) prohibits any "government entity or official" from restricting any other "government entity or official" from exchanging immigration status information with INS. As is apparent, subsection (a) is

directed exclusively to state actors. Second, subsection (b) prohibits any "person or agency" from doing the same. 8 U.S.C. § 1373. Subsection (b) does not meaningfully expand the statute's scope by including "person[s]": Who but a government actor can restrict the activities of a government entity or official? *See id.*

The import is clear: Section 1373 does not evenhandedly regulate activities in which both private and government actors engage. Thus, the saving grace of *Reno* does not apply here. Rather, this statute mandates that local government employees have the option of furnishing immigration information to the INS while acting in their official, state-employed capacities. Unlike in *Reno,* the anticommandeering doctrine applies, and here it is offended in four ways.

First, Section 1373 supplants local control of local officers; the statute precludes Chicago, and localities like it, from limiting the amount of paid time its employees use to communicate with INS. This weighs heavily on the constitutionality analysis. A state's ability to control its officers and employees lies at the heart of state sovereignty: "To say that the Federal Government cannot control the State, but can control all of its officers, is to say nothing of significance. Indeed, it merits

the description 'empty formalistic reasoning of the highest order.'" *Printz*, 521 U.S. at 931 (citation omitted). Adding credence to this constitutional objection is the fact that the information at issue is state-owned and only accessible to city employees in their official capacities. *Id.* at 932 n.17 (noting that a constitutionally-impermissible statute required state employees "to provide information that belongs to the State and is available to them only in their official capacity"). To illustrate further, it is clear under *Printz* that an explicit federal directive to state employees is unconstitutional. *See Murphy*, 138 S. Ct. at 1477 (characterizing *Printz*). Given the pre-*Murphy* command-versus-proscription dichotomy, Congress, perhaps cautious of running afoul of the Tenth Amendment by demanding that states share immigration-status information, drafted Section 1373 to avoid the potential *Printz* problem by framing it as a prohibition on, rather than a directive to, state employees. Rather than requiring state employees to share immigration information with federal authorities, Section 1373 prohibits state policymakers from *preventing* their employees from sharing. *See* 8 U.S.C. § 1373. Yet as *Murphy* demonstrates, this draftsmanship does not diminish the infringement on state sovereignty. To analogize to *Printz*: the Brady Act considered

- 23 -

there would still be unconstitutional even if, rather than affirmatively requiring state employees to complete background checks, the Act instead prohibited state policymakers from preventing state employees from doing the same.

Second, the statute indirectly constrains local rule-making by precluding city lawmakers from passing laws, like the Welcoming City Ordinance, that institute locally-preferred policies which run counter to Section 1373. This was the concern squarely addressed in *Murphy*, where the Court observed that a "more direct affront to state sovereignty is not easy to imagine" than in a federal law that "dictates what a state legislature may and may not do." *Murphy*, 138 S. Ct. at 1478. True, the statute in *Murphy*, which explicitly forbade local lawmaking, presented a clearer case than the one at bar. *See id.* But the spirit of *Murphy* is not diminished here, where Section 1373 imposes a blanket, if indirect, prohibition on certain local lawmaking. *See id.; see also Printz*, 521 U.S. at 928 ("It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority."); *United States v. California*, No. 2:18 CV 490, 2018 WL 3301414, at *13 (E.D. Cal. July 5, 2018) ("Section 1373 does just what *Murphy* proscribes: it tells States they may not prohibit (i.e., through legislation) the

sharing of information regarding immigration status with the INS or other government entities.")

Third, Section 1373 redistributes local decision-making power by stripping it from local policymakers and installing it instead in line-level employees who may decide whether or not to communicate with INS. This effects a federally-imposed restructuring of power within state government. *See* Spencer E. Amdur, *The Right of Refusal: Immigration Enforcement and the New Cooperative Federalism*, 35 Yale L. & Pol'y Rev. 87, 136 (2016). The Supreme Court tussled with a similar problem in *Printz*. In that case, the background-check law required local officials to make "reasonable efforts" within five days of receiving information regarding a prospective gun purchase to determine whether the sales therein described were lawful. 521 U.S. at 905. The government argued unsuccessfully that the anticommandeering doctrine prohibits only federal statutes compelling states to make certain law, but not statutes that simply require local officials to provide "limited, non-policymaking help in enforcing [federal] law." *Id.* at 927. The Supreme Court did not agree with that distinction, pointing out that the decision concerning what "reasonable efforts" should be expended in conducting a background check is "preeminently a matter of policy." *Id.* at 927-28. In

this case, Section 1373 prohibits the City from restricting its employees' communications with federal immigration authorities. As such, the degree of discretion afforded to each City employee or police officer is broad indeed. Beyond simply determining what constitutes "reasonable efforts," as in *Printz*, City employees may decide for themselves whether to communicate with federal authorities *at all*. *See id.* This is certainly a matter a policy, and yet it is a matter that, under Section 1373, state policymakers are not allowed to touch.

Finally, because Section 1373 eliminates the City's ability to control its employees' communications with INS, the statute prevents Chicago from extricating itself from federal immigration enforcement. Section 1373 thus impermissibly forecloses *New York*'s "critical alternative": the option of non-participation in a federal program. *New York*, 505 U.S. at 176.

Beyond this, the policy rationales undergirding the anticommandeering principle further counsel its application in this case. *Murphy* articulated three such rationales: First, the principle protects individual liberty by dividing authority between federal and state governments; second, it promotes political accountability by clarifying whether laws and policies are promulgated by federal or state actors; and third, it prevents

Congress from shifting the costs of regulation to the states. *Murphy*, 138 S. Ct. at 1477. Section 1373 flouts these rationales; the statute makes it difficult for citizens to distinguish between state and federal policy in the immigration context by barring states from adopting policies contrary to those preferred by the federal government. The statute also forces states to allow their employees to participate in the federal scheme, shifting employee time—and thus corresponding costs—to federal initiatives and away from state priorities.

Despite all this, the Attorney General contends that Section 1373 does not pose nearly the regulatory imposition Chicago claims. Instead, he says, the dictates of Section 1373 boil down to mere information sharing, which the Attorney General believes to be exempt from Tenth Amendment scrutiny. To that end, the Attorney General opines that "the analysis in *Murphy* would likely have been very different if PASPA had only required States to share information regarding sports betting operations to facilitate federal regulation." (Def.'s Resp. at 4, Dkt. No. 176.) This Court is not so sure.

The Attorney General contends that information sharing is immune from challenge under the anticommandeering doctrine. From the Attorney General's view, Congress could constitutionally

*require* states to provide the federal government with immigration-related information. And if that is constitutional, then surely a statute merely requiring that states *allow* their employees to provide immigration-related information is also constitutional. *Cf. Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 213-14 (4th Cir. 2002) (finding no Tenth Amendment violation where state medical boards were required to share doctors' licensure information). The Attorney General rests his argument in favor of an information sharing carve-out on *Printz*. It is true that *Printz*'s dicta signals that such an exception might exist, but the opinion neither states an exception conclusively nor provides any guidance as to its contours. In *Printz*, the Supreme Court distinguished the unconstitutional Brady Act from a law "requir[ing] only the provision of information to the Federal Government," but declined to elaborate on the distinction. 521 U.S. at 917-18. Justice O'Connor's concurrence echoed the distinction, remarking that "the Court appropriately refrains from deciding whether other purely ministerial reporting requirements imposed by Congress on state and local authorities pursuant to its Commerce Clause powers are similarly invalid." *Id.* at 936 (O'Connor, J., concurring). Justice O'Conner cited 42 U.S.C. § 5779(a) as an example of such a federal statute, which requires

state and local law enforcement agencies to report cases of missing children to the DOJ. *Id.* In this way, the Supreme Court left open whether a federal law demanding "only the provision of information to the Federal Government" or else imposing "purely ministerial reporting requirements" violates the anticommandeering doctrine. *Id.* at 918, 936. Now, the Attorney General wants this Court to go further than the Supreme Court has and hold that information sharing is constitutionally unique. Though this Court acknowledges the open question, the Attorney General's request is a stretch too far. This Court will not, in the face of clear guidance from *Murphy* and *Printz*, hang its hat on a possible information sharing carve-out derived solely from dicta.

Still, the Attorney General argues that policy rationales bolster his argument: Federal immigration efforts could be frustrated if localities may prohibit their employees from sharing immigration-related information with federal authorities. But these rationales do not advance his position. First, the Seventh Circuit has already rejected the Attorney General's argument that finding the Conditions unlawful allows the City to "thwart federal law enforcement," characterizing such argument as a "red herring." *See City of Chicago v. Sessions*, 888 F.3d at 282 ("[N]othing in this case involves any affirmative *interference* with federal law

enforcement at all, nor is there any interference whatsoever with federal immigration authorities. The only conduct at issue here is the refusal of the local law enforcement to aid in civil immigration enforcement . . . ."); *see also United States v. California*, No. 2:18 CV 490, 2018 WL 3301414, at *18 (E.D. Cal. July 5, 2018) ("Standing aside does not equate to standing in the way.").

Granted, the concern that federal enforcement efforts will be impeded obviously extends to other federal initiatives that depend upon state information. *See, e.g.*, Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 806, 84 Stat. 922, 939-40 (creating commission to evaluate national gambling policy, which was "authorized to call upon . . . States to furnish . . . statistical data, reports, and other information as the Commission deems necessary"). Yet this Court has found no controlling authority holding that such information sharing provisions are constitutionally impervious, and a mere policy rationale does not empower the Court to craft a constitutional exception heretofore unidentified in Tenth Amendment jurisprudence. Put more finely: A federal need for state information does not automatically free the federal government of the sometimes laborious requirement to acquire that information by constitutional means. *See Printz*, 521

U.S. at 932-33 (rejecting the application of a balancing analysis even where the federal law at issue served important purposes); *New York*, 505 U.S. at 181 ("State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting))).   In short, the federalist diffusion of power necessarily creates political barriers and inefficiencies.   But these inefficiencies are part of federalism's intended structure, not imperfections to be remedied by judicially-wrought consolidation of power.   *See New York*, 505 U.S. at 187 ("[T]he Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.").

Furthermore, Section 1373 is more than just an information-sharing provision.   As described above, Section 1373 prohibits certain rule making by state policymakers.   In doing so, Section 1373 presents more like the statute in *Murphy* and less like the innocuous missing-children law mentioned in Justice O'Connor's *Printz* concurrence.   *Compare Murphy*, 138 S. Ct. at 1478, *with Printz*, 521 U.S. at 936 (O'Connor, J., concurring) (citing 42

U.S.C. § 5779(a)). Whether a different federal law merely requiring the submission of information but not explicitly prohibiting any state policymaking would be permissible under an information sharing carve-out is irrelevant; that is not the law before the Court now.

In sum, Section 1373 impermissibly directs the functioning of local government in contravention of Tenth Amendment principles, and the Attorney General's reliance on the purported information sharing carve-out—which is not confirmed in *Printz* nor in any other controlling case—cannot save it. Section 1373 is thus unconstitutional on its face. *See United States v. California*, No. 2:18 CV 490, 2018 WL 3301414, at *14 (E.D. Cal. July 5, 2018) (finding the constitutionality of Section 1373 "highly suspect"); *City of Philadelphia v. Sessions*, No. 17-3894, 2018 WL 2725503, at *31-33 (E.D. Pa. June 6, 2018) (holding Section 1373 unconstitutional under the anticommandeering doctrine).

In so holding, this Court must respectfully disagree with *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999). In that case, New York City implemented an executive order prohibiting City employees from providing federal immigration authorities with information concerning the immigration status of any individual unless certain circumstances applied. *Id.* at 31-33. The City

- 32 -

then sued, challenging the constitutionality of Section 1373 under the Tenth Amendment. *Id.* at 33. The Second Circuit upheld the statute's constitutionality, refusing to permit the City to engage in what the court of appeals called "passive resistance" to federal programs. *Id.* at 35. For several reasons, this Court declines to follow that decision's lead.

First, the Supreme Court has explicitly approved of the type of passive resistance criticized in *City of New York*, finding that states have the prerogative to "not yield[] to federal blandishments when they do not want to embrace the federal policies as their own." *NFIB*, 567 U.S. at 579 (internal quotation marks and citation omitted). Second, as this Court has noted once before, the balancing applied in *City of New York* is not the appropriate analysis in weighing encroachments on federalism. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 947 (citing *Printz*, 521 U.S. at 932; *Travis v. Reno*, 163 F.3d 1000, 1003 (7th Cir. 1998) (both opinions disavowing use of balancing analysis in Tenth Amendment challenges)). And yet, the strongest rationale for departing from *City of New York* is the same reason this Court took up reconsideration of Section 1373's constitutionality in the first place. *City of New York*'s outcome ultimately does not depend on the balancing test it employs, but rather the distinction it

draws between affirmative obligations and proscriptions. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 947-48 (characterizing *City of New York*). This is the same distinction that motivated this Court's earlier finding that Chicago was not likely to succeed on its anticommandeering argument, and it is the same distinction the Supreme Court has since deemed "empty." *See Murphy*, 138 S. Ct. at 1478. For the same reasons explained above, the Court believes that *Murphy*'s holding deprives *City of New York* of its central support and thus provides the Attorney General little counterweight to Chicago's argument against this statute's constitutionality. *See id.* In the end, Section 1373 requires local policymakers to stand aside and allow the federal government to conscript the time and cooperation of local employees. This robs the local executive of its autonomy and ties the hands of the local legislature. Such affronts to State sovereignty are not countenanced by the anticommandeering principle of the Constitution. Section 1373 is unconstitutional and cannot stand.

### C. *Ultra Vires* and Separation of Powers (Counts I and II)

In Counts I and II, Chicago claims that Congress did not confer authority on the Attorney General to impose the Conditions, so his imposition treads upon the separation of powers and is *ultra vires*. *City of Arlington v. FCC*, 569 U.S. 290, 317 (2013)

- 34 -

("Agencies are creatures of Congress; 'an agency literally has no power to act . . . unless and until Congress confers power upon it." (internal quotation marks and citation omitted)).

### 1. *Notice and Access Conditions*

The Attorney General moves to dismiss Counts I (*ultra vires*) and II (separation of powers), arguing that the Byrne JAG statute provides authority to impose the Conditions, and Chicago moves for summary judgment on the same counts. This Court previously granted Chicago a preliminary injunction as to the Notice and Access Conditions, finding that Chicago was likely to succeed on its argument that the Byrne JAG statute does not authorize them. *City of Chicago v. Sessions*, 264 F. Supp. 3d at 937-40. A panel of the Seventh Circuit affirmed that decision. *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018), *en banc reh'g granted on other grounds, vacated in part by* Order, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128.

In affirming, the Seventh Circuit found Chicago likely to succeed in arguing that neither Byrne JAG nor any other statute grants the Attorney General "the authority to impose conditions that require states or local governments to assist in immigration enforcement, nor to deny funds to states or local governments for the failure to comply with those conditions." *Id.* at 284. In so

holding, the court rejected the Attorney General's "untenable" contention that 34 U.S.C. § 10102(a)(6), which sets forth the functions of the Assistant Attorney General for the Office of Justice Programs, provides the Attorney General an expansive, stand-alone grant of authority to impose *any* conditions on grant recipients. *Id.* at 284-85. The court added that the structure of § 10102 and the Byrne JAG statute supported that conclusion, as § 10102 would be "an odd place indeed" for Congress to have squirreled away a sweeping grant of authority. *Id.* The Seventh Circuit concluded that "[t]he Attorney General in this case used the sword of federal funding to conscript state and local authorities to aid in federal civil immigration enforcement. But the power of the purse rests with Congress, which authorized the federal funds at issue and did not impose any immigration enforcement conditions on the receipt of such funds." *City of Chicago v. Sessions*, 888 F.3d at 277.

In light of the Seventh Circuit's reasoning and considering that the Attorney General has not mustered any other convincing argument in support of greater statutory authority, nothing has shaken this Court from the opinion it expressed at the preliminary injunction stage. As such, for the same reasons stated in this Court's preliminary injunction ruling and the Seventh Circuit's

opinion, the Court holds that the Notice and Access Conditions are unlawful. The Attorney General's Motion to Dismiss is denied, and Chicago's Motion for Summary Judgment is granted on Counts I and II as to the Notice and Access Conditions.

### 2. *Compliance Condition*

The Attorney General's authority to impose grant conditions extends only as far as Congress allows. *See Alexander v. Sandoval*, 532 U.S. 275, 291 (2001) ("Agencies may play the sorcerer's apprentice but not the sorcerer himself."). Whether the Attorney General has authority to impose the third and final condition turns on the meaning of the phrase "all other applicable Federal laws" as it appears in the Byrne JAG statute. Because this issue was not considered on appeal, the Court must proceed without the benefit of the Seventh Circuit's guidance. *See City of Chicago v. Sessions*, 888 F.3d at 280 (expressing "no opinion" as to the denial of the Compliance Condition).

We start with the text:

(A) . . . To request a grant under this part, the chief executive officer of a State . . . shall submit an application to the Attorney General . . . in such form as the Attorney General may require. **Such application shall include** the following:
[. . .]
    (5) **A certification . . . that--**
        (A) the programs to be funded by the grant meet all the requirements of this part;

> (B) all the information contained in the application is correct;
> (C) there has been appropriate coordination with affected agencies; and
> (D) **the applicant will comply with all provisions of this part and *all other applicable Federal laws*.**

34 U.S.C. § 10153(A)(5)(D) (emphasis added). The parties offer competing interpretations of this language. The Attorney General argues that the word "applicable" refers to laws applicable to the grantee—here, the City—and thus covers any federal law that applies to Chicago; it follows that because Section 1373 plainly applies to "local government entit[ies]," Section 1373 falls within that broad sweep. 8 U.S.C. § 1373. Chicago offers a far narrower interpretation, comprising just those federal laws applicable to federal grantees generally. That is, according to Chicago, the "applicable Federal laws" countenanced by the Byrne JAG statute include only those laws that "by their express terms govern recipients of federal funds," such as 42 U.S.C. § 2000d, which prohibits discrimination in "any program or activity receiving Federal financial assistance." (Pl.'s Mem. in Supp. of Summ. J. at 6, Dkt. No. 152.) Chicago concludes that because Section 1373 does not expressly apply to federal grants, it is not an "applicable law" under the Byrne JAG statute.

- 38 -

The Court already dealt with this question once, in its preliminary injunction ruling, and sees no convincing reason to depart from the analysis conducted there. Simply put, this statute is most consistent and coherent when "all other applicable Federal laws" is "read to mean what it literally says." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 228 (2008) (citation omitted). The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 254-55 (1992) (citations omitted). Here, the language is unambiguously expansive, the prefatory "all other" indicating a broad reading in line with the Attorney General's interpretation. *Cf. Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991) ("By itself, the phrase 'all other law' indicates no limitation."). Had Congress intended to limit § 10153(A)(5)(D)'s reach to only a specific body of federal grant-making laws, as Chicago argues, it easily could have. But Congress opted not to include additional, limiting language; instead, it used the capacious phrase "all other applicable Federal laws." The Court is unpersuaded by Chicago's attempt to create ambiguity where a plain reading of the Byrne JAG statute suggests none. *See id.*

If the Court were conducting this *ultra vires* inquiry in a vacuum, it would conclude that because Section 1373 is generally applicable to Chicago, Section 1373 falls within the "applicable Federal laws" described in the Byrne JAG statute and thus counts among those statutes with which the Attorney General may lawfully demand compliance as a condition for funding. 34 U.S.C. § 10153(A)(5)(D). Instead, the Court concludes this analysis in light of its earlier finding that Section 1373 violates the anticommandeering principle and is unconstitutional. As an unconstitutional law, Section 1373 automatically drops out of the possible pool of "applicable Federal laws" described in the Byrne JAG statute. *Cf. Branch v. Smith*, 538 U.S. 254, 281-82 (2003) (observing that adherence to an unconstitutional state law is not mandated by a federal statute requiring congressional redistricting "as state law requires"). Thus, it makes no difference that the Court reads "all other applicable Federal laws" broadly; no matter the breadth of this provision, it will never capture an unconstitutional statute. *See id.* Accordingly, the Attorney General has no authority to demand compliance with Section 1373, hereby deemed unconstitutional, under the Byrne JAG statute.

It is worth emphasizing a key constitutional distinction between Section 1373 and the Compliance Condition. Even though the Compliance Condition is substantively the same as Section 1373 because the Condition was designed to reinforce Section 1373's requirements, the two are constrained by different constitutional limitations. The former is a federal statute carrying the force the law, while the latter is merely a condition imposed on a federal grant that Chicago may freely decline. This distinction matters because, as already described, the anticommandeering doctrine does not limit the conditions agencies may attach to federal grants. *See Dole*, 483 U.S. at 210 (reciting that the Tenth Amendment's limit on congressional regulation of state affairs does not equally limit the conditions attachable to federal grants). Thus, the Compliance Condition does not fail because it violates the anticommandeering doctrine. It fails because the statutory authority on which it depends sanctions only the imposition of "applicable" federal laws; because Section 1373 no longer falls within that category, the authority for the Compliance Condition has been stripped away. *Cf. Branch*, 538 U.S. at 281-82.

Accordingly, the Attorney General's Motion to Dismiss must be denied, and Chicago's Motion for Summary Judgment must be granted on Counts I and II as to the Compliance Condition.

*      *      *

Granting Chicago summary judgment on Counts I and II affects the balance of Chicago's claims. It renders the remaining counts—Counts III, V, VI, and VII—moot. The Court dismisses them as such.

### D.  Injunctive Relief

### 1.  *Permanent Injunction*

As discussed above, this Court grants Chicago's Motion for Partial Summary Judgment on Counts I and II as to all three Conditions. With the merits decided, Chicago asks the Court to issue a permanent nationwide injunction. The Court may issue permanent injunctive relief if the moving party demonstrates:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). The permanent injunction standard is essentially the same as the standard for a preliminary injunction except that the plaintiff must in fact succeed on its claims rather than merely show a

- 42 -

likelihood of success. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987); *compare id.*, *with Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). This Court discussed in detail how Chicago met the four factors in its preliminary injunction ruling and now incorporates that analysis here. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 949-51. The material facts have not changed since that earlier ruling and adding the Compliance Condition to the mix does not change the Court's evaluation of the harm caused by the unlawful Conditions. All three Conditions undermine Chicago's ability to protect its relationship with its immigrant communities which the City contends is vital to effective law enforcement. As reflected by a fresh consideration of the four injunction factors, the circumstances here continue to demand equitable relief.

First, Chicago's harm is irreparable and cannot be compensated by monetary damages. Chicago submits an affidavit from Lieutenant Kevin Hannigan, a longtime Chicago police officer, explaining that if the City complies with the Conditions, undocumented immigrants will be less likely to interact and cooperate voluntarily with local police, believing that such contacts could put them or their families at risk of deportation. (Def.'s Resp. to Pl.'s Facts ¶¶ 7, 11, Dkt. No. 168; Hannigan Decl.

- 43 -

¶¶ 2, 5, Dkt. No. 155.)   In Lieutenant Hannigan's view, informed by twenty-nine years of experience, "requiring Chicago's police officers to request immigration status would drive a wedge between [the CPD] and the local communities."   (Hannigan Decl. ¶ 5, Dkt. No. 155.)   Doing so "would run the risk of alienating portions of the Chicago population; could increase hostility toward law enforcement in vulnerable areas of the City; and could deprive officers of valuable sources of information." *Id.*   If Chicago were to adopt such a policy, he avers "that the type of cooperation [the CPD is] able to achieve with immigrant communities would be materially damaged." *Id.*   Chicago adopted this view in its Welcoming City Ordinance, which the City clearly intended to protect against such harms: The Ordinance itself states that "[t]he cooperation of the City's immigrant communities is *essential* to prevent and solve crimes and maintain public order, safety and security in the entire City" because the "assistance from a person, whether documented or not, who is a victim of, or a witness to, a crime is important to promoting the safety of all . . . residents." § 2-173-005 (emphasis added).

The Attorney General takes the contrary view, arguing that so-called sanctuary policies increase crime and make cities that implement them less safe.   Of this the Court is not convinced.

- 44 -

Chicago points out that not only are there no peer-reviewed studies supporting the AG's proposed correlation, the scholarship on the subject actually suggests that such policies do not affect, and might even lower, crime rates. (*See* Def.'s Resp. to Pl.'s Facts ¶¶ 24-25 (noting University of California Riverside study found "no support" for proposition that "sanctuary policies lead to increased crime" and Center for American Progress study found "crime [] statistically significantly lower in sanctuary counties compared to nonsanctuary counties").) But the Court need not delve into this factual determination. *Cf. City of Chicago v. Sessions*, 888 F.3d 272, 277 (7th Cir. 2018) ("Our role in this case is not to assess the optimal immigration policies for our country."). The key point here is that the Attorney General offers no facts or affidavits belying Chicago's declarations concerning the connections between its policies and the effectiveness of its police force. The Attorney General never addresses the above-discussed harm to Chicago's immigrant communities or considers that such harm may affect the CPD's ability to prevent and solve crimes. (*See* Def.'s Resp. to Pl.'s Facts ¶¶ 5, 7, 11; May 31, 2016 Office of Inspector General Mem., Ex. H to Def.'s Request for Judicial Notice, Dkt. No. 140-8; July 25, 2017 DOJ Press Release, Ex. R to Pl.'s Request for Judicial Notice, Dkt. No. 157-18.) As

such, this Court finds that Chicago's compliance with the Conditions would damage local law enforcement's relationship with immigrant communities and decrease the cooperation essential to prevent and solve crimes both within those communities and Chicago at large. Trust once lost is not easily restored, and as such, this is an irreparable harm for which there is no adequate remedy at law. *Cf. Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1140 (7th Cir. 1994) (finding that loss of goodwill can qualify as an irreparable harm for which there is no adequate remedy at law). Beyond that, the Hobson's choice that now confronts the City—whether to suffer this injury or else decline much-needed grant funds—is not a choice at all and is itself sufficient to establish irreparable harm. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (finding injunctive relief available where plaintiffs faced choice between continually violating state law and facing huge liability or violating the law once as a test case but suffering the injury of obeying the allegedly unconstitutional law during the pendency of review); *see also City of Chicago v. Sessions*, 264 F. Supp. 3d at 950. Additionally, a constitutional injury alone can constitute irreparable harm. *See* 11A Wright & Miller, Federal Practice & Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of

a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."); *see also Ezell v. City of Chicago,* 651 F.3d 684, 698-700 (7th Cir. 2011); *County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017), *appeal dismissed as moot*, *sub nom. City & County of San Francisco v. Trump*, No. 17 16886, 2018 WL 1401847, at *1 (9th Cir. Jan. 4, 2018). Chicago faces such an injury here, where the Attorney General subjects the City's receipt of grant funds to unconstitutionally imposed Conditions. For all of those reasons, Chicago demonstrates irreparable harm and lacks an adequate remedy at law.

The balance of hardships weighs in Chicago's favor as well. As already explained, Chicago will suffer irreparable harm if the Attorney General's imposition of the Conditions is not enjoined. If Chicago accepts the Byrne JAG funds and its Conditions, the City's relationship with its immigrant communities will be degraded, making the City's task of preventing and prosecuting crime more difficult. (Def.'s Resp. to Pl.'s Facts ¶¶ 5, 7, 11.) The picture is no brighter if Chicago declines the funds. If it does so, it will do so only to avoid the Conditions which the Attorney General has no authority or right to impose. Chicago intends to use the FY 2017 funds to expand its use of the

ShotSpotter acoustic-surveillance technology into two communities plagued by high rates of gun violence. (*Id.* ¶ 15.) According to Chicago's submissions, implementing this technology has a direct and positive effect on public safety. (*See id.*; Sach Decl. ¶ 15 (reciting that Chicago had 302 fewer shootings compared to the equivalent period in 2016 and that more than half of the reduction came from areas that recently deployed ShotSpotter).) But without the already-budgeted FY 2017 Byrne JAG funds, Chicago will not be able to expand its use of that technology as planned. (Sach Decl. ¶ 11.) Thus, the Conditions' continued application causes Chicago hardship by unlawfully blocking it from funds it could otherwise accept without grievance.

On the other side of the scale, the Attorney General experiences little hardship from the imposition of this injunction. First, as the Seventh Circuit recognized, Chicago, "like other 'welcoming' or 'sanctuary' cities or states, does not interfere in any way with the federal government's lawful pursuit of its civil immigration activities, and presence in such localities will not immunize anyone to the reach of the federal government. The federal government can and does freely operate in 'sanctuary' localities." *City of Chicago v. Sessions*, 888 F.3d at 281 (citation omitted). True, the corresponding downturn in

cooperation from local jurisdictions could, as the Attorney General fears, decrease the effectiveness of federal immigration enforcement. (*See* May 31, 2016 Office of Inspector General Mem., Ex. H to Def.'s Request for Judicial Notice, Dkt. No. 140-8; July 25, 2017 DOJ Press Release, Ex. R to Pl.'s Request for Judicial Notice, Dkt. No. 157-18.) Yet while the Attorney General would prefer to avoid that outcome, his present attempt to steer around it relies upon unlawfully imposing unauthorized grant Conditions. Though the Attorney General has many tools at his disposal to increase such local cooperation, conditioning the Byrne JAG grant as he has here is not one of them. The Attorney General thus suffers little hardship here because the injunction does not strip away any option he could otherwise exercise. In the end, the weight of the hardships rests with Chicago.

Finally, the public interest is served by issuing a permanent injunction. The Attorney General must administer the Byrne JAG grant program in conformance with the limited statutory authority Congress affords him. As explained at length, Congress provided the Attorney General no authority to impose the Conditions. The role of the judiciary to enjoin conduct by the executive that crosses its constitutionally-imposed limits is as essential to our form of government as it is well-established:

The founders of our country well understood that the concentration of power threatens individual liberty and established a bulwark against such tyranny by creating a separation of powers among the branches of government. If the Executive Branch can determine policy, and then use the power of the purse to mandate compliance with that policy by the state and local governments, all without the authorization or even acquiescence of elected legislators, that check against tyranny is forsaken. . . . It falls to us, the judiciary, as the remaining branch of the government, to act as a check on such usurpation of power. We are a country that jealously guards the separation of powers, and we must be ever-vigilant in that endeavor.

*City of Chicago v. Sessions*, 888 F.3d at 277. By enjoining the unlawful Conditions, the Court acts as a check on the executive's encroachment of congressional power and thus serves the public interest by constraining the Attorney General's authority in order to preserve the Byrne JAG program as Congress envisioned. *Cf. Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an unconstitutional law is always contrary to the public interest." (citations omitted)).

In conclusion, Chicago has demonstrated all four requirements for permanent injunctive relief: (1) Chicago's harm is irreparable; (2) such harm cannot be fully remedied by monetary damages; (3) the balance of hardships favors Chicago; and (4) a permanent injunction will not undermine the public interest. *See eBay,* 547 U.S. at 391; *accord City of Philadelphia v. Sessions*, No. 17-3894, 2018 WL 2725503, at *40-43 (E.D. Pa. June 6, 2018)

(granting permanent injunctive relief in analogous factual circumstances); *City of Los Angeles v. Sessions*, 293 F. Supp. 3d 1087, 1100-01 (C.D. Cal. 2018) (same). Accordingly, the Court finds permanent injunctive relief warranted as to all three Conditions.

## 2. *Scope of the Permanent Injunction*

The scope of the preliminary injunction is currently on appeal before the Seventh Circuit sitting *en banc*. This Court entered the preliminary injunction on September 15, 2017, enjoining the Attorney General from imposing Conditions nationwide. *See City of Chicago v. Sessions*, 264 F. Supp. 3d at 951-52. On appeal, the Seventh Circuit panel unanimously affirmed this Court's ruling that the Attorney General lacks the statutory authority to impose the Conditions and a divided panel affirmed this Court's corresponding issuance of a nationwide preliminary injunction. *See City of Chicago v. Sessions*, 888 F.3d at 293. The Attorney General petitioned for rehearing *en banc* solely as to the nationwide scope of the injunction, and the Seventh Circuit granted that request. *See En Banc* Order, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. June 4, 2018), Dkt. No. 128. While the *en banc* rehearing is pending, the Seventh Circuit stayed the nationwide scope of the preliminary injunction, thus limiting it,

for now, to Chicago. *See* Order, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. June 26, 2018), Dkt. No. 134. The eventual *en banc* ruling may well shed much-needed light on the proper scope of such injunctions, which is at present a matter of some debate. *See City of Chicago v. Sessions*, No. 17 C 5720, 2017 WL 4572208, at *4 (N.D. Ill. Oct. 13, 2017) (discussing the advantages and disadvantages of nationwide injunctions); *see, e.g.*, *Trump v. Hawaii,* 138 S. Ct. 2392, 2425-29 (2018) (Thomas, J., concurring) (questioning the legality and historical underpinnings of universal or nationwide injunctions); *id.* at 2446 n.13 (Sotomayor, J., dissenting) (finding the district court did not abuse its discretion by granting nationwide relief); Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 469 (2017) (arguing injunctions should only constrain defendant's conduct against the plaintiff); Spencer E. Amdur and David Hausman, *Nationwide Injunctions and Nationwide Harm*, 131 Harv. L. Rev. Forum 49 (2017) (responding to Bray's criticisms of nationwide injunctions); Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. (forthcoming 2018) (defending the use of nationwide injunctions); Getzel Berger, Note, *Nationwide Injunctions Against the Federal Government: A Structural Approach*, 92 N.Y.U. L. Rev. 1068, 1100 (2017) (arguing injunctions against

the federal government should extend only to the circuit where the district court sits).

And yet, though the *en banc* rehearing is pending, these district court proceedings do not freeze in place. When a preliminary injunction goes up on appeal, the district court retains the power to reach the merits of a case and, in fact, is duty-bound to do so. *See* 16 Wright & Miller, *Federal Practice & Procedure* § 3921.2 (3d ed.) (collecting cases and recognizing "cases involving injunctive relief are apt to present an urgent need for action"); *Staffa v. Pollard*, 597 F. App'x 893, 895 (7th Cir. 2015) ("[A]n appeal from an interlocutory decision—here, the denial of a preliminary injunction—does not divest a district court of jurisdiction or prevent the court 'from finishing its work and rendering a final decision.'" (quoting *Wis. Mut. Ins. Co. v. United States*, 441 F.3d 502, 504 (7th Cir. 2006)) (citations omitted)); *qad. Inc. v. ALN Assocs., Inc.*, 974 F.2d 834, 837 (7th Cir. 1992) (finding the district court "on solid legal ground" where it dissolved an injunction even while appeal of the injunction was pending). Federal Rule of Civil Procedure 62(c) specifically contemplates this circumstance and specifies that the trial court retains power to "suspend, modify, restore, or grant an injunction" during the pendency of the interlocutory appeal.

FED. R. CIV. P. 62(c); *see also State v. Trump*, 263 F. Supp. 3d 1049, 1056 (D. Haw. 2017) ("Federal Rule of Civil Procedure 62(c) allows this Court to issue further orders with respect to an injunction it issued, notwithstanding appeal, in order to preserve the status quo or ensure compliance with its earlier orders."), *aff'd,* 871 F.3d 646 (9th Cir. 2017). District courts routinely enter summary judgment and convert injunctions from preliminary to permanent while such appeals are pending. *See, e.g.*, *FTC v. Assail, Inc.*, 98 F. App'x 316, 317 (5th Cir. 2004) ("[I]t is settled that a district court has jurisdiction to proceed with the merits of the case and to grant a permanent injunction while an appeal of a preliminary injunction order is pending." (citations omitted)); *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1174 (6th Cir. 1995) (same); *cf. United States v. City of Chicago*, 534 F.2d 708, 711 (7th Cir. 1976) (recognizing that "an order granting or denying an interlocutory or preliminary injunction is merged in a decree or order granting or denying the permanent injunction, and that when both orders are appealed from, the appeal from the former will be dismissed").

Even so, the weight of practice and respect for both judicial efficacy and higher authorities dictate that district courts should use such power only in a manner that preserves the status

quo and thus the integrity of the appeal. *See Aljabri v. Holder*, 745 F.3d 816, 820 (7th Cir. 2014) (noting that a district court should not modify an order up on interlocutory appeal because to do so is "at best wasteful of resources and at worst chaotic"); *Coastal Corp. v. Tex. E. Corp.*, 869 F.2d 817, 819-20 (5th Cir. 1989) (finding that district courts should not act in a way that could divest the court of appeals from jurisdiction during the pendency of an interlocutory appeal); *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir. 1962) (same); *cf. N.W. Enters. Inc. v. City of Houston*, 372 F.3d 333, 338 (5th Cir. 2004) (per curiam) (holding district court lacked jurisdiction to reverse injunctive relief already on appeal). Beyond this, the Court notes that there have been no intervening changes in facts or law since the preliminary injunction ruling that would shift this Court's understanding of the original injunction's propriety. A Seventh Circuit reversal *en banc* would, of course, be such a change, but until such a ruling comes down, this Court will not depart from its earlier analysis, which will preserve the status quo and the integrity of the pending appeal. As such, the Court now orders a permanent nationwide injunction as to all three Conditions, consistent with the Court's earlier ruling enjoining

the Attorney General from imposing the Notice and Access Conditions nationwide.

However, recognizing and deferring to the Seventh Circuit's stay of the preliminary injunction as to all parts of the country beyond Chicago, this Court stays the nationwide scope of the permanent injunction in the same fashion. "Stays, like preliminary injunctions, are necessary to mitigate the damage that can be done during the interim period before a legal issue is finally resolved on its merits. The goal is to minimize the costs of error." *In re A & F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). Courts use four factors to determine whether a stay is appropriate: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). In weighing the factors, "a 'sliding scale' approach applies; the greater the moving party's likelihood of success on the merits, the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A & F Enters.*, 742 F.3d at 766.

Here, those factors weigh in favor of staying the nationwide scope of the injunction. First, as illustrated above, the scope of the injunction involves novel issues upon which reasonable minds could differ, as evidenced by the disagreement between the majority and dissenting opinions in the Seventh Circuit's now-vacated panel opinion. *See City of Chicago v. Sessions*, 888 F.3d at 288-300. And, while certainly not determinative, the fact that the court of appeals granted rehearing *en banc* and stayed the injunction in the first place makes Chicago's nationwide-scope argument less auspicious than it had otherwise been. The first factor thus tilts the scales toward granting the stay, and the other factors do not reset the balance. The second and third factors weigh neutrally. The Attorney General faces no great harm absent a stay because he has no authority to impose the Conditions, and Chicago will not be directly affected by the stay. Finally, the fourth factor weighs in favor of granting the stay. The public interest will be best served by allowing the court of appeals time to issue its ruling. Noting that this complex issue is currently pending, prudence dictates waiting for guidance before effectuating such broad relief. Given the *en banc* stay already in place, mimicking that stay now will keep these scope issues streamlined and, if the *en banc* ruling were to overturn the panel's affirmance, reduce the

judicial whiplash to which Byrne JAG applicants nationwide will be subjected.  In sum, the required elements for a stay of the nationwide scope of the permanent injunction are satisfied.

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, the Court grants the City of Chicago's Motion for Summary Judgment on Counts I and II and correspondingly denies the Attorney General's Motion to Dismiss Counts I, II, and IV.  The Court enters and immediately stays permanent injunctive relief as detailed above.  The remaining claims are dismissed as moot.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

Dated: 7/27/2018

- 58 -