In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 18-2885 & 19-3290

CITY OF CHICAGO,

*Plaintiff-Appellee,*

*v.*

WILLIAM P. BARR, Attorney General
of the United States,

*Defendant-Appellant.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 1:17-cv-05720 & 1:18-cv-06859 — **Harry D. Leinenweber**, *Judge.*

———————————

NO. 18-2885 ARGUED APRIL 10, 2019,

NO. 19-3290 SUBMITTED FEBRUARY 6, 2020

DECIDED APRIL 29, 2020

AMENDED JUNE 4, 2020

———————————

Before BAUER, MANION, AND ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge*. In this appeal from two consolidated cases, we consider for a second time the legality of conditions imposed by the Attorney General on the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG"). *See* 34 U.S.C. § 10151 et seq. (formerly 42 U.S.C. § 3750). Previously, the district court granted a preliminary injunction as to two conditions—known as the notice and access conditions—imposed by the Attorney General on the FY 2017 Byrne JAG grant applicants. We upheld the preliminary injunction and its nationwide scope in *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ("*Chicago I*").

The Attorney General then took the rare step of seeking en banc review limited to only the nationwide scope of the injunction, excluding the determination that injunctive relief was proper as to the notice and access conditions, and we granted en banc review. During the pendency of that review, the district court granted a permanent injunction, and in light of that superseding relief we vacated the decision granting en banc review. *City of Chicago v. Sessions*, No. 17-2991, 2018 WL 4268814, at *2 (7th Cir. Aug. 10, 2018). The district court again determined that the notice and access conditions imposed by the Attorney General were unlawful and unconstitutional, but also determined that a third condition—the compliance condition—was unconstitutional as well. *City of Chicago v. Sessions*, 321 F. Supp. 3d 855 (N.D. Ill. 2018). The court extended the injunction to apply to all FY 2017 grant recipients program-wide, but in light of our prior grant of en banc review regarding the scope of the injunction, stayed the injunction to the extent that it applied beyond the City of Chicago.

Nos. 18-2885 & 19-3290                                            3

The Attorney General appealed that determination, and while it was pending in this court, the district court granted a permanent injunction in a second case brought by the City of Chicago, this time challenging the Attorney General's imposition of conditions on the FY 2018 Byrne JAG grant. *City of Chicago v. Barr*, 405 F. Supp. 3d 748 (N.D. Ill. 2019). Those conditions included the same notice, access, and compliance conditions that the district court enjoined as to the FY 2017 grant, as well as some new conditions. The district court enjoined the imposition of all of the challenged conditions as to the FY 2018 Byrne JAG grant and all future years, and once more stayed the injunction as to grantees other than the City of Chicago. *Id*. at 770. The Attorney General again appealed to this court, and we consolidated the two cases for the purposes of the appeal.

The stakes in this case are high. Chicago, like many local governments, has determined that: (1) effective law enforcement requires the cooperation of its undocumented residents; (2) such cooperation cannot be accomplished if those residents fear immigration consequences should they communicate with the police; and, therefore, (3) local law enforcement must remain independent from federal immigration enforcement. The Byrne JAG grant was enacted by Congress to support the needs of local law enforcement to help fight crime, yet it now is being used as a hammer to further a completely different policy of the executive branch—presenting a city such as Chicago with the stark choice of forfeiting the funds or undermining its own law enforcement effectiveness by damaging that cooperative relationship with its residents.

The Attorney General repeatedly expresses frustration that Chicago, or any other jurisdiction, can "simultaneously

accept federal law enforcement grants, yet maintain local policies that frustrate federal immigration enforcement." Appellant's Brief 1-3-20 at 1. It is a sentiment echoed by the only circuit—of the five that have considered it—to uphold the challenged conditions thus far. *See State of New York v. Dept. of Justice*, 951 F.3d 84, 107 (2d Cir. 2020) ("there is something disquieting in the idea of States and localities seeking federal funds to enforce their own laws while themselves hampering the enforcement of federal laws, or worse, violating those laws.") But states do not forfeit all autonomy over their own police power merely by accepting federal grants. And the Attorney General's perception of the urgency of immigration enforcement does not corral for the executive branch the powers entrusted to the legislative branch. The executive branch has significant powers over immigration matters; the power of the purse is not one of them. This tendency to overlook the formalities of the separation of powers to address the issue-of-the-day has been seen many times by the courts, and it is no more persuasive now than it was in those cases. As the Supreme Court has stated, repeatedly:

> Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear 'formalistic' in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power among sovereigns and among branches of government precisely so that we may resist the

> temptation to concentrate power in one location
> as an expedient solution to the crisis of the day.

*Printz v. United States*, 521 U.S. 898, 933 (1997), quoting *New York v. United States*, 505 U.S. 144, 187 (1992).

We conclude again today, as we did when presented with the preliminary injunction, that the Attorney General cannot pursue the policy objectives of the executive branch through the power of the purse or the arm of local law enforcement; that is not within its delegation. It is the prerogative of the legislative branch and the local governments, and the Attorney General's assertion that Congress itself provided that authority in the language of the statutes cannot withstand scrutiny.

## I. Facts and District Court Rulings

In *Chicago I*, we discussed at length the Byrne JAG program and Chicago's Welcoming Ordinance, as well as their respective purposes. *See Chicago I*, 888 F.3d at 276–82. In short, the Byrne JAG grants are awarded annually to address the needs of state and local law enforcement. They are the primary source of federal criminal justice enforcement funding for state and local governments. This lawsuit stemmed initially from the Attorney General's decision to attach three conditions to those grants—the notice, access and compliance conditions, which as set forth by the district court provide respectively:

> (1) A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request

authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable—provide the requested notice to DHS.

(2) A State statute, or a State rule, -regulation, -policy, or -practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given [] access [to] any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

(3) The applicant local government must submit the required 'Certification of Compliance with 8 U.S.C. § 1373' (executed by the chief legal officer of the local government).

*City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 937–38 (N.D. Ill. 2017). In short:

- the **notice** condition requires that state or local officials honor requests to provide federal agents advance notice of the scheduled release date and time for aliens in custody;

- the **access** condition requires state or local correctional facilities to give federal agents access to aliens in their custody;

- and the **compliance** condition requires the state or local governments to certify their compliance with 8 U.S.C. § 1373 (hereinafter "§ 1373"), which prohibits state and local governments from restricting their own officials from communicating information regarding the citizenship or immigration status of any individual to the Immigration and Naturalization Service.[1]

All of those conditions were imposed on applicants for the FY 2018 Byrne JAG grant as well, but three new conditions were added. The first was virtually identical to the compliance condition, except that it referenced 8 U.S.C. § 1644 (hereinafter § 1644) rather than 8 U.S.C. § 1373 which contains essentially the same language:

- the **§ 1644 compliance condition** requires certification that the "program or activity" funded under the Byrne JAG award complies with § 1644, which provides "[n]otwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any

---

[1] The Homeland Security Act of 2002 completely dismantled the Immigration and Naturalization Service and created a new cabinet level agency—the Department of Homeland Security—under which Immigration and Customs Enforcement (ICE) now operates. *See* Homeland Security Act of 2002, Pub. L. No. 107–296, 116 Stat. 2135.

> way restricted, from sending to or receiving
> from the Immigration and Naturalization
> Service information regarding the immigra-
> tion status, lawful or unlawful, of an alien in
> the United States."

The Attorney General concedes that the two compliance
conditions are equivalent and that our disposition as to one
will control as to the other.

The Attorney General imposed two additional conditions
on the FY 2018 Byrne JAG grant that were distinct from those
imposed on the FY 2017 grant, which have been termed the
"harboring" condition and the "additional certification" con-
dition:

- The **harboring condition** prohibits the recip-
  ient jurisdiction from making any "public
  disclosure … of any federal law enforcement
  information in a direct or indirect attempt to
  conceal, harbor, or shield from detection any
  fugitive from justice under 18 U.S.C. ch. 49,
  or any alien who has come to, entered, or re-
  mains in the United States in violation of
  8 U.S.C. ch. 12—without regard to whether
  such disclosure would constitute (or could
  form a predicate for) a violation of 18 U.S.C.
  1071 or 1072 or of 8 U.S.C. 1324(a)."

- The **additional certification** condition re-
  quires the certification that "neither the ju-
  risdiction nor any entity, agency, or official
  of the jurisdiction has in effect … any law,
  rule, policy, or practice that would apply to

> the 'program or activity' to be funded … that
> would or does—(a) impede the exercise by
> federal officers of authority under 8 U.S.C.
> § 1357(a); or (b) impede the exercise by fed-
> eral officers of authority relating to 8 U.S.C.
> § 1226(a) or (c), 8 U.S.C. § 1231(a), or 8 U.S.C.
> § 1366(1) or (3)."

*Chicago*, 405 F. Supp. 3d at 754–55.

Those conditions conflict with the Welcoming City Ordi-
nance, which reflects Chicago's determination that the coop-
eration of all persons, whether documented or undocu-
mented, "'is essential to achieve the City's goals of protecting
life and property, preventing crime and resolving problems.'"
*Chicago I*, 888 F.3d at 279 (quoting Chicago Municipal Code,
Welcoming City Ordinance (the "Ordinance"), § 2-173-005
"Purpose and Intent"). Toward that end, the Ordinance sets
forth standards which include prohibitions on requesting or
disclosing information as to immigrant status, as well as a
prohibition on detaining persons solely based on a belief as to
their immigration status or on immigration detainers based
solely on violations of civil immigration laws. *Chicago I*, 888
F.3d at 279; Ordinance, § 2-173-020, -030, -042. The Ordinance
further provides that "unless acting pursuant to law enforce-
ment purposes unrelated to the enforcement of civil immigra-
tion law, no agency or agent shall permit Immigration and
Customs Enforcement (ICE) agents access to a person being
detained or permit the use of agency facilities for investigative
interviews, nor can an agency or agent while on duty expend
time responding to ICE inquiries or communicating with ICE
as to a person's custody status or release date." *Chicago I*, 888
F.3d at 279; Ordinance § 2-173-042. Those restrictions in the

Ordinance are inapplicable when the subject of the investiga-
tion "has an outstanding criminal warrant, … has been con-
victed of a felony, … is a defendant … where … a felony
charge is pending, … or has been identified as a known gang
member either in a law enforcement agency's database or by
his or her own admission." Ordinance, § 2-173-042(c); *Chicago
I*, 888 F.3d at 279–80.

### A. Challenge to FY 2017 grant

In the first of the two cases before us, Chicago challenges
the conditions imposed on the FY 2017 grant, alleging: that
the conditions were unconstitutional because the Byrne JAG
statute does not provide the Attorney General with the statu-
tory authority to impose the conditions, and that the imposi-
tion is therefore *ultra vires* and a violation of the separation of
powers; that the conditions violate the Spending Clause of the
Constitution; and that, independent of the Byrne JAG grant,
§ 1373 is an impermissible federal conscription of state power
and is unconstitutional under the anticommandeering doc-
trine of the Tenth Amendment. Chicago also sought a declar-
atory judgment providing that even if § 1373 is constitutional,
Chicago is in compliance with it. Finally, Chicago alleged that
the imposition of the conditions was arbitrary and capricious
in violation of the Administrative Procedures Act and vio-
lated the Paperwork Reduction Act.

The Attorney General sought dismissal of the complaint
in its entirety, arguing that the complaint was insufficient to
state a claim and that the court lacked subject matter
jurisdiction. As to subject matter jurisdiction, the Attorney
General asserted that the Department of Justice had not yet
consummated any final agency action that was ripe for
judicial review because it had not reached a final decision as

to whether to award Chicago funds under the Byrne JAG grant. Chicago responded that its challenge was not to the Attorney General's pending decision as to whether to award the grant funds, but rather to the decision to attach the conditions to the grant in the first instance. The district court agreed with Chicago as to the nature of the challenge, noting that the complaint requested that the court "[d]eclare that all three immigration-related conditions for the FY 2017 Byrne JAG are unlawful." *City of Chicago*, 321 F. Supp. 3d at 865. The court noted that in order for an agency action to be final, two criteria must be satisfied: it must mark the consummation of the agency's decision-making process and not merely a tentative or interlocutory decision; and it must be one by which rights or obligations of the challenging party have been determined or from which legal consequences will flow. *Id.* at 865 (citing *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). The court held that the action was not merely tentative or interlocutory, because the Attorney General stated in his declaration that every FY 2017 award would include conditions identical to the ones in the grant already awarded, which included all of the challenged conditions. *Id.* at 865. In addition, the court noted that the FY 2017 grants were awarded based on a solicitation that clearly imposed the challenged conditions. *Id*. The court held that the second criteria was met as well, because the conditions force Chicago to choose between accepting the award with those conditions, or forgoing the grant and the corresponding law enforcement benefit in favor of maintaining the policies that it believed would maximize law enforcement goals. *Id*. at 866.

Chicago moved for partial summary judgment as to three counts, arguing that the Attorney General acted *ultra vires* in imposing the conditions, and in violation of the separation of

powers, and contending that even if the compliance condition was valid, Chicago was not in violation of § 1373. The district court granted the motion and determined that § 1373 was facially unconstitutional under the Tenth Amendment's anticommandeering principle, that the Attorney General exceeded the authority delegated by Congress in the Byrne JAG statute, 34 U.S.C. § 10151 et seq., and in 34 U.S.C. § 10102(a)(6), and that the Attorney General violated the principle of the separation of powers in attaching conditions to the FY 2017 Byrne JAG grant. The court enjoined the imposition of the three conditions program-wide, but stayed the injunction beyond the City of Chicago pending the appeal. *Id*. at 882. The Attorney General now appeals that decision as to all three of the conditions.

## B. Challenge to FY 2018 grant

In the second of the two cases consolidated in this appeal, Chicago raises identical challenges to the notice, access and compliance conditions, and also challenges the harboring condition and the additional certification requirement.[2] The district court held that the notice, access, and compliance conditions were materially identical to the conditions it had already enjoined in the case challenging the FY 2017 grant conditions, and that the new compliance condition referencing § 1644 was indistinguishable from the § 1373 compliance condition and therefore unlawful under the same reasoning. As

---

[2] Although one additional claim was dismissed without prejudice, the City of Chicago has informed the court that it disavows any right to further pursue that claim in this action, and therefore the judgment is reviewable under § 1291. *See West v. Louisville Gas & Elec. Co.*, 920 F.3d 499, 506 (7th Cir. 2019).

Nos. 18-2885 & 19-3290                                                13

to the additional certification requirement, the court first rec-
ognized that the Executive possesses no inherent authority to
impose conditions on the payment of federal funds author-
ized by the Legislature, and that the Attorney General had
failed to identify any source of authority as to the imposition
of the additional certification requirement. The district court
nevertheless proceeded to analyze whether any statutory ba-
sis for the Attorney General's authority was apparent.

The court first noted that the Byrne JAG statute itself pro-
vided no such authority, and in fact strictly delineated the for-
mula for the distribution of grant funds. The court then noted
that it had already held, with respect to the notice and access
conditions, that § 10102(a)(6) did not provide such authority.
The court further held that the statutes enumerated in the ad-
ditional certification requirement applied only to the federal
government and did not require cities or localities to do any-
thing, and therefore the Attorney General could not require
compliance with those statutes as an "applicable federal law"
under § 10153(A)(5)(D). Finally, the court addressed the har-
boring condition. After again noting that § 10102(a)(6) cannot
provide a source of such authority, the court considered the
Attorney General's argument that 34 U.S.C. §§ 10102(a)(2)
and (4) authorize the imposition of the harboring condition.
Those sections require the Assistant Attorney General to
maintain liaison with the executive and judicial branches of
the federal and state governments, public and private educa-
tional and research institutions, state and local governments,
and governments of other nations, relating to criminal justice.
The district court held that §§ 10102(a)(2) and (4) contain no
delegation of authority to place a harboring condition on
Byrne JAG grantees, but rather are more plausibly read as an

instruction that the Assistant Attorney General maintain bilateral communications with state and local governments.

## II. Analysis—Overview

As we discussed in *Chicago I*, this appeal is not about optimal federal or state immigration policies. That is not for the court to discuss or decide. Rather, the issues before us today concern the spheres of power that reside in the state rather than in the federal government, and the critical balance of power between the executive, legislative, and judicial branches of the federal government. Chicago, in deciding that its law enforcement needs would be better met if its undocumented residents could report crimes and communicate with its police force without fear of immigration consequences, is exercising its police power—an area of power long recognized as resting with the states. The Attorney General now seeks to pursue the federal government's interest in enforcing its immigration laws. Regulating immigration into this country is a legitimate federal interest, and the executive branch including the Attorney General has authority to enforce the nation's immigration laws. But the methods the executive employs in pursuit of those legitimate ends must be lawful and, in this case, the means the Attorney General has chosen are not lawful. The federal government cannot merely conscript the police forces of the state or local governments to achieve its ends; that would eviscerate the principles of federalism that rest at the very foundation of our government.

The Attorney General's use of extra-statutory conditions on federal grant awards as a tool to obtain compliance with his policy objectives strikes at the heart of another core value,

Nos. 18-2885 & 19-3290                                        15

which is the separation of powers among the branches of the federal government. The authority to pass laws and the power of the purse rest in the legislative not the executive branch. The composition of the legislature—with elected representatives and dual chambers—provides institutional protection from the abuse of such power. But no such institutional protection from abuse exists should such power be concentrated in the executive branch, where one individual—whether the President or the Attorney General or another official—determined to impose his or her policy preferences regardless of the will of Congress, could proceed unimpeded by the types of institutional checks present in the legislative body. Such a concentration of power would allow tyranny to flourish, and our system of government is wisely set up by the Founders to foreclose such a danger. The executive branch has significant powers of its own—particularly in matters such as immigration—but the power to wield the purse to alter behavior rests squarely with the legislative branch. Congress has thus far refused to pass legislation that would do precisely what the Attorney General seeks to do here. "Respecting the separation of powers forecloses no substantive outcomes. It only requires us to respect along the way one of the most vital of the procedural protections of individual liberty found in our Constitution." *Gundy v. United States*, 139 S. Ct. 2116, 2145 (2019)(Gorsuch, J., dissenting).

Article I of the Constitution vests the power to legislate with Congress, not the Executive. *Id*. at 2123. Therefore, "when Congress confers decisionmaking authority upon agencies *Congress* must 'lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform.'" (emphasis in original) *Whitman v.*

*Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001), quoting *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928).

### III. Notice, Access, Harboring and Additional Certification Conditions

For his authority to impose the conditions, the Attorney General points to 34 U.S.C. § 10102, which sets forth the duties and functions of the Assistant Attorney General as follows:

**(a) Specific, general and delegated powers**

The Assistant Attorney General shall--

**(1)** publish and disseminate information on the conditions and progress of the criminal justice systems;

**(2)** maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;

**(3)** provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;

**(4)** maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;

**(5)** coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute

Nos. 18-2885 & 19-3290                                                    17

of Justice, the Bureau of Justice Statistics, the Of-
fice for Victims of Crime, and the Office of Juve-
nile Justice and Delinquency Prevention; and

**(6)** exercise such other powers and functions as
may be vested in the Assistant Attorney General
pursuant to this chapter or by delegation of the
Attorney General, including placing special
conditions on all grants, and determining prior-
ity purposes for formula grants.

34 U.S.C. § 10102.

The Attorney General argues that §§ 10102(a)(2), (4), and
(6) provide authority for him to impose the substantive con-
ditions on the Byrne JAG grant. Specifically, he points to
§ 10102(a)(6) as allowing virtually unlimited authority to
place conditions on grants and therefore allowing the imposi-
tion of the notice, access, harboring and additional certifica-
tion conditions. He further points to the provisions in
§§ 10102(a)(2) and (4) empowering the Assistant Attorney
General to "maintain liaison" as further authority for the har-
boring condition.

### A. Section 10102(a)(6)

We turn first to the notice and access conditions, which we
previously addressed in the appeal from the grant of a pre-
liminary injunction. *Chicago I*, 888 F.3d 272. The district
court imposed a preliminary injunction as to those notice and access
conditions, and in *Chicago I* we upheld that preliminary in-
junction. The standard for preliminary injunctive relief re-
quires only a showing of a likelihood of success on the merits,
whereas permanent relief requires a determination on the
merits. *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 546

n.12 (1987). As to the challenge to the notice and access conditions, however, this is a distinction without a difference.

Our reasoning in *Chicago I* established Chicago's entitlement to relief on the merits, not merely a likelihood of success. The Attorney General relied on 34 U.S.C. § 10102(a)(6) as providing the statutory authority to impose both of those conditions.

Subsection (a)(6) provides that the Assistant Attorney General shall "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, **including placing special conditions on all grants, and determining priority purposes for formula grants.**" § 10102(a)(6) (emphasis added). During the first appeal, we held that the plain meaning of that language was to delineate the subcategory of powers and functions that the Assistant Attorney General could exercise when vested in the Assistant Attorney General either by the terms of this chapter or by delegation of the Attorney General. *Chicago I*, 888 F.3d at 285; *accord New York*, 951 F.3d at 102, *City of Philadelphia v. Atty. Gen. of United States*, 916 F.3d 276, 287 (3d Cir. 2019), *City & Cnty. of San Francisco v. Sessions*, 372 F. Supp. 3d 928, 943 n.4 (N.D. Cal. 2019). The "inescapable problem" with the Attorney General's interpretation, however, was that he did not even claim that the power exercised here was authorized anywhere in the chapter, nor could he claim that the Attorney General possesses that authority and could delegate it to the Assistant Attorney General. *Chicago I*, 888 F.3d at 285. And the plain language of § 10102(a)(6) precludes an interpretation that it is a stand-alone grant of power unrelated to the authority granted in the chapter or the authority granted to the Attorney General. *Id*.

Nos. 18-2885 & 19-3290                                     19

We further noted that our plain reading of the statute was
consistent with the structure of § 10102 and the Byrne JAG
program itself. *Id*. at 285–86. In contrast to discretionary
grants, the Byrne JAG program was a formula grant program,
with strictly-circumscribed provisions allocating award
amounts and penalties. An interpretation of § 10102(a)(6) that
would authorize the wholesale denial of all grant funds
would be a radical departure from the otherwise carefully-
delineated rules for the awarding and the withholding of
funds, and one would expect such a significant power to be
unmistakable in its language and to be connected to the Byrne
JAG (or grant awards in general) by reference. We noted that

> '[a] clause in a catch-all provision at the end of
> a list of explicit powers would be an odd place
> indeed to put a sweeping power to im-
> pose *any* conditions on *any* grants—a power
> much more significant than all of the duties and
> powers that precede it in the listing, and a
> power granted to the Assistant Attorney Gen-
> eral that was not granted to the Attorney Gen-
> eral. … As the Supreme Court has repeatedly
> held, 'Congress … does not alter the fundamen-
> tal details of a regulatory scheme in vague terms
> or ancillary provisions—it does not, one might
> say, hide elephants in mouseholes.'

*Id*. at 285–87, quoting *Gonzales v. Oregon*, 546 U.S. 243, 267
(2006); *Philadelphia*, 916 F.3d at 288. We will not repeat that
analysis here, but it applies equally in the context of a perma-
nent injunction. No new meritorious arguments have been
raised by the Attorney General as to those conditions in this
appeal. Accordingly, we adopt and incorporate the reasoning

from Section III of that opinion in this appeal. *Chicago I*, 888 F.3d at 282–87. For the reasons stated in *Chicago I*, the district court did not err in granting permanent injunctive relief as to the notice and access conditions. The Attorney General relies on § 10102(a)(6) as the authority to impose the additional certification and harboring conditions as well, and our rejection of that argument in *Chicago I* forecloses the argument as to those conditions as well.[3]

## B. Sections 10102(a)(2) and (4)

The Attorney General attempts to salvage the harboring condition by pointing to a different portion of § 10102—the subsections that instruct the Assistant Attorney General to maintain liaisons with other entities—in (a)(2), "with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice," and in (a)(4) "with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice." That language entrusts the Assistant Attorney General with maintaining lines of

---

[3] In the course of his argument that § 10102(a)(6) authorizes the imposition of the additional certification condition, the Attorney General also states in a parenthetical that the additional certification condition "also involves the provision of programmatic information to the extent that any active impeding takes the form of withholding information, *see* 34 U.S.C. § 10153(A)(4)." Appellant Brief, No. 19-3290, at 22; *see also City of Providence v. Barr*, 2020 WL 1429579 at *7 (1st Cir. March 24, 2020) (rejecting the argument that the "programmatic information" language in § 10153(A)(4) provided authority for the conditions). That is the sole reference to § 10153(A)(4) as a basis to support the imposition of the additional certification condition, and is insufficient to raise the argument before this court. *See Sauk Prairie Conservation All. v. United States Dep't of the Interior*, 944 F.3d 664, 674 (7th Cir. 2019).

communication with other entities, and is sandwiched between a recitation of other relatively-ministerial duties of the Assistant Attorney General including the power to: "publish and disseminate information on the conditions and progress of the criminal justice systems [in (a)(1)], … provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice [in (a)(3),] … [and] coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention [in (a)(5)]." 34 U.S.C. §§ 10102(a)(1), (3), (5); *Chicago I*, 888 F.3d at 287.

Nothing in that language even references, let alone authorizes, the Assistant Attorney General to impose conditions on the distribution of funds authorized by Congress. *See State of Oregon v. Trump*, 406 F. Supp. 3d 940, 969 (2019) (holding that the definition of liaison does not even hint at a punitive aspect, "let alone a discretionary authority to completely dissolve relations when one side does not abide by the wishes of the other," and that the structure of the statute also weighs against the Attorney General's interpretation); *San Francisco*, 372 F. Supp. 3d at 944 (noting that "[t]he structure of Section 10102 does not support the contention that 'maintain liaison' in Section 10102(a)(2) provides more than a ministerial duty on the Attorney General to maintain communication with other Federal and State agencies."). It would strain statutory interpretation to the breaking point to interpret a provision that requires the fostering of communication as handing to the Assistant Attorney General the power to withhold the entire Byrne JAG award for the failure to comply with

substantive conditions imposed by the Attorney General—particularly given that the language in the Byrne JAG grant sets forth highly detailed and precise circumstances that would justify the withholding of funds and the percentages that can be withheld. *See Chicago I*, 888 F.3d at 286–87.

Moreover, the language in subsections (a)(2) and (4) could not support the harboring condition even if we were to ignore the problem that the language itself does not authorize the imposition of conditions. Both subsections address the power to maintain liaisons *relating to criminal justice matters*. But the harboring condition that the Attorney General seeks to impose on the Byrne JAG grant is explicitly not targeted to criminal matters. The harboring condition prohibits the recipient jurisdiction from making any "public disclosure … of any federal law enforcement information in a direct or indirect attempt to conceal, harbor, or shield from detection any fugitive from justice under 18 U.S.C. ch. 49, or any alien who has come to, entered, or remains in the United States in violation of 8 U.S.C. ch. 12—*without regard to whether such disclosure would constitute (or could form a predicate for) a violation of [federal criminal law provisions] 18 U.S.C. 1071 or 1072 or of 8 U.S.C. 1324(a).*" (emphasis added) *Chicago*, 405 F. Supp. 3d at 754–55. Thus, it would withhold funds even regarding disclosures that related only to civil immigration and not the more narrow category of criminal immigration matters. And it is being used by the Attorney General to target Chicago's Welcoming City Ordinance, which explicitly allows the City to cooperate in criminal, as opposed to civil, immigration matters. The Attorney General cannot rely on a provision encouraging communications as to criminal justice matters as authority to deny funds for disclosures related only to civil matters. *See San Francisco*, 372 F. Supp. 3d at 945 (holding that the scope of the harboring

condition exceeds the ministerial duty to maintain liaison). For that reason as well, §§ 10102(a)(2) and (4) do not provide authority for the harboring condition.

## IV. Compliance Condition

We turn, then, to the compliance condition, which requires the state or local government to certify that it will not restrict its own officials from communicating information regarding the citizenship or immigration status of any individual. The burden of that requirement is not insignificant. For instance, in *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 952 (N.D. Cal. 2018), considering only detainer requests, the district court noted that "California's law enforcement agencies experienced double the detainer requests from ICE in one year—from 15,000 in fiscal year 2016 to 30,000 in fiscal year 2017." Under the Attorney General's compliance condition, a state or local government could not instruct its own employees that they must devote their time to law enforcement tasks that it deems a higher priority rather than respond to those information requests from ICE.

The compliance condition was not before this court in the prior appeal. The district court had denied preliminary relief as to that condition and Chicago did not cross-appeal that issue to this court. At the permanent injunction stage, however, the court reversed course and granted injunctive relief as to that condition as well based on the Supreme Court's decision in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), which had been issued in the interim.

### A. District Court Analysis

In the "Overview of Legal Requirements Generally Applicable to OJP [Office of Justice Programs] Grants and

Cooperative Agreements - FY 2017 Awards," (hereinafter "Overview of Legal Requirements"), the Attorney General declared that he was imposing the compliance condition "[c]onsistent with OJP's statutory authority to impose grant conditions, including 42 U.S.C. 3712 [now found at 34 U.S.C. § 10102]." *See* Dist. Ct. R. 26, Exh. M. As with the notice and access conditions, the Attorney General points to § 10102(a)(6) as authorizing the Assistant Attorney General to place special conditions on all grants and determine priority purposes for formula grants. We rejected that interpretation in *Chicago I* as to the notice and access provisions, and we have adopted that rationale in this appeal as well. The Attorney General's reliance on § 10102(a)(6) fails for the same reason when applied to the compliance condition.

Despite his declaration that the grant condition would be imposed pursuant to his power under § 10102, in the district court and on appeal the Attorney General primarily anchors the compliance condition to 34 U.S.C. § 10153(A)(5)(D) (hereinafter "§ 10153"). That provision states that in a request for a grant, the application "shall include … [a] certification, made in a form acceptable to the Attorney General … that … the applicant will comply with all provisions of this part *and all other applicable Federal laws*." (emphasis added) The Attorney General argues that the italicized portion allows him to require that applicants certify compliance with 8 U.S.C. § 1373.

Section 1373 provides:

**(a) In general**

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit,

or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional authority of government entities**

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

**(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

**(2)** Maintaining such information.

**(3)** Exchanging such information with any other Federal, State, or local government entity.

**(c) Obligation to respond to inquiries**

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by

Nos. 18-2885 & 19-3290

providing the requested verification or status information.

Under the Attorney General's reasoning, Congress itself incorporated § 1373 into the Byrne JAG program by requiring compliance with "all other applicable federal laws." And the Attorney General interprets the requirements of § 1373 incredibly broadly, maintaining that the information as to "citizenship or immigration status" incorporates information beyond an individual's immigration status, including, for instance, an alien prisoner's release date.

The district court interpreted the term "all other applicable federal laws" as encompassing all federal law. *City of Chicago*, 321 F. Supp. 3d at 875. The court held that if Congress wanted to limit the term to include just a specific body of federal grant-making laws, it could have done so, but that the language "all other applicable federal law" includes any federal law that applies to Chicago. *Id*. Because § 1373 is a federal law, the court held that § 10153 would require applicants to certify compliance with it. *Id*.

But the district court then considered whether § 1373 was itself constitutional, reasoning that an unconstitutional law could not constitute an "applicable law" under § 10153. The court held that § 1373 violated the anticommandeering doctrine of the Tenth Amendment in light of the Supreme Court's decision in *Murphy*, 138 S. Ct. 1461. *City of Chicago*, 321 F. Supp. 3d at 866–73, 875. In *Murphy*, the Court made clear that regardless of whether a federal law commands state action or precludes it, Congress cannot issue direct orders to state legislatures. *Murphy*, 138 S. Ct. at 1478. Accordingly, the language in § 1373 could be problematic under the Tenth Amendment even if it merely operated to preclude the state

from taking certain actions. The district court then considered the language of § 1373, which bars any government entity or official from prohibiting, or in any way restricting, any other government entity or official from exchanging information with federal immigration authorities, and also prohibits any person or agency from doing the same. The court held that Chicago had challenged § 1373 as an independent statute, and concluded that it was unconstitutional under the anti-commandeering doctrine of the Tenth Amendment. *City of Chicago*, 321 F. Supp. 3d at 867, 869. The court noted that a state's ability to control its offices and employees is at the heart of state sovereignty and that § 1373 violates that in a number of ways: first, it supplants local control of officers, precluding Chicago and other localities from limiting the amount of paid time its employees use to communicate with federal immigration authorities; second, it indirectly constrains local rule-making by precluding local lawmakers from passing laws that implement the localities' preferred policies, such as the Welcoming City Ordinance, which run counter to § 1373—a concern squarely addressed in *Murphy*; third, it redistributes local decision-making power by transferring that power from local policymakers to line-level employees who are empowered to decide for themselves whether or not to communicate with immigration authorities; and finally, because it eliminates the ability of a locality such as Chicago to control its employees' communications with federal immigration authorities, § 1373 prevents that locality from extricating itself from federal immigration enforcement, thus foreclosing the "critical alternative" recognized in *New York v. United States*, 505 U.S. 144, 177 (1992), of the option of non-participation in a federal program. *City of Chicago*, 321 F. Supp. 3d at 869–70. The court concluded that § 1373 was

unconstitutional on its face and, as an unconstitutional law, it could not be considered an "applicable federal law" for purposes of § 10153. *Id*. at 875–76. It rejected the Attorney General's baseless argument that even an unconstitutional law could be considered an "applicable federal law" under § 10153.

## B. Section 10153

The Attorney General challenges those conclusions on appeal, but we need not address the district court's compelling analysis of that Tenth Amendment issue, because we hold that the term "all other applicable federal law" cannot be construed so broadly as to encompass § 1373. *Pearson v. Callahan*, 555 U.S. 223, 241 (2009) (noting the court's long-time practice of "constitutional avoidance," where courts do not pass on questions of constitutionality unless such adjudication is unavoidable). Our analysis begins with the plain language of § 10153, interpreted not in a vacuum, but in light of the context and the statutory structure as a whole. *Gundy*, 139 S. Ct. at 2126; *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18–19 (1981). Proper interpretation considers not only the specific context in which the language is used, but the overall structure of the statute as a whole, as well as its history and purpose. *Gundy*, 139 S. Ct at 2126.

### 1. Plain Language

The Attorney General argues that the term "all other applicable federal law" incorporates all federal law that applies to states or localities. The immediate problem with that interpretation is that it renders the words "other applicable" superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)) ("[i]t is 'a

Nos. 18-2885 & 19-3290                                             29

cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"); *Philadelphia*, 916 F.3d at 289 ("the canon against surplusage counsels us to read the term 'applicable' in a way that gives it some independent heft.") If Congress meant to incorporate all law that applies to States or localities, that would be accomplished by requiring compliance with "all federal law." Any federal laws that did not apply to states or localities would simply be irrelevant in considering compliance, in that an entity could not fail to comply with a law that does not impose any legal obligations on it, and therefore the term would not be overinclusive. By including only "applicable" federal laws, the provision encompasses only laws that apply by their terms to the award itself.

The natural reading of the phrase considers the language in the subsection as a whole:

> **(A)** To request a grant … the … State or unit of local government shall submit an application to the Attorney General … in such form as the Attorney General may require. Such application shall include the following:
>
> **…**
>
> **(5)** A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), that—

**(A)** the programs to be funded by the grant meet all
the requirements of this part;

**(B)** all the information contained in the application
is correct;

**(C)** there has been appropriate coordination with
affected agencies; and

**(D)** the applicant will comply with all provisions of
this part and all other applicable Federal laws.

34 U.S.C. § 10153(A)(5). This provision relates to the grant ap-
plication itself and conformance to all of its requirements. It
provides for an assurance that the programs to be funded by
the grant meet all the requirements, that the information in
the grant application is correct, that appropriate coordination
with agencies affected by the grant has occurred, and that the
applicant will comply with all provisions of this part and "all
*other applicable* Federal laws." The most natural reading of the
last provision is that "all other applicable" laws refers to the
many federal laws that apply specifically to grants or grant-
ees. That is consistent with the structure of the provision as a
whole which addresses requirements related to the grant and
the application for the grant itself. *See City of Providence v. Barr*,
2020 WL 1429579 at *11 (1st Cir. March 24, 2020); *Philadelphia*,
916 F.3d at 289 (noting that those four subsections all relate to
the programs that will be funded under the grant, thus coun-
seling against a broader interpretation of the applicable laws
clause); *San Francisco*, 349 F. Supp. 3d at 954 (noting that all of
the conditions preceding it apply to the grant itself). This
reading also tracks more closely to the language of
§ 10153(A)(5)(D) itself, which requires certification that the
"applicant" will comply with all provisions of this part and

all other applicable federal laws, thus signaling that the requirement is tethered to the status of the state and locality as a grant *applicant* and not merely as a governmental entity.

## 2. Consistency with Other Statutes Applied

The language at issue is mirrored in a subsequent subchapter that also applies on its terms to the Byrne JAG program, and provides:

> Whenever, after reasonable notice and opportunity for a hearing on the record in accordance with section 554 of Title 5, the Bureau of Justice Assistance, the National Institute of Justice, and the Bureau of Justice Statistics finds that a **recipient of assistance under this chapter** has failed to comply substantially with—
>
> **(1)** any provisions of this chapter;
>
> **(2)** any regulations or guidelines promulgated under this chapter; or
>
> **(3)** any application submitted in accordance with the provisions of this chapter, or the provisions of **any other applicable Federal Act**;
>
> the Director involved shall, until satisfied that there is no longer any such failure to comply, terminate payments to the recipient under this chapter, reduce payments to the recipient under this chapter by an amount equal to the amount of such payments which were not expended in accordance with this chapter, or limit the availability of payments under this chapter to

>        programs, projects, or activities not affected by
>        such failure to comply.

(emphasis added) 34 U.S.C. § 10222. Again, the statute speaks
in terms of the "recipient of assistance under this chapter"
complying with "the provisions of any other applicable Fed-
eral law," thus signaling that the laws that would be "appli-
cable" are laws that refer specifically to grant recipients, not
any laws that apply generally to states or localities. The refer-
ence to "other" applicable Federal law is a nod to the require-
ments that precede it, which all relate to the grant itself and
regulations relating to it. Specifically, preceding the "all other
applicable Federal law" provision are the requirements that
the recipient of assistance comply substantially with provi-
sions of that chapter, regulations or guidelines promulgated
under that chapter, and applications submitted in accordance
with the provisions of this chapter. All of those requirements
directly relate to the requirements specific to the subject mat-
ter of the grants. The most natural reading of the phrase "all
other applicable Federal law," then, is that it includes laws *re-
lating to grant recipients* that appear outside this specific chap-
ter of the United States Code.

And that is true of the same language in § 10153(A)(5)(D)
as well. Because many federal laws explicitly apply to federal
grantees, the most natural reading of § 10153 as a whole is that
it requires the applicant to certify that it will comply with all
of those federal laws that apply, by their terms, to successful
grant applicants. That is consistent with the other listed pro-
visions in § 10153(A)(5) which relate to the grant itself—either
in assuring that it is awarded based on correct information, or
that it is pursued in proper coordination with affected agen-
cies, or, in the part at issue here, that it will be in compliance

with all the grant requirements in this part or other parts of federal law. It is also reflected in the OJP's own explanation of grant requirements as set forth in its Overview of Legal Requirements, which explains that "[e]ach recipient of an OJP grant or cooperative agreements **must comply with all federal statutes and regulations** *applicable to the award*, as well as the particular award conditions included in the award document." (emphasis added) Dist. Ct. R. 26, Exh. M.; *see also id.* (providing applicant an overview of statutes and award conditions "that *apply to* many (or in some cases, all) *OJP grants and cooperative agreements* awarded in 2017") (emphasis added). As that language makes clear, the connection of the law to the award itself is what renders a particular federal law "applicable."[4]

Such statutes directly applying to grants and grant recipients are plentiful, and the Byrne JAG program explicitly identifies a number of them in its application. In fact, a review of the other federal laws referenced in the application reveals a clear pattern of laws that explicitly apply to those receiving federal funds. The Edward Byrne Memorial Justice Assistance

---

[4] The Attorney General argues that some federal laws and regulations include language modifying "applicable," and that absent such language the term should be interpreted as unbounded (citing 42 U.S.C. § 16154(g)(1) ("generally applicable Federal laws and regulations governing awards of financial assistance, contracts, or other agreements") and Pub. L. No. 113-121, § 1043 (a)(3)(C)(ii)(II), 128 Stat. 1193, 1246 (2014) ("all applicable Federal laws (including regulations) relating to the use of the funds")). It is not at all clear that such language serves to narrow rather than to clarify, but regardless, the use of modifying language in other statutes does not alter our conclusion that the context, language and structure of this statute defines the phrase as including only laws relating to grants and grantees.

Grant Program FY 2017 Local Solicitation directs applicants
to the web pages accessible through the "Overview of Legal
Requirements Generally Applicable to OJP Grants and Coop-
erative agreements – FY 2017 Awards" for a general overview
of the important statutes and regulations that apply to the
grant. Appellant's Appendix, No. 18-2885, at A175. That
source identifies a number of federal laws that apply to the
grant, and those laws are identified in the grant award itself
as well. *See id.* at A50–A69. Unlike § 1373, however, those laws
by their very language apply expressly to grants and recipi-
ents of grants. For instance, the laws include:

> 18 U.S.C. § 1913—Lobbying with appropriated
> moneys, which provides that **"[n]o part of the
> money appropriated by any enactment of Con-
> gress** shall, in the absence of express authoriza-
> tion by Congress, be used directly or indirectly
> to pay for any personal service, advertisement,
> [etc.] … intended or designed to influence in
> any manner a Member of Congress … ."

> 22 U.S.C. § 7104—Prevention of trafficking,
> which in § 1704(g) provides that "the President
> **shall ensure that any grant** … provided or en-
> tered into by a Federal department or agency
> under which funds are to be provided to a pri-
> vate entity, in whole or in part, shall include a
> condition that authorizes the department or
> agency to terminate the grant … if the grantee
> or any subgrantee … engages in … (1) severe
> forms of trafficking in persons … ."

> 41 U.S.C. § 4712(a)(1)—Enhancement of con-
> tractor protection from reprisal for disclosure of

certain information, providing that **"[a]n employee of a … grantee, or subgrantee … may not be** discharged, demoted or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant … ."

28 C.F.R. § 54.100—Title IX regulation "designed to eliminate (with certain exceptions) discrimination on the basis of sex **in any education program or activity receiving Federal financial assistance,** whether or not such program or activity is offered or sponsored by an educational institution … ."

28 C.F.R. § 42.102-42.105—Title VI of the Civil Rights Act—prohibits discrimination on the ground of race, color, or national origin and "applies to **any program for which Federal assistance is authorized** under a law administered by the Department," with Federal financial assistance defined as **including "grants and loans of Federal funds**." It also requires that "[e]very application for Federal financial assistance to which this subpart applies … shall, as a condition to its approval and the extension of any Federal financial assistance pursuant to the application, contain or be accompanied by an assurance that the program will be conducted or the facility operated in compliance with all

requirements imposed by or pursuant to this subpart."

31 U.S.C. § 1352—Limitation on use of appropriated funds to influence certain Federal contracting and financial transactions, providing that **"[n]one of the funds appropriated by any Act may be expended by the recipient of a Federal ... grant ... to** pay any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with [federal contracts]."

(emphasis added). Those statutes and regulations also provide specific remedies tailored to each provision for violations—ranging from civil penalties to abatement measures to grant termination—in contrast to §1373 for which the Attorney General himself has determined that wholesale withholding of the entire grant is the remedy for noncompliance. *See, e.g.*, 31 U.S.C. § 1352(a)–(c) incorporated by reference in 18 U.S.C. § 1913, 22 U.S.C. § 7104(g), 41 U.S.C. § 4712(c). Section 1373, therefore, represents a departure from the other federal law incorporated into the grant. In fact, the Third Circuit in *Philadelphia*, 916 F.3d at 290, considered the history as to which laws the Justice Department included under the applicable laws clause, and noted that "[e]very condition that is authorized by the Applicable Laws Clause applies specifically to programs funded under the grant, not more generally to the grantee."

### C. Problems with AG's Interpretation

The Attorney General's interpretation of the compliance provision, in contrast, would expand that provision far beyond the context of the grant and its application, to encompass the broad, unrelated array of federal laws that apply to states or local governments regardless of their connection to this or any grant. Moreover, as we will explain, the Attorney General's interpretation would: (1) allow the executive to impose conditions that Congress repeatedly declined to institute itself; (2) allow the Attorney General in his discretion to impose a substantive qualifying condition on a grant that Congress explicitly established as a formula rather than a discretionary grant; (3) render irrelevant or illogical other provisions in the Byrne JAG statute and raise constitutional concerns; and (4) conflict with another statutory provision. As such, it is inconsistent with the bedrock principles of separation of powers and federalism, and the district court properly granted injunctive and declaratory relief.

**1.**

Although the Attorney General interprets § 10153 as requiring compliance with § 1373, Congress has repeatedly refused to pass legislation that would do precisely that, as we recognized in *Chicago I*:

> In the past few years, numerous pieces of legislation were introduced in the House and Senate seeking to condition federal funding on compliance with 8 U.S.C. § 1373—which was intended to address "sanctuary cities" and prohibit federal, state or local government officials or entities from restricting the exchange of information

> with the immigration authorities regarding citizenship or immigration status. None of those efforts were passed by Congress. See, e.g., Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3 (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2 (2015) (all available at https://www.congress.gov). see also Annie Lai & Christopher N. Lasch, *Crimmigration Resistance and the Case of Sanctuary City Defunding*, 57 Santa Clara L. Rev. 539, 553 n. 87 (2017) (listing eight pieces of legislation introduced during that time, all of which were unsuccessful).

*Chicago I*, 888 F.3d at 277–78. The Attorney General's reading would thus allow the Executive Branch to override Congress' refusal to endorse § 1373 compliance and would effectively "legislate" a different result.

**2.**

Second, the Attorney General's interpretation would vest the executive branch with unbridled power to identify select federal laws and impose them as a precondition for the receipt of federal grant money allocated by Congress. That discretionary authority is fundamentally inconsistent with the nature of the Byrne JAG grant as a formula grant, located in a separate section of the Act than the discretionary grants. *See*

generally Bureau of Justice Assistance Grant Program, 34 U.S.C. § 10151 et seq. As a formula grant rather than a discretionary grant, the grant awarded is a function of the state or local government's proportionate crime rate and population, and is incompatible with the sort of unbridled discretion that the Attorney General's interpretation would yield. *See Philadelphia*, 916 F.3d at 290 (noting that Congress structured the Byrne JAG program as a formula grant, and that allowing the withholding of funds "because a jurisdiction does not certify compliance with any federal law of the Attorney General's choosing undermines the predictability and consistency embedded in the program's design, thus turning the formula grant into a discretionary one.").[5]

The Attorney General dismisses this as a non-issue, declaring that the States and local governments were already subject to those laws and therefore the certification of compliance imposes no burden or barrier. He disclaims any role in determining which laws will be applied, stating that his interpretation "does not require compliance with laws 'selected at the Attorney General's uncabined discretion.'" Reply Brief, No. 18-2885, at 5. Instead, he declares that he is "not urging that the Attorney General has discretion to select applicable laws; rather, Congress has made laws applicable to Chicago, and Chicago must comply with them." *Id*. at 5–6. But that argument is utterly inconsistent with the application process

---

[5] As we noted in *Chicago I*, the provision for discretionary grants is located in a different subpart of the same statute, and "imbues the Director (who reports to the Assistant Attorney General) with the authority to award funds on terms and conditions that the Director determines to be consistent with that subpart." *Chicago I*, 888 F.3d at 286.

that the Attorney General has actually implemented and is meritless.

First, the grant application does not purport to track compliance with the entire universe of federal law. Instead, the Attorney General has singled out particular federal laws which act as a gatekeeper to control and limit access to the grant. That is apparent in the language of the application—which identifies specific statutes—and also in the Attorney General's apparent absence of concern with the multitudes of other federal laws that apply by their terms to states and cities, such as OSHA requirements or EPA regulations or any other federal constitutional, statutory or regulatory law. In fact, the Attorney General has *singled out* § 1373 and required a separate certification of compliance for that statute alone, with penalties for false statements or omissions ranging from civil penalties to criminal prosecution. Rather than conditioning the award of the grant on evidence that the state or local government is in compliance with *all* federal laws that by their terms apply to states or local governments, the Attorney General conditions the award on a certification that the state or locality is in compliance with one specific law—§ 1373—as is trumpeted in the following notice to grant applicants:

> **Alert:  New Requirements for Certain FY 2017 Programs**
>
> Consistent with OJP's statutory authority to impose grant conditions, including 42 U.S.C. 3712, OJP will include—in an award document sent to a prospective FY 2017 Edward Byrne Justice Assistance Grant ("Byrne JAG") recipient for acceptance—express award conditions concerning ongoing compliance

with 8 U.S.C. 1373, throughout the award period, in the "program or activity" funded by the award. (In general, section 1373 bars restrictions on communication between State and local agencies and officials and the Department of Homeland Security (and certain other entities) with respect to information regarding the citizenship or immigration status of any individual.) States and units of local government that apply for awards under the FY 2017 Byrne JAG Program will be required—prior to award acceptance—to submit a specific certification from the chief legal officer of the jurisdiction regarding the applicant's compliance with 8 U.S.C. 1373(a) and (b). Interested applicants may view a sample certification document at https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm.

In addition, consistent with OJP's statutory authority, OJP will include in any FY 2017 Byrne JAG award (as part of the award document) additional express conditions that, with respect to the "program or activity" that would be funded by the FY 2017 award, are designed to ensure that States and units of local government that receive funds from the FY 2017 Byrne JAG award: (1) permit personnel of the U.S. Department of Homeland Security ("DHS") to access any correctional or detention facility in order to meet with an alien (or an individual believed to be an alien) and inquire as to his or her right to

> be or remain in the United States; and (2) pro-
> vide at least 48 hours' advance notice to DHS re-
> garding the scheduled release date and time of
> an alien in the jurisdiction's custody when DHS
> requests such notice in order to take custody of
> the alien pursuant to the Immigration and Na-
> tionality Act.

Overview of Legal Requirements, Dist. Ct. R. 26, Exh. M. That
alert to future grant applicants expressly recognizes that the
OJP has selected one federal statute to impose as a grant con-
dition with requirements of certification that are specific to
that statute. Its contention that Congress, rather than the At-
torney General, has selected the laws that will constitute con-
ditions of the grant is patently false.

The argument that the certificate of compliance imposes
no burden because government entities were already
required to follow the law fails for an additional reason. The
identification of a federal law as an "other applicable law" for
receipt of the grant imposes a penalty on the violation of that
law that would otherwise not exist. It transforms every
federal legal obligation into a potential basis to withhold
funding that has been designated by Congress for
disbursement to state and local governments for law
enforcement. Yet that penalty for non-compliance is not a
penalty set forth by Congress in those other statutes.
Therefore, the interpretation by the Attorney General which
could transform any federal law into a condition of the grant
would indeed impose a burden not already provided by the
federal law itself, in the form of a steep financial penalty. In
fact, that "penalty" could extend well beyond the denial of the
Byrne JAG grant if the Attorney General's interpretation of

Nos. 18-2885 & 19-3290                                    43

"all other applicable federal law" is adopted. It would allow the Attorney General to withhold myriad other grants that have been authorized by Congress because that precise term is used in numerous other statutes—often as part of a statutory section that mirrors the one in the Byrne JAG grant at issue here—including statutes providing grants under: the Comprehensive Opioid Abuse Grant Program, 34 U.S.C. § 10702; Matching Grant Program for School Security, 34 U.S.C. § 10552; Career and Technical Education Assistance to the States, 20 U.S.C. § 2322; and the Byrne JAG discretionary grants, 34 U.S.C. §10181.

Interpreting that language as potentially incorporating any federal law would vest the Attorney General with the power to deprive state or local governments of a wide variety of grants, based on those entities' failure to comply with whatever federal law the Attorney General deems critical. Yet there is nothing in those statutes that even hints that Congress intended to make those grants dependent on the Attorney General's whim as to which laws to apply, cabined only by the requirement that the laws apply generally to states or localities. That anomalous result is avoided if we interpret the term "all other applicable federal law" to incorporate federal laws that explicitly apply to grants or grant recipients. As to those federal laws, Congress clearly intended them to apply to states and local governments applying for federal grants, and to impact those grants.

The potential for abuse is apparent. Here, the Attorney General has used the broad interpretation of "other applicable law" as a means of hijacking the legislatively-established Byrne JAG program to further particular policy goals of the Executive, despite the repeated refusal of Congress to impose

such a prerequisite itself. The open-ended ability to choose federal laws at will would allow the targeting of states or policy issues if the Attorney General chose to do so. For instance, the Attorney General could effectively isolate specific states by requiring certification of compliance with federal law regarding controlled substances, thus disqualifying states or local governments that have legalized or decriminalized marijuana, or by requiring a certification of compliance with federal constitutional law such as *Roe v. Wade*, 410 U.S. 113 (1973), thus eliminating grant funding for states that recently have passed "heartbeat bills" and other legislation designed to challenge *Roe*. That would transform the highly-structured formula grant into one that vested total in the Attorney General to impose barriers to the grant through his choice as to which other federal laws to target as grant conditions.[6]

### 3.

The Attorney General's identification of a specific law—and the conditioning of the grant on compliance with it—falls far astray from the language, context and structure of the statute itself. And a reading of the statutory language in a manner promoted by the Attorney General would raise potential

---

[6] In addition to the impropriety of such discretion in a formula grant generally, the discretion to set conditions here is also problematic because the certification provided in § 10153(A)(5) is only a certification "in a form acceptable to the Attorney General" that the applicant will comply with all other applicable federal laws. The statute, then, grants discretion only over the *form* of the certification, not the *content* as the Attorney General seeks to assert here. *Compare* 13 U.S.C. § 141 (providing that "[t]he Secretary shall … take a decennial census of the population … in *such form and content* as he may determine … .") (emphasis added); *accord City of Providence*, 2020 WL 1429579 at *11.

constitutional and statutory concerns. First, as we have al-
ready discussed, the statute cited as providing the authority
for the imposition of the condition grants no such power to
the Attorney General. Moreover, the vesting of such discre-
tionary authority in the hands of the Attorney General would
render irrelevant or illogical the statute's exacting delineation
of the formula for grant awards and the precise limits on the
extent to which the Attorney General can deviate from that
distribution, as we discussed in *Chicago I*, 888 F.3d at 286:

> The ability of the Attorney General to depart
> from the distribution mandated by the formula
> is strictly circumscribed. For instance, of the to-
> tal amount available in a given fiscal year, the
> Attorney General is authorized to reserve "not
> more than 5 percent, to be granted to 1 or more
> States or units of local government" for one or
> more of the allowed statutory purposes, "pur-
> suant to his determination that the same is nec-
> essary (1) to combat, address, or otherwise re-
> spond to precipitous or extraordinary increases
> in crime, or in a type or types of crime; or (2) to
> prevent, compensate for, or mitigate significant
> programmatic harm resulting from operation of
> the formula … ." 34 U.S.C. § 10157(b). Moreo-
> ver, the Attorney General is authorized by other
> statutes to reduce the funding in certain circum-
> stances, but even then the amount of the reduc-
> tion is set by statute. For example, the Sex Of-
> fender Registration and Notification Act man-
> dates a 10 percent reduction in JAG funding if a
> state fails to substantially implement its provi-
> sions. 34 U.S.C. § 20927(a). And the Prison Rape

Elimination Act of 2003 stipulates that a state that does not certify full compliance with its national standards can forfeit 5 percent of JAG funds unless it certifies that no less than 5 percent of such funds will be used solely to achieve compliance. 34 U.S.C. § 30307(e)(2)(A).

In contrast to those carefully delineated reductions for specific circumstances, the Attorney General's interpretation would allow the Attorney General to withhold 100% of funds based on his determination as to which federal law to target.

In addition to the dissonance with the statutory structure, the selective targeting of specific statutes without regard to the statute's relation to the grant or its purposes could present constitutional concerns. First, we note that as the Supreme Court reaffirmed in *Gundy*, 139 S. Ct. at 2129, a statutory delegation of authority "is constitutional so long as Congress has set out an 'intelligible principle' to guide the delegee's exercise of authority … [o]r in a related formulation, the Court has stated that a delegation is permissible if Congress has made clear to the delegee 'the general policy' he must pursue and the 'boundaries of [his] authority.'" Although courts rarely second-guess the degree of policy judgment left by Congress to those responsible for executing the law, the term "applicable" by itself is so devoid of any definition or guidance that, if the Attorney General were relying on that provision as a delegation of authority to impose the conditions, it would vest discretion unmoored by any legislative general policy or boundaries of authority.

In fact, the Supreme Court in *Gundy* recognized the constitutional issues presented by statutory provisions vesting such broad discretion, in considering the Sex Offender

Registry Notification Act ("SORNA") which provided that "[t]he Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter … and to prescribe rules for the registration of any such sex offender." *Id*. at 2122. Although the Justices in the plurality decision in *Gundy* could not agree as to the outcome, a majority recognized that such a provision, if read as granting the Attorney General discretion to determine *whether* to apply SORNA to offenders rather than the mechanics of *how* to apply it, would present constitutional nondelegation problems. *See Gundy*, 139 S. Ct. at 2123, 2128 (plurality) (discussing the whether/how distinction and noting that it would present a nondelegation question if, as Gundy argued, the provision in the SORNA statute "grants the Attorney General plenary power to determine SORNA's applicability to pre-Act offenders—to require them to register, or not, as she sees fit, and to change her policy for any reason and at any time") and 139 S. Ct. at 2143, 2145 (dissenting) (noting that the provision "gave the Attorney General unfettered discretion to decide which requirements to impose on which pre-Act offenders" and that "[m]ost everyone, the plurality included, concedes that if SORNA allows the Attorney General as much authority as we have outlined, it would present 'a nondelegation question.'").

Here, the Attorney General's interpretation of the "other applicable federal law" language would grant the type of unfettered discretion to determine *whether* a particular federal law will be a precondition of the grant that seven Justices of the *Grundy* Court recognized presents a constitutional nondelegation issue. Accordingly, the language of the statute, if read as delegating the authority to the Attorney General to

choose which federal laws would constitute conditions of the grant, would raise grave constitutional concerns.

But the Attorney General has not relied on that language in that manner. Instead, the Attorney General asserts that Congress, with the "other applicable law" provision, itself imposed the condition on the grant under its Spending Clause power because Congress thereby incorporated all federal laws as grant conditions. Yet among the requirements for the constitutional exercise of such spending power, is the requirement that Congress, if it desires to condition the receipt of federal funds, "'must do so unambiguously …, enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *South Dakota v. Dole*, 483 U.S. 203, 207 (1987), quoting *Pennhurst*, 451 U.S. at 17. A state cannot knowingly accept the conditions of the federal funding if that state is unaware in advance of the conditions or unable to ascertain what is expected of it, and therefore we insist that Congress must speak with a clear voice. *Pennhurst*, 451 U.S. at 17. An interpretation of "other applicable federal laws" that is limited to laws that expressly apply to grantees is clearly ascertainable, in contrast to the broader interpretation of the Attorney General which is unbounded—which would literally include thousands of federal statutes and regulations.

The Second Circuit, in adopting the broad interpretation of the language that the Attorney General seeks, acknowledges—even celebrates—the unbounded authority that such an interpretation would provide, and makes clear that the interpretation will allow denial of the grant for federal laws entirely unrelated to the purposes of the grant such as environmental laws:

> Indeed, whether a grant is awarded by formula or by discretion, there is something disquieting in the idea of States and localities seeking federal funds to enforce their own laws while themselves hampering the enforcement of federal laws, or worse, violating those laws. One has only to imagine millions of dollars in Byrne funding being sought by a locality that is simultaneously engaged in persistent, serious violations of federal environmental laws. The formula nature of the Byrne Program does not dictate that such an applicant must be given federal money even as it continues to flout federal law. To the contrary, § 10153(a)(5)(D) authorizes the Attorney General to condition the locality's receipt of a Byrne grant on its certified willingness to comply with *all* federal laws *applicable* to that locality, which includes environmental laws.

*New York*, 951 F.3d at 107–08.

We do not agree with that interpretation of the language. Congress, under its spending power, can attach only conditions that "bear some relationship to the purpose of the federal spending," and the universe of *all* federal laws as promoted by the Attorney General would necessarily include many laws that fail to meet that standard—once again rendering the conditions ambiguous. *New York v. United States*, 505 U.S. 144, 167 (1992), citing *South Dakota*, 483 U.S. at 207–08 and n.3. Thus, the more narrow reading of the language is not only more consistent with the structure of the statute, but it avoids potential constitutional questions.

### 4.

Moreover, the narrower interpretation that we adopt today also avoids a conflict with 34 U.S.C. § 10228, which applies to the chapter that includes the Byrne JAG grant provisions. Section 10228 provides:

> **(a) General rule**
>
> Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.

The incorporation of § 1373 as a condition of the Byrne JAG grant directly conflicts with § 10228. Through § 1373, the Attorney General seeks to prohibit the state or political subdivision from providing certain instructions and limitations on the actions of its own police force, thus exercising "direction, supervision, or control" over that police force. Nor does it matter that § 1373 prohibits the state from taking an action, as opposed to requiring an action. As the Supreme Court recognized in *Murphy* (in considering a claim under the anticommandeering doctrine of the Tenth Amendment), it does not matter whether a law commands a state to take an affirmative action or prohibits a state from taking an action—either situation involves the exercise of control over the state. *Murphy*, 138 S. Ct. at 1478. Section 1373 declares that a state or local government may not prohibit or restrict its own officials from communicating information regarding the citizenship or immigration status of any individual to the INS. That restriction

of the state or local government would constitute direction or control over the communications by the state or local police force. Because § 10228 declares that "[n]othing in this chapter or any other Act shall be construed to authorize" such direction or control, we should not construe § 10153 in a manner that would incorporate § 1373 as a condition of the grant. *See Philadelphia*, 916 F.3d at 291 (noting that § 10228 may be a statutory limit to which laws are "applicable").

Accordingly, based on the language, structure, and purpose of the Act, the reference to "all other applicable federal laws" in § 10153 should be read as referencing any federal law that by its terms applies to federal grants or grantees in that capacity. *Accord Providence*, 2020 WL 1429579 at *12. Because we so hold, we need not consider the alternative argument that § 1373 cannot be considered an "applicable federal law" even under the broader reading by the Attorney General because it is unconstitutional under the anticommandeering doctrine of the Tenth Amendment. *See Pearson*, 555 U.S. at 241 (noting that we generally should avoid constitutional questions if possible). The holding that § 1373 is not an "applicable federal law" equally dooms the argument that § 1644 provides authority for the compliance condition, as the parties concede that § 1644 is identical to § 1373.

## V. Relief

We turn, then, to the final issue in this case, which is whether the district court erred in extending the injunction beyond the City of Chicago. In its Final Judgment and Order in the FY 2017 litigation, the district court granted declaratory and injunctive relief to Chicago. The district court ordered that "the Attorney General's decision to attach the Conditions to the FY 2017 Byrne JAG grant is set aside and shall have no

legal effect" and enjoined the Attorney General from "deny-ing or delaying issuance of any FY 2017 Byrne JAG award in-sofar as that denial or delay is based on the Conditions." Dist. Ct. Final Judgment and Order, R. 211 at 3. The court further held that "[t]his Order applies to the Attorney General's im-position of the Challenged Conditions on the Byrne JAG grant program as a whole. Its effects run to the benefit of all Byrne JAG applicants and recipients are not limited to the City of Chicago and its sub-grantees." *Id*. at 4. The court stayed the order as to all areas of the country beyond Chicago in light of the stay our court had granted pending the since-vacated grant of an en banc rehearing.

The court declared that § 1373 violated the Tenth Amend-ment's anticommandeering principle and was therefore fa-cially unconstitutional, that the Attorney General exceeded the authority delegated by Congress in the Byrne JAG statute, 34 U.S.C. § 10151 et seq., and in 34 U.S.C. § 10102(a)(6), and that the Attorney General's decision to attach the conditions to the FY 2017 Byrne JAG grant violated the constitutional principle of separation of powers. Dist. Ct. Final Judgment and Order, R.211 at 2. In the subsequent challenge to the FY 2018 grant conditions, the district court held that §§ 1373 and 1644 violate the Tenth Amendment's anti-commandeer-ing principles and are therefore facially unconstitutional, that the Attorney General exceeded the authority delegated by Congress in the Byrne JAG statute and in § 10102(a) in attach-ing the challenged conditions to the FY 2018 Byrne JAG grant, and that the decision to attach those conditions to the grant violated the constitutional principle of separation of powers. The district court extended the permanent injunction it had imposed as to the FY 2017 Byrne JAG grant to include FY 2018 and all future years, enjoining the Attorney General from

Nos. 18-2885 & 19-3290                                              53

denying or delaying issuance of the Byrne JAG award insofar
as that denial or delay is based on the challenged conditions
or materially identical conditions. Dist. Ct. Final Judgment
and Order, Appellant Appendix, No. 19-3290, at SA50. The
court stayed the injunction to the extent that it applied to
grantees other than the City of Chicago.

The district court's decision to extend the injunctive relief
to include future years reflected the history of litigation and
the positions taken by the Attorney General. In the litigation
challenging the FY 2017 injunction, the Department of Justice
attorney representing the Attorney General [hereinafter "DOJ
attorney"], asserted that it would be premature to enjoin con-
ditions in FY 2018 or the years to follow because those condi-
tions were "still in formation and … will be different in some
respects from the 2017 conditions." Dist. Ct. Transcript of Pro-
ceedings, Doc. 213 at 5. The DOJ attorney then stated that alt-
hough disagreeing with the district court's analysis, "we've
certainly taken it to heart. And so we are looking at the con-
ditions for next year against the backdrop of your prior deci-
sion." *Id*. He argued to the district court that relief beyond the
specific year was improper because the issue was not yet ripe,
arguing:

> **[DOJ attorney]**: Your Honor, two things. One,
> the solicitation is not – are not the actual condi-
> tions. This is an invitation to seek a grant. It
> doesn't expressly state what the conditions are.
>
> Two, I've told you that we're looking at those
> conditions and that we are taking to heart your
> prior decision. And three, I think your point
> about, if we impose the exact same conditions
> without notice and force them to affirmatively

file a case, there might be other remedies available to the plaintiffs in that context.

**[District court]**: That would mean their lawyers would get paid.

*Id*. at 5–6. Despite these assurances made by the DOJ attorney to Judge Leinenweber, the Attorney General nevertheless imposed the very same conditions again in the FY 2018 grant application, and indeed also added yet another condition that was identical to the § 1373 compliance condition as well as two more conditions that relied on the same statutory authority that the district court and this court rejected. In its FY 2018 Byrne JAG application, Chicago included an addendum indicating that it would not comply with those conditions. The Department of Justice began announcing grant recipients in the fall of 2018, issuing 752 Byrne JAG local awards by October 12, but still had not granted Chicago's application; at that time Chicago filed a complaint challenging the FY 2018 conditions. About a month after Chicago filed suit, on November 20, the Department of Justice informed Chicago that it was awarded the grant. The Department of Justice subsequently announced that in light of the ongoing litigation, it would not enforce the notice, access, compliance, and additional certification conditions against Chicago, but that it retained the right to enforce the harboring condition.

The temporal scope of the injunctive relief in this case is proper. Injunctive relief is forward-looking, and a plaintiff injured by an unconstitutional or unlawful action in one year does not need to suffer injuries repeatedly in each ensuing year—and separately sue after each injury—to obtain relief from the unlawful actions. *See United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952) ("[t]he sole function of an

action for injunction is to forestall future violations"); *see
generally* § 2942 Availability of Injunctive Relief—In General,
11A Fed. Prac. & Proc. Civ. § 2942 (3d ed.) (noting
that injunctive relief looks to the future and is designed to
deter rather than punish, and that even if the defendant
claims the conduct has been discontinued, the court will deny
injunctive relief only if there is no reasonable expectation of
future injurious conduct). Injunctive relief is designed to
prevent precisely that scenario. Once an injury is shown in the
imposition of the grant conditions sufficient to demonstrate
standing, Chicago can challenge the imposition of those
conditions in the Byrne JAG grant, and that challenge is not
temporally limited—at least where, as here, the challenge is
not in any way related to the timing of the conditions. And of
course, the Attorney General's indication to the district court
that it would alter the conditions in future grants proved
false. *See Oregon State Med. Soc.*, 343 U.S. at 333 ("It is the duty
of the courts to beware of efforts to defeat injunctive relief by
protestations of repentance and reform, especially when
abandonment seems timed to anticipate suit, and there is
probability of resumption."). The district court need not await
yet another round of the same conditions and the same
rejected justifications before enjoining the future conduct.

## A. Injunctive Relief Beyond City of Chicago

The Attorney General argues that, even if we agree with
the district court on the merits, the court erred in extending
injunctive relief beyond the City of Chicago. In *Chicago I*, 888
F.3d 272, the panel addressed a similar issue as to the prelim-
inary injunctive relief, with the majority holding that nation-
wide injunctive relief was proper and with one panel member
dissenting. Our court granted rehearing en banc to consider

only the issue of the proper scope of the injunction, but that rehearing was vacated when the district court's grant of the permanent injunction superseded the preliminary injunction. We now are presented again with the issue of the proper scope, although in the different context of a permanent rather than a preliminary injunction.

At the outset, we note that a remand is necessary for the district court to consider whether any additional injunctive relief is appropriate as to the unlawful imposition of the compliance condition. The court imposed declaratory relief as to the constitutionality of § 1373, and injunctive relief as to the imposition of that condition. But because we have determined that the term "all other applicable Federal law" encompasses only law that by its terms applies to federal grants or grantees in that capacity, we have not reached that Tenth Amendment issue. A remand is required to allow the district court to determine whether any additional injunctive relief is appropriate for the violation as we have framed it. For instance, the declaratory relief would no longer be necessary because § 1373 is inapplicable here, but other injunctive relief might be proper, such as enjoining the Attorney General from interpreting the phrase "all other applicable federal law" to include laws that do not explicitly apply by their terms to the grant or grantees. The Attorney General relied on that misuse of § 10153 to impose the § 1373 compliance condition on Chicago. In the FY 2018 grant, the government continues to require a certification of compliance with § 1373, but perhaps anticipating the foreclosure of that option, added the requirement of certification of compliance with the parallel provision in § 1644.

Nos. 18-2885 & 19-3290                                    57

That FY 2018 condition leaves no doubt that the Attorney General intends to continue to interpret § 10153 as allowing the incorporation of federal laws unrelated to the grant or grantees. Because the injury to Chicago in this case, in relation to the compliance conditions in both § 1373 and § 1644, is caused by the Attorney General's unsupportable interpretation of § 10153 as allowing the incorporation of all federal law as a condition of the grant, proper relief in this case could include an injunction preventing the Attorney General from incorporating federal law unrelated to grants or grantees as a condition of the grant under § 10153. The proper scope of any additional relief, however, is for the district court, not this court, to determine as an initial matter, and we remand for the district court to consider whether to order any other relief as to the unlawful imposition of the compliance condition in light of our decision. We review such decisions only for an abuse of discretion. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). We may consider, however, the propriety of the injunctive relief that has already been granted as to all of the challenged conditions

### 1. Authority of the Court

Courts and commentators, particularly recently, have recognized serious concerns with imposing injunctive relief that extends beyond the parties before the court to include third parties. In fact, the question as to the authority of a court to issue such nationwide, or universal, injunctions, as well as the propriety of such injunctions, has spawned a veritable cottage industry of scholarly articles in the past few years. *See e.g.* Mila Sohoni, *The Lost History of the "Universal" Injunction*, 133 HARV. L. REV. 920, 924–25 N. 16 (2020) [hereinafter Sohoni, *Lost History*], citing: Spencer E. Amdur & David Hausman,

Response, *Nationwide Injunctions and Nationwide Harm*, 131 Harv. L. Rev. F. 49 (2017) [hereinafter Amdur & Hausman, *Nationwide Injunctions*]; Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 419 (2017) [hereinafter Bray, *Multiple Chancellors*]; Zachary D. Clopton, *National Injunctions and Preclusion*, 118 Mich. L. Rev. 1 (2019); Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065 (2018) [hereinafter Frost, *In Defense*]; Suzette M. Malveaux, *Class Actions, Civil Rights, and the National Injunction*, 131 Harv. L. Rev. F. 56 (2017) [hereinafter Malveaux, *Class Actions*]; Michael T. Morley, *De Facto Class Actions?: Plaintiff- and Defendant-Oriented Injunctions in Voting Rights, Election Law, and Other Constitutional Cases*, 39 Harv. J.L. & Pub. Pol'y 487 (2016); Michael T. Morley, *Nationwide Injunctions, Rule 23(b)(2), and the Remedial Powers of the Lower Courts*, 97 B.U. L. Rev. 615 (2017); Zayn Siddique, *Nationwide Injunctions*, 117 Colum. L. Rev. 2095 (2017); Alan M. Trammell, *Demystifying Nationwide Injunctions*, 98 Tex. L. Rev. 67 (2019); Howard M. Wasserman, *"Nationwide" Injunctions Are Really "Universal" Injunctions and They Are Never Appropriate*, 22 Lewis & Clark L. Rev. 335 (2018) [hereinafter Wasserman, *Nationwide Injunctions*]. [7] Those articles are a response to the perceived increase in the utilization of universal injunctions in the past few decades. It is a question for another forum

---

[7] The terms "nationwide" and "universal" injunctions are both used by courts and commentators to describe injunctions for which relief extends beyond the plaintiff, *see* Wasserman, *Nationwide Injunctions* at 352–53, and we use these terms interchangeably in this opinion. As to the relief provided in this case, we use "program-wide" injunction because it is more descriptive of the actual reach of the injunction here.

whether any such increase signals an expanding judicial over-reach or an increasing executive autocracy.

As to the authority to issue such injunctions, some urge that injunctions extending beyond the parties before the court are a recent invention, first appearing in the 1960s, and that the absence of such equitable relief before that time should cause us to question the legitimacy of that remedy. *See e.g. Trump v. Hawaii*, 138 S. Ct. 2392, 2425 & 2428 (2018) (Thomas, J. concurring) (indicating that the first universal injunction emerged "a century and a half after the founding," in 1963, and "appear to be inconsistent with longstanding limits on equitable relief and the power of Article III courts"); *see also* Bray, *Multiple Chancellors* at 437–38; Wasserman, *Nationwide Injunctions* at 353.

But recent scholarship casts doubt on that constricted window of universal injunctions, exhaustively documenting the use of injunctions that extend beyond the plaintiff going back over a century, from a Supreme Court decision in 1913 to the present. *See* Sohoni, *Lost History*, 133 Harv. L. Rev. 920, 924 (2020); *see also* Samuel Bray, *A Response to The Lost History of the "Universal" Injunction*, 36 Yale J. on Reg.: Notice & Comment (Oct. 6, 2019) available at: https://www.yalejreg.com/nc/a-response-to-the-lost-history-of-the-universal-injunction-by-samuel-bray/ (last visited 4/7/2020) (discussing "four serious problems" with Sohoni's analysis), and Mila Sohoni, *A Reply to Bray's Response to The Lost History of the "Universal" Injunction*, 36 Yale J. on Reg.: Notice & Comment (October 10, 2019) (http://perma.cc/P8BA-2UJ6 (last visited 4/7/2020) (refuting Bray's concerns). Sohoni meticulously examines equitable remedies in the past century, documenting the equitable relief that extended to non-parties throughout that history,

and reaching the conclusion that universal injunctions are consistent with those traditional equitable remedies. *Id.*

That conclusion has found support as well in an amicus brief submitted to this court by a group of legal historians, professors at Stanford and Columbia Law Schools and Princeton University, who concluded that "[n]ot only did equity courts have the equitable power to grant injunctions that look like modern nationwide injunctions (save they did not run against the federal government itself),[8] but they in fact issued injunctions of astonishing scope." Brief of Amici Curiae Legal Historians In Support of Plaintiff and Appellee the City of Chicago [hereinafter "Amicus"], No. 18-2885, at 6. That wide scope included even exercising "their equity powers at nationwide scale in the 19th and early 20th centuries, to enjoin the activities of hundreds of thousands of individuals, including thousands of non-parties." Amicus at 18. Bray, a leading opponent of universal injunctions, disagreed with their conclusions, but nevertheless acknowledged the gravitas of the authors of that amicus brief, characterizing the authors as "an all-star cast of legal historians and historians of the early Republic" and recognizing that "[t]hese historians have written some of the leading scholarship on American equity." Bray, *National Injunctions: Historians Enter the Lists*, THE VOLOKH

---

[8] They subsequently explained that injunctions restraining the "United States" from nationwide enforcement of a law could not happen until after 1976, when the United States enacted its first general waiver of sovereign immunity, and that suits to restrain high level executive branch officials like the Attorney General were difficult to bring because "[i]n the absence of the modern venue statute, and because of doctrinal barriers that no longer exist, a modern nationwide injunction could only have been brought in Washington, D.C." Amicus at 18–19.

Nos. 18-2885 & 19-3290                                    61

CONSPIRACY (Nov. 17, 2018, 2:21 PM), https://rea-son.com/2018/11/17/national-injunctions-historians-enter-th/ (last visited 4-7-2020). Those historians examined the relief provided in equity from the 18th century onward, such as bills of peace as well as ordinary bills for injunctions includ-ing injunctions to abate nuisances, and concluded that "equity courts had the equitable powers to issue nationwide injunc-tions in the early republic," and "have long issued injunctions that protect the interests of non-parties." Amicus at 6, 8. In fact, the historians noted periods of time in which the equita-ble remedies were much more drastic, extending as far as en-joining non-parties (which it noted would not be accepted to-day) and including a period of time in which injunctions were so broad they were called "omnibus injunctions" and "Gat-ling-gun injunctions." Amicus at 16–17. They noted that those omnibus injunctions were repeatedly upheld by the Supreme Court, and ultimately Congress used its power to restrain their issuance. Amicus at 17. Although concluding that na-tionwide injunctions are historically grounded, the legal his-torians cautioned against an approach that would anchor eq-uitable remedies too closely to the "notoriously difficult sub-ject" of history, noting that the continuity of some traditional equity practices should not foreclose adapting equitable rem-edies to modern circumstances. Amicus at 25; *see also* Frost, *In Defense* at 1081.

## 2. Consistency with Supreme Court Law

Therefore, there is a substantial historical basis for the concept of injunctive relief that extends to the benefit of non-parties. The Attorney General and the dissent in this case nevertheless argue that universal injunctions are inconsistent with the Supreme Court's decision in *United States v. Mendo*za,

464 U.S. 154 (1984). The *Mendoza* Court held that the government in that case should not be subjected to nonmutual offensive collateral estoppel because the "economy interests underlying a broad application of nonmutual collateral estoppel are outweighed by the constraints which peculiarly affect the government." *Id.* at 162–63. The Court was concerned with the impact on the government if one decision could bind the government as to that legal issue in any subsequent cases brought by other litigants. The Attorney General and the dissent argue that the same danger is presented in a universal injunction.

There are, however, important distinctions between non-mutual offensive collateral estoppel and a universal injunction. First, as is obvious, the legal concepts at issue here are not identical, so the Court's decision as to an estoppel issue is in no way dispositive of the question as to the availability of universal injunctions. The significance of *Mendoza* must come from its reasoning, then. But the very different contexts make *Mendoza* of less relevance to this question. As to collateral estoppel, "once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *Id.* at 158. The principle would apply to litigation remote in time, involving different underlying causes of actions, and regardless of whether the litigant in the subsequent suit was similarly situated to the one in the past case.

That expansive reach presented issues uniquely problematic for the government. Whereas in disputes over private rights between private litigants, there was "'no sound reason for burdening the courts with repetitive litigation,'" the

position of the government is not identical to that of the private litigant. *Id*. at 159–60., quoting *Standefer v. United States*, 447 U.S. 10, 24 (1980). The government is more likely to be involved in cases with significant legal issues and is likely to be sued more often than a private party, thus increasing the potential for estoppel to be invoked. *Id*. at 160. In addition to depriving the government of the benefit of multiple courts of appeal weighing in on the issue, the application of estoppel would force the government to appeal every time it disagreed with a legal issue regardless of the significance of the case in which it was presented, or risk being bound by that holding in a later case of more importance to the government. *Id*. at 160–61. Finally, the use of estoppel would prevent subsequent Administrations from altering the government's position on a legal issue, thus upsetting the ability of the Executive Branch to adapt to the changing philosophies of subsequent political leaders. *Id*. at 161–62. In light of those concerns unique to the government as a litigant, the Court held that "[t]he conduct of government litigation in the courts of the United States is sufficiently different from the conduct of private civil litigation in those courts so that what might otherwise be economy interests underlying a broad application of collateral estoppel are outweighed by the constraints which peculiarly affect the government." *Id*. at 162–63.

The concerns expressed by the Court as to the use of estoppel against the government are not equally present in the context of the universal injunction. Of course, both situations present the concern with one court's decision preventing the percolation of the issue in different courts. But unlike the collateral estoppel context, the universal injunction by its nature will concern an issue that is common to all parties bound by it who will be similarly-situated, will involve an issue of

obvious and significant impact (thus not presenting the government with the need to appeal every adverse legal decision in even minor cases), and will not interfere with the ability of future Administrations to change policies (because the impact of the universal injunction will be felt in one ongoing case that would be appealed, not in unlimited, unforeseeable cases in the future). Its restriction on the government's ability to relitigate an issue will be limited to that case and will not raise the prospect of impacting future unforeseeable situations remote in time. Therefore, the reasoning of *Mendoza* counsels an outcome as applied to universal injunctions. *See* Frost, *In Defense* at 1113. To the extent that *Mendoza* identifies factors relevant to both estoppel and universal injunctions, the weighing of the factors should occur—as it routinely does—in the district court's discretionary determination as to the appropriate equitable relief. The situations are not similar enough to support a blanket prohibition of universal injunctions under the reasoning of *Mendoza*.

And the decisions of numerous courts post-*Mendoza*, including the Supreme Court itself, support that conclusion. The historical underpinning for the argument that courts have the power to issue universal injunctions is complemented by the actual allowance of injunctions benefitting non-parties more recently. As we noted in *Chicago I,* the Supreme Court in *Trump v. Intern. Refugee Assistance Project*, 137 S. Ct. 2080 (2017) ("*IRAP*"), allowed an injunction to remain in place that applied to non-parties. 888 F.3d at 289. In *IRAP*, the Court denied in part a request for a stay of a nationwide injunction in a challenge to an Executive Order that suspended entry of foreign nationals from seven countries. The Court recognized that "[c]rafting a preliminary injunction is an exercise of discretion and judgment, often dependent as

much on the equities of a given case as the substance of the legal issues it presents." *IRAP*, 137 S. Ct. at 2087. The Court granted the government's request to stay the injunction as to foreign nationals who lacked any bona fide relationship with a person or entity in the United States, but refused to stay the injunction not only as to the respondents in the case, but also as to persons not parties to the case who were similarly situated. *Id*. at 2088. If the lower court was without the power to impose an injunction that provided relief to non-parties, and thus relief greater than that necessary for the parties before the court, then the Supreme Court's decision to allow the injunction to remain in place as to those non-parties would be inexplicable.

The concurring and dissenting justices in *IRAP* would have stayed the injunction entirely, but particularly argued that the injunctions should not have remained in place as to "an unidentified, unnamed group of foreign nationals abroad" for whom no class had been certified and in a case in which neither party had asked for the scope of relief applied by the Court. *Id*. at 2090 (Thomas, J. concurring in part, dissenting in part). They further asserted that the role of courts was to provide complete relief only to the plaintiffs, and not to non-parties. *Id*. The *IRAP* Court's refusal to stay the injunction as to similarly-situated individuals, in light of those arguments in the dissent, should put to rest any argument that the courts lack the *authority* to provide injunctive relief that extends to non-parties. *See* Frost, *In Defense* at 1086.

### 3. Propriety of Injunctive Relief

Therefore, both historical and current practice lends support to a determination that the courts possess the authority to impose injunctions that extend beyond the parties before

the court. The propriety of such an injunction, in a given case, is another matter.

Such injunctions present real dangers, and will be appropriate only in rare circumstances. For instance, a nationwide injunction can truncate the process of judicial review, elevating the judgment of a single district court. That effect, however, is not absolute. As a practical matter, the issuance of such an injunction is unlikely to dramatically foreclose all other review, because the possibility of a stay while seeking review in the court of appeals—as happened here—limits the immediate impact on litigation in other jurisdictions, and ensures review by multiple judges in short order. *See* Amdur & Hausman, *Nationwide Injunctions* at 53 n.27 (providing examples in which nationwide injunctions did not foreclose percolation). But even if the impact is not absolute, it is nonetheless a concern and has the clear potential to narrow the input from different judicial panels. Moreover, the potential for forum shopping is a real hazard and alone should caution against such broad injunctive relief. *See e.g.* Bray, *Multiple Chancellors* at 457; Frost, *In Defense* at 1104.

That does not, however, mandate a conclusion that universal injunctions are never proper. *See* Frost, *In Defense* at 1105 (noting that "[a]bolishing nationwide injunctions is both an over- and under-inclusive response to that problem"). In some circumstances, universal injunctions can be necessary "to provide complete relief to plaintiffs, to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions." *Id*. at 1101. Just as the percolation through the courts is a valid consideration, so too the desire to avoid a multiplicity of suits has long been a consideration in equity, which even the opponents of

universal injunctions acknowledge. *See* Bray, *Multiple Chancellors* at 426; *Hawaii*, 138 S. Ct. at 2427 (Thomas, J, concurring).

An outright prohibition of such injunctions, however, would handcuff the ability of courts to determine the relief that is proper in exceptional circumstances. Any number of factors could influence a court's determination as to the proper scope of an injunction, including the nature of the violation, the extent of the impact, the urgency of the situation, the multiplicity of litigation, and the ability of others to even access the courts. *IRAP* presented the type of situation in which the remedy of a universal injunction can be particularly crucial. 137 S. Ct. 2080. As we stated above, in that case, the Supreme Court denied in part a request for a stay of a nationwide injunction in a challenge to an Executive Order that suspended entry of foreign nationals from seven countries. The travel ban was imposed suddenly, impacting an immense number of people immediately—including people who were already on planes to the United States—and the ability of persons affected by the ban to access the courts individually for redress was extremely limited. In such a circumstance, a court that in its discretion determines that the equities of the case and the substance of the legal issues justifies an injunction, should not be limited to imposing that relief only as to those few persons who could obtain attorneys or present themselves in court.

Nor is the presence of the vehicle of a class action a realistic alternative in such a case. The difficulties, expense and delay inherent in pursuing a class action would render it inadequate for the type of situation presented in *IRAP*. As noted by Frost,

> [d]emonstrating these prerequisites [of numer-
> osity, commonality and typicality and the ade-
> quacy of the named plaintiff to represent the
> class] is difficult and time consuming and has
> been getting harder as a result of recent court
> decisions and federal legislation. Courts have
> heightened the evidentiary standard for class
> certification, requiring hearings and sometimes
> significant amounts of evidence on the merits of
> the case before certifying the class. In recent
> years, courts have started to deny class certifica-
> tion if they think there has been a flaw in class
> definition. These courts typically deny certifica-
> tion without first allowing the plaintiffs to
> amend that definition in response to the court's
> concerns. Under Federal Rule of Civil Proce-
> dure 23(f), defendants can seek interlocutory re-
> view of a court's decision to certify a class, add-
> ing further delay and expense to the certifica-
> tion process. Noting these difficulties, one com-
> mentator has described the class certification
> process as a "drawn-out procedural bog,"
> which comes with significant expense and delay
> for the would be class member.

(footnotes omitted) Frost, *In Defense* at 1096–97, quoting Sam-
uel Issacharoff, *Private Claims, Aggregate Rights*, 2008 SUP. CT.
REV. 183, 208; *see also* Malveaux, *Class Actions* at 59 (describing
the increasing hurdles to class actions and arguing that
"Bray's concession that 'the requirements for a class action
will not always be easy to meet' understates the significant
hurdles erected over the last fifty years"). The class action

Nos. 18-2885 & 19-3290                                          69

mechanism is not an adequate substitute for a universal in-
junction in the proper case.

Absent the ability to grant injunctive relief that extends be-
yond the particular party, courts will have little ability to
check the abuse of power that presents the most serious threat
to the rule of law—such as that which is swift in implementa-
tion, widespread in impact, and targeted toward those with
the least ability to seek redress. Although circumspection is
appropriate in ascertaining whether such relief is appropriate,
an outright ban of such injunctions is neither required by his-
tory nor desirable in light of the range of situations—some as
unpredictable and impactful as the sudden travel ban—that
courts may confront.

That said, it is a more difficult question as to whether the
nationwide injunction is proper in this case. In exercising its
discretion to impose the permanent injunction nationwide,
the district court identified a number of factors that strongly
weighed in favor of an injunction that included more compre-
hensive relief. The court first noted that compliance with the
Attorney General's conditions would damage the relation-
ship between local law enforcement and immigrant commu-
nities, and would decrease the cooperation with those com-
munities that is critical to preventing and to solving crimes.
The court held that the loss of trust, which once lost is not eas-
ily restored, would cause irreparable harm that could not be
remedied with money damages. Moreover, the court held
that the balance of hardships favored Chicago, noting that the
Attorney General could distribute the funds without impos-
ing the conditions, and nothing in the injunction would pre-
vent any state or local government from coordinating its local
law enforcement with the federal authorities absent those

unlawful conditions. Finally, the court recognized that the public interest was served by an injunction in that it acts as a check on the executive's encroachment of congressional power that violates the separation of powers.

The Attorney General does not address those factors and does not question the court's determination that injunctive relief is proper. Instead, the Attorney General focuses his challenge on the scope of the injunction, asserting injunctive relief must be limited to that necessary to provide complete relief to the plaintiff and *cannot* extend to non-parties. But as we have already discussed, courts have the *authority* to extend injunctive relief to non-parties, and therefore those arguments fail.

The district court identified a number of considerations that supported extending injunctive relief in this case program-wide and to include future years. Among those considerations was the Attorney General's repeated imposition of the conditions despite adverse court rulings. Upon our decision affirming the grant of the preliminary injunction in this case, the Attorney General took the highly unusual step of seeking en banc review only as to the scope of the injunction, declining to present for en banc consideration our holding that the Attorney General's claim to lawful authority was unfounded. And despite his failure to seek rehearing as to the preliminary injunctive relief to Chicago itself, the Attorney General continued to refuse to release the grant funds to Chicago, choosing instead to withhold the grant of all funds to all recipients. *See* U.S. Department of Justice FY 2020 Performance Budget Office of Justice Programs March 2019, https://www.justice.gov/file/1144566/download, at 99–100 (last visited 4-8-20) (noting that of the $403 million available

for Byrne JAG grants in FY 2017, only $254.4 million had been awarded and similarly only $256 million of the $415.5 million available had been awarded in FY 2018, and explaining in a footnote that some FY 2017 and FY 2018 formula grants had not been released to grantees as a result of "concerns regarding compliance with federal immigration laws and ongoing litigation related to those matters.") Because of that conduct, the district court explicitly enjoined the Attorney General from denying *or delaying* the issuance of the grant funds in the permanent injunction.

Moreover, as described earlier, the Attorney General assured the district court that the permanent injunction need not cover future years, because the conditions imposed in future years would reflect a careful consideration of the court's holdings as to their legality. The court accepted that assurance, and yet the Attorney General proceeded to impose the *identical* conditions on the grants for the next year, issuing an award to Chicago that was not dependent on satisfaction of the unlawful conditions only after Chicago filed suit yet again. *See City & Cty. of San Francisco*, 372 F. Supp. 3d at 940–41 ("There is no dispute that certain challenged conditions in the fiscal year 2018 Byrne JAG Program are functionally the same as the notice, access, and Section 1373 certification conditions in the fiscal year 2017 Byrne JAG program at issue in the previous related litigation."). Despite choosing to forgo en banc review as to the unlawfulness of the grant conditions, and with no change in the legal basis for those conditions, the Attorney General persists in his determination to impose conditions on the Byrne JAG grant that we held unlawful and that Congress itself has failed to impose. Those actions make manifest that each and every state and local government will have to bring its own suit in order to obtain relief (and possibly for

each new grant year, given the Attorney General's penchant for adding new statutory authorizations—even ones identical in language to rejected ones), leaving behind those who cannot afford such litigation. The concern with multiplicity of litigation is a valid factor in assessing the appropriate scope of injunctive relief.

As the district court held, the nature of the violation also supports the scope of the injunction here, in that it involves a violation of the separation of powers doctrine. The nature of the injury is a valid consideration in determining the proper scope of injunctive relief. Whether deemed a statutory or a constitutional violation, the executive's usurpation of the legislature's power of the purse implicates an interest that is fundamental to our government and essential to the protection against tyranny. *See Dalton v. Spector*, 511 U.S. 462, 472 (1994) (distinguishing ultra vires claims, alleging an action that exceeded the authority, from constitutional claims, alleging an absence of *any* authority).

At its core, this case implicates principles of federalism—involving federal intrusion into spheres of power possessed by states—and, more directly, principles of the separation of powers between the executive, the legislative, and the judicial branches.

> Why did the framers insist on this particular arrangement? They believed the new federal government's most dangerous power was the power to enact laws restricting the people's liberty…. Some occasionally complain about Article I's detailed and arduous processes for new legislation, but to the framers these were bulwarks of liberty.

…

If Congress could pass off its legislative power
to the executive branch, the "[v]esting [c]lauses,
and indeed the entire structure of the Constitu-
tion," would "make no sense." Without the in-
volvement of representatives from across the
country or the demands of bicameralism and
presentment, legislation would risk becoming
nothing more than the will of the current Presi-
dent. And if laws could be simply declared by a
single person, they would not be few in number,
the product of widespread social consensus,
likely to protect minority interests, or apt to pro-
vide stability and fair notice. Accountability
would suffer too.

…

[E]nforcing the separation of powers isn't about
protecting institutional prerogatives or govern-
mental turf. It's about respecting the people's
sovereign choice to vest the legislative power in
Congress alone. And it's about safeguarding a
structure designed to protect their liberties, mi-
nority rights, fair notice, and the rule of law. So
when a case or controversy comes within the ju-
dicial competence, the Constitution does not
permit judges to look the other way; we must
call foul when the constitutional lines are
crossed. Indeed, the framers afforded us inde-
pendence from the political branches in large
part to encourage exactly this kind of "fortitude

… to do [our] duty as faithful guardians of the
Constitution."

*Gundy*, 139 S. Ct. at 2134–35 (Gorsuch, J., joined by the Chief
Justice and Thomas, J., dissenting). In our case, the executive
branch has usurped the power of the legislature to determine
spending and to set conditions on that spending. It has done
so to conscript the police power of the states to serve the civil
immigration goals of the federal government. The challenged
actions strike at the heart of the vital principles of separation
of powers and federalism and comity for state's rights.

That is particularly true in this case where the revolving
door of statutory provisions relied upon by the Attorney Gen-
eral as authorization for the withholding of funds upends the
process. Like a whack-a-mole game at a carnival, the Attorney
General has presented the courts with one statutory "author-
ization" after another for the decision to withhold all Byrne
JAG funding from sanctuary cities—from § 10102(a)(6) ini-
tially to §§ 10153(A)(4), 10153(A)(5)(C), and 10155 before the
First and Second Circuits for the notice and access conditions;
from § 1373 to § 1644 for the federal law supporting the com-
pliance condition; and from § 10102(a)(6) to § 10153(A)(5)(D)
as the catch-all for the conditions. *See e.g. City of Providence*,
2020 WL 1429579 at *6–9. By relying on a moving target of
statutory provisions, the Attorney General undermines his
own argument that the conditions were a response to a legis-
lative grant of authority rather than an executive policy in
search of a legislative "hook." The nature of the violation in
this case strongly weighs in favor of more comprehensive re-
lief, both because respect for the separation of powers is fun-
damental to our government, and because the willingness to
add new "statutory authorizations" every time a court strikes

one down—and to reimpose conditions on jurisdictions in ensuing years that have already been rejected—portends a multiplicity of litigation that would be a drain on the resources of the courts. At this point in time, five circuits have weighed in on the issues, diluting the benefit of any additional "percolation" through the courts. Those factors provide a strong argument in favor of the district court's determination that program-wide relief extending to non-parties is proper.

### B. Injunction as Providing Complete Relief to Plaintiff

But we should avoid deciding that more expansive issue if a more narrow approach is available, and it is available here. It is widely accepted—even by self-professed opponents of universal injunctions—that a court may impose the equitable relief necessary to render complete relief to the plaintiff, even if that relief extends incidentally to non-parties. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); Wasserman, *Nationwide Injunctions* at 360–61; *see, e.g.*, *McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997) (noting that "in reapportionment and school desegregation cases, for example, it is not possible to award effective relief to the plaintiffs without altering the rights of third parties"); *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (recognizing, for instance, in two malapportionment cases, that "the only way to vindicate an individual plaintiff's right to an equally weighted vote was through a wholesale 'restructuring of the geographical distribution of seats in a state legislature'"). Here, because of the statutory structure of the grant calculations, an injunction limited to providing complete relief to the plaintiff alone will have the practical impact of preventing the application of the conditions program-wide, thus ameliorating the equitable concerns

expressed above, without the need to extend injunctive relief beyond the plaintiff itself to non-parties.

The Byrne JAG grant is a formula grant, not a discretionary grant. The determination of the funds that will be provided to a grantee is based upon a very structured, precise calculation that is set forth by Congress at 34 U.S.C. § 10156 (formerly 42 U.S.C. § 3755), and the amount received by a specific state or locality is dependent on the calculations related to the other states and localities. Therefore, to provide complete and accurate relief to Chicago now and in the future, and ensure that it receives the allocation that it would receive if the Attorney General did not apply the unlawful conditions, the allocations *as a whole* must be lawfully determined. In this formula grant, the unlawfully-imposed conditions must be rendered inapplicable program-wide in order for the grant amounts to be properly calculated for the plaintiff itself.

Before delving into the minutia as to the structure of the Byrne JAG awards and the interrelationship of the grants, it might be helpful to provide a brief overview. If every grantee was allocated a set grant amount, independent from each other, then relief for Chicago could be calculated and awarded in a vacuum. There would be no need to enjoin the conditions beyond Chicago to redress the monetary injury, because the imposition of the conditions beyond Chicago would not impact Chicago's grant award. But that is not the case. The slice of the Byrne JAG pie that Chicago receives is related to the slices received by Illinois and other states, and if the imposition of the unlawful conditions eliminates Illinois or other states from receiving their own awards, then that can impact Chicago's award as well. The grant awards are statutorily interrelated.

The Byrne JAG program allocates grant amounts to some localities directly, and also allocates grant amounts to each state, which then must pass on a certain percentage to other localities. If a state is unable to qualify to receive funds under the program, that state's award is redistributed to the localities. In that way, the amount a locality can receive is connected to the amount the state is awarded and to the ability of the state to participate in the program. And the amount that the state is awarded is itself impacted by the amounts awarded to other states. In a number of ways, Byrne JAG funds can be redistributed from some states to other states, thus decreasing some states' awards and increasing the award for the other states.

The Byrne JAG conditions challenged here disrupt the entire distribution plan, because they can prevent the states from even applying for an award—and clearly prevent the states from receiving a Byrne JAG award—if they cannot comply with the unlawful conditions at issue in this case. Because the awards to states are interrelated, and the award for localities is also related to the award to states, the imposition of the unlawful conditions impacts the proper calculation of all awards, including awards to localities such as Chicago.

As we will see, the Attorney General does not really contest that Chicago's award could be impacted by the imposition of conditions on states. Instead, the Attorney General argues that we need not be concerned with that because the imposition of the unlawful conditions on other grant applicants would be a windfall to Chicago, resulting in a higher grant amount than it would otherwise receive, and Chicago cannot complain of receiving a higher amount. As we will discuss, the impact on Chicago if the unlawful conditions are applied

to the states would not necessarily be an increase in its grant amount; it could operate to decrease the grant to Chicago as well. Moreover, even an improper increase in its award would be problematic. Once we have concluded that the Attorney General is without the authority to impose the challenged conditions, the court's role should be to ensure that Chicago receives the grant it would have been entitled to absent the unlawful conditions. Courts should not impose relief that makes Chicago an involuntary beneficiary of the very conduct that it seeks to enjoin. That can only be assured if the Byrne JAG awards as a whole are calculated absent the imposition of the unlawful conditions.

### 1. Statutory Formula for Allocation

That is the overview. We turn, now, to the details. As an initial matter, it is important to understand the statutory formula for calculating grants, with its awards to states and localities. In this subpart, we describe the statutory formula for the initial allocations of funds as to states and localities. That is the base, from which subsequent redistributions will occur, which we discuss in subsections 2 and 3. The dissent argues that we misunderstand § 10156(d) and (e) as making Chicago's award contingent on any governing body's compliance with the unlawful conditions. We do not argue that § 10156(d)-(e) has any such effect. Those provisions set forth the formula for the allocation of funds at the outset, which is determined proportionally and therefore will inform redistributions of funds as well. Subsections 2 and 3 demonstrate the redistributions of funds that are provided in the statute, and explain how the imposition of the unlawful conditions on states can alter that redistribution and thereby impact Chicago's Byrne JAG grant award.

Consideration of the precise formula delineated by Congress in § 10156 makes clear the need for program-wide treatment. Under that statute, the Attorney General first determines the initial allocations to states and U.S. territories (hereinafter collectively referred to as "states"), allocating half of the available funds based on the ratio of a state's population to the national population, and half allocated based on the ratio of a state's share of violent crime to that of the nation. 34 U.S.C. § 10156(a)(1). If that number falls below the minimum allocation provided in § 10156(a)(2), reflecting 0.25% of the total Byrne JAG allocation, the state is awarded that minimum allocation. The population and crime data from those states receiving the minimum allocation is excluded in calculating the ratios in § 10156(a)(1). With the exception of the U.S. territories and the District of Columbia, 60% of the total allocation to a state is retained by the state, with 40% set aside for local governments. § 10156(b). The amounts allocated to local governments are calculated based on their share of all violent crimes reported in the state. §10156(d). If the local government is entitled to an award greater than or equal to $10,000, then that unit of local government is eligible to receive the award directly. § 10156(c)–(e). If the amount allocated to a unit of local government is less than $10,000, that amount is returned to the state governments for redistribution to state law enforcement agencies and local governments. *Id*. Moreover, units of local government may not receive a Byrne JAG award that exceeds that local government's total expenditures on criminal justice services for the most recently completed fiscal year, and therefore award amounts in excess of that total expenditure are reallocated *proportionally* among other units of local government. § 10156(e)(1).

The formula for grant distribution also recognizes that, in some circumstances, a disparity can exist between the funding eligibility of a county and its associated municipalities. The three types of disparity include: a zero-county disparity, when one or more municipalities within a county are eligible for a direct award but the county is not, yet the county is responsible for providing criminal justice services for the municipality and therefore should be entitled to part of the municipality's award; a disparity in which both a county and a municipality within it qualify for a direct award, but the award amount for the municipality exceeds 150% of the county's award amount; and a disparity in which a county and multiple municipalities within that county are all eligible for direct awards, but the sum of those awards exceeds 400% of the county's award amount. § 10156(d)(4); *see also* BJA Technical Report, Justice Assistance Grant Program, 2016, https://www.bja.gov/JAG/pdfs/JAG-Technical-Report.pdf at 2–6 ("BJA Technical report") (last visited 4-8-2020); BJA Edward Byrne Memorial Justice Assistance Grant Program Frequently Asked Questions https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/JAGFAQ.pdf at 23–24 (last visited 4-8-2020). Jurisdictions subject to such disparity must identify a fiscal agent to submit a joint application for the aggregate of funds to which the units of local government are eligible, and that joint application must specify the amount of funds to be distributed to each of the units of local government and the purposes for which the funds will be used. *Id*.

Accordingly, the statutory formula for distribution of Byrne JAG funding includes both direct and indirect distributions to states and units of local government, and in some circumstances requires a unit of local government to submit a joint application on behalf of itself and specified

geographically constituent units of local government. Chicago falls within those provisions, and therefore it files its application for Byrne JAG funding on behalf of itself but also on behalf of eleven other neighboring units of local government. *Chicago I*, 888 F.3d at 292. For instance, the City of Evanston, which is currently pursuing its own challenge to the Byrne JAG conditions along with the United States Conference of Mayors, receives its funds indirectly through an application submitted by the City of Chicago.

The statute therefore employs a precise formula for determining the amounts to be awarded to applicants, including states and units of local governments. Because the amounts allocated are based on percentages, the actual amount that a unit of local government such as Chicago will receive is dependent on the number of applicants and the local government's share of all violent crimes reported in the state relative to those other applicants. Nor is the award a static one that, once awarded, is automatically and permanently distributed to the applicants. The awards themselves are for a four-year period of time. During that time, the award requires of each applicant ongoing compliance with the terms of the award, which according to the Attorney General, includes the requirement of compliance with § 1373. An inability to comply with § 1373 during that time can result in the loss of the award. As we will explain, when a state is forced to relinquish its award or cannot qualify for an award in the first place for any reason including the unlawful conditions, that situation can impact the award amount provided both to localities and to other states.

Essentially, application of the unlawful conditions to the Byrne JAG program can impact Chicago's grant in any of

three different ways: (1) if applied to Chicago, it will eliminate its grant entirely; (2) if applied to Illinois, it could disqualify Illinois from receiving a grant and increase Chicago's grant award as described in subsection 2; (3) if applied to other states, it can impact Illinois' award either by increasing or decreasing the award that Illinois otherwise would get as described in subsection 3. And again, that altered amount can impact Chicago's award as described in subsection 2—even if the unlawful conditions were not applied to Illinois.

### 2. Redistribution from State to Locality

First, a state's inability to participate in the Byrne JAG program for any reason, including the inability to comply with the unlawful conditions, can result in an increase in the grant received by the locality. In that way, the grant for the locality is interconnected with the grant to the state.

Section 10156(f) explicitly provides for additional funding to units of local government, where a state is unable or unwilling to comply with the program's requirements during that time, as follows:

**(f) Funds not used by the State**

**If the Attorney General determines,** on the basis of information available during any grant period, **that any allocation (or portion thereof)** under this section **to a State for such grant period will not be required, or that a State will be unable to qualify or receive funds under this part, or that a State chooses not to participate in the program established under this part, then such State's allocation (or portion thereof) shall be awarded by the Attorney**

> **General to units of local government, or com-
> binations thereof, within such State, giving
> priority to those jurisdictions with the highest
> annual number of part 1 violent crimes** of the
> Uniform Crime Reports reported by the unit of
> local government to the Federal Bureau of In-
> vestigation for the three most recent calendar
> years for which such data are available.

(emphasis added). Thus, even after the initial award, during
that four-year period of the grant the Attorney General could
determine that a State no longer qualifies to receive funds,
and those funds will be redistributed to the units of local gov-
ernment, as long as that allocation does not exceed the local
government unit's total expenditure on criminal justice ser-
vices for the most recently completed fiscal year for which
such data is available. § 10156(e)(1). That can result in a redis-
tribution of funds from Illinois to its localities for any of a
number of reasons; one of those possible reasons is if the un-
lawful conditions were applied to Illinois and it was unable
to comply with those conditions.

The possibility of that provision impacting Chicago's
grant amount is far from negligible. The State of Illinois, for
instance, recently passed the Keep Illinois Families Together
Act, 5 ILCS § 835/1, which forbids local law enforcement agen-
cies *or officials* from participating in the federal 287(g) pro-
gram, an ICE program that allows local law enforcement offi-
cials to identify and remove undocumented residents from
the United States. *Id*. at § 835/5. If the Attorney General were
to determine that the law operated to restrict a local govern-
ment official's ability to send or receive information regarding
immigration status in violation of § 1373, or if Illinois were to

extend its protections of its families to prevent all communi-
cations regarding immigration status, then under § 10156(f)
the funds awarded to the State of Illinois could be redistrib-
uted to units of local government.

Regardless of whether the State of Illinois is in compliance
with the unlawful conditions, the point here is that the award
to a unit of local government such as the City of Chicago can
be impacted by the award and compliance status of the state
and the other units of local government, not just in the grant
year but in the three years following it. That would require, at
a minimum, that injunctive relief extend to the state level. But
an injunction prohibiting the application of the unlawful con-
ditions to Illinois would not itself ensure that Chicago re-
ceives the proper grant amount because, under § 10156(f), any
number of scenarios can result in the redistribution of Illinois'
grant award to its localities. And the grant that Illinois re-
ceives, which can then be redistributed to its localities, is itself
impacted by the enforcement of the unlawful conditions as to
the other states. That is because the structure of the Byrne JAG
program renders the grants at the state level interrelated as
well. *See City and County of San Francisco v. Trump*, 897 F.3d
1225, 1244 (9th Cir. 2018); Wasserman, *Nationwide Injunctions*
at 387–88 (acknowledging that the Ninth Circuit properly al-
lowed the injunction to run to non-party California because
the state grant could impact San Francisco's grant).

### 3. Redistribution from State to State

Byrne JAG grant awards to each state are not determined
in isolation from each other. First, the awards are based on the
statistics of each state relative to that of the others. If states are
no longer eligible for the grant program based on the unlaw-
ful conditions, the allocations could be calculated excluding

those states, resulting in a higher amount for the remaining states. That is a hypothetical possibility, not a certainty, because it is possible that the initial allocations would still be calculated as to all states—even those rendered ineligible for funds—and the states would be excluded only at the award stage. If that was the only redistribution, we would remand to the district court for further fact-finding to determine whether the initial grant allocations will be impacted by the ineligibility of states due to the unlawful conditions. But we need not remand here because the state Byrne JAG awards are interrelated in other ways that do not require factual development.

What is clear, even without factfinding, is that other statutorily-mandated redistributions of Byrne JAG funds among states will be upended by the imposition of the unlawful Byrne JAG conditions. Just as recipients of Byrne JAG grants have to certify compliance with anti-lobbying statutes and other grant-related requirements in order to be eligible for their grant award, grantees also can have their grant award reduced or increased based on their compliance with the Sex Offender Registration and Notification Act (SORNA), 34 U.S.C. § 20927(a), and the Prison Rape Elimination Act (PREA), 34 U.S.C. § 30307(e)(2)(A). In contrast to the award conditions imposed in this case by executive fiat, the conditions of compliance with SORNA and PREA are legislatively-authorized, in explicit statutory language. *See* 34 U.S.C. § 20927(a),(c), and § 30307(e)(2)(A), (E).

As described above, in the Byrne JAG program, initial allocations of Byrne JAG funds are made to states and, after the states submit their applications with the required

Nos. 18-2885 & 19-3290

certifications, awards of the grant are issued. If a state seeking a Byrne JAG grant is non-compliant with the requirements of SORNA, then its Byrne JAG grant award is reduced by 10 percent. Those funds are then reallocated as an addition to the Byrne JAG grant award to other, SORNA-compliant states in the following fiscal year unless the non-compliant state seeks reallocation of those funds to its own Byrne JAG grant award by certifying that the funds will be used solely to obtain SORNA compliance and that request is approved. 34 U.S.C. § 20927(c). The amounts at stake in that redistribution can be significant. For FY 2016, the 10% penalty applied to SORNA-non-compliant states reduced Byrne JAG grants by more than $6 million, with approximately $5 million reallocated to the SORNA-non-compliant states that applied for the funds to promote SORNA implementation, and over a million dollars reallocated as a bonus award to SORNA-compliant states. *See* Justice Assistance Grant Program, 2016 Technical Report at 7, at https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/jag-technical-report.pdf (last visited 4-8-2020).

Accordingly, a state's Byrne JAG award can be increased or decreased based on that state's own compliance with SORNA and based on whether other states are non-compliant. Because the penalty is assessed when the Byrne JAG grant is awarded, it will not be assessed as to states that either cannot even apply for the award because they cannot certify that they are in compliance with the unlawful conditions, or that apply and are denied an award because they are not in compliance with those conditions. *See* Office of Justice Programs SMART, Byrne JAG Grant Reductions Under              SORNA              at https://smart.gov/byrneJAG_grant_reductions.htm       (last

visited 4-8-2020)(noting that the 10 percent reduction is imposed when the awards are made).

That is a real problem if the unlawful Byrne JAG conditions challenged in this case are imposed upon the states. States that cannot or will not comply with those unlawful conditions will not be able to receive any award under the Byrne JAG grant. In fact, even filing an application for the Byrne JAG grant is problematic for such states. The application requirements and penalties leave potential applicants in "sanctuary" or "welcoming" jurisdictions with few options. The chief executive of each state or unit of local government must certify that the unit of government will comply with all Byrne JAG provisions and all applicable federal laws, and must include the certification of compliance with § 1373. The solicitation for Byrne JAG applications makes clear that the certification is subject to review by DOJ, and that a false statement or concealment or omission of a material fact may result in criminal prosecution, and also may trigger civil penalties and administrative remedies including suspension or termination of the award, placement on the DOJ high risk grantee list (with attendant consequences), disallowance of costs, and suspension or debarment of the recipient. *See* Edward Byrne Memorial Justice Assistance Grant Program FY 2017 Local Solicitation CFDA # 16.738 at 8–9, Appellant's Appendix, No. 18-2885, at A153–54. In the amicus briefs in this case alone, fourteen states have challenged the conditions, which indicates that the number of states that could be impacted by the imposition is significant. That likelihood is apparent as well in the Department of Justice's Byrne JAG Application and Award History, which as of March 2019 indicated that approximately $150 million of the $400 million in Byrne JAG funds each year for FY 2017 and FY 2018 still had not been released to grantees

"as a result [of] concerns regarding compliance with federal immigration laws and ongoing litigation related to these matters." U.S. Dept. of Justice, FY 2020 Performance Budget, OJP March 2019, https://www.justice.gov/file/1144566/download at 100 (last visited 4-8-2020).

If states cannot apply for or receive Byrne JAG awards, then that impacts the SORNA penalties collected from and redistributed to the remaining states in the Byrne JAG grants. For instance, if SORNA-non-compliant states can no longer qualify for Byrne JAG funds because of the unlawful conditions challenged here, then the 10 percent SORNA penalty will not be assessed as to them because they will have no award. Therefore the penalty amounts will not be redistributed to the Byrne JAG grant the following year to SORNA-compliant states, thus *lowering* the Byrne JAG grant awards that the remaining states would have received. Those SORNA-compliant states will not receive the additional funds that would have been reallocated from the award of those non-compliant states. Similarly, if SORNA-compliant states are unable to participate in the Byrne JAG program because they cannot comply with the unlawful conditions, then the remaining SORNA-compliant states will receive a *larger* share of the SORNA penalty funds solely because the unlawful conditions forced the exclusion of those states and impacted the number of SORNA-compliant states left in the redistribution mix. The inability of SORNA-non-compliant states to seek reallocation of the penalty to their own Byrne JAG award, in years for which the unlawful conditions deprive them of any award, will also skew the calculations.

Whether states experience a loss or a windfall, the result is that the imposition of the unlawful Byrne JAG conditions, by

precluding states from eligibility for Byrne JAG awards, will alter the Byrne JAG grant amounts for other states, and therefore can alter amounts for localities as well. In other words, if the unlawful conditions are imposed upon the states so as to render some of them ineligible for the Byrne JAG award, the Byrne JAG award for other states will be impacted because the Byrne JAG award for each state is impacted by the amounts redistributed from other states.

A similar redistribution of funds between states occurs based on compliance with the PREA. The PREA stipulates that a state that does not certify full compliance with its national standards can forfeit 5 percent of Byrne JAG funds unless it certifies that no less than 5 percent of such funds will be used solely to achieve compliance. *See* 34 U.S.C. § 30307(e)(2)(A). In FY 2019, as a result of the PREA compliance requirement, nearly $3 million in Byrne JAG grant funds were reallocated, held in abeyance, or reduced. *See* Impact of PREA on Justice Grants, FY 2019 at https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/FY2019-PREA-Grant-Impact.pdf (last visited 4-8-2020). If states are unable to comply with certain PREA requirements, the PREA provides that "the Attorney General shall redistribute the funds of the State held in abeyance to other States to be used in accordance with the conditions of the grant program for which the funds were provided." 34 U.S.C. § 30307(e)(2)(E)(iii).

States that are ineligible for Byrne JAG funds because they cannot comply with the challenged conditions will not be awarded Byrne JAG funds, and therefore the redistribution of Byrne JAG funds that would occur for non-compliance with the PREA will be disrupted. Once again, the impact of the challenged conditions will impact not only the individual

state's Byrne JAG grant amount, but will impact the grant amount of other states as well. Just as the Byrne JAG grants for localities are impacted by the grants for states and each state's ability to comply with the challenged Byrne JAG conditions, so too the grants for states are impacted by the ability of each other state to comply with those Byrne JAG conditions.

### 4. Complete Relief to Plaintiff

Complete relief to the plaintiff requires the calculation of its Byrne JAG grant as if the conditions were universally inapplicable. As set forth above, based on our analysis of the structure of the statute, the only way to ensure that the plaintiff receives, now and in the future, the Byrne JAG grant amount that it would be entitled to in the absence of the unlawful conditions, is to calculate the amounts for grant recipients as a whole absent the unlawful conditions. Like a river that flows throughout an entire region, in which an impact on one part cannot be separated from the whole and relief for injury to the part must target the whole, relief for one grantee in the Byrne JAG program must target the whole program. Complete relief to Chicago requires that in calculating its grants the unlawful grant conditions are not applied program-wide.

The dissent asserts that SORNA and PREA are irrelevant to a claim involving the Byrne JAG grant. But the focus here is not on the source of the redistribution of Byrne JAG funds; rather, the relevant question is whether that required redistribution renders Byrne JAG funding intertwined, such that the elimination of some states from the Byrne JAG program as a result of the unlawful conditions can impact the funds received by other states and localities in that program. In other words, the relevant question is whether the formula for

calculating the Byrne JAG award renders one state's and one locality's award dependent on the award for other states, and whether the imposition of the unlawful conditions challenged in this lawsuit disrupts that calculation. If the imposition of the unlawful Byrne JAG conditions on the states as a whole could alter the award that a state (and therefore a locality) would receive, then a program-wide disregard of those conditions is necessary in order for Chicago to receive the award that it would be entitled to in the absence of the unlawful conditions. Chicago's award is impacted not only if the unlawful conditions are applied to its own Byrne JAG application, but if they are applied to deny Byrne JAG awards to Illinois or to other states. Accordingly, the relief that would eliminate the impact of those unlawful conditions on Chicago's Byrne JAG grant is an injunction preventing the consideration of those unlawful conditions program-wide in the awarding of Chicago's Byrne JAG grant. A program-wide application is necessary to provide complete relief to the plaintiff, and therefore is proper.

Notably, the Attorney General has never tried to establish that the grant awards are not interdependent. In his brief, the Attorney General addressed "the panel majority's belief that 'the structure of the Byrne JAG program itself' supports entry of nationwide injunction." Appellant's Brief, No. 18-2885, at 54. But rather than challenge the assumption that the Byrne JAG funds would be redistributed from jurisdictions that lost funding, the Attorney General declared that the panel majority "failed to explain how that redistribution required a nationwide injunction to protect Chicago's interests," because such redistribution would benefit Chicago by increasing its grant. *Id*. at 54–55. At oral argument, the Attorney General again declared only that it is "unclear" whether funds from

another applicant could increase Chicago's award if the conditions rendered that applicant unable to retain or obtain a Byrne JAG award, but again argued that such redistribution would be a windfall of which Chicago could not complain. Under the Attorney General's theory, then, even if Chicago would receive more funds if the unlawful conditions are applied to other Byrne JAG applicants, that would constitute a surplus and Chicago could not complain that it failed to obtain all relief to which it is entitled. The notion that a plaintiff cannot complain if it becomes a beneficiary of the unlawful actions it is challenging is an odd one. It is the equivalent of arguing that a victim of an unlawful pyramid scheme can receive proper relief from the illegal conduct if that victim is given a cut of the profits of that very same ongoing unlawful scheme. Chicago seeks a remedy that provides redress for the unlawful conduct, not one that allows it to profit from the continued imposition of that unlawful conduct as to others. A remedy that essentially makes the City complicit in the action it seeks to prohibit is no remedy at all, and certainly not one that can, by any measure, constitute a remedy grounded in equity.

Courts have an obligation to award *proper* relief, and a windfall achieved by the imposition of unlawful conditions on other applicants is not proper relief. This is not a situation in which it is impossible to ensure that Chicago receives the award it would be entitled to without the unlawful conditions; it requires only that the unlawful conditions not be applied to the Byrne JAG awards at all. That relief is the proper and complete relief here, and it does not cease to be proper merely because other, non-plaintiffs, may thereby be relieved of the unlawful conditions that would otherwise be applied to their grant awards. In fact, relief that requires consistency

in the application of conditions to all Byrne JAG grants is truer to the statutory structure. Particularly where, as discussed above, the other equitable factors also weigh in favor of broad relief, there is no reason in equity to deny the remedy that will provide complete relief to Chicago.

Moreover, as discussed above, the impact of the unlawful conditions on the other states would not necessarily result in a windfall. It could also result in a lower grant award than would be proper absent the impact of those unlawful conditions. If, for example, SORNA-non-compliant states cannot receive a grant award, then the 10 percent penalty cannot be imposed on their award and redistributed to other states. That will decrease the awards to other SORNA-compliant states, and as set forth above, the state award can impact the local award. The assumption, then, that Chicago could only experience a windfall is unsupported as the statutory formula is structured.

We have determined that the Attorney General lacked the authority to impose the challenged conditions. The proper relief to Chicago is to enjoin the imposition of the conditions to the extent necessary to ensure that Chicago receives the grant award that it would be entitled to if the unlawful conditions were not imposed. In a formula grant structure such as the one presented here, in which grant amounts are based on percentages and the award amounts are interrelated and interdependent, an injunction requiring the Attorney General to disregard the challenged conditions program-wide is necessary to ensure that Chicago itself receives proper relief. Because we hold that program-wide application is necessary to provide complete relief to Chicago itself, the injunction should reflect that limitation, which is the narrowest relief that will redress

the injury. Any impact on other grantees in that context is incidental, rather than direct, and the injunction does not provide those grantees with independently-enforceable rights.

To clarify that focus, we direct the court on remand to modify the language of the injunction to require the Attorney General to calculate the City of Chicago's Byrne JAG grant as if the challenged conditions were universally inapplicable to all grantees. This modification is true to our focus on providing the plaintiff with complete relief, while keeping the injunction as narrow as possible. As a practical matter under our analysis above, that injunctive relief under the current statutory structure can only be accomplished by requiring the elimination of the conditions program-wide. That is because the grant calculation is not an isolated annual action without impact beyond that year, such that a calculation could be made separately as to Chicago alone. Proper calculation of grant amounts under the Byrne JAG program is not a static process in which grants, once awarded, are permanently and automatically distributed to the applicant and not subject to further redistribution. The behavior of the states *following* the awarding of grants impacts the redistributions under SORNA and PREA. Therefore, the continued imposition of the unlawful conditions on those states at any time interrupts the process such that the redistribution among states and localities *cannot* be properly calculated.

For that reason, it will be difficult if not impossible to properly calculate Chicago's grant without eliminating the conditions for all grantees. We have explained the structural reasons above, but perhaps an example will illustrate the incapability of separating the calculations. Suppose that in 2019, the government calculates Chicago's grant by determining

Nos. 18-2885 & 19-3290                                                    95

what each state and locality would get absent the unlawful
conditions, giving Chicago its proper amount for that year
with the unlawful conditions disallowed, but then proceeds
to apply the unlawful conditions to the other states' grant de-
terminations. Now, under that scenario, State A does not get
a grant that year because it cannot comply with the unlawful
conditions. We now move to 2020-2023. The government can-
not properly calculate Chicago's grant "absent the unlawful
conditions," because the actions State A would have taken
with respect to its grant in 2019 and beyond are unknowable,
and those actions could have impacted Chicago's grant. State
A's 2019 grant would have spanned four years if it had re-
ceived a 2019 Byrne JAG award. Upon receiving that award,
it could have sought reallocation of any SORNA penalty to be
used for the purpose of SORNA implementation, and that re-
quest could have been granted or denied. Furthermore, dur-
ing the ensuing years, even if State A was granted that reallo-
cation of the SORNA penalty, it could have had the funds
withheld if it subsequently failed to properly use them for
SORNA implementation. In short, the factors that would im-
pact the redistributions among states *cannot* be known if the
unlawful conditions continue to be imposed on other states,
requiring that the conditions need to be eliminated program-
wide for all grantees. We nevertheless narrow the language of
the injunction to allow for the possibility that the Attorney
General can establish to the district court, now or in the fu-
ture, that Chicago's grant can be separately calculated in a
manner that would allocate funding to Chicago taking into
account all of the redistributions of funds set forth above as if
the conditions were inapplicable to the Byrne JAG program
as a whole.

Because we hold that the challenged conditions must be considered inapplicable program-wide for the purpose of calculating Chicago's grant, we need not consider Chicago's argument that program-wide relief is proper under the Administrative Procedure Act's authorization that unlawful agency actions should be "set aside." *See D.C. v. U.S. Dep't of Agric.*, ___ F.3d ___, 2020 WL 1236657, at *34 (D.D.C. Mar. 13, 2020) and cases cited therein (discussing a line of cases all holding that "the APA's instruction that unlawful agency actions be 'set aside' is ordinarily read as an instruction to vacate, wherever applicable, unlawful agency rules"); *see also* Sohoni, *Lost History* at 991 n.466.

## VI. Conclusion

Once again, we address the need to preserve the separation of powers between the legislative and executive branch. The separation of powers is a foundation of our government, not a formality to be swept aside on the path to achieving goals that the executive branch deems worthy. The Attorney General's nod to checks and balances rings hollow in light of the changing justifications provided here for the conditions, with a new purported legislative "authorization" whenever another is deemed baseless by the court. Rather than an exercise of authority granted to it by the legislature, the conditions imposed here are an executive usurpation of the power of the purse. *See Providence*, 2020 WL 1429579 at *8 ("[i]t is nose-on-the-face plain that [C]ongress intended Byrne JAG to operate as a formula grant program. … Congress did not make an allowance for any deviation that would justify the actions undertaken by the DOJ in this case.")

The imposition of the challenged conditions in this manner is an abrogation of the legislative process. Preservation of

the separation of powers is paramount if our democracy is to
survive.

Accordingly, we affirm the grants of declaratory relief as
to the declarations that the Attorney General exceeded the au-
thority delegated by Congress in the Byrne JAG statute, 34
U.S.C. § 10151 et seq., and in 34 U.S.C. § 10102(a), in attaching
the challenged conditions to the FY 2017 and FY 2018 grants,
and that the Attorney General's decision to attach the condi-
tions to the FY 2017 and FY 2018 Byrne JAG grants violated
the constitutional principle of separation of powers. In light
of our determination as to the language in § 10153, it is unnec-
essary to reach the constitutionality of § 1373 under the anti-
commandeering doctrine of the Tenth Amendment. We re-
mand for the district court to modify the injunction to require
the Attorney General to calculate the City of Chicago's Byrne
JAG grant as if the challenged conditions were universally in-
applicable to all grantees. As set forth in this opinion, as the
grant is currently structured and implemented, that would re-
quire program-wide elimination of the conditions in the
awarding of the grants unless the Attorney General estab-
lishes in the district court an alternative that would satisfy the
injunction. Although that may have the practical impact of al-
tering the grants of all grantees program-wide, that is an inci-
dental effect of the injunctive relief that we uphold today,
which is limited in scope to the plaintiff itself and does not
grant relief directly to other grantees. We affirm the extension
of injunctive relief to include the application of the challenged
conditions to the Byrne JAG grant now and in the future,
which included enjoining the Attorney General from denying
or delaying issuance of the Byrne JAG award to grants in FY
2017, FY 2018, FY 2019 and any other future program year in-
sofar as that denial or delay is based on the challenged

conditions or materially identical conditions. We remand for
the district court to determine if any other injunctive relief is
appropriate in light of our determination that § 10153 cannot
be used to incorporate laws unrelated to the grants or grant-
ees. Finally, because the injunctive relief is necessary to pro-
vide complete relief to Chicago itself, the concern with im-
properly extending relief beyond the particular plaintiff does
not apply, and therefore there is no reason to stay the appli-
cation of the injunctive relief.

Nos. 18-2885 & 19-3290                                            99

MANION, *Circuit Judge*, concurring in the judgment.

Today's amended opinion holds unlawful several condi-
tions attached to the Byrne JAG program and affirms injunc-
tive relief for Chicago alone. While I concur in the judgment
as a whole, I do not agree that Chicago's relief is a function of
the awards of all other Byrne JAG applicants. I also write sep-
arately to underscore the importance of limiting injunctive re-
lief to the plaintiff, Chicago.

## I.

The Attorney General challenges the district court's con-
clusion that the notice, access, and § 1373 compliance condi-
tions required of FY 2017 and FY 2018 Byrne JAG applicants
are unlawful. He also challenges the same finding regarding
three new conditions placed on FY 2018 grant applicants: the
§ 1644 compliance condition; the harboring condition; and the
additional certification condition. These requirements all con-
flict with Chicago's "Welcoming City Ordinance,"[1] which,
broadly speaking, forbids the city's agencies or agents from
cooperating with federal immigration authorities unless the

---

[1] Although Chicago's ordinance places the city among other so-called
"sanctuary" jurisdictions, Chicago creatively labels itself a "welcoming
city," perhaps to avoid prosecutorial suspicion over whether its elected
officials are committing a federal harboring offense. Federal law makes it
a crime for any person, "knowing or in reckless disregard of the fact that
an alien has come to, entered, or remains in the United States in violation
of law," to "harbor" that alien. 8 U.S.C. § 1324(a)(1)(A)(iii). The same stat-
ute also criminalizes encouraging or inducing an alien to "come to, enter,
or reside in the United States," knowing that such entry or residence
would be in violation of law. *Id.* § 1324(a)(1)(A)(iv). With the right facts, a
policy like Chicago's could very well facilitate harboring or at least en-
courage and induce aliens to enter and reside unlawfully in the United
States.

individual subject to federal inquiry has an outstanding criminal warrant, a pending felony charge, or gang affiliations. Chicago, Ill., Mun. Code § 2-173-042. This ordinance, in my opinion, spoils the many inherent values gained when local and federal law enforcement agencies collaborate, yet the city claims this measure is necessary to foster cooperation between local law enforcement and "undocumented" immigrants, i.e., those here *illegally*, who might otherwise fear detention and removal (*legal* consequences) after coming forward as criminal witnesses. The city further insists the cooperation of illegal aliens "is essential to achieve the City's goals of protecting life and property, preventing crime and resolving problems." § 2-173-005. I find this logic unconvincing when, in 2018, Chicago's self-reported clearance rates (cases in which a suspect was arrested, charged, and prosecuted) for murder (44.42 percent) and aggravated assault (38.42 percent) fell substantially below the national clearance average for those crimes (62.3 and 52.5 percent, respectively).[2] Clearly, willing witnesses are lacking in Chicago despite its "welcoming" policies.

We already addressed the notice and access conditions in *City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) ("*Chicago I*"), where we rejected the Attorney General's reliance on § 10102(a)(6) of the Byrne JAG statute and upheld the district

---

[2] *Compare* 2018 CHI. POLICE DEP'T ANN. REP., at 62 (2019), *available at* http://home.chicagopolice.org/wp-content/uploads/2019/07/2018AnnualReport-05July19.pdf (last visited June 4, 2020), *with* FED. BUREAU OF INVESTIGATION, CRIME IN THE UNITED STATES 2018, Table 25: Percent of Offenses Cleared by Arrest or Exceptional Means, *available at* https://ucr.fbi.gov/crime-in-the-u.s/2018/crime-in-the-u.s.-2018/topic-pages/tables/table-25 (last visited June 4, 2020).

Nos. 18-2885 & 19-3290                                    101

court's grant of a preliminary injunction regarding those two
requirements. Here, the Attorney General relies on
§ 10102(a)(6) once again, this time maintaining the provision
extends to support the new harboring and additional certifi-
cation conditions. But he raises no new meritorious argu-
ments regarding § 10102(a)(6) in this appeal, so I agree with
the court that our earlier reasoning warrants the same result
here. I also agree that §§ 10102(a)(2) and (a)(4) do not support
the harboring condition. Those provisions only permit the As-
sistant Attorney General to "maintain liaisons" with govern-
ment agencies regarding criminal justice matters, not to im-
pose conditions on grant money.

That still leaves the Attorney General's § 1373 compliance
condition.[3] Section 1373 prohibits states and localities from re-
stricting the flow and maintenance of information regarding
the citizenship or immigration status of any individual.
8 U.S.C. § 1373. According to the Attorney General, condition-
ing Chicago's grant award on the city's compliance with this
law is proper under § 10153 of the Byrne JAG statute. Section
10153 requires applicants to certify, among other things, com-
pliance with the program's provisions and "all other applica-
ble Federal laws." 34 U.S.C. § 10153(A)(5)(D). The Attorney
General argues this language captures § 1373, but such logic
depends on a revision to the statutory language, one that re-
quires certified compliance with "*all* Federal laws," not just
the *applicable* ones.

There are thousands of federal laws. Adopting the Attor-
ney General's literal position would condition a grant award

---

[3] As the court notes, the Attorney General concedes the two compli-
ance conditions—§ 1373 and § 1644—rise and fall together.

on certifying compliance with each and every one of them. That cannot be the case. Under its spending power, Congress can attach only those conditions that "bear some relationship to the purpose of the federal spending" and must do so unambiguously. *New York v. United States*, 505 U.S. 144, 167, 172 (1992) (citations omitted). The Attorney General's unbounded interpretation ignores this concept. His oversight makes a difference because the relevant statutory context limits § 10153(A)(5)(D)'s "all other applicable Federal laws" language to federal grant applicants. Reading § 10153 as a whole makes this clear. Indeed, the immediately preceding subsections, (A)–(C), all require certification of items pertaining directly to the Byrne JAG application itself. Moreover, the Byrne JAG program's FY 2017 solicitation literature directs applicants to specific federal laws that the applicants need to abide by. Those laws, unlike § 1373, by their very language pertain expressly to federal grants and grant recipients, further indicating that compliance with § 1373 represents a departure from the grant's statutory requirements.

The Attorney General's conditions, viewed in isolation, are perfectly reasonable. Federal officers have a basic duty to ensure enforcement of and compliance with our country's immigration laws. That the federal government would require cooperation with its agencies in exchange for grant funds should come as no surprise. Nevertheless, the Constitution places the power to spend money in the legislative branch. *See* U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power … to pay the Debts and provide for the … general Welfare of the United States … ."). The spending power also comes with the ancillary authority to place conditions on the receipt of federal funds. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 576 (2012). So, the executive lacks authority to place conditions on

the receipt of federal funds unless Congress vests it with such power. *See generally La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). Here, context clashes with the Attorney General's expanded reading of § 10153(A)(5)(D), and he has received no such assignment of power from Congress. Holding Byrne JAG applicants to § 1373, therefore, is not supported by law.

## II.

I agree with my colleagues that the injunction here must be limited to Chicago.[4] But I do not share their approach to calculating Chicago's deserved grant award amount. In a nutshell, the court claims the Byrne JAG statute's structure renders the award amounts of all applicants—localities and states—interconnected. Therefore, according to the court, proper relief requires the Attorney General to calculate Chicago's award as if the challenged conditions do not apply across-the-board.

The court misinterprets the statute. With one exception, none of the provisions invoked by the court—read singly or in combination—make Chicago's award contingent on any other governing body's compliance with the Attorney General's conditions. *See generally* 34 U.S.C. § 10156. For example, any reallocated funds Chicago receives under § 10156(e)(1) come from *excess* awards granted to other local governments, not from those jurisdictions' noncompliance. And, the joint

---

[4] I also agree with the court's decision to affirm the injunction's temporal scope, i.e., "all future years." And I concur with remanding for the district court to consider proper injunctive relief regarding the compliance condition.

application process described in § 10156(d)(4) is likewise silent on whether one local government's failure to comply can alter the grant awards of its fellow "geographical constituent units."

Furthermore, the court theorizes that the disqualification of a given locality (for failing to comply with the Attorney General's conditions) can alter Chicago's award amount because Chicago's funds depend on both "the number of *applicants*" and its "share of all violent crimes reported in the state relative to those other *applicants*." Maj. Op. at 81 (emphasis added). That's not what the statute says. Subsection 10156(d)(2)(A) governs grant allocations to localities. It directs the Attorney General to allocate an amount equal to the ratio of (1) the average number of violent crimes reported by the applicant over the three most recent years for which such data is available to (2) the number of "violent crimes reported by *all units of local government in the State* in which the [applicant] is located … for such years." *Id.* (emphasis added). By its own language—"all units of local government"—§ 10156(d)(2)(A) simply compares the applicant's violent crimes against those reported by *all localities* within the applicant's state. In other words, even if another Illinois locality fails to comply with the notice and access conditions, its violent crime statistics are not removed from § 10156(d)(2)(A)'s formula; they are still used to calculate Chicago's award. The ratio remains the same regardless of any other locality's noncompliance, and the yield for Chicago, therefore, is not affected.

The one exception, foreshadowed above, is § 10156(f). That subsection provides:

> If the Attorney General determines … that a
> State will be unable to qualify or receive funds

> under this part … then such State's allocation
> (or portion thereof) shall be awarded by the At-
> torney General to units of local government, or
> combinations thereof, *within such State* … .

*Id.* (emphasis added). So, if a state falls out of compliance, any redistribution of funds benefits *that state's* local governments. But if, for example, California refuses to comply with the Attorney General's conditions, then California's allocation would *not* go to Chicago or otherwise change Chicago's award at all. The states' allocations are siloed by state; in this example, California's allocation (or portion thereof) would be redistributed only to compliant localities within its borders.

The court showcases the Keep Illinois Families Together Act, 5 ILCS 835, to emphasize that "[t]he possibility of [§ 10156(f)] impacting Chicago's grant amount is far from negligible" because the Attorney General may determine the legislation runs afoul of his unlawful requirements. Maj. Op. at 83. Maybe so. But while the possibility of an Illinois law impacting Chicago's Byrne JAG award is "more than negligible" under § 10156(f), the possibility of *another* state's law impacting Chicago's award is *zero*.

My colleagues' reliance on the reallocation clauses in SORNA and PREA is similarly lacking. SORNA and PREA each provide that jurisdictions failing to implement the statutes' mandates will be penalized with a reduction to their Byrne JAG award. 34 U.S.C. § 20927(a) and § 30307(e)(2)(A). Those reductions are redistributed among SORNA- and PREA-compliant    jurisdictions.    *Id.*    § 20927(c)    and § 30307(e)(2)(E)(iii). The court's theory is that, if states other than Illinois both (1) are held ineligible for a Byrne JAG grant because of the Attorney General's unlawful conditions *and* (2)

fail to implement SORNA and PREA, then Illinois—and perhaps by extension, Chicago—will miss out on the reallocated penalties.

But Illinois and Chicago are not guaranteed reallocated funds in the first place; that depends on whether any other jurisdictions fail to implement SORNA and PREA. Even still, how much money would Chicago stand to receive? Any reallocated penalties, while not small sums themselves, are a drop in the bucket compared to all Byrne JAG funds. As the court notes, in FY 2016, reallocated SORNA penalties exceeded $6 million across the country. Reallocated PREA penalties in FY 2019 exceeded $3 million. Compare those amounts with nearly $275 million in Byrne JAG funds distributed for FY 2016 and over $252 million for FY 2019.[5] Describing the reallocated SORNA and PREA penalties as "significant" overstates the matter.

Since other state and local governments' compliance with the Attorney General's conditions does not affect Chicago's award amount, the purported need to calculate Chicago's award as if the challenged conditions were universally inapplicable disappears.

---

[5] *See* https://www.bjs.gov/content/pub/pdf/jagp16.pdf (last visited June 4, 2020); https://external.ojp.usdoj.gov/selector/title?solicitationTitle=BJA%20FY%2019%20Edward%20Byrne%20Memorial%20Justice%20Assistance%20Grant%20(JAG)%20Program%20-%20State%20Solicitation&po=BJA (last visited June 4, 2020); https://external.ojp.usdoj.gov/selector/title?solicitationTitle=BJA%20FY%2019%20Edward%20Byrne%20Memorial%20Justice%20Assistance%20Grant%20(JAG)%20Program%20-%20Local%20Solicitation&po=BJA (last visited June 4, 2020).

### III.

Nevertheless, the injunctive relief directed by the court today avoids overstepping the well-established maxim that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*," not to non-litigant third parties. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added); *see also Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1094 (7th Cir. 1988) (holding that the geographic scope of an injunction "must not exceed the extent of the *plaintiff's* protectable rights.") (emphasis added); *California v. Azar*, 911 F.3d 558, 584 (9th Cir. 2018) ("The scope of [injunctive relief] must be no broader and no narrower than necessary to redress the injury shown *by the plaintiff[s]*.") (emphasis added).

The "usual rule," after all, is "that litigation is conducted by and on behalf of the individual named parties only." *Califano*, 442 U.S. at 700–01. Thus, the court's approach also keeps with "American courts' tradition of providing equitable relief *only to parties* … ." *Trump v. Hawaii*, 138 S. Ct. 2392, 2427 (2018) (Thomas, J., concurring) (emphasis added). As Justice Thomas outlined:

> For most of our history, courts understood judicial power as fundamentall[y] the power to render judgments in individual cases. Misuses of judicial power, Hamilton reassured the people of New York, could not threaten the general liberty of the people because courts, at most, adjudicate the rights of individual[s].

108                                        Nos. 18-2885 & 19-3290

*Id.* at 2427–28 (alterations in the original) (internal quotation marks and citations omitted).[6]

Today's holding also guards against a decision premised on faulty assumptions: that the parties presented the district court with the very best arguments on the merits; that no other jurisdictions' standards for injunctive relief would yield different results than in this case; that what goes for a Chicago-specific ordinance goes for all others; and that no trial judge sitting in the 93 other districts could possibly reach a different decision on these issues.

The Supreme Court cautioned against these same kinds of assumptions in *United States v. Mendoza*, determining that a judicial holding against the federal government in one case could not be used by another party in another case "to preclude relitigation of issues … ." 464 U.S. 154, 162 (1984). The Court was concerned that allowing parties to use preclusion in this way "would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue," thereby depriving the Court of the benefit it receives when the various circuits explore and address difficult legal issues. *Id.* at 160. Thus, in barring the use of such nonmutual offensive collateral estoppel against the government, the Court sought to promote "thorough development of legal doctrine by allowing litigation in multiple forums." *Id.* at 163.

---

[6] In the analogous context of Article III standing, the Supreme Court has also "caution[ed] … that 'standing is not dispensed in gross': A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)).

Nos. 18-2885 & 19-3290                                            109

While the Court in *Mendoza* did not address its concerns within the framework of nationwide injunctions, its reasoning nonetheless applies here. Indeed, the Fourth and Ninth Circuits have overruled nationwide injunctions as preventing the development of divergent views and outcomes. *See Va. Soc'y for Human Life, Inc. v. Fed. Election Comm'n*, 263 F.3d 379, 393 (4th Cir. 2001) (remanding nationwide injunction in favor of more limited relief because such a broad measure encroaches on other circuits' ability to develop their own precedent, relying on *Mendoza*), *overruled on other grounds by Real Truth About Abortion, Inc. v. FEC*, 681 F.3d 544, 550 n.2 (4th Cir. 2012); *East Bay Sanctuary Covenant v. Barr*, 934 F.3d 1026, 1029–30 (9th Cir. 2019) (criticizing nationwide injunctions for depriving other parties of the ability to litigate issues in other jurisdictions, interfering with judicial decisionmaking, and preventing the percolation of legal issues and the development of the law, citing accordance with *Mendoza* in a footnote); *Azar*, 911 F.3d at 583–84 (determining nationwide injunction overbroad, citing *Mendoza*'s concerns).[7]

Affirming the district court's nationwide injunction here would block the underlying issues from percolating through the lower courts. This would hinder the issues' development, prevent divergent legal views and opinions from coming to the fore, and force all future litigants in this country to accept

---

[7] We have also invoked *Mendoza* in the Rule 23 context to uphold a geographically limited class in light of "the Supreme Court's admonition that certification of a nationwide class may have a detrimental effect by foreclosing adjudication by a number of different courts and judges, and of increasing, in certain cases, the pressures on [the Supreme Court's] docket." *Shvartsman v. Apfel*, 138 F.3d 1196, 1201 (7th Cir. 1998) (alteration in the original) (internal quotations and citation omitted).

the determination of *one* district judge who was presented with *one* city's ordinance and who took arguments from *one* set of parties. These are real, tangible harms that impair our federal legal system. *See Hawaii*, 138 S. Ct. at 2425 (Thomas, J., concurring) ("[Nationwide] injunctions are beginning to take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."). And the fact that five circuits have now sounded off on the Attorney General's conditions does not lessen the need for other courts to do so. Diversity of thought and opinion that flows from percolation is meant to benefit not only the Courts of Appeals, but our Supreme Court as well. *See Arizona v. Evans*, 514 U.S. 1, 23 n.1 (1995) (Ginsburg, J., dissenting) ("[W]hen frontier legal problems are presented, periods of 'percolation' in, and diverse opinions from, state and federal appellate courts may yield a better informed and more enduring final pronouncement by this Court."). Why should the judiciary call it a day after only five circuits weigh in, especially when they are split?

The phenomenon of nationwide injunctions began to emerge in the latter half of the twentieth century but has "exploded in popularity" in recent years. *Hawaii*, 138 S. Ct. at 2429 (Thomas, J., concurring). Indeed, in the public domain, the Attorney General has represented that, as of September 2019, the current administration had already faced at least forty such injunctions, compared with twenty total

throughout the previous administration's eight years.[8] That figure has since gone up.

The nationwide injunction trend has also received scrutiny from the academy, and as Justice Thomas cautioned, the Supreme Court will be "dutybound to adjudicate" the lower courts' authority to issue such "legally and historically dubious" injunctions should the practice continue. *Hawaii*, 138 S. Ct. at 2429 (Thomas, J., concurring).

Last year, when ordering a limited injunction to ensure relief to the sole plaintiff before him, Judge Bennett of the District of Maryland observed:

> It is clear that most of the nationwide injunctions issued against the federal government in the past two years have come from United States District Courts in states less favorably inclined politically to the current administration. It is also clear that most of the nationwide injunctions against the federal government in the years before also came from United States District Courts in states less favorably inclined politically to the previous administration. *It is important that the federal judiciary not allow itself to become part of underlying policy debate.*

*Mayor & City Council of Baltimore v. Azar*, 392 F. Supp. 3d. 602, 619 n.12 (D. Md. 2019) (emphasis added) (internal quotations and citations omitted). Considering the recent flood of nationwide injunctions, I echo Judge Bennett in emphasizing this

---

[8] William Barr, *End Nationwide Injunctions*, The Wall Street Journal, Sept. 5, 2019, http://www.wsj.com/articles/end-nationwide-injunctions-11567723072 (last visited June 4, 2020).

112                                    Nos. 18-2885 & 19-3290

final point: we must not allow nationwide injunctions to serve
as pretext for judicial activism.

An injunction is a "drastic and extraordinary" remedy,
*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010),
outdone only by an injunction issued on a national scale. This
type of relief should be issued only when absolutely neces-
sary and the court rightly recognizes it is far from necessary
here. This is a funding case at its core, not an immigration
case, where a nationwide injunction may, in very limited cir-
cumstances, be appropriate. *See, e.g.*, *Int'l Refugee Assistance
Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) (upholding
a nationwide injunction on the President's "travel ban" be-
cause plaintiffs were "dispersed throughout the United
States" and there existed a need to apply immigration laws
uniformly). Those circumstances are not present here.

CERTIFIED COPY

A True Copy
Teste:

_Lindau Quinn_
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit